ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JAN 14 2004
U.S. COURT OF FEDERAL CLAIMS

**CAROLINA POWER & LIGHT COMPANY,**
410 S. Wilmington St.
Raleigh, NC 27601-1748

**FLORIDA POWER CORPORATION,**
100 Central Ave.
St. Petersburg, Florida 33701

Plaintiffs,

v.

**UNITED STATES OF AMERICA,**

Defendant.

04-0037C
Case No. ________

Judge: __________

## COMPLAINT

Plaintiffs, Carolina Power & Light Company ("CP&L"), and Florida Power Corporation ("FPC") (collectively for these purposes "Plaintiffs"), which are respectively a direct and an indirect subsidiary of Progress Energy, Inc., file this Complaint against the Defendant, the United States of America, acting through the United States Department of Energy ("DOE"), and state as follows:

## NATURE OF THE CASE

1. This is an action for breach of contract. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq.* ("NWPA"), in June of 1983 the DOE entered into written contracts, known as the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Waste (the "Contracts" or "Standard Contracts"), with the owners of the Brunswick Nuclear Plant, Units 1 and 2 ("Brunswick"), the

Shearon Harris Nuclear Plant, Unit 1 ("Harris"), the H. B. Robinson Nuclear Plant, Unit 2 ("Robinson"), and the Crystal River Nuclear Plant, Unit 3 ("Crystal River"). Pursuant to the terms of the Standard Contracts, the Government was to accept and dispose of spent nuclear fuel and high level waste (collectively for these purposes, "SNF") generated by the five commercial nuclear power plants on or before January 31, 1998, in exchange for payments as provided in the Standard Contracts. Plaintiffs have honored all of their contractual obligations under the Standard Contracts. The Government breached the Standard Contracts by failing to accept SNF for disposal as required.

**JURISDICTION**

2. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1491(a)(1). This action is brought by Plaintiffs within six years of the date of the breach, in accordance with 28 U.S.C. § 2501.

3. Plaintiffs may seek damages without exhausting any administrative remedies because DOE's complete failure to begin acceptance and disposal of Plaintiffs' SNF is a partial material breach of the Standard Contract, and the claim does not "arise under" the Standard Contract. *Maine Yankee Atomic Power Co. v. U. S.*, 225 F.3d 1336 (Fed. Cir. 2000); *Northern States Power Co. v. U. S.*, 224 F.3d 1361 (Fed. Cir. 2000).

4. Furthermore, Article XI of the Standard Contract states, "[n]othing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." Pursuant to this provision, Plaintiffs are entitled to pursue their legal claims without exhausting any administrative remedies.

## PARTIES

5. CP&L is the majority owner of Brunswick and Harris, and the full owner of Robinson. A minority ownership interest in Brunswick and Harris is held by the North Carolina Eastern Municipal Power Agency ("NCEMPA"). CP&L is authorized to act on behalf of NCEMPA for these purposes.

6. CP&L, which also does business as Progress Energy Carolinas, Inc., is a subsidiary of Progress Energy, Inc., and the current holder of the single Standard Contract for Brunswick, Robinson, and Harris. CP&L is the operator of Brunswick (located in Southport, NC), Harris (located in New Hill, NC) and Robinson (located in Hartsville, SC).

7. FPC is the majority owner of Crystal River. Minority ownership interests in Crystal River are held by a number of Florida municipalities and cooperatives, upon whose behalf FPC is authorized to act for these purposes.

8. FPC, which also does business as Progress Energy Florida, Inc., is an indirect subsidiary of Progress Energy, Inc., and the current holder of the Standard Contract for Crystal River. FPC is the operator of Crystal River (located in Crystal River, Florida). On or about November 30, 2000, Progress Energy, Inc. completed an acquisition of FPC.

9. Defendant is the United States of America, acting by and through the DOE. (Defendant may be referred to interchangeably in this Complaint as the United States, DOE, or the Government.)

**STATEMENT OF FACTS**

10. Since enactment of the Atomic Energy Act of 1954, the Government has encouraged the development of commercial reactor technology in the United States. The Brunswick, Robinson, Harris, and Crystal River commercial reactors were developed and operated pursuant to licenses issued by the Atomic Energy Commission, now the Nuclear Regulatory Commission ("NRC").

11. SNF was and continues to be generated at Brunswick, Robinson, Harris, and Crystal River as a byproduct of the operation of those reactors, and remains stored there now. SNF is composed, in significant part, of uranium and plutonium and other highly radioactive substances. SNF remains radioactive after it is removed from a nuclear reactor and must be isolated in safe disposal facilities for an indefinite period.

**The Government's Obligations Under the Standard Contract**

12. In 1982, Congress enacted the NWPA, codifying and confirming the Federal Government's long-standing commitment to accept responsibility and provide for the timely disposition of civilian SNF. *See* 42 U.S.C. § 10101 *et. seq.* The NWPA provides that the generators and owners of SNF have the primary responsibility to provide for "the interim storage of such waste and spent fuel until such waste and spent fuel is accepted by [DOE] in accordance with the provisions of this Act." 42 U.S.C. § 10131(a)(5).

13. Pursuant to Section 302 of the NWPA (42 U.S.C. § 10222), the Government in 1983 developed the Standard Contract. The Standard Contract prescribes the payment of certain fees into the Nuclear Waste Fund based on specified criteria, primarily megawatts-electric ("MWe") generated, and the acceptance and disposition of

SNF by the Government. *See* 10 C.F.R. § 961.11. Reactor operators were required to enter into these Contracts or risk losing their NRC operating licenses.

14. In 1983, DOE entered into the Standard Contracts at issue here with CP&L (for Brunswick, Harris, and Robinson) and FPC (for Crystal River).

15. Article IV of the Standard Contract sets out the Responsibilities of the Parties. Section A of Article IV establishes the Purchaser's Responsibilities, including payment of certain fees.

16. CP&L and FPC have fully complied with all of their obligations under the Standard Contracts, including the payment of required fees.

17. The Standard Contracts for Brunswick, Robinson, Harris, and Crystal River obligate the Government to commence acceptance and disposal of SNF by January 31, 1998 in accordance with the priority established by DOE. *E.g.,* Standard Contract Art. II, Art. IV.B.5(a).

18. The Standard Contract provided that the DOE was to begin accepting SNF no later than January 31, 1998 and to continue "until such time as all SNF and/or HLW [high level radioactive waste] from the civilian nuclear power reactors … has been disposed of." Standard Contract, Art. II.

**<u>DOE's Partial Material Breach of the Standard Contract</u>**

19. An important element of the NWPA was the initial development of waste disposal facilities according to a firm and fixed schedule. DOE quickly fell behind that schedule, failing to meet nearly every one of the early milestones established by the NWPA.

20. In late 1993 and early 1994, DOE began to take actions both recognizing that it would not meet the January 31, 1998 deadline for acceptance of SNF, and tentatively asserting it may have no obligation to meet that deadline absent an operational repository or other facility.

21. In a joint letter to DOE, dated November 19, 1993, a number of utility, regulatory, and state officials requested that DOE address its responsibilities for accepting and disposing of SNF.

22. On May 25, 1994, DOE published a Notice of Inquiry ("NOI") to elicit views of affected parties on matters relating to the continued storage of SNF at reactor sites beyond 1998. *See* 59 *Fed. Reg.* 27,007 (1994). DOE noted in its NOI its "preliminary view" that it had no statutory obligation to accept SNF by the 1998 deadline in the absence of an operational repository or other facility constructed under the Act.

23. On April 28, 1995, DOE completed the NOI process by issuing its "Final Interpretation." The Final Interpretation proceeded from the premise that DOE would not be able to begin accepting SNF by the January 31, 1998 date established in the Act. *See* 60 *Fed. Reg.* 21,793 (1995). Instead, DOE announced "that it does not have a legal obligation under . . . the Act . . . to begin disposal of SNF by January 31, 1998, in the absence of a repository or interim storage facility constructed under the [NWPA]." *Id.* at 21,794.

24. DOE's position was challenged by several utilities in a lawsuit brought before the United States Court of Appeals for the District of Columbia, which ruled that the NWPA imposed an unconditional obligation on DOE to begin accepting SNF on or

before January 31, 1998. *See Indiana Michigan Power Co. v. U. S. Dept. of Energy,* 88 F.3d 1272 (D.C. Cir. 1996).

25. In response to the *Indiana Michigan* decision, on December 17, 1996, DOE issued a letter to Standard Contract holders stating: "Pursuant to Article IX of the Standard Contract, this letter is to advise you that DOE anticipates that it will be unable to begin acceptance of SNF for disposal in a repository or interim storage facility by January 31, 1998." DOE subsequently stated that "this delay was due to circumstances beyond the reasonable control of DOE and therefore the anticipated delay was unavoidable' within the meaning of Article IX of the Standard Contract."

26. On January 31, 1997, a number of utilities filed a petition with the D.C. Circuit for a Writ of Mandamus to compel DOE to comply with the mandate in *Indiana Michigan*.

27. On June 3, 1997, while the mandamus proceeding was pending, DOE issued a Preliminary Determination that DOE's delay in beginning SNF disposal was "unavoidable."

28. On November 14, 1997, the D.C. Circuit issued its decision in *Northern States Power Co. v. U. S. Dept. of Energy,* 128 F.3d 754 (D.C. Cir. 1997) in response to the Writ of Mandamus filed by utilities, rejecting DOE's June 3, 1997 Preliminary Determination.

29. The Court in *Northern States Power* expressed dissatisfaction with DOE's response to the *Indiana Michigan* decision. The Court stated:

> After issuing our decision in *Indiana Michigan*, we would have expected that the Department would proceed as if it had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998 deadline. Not so. Quite the contrary. . . the contractual obligations

> created consistently with the statutory contemplation leave no room for DOE to argue that it does not have a clear duty to take the SNF from the owners and generators by the deadline imposed by Congress…We held in *Indiana Michigan* that the NWPA imposes an unconditional duty on DOE to assume an unqualified obligation to take materials by the statutory deadline…

*Id.* at 757 - 760.

30. The Court refused to accept DOE's defense of unavoidability, finding the defense merely a recycled argument which had been previously rejected by the Court in *Indiana Michigan*.

31. The Court invalidated DOE's interpretation of the "unavoidable delays" clause because it would "absolve itself from bearing the costs of its delay if the delay is caused by the government's own acts." *Id.* at 760.

32. The Court, in applying the mandamus test, did not grant all of the relief requested by petitioners. While the Court found that there was a clear right to relief and a clear duty to act, it also found that the Standard Contract presents "another potentially adequate remedy." *Id.* at 759. The Court held that the petitioners must, in the first instance, pursue contract-based remedies.

33. January 31, 1998, came and went without DOE accepting any SNF from any Standard Contract holder, including CP&L and FPC.

34. A number of Standard Contract holders have filed and pursued lawsuits against the DOE in this Court.

35. On August 31, 2000, the United States Court of Appeals for the Federal Circuit issued companion decisions in *Maine Yankee Atomic Power Co. v. U. S.*, 225 F.3d 1336 (Fed. Cir. 2000) and *Northern States Power Co. v. U. S.*, 224 F.3d 1361 (Fed. Cir. 2000), effectively holding that the DOE is liable for breach of the Standard Contract and that claims for damages should be pursued through lawsuits in the Court of Federal Claims. In these opinions, which resolved divergent holdings of two Court of Federal Claims judges and became final in December 2000, the Federal Circuit concluded that

claims against DOE in these circumstances do not "arise under" the contracts, and may therefore be brought directly in court.

36. The rationale, articulated in the *Maine Yankee* decision, was that the DOE's across-the-board failure to begin taking fuel was not a "delay" as that term is used in the Standard Contract. Rather, the "delay" term of the Standard Contract contemplates the sort of routine delays one might expect to arise in connection with acceptance of fuel from individual utilities, *i.e.*, after programmatic performance by the DOE had commenced.

37. The Federal Circuit's *Northern States Power* decision adopted the rationale of the *Maine Yankee* decision on the jurisdictional issue, reversing the lower court. It also reiterated the unconditional obligation of the DOE as expressed by the D.C. Circuit, and accordingly affirmed the ruling in plaintiff's favor on liability for breach of contract.

38. DOE continues to refuse to provide a firm date for commencing the disposal of Plaintiffs' SNF.

**Damages to Plaintiffs Caused by DOE's Partial Material Breach**

39. Plaintiffs have complied with their obligations under the Standard Contracts but have not received DOE's promised performance. DOE's partial material breach of its statutory and contractual obligations has required Plaintiffs to take actions, at substantial cost, to maintain the SNF at Plaintiffs' reactor sites.

40. The damages incurred and to be incurred by Plaintiffs as a direct and proximate result of Defendant's breach include, but are not limited to, costs associated with materials, engineering, acquisition, planning, training, wages, health physics, surveillance monitoring and testing, security, environmental monitoring, insurance, overhead, licensing, transportation, regulatory oversight, maintenance, finance, taxes, and delayed decommissioning activities relating to SNF storage and management activities,

including design, construction and operation of dry SNF storage at Independent Spent Fuel Storage Installations (ISFSIs), and purchase of associated dry storage casks.

## CLAIMS FOR RELIEF

## COUNT I

**(Partial Material Breach of Express Written Contract)**

41. Plaintiffs repeat and re-allege paragraphs 1 through 40 above.

42. The Standard Contracts are valid and binding contracts between Plaintiffs and Defendant.

43. The Standard Contracts required Defendant to commence accepting SNF on or before January 31, 1998.

44. Plaintiffs have complied and continue to comply with all of their obligations under the Standard Contracts.

45. Defendant, which has an unconditional obligation to commence accepting SNF by January 31, 1998, has not accepted any SNF from Plaintiffs.

46. Defendant's failure to perform the services contemplated by the Standard Contracts on or before January 31, 1998 constitutes a partial material breach of the Standard Contracts by Defendant.

47. Plaintiffs have incurred and will continue to incur significant damages as a direct and proximate result of Defendant's partial material breach of the Standard Contracts.

48. As a direct and proximate result of Defendant's partial material breach, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT II

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

49. Plaintiffs repeat and re-allege paragraphs 1 through 48 above.

50. The Standard Contracts between Plaintiffs and Defendant contain an implied covenant of good faith and fair dealing, pursuant to which Defendant has a duty to perform its obligations under the Contract in good faith and not to take actions detrimental to Plaintiffs' contractual rights. Defendant has breached the covenant of good faith and fair dealing by failing and refusing to take reasonable steps to meet the contractual deadline for beginning to dispose of SNF; by consistently attempting to avoid its obligations under the Contracts as defined by the D.C. Circuit; and by failing to take steps that it could have taken to dispose of Plaintiffs' SNF or even to provide Plaintiffs with a firm date on which Defendant will begin to do so.

51. Defendant's failure to act has not been the result of technical inability, legal impediment, or inadequate resources. DOE annual expenditures from the Nuclear Waste Fund have consistently been well below the level of annual receipts into the Nuclear Waste Fund. There are ample funds available to DOE to comply with its contractual obligations.

52. In contrast to Defendant's failure to take any action to meet its contractual commitments to Plaintiffs, Defendant has taken action to receive, transport and store SNF

from other entities. For example, Defendant has accepted and stored SNF from domestic and foreign research reactors.

53. As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered and will continue to suffer damages as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant, the United States, in an amount to be determined in further proceedings, together with such additional costs, fees, and other relief as the Court may deem just and appropriate.

Respectfully submitted,

Brad Fagg (Counsel of Record)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania, N.W.
Washington, DC 20004
(202) 739-5191 Telephone
(202) 739-3001 Facsimile

January 14, 2004

Of Counsel:
Paul M. Bessette
MORGAN, LEWIS & BOCKIUS LLP

Attorneys for Plaintiffs
Carolina Power & Light Company, and
Florida Power Corporation

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JAN 1 4 2004
U.S. COURT OF FEDERAL CLAIMS

**CAROLINA POWER & LIGHT COMPANY,**
410 S. Wilmington St.
Raleigh, NC 27601-1748

**FLORIDA POWER CORPORATION,**
100 Central Ave.
St. Petersburg, Florida 33701

Plaintiffs,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 04-0037C

Judge: __________

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to RCFC 7.1, Plaintiffs, Carolina Power & Light Company and Florida Power Corporation, through undersigned counsel, respectfully submit this corporate disclosure statement. Carolina Power & Light Compnay is a wholly-owned direct subsidiary of Progress Energy, Inc., and Florida Power Corporation is a wholly-owned indirect subsidiary of Progress Energy, Inc. Progress Energy, Inc. is a publicly held corporation and, directly or indirectly, owns more than 10% of Carolina Power & Light Company and Florida Power Corporation.

Respectfully submitted,

Brad Fagg (Counsel of Record)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-5191 – telephone
(202) 739-3001 – facsimile

January 14, 2004

Of Counsel:
Paul M. Bessette
MORGAN, LEWIS & BOCKIUS LLP

Attorneys for Plaintiffs,
Carolina Power & Light Company, and
Florida Power Corporation