**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLINA POWER & LIGHT COMPANY, et al.** | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-37C<br>(Judge Wheeler) |
| **UNITED STATES OF AMERICA,** | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Of Counsel:

Paul M. Bessette
David M. Kerr
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

BRAD FAGG
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiff

September 12, 2007

# TABLE OF CONTENTS

**Page**

I. STATEMENT OF THE FACTS ........ 1

A. Crystal River. ........ 5

B. Harris. ........ 6

C. Robinson. ........ 8

D. Brunswick. ........ 9

E. Government contentions. ........ 10

II. LEGAL PRINCIPLES ........ 11

A. The applicable framework. ........ 11

B. Government arguments regarding burdens and "non-incremental" costs. ........ 14

C. The law regarding offsets and avoided loss. ........ 17

III. ISSUES OF FACT AND LAW ........ 19

A. The So-Called "Pick Up Rate": If DOE Had Performed At A Reasonable Rate, Progress Energy Would Not Have Activated Harris C & D Pools To Perform its Obligations Under the Standard Contract........ 21

1. *The Court must supply a reasonable acceptance rate term.* ........ 22

2. *The fundamental objectives of the NWPA support imposition of an acceptance rate sufficient to prevent utilities from bearing additional at-reactor storage costs for SNF after January 31, 1998* ........ 25

3. *The Standard Contract's quid pro quo exchange of obligations support imposition of an acceptance rate sufficient to prevent utilities from bearing additional storage costs for SNF after January 31, 1998* ........ 27

4. *Contemporaneous evidence manifests DOE's intent to collect SNF beginning in 1998 at a rate sufficient to prevent additional at-reactor storage costs for utilities and to reduce the accumulated backlog of SNF* ........ 31

5. *Progress Energy understood that DOE was obligated to collect SNF beginning in 1998 at a rate sufficient to prevent additional at-reactor storage costs after that date* ........ 35

6. *A 3,000 MTU steady-state acceptance rate achieves these two fundamental objectives and effectuates the parties' understanding and intentions under the standard contract* ........ 36

7. *DOE's issuance of rate schedules and allocations utilizing a lower acceptance rate, and Delivery Commitment Schedules based upon those schedules, do not support the imposition of that lower rate* ........ 42

**TABLE OF CONTENTS, Continued**

**Page**

B. The Government Is Not Entitled To A Damage Reduction Due To Alleged "Losses Avoided" For Disposal Of Unused Racks And "Crud" Waste Material ........ 47

C. The Government Is Not Entitled To A Damage Reduction Due To Secondary Benefits Of The Upgraded Harris Component Cooling Water System ........ 48

D. The Government Is Not Entitled To A Damage Reduction Due To Hypothetical Costs Of Loading DOE Casks That Were Never Supplied, And Which DOE Has A Duty To Provide One Day ........ 49

E. The Government Is Not Entitled To A Damage Reduction Due To Railroad Track Maintenance Costs, Based Upon Unsupported Speculation Regarding How DOE Might Have Performed ........ 49

F. DOE's Delay Was A Substantial Causal Factor in Progress Energy's Decision to Rerack the Crystal River Pool ........ 50

G. The Government Is Not Entitled To A Damage Reduction Due To Alleged Lack Of Foreseeability Of The Precise Interested-Party Intervention In The Harris C and D Pool Licensing Proceeding ........ 53

H. The Government Is Not Entitled To A Damage Reduction Due To Progress Energy's Use Of Its Own Employees On Mitigation Activities ........ 54

I. The Government Is Not Entitled To A Damage Reduction Due To AFUDC Costs Incurred By Progress Energy ........ 56

J. The Government Is Not Entitled To A Damage Reduction Due To Progress Energy's Use Of Its Internal Warehouse And Construction Service Resources ........ 58

K. Any Costs Still Challenged By The Government At The Time Of Trial On Adequacy-Of-Support Grounds Will Be Established By Progress Energy Under The Applicable Standards ........ 59

IV. CONCLUSION ........ 61

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Alvin Ltd. v. United States Postal Serv.*, 816 F.2d 1562 (Fed. Cir. 1987) ..................23, 31

*Bank of America, FSB v. United States*, 70 Fed. Cl. 246 (2006).................................... 50

*Bank of New York v. Southwire Co.*, 470 F.3d 264 (6th Cir. 2006)................................ 23

*Barco Urban Renewal Corp. v. Housing Authority of Atlantic City*, 674 F.2d 1001 (3d Cir. 1982)......................................................................................... 23

*Bluebonnet Savings Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001)................... 60

*In re Carolina Power & Light Co.*, 53 N.R.C. 113 (2001) ............................................ 54

*Coast Federal Bank, FSB v. United States*, 48 Fed. Cl. 402 (2000)............................... 15

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003)............................ 24

*Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) .............................55, 56

*David Nassif Associates v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ......................... 23

*Dominion Resources, Inc. v. United States*, 77 Fed. Cl. 151 (2007) .............................. 18

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)......................... 14

*Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547 (Ct. Cl. 1971).................. 23

*Florida Power & Light v. Westinghouse Electric Corp.*, 826 F.2d 239 (1987)............... 36

*Franconia Associates v. United States*, 61 Fed. Cl. 718 (2004)................................16, 52

*Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001).........15, 17

*Glendale Federal Bank, FSB v. United States*, 378 F.3d 1308 (Fed. Cir. 2004)............. 16

*Granite Management Corp. v. United States*, 74 Fed. Cl. 155 (2006) ........................... 15

*Home Savings of America v. United States*, 399 F.3d 1341 (Fed. Cir. 2005).................. 14

*Howell v. United States*, 51 Fed. Cl. 516 (2002).......................................................... 23

*Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996)......................................................................................... 27

**TABLE OF AUTHORITIES, Continued**

**Page**

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003) ........................ 24, 36

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) ....... *passim*

*Julius Goldman's Egg City v. United States*, 697 F.2d 1051 (Fed. Cir. 1983) ................. 31

*KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68 (1996) ........................................ 31, 45

*In re: Kellett Aircraft Corp.*, 186 F.2d 197 (3rd Cir. 1950) ........................................... 17

*Lisbon Contrs., Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987) ............................. 13

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) ..................................................... 22

*Long Island Savings Bank, FSB v. United States*, 60 Fed. Cl. 80 (2004) ........................ 17

*Long Island Savings Bank, FSB v. United States*, 67 Fed. Cl. 616 (2005) ...................... 50

*Long Island Savings Bank, FSB v. United States*, 476 F.3d 917 (Fed. Cir. 2007) ........... 50

*Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ........................................................................................ 1, 2, 12, 28

*National Australia Bank v. United States*, 452 F.3d 1321 (Fed. Cir. 2006) ..................... 60

*Northern States Power Company v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) ....... 12

*Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006) ........................... 14, 16

*Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333 (2006) ............... 10, 25

*Roedler v. DOE*, 255 F.3d 1347 (Fed. Cir. 2001) ..................................................... 25, 44

*Sacramento Mun. Utility Dist. v. United States,* , 70 Fed. Cl. 332 (2006) ....................... 49

*San Carolos Irrigation & Drainage District*, 111 F.3d 1557 (Fed. Cir. 1997) ................ 19

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007) ............... *passim*

*Tenn. Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) .................................... 12

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006) ....................... *passim*

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ............................................... 16, 26

**TABLE OF AUTHORITIES, Continued**

**Page**

*Vermont Yankee Nuclear Power Corporation v. United States*, 73 Fed. Cl. 236 (2006) .......... 43

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) .......... 57

*White v. Delta Construction International*, 285 F.3d 1040 (Fed. Cir. 2002) .......... 13

*Wickham Contracting Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994) .......... 57

*Yankee Atomic Electric Co. v. United States*, 73 Fed. Cl. 249 (2006) .......... 13, 24

**FEDERAL STATUTES AND REGULATIONS**

5 U.S.C. § 706(1) .......... 26

28 U.S.C. § 1491(a)(1) .......... 11

Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq*

42 U.S.C. § 10131(a) .......... 3

42 U.S.C. § 10131(a)(2) .......... 26

42 U.S.C. § 10131(a)(4) .......... 25

42 U.S.C. § 10131(a)(7) .......... 26

42 U.S.C. § 10131(b)(4) .......... 25

42 U.S.C. § 10132(a) .......... 27

42 U.S.C. § 10134 .......... 27

42 U.S.C. § 10221(a) .......... 32

42 U.S.C. § 10222(a)(4) .......... 46

42 U.S.C. § 10222(a)(5) .......... 25

42 U.S.C. § 10222(a)(5)(A) .......... 27, 44

42 U.S.C. § 10222(b)(1)(A) .......... 28

42 U.S.C. § 10222(b)(2)(A) .......... 27

**TABLE OF AUTHORITIES, Continued**

**Page**

10 C.F.R. § 2.174 (1998) .......... 53

18 C.F.R. pt 101 .......... 56

48 Fed. Reg. 16,590 (Apr. 18, 1983) .......... 28

64 Fed. Reg. 2237 (Jan. 13, 1999) .......... 54

48 Fed. Reg. 5458 (Feb. 4, 1983) .......... 27

59 Fed. Reg. 27,007 (May 25, 1994) .......... 3

**MISCELLANEOUS**

S. Rep. No. 95-548 (1980), *reprinted in 1980 USCCAN 6933* .......... 36

Corbin on Contracts, §57.10 (2005) .......... 17, 18

Corbin on Contracts § 57.11 (2005) .......... 14, 53

Corbin on Contracts § 57.16 (2005) .......... 54

Dobbs Law of Remedies, § 12.6(2) (1993) .......... 53

Restatement (Second) of Contracts § 204 (1981) .......... 23

Restatement (Second) of Contracts § 347 (1981) .......... *passim*

Restatement (Second) of Judgments, § 26(1) .......... 60

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CAROLINA POWER & LIGHT COMPANY, et al.**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA,**<br><br>Defendant. | No. 04-37C<br>(Judge Wheeler) |

**PLAINTIFFS' MEMORANDUM OF**
**CONTENTIONS OF FACT AND LAW**

Pursuant to the Court's January 30, 2007 Pretrial Order (as amended by the Court's June 22, 2007 and August 29, 2007 Orders), and Appendix A of the Rules of the United States Court of Federal Claims, Plaintiffs Carolina Power & Light Company ("CP&L") and Florida Power Corporation ("FPC") respectfully file this Memorandum of Contentions of Fact and Law.

## I. STATEMENT OF THE FACTS

This is a spent nuclear fuel damages case. *See generally, Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). The lawsuit involves the Department of Energy's ("DOE's") failure to fulfill its contractual obligation to accept and dispose of spent nuclear fuel. CP&L and FPC (collectively for these purposes, "Progress Energy")[1] operate five nuclear reactors at four power stations: Brunswick Nuclear Plant, Units 1 and 2 ("Brunswick"), Shearon Harris Nuclear Plant, Unit 1 ("Harris"), H.B. Robinson Nuclear Plant, Unit 2 ("Robinson"), and Crystal River Nuclear Plant, Unit 3 ("Crystal River").[2] DOE,

[1] CP&L, which also does business as Progress Energy Carolinas, Inc., is a wholly-owned subsidiary of Progress Energy, Inc. FPC, which also does business as Progress Energy Florida, Inc. is an indirect wholly-owned subsidiary of Progress Energy, Inc.

[2] CP&L is the majority owner of Brunswick and Harris, and the full owner of Robinson. A minority ownership interest in Brunswick and Harris is held by the North Carolina Eastern Municipal Power Agency. FPC is the

acting on behalf of the Government of the United States, entered into a "Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste" (the "Standard Contract") with nuclear power generators including CP&L and FPC.[3] Under the Standard Contracts, Progress Energy quarterly pays (and has paid since April 7, 1983) a fee to DOE based on electricity production from nuclear fuel in exchange for DOE's obligation to dispose of spent nuclear fuel and high level waste (collectively for these purposes "spent fuel" or "SNF") beginning no later than January 1, 1998.

There is no dispute that DOE breached its contracts not just with CP&L and FPC but with "all the utilities that had signed the contract—the entire nuclear electric industry." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Yet, Progress Energy has paid approximately $719 million in fees for the disposal of spent fuel under the contracts. Progress Energy expects that DOE on some future date will perform. DOE's failure to pick up the spent fuel in a timely manner is thus a partial breach of the contract. *See generally, Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1375 (Fed. Cir. 2005) ("*Indiana Michigan II*"). The essential issue to be resolved in the present case, therefore, is the measure of damages.

When spent nuclear fuel is removed from a reactor it is temporarily placed in a spent fuel pool connected to the reactor. Spent fuel pools were designed for short-term storage to allow the fuel to cool so it could be shipped off to a reprocessing plant or elsewhere for disposal. In 1977, the federal government barred reprocessing indefinitely. Approximately five years later, through passage of the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq.* ("NWPA"), the federal government confirmed its obligations to accept spent nuclear fuel and

---

majority owner of Crystal River, and minority ownership interests in Crystal River are held by a number of Florida municipalities and cooperatives. CP&L and FPC are authorized to act on behalf of the minority owners of their respective plants.

[3] CP&L is the current holder of the single Standard Contract for Brunswick, Robinson, and Harris. FPC is the current holder of the Standard Contract for Crystal River.

assumed responsibility "to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment." 42 U.S.C. § 10131(a). Recognizing that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel," *id.,* the NWPA authorized the Secretary of DOE to enter into a Standard Contract with each nuclear power generator. The intent of the Standard Contract was for utilities to pay into the Nuclear Waste Fund in exchange for disposal services that would (1) ensure that utilities would not have to build any additional at-reactor storage after 1998 and (2) work off the backlog of SNF already stored on-site as of 1998. DOE unequivocally announced on May 25, 1994 that it would not fulfill its contractual obligations in 1998. Notice of Inquiry, Waste Acceptance Issues, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994); *Indiana Michigan II*, 422 F.3d at 1375. As a result of DOE's delay in picking up spent fuel, Progress Energy decided to pursue several on-site storage strategies to avoid having to shut down its nuclear reactors.

Specifically, to mitigate the potential damages from DOE's breach, Progress Energy decided to (1) replace storage racks in the spent-fuel pool at Crystal River; (2) activate two additional spent-fuel pools the Harris plant, the "C" and "D" pools; (3) conduct certain transshipments of spent fuel from Brunswick and Robinson to Harris; (4) construct a dry storage facility at Robinson known as an Independent Spent Fuel Storage Installation ("ISFSI") and procure and load spent fuel dry storage casks onto the ISFSI; and (5) begin design studies of an ISFSI at Brunswick.

The following is a summary of the costs Progress Energy incurred, through December 31, 2005,[4] in pursuing these projects, followed by an overview of spent fuel management (including

4 Pursuant to *Indiana Michigan II*, 422 F.3d 1369, damages may only be sought up until the time of trial, but Progress Energy is entitled under the law to pursue after-incurred damages in subsequent proceedings, free from government defenses of statute of limitations, merger, or the like. In order to allow the government sufficient opportunity to review historic cost documentation, Progress Energy agreed to a damages cut-off for

these mitigation projects) at Progress Energy's power plants:

| Activity | Cost |
|---|---|
| Crystal River Rerack | $4,675,392 |
| Harris C and D Pool Activation | $32,734,951[5] |
| Transshipment Campaigns | $16,975,182 |
| Robinson ISFSI | $36,027,545[6] |
| Brunswick ISFSI | $208,120 |
| Total: | $90,621,190 |

Progress Energy generally maintains full core reserve at all of its nuclear plants for each reactor. Full core reserve is defined as maintaining empty spent fuel pool storage cells in the spent fuel storage pool equal to or greater than the number of fuel assemblies in the reactor core. This allows for the full core to be offloaded, should circumstances so require.[7] While maintaining full core reserve is not a strict legal requirement, it is a widely-recognized prudent operating practice within the industry, and the primary driver of Progress Energy's decision-

these proceedings of December 31, 2005. In some other spent fuel cases, the government has taken the position that the complaints (filed before *Indiana Michigan II*) must be formally supplemented or amended to make clear the applicable damages cut-off date for the instant proceedings. The Court clearly has the power to deem the complaint so amended or supplemented under RCFC 15, or, alternatively, Progress Energy would have no objection to so amending or supplementing its complaint.

5 In its Initial Disclosure of Claimed Damages, Progress Energy claimed $32,754,732, but voluntarily reduced this amount by $19,782 to remove some legal fees when it could not be verified that they were related to this activity.

6 In its Initial Disclosure of Claimed Damages, Progress Energy claimed $37,052,665 but voluntarily reduced this by $610,397 to remove the cost of certain backfill labor that only indirectly supported the Robinson dry storage project and further reduced by $6,209 for the portion of a repair to the Robinson crane, unrelated to DOE's breach, that was made at the same time as the modifications to the crane that resulted from DOE's breach. Finally, Progress Energy further voluntarily reduced its claim by $408,514, for certain initially claimed security-related costs, due in part to documentation issues.

7 As each of Progress Energy's nuclear plants nears its next refueling outage, Progress Energy endeavors to increase the number of empty storage cells in the spent fuel pool so that the new fuel to be loaded during the outage can be stored in the spent fuel pool and still leave room for full core reserve in the pool. This is sometimes referred to as maintaining "prudent operating reserve." Prudent operating reserve is desirable, but the impact of failing to maintain such a reserve can, depending upon the circumstances, be acceptably managed.

making regarding spent fuel storage.

A. *Crystal River.* Crystal River is a single unit pressurized water reactor ("PWR") site located near Crystal River, Florida. Crystal River began commercial operation in 1977 and is currently licensed to operate through 2016. Progress Energy now plans to submit an application in or around September 2008 to renew the Crystal River operating license for an additional 20 years, although that decision had not been made as-of the late 1990's. Crystal River has two interconnected spent fuel pools, A and B. Progress Energy increased the capacity of the spent fuels pool in 1978 and 1991 by replacing the existing spent fuel storage racks with higher density racks. The licensed capacity of the Crystal River spent fuel pools after the 1978 and 1991 rerack projects was 1357 spent fuel assemblies.[8]

After DOE announced that it would not perform under the Standard Contract, Progress Energy began to investigate spent fuel storage options for Crystal River. Based on the licensed spent fuel capacity and the predicted number of spent fuel assemblies discharged into the spent fuel pools each cycle, Progress Energy determined that Crystal River would lose full core reserve in or around 2011. A ten-year plan was designed to avoid the expected loss of full core reserve. Phase I of that plan, to be undertaken in the first three years, was to replace existing racks in Pool B with higher density racks, which would allow Crystal River to operate for another full cycle. Subsequent phases would implement plant modifications to accommodate Mutli-Purpose Canisters, and construct a dry storage ISFSI. The rerack to increase storage space would also have the added effect of improving spent fuel pool water chemistry by replacing the existing racks, which contained a neutron absorbing material called Boraflex that slowly degrades under long term radiation exposure. Significantly, however, there would have been alternative,

---

[8] The costs associated with Crystal River's 1978 and 1991 spent fuel pool rerack projects are not being claimed because the decision was made to pursue that rerack without regard to DOE's level of performance under the Standard Contract.

cheaper methods of addressing the Boraflex degradation and associated water chemistry issues if additional pool space had not been necessitated by DOE's performance failures. At a minimum, DOE's performance failures were clearly a substantial causal factor in Progress Energy's decision to re-rack the Crystal River pool. Accordingly, Progress Energy's damages at Crystal River include the costs incurred so far to implement the spent fuel storage plan, that is, to analyze, design, construct, and replace the Pool B spent fuel racks and dispose of the old racks.

B. *Harris.* Harris is a single unit PWR site located near New Hill, North Carolina. Harris began commercial operation in 1987 and is currently licensed to operate through 2026. Last year Progress Energy submitted an application to renew the Harris operating license for an additional 20 years. The Harris site was originally planned to accommodate four nuclear units (Units 1, 2, 3, and 4). It was intended that Units 1 and 4 would share spent fuel pools A and B, and Units 2 and 3 would share spent fuel pools C and D. Construction of Unit 1 and the Fuel Handling Building ("FHB"), which housed all four spent fuel pools (A, B, C, and D), was well underway when these plans changed. During construction of Unit 1, Units 2, 3, and 4 were cancelled. Unit 1, those portions of the FHB that supported Unit 1, and all four spent fuel pools were completed. While much of the piping and major pieces of equipment associated with Units 2 and 3 spent fuel storage were partially completed (*i.e.*, those that supplied Pools C and D), the Spent Fuel Pool Cooling and Cleanup ("SFPCC") System for Units 2 and 3 was never completed. Components of the SFPCC System that were installed and not required for Unit 1 operation were left in place and remained dormant. To maintain full core reserve at Robinson and Brunswick Units 1 and 2, during the 1990's Progress Energy shipped a number of spent fuel assemblies from Robinson and Brunswick to Harris for storage in Harris spent fuel pools A and B. In order to accommodate the Brunswick and Robinson spent fuel, Progress Energy added

additional racks to the A and B pools in 1991 and additional racks to the B pool in 1996.[9]

Around 1995, however, Progress Energy determined that, based on spent fuel shipping schedules, Harris spent fuel pools A and B would be full around 2000. In response, Progress Energy took the actions necessary to activate the Harris spent fuel pools C and D. This project was completed in 2001. The decision to activate the Harris C and D pools resulted from DOE's partial breach. Accordingly, Progress Energy seeks to recover costs incurred to activate the Harris C and D pools.[10]

As mentioned above, transshipments have been an important part of Progress Energy's spent-fuel management. To alleviate spent fuel pool capacity constraints at Robinson, Progress Energy transshipped 304 assemblies in 44 shipments from Robinson to Brunswick from 1977 to 1981. In addition, Progress Energy shipped 504 assemblies in 37 shipments from Robinson to Harris from 1990 to 2004. In addition, to alleviate spent fuel pool capacity constraints at Brunswick, Progress Energy transshipped 3,853 spent fuel assemblies in 113 total shipments from Brunswick Units 1 and 2 to Harris, over a multi-year period, beginning in 1989 and ending in 2005. For these transshipments, Progress Energy used rail casks it owned and acquired, known as IF-300's. Each IF-300 transport cask holds 17 channeled (18 unchanneled) BWR spent fuel assemblies and weighs approximately 75 tons when loaded. Alternatively, each transport cask can hold six or seven PWR spent fuel assemblies.[11] Thus these casks also

---

9 The costs associated with the addition of racks to Harris pools A and B in 1991 and 1996, and the costs associated with the early shipping campaigns, are not being claimed because the decisions to pursue those activities was made to maintain full core reserve at Harris, Robinson, and Brunswick without regard to the level of DOE's performance under the Standard Contract.

10 Had DOE performed and Progress Energy therefore not been required to activated Harris C and D pools, however, it would have had to make certain changes to the racks in Harris pool B in order to maintain full core reserve at Harris, Robinson, and Brunswick. Specifically, Progress Energy would have removed two BWR racks and installed three PWR racks in Pool B. A reasonable calculation of the costs that would have been incurred in connection with such a storage strategy is $1,087,280, which Progress Energy has deducted from the mitigation damages it is claiming.

11 The capacity of each of the transport casks is nominally seven PWR assemblies. However, shipment of certain higher uranium enrichment fuel assemblies requires that one space be left vacant to account for criticality concerns.

supported transshipments of PWR spent fuel from Robinson to Harris.

DOE's partial breach was the reason for Progress Energy's decision to continue transshipping spent fuel from Robinson to Harris after 1999[12] and from Brunswick Units 1 and 2 to Harris after 2001 and 1999, respectively. Accordingly, Progress Energy's damages include costs associated with 14 transshipments of spent fuel from Robinson to Harris from 2000 to 2004, costs associated with 18 Brunswick Unit 1 transshipments to Harris from 2002 to 2004, and 24 Brunswick Unit 2 transshipments to Harris from 2001 to 2005.[13]

C. *Robinson.* Robinson is a single unit PWR site located near Hartsville, South Carolina. Robinson began commercial operation in 1971 and is licensed to operate through 2030. Robinson has a single spent fuel pool. Progress Energy significantly increased the capacity of the Robinson spent fuel pool in 1983 by replacing some of the existing low density spent fuel storage racks with higher density racks. To further alleviate spent fuel pool capacity constraints, as explained above, Progress Energy transshipped spent fuel from Robinson to Brunswick from 1977 to 1981. Additionally, Progress Energy shipped spent fuel from Robinson to Harris from 1990 to 2004.[14] The transshipments of spent fuel from Robinson to Harris ended in 2004, due in part to the license restrictions on the spent fuel shipping cask, and also due to the increasingly apparent fact that DOE performance was nowhere in the foreseeable future, and alternatives to transshipment (due to the finite capacity of the Harris pools) would be necessary.

Based on the Robinson spent fuel inventory, planned transshipments, transport cask license restrictions, and projected spent fuel discharges, Progress Energy required additional

---

12 There were no transshipments from Robinson to Harris in 1998 or 1999.

13 The costs associated with the Robinson transshipments to Harris prior to 1999, the 42 Brunswick Unit 1 transshipments to Harris prior to 2001, and the 29 Unit 2 transshipments to Harris prior to 1999 are not being claimed since the decision to conduct those activities was made to maintain full core reserve at Robinson and Brunswick without regard to the level of DOE's performance under the Standard Contract.

14 Progress Energy also shipped one assembly to the DOE in 1975 for research purposes. In addition, during the period from about 1987 until 1989, Progress Energy constructed an ISFSI which holds 56 spent fuel assemblies as part of a DOE dry storage demonstration project, which was partially funded by the DOE.

spent fuel storage at Robinson by 2005 in order to maintain full core reserve. Accordingly, Progress Energy constructed an ISFSI at the Robinson site and loaded the first four dry storage canisters onto the ISFSI in August 2005. To support the operation of the ISFSI, Progress Energy made extensive and necessary modifications to the cask preparation area, spent fuel cask storage area, and the crane. In addition, the perimeter of the plant's protected area was expanded to accommodate the ISFSI. DOE's partial breach under the Standard Contract was the reason for Progress Energy's decision to construct the Robinson ISFSI. Accordingly, Progress Energy's damages at Robinson include costs associated with the design and construction of, and loading of spent fuel onto, the Robinson ISFSI.[15]

D. *Brunswick.* Brunswick is a two unit boiling water reactor ("BWR") site located near Southport, North Carolina. Brunswick Units 1 and 2 began commercial operation in 1977 and 1975 and are licensed to operate through 2036 and 2034, respectively. Brunswick has two spent fuel pools, which are not connected. Progress Energy increased the capacity of the Brunswick spent fuels pool in 1977 and 1984 by replacing the existing spent fuel storage racks with higher density racks. To further alleviate spent fuel pool capacity constraints, Progress Energy transshipped 3,853 spent fuel assemblies in 113 total shipments from Brunswick Units 1 and 2 to Harris, over a multi-year period, from 1989 through the end of 2005. The transshipments of spent fuel from Brunswick to Harris are scheduled to end in 2008, due in part to the expiration of the cask license in October 2008, and, again, because it has become apparent that additional spent fuel storage capacity will be needed.

Based on current spent fuel pool capacities and planned spent fuel discharge rates, Progress Energy will require additional spent fuel storage at Brunswick Unit 1 by 2010 in order

15 The costs associated with Robinson's early spent fuel pool rerack projects and the 1989 ISFSI demonstration project are not being claimed because the decision to engage in those activities was made without regard DOE's lack of performance under the Standard Contract.

to maintain full core reserve in its pool. Additional spent fuel storage at Brunswick Unit 2 is required by 2011 in order to maintain full core reserve in its pool. Progress Energy considered reracking the Brunswick spent fuel pools and other options in order to provide the additional spent fuel storage but, for a number of reasons, determined that an ISFSI was the preferred alternative. Presently, Progress Energy has completed the Brunswick ISFSI feasibility study, which consists of several independent assessments which collectively establish the scope of work required to implement the Brunswick ISFSI. From these assessments, a conceptual design for the facility has been established and the project implementation work scope has been identified.

Progress Energy's decision to construct an ISFSI at Brunswick, in order to maintain full core reserve through the projected operating life of the units, was the result of DOE's delay in picking up spent fuel. Accordingly, Progress Energy's damages at Brunswick include preliminary ISFSI design activities incurred through December 31, 2005.[16]

E. *Government contentions.* The government will contest little, if any, of the above—and, how could it, given that the actions taken by Progress Energy are well-documented, historical facts? Nevertheless, the government apparently will argue that Progress Energy should only recover some $43,387,429 of the $90,621,190 that the government admits that Progress Energy spent for on-site storage of spent fuel. The primary government defense is based not upon any dispute about factual matters or the reasonableness of Progress Energy's mitigation efforts, but upon hypothetical constructs and arguments about the government's legal obligations under the contracts, *i.e.,* the so-called "pick up rate" arguments rejected so thoroughly by the Court in *Southern Nuclear Operating Co. v. United States* 77 Fed. Cl. 396 (2007).[17]

[16] The costs associated with Brunswick's 1977 and 1984 spent fuel pool rerack projects are not being claimed because the decision to conduct those activities was made without regard to DOE's performance under the Standard Contract.

[17] *But see, contra, Pacific Gas & Electric Company v. United States,* 73 Fed. Cl. 333 (2006) ("*PG&E*"), *appeal pending* (Fed. Cir.). For reasons explained further below, Progress Energy respectfully disagrees with the result reached by the trial court, albeit on the different record then before it, in *PG&E*.

In addition, even if the government were not to prevail in its pick-up rate arguments, the government apparently will still contend that Progress Energy should only recover $59,124,265 of the $90,621,190 incurred in mitigation activities, due to a miscellany of other alleged subtractions and offsets described further in Section III below. For example, the government challenges recovery of a $1,166,640 component of the Harris C and D pool activation efforts, because that component (specifically, upgrades to a Component Cooling Water, or CCW, system) also facilitated unrelated power uprate and steam generator replacement activities at Harris. Significantly, however, there will be no evidence or testimony whatsoever that the Harris C and D pool activation could have been accomplished without CCW system upgrades. (The government's technical expert has admitted that he cannot, and will not, so testify.) Other persuasive evidence will establish that alternatives to upgrade of the Harris CCW systems would likely have been available to support power uprate and steam generator replacement, if it were not also necessary to mitigate DOE's breaches through Harris C and D pool activation. Clearly, the DOE's breach was a substantial causal factor in the incurred CCW system upgrade damages.

Other claimed subtractions and offsets that the government will apparently pursue involve challenges to internal labor costs (such as those rejected in *Southern Nuclear*, 77 Fed. Cl. at 442-443), and challenges to certain capital construction cost damages (such as those rejected in *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006)). For the reasons described further in Section III below, each of the government's contentions should be rejected. Progress Energy is entitled to judgment in its favor in the amount of $90,621,190.

## II. LEGAL PRINCIPLES

A. *The applicable framework.* The basic legal principles that control Progress Energy's claim against DOE for its partial breach of the Standard Contracts are straightforward. As an initial matter, the Court has jurisdiction over Progress Energy's partial breach of contract

claim pursuant to 28 U.S.C. § 1491(a)(1), and the government has not disputed that its continuing failure to accept spent fuel constitutes a partial breach of the standard contracts with Progress Energy. *See generally, Northern States Power Company v. United States,* 224 F.3d 1361 (Fed. Cir. 2000); *Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000).

An injured party is entitled, besides seeking damages for what might have been, to recover for "any other loss" he actually suffered. Restatement (Second) of Contracts § 347 cmt. c. This includes incidental loses, that is, the costs he actually incurred as a result of the reasonable efforts he took to minimize or mitigate the damages caused by a breach. Restatement (Second) of Contracts § 347 cmt. c ("Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss."). To establish such incidental losses, a plaintiff does not use a but-for world to estimate his damages (as with certain other measures of expectation damages—see below), but, rather, must establish his actual costs in the real world. The Federal Circuit has described the required showings by a plaintiff in a spent nuclear fuel damages case: "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Michigan II* at 1373; *see also*, *Southern Nuclear*, 77 Fed. Cl. at 404.

"Foreseeablilty" does not appear, at least in the main, to be contested in this case. If a nuclear power generator has no place to store spent fuel, it can no longer operate its reactor and must replace the lost electricity generation with more expensive alternatives. The damages caused by allowing a spent fuel pool to fill up, therefore, would be staggering. There thus can be no serious dispute that it was foreseeable that nuclear power generators, such as Progress Energy, would take steps to mitigate the harm caused by DOE's failure to meet its contractual obligation

and begin picking up spent fuel not later than January 31, 1998 as required under the Standard Contract. *E.g., Tenn. Valley Auth. v. United States*, 60 Fed. Cl. 665, 675 n.10 (2004) ("[T]he intent of the NWPA and the parties [to the Standard Contract] was to avoid the construction by utilities of additional at-reactor storage [after January 31, 1998]. DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall." (internal citation omitted).

With regard to "substantial causal factor," that is a very straightforward factual inquiry in this case: Was DOE's delay in performing under the Standard Contract a substantial causal factor in Progress Energy's decision to pursue the at-reactor storage facilities giving rise to the costs being claimed? *See Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 405 (2007) ("The breach must be a 'substantial causal factor' in the mitigation decisions.") Also, "in determining whether a decision was substantially caused by DOE's delay, reasonable not absolute certainty suffices." *Yankee Atomic Electric Co. v. United States*, 73 Fed. Cl. 249, 268 (2006).

Finally, largely as a result of the pre-trial discovery efforts and the Court's Pretrial Order on Damages dated March 23, 2006, the requisite "reasonable certainty" of the measure of damages sought will be for the most part uncontested, and the evidence will clearly confirm the requisite certainty of any damages that the government might determine to persist in challenging.

After the plaintiff has satisfied his burden of establishing his loss as a result of the breach, a concomitant burden of proof then shifts to the breaching party to show that the damages should be offset by costs or other loses that the injured party has avoided by not having to perform. *See, e.g.*, *Lisbon Contrs., Inc. v. United States*, 828 F.2d 759, 769 (Fed. Cir. 1987) (affirming that the burden was on the government to establish a setoff to plaintiff's damages). This approach enforces two fundamental principles of contract law: (1) preventing the non-breaching party

from recovering more than the benefit of his bargain, s*ee White v. Delta Constr. Int'l.*, 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("[T]he non-breaching party should on no account get more than would have accrued if the contract had been performed" (internal quotation marks and citation omitted)); and (2) placing the risk of uncertainty with the breaching party, *see Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002) ("[T]he risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.").

The breaching party also bears the burden of proof to show that the mitigation-related activities were unreasonable. *Southern Nuclear*, 77 Fed. Cl. at 407 ("[D]efendant bears the burden of establishing that mitigating decisions or expenditures were unreasonable."); *Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 (2006) ("To eliminate or reduce TVA's mitigation-related damages, the government bears the burden of showing that TVA's mitigation efforts were unreasonable."). "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damages." *Indiana Michigan II*, 422 F.3d at 1375. And "[w]hen mitigating damages from a breach, a party must only make those efforts that are fair and reasonable under the circumstances." *Home Savings of America v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (internal quotation marks omitted). The "over-arching requirement," therefore, is one of reasonableness: "The question is largely a factual inquiry into whether the injured party's post breach behavior was reasonable." *Corbin on Contracts* § 57.11, at 314 (2005). To limit recovery for actual costs incurred for mitigation activities, the breaching party therefore must show that the mitigation decisions were unreasonable. *See, e.g.*, *Old Stone Corp. v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006) ("The government has not shown that it was unreasonable for OSC to replace the entire amount of regulatory capital that was eliminated by FIRREA.").

B. *Government arguments regarding burdens and "non-incremental" costs.* In

some prior spent fuel damages cases, the government (and some plaintiffs) have engaged in extensive debates regarding the respective burdens of proof. For purposes of this case, such a debate would be largely academic, since the evidence will so clearly establish the propriety of the damages sought by Progress Energy under any plausible standard or burden of proof. Nevertheless, for the record, the government's anticipated efforts to shift burdens of uncertainty and persuasion to the non-breaching party in these circumstances should be rejected.

Separate and apart from the sort of mitigation damages being sought here, a court may measure the injured party's expectation interest by assessing the "loss in value" of the breaching party's performance. The expectation interest, subject to some limitations, can be measured by: "(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." Restatement (Second) of Contracts § 347 (1981). To estimate loss in value of the party's performance with reasonable certainty, some cases have held that a plaintiff must present a plausible but-for world. *See, e.g.*, *Granite Mgmt. Corp. v. United States*, 74 Fed. Cl. 155, 169 (2006) (considering claim for lost value on sale of a company). Indeed, "expectancy damages" are often equated with a specific measure of loss in value, lost profits, and "[t]he problems of proof attendant on the burden placed on the non-breaching party of establishing lost profits—on establishing what might have been—are well recognized." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001). *Accord Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402, 429 n.25 (2000) (lost profits claim).

Significantly, however, this is not the measure of expectancy damage sought by Progress Energy here. As described above, Progress Energy is seeking mitigation damages—the straightforward, largely uncontested, actual real-world dollars associated with activities taken to

avoid shutting down its multi-billion dollar nuclear generating assets as a result of DOE's performance failures. Any uncertainties regarding the value of DOE's non-existent performance or a hypothetical but-for world are occasioned, of course, by DOE's massive breach. It is simply perverse for the government to now argue that the burden of disproving such uncertainties falls upon the innocent, non-breaching party, and potentially defeats recovery.

The government characterizes virtually all of its defenses as allegations that the plaintiff is seeking "non-incremental costs" that the government contends cannot be shown to be "caused" by DOE's breach. In so doing, the government is clearly attempting to frustrate the above-described sensible allocations of burdens applicable to this case. The distinction between the issue of causation (what Progress Energy did to mitigate DOE's breach) and appropriate mitigation (whether the mitigation efforts were reasonable under the circumstances) can be important for these purposes. Otherwise, "a breaching party could simply recast its mitigation defense in causation terms and thereby avoid the hurdles imposed by the established case law." *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 750 (2004). If claims challenging recovery of proven mitigation efforts are transformed into causation issues, defendants would not be bound by the concepts of "reasonable decisionmaking" that otherwise apply in such cases: "A breaching party could spin out a tangled web of damage-reducing hypothetical events in hopes that the injured party would become ensnared in failing to disprove at least one of them." *Id.*[18] DOE's partial breach clearly resulted in the mitigation activities at issue in this case, it thus is up to the government to try to show that Progress Energy was unreasonable in its mitigation decisions. *See Old Stone*, 450 F.3d at 1370 (affirming that the burden was on the government to establish that plaintiff's mitigation efforts exceeded what was necessary to address the damage

---

[18] In the *Winstar* context, the Federal Circuit cautioned litigants to avoid becoming entangled in endless theoretical disputes. *See Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004) ("We remain optimistic that with the additional guidance and support given the trial court in this opinion the remainder of the Winstar cases can be disposed of either by settlement or by trial based on the particular facts of the case, and without further dispute over the theory on which damages may be calculated.").

caused by the breach).

Once the Court determines that Progress has demonstrated that the breach was a "substantial factor" in causing its damages, it then should address whether the government has met its burden and shown that Progress's "efforts at mitigation were unreasonable." *Long Island Savings Bank, FSB v. United States*, 60 Fed. Cl. 80, 90, 93 (2004). *See also In re: Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3rd Cir. 1950) ("Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen. The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party . . . .").

Finally, it is worth repeating that how the government characterizes its defenses or, for that matter, Progress Energy's damages claim, does not change the fact that Progress Energy's loses are recoverable: "[T]he general principle is that all losses, however described, are recoverable." Restatement (Second) of Contracts § 347 cmt. c. At trial, Progress Energy will show that it incurred reasonable and foreseeable costs storing spent fuel to mitigate DOE's delay in picking up spent fuel under the Standard Contract. And Progress Energy, the non-breaching party, should be made whole. *Glendale*, 239 F.3d at 1380.

C. *The law regarding offsets and avoided loss.* Damages are offset by avoided losses only if the offset is related to a party's performance under the contract and is not speculative. In particular, "any cost or other loss that [the non-breaching party] has avoided by not having to perform" must be subtracted from his damages. Restatement (Second) of Contracts § 347 (1981) (emphasis added). For example, "when a building contractor is wrongfully prevented from completing construction, the cost of completion that is saved is deducted from the contract price to which the contractor would have earned by full

performance." Corbin on Contracts, Vol. 11, §57.10. And "when an employee is wrongfully discharged, the value of the employee's time and opportunity to work elsewhere is deducted from the promised wages that the employee would have earned if the discharge had not occurred." *Id.* The fact that an injured party may have suffered subsequent loses had the contract been performed is wholly immaterial. *See id.* In other words, "[t]he only saving that is to be deducted is the saving of expense with respect to performance by the plaintiff that the defendant's breach has made unnecessary." *Id.*; *see also* Restatement (Second) of Contracts § 347 cmt. d (1981) ("Loss avoided is subtracted only if the saving results from the injured party not having to perform rather than from some unrelated event." (emphasis added)). *Cf., Dominion Resources, Inc. v. United States*, 77 Fed. Cl. 151, 157 (2007) (argued damage reductions for "benefits" conferred not applicable where no "substitute transaction" implicated) and *Indiana Michigan II*, 422 F.3d at 1374 (no substitute transaction possible because "the NWPA provided that DOE was exclusively responsible for SNF collection and disposal in the United States, thereby prohibiting [plaintiff] or any other nuclear utility from seeking alternative disposal means.").

The government, however, will nevertheless seek offsets for alleged savings from events wholly unrelated to Progress Energy's performance under the Standard Contract, and/or which are entirely speculative. As described further in Section III below, all such asserted offsets should be rejected. Crediting the government with costs Progress Energy may have avoided by its chosen mitigation activities (as opposed to by not having to perform under the contract) would not give Progress Energy the benefit of its bargain with DOE. Moreover, even if such subtractions might be appropriate in other contexts, in this case Progress Energy would have had the flexibility to reduce or avoid, by other means, the costs that DOE alleges were avoided if DOE had in fact performed, and the argued offsets are speculative and inappropriate for this

additional reason. Finally, to establish an offset the government is bound by the same rules regarding a showing of damages, and "recovery for speculative damages is precluded." 422 F.3d at 1373. (quoting *San Carolos Irrigation & Drainage Dist.*, 111 F.3d 1557, 1562 (Fed. Cir. 1997)).

## III. ISSUES OF FACT AND LAW

There are, at the end of the day, only a handful of relatively discrete contested issues in this case. Pursuant to the Court's Pretrial Order on Damages dated March 23, 2006, and the associated (exhaustive) pre-trial government audit and discovery process, the voluminous underlying cost documentation has been thoroughly analyzed and reviewed by a full team of government auditors, experts and lawyers. With just a couple of possible exceptions noted below, the government does not contest the accuracy or admissibility of the schedules, summaries, items and figures from books of account and other records that establish the amounts of the damages claimed by Progress Energy.[19] Introduction and consideration of voluminous cost documentation, therefore, will not be necessary at trial.

The remaining contested issues in the case, which are described in more detail below, are:

(A) the government's arguments regarding its so-called "pick up rate" obligations under the Standard Contracts, which according to the government implicate recovery of the Harris C and D pool activation costs and certain associated shipping costs, but not Robinson, Brunswick, or Crystal River damages;

(B) reductions in damages argued by the government to be losses avoided, because such activities (namely, disposal of some unused spent fuel racks and waste material from the pools) would allegedly be necessary if and when the Harris plant is ever taken out of service and decommissioned, decades from now;

[19] The government so confirmed in correspondence dated August 14, 2007.

(C) argued reductions in damages due to upgrades to the Harris Component Cooling Water (CCW) system—which the government will not dispute were necessary for the Harris C and D pool activation—because those upgrades had secondary benefits to the plant;

(D) argued reductions in damages due to hypothesized costs of loading DOE casks that did not occur, despite the wholly speculative nature of such argued reductions and the fact that costs for loading of DOE casks may well be incurred by Progress Energy if and when DOE ever does perform (and such reductions would therefore represent a double penalty to Progress Energy);

(E) alleged costs of railroad maintenance to support the real world shipping campaigns undertaken by Progress Energy, even though the government will proffer no expert regarding railroad maintenance matters nor has it even committed that it would use rail casks to take fuel from the Progress Energy sites;

(F) the government's challenge to all costs associated with the Crystal River re-racking project, because, in addition to being necessary to increase at-reactor storage space at the site, that project had the secondary benefit of addressing certain water chemistry issues (for which mitigation measures costing less than a rerack could have been employed);

(G) the government's challenge to costs associated with interested party interventions, expressly contemplated by existing regulations, in administrative legal proceedings associated with the Harris C and D pool activation;

(H) the government's challenge to internal Progress Energy labor costs, upon the basis of the same government arguments rejected in *Tennessee Valley Authority*, 69 Fed. Cl. at 537-539, and *Southern Nuclear*, 77 Fed. Cl. 396 at 442-443;

(I) the government's challenge to costs associated with the use of funds necessary for the major capital projects involved, governed by federal regulation and referred to as Allowance

For Funds Used During Construction (AFUDC);

(J) the government's challenge to costs associated with internal Progress Energy warehouse and construction services; and

(K) possible argued lack of support for a very limited set of claimed costs, which, if not resolved prior to trial, will be established under the applicable standards through documentation and testimony of knowledgeable company personnel.

These matters are addressed, in turn:

**A. The So-Called "Pick Up Rate": If DOE Had Performed At A Reasonable Rate, Progress Energy Would Not Have Activated Harris C & D Pools To Perform its Obligations Under the Standard Contract.**

Progress Energy would not have had to activate the Harris C and D pools if DOE had complied with the Standard Contract. Under the contracts, Progress Energy was responsible for finding short-term storage solutions up to the point of DOE beginning its performance, after which time the utilities were to be freed from the burden and expense of creating new storage facilities. Activation of the Harris C and D pools would not have been required if DOE had commenced performance in 1998 that complied with the essence of the *quid pro quo* embodied by the NWPA and the Standard Contracts, that is, in exchange for payment of hundreds of millions of dollars, DOE would provide reasonable performance that would eliminate the need for additional utility expenditures for spent fuel storage after 1998. At trial, Progress Energy will demonstrate that the C and D pools would not have been activated if DOE had commenced performance in 1998 and performed at one hypothetical DOE pick-up rate that largely satisfies this standard, namely 3000 MTU/year from the industry at large. At that assumed rate, the government will <u>not</u> dispute that activation of the Harris C and D pools would have been unnecessary.[20]

---

[20] To ensure that an injured party does not receive damages better than his bargain, "any cost or other loss that he

The government, however, disputes its pick-up rate obligations and contends that had DOE complied with its legal duties under the contract, Progress Energy would in fact have activated the Harris C & D pool. And, thus, the government argues that Progress Energy's costs to activate the Harris C & D pools, approximately $32 million, should be offset by approximately $23 million for costs avoided.[21]

At the heart of this issue, of course, is the question of the rate that DOE was obligated to pick up spent fuel in order to satisfy its part of the bargain. Notwithstanding the government's assertions to the contrary, DOE's obligation under the Standard Contract can be determined with reasonable certainty from contemporaneous documents and statements. Nonetheless, even if the acceptance rate required under the Standard Contract is difficult to determine, that, of course, does not bar Progress Energy's recovery. As this Court has made clear, "[d]ifficulty of ascertainment . . . does [not] exonerate the defendant that his misconduct, which has made necessary the inquiry into the question of harm, render that inquiry difficult." *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960).

**1. The Court must supply a reasonable acceptance rate term.**

Although the Standard Contract embodies a clear exchange of obligations, it does not specify on its face a precise amount of SNF that DOE was obligated to begin accepting in 1998.

---

has avoided by not having to perform" must be subtracted from his damages. Restatement (Second) of Contracts § 347 (1981). As described in the Statement of the Facts section above, DOE's delay resulted in Progress Energy avoiding the cost of reracking the Harris B pool, which would have been necessary to maintain full core reserve up to the point in time where the responsibility of creating new storage facilities for spent fuel shifted to DOE and to avoid the much larger expense of activating the C and D pool. Progress Energy therefore has deducted a reasonable estimate for those avoided costs from its damage claim.

21 Included in the government's offset is a sum of $2,524,326 ($227,520 and $2,296,806) for seven additional racks the government argues would be required in its but-for world. This portion of the argued offset simply does not make sense. Had DOE performed at the 900 MTU rate the government argues to be appropriate, Progress Energy admits it would have needed to activate the Harris C & D pools. Progress Energy, therefore, would not have incurred any costs in the government's but-for world to avoid the need to activate the C & D pools. Moreover, in the actual world Progress Energy activated the pool so it could store all the fuel being discharged. It is counterintuitive for the government to argue that Progress Energy, after activating the pool in the government's but-for world, would need seven "additional" racks to store, in effect, fewer assemblies than it did in the real world.

Nor does the Standard Contract define the rate at which DOE is obliged to accept SNF over the course of the Contract. In this circumstance, where parties to a contract fail to specify a term that is essential to a determination of their respective legal obligations, the omitted contract term is supplied by the court. *See Howell v. United States*, 51 Fed. Cl. 516, 523 (2002) (supplying a minimum reasonable order amount where government's minimum order obligation under a contract was not stated). As the Restatement (Second) of Contracts explains:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

Restatement (Second) of Contracts § 204 (1981).

In determining what constitutes a "reasonable" acceptance rate, the Court must examine both the provisions of the Standard Contract and evidence of the parties' contemporaneous intent. *See Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct. Cl. 1971). The Court should endeavor to give effect to the "principal purpose of the parties" when they entered into the contract. *Alvin Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1565 (Fed. Cir. 1987) (citations omitted). Moreover, in determining what the parties' understanding and intent at the time of contracting, the Court must consider the available evidence in light of "community standards of fairness and policy" in order to determine "what is <u>reasonable</u> in the circumstances." *Restatement* § 204, cmt. d, e (emphasis supplied). *See also Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir. 1982) ("Determination of what is a reasonable time requires an inquiry into the circumstances surrounding the formation of the contract, its purpose, community standards of fairness, and public policy."). Thus, considerations of reasonableness should guide the Court's resolution of any ambiguity and selection of the term to be supplied. *See David Nassif Assocs. v. United States*, 557 F.2d 249, 262-63 (Ct. Cl. 1977). *See also Bank of New York v. Southwire Co.*, 470 F.3d 264, 272 (6th Cir.

2006) (applying § 204 and giving "preference to the party burdened with additional risk" as a result of post-contract developments).

In light of the overwhelming evidence, the only reasonable conclusion to be drawn is that the parties understood the Contract to require DOE not only begin accepting SNF starting no later than January 31, 1998, but also to continue to do so at a rate that, at a minimum, was sufficient to: (1) prevent commercial nuclear utilities from needing to create additional at-reactor storage of SNF and (2) to promptly ramp up collection to a steady-state rate that was sufficient to eliminate the growing backlog of SNF accumulating at nuclear plants around the country. At a minimum then, the Court must assume an acceptance rate term that is sufficient to meet these fundamental obligations. Even if the Standard Contract does not impose on DOE a precise acceptance rate obligation, it most certainly imposes an obligation to accept SNF at a rate sufficient to meet these two fundamental objectives.

The reasonableness of such a minimum acceptance rate obligation is supported by the express terms of the NWPA, the substantial financial payments contractually undertaken by the nuclear utilities, and the contemporaneous evidence of the contracting parties' intent. When considered together, the cumulative weight of the evidence leaves no serious doubt that the DOE was obligated to accept SNF at such a rate. Indeed, this Court on a number of occasions has previously reached this conclusion, most recently and emphatically in *Southern Nuclear*, 77 Fed. Cl. at 396. *See also Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99-100 (2003) (Judge Hodges) ("The parties understood that utilities were not to store additional waste on site after 1998. This was Congress' purpose in passing the Nuclear Waste Policy Act, and it was the parties' intent in signing the Standard Contract."); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 667 (2003) (Judge Hewitt) ("[T]he intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage."); *Yankee Atomic*, 73

Fed. Cl. at 267 (Judge Merow) ("[T]he intent not only of the NWPA, but of the parties (including the government) at the time of contracting was to avoid the tremendous costs of additional on-site storage.").[22]

**2. The fundamental objectives of the NWPA support imposition of an acceptance rate sufficient to prevent utilities from bearing additional at-reactor storage costs for SNF after January 31, 1998.**

Because the Standard Contract "implements a statutory enactment," the Court must take care to give meaning and effect to the fundamental objectives underlying the NWPA. *Roedler v. DOE*, 255 F.3d 1347, 1352 (Fed. Cir. 2001). Thus, in determining what constitutes a reasonable acceptance rate obligation, the Court must "inquire into the governing statute *and its purpose*" in determining what the parties intended at the time of contracting. *Id.* (emphasis added).

All available evidence demonstrates that, in order to fulfill the objectives of the NWPA, DOE would be required to accept and dispose of SNF at a rate that is sufficient to (1) prevent utilities from bearing additional at-reactor storage costs for SNF after January 31, 1998, and (2) reduce the backlog of SNF accumulated at nuclear reactors around the country. An acceptance rate that fails to fulfill these objectives is inconsistent with both the express terms and primary goals of the NWPA.

Under the NWPA, the Federal government assumed the responsibility for the permanent storage and disposal of SNF beginning January 31, 1998. *See* NWPA, 42 U.S.C. § 10131(a)(4), (b)(2). In exchange, Congress imposed on nuclear utilities the obligation to pay for the costs of the government's spent fuel disposal program. *Id.* at § 10131(a)(4), (b)(4). Critically, Congress chose not to implement the NWPA by exercising its regulatory and taxing powers, but rather required that its provisions be implemented by contract. *Id.* at § 10222(a)(5). Congress's

[22] *But see, contra, Pacific Gas & Electric Company v. United States,* 73 Fed. Cl. 333 (2006) ("*PG&E*"). *PG&E* is the only case to so hold, and the matter is currently on appeal. Progress Energy respectfully disagrees with the result reached by the trial court, albeit on the different record then before it, in *PG&E*, for reasons that include those described in the text.

decision to require the DOE to enter into contracts with the utilities evinces a clear intent to impose binding contractual obligation on DOE because government contracts are enforced under traditional rules of commercial reasonableness and a governmental breach results in liability for damages. *Compare United States v. Winstar Corp.*, 518 U.S. 839, 866 (1996) *with* Administrative Procedure Act, 5 U.S.C. § 706(1) (limited scope of review for agency action).

By its very terms then, the NWPA fundamentally implemented a *quid pro quo* exchange of obligations in which the federal government assumes responsibility for spent fuel storage and disposition costs beginning no later than January 31, 1998. That "day certain" thus delineates a point of demarcation on which federal responsibility for SNF disposal begins and, concurrently, the utilities' disposal responsibility ceases.

The terms of the NWPA also make clear that the government took it upon itself to assume the responsibility for disposing of commercial SNF because "a national problem has been created by the accumulation of spent nuclear fuel from nuclear reactors[.]" NWPA, 42 U.S.C. § 10131(a)(2). Because of this growing national problem, Congress found it appropriate to "establish the Federal responsibility" for the permanent disposition of SNF in order to "ensure that such waste and spent fuel do not adversely affect the public health and safety and the environment for this or future generations." *Id.* at § 10131(a)(7). Consequently, although the NWPA did not establish a specific numeric rate at which the government was required to accept and dispose of SNF, it is evident that the government intended the NWPA to impose upon the DOE the obligation to accept SNF from utilities at rate sufficient to alleviate the "national problem" caused by the growing backlog of SNF accumulating at nuclear plants around the country. *See* DOE Report on The Need for and Feasibility of Monitored Retrievable Storage – A Preliminary Analysis at iv (Apr. 1985) ("The primary goal of the Federal waste-management system is to dispose of commercially generated spent fuel and high-level radioactive waste in a

manner that protects the health and safety of the public and maintains the quality of the environment. . . . The DOE is fully committed to meeting these responsibilities and furthermore recognizes an obligation to the electric utilities and their rate payers to establish a firm schedule for accepting spent fuel for disposal."). Thus, in enacting the NWPA, the government intended to assume the responsibility not only to accept and dispose of SNF, but also to do so at a rate that fulfilled these underlying objectives and to bind DOE to that commitment.

It is for precisely this reason that the NWPA expressly declares that the DOE "shall take title to the high-level radioactive waste or spent nuclear fuel involved *as expeditiously as practicable* upon the request of the generator or owner of such waste or spent fuel." (emphasis added). NWPA, 42 U.S.C. § 10222(a)(5)(A). To effectuate and fulfill this obligation, the NWPA imposed provisions establishing numerous interim deadlines designed to ensure that the government fulfill its contractual commitments as expeditiously as possible. *See, e.g.*, *id.* at §§ 10132(a), 10134 (imposing deadlines for selection and approval of repository sites and circumscribing delays). As the D.C. Circuit has recognized, such provisions "evince a strong congressional intent that DOE's various obligations be performed in a timely manner." *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) ("*Indiana Michigan I*").

### 3. The Standard Contract's *quid pro quo* exchange of obligations support imposition of an acceptance rate sufficient to prevent utilities from bearing additional storage costs for SNF after January 31, 1998.

The NWPA was signed into law on January 7, 1983. Because the NWPA required that contracts between DOE and utilities be signed by June 30, 1983, 42 U.S.C. § 10222(b)(2)(A), DOE determined that it did not have sufficient time to negotiate the terms of the contracts with each commercial nuclear utility individually. *See* Proposed Rule, Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, 48 Fed. Reg. 5458, 5459 (Feb. 4,

1983). Instead, DOE chose to develop a standard contract to be used with all utilities through notice and comment rulemaking. *Id.* Although DOE submitted its draft of the Standard Contract for public comment, DOE provided for very little opportunity for input from utilities. In fact, DOE generally refused to include terms in the contract that were not otherwise set out as requirements in the NWPA. *See* Final Rule, Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, 48 Fed. Reg. 16,590, 16,590-98 (Apr. 18, 1983). As a result, although several utilities and industry groups requested that the Standard Contract confirm DOE's obligations through identification or express acknowledgment of an acceptance rate or term, DOE did not include such a term in the final Standard Contract.

Nonetheless, the Restatement recognizes that an essential missing term still must be supplied by the Court where the parties omitted the term "because discussion of it might be unpleasant or might produce delay or impasse." Restatement (Second) of Contracts § 204 cmt. b. In addition, given that the NWPA prohibited the Nuclear Regulatory Commission from issuing licenses to any operator who had not "entered into a contract with the Secretary" or who was not "actively and in good faith negotiating with the Secretary for a contract," 42 U.S.C. § 10222(b)(1)(A), the utilities were not afforded the same opportunities to object to the omission of an acceptance rate term that they would have had in a private contractual negotiation process. *See* Letter from Robert Morgan, Director, NWPA Project Office, to John J. Kearney, Senior Vice President, Edison Electric Institute, at 1 (June 17, 1983) ("Recognizing the stringent time constraints the Act has imposed on the Department, we clearly cannot reexamine any issue of concern to the utilities prior to the June 30, 1983, deadline."). Indeed, the Federal Circuit has recognized that the NWPA "effectively made entry into such contracts mandatory for the utilities[.]" *Maine Yankee*, 225 F.3d at 1337.

Despite this abbreviated—and imbalanced—drafting process, there is no contemporaneous evidence that the parties intended or understood the Contract to permit the government to dispose of SNF at a rate that would not fulfill the dual goals underlying the NWPA. And there certainly is nothing to support the notion that the parties intended to leave the rate to DOE's discretion. To the contrary, the parties understood and intended the Contract to impose an acceptance rate that would, at the very least, fulfill the purposes of the NWPA, which, as noted above, certainly imposed on DOE a minimum acceptance rate obligation.

Indeed, the terms of the Contract demonstrate that the parties intended to effectuate the underlying purpose of the NWPA. In particular, the contractual fee provisions of the Standard Contract unequivocally evince that the parties understood that the Contract imposed substantial and definite acceptance obligations on the federal government. Although DOE did not include an express acceptance rate provision in the Standard Contract, DOE did reaffirm that the NWPA mandate that it was "obligated to provide [permanent SNF] disposal services." Contract at 1. As demonstrated below, this provision reflected the fact that regulators were well aware that utilities faced a future shortage of storage capability, and DOE planning documents cited avoiding a storage shortfall as a primary program goal.

In order to secure this commitment, Plaintiffs and other nuclear utilities committed to paying "all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel." *Id.* This was accomplished by imposition of a one-time fee for SNF already discharged as of the time of contract formation in 1983, and additional fees of 1.0 mill per kilowatt hour of electricity generated and sold thereafter. *Id.* at Art. VIII.A.1. These payments fulfilled the utilities' total obligations to DOE. *Id.* at Art. VIII.D.

In light of this clear exchange of obligations, it is critical for the Court to accord great weight to the exchange of obligations that the utilities secured by committing to such

extraordinary contractual fee obligations. Overall, the commercial nuclear utilities have paid a combined estimated $14.954 billion into the Nuclear Waste Fund through December 31, 2006,[23] and are obliged to continue to contribute billions more over the life of the program. For their part, CP&L and FPC paid approximately $119.8 million in one-time fees, and have paid a total of $719.1 million into the Fund thus far.

In effect, the Court's acceptance rate inquiry must determine what constitutes a reasonable obligation to impose on the government as a *quid pro quo* exchange for the *billions* of dollars in fees paid by utilities thus far under the Contract. Absent a minimum acceptance rate, the industry's contractual bargain would be meaningless. The staggering amount that Progress Energy and other utilities agreed to pay, and in fact have paid, to DOE is reasonable only because the government repeatedly reassured the utilities that it intended to assume responsibility for permanent storage and disposal of SNF beginning on January 31, 1998.

Thus, the only way to give any meaning at all to the *quid pro quo* exchange of obligations embodied in the Standard Contract is for the Court to supply an acceptance rate that obligates DOE to accept SNF at a rate such that reflects the payments made thus far by Progress Energy and other utilities. Only an acceptance rate that, at a minimum, prevents utilities from being required to incur *additional* costs for at-reactor storage after January 31, 1998 would fulfill that exhange of obligations. Any lower acceptance rate would be completely out of line with the parties' intent and would render the utilities' payments under the Contract meaningless and thus deprive them of their reasonable expectations under the Contract. The utilities clearly did not intend to pay for storage of spent fuel under the Standard Contract and then pay again for at-reactor facilities.

[23] Estimated payments to the Nuclear Waste Fund are available at http://www.nei.org/filefolder/u.s._state_by_state_used_fuel_and_payments_to_nwf.xls.

**4. Contemporaneous evidence manifests DOE's intent to collect SNF beginning in 1998 at a rate sufficient to prevent additional at-reactor storage costs for utilities and to reduce the accumulated backlog of SNF.**

In supplying a reasonable acceptance rate under the Standard Contract, the Court also must interpret the parties' contractual obligations "in accordance with the parties' understanding as shown by their conduct before the controversy." *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed. Cir. 1983). Indeed, the Court's function is to effectuate the "original intention[s]" and "principal purpose of the parties" at the time of contract formation. *Alvin Ltd.*, 816 F.2d at 1565 (citations omitted). To determine the intent of the parties, the court may look to "all of the relevant circumstances surrounding the transaction," including the "conduct of the parties before the advent of the controversy, oral statements, writings, the recitals to a contract, prior negotiations, and other conduct by which the parties manifested their assent." *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 76 (1996), *aff'd mem.*, 108 F.3d 1393 (Fed. Cir. 1997).

The overwhelming weight of contemporaneous evidence reflects that the parties understood and intended that the government would accept SNF at a rate such that no utility would have to create additional SNF storage capacity after January 31, 1998. For example, the September 15, 1983 Draft Mission Plan summarized DOE's prior planning meetings and decisions, explaining that DOE planned to implement the program with an acceptance rate "such that no utility would have to build additional storage facilities after 1998." The December 20, 1983 Draft Mission Plan also stated that DOE intended to implement the spent fuel disposal program with an "acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge of spent fuel each year." Excerpts from Draft Civilian Radioactive Waste Management Program Mission Plan, Volume I, Overview and

Current Program Plans, at 2-1 (Dec. 20, 1983) ("1983 Draft Mission Plan"). In developing the 1983 Draft Mission Plan, Richard H. Williamson, from the NWPA Project Office, issued a "Mission Plan Strategy" memorandum describing the "central criteria" for DOE's waste acceptance schedule as:

> [1] an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998[; and]
> [2] an acceptance rate after the first 5 years equivalent to the actual rate of utility discharge of spent fuel each year.

Mission Plan Strategy, at 1 (Sept. 15, 1983). And Michael T. Lawrence, then-Acting Director of the OCRWM, in his February 22, 1984 Statement to the House Subcommittee on Energy Conservation and Power, declared that the waste acceptance schedule set forth in the Draft Mission Plan was intended to fulfill the objective of the NWPA because it would "initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998[.]" Statement at 2.

These statements of DOE's understanding of its obligations under the Standard Contract and the NWPA are particularly significant considering that DOE developed the Mission Plan to fulfill its statutory obligation to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program." NWPA, 42 U.S.C. § 10221(a). As such, the 1983 Draft Mission Plan is a document that should provide authoritative, if not dispositive, evidence of the government's contemporaneous understanding of its obligations under the NWPA and the Standard Contract. *See, e.g.*, Deposition of Alan Brownstein, 414:3-12 (April 10, 2002) (affirming that "the DOE made an effort in the mission plans to be as accurate and informative as possible").[24] It thus is particularly significant that this critical program

[24] For efficiency, Progress Energy intends to move, under the Rules, for admission of a limited number of prior sworn statements by DOE officials, on grounds including (but perhaps not limited to) the fact that such statements are admissions by a party opponent, under Fed. R. Evid. 801(d)(2). Progress Energy thereby expects to greatly reduce the number of current and former DOE personnel that will be required to testify on these matters. Although the potential record is daunting (covering thousands of pages of testimony and

document unequivocally evinces that DOE intended to develop and implement a SNF disposal acceptance schedule at a rate at least sufficient to enable commercial nuclear utilities to avoid additional at-reactor storage costs.

DOE officials throughout this period repeatedly confirmed that the government intended to administer the spent fuel program at a rate sufficient to fulfill these two fundamental objectives. For instance, Robert Morgan, then Acting Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), expressly and unequivocally confirmed this understanding of DOE's obligations at an OCRWM informational meeting held in December of 1983, where he stated that:

> I think that most of you know that the Act requires that we receive waste from the utilities by January 1, 1998. Technically, the Act does not specify how much waste or spent fuel we must be receiving at that time. In fact, if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act. However, *we did not believe that meets the intent of the Act.* The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, *we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.*

Excerpts from Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting: Program Overview, at 1 (Dec. 12-15, 1983) (emphasis added).[25]

Echoing this same understanding, Michael J. Lawrence, then Acting Director of OCRWM, testified in February of 1984 before the House Subcommittee on Energy Conservation and Power that achieving the "fundamental objective[s]" of the NWPA required "an appropriate waste acceptance schedule" that would "initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998." Statement of Michael J. Lawrence before the

---

hundreds of thousands of pages of documents), Progress Energy anticipates that the prior testimony designations will be of a reasonable scope.

25 Robert Morgan has since confirmed that this statement reflected the DOE's "strategy . . . to preclude the need for additional at reactor storage after January 31, 1998 . . . [and] ultimately to remove from at-reactor storage all waste more than five years old." Deposition of Robert L. Morgan, 113:13-22 (November 15, 2006).

Subcommittee on Energy Conservation and Power, House Committee on Energy and Commerce, at 3 (Feb. 22, 1984). *See also* Letter from Michael J. Lawrence, Manager, DOE's Richland Operations Office, to Ben C. Rusche, Director, OCRWM, enclosure 1 at 1 (July 23, 1984) ("Based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.").

The government also assured the nation's utilities that DOE in fact intended to administer the spent fuel disposal program in a manner consistent with these fundamental objectives. In 1987, in response to concern about the possibility of DOE's asserting a "one spent fuel element" interpretation, Christopher Jedrey, DOE's Contracting Officer, assured the Utility Nuclear Waste Management Group ("UNWMG") that DOE's interpretation of the Contract and its responsibilities thereunder did not include any such view:

> [W]ith respect to your concern that DOE could, in theory, meet its contractual obligation to begin the waste acceptance process by accepting a single assembly in 1998 and no more until decades later, I can assure you that the Department intends to honor *both the letter and the spirit of the NWPA and the Contract*, rather than seek opportunities to circumvent its obligations.

Letter from Christopher T. Jedrey, Contracting Officer, DOE's Office of Procurement Operations, to S. P. Kraft, Director, UNWMG, at 2 (Oct. 2, 1987).

Taken together, the numerous DOE program documents and repeated statements from DOE officials unambiguously demonstrate that DOE understood the NWPA to require and intended the Standard Contract to implement an acceptance rate sufficient to: (1) avoid the need for the nation's nuclear utilities to develop additional SNF storage at nuclear plant sites after 1998; and (2) reduce the backlog of SNF accumulating at nuclear plants around the country. *See* Deposition of Billy M. Cole, 131:23—132:1; 175:17-23 (March 12, 2002) ("[T]he whole

purpose of the Nuclear Waste Policy Act was to keep the utilities from having to add new storage so they could keep operating. . . . Not only did they want to help utilities so they wouldn't have to add additional capacity, they wanted to make sure that you had to work off the backlog."). Indeed, in light of the NWPA's terms and purposes, the bargain agreed to in the Standard Contract, and the parties' intent at the time of contract formation, the only acceptance rate that is reasonable under the circumstances is one that is sufficient to achieve these two goals. The government's assertions to the contrary are fundamentally inconsistent with the overwhelming weight of evidence. Accordingly, this Court should interpret the Standard Contract to include a reasonable acceptance rate consistent with these fundamental objectives.

**5. Progress Energy understood that DOE was obligated to collect SNF beginning in 1998 at a rate sufficient to prevent additional at-reactor storage costs after that date.**

The managers for CP&L who were present at the time of the Standard Contract, and who reviewed and approved execution of the contract by CP&L, will testify that their understandings were consistent with DOE being obligated to accept spent nuclear fuel in a manner so as to prevent further expenditures for at-reactor storage after January 31, 1998. In particular, Louis Martin, manager of nuclear fuel during the 1983 period, will testify that DOE represented that under the Standard Contract it would pick-up fuel on a schedule that would preclude utilities, including CP&L, from having to provide additional at-reactor storage capacity after January 31, 1998. Picking up less than this, according to Mr. Martin, would not satisfy the objective of the contract and would mean that effectively utilities would pay twice for the services they were paying for under the Standard Contract. Mr. Martin will therefore confirm the company's understanding that the essential contractual *quid pro quo* involved CP&L receiving, in exchange for its substantial payments to DOE, performance sufficient to prevent further expenditures on storage after 1998.

Similarly, Robert Kunita, the long-time manager of spent nuclear fuel at CP&L and a former employee with spent fuel responsibilities since the late 1970's, will confirm his understanding that the DOE Standard Contract embodied an obligation to accept "batch-wise quantities" of fuel from CP&L; that is, acceptance of quantities of fuel at least equal to the "batches" of fuel being discharged during normal operations of the CP&L plants. Indeed, Mr. Kunita's involvement in the industry goes back to the days when the federal government contemplated discharging its obligations to safely dispose of spent nuclear fuel through reprocessing, the suspension of which ultimately led to the NWPA.[26]

**6. A 3,000 MTU steady-state acceptance rate achieves these two fundamental objectives and effectuates the parties' understanding and intentions under the standard contract.**

The government's anticipated contention that DOE was obliged to accept SNF at a rate of 900 MTU per year is contradicted by all the available contemporaneous evidence. The 900 MTU rate is unreasonable in light of the parties' intent to eliminate the need to construct additional on-site storage facilities for SNF after January 31, 1998 because it is evident that such a low rate could not accomplish this purpose.

Early program documents not only confirmed the 1998 date for commencement of performance at a repository, but reveal that DOE planned a robust rate of acceptance, almost uniformly achieving a 3,000 MTU steady-state rate. From the very outset of the program, DOE understood that commercial nuclear utilities would be discharging in excess of 2,000 MTU of spent fuel per year in and after 1998. *See* 1983 Draft Mission Plan at 2-3; Deposition of Lake Barrett, 1331:12-17 (May 10, 2002). Thus, it was understood by all parties that an acceptance rate at least above the 2,000 MTU threshold was necessary to effectuate the NWPA's objectives,

---

[26] *E.g., Florida Power & Light v. Westinghouse Elec. Corp.*, 826 F.2d 239, 244 (1987). Indeed, from the beginning and even prior to the NWPA, it has been a given that the federal government has the responsibility for eventual disposal of high level radioactive waste and spent fuel. S. Rep. No. 95-548 (1980), *reprinted in* 1980 USCCAN 6933, 6934 ("The stated policy of the federal government has always been that the safe disposal of high-level waste is to be accomplished under federal management.").

including avoiding additional at-reactor storage costs and working off the spent fuel backlog existing at that time would require. Clearly, if the commercial nuclear industry is generating 2,000 metric tons of SNF each year, the government's "900-ton rate would cause the Department of Energy to fall farther behind each year." *Indiana Michigan*, 57 Fed. Cl. at 99.

Notwithstanding the government's insistence to contrary, the overwhelming weight of evidence reveals that an acceptance rate from commercial nuclear utilities of approximately 3,000 MTU per year after a short ramp-up period starting in 1998 was understood as necessary to achieve the indisputable objectives of the NWPA, and thus is a reasonable acceptance rate that implements the parties' intent. As an OCRWM official specifically concluded in commenting on the 1984 Draft Mission Plan, in order "to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU . . . ." Letter from Michael J. Lawrence, Manager, DOE's Richland Operations Office, to Ben C. Rusche, Director, OCRWM, at 1 (July 23, 1984). Nor is there any support for the notion that the 3,000 MTU steady-state rate was simply a conceptual design rate that remained subject to later amendment. *See* Deposition of Billy M. Cole, 44:1-7 (June 4, 2002) (rejecting the idea that "the actual rate of acceptance [set forth in the 1987 ACR] was still at the conceptual design stage and subject to much uncertainty").

The evidence confirming this conclusion is overwhelming. Indeed, a 3,000 MTU steady-state acceptance rate is consistently identified as the necessary acceptance rate in a wide variety of DOE documents that span the life of the program:

- DOE's July 1983 report on the adequacy of fees under the Standard Contract assumed the repository would open in 1998 with "a design receipt rate of 3,000 metric tons (MT) a year, although a receiving rate of 1,800 MT annually is assumed for the first five years." Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste by U.S. Department of Energy at 8 (July 1983). Critically, DOE deemed the utilities' contract fee of 1 mill/kwhr sufficient to cover the entire cost of disposing of 3,000 MTU per year. *Id.* at 2.

- At the December 1983 Civilian Radioactive Waste Management Information Meeting, Robert Morgan, Interim Director of DOE's Spent Nuclear Fuel Program, stated that "beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location." Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting: Program Overview at 11 (Dec. 12-15, 1983).

- In his testimony in February of 1984 before the House Subcommittee on Energy Conservation and Power, Michael J. Lawrence, then Acting Director of OCRWM, explained that "to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU." Statement of Michael J. Lawrence before the Subcommittee on Energy Conservation and Power, House Committee on Energy and Commerce (Feb. 22, 1984).

- The waste acceptance schedule set forth in the 1984 Draft Mission Plan showed DOE accepting 3,000 MTU of SNF per year after a five year ramp-up period. *See* Draft Mission Plan for the Civilian Radioactive Waste Management Program at 2-2 (Apr. 1984).

- The final draft of DOE's Preliminary Analysis of the Total System Life Cycle Cost ("TSLCC") of the SNF disposal program assumed a "design receipt rate" of "1800 MTU per year for the first five years of operation, and 3000 MTU per year thereafter." Excerpts from Final Draft of Preliminary Analysis of the Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program at 2-3 (Apr. 27, 1984).

- Confirming its 1983 conclusion, the DOE's fee adequacy report for 1984 again found the utilities' contract fee of 1 mill/kwhr sufficient to cover a receipt rate of "1,800 MTU/yearly for the first five years, and then 3,000 MTU/yearly thereafter." *See* Nuclear Waste Fund Fee Adequacy: An Assessment at 3 (July 1984).

- In its 1985 fee adequacy report, the DOE's fee adequacy analyses again assumed a 3,000 MTU steady-state rate after a five year ramp-up period. *See* Nuclear Waste Fund Fee Adequacy: An Assessment at 3 (Feb. 1985). This consistent use of the 3,000 MTU steady-state rate as the basis for calculating the adequacy of the utilities' contractual fee evinces that the heart of the contractual bargain between DOE and the utilities is that DOE would operate the spent fuel disposal program at a 3,000 ton rate.

- DOE's 1985 analysis of the TSLCC also indicates that one of the "Key Assumptions for the Reference Case" is a repository design receipt rate of 3,000 MTU after a five year ramp-up period. *See* Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program at 2-3 (Apr. 1985).

- OCRWM's Final 1985 Mission Plan also indicates that DOE intended to accept "3000 MTU" of SNF per year by the sixth year after DOE began accepting SNF. *See* Mission Plan for the Civilian Radioactive Waste Management Program, Volume I at 26 (June 1985).

- As with each of the previous analyses, DOE's 1986 fee adequacy report again assumed a 3,000 MTU steady-state rate after a five year ramp-up period. *See* Nuclear Waste Fund Fee Adequacy: An Assessment at 4 (Mar. 1985).

- DOE's 1986 TSLCC report, like all previous TSLCC reports, assumed that the repository would receive spent fuel at an annual rate of 3,000 MTU starting five years after DOE began accepting waste in 1998. *See* Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program, Volume I: The Analysis and Its Results at 11 (Apr. 1986).

- Even in DOE's 1987 proposal to Congress to construct and operate a facility for the monitored retrievable storage ("MRS") of SNF, DOE committed to accept spent fuel "at a rate of 2500 to 3000 MTU per year" after a brief ramp-up period. *See* Monitored Retrievable Storage Submission to Congress, Volume I: The Proposal at 20 (Mar. 1987).

- DOE first acknowledged that it likely would be unable to begin acceptance of spent nuclear fuel in 1998 as required under the NWPA in its 1987 Mission Plan Amendment. *See* OCRWM Mission Plan Amendment at 6 (June 1987). Nonetheless, in that document, DOE still indicated that it intended to operate the spent fuel disposal program at a 3,000 MTU steady-state acceptance rate once the program became fully operational. *Id.* at 61-62 (planning the spent fuel acceptance rate for the total system after a five year ramp-up period to be 3,000 MTU per year, with the repository receiving 350 MTU directly from nearby reactors and 2,650 MTU from the MRS facility).

- Consistent with the 1987 Mission Plan Amendment, DOE's 1987 Annual Capacity Report ("ACR") established a system receipt rate of 2,650 MTU after a six year ramp-up period. *See* 1987 Annual Capacity Report at 7 (June 1987).

- In its 1988 Draft Mission Plan Amendment, DOE again projected a steady-state repository receipt rate of 3,000 MTU by the sixth year after DOE began accepting SNF. *See* Draft 1988 Mission Plan Amendment at 19 (June 1988).

- Consistent with the 1988 Draft Mission Plan projection, DOE's 1988 ACR also projected an acceptance rate of 3,000 MTU by the sixth year after DOE began accepting SNF. *See* 1988 Annual Capacity Report at 5 (June 1988).

- In a November 1990 response to comments document, DOE considered the possibility that a repository may not be operational in 1998, stating that an MRS facility would provide DOE with a provisional means of fulfilling its contractual obligations because the MRS facility "is expected to preclude the need for additional at-reactor storage space for spent fuel storage [sic] between 1998 and 2010 and beyond." Comment Response Document for The Secretary of Energy's

Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program at 14 (Nov. 1990).

- In a 1990 addendum to its 1989 TSLCC analysis, DOE, although projecting significant delays in the beginning of the disposal program, nonetheless projected a 3,000 MTU steady-state acceptance rate after a five year ramp-up period. *See* Preliminary Estimates of the Total-System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total-System Life Cycle Cost for the Civilian Radioactive Waste Management Program at A-1 (Dec. 1990).

- Likewise, DOE's 1990 ACR projected and "upper bounding case" waste acceptance schedule that ramped up after five years to a steady-state rate of 3,000 MTU. *See* 1990 Annual Capacity Report at 7 (Dec. 1990).

- In its 1995 TSLCC assumptions package, DOE detailed the major assumptions underlying its assessment of the total cost of the SNF disposal program. *See* Memorandum from Ronald A. Milner, Department of Energy, to Director, OCRWM at 1 (Feb. 16, 1995). One of the assumptions that DOE relied on to calculate costs over the life of the program was that DOE would accept SNF at a 3,000 MTU steady-state rate after a four year ramp-up period. *See* 1995 TSLCC Assumptions Package at 14-15, 22-23 (Feb. 1995).

- DOE's 1995 TSLCC analysis confirms that DOE relied on the 3,000 MTUsteady-state acceptance rate to calculate program costs. *See* Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program at 8 (Sept. 1995).

- In determining the viability of the Yucca Mountain site, DOE relied on an annual receipt rate of 3,000 MTU to determine whether the repository could safely be built at the site. *See* Viability Assessment of a Repository at Yucca Mountain, Volume 2: Preliminary Design Concept for the Repository and Waste Package at 3-2 (Dec. 1998).

- As in previous TSLCC analyses, DOE's 1998 TSLCC Report once again relied on a 3,000 MTU steady-state acceptance rate to calculate the costs of the spent fuel disposal program. *See* Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program at 15 (Dec. 1998).

- Likewise, in its 2001 TSLCC Report, DOE also projected costs based on a 3,000 MTU steady-state rate over the life of the program after an initial five year ramp-up period. *See* Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program at 4-14 (May 2001).

- Recently, in detailing the necessary requirements for a permanent repository for commercial SNF, DOE once again relied on a projected 3,000 MTU steady-state acceptance rate. *See* Civilian Radioactive Waste Management System, Waste Acceptance System Requirements Document, Revision 4, at 46 (Jan. 2002).

- DOE's 2004 APR/ACR also indicated an acceptance rate of 3,000 MTU by the fifth year after DOE began accepting SNF. *See* Acceptance Priority Ranking & Annual Capacity Report at 2 (July 2004).

Clearly, DOE program documents that span the life of the program consistently identify a 3,000 MTU steady-state acceptance rate as the necessary acceptance rate.

Testimony by current and former DOE officials also confirms that the government understood a 3,000 MTU rate to be necessary to achieve the goals of the NWPA, and thus a reasonable obligation under the Contract:

- "My recollection is that the [Repository] was to receive 3,000 tons a year . . . which was in excess of the generation rate of around 2,000." Deposition of Lake Barrett, 52:7-10 (April 22, 2002).

- "Q: So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct? . . . A: Yes." Deposition of Lake Barrett, 59:4-11 (April 22, 2002).

- "Q: Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct? . . . A: That has been our goal to do that. Q: And it continues to be your goal today, correct? A: Correct." Deposition of Lake Barrett, 118:16—119:4 (April 22, 2002).

- "The receipt rate [should be] a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take rate [should be] exceeding the generation rate in the nation." Deposition of Lake Barrett, 1164:19—1165:1 (May 10, 2002).

- "Q: All right, but the DOE goal or objective was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance of spent nuclear fuel, is that correct? A: That was a goal." Deposition of Alan Brownstein, 412:16-21 (April 10, 2002).

- "[The] basic purpose of the Nuclear Waste Policy Act was to try to help keep the utilities from having to run out of storage space, so the utilities are in there for generating electricity and not storing fuel. You know, the government had a responsibility to help them because they, like I said, they stopped reprocessing. This is a basic strategy, and a part of the primary mission was to keep them from having to add more storage. That was one of the major goals of the program." Deposition of Billy M. Cole, 81:1-13 (March 12, 2002).

- "[W]e wanted to accept fuel at a rate that would allow the utilities not to require additional at-reactor fuel storage. That means you don't have to consolidate,

rerack, you don't have to go for dry storage." Deposition of Patrick McDuffie, 71:14-18 (March 18, 2002).

- The basis of the 3,000 MTU rate was "to try and keep up with spent fuel discharges and the need for alleviating the need for additional on-site dry storage at the purchaser sites." Deposition of Thomas Pollog, 12:23-25 (April 12, 2002).
- "Q: Was it your understanding that after 1998, the Department of Energy would become responsible for providing or eliminating the need for additional on-site storage? A: Yes." Deposition of Robert M. Rosselli, 140:6-10 (April 15, 2002).
- "[W]e would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time. And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage." Deposition of Victor W. Trebules, Jr., 53:12-19 (April 17, 2002).
- "As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or none." Deposition of Victor W. Trebules, Jr., 97:8-13 (April 17, 2002).

Thus, it was understood by all parties that an acceptance rate at least above the 2,000 MTU threshold was necessary to effectuate the NWPA's objectives and avoid additional at-reactor storage costs and to work off the spent fuel backlog existing at that time. As such, the only "reasonable" acceptance rate is one that, at the very least, obligates DOE to reach a steady-state rate of at least 2,000 MTU. Indeed, in light of the overwhelming weight of supporting evidence, the most reasonable rate under the circumstances actually should reach a 3,000 MTU steady-state acceptance rate.

**7. DOE's issuance of rate schedules and allocations utilizing a lower acceptance rate, and Delivery Commitment Schedules based upon those schedules, do not support the imposition of that lower rate.**

Under the Standard Contract, the DOE was required to issue an annual capacity report ("ACR") no later than July 1, 1987. Contract at Art. IV.B.5. Such documents were "for planning purposes only," and consistently recited that they were "not contractually binding" on either the government or utiltiies. The Contract also required DOE to issue an annual priority

ranking beginning April 1, 1991. *Id.* The APR assigns an acceptance priority ranking to units of SNF based on the age of the spent fuel as measured by its reactor discharge date. The ACR projects annual acceptance amounts and applies the priority rankings from the APR to allocate the annual acceptance amounts to individual utilities. As the evidence discussed above overwhelmingly reveals, during the early years of the spent fuel program, DOE routinely published acceptance rate schedules showing a 3,000 MTU steady-state acceptance rate. Starting in 1991, however, DOE, anticipating its eventual breach of its obligation to begin accepting spent fuel in 1998, began implementing a concerted, intentional strategy to reduce its liability and exposure.

To this end, DOE's 1991 and 1992 ACRs published acceptance rates that dramatically departed from the rates stated in all earlier program documents. Supposedly in response to the NWPA Amendments which limited the capacity of DOE's proposed monitored retrievable storage ("MRS") facility, DOE listed an acceptance rate that ramped up to a 900 MTU steady-state rate. *Id.* DOE repeatedly published documents listing this reduced acceptance rate over the next few years. For the Delivery Commitment Schedules ("DCSs") due under Article V.B. of the Contacts in 1992, DOE dictated that utilities use the 900 MTU/year rate allocations from its then-existing ACRs. *See generally, Vermont Yankee Nuclear Power Corporation v. United States,* 73 Fed. Cl. 236, 244 (2006) (description of DCS process). For a host of reasons, this 900 MTU acceptance rate figure, even with the ACR/DCS gloss that the government seeks to add to the argument, cannot reasonably be accepted as the limit of DOE's obligation under the NWPA and the Standard Contracts. *See generally, Southern Nuclear*, 77 Fed. Cl. at 396.

First, a 900 MTU acceptance rate simply would not meet the stated goals of the NWPA. If DOE were to accept only 900 tons of SNF each year, the spent fuel disposal program could not keep pace with the approximately 2,000 MTU of SNF and HLW generated by the nation's

nuclear utilities each year. *See* 1983 Draft Mission Plan at 2-3. Nor could the program even begin to dispose of the 50,000 metric ton backlog of SNF that has accumulated at plant sites around the country. A 900 MTU acceptance rate thus would unnecessarily stretch DOE's disposal program far into the future, entailing greater costs to both DOE and utilities alike. As such, the government's proposed 900 MTU acceptance rate amounts to a breach of DOE's acknowledged fiduciary duty to use the Nuclear Waste Trust Fund responsibly, as well as the government's responsibility to prepare a cost-effective system to minimize the cost on waste generator's for society's good.

Second, the government's minimalist interpretation of its obligations under the Contract directly conflicts with the NWPA's mandate that "the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved *as expeditiously as practicable* upon the request of the generator or owner of such waste or spent fuel." NWPA, 42 U.S.C. § 10222(a)(5)(A). (emphasis added.)

Third, the 900 MTU rate was developed specifically in response to the NWPA amendments and the limits imposed on any future MRS facility. Significantly, the 1987 Nuclear Waste Policy Amendments Act explicitly <u>prohibited</u> DOE from constructing an MRS facility until the agency received a construction license from the NRC for a permanent geologic repository—a so-called statutory "linkage" that was never amended or satisfied. DOE's position, therefore, is that its pick-up obligations are defined by an effectively illegal rate, based not upon interpretation of the contract in light of the statute pursuant to which it was promulgated, *see Roedler*, 255 F.3d at 1352, but upon *a presumed change in the law by Congress that never occurred*. The individual at the DOE directly responsible for the development of the 900 MTU rate has repeatedly acknowledged that the 900 MTU rate was developed specifically (and only)

because of these limitations.[27] Given that the 900 MTU rate reflects the limitations imposed on the MRS facility, and that the MRS program is now defunct, there is no justifiable reason to apply that rate here. *See* Deposition of Billy Cole, 22:25-26 (June 4, 2002) ("the basis for the original 4-6-9 [hundred MTU rate] is out the window").

Fourth, the Court should reject the government's proposed 900 MTU rate, whether the government "backs into" that rate through its DCS arguments or otherwise, because the government plainly is advocating that rate to limit its liability in this and other lawsuits arising out of its partial breach of the Standard Contract. To determine the intent of the parties, the court may look to "all of the relevant circumstances surrounding the transaction," including the "conduct of the parties *before the advent of the controversy*, oral statements, writings, the recitals to a contract, prior negotiations, and other conduct by which the parties manifested their assent." *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 76 (1996), *aff'd*, 108 F.3d 1393 (Fed. Cir. 1997). (emphasis added.) The 900 MTU rate thus must be rejected because it is being asserted here with the clear goal of limiting the government's liability. Indeed, DOE personnel have made clear that the government continued to assert that the 900 MTU rate defined DOE's acceptance obligations under the Contract even after the MRS program effectively was dead simply to limit the government's anticipated liability. *See, e.g.*, Deposition of David Zabransky, 243:16-20 (June 6, 2002) ("If you're asking me was it my opinion that they were trying, the department was trying to minimize its obligations by using [the 900 MTU rate in the 1995] ACR? That's still my belief. I believe they were trying to do that.").

Finally, the 900 MTU rate should be rejected because it is inconsistent with fundamental

[27] *See* Deposition of Billy M. Cole, 178:15-18; 180:19-24 (March 12, 2002) ("I developed [the 1991 ACR 900 MTU rate] personally. I mean I can't pass that one off to anybody else. . . . I had 10,000 tons [of MRS capacity] to divide up over 12 years, and it worked out pretty slick. If you do 900 tons a year for 11 years, and – I mean ten years, and you do four and six [hundred MTUs as a ramp up], voila, you've got 10,000. I didn't even need my calculator for that one."). *See also* Deposition of Thomas Pollog, 136:1-3 (April 12, 2002) ("I believe the 875 [MTU rate] was a direct result of the 10,000-MTU limit on the capacity of the MRS only.").

DOE assumptions underlying almost all program documents. *See* Deposition of Billy M. Cole, 45:33-40 (June 4, 2002) ("[The 3,000 MTU rate] was not only a rate for the utilities to plan by, it was a rate for the DOE people out in the field who were tasked with building facilities to plan by. This is what DOE is trying to promise the utilities we're going to do, so go build me a facility. You know, it worked both ways. It was planning for the whole system."). For instance, the NWPA requires DOE to review annually the adequacy of the ongoing Contract fees initially set by statute. 42 U.S.C. § 10222(a)(4). In fulfilling this obligation, DOE consistently has relied upon a 3,000 MTU steady-state acceptance rate to determine the projected total system life cycle costs against which the adequacy of the fees paid by the utilities under the Contract is measured. *See, e.g.*, Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program, Volume I: The Analysis and Its Results, at 11 (Apr. 1986); Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, at 8 (Sept. 1995); Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, at 4-14 (May 2001). The DOE utilized the 3,000 MTU steady-state rate as the basis for developing the Total System Life Cycle Cost reports because that rate reflected "a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have – you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000 based on an early 1980s [evaluation], seemed like a reasonable number to use." Deposition of Lake Barrett, 1333:8-16 (May 10, 2002). No program planning documents are based on the 900 MTU rate proposed by the government. *See, e.g.*, Deposition of Lake Barrett, 348:19-22 (April 23, 2002) ("Q: Are you aware of any TSLCC or fee adequacy study that assumed a 900 MTU per year acceptance rate on a steady state basis? A: No."). Because the 900 MTU rate is inconsistent with the basic assumptions underlying the

spent fuel program, it would be unreasonable to apply it here.

If the Court rejects the government's proposed 900 MTU rate and imposes a reasonable acceptance rate that approaches the 3,000 MTU rate, the government agrees and admits that the activation of the Harris C & D pools and transshipments to the Harris were reasonable mitigation activities. For all of the reasons described above, that is the plainly the correct result here, and the costs associated with those pool activation activities should be awarded.

### B. The Government Is Not Entitled To A Damage Reduction Due To Alleged "Losses Avoided" For Disposal Of Unused Racks And "Crud" Waste Material

The government will seek damage reductions for costs associated with disposal of certain unused pool racks and "crud" waste material from the Harris C and D pools. Even though those activities will be admitted to have been necessary for activation of the pools, the government will contend that such materials would have to be disposed of if and when the Harris site is ever decommissioned.

The Harris plant is currently licensed to operate through 2026, and Progress Energy has submitted an application to renew the Harris operating license through 2046. Prospective losses 40 years hence that were arguably avoided as a result of Progress Energy's mitigation activities should not be subtracted from Progress Energy's damages because they would have resulted from an activity (decommissioning) unrelated to Progress Energy's performance under the contract. As set forth above, a loss or cost avoided is subtracted only if the savings results from Progress Energy's not having to perform its obligations under the Standard Contract.

Even if it were appropriate to credit the government with savings resulting from activities unrelated to Progress Energy's performance under the contract, the costs of removing the spent fuel racks and crud in 2046 as part of the overall decommissioning of the plant are wholly speculative. During decommissioning these would not be isolated costs but part of a much larger

disposal and cleanup effort. It would likely be impossible to discern the added costs (if any) that these relatively small activities would add to the overall decommissioning of the plant. And, even if one could isolate the costs, they would likely be much less because of economies of scale and, with regard to the crud, the radioactivity will decay significantly as it sits in the pool. In short, the fact that 40 years from now Progress Energy would likely be forced to remove the spent fuel racks and crud as part of the overall decommissioning of the plant does not alter the bargain it struck with DOE, nor the fact that it should get the full benefit of that bargain.

### C. The Government Is Not Entitled To A Damage Reduction Due To Secondary Benefits Of The Upgraded Harris Component Cooling Water System

Progress Energy managers responsible for the actual work performed will explain at trial that, to accommodate the decay heat from pools C and D, those pools had to be connected to the Component Cooling Water ("CCW") System for Unit 1. As a result of the activation of pools C and D and the storage of the spent fuel contemplated, the system had to be upgraded. Significantly, the government's technical expert is not prepared to contradict the testimony of the responsible Progress Energy managers that the CCW system upgrades were necessary for the C and D pool activation. That will be dispositive. Nevertheless, the government technical expert apparently will opine, without having performed any calculations of his own, that the CCW system pump upgrades would have been required even if pools C and D had not been activated due to the heat load increase associated with a steam generator replacement/power uprate project performed by Progress Energy, and Progress Energy was thereby saved from having to do the upgrade for other reasons, unrelated to the storage of spent fuel. As described in Section II.C above, this argued savings from a source unrelated to Progress Energy's performance under the contract, even accepting the factual validity of the position for argument's sake, is not relevant. As noted, there will be no dispute that Progress Energy had to upgrade the CCW system in order to store spent fuel due to DOE's breach. Whether or not Progress Energy would have had to

upgrade the CCW for unrelated reasons is simply not relevant to the bargain it struck with DOE.

Even if it were appropriate to give the government an offset for unrelated losses Progress Energy might have avoided as a result of its mitigation measures, the evidence will in any event show that Progress Energy would not have upgraded the CCW solely as a result of the steam generator replacement and power uprate project. The evidence will confirm that, based on the experience of other plants conducting similar replacement-uprates, the increased heat loads from the steam generator replacement and power uprate would not have required CCW upgrades.

### D. The Government Is Not Entitled To A Damage Reduction Due To Hypothetical Costs Of Loading DOE Casks That Were Never Supplied, And Which DOE Has A Duty To Provide One Day

According to the government, if DOE had begun accepting spent fuel from the industry in 1998, Progress Energy would have incurred costs to transfer the fuel to DOE. In the real world, however, when DOE begins accepting spent fuel, Progress Energy will almost surely incur costs to transfer the fuel to DOE. Costs for loading DOE's casks, therefore, have not been avoided as a result of DOE's breach, they have only been deferred due to DOE's breach. And "[a]ny benefit inhering in TVA because of delayed loading costs would be entirely speculative." *Tennessee Valley Auth.*, 69 Fed. Cl. at 542; *see also Sacramento Mun. Utility Dist. v. United States*, 70 Fed. Cl. 332, 372 (2006) ("Since DOE and SMUD both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to SMUD, because of delayed loading costs, would be entirely speculative."). The government's own expert will admit that it is not possible to identify with certainty the specific type and size of the cask DOE would have provided to Progress Energy. The cost of loading DOE's cask will depend to some degree on what kind of cask it is. One would also have to speculate on whether costs might increase as a result of higher labor costs or increased regulations, and address time value of money considerations. For all of these reasons, the government will be entitled to no offset for cask

loading activities.

### E. The Government Is Not Entitled To A Damage Reduction Due To Railroad Track Maintenance Costs, Based Upon Unsupported Speculation Regarding How DOE Might Have Performed

The government apparently will claim that there must be an offset for the cost of maintaining and repairing the railroad lines at Robinson and Harris because such activities would have occurred in both the actual and but-for worlds. Once again, however, the government is merely speculating that this activity would have occurred if DOE had performed under the contract. DOE has not determined how it will accept spent-fuel casks. *Tennessee Valley Auth.*, 69 Fed. Cl. at 542 ("The mode of transport has not been determined."). Progress Energy has used rail to transship in the past and there would thus be advantages to using that method; however, there is no certainty that DOE would have honored a request from Progress Energy to use rail. Indeed, the government expert upon whom the government's challenge is based, in addition to readily admitting that he is no railroad track maintenance expert, acknowledges that possible methods that DOE might use to accept spent fuel include legal weight or overweight truck casks. Like the other argued offsets described above, the government's allegations of this avoided cost should be rejected.

### F. DOE's Delay Was A Substantial Causal Factor in Progress Energy's Decision to Rerack the Crystal River Pool.

The government's expert argues that regardless of Progress Energy's need for additional storage space for spent nuclear fuel, there were other factors that were "sufficient, compelling and primary in the decision to replace the spent fuel racks" at Crystal River.[28] The evidence,

---

[28] This argument is the closest the Government gets to raising a causation issue because it challenges whether the decision to rerack was made as a result of the breach versus independent business reasons. This Court, however, in similar circumstances, has rejected characterizing such an argument as challenging the causation element of plaintiff's case-in-chief. *See Bank of America, FSB v. United States*, 70 Fed. Cl. 246, 250 (2006) (describing defendant's argument that actions were the product of an independent business decision as a challenge to plaintiff's mitigation efforts and rejecting defendant's "effort to shift defendant's burden (of

however, will show that the need for storage space, as a result of DOE's delay in picking up spent fuel, was—at a minimum—a substantial causal factor in Progress Energy's decision to rerack at Crystal River.

Documents show that in June 1996, then FPC management asked the issue manager for the "Boraflex project" to also "evaluate spent fuel storage capabilities" at Crystal River. The inquiry into spent fuel storage capability was indisputably in response to DOE's anticipated delay in picking up the spent fuel from Crystal River. The existing Boraflex project was being conducted to assess and respond to degradation of the neutron absorbing material, i.e., Boraflex, in the existing spent-fuel racks in the Crystal River pool. To control criticality of spent fuel in the spent fuel pool, a neutron absorbing material must be present. One way to accomplish this was to use spent-fuel racks lined with a material called Boraflex. Boraflex, however, was discovered to degrade when subject to long term radiation exposure.

The Boraflex team was tasked with addressing the issues related to the Boraflex degradation. First, a new neutron absorber had to be found. The testimony and evidence will establish that there are several possibilities to solve this criticality issue, such as introducing dissolved boron into the water. Second, as the Boraflex degrades, silica is released into the water which, if enough found its way into the core, could affect the efficiency of the nuclear fuel. So a means of keeping the pool water relatively clear of silica had to be found. Again, however, the testimony and evidence will establish that there are several possible solutions to this problem, including using reverse osmosis on a periodic basis to clean the water. Such options would have been far less expensive ways to deal with criticality and silica issues, if the Boraflex degradation were the only issue on the table.

proving mitigation efforts were unreasonable) to plaintiff (who bears the obligation of proving causation)." (citing *Long Island Savings Bank*, *FSB v. United States*, 67 Fed Cl. 616, 639 (2005) *rev'd on other grounds* 476 F.3d 917 (Fed. Cir. 2007)).

In May 1996, the Boraflex team concluded in its phase one report that the Boraflex racks were in "relatively good condition" and they were expected to maintain their integrity through the end of the plaint's current operating license in 2016. In November 1996, in its phase two report, the Boraflex team concluded that reverse osmosis appeared to be the best option to manage the silica issue. Reverse osmosis would cost approximately $200,000 every two years, and thus could be performed well past the current operating license for 2016 for less that the anticipated cost of a rerack. Significantly, however, no final decision from management was requested regarding the Boraflex issues, pending a study of spent fuel storage options in light of DOE's impending breach. The third phase of the project was to develop a strategic spent fuel storage plan. In its September 1997 phase-three report, the Boraflex team recommended reracking the Crystal River pool as part of a ten-year project to address the spent fuel storage problem, noting that this would also solve the boraflex and silica problems.

The reracking, by adding 117 spent fuel assembly storage locations, was a cost-effective means to delay the loss of full core reserve and thus a commercially reasonable first step in its ten-year project. The evidence, including extensive contemporaneous documentation, will establish that storage space is what drove the decision to rerack. Had the storage space not been an issue, Progress Energy would have chosen other, less expensive options to deal with the criticality and silica issues. Without the benefit of additional space, the cost-benefit analysis weighs against a rerack and in favor of managing silica concentrations and crediting soluble boron.

In short, the evidence in this case will establish that there is no basis for the government's contention that the Boraflex degradation was a sufficient and primary reason to replace the spent fuel racks. This case is thus the exact opposite of the situation in *Indiana Michigan II*. While Indiana Michigan's decision to rerack was made <u>in the normal course of business</u> six years

before DOE's 1994 announcement that it would be unable to begin timely collection of spent fuel, *Indiana Michigan II*, 422 F.3d at 1376, the evidence in this case will show that Progress Energy's 1997 decision to rerack the Crystal River spent-fuel pool was substantially the result of DOE's delay. The government's challenge to recovery of these costs should be rejected. *E.g., Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 750 (2004) ("Plaintiffs need not show that each dollar claim was entirely unaffected by outside events.").

**G. The Government Is Not Entitled To A Damage Reduction Due To Alleged Lack Of Foreseeability Of The Precise Interested-Party Intervention In The Harris C and D Pool Licensing Proceeding**

Apparently, the government intends to argue that the costs of defending a third-party intervention in the procedure to license the activation of the Harris C & D pool, and related communications to the public, are not recoverable because they were not specifically foreseeable when DOE breached. The contemplation-of-the-parties rule, however, clearly does not apply to every line item of Progress Energy's mitigation expenses. *See* Dobbs Law of Remedies, § 12.6(2) ("[T]he rule . . . limiting special damages to those within the contemplation of the parties, seems to have no application to reasonably incurred expenses of minimizing damages."). Rather, the over-arching requirement is merely one of reasonableness. *Corbin on Contracts* § 57.11, at 314 (2005).

North Carolina Waste Awareness Network, a local environmental organization, was actively opposed to Progress Energy's activation of Harris C & D pools. The Board of Commissioners of Orange County ("BCOC"), a local government organization, formally intervened. Full Nuclear Regulatory Commission ("NRC") Atomic Safety and Licensing Board ("ASLB") hearings were held. Progress Energy, therefore, incurred costs to hire an outside law firm with expertise in NRC licensing proceedings, and to perform additional analyses, inspections and tests to respond to the contentions during the ASLB process. Progress Energy

also incurred costs to provide community outreach and communications for activities related to the Harris spent fuel pools C & D activation effort.

Under NRC's rules of practice for licensing procedures in effect at the time Progress Energy filed for an amendment to activate spent fuel pools C and D, "[a]ny person whose interest may be affected by a proceeding and who desires to participate as a party shall file a written petition for leave to intervene." 10 C.F.R. § 2.174 (1998). The procedure to file petitions to intervene was also set forth in the required January 13, 1999 Federal Register Notice regarding the amendment and opportunity for a hearing. 64 Fed. Reg. 2237, 2240. When the BCOC intervened under this process, Progress Energy was confident that BCOC's contentions were without merit and that the activation of the Harris C and D pools posed no significant safety hazards. Indeed, Progress Energy was ultimately successful. *In re Carolina Power & Light Co.*, 53 N.R.C. 113 (2001) (denying BCOC's petition for review of staff's issuance of license amendment). Defending against BCOC's intervention was a commercially reasonable (indeed, necessary) decision. In addition, even if foreseeability were a requirement, intervention by an interested party is a foreseeable part of the process to obtain an amendment to a license to store spent fuel.

It was also commercially reasonable to provide a possibly anxious public with information about the activation of pools C and D. *See Corbin on Contracts* § 57.16, at 347 (highlighting a case in which the costs of paid advertisements were recovered as a reasonable effort to refute accusations of supporting the enemy). Indeed, the intervention by BCOC demonstrates the need to educate and inform the public when building facilities to store radioactive waste. Such expenses in the nuclear industry are also foreseeable. Defending against the intervention and undertaking the community outreach were reasonable, necessary, and even foreseeable aspects of Progress Energy's mitigation of damages through the activation of the

Harris C and D pool. Progress Energy, therefore, should recover these costs.

### H. The Government Is Not Entitled To A Damage Reduction Due To Progress Energy's Use Of Its Own Employees On Mitigation Activities

Progress Energy relied on its employees to assist in the mitigation activities. Progress Energy was thus deprived of the time its employees spent on mitigation activities. That time, no matter the amount, could not be spent on other projects or tasks. The costs associated with that time is thus recoverable. *See TVA*, 69 Fed. Cl. at 539 (confirming that test for recoverability is "whether use of the internal resources by TVA deprived it of the ability to employ those resources on other projects"); *see also Southern Nuclear*, 77 Fed. Cl. at 396.

The government contends, as it does in every spent fuel damages case, that there is a threshold amount an employee must spend on a mitigation project in a given year before his or her time is recoverable. Apparently, the government's position is that the cost for labor on the mitigation activities under the threshold set by its expert is a fixed cost. Whether a cost is "fixed," however, is not relevant to the issue of whether it is recoverable. *Id.* ("That TVA would have paid its employees in all events is not material to this inquiry."). In reaching this conclusion, the Court in *TVA* was persuaded by cases like *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982), in which the "fixed cost" analysis was rejected: "The issue is not whether Convoy would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived Convoy of the services it paid for." *Id.* at 785. Under this correct analysis there is no logical threshold of amount of time a particular employee must spend on a mitigation project. If government's breach deprived Progress Energy of any of the services it paid for, that amount should be recoverable. And Progress Energy was deprived of <u>all</u> the time that its employees spent on mitigation activities. It is clearly a commercially reasonable decision to pull resources from throughout the company as opposed to segregating a group of

employees to work full-time on mitigation activities.

As the Court noted in *Southern Nuclear*, the government's position creates a perverse incentive. If the rule in these spent nuclear fuel cases were that a company employee's time under a certain hour threshold is not recoverable, the natural consequence by a rational utility would be to prohibit its employees from undertaking tasks associated with mitigation activities involving spent fuel, and to instead utilize outside contractor or supplemental labor. Such outside labor, however, would almost surely be more expensive than utilization of internal resources, and the resulting damages in subsequent proceedings would accordingly increase. The government's arguments in this regard are not well founded, and efficiency and common sense further dictate that the government's argued reductions be rejected.

Moreover, the time Progress Energy's employees spent on various projects was accurately recorded and allocated. In *Convoy* the Ninth Circuit awarded costs, despite the contention that employee estimates (ten years after the event) of how much time was spent on the relevant activities were too speculative. Although the evidence in Convoy was sufficient, Progress Energy's evidence is even better. An employee's time was billed to particular projects contemporaneously, in the normal course of business. Progress Energy, therefore, has complete and accurate business records, which the government has had an opportunity to examine and audit, to discern precisely what time was spent on mitigation activities. The government's attempts to limit recovery of Progress Energy's claim for internal labor should be rejected.

**I. The Government Is Not Entitled To A Damage Reduction Due To AFUDC Costs Incurred By Progress Energy.**

In the normal course of business, Progress Energy calculates the Allowance for Funds Used During Construction ("AFUDC") for each capital project, and includes such costs as part of the recorded total cost of the capital project. Including AFUDC in the cost of capital projects

is "an industry-wide practice that is consistent with requirements promulgated by the Federal Energy Regulatory Commission ("FERC"). *TVA*, 69 Fed. Cl. at 541 (citing 18 C.F.R. pt. 101 Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act, Electric Plant Instructions, ¶ 3.A(17)).

Within Progress Energy, major site projects are typically assigned a discrete Project Identification ("Project ID") and project costs are tracked within Progress Energy's corporate accounting general ledger system by Project ID. Progress Energy's damages claim is based on the costs charged to the Project IDs the identified mitigation activities, as captured by its corporate accounting system. AFUDC charges to a Project ID are based on the individual project's characteristics, including the timing of charges to the project and the in-service date. AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used." *Id.*

The government's expert asserts that Progress Energy's inclusion of AFUDC "amounts to pre-judgment interest in its calculation of asserted damages." AFUDC, however, is not interest on the cost to mitigate DOE's breach.[29] Rather, it is part of the cost Progress Energy incurred to mitigate DOE's breach. The Federal Circuit has recognized that the cost of funds used as a result of a breach are recoverable: "Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994). In *Wickham*, a contractor recovered interest paid

29 Although it represents a real cost and harm arising from DOE's breach, Progress Energy does not seek "cost of capital" or after-the-fact calculated interest expense, based upon hurdle rates and expert opinions, of the sort rejected by the Court in *Southern Nuclear*, 77 Fed. Cl. at 396, and in recognition of the rule in cases such as *Library of Congress v. Shaw*, 478 U.S. 310 (1986). However, AFUDC, unlike such prejudgment interest claims, is different. It is a cost incurred in real time and recorded contemporaneously in the books and records of the company. Even if one calls it "interest," it is clearly not interest "on a claim," but, rather, interest as "an element of damages." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part*, 407 F.3d 1352 (Fed. Cir. 2005). As such, it is recoverable.

on funds that it borrowed to finance a construction contract that was delayed due to the government's breach.

To recover under *Wickham*, a plaintiff must show that "borrowed funds were used in connection with the . . . project." *Id.* at 1583. The government will apparently contend, as it did unsuccessfully in *TVA*, that this means that in order to recover AFUDC, Progress Energy must demonstrate that it borrowed funds specifically to finance the particular mitigation projects for which costs are claimed. Like most utilities, however, Progress Energy does not issue debt instruments for specific capital projects. Rather, on a regular basis, it issues short- and long-term general debt. This capital structure is commercially reasonable and widely-accepted. *TVA*, 69 Fed. Cl. at 542. Indeed, it conforms to the FERC standard for calculating the cost of the funds used in capital projects. Progress Energy obviously had to gather substantial financial resources to build the Robinson ISFSI and activate the Harris C & D pools. AFUDC is part of the cost incurred in this effort and should be included in Progress Energy's damages.

**J. The Government Is Not Entitled To A Damage Reduction Due To Progress Energy's Use Of Its Internal Warehouse And Construction Service Resources**

Progress Energy incurs costs to maintain and operate internal resources such as warehouses and general construction services. These costs are not directly assignable to a specific project and are thus treated as overhead and allocated proportionately to all eligible projects. An allocation of these costs is proportionately charged to each Project ID in the normal course of business.

Warehouse or "stores costs" include the supervision, labor and other expense incurred in the operation of general and location storerooms, including purchasing, storage, handling and distribution of material and supplies. The warehouses, of course, were essential to the mitigation projects. To complete the mitigation projects, Progress Energy employees made more than 5500

orders for material purchased, stored, and distributed by Progress Energy's warehouses. An allocation for the costs incurred for this internal resource is reflected in Progress Energy's claim for damages.

Construction work in progress ("CWIP") costs include salaries (for secretarial services, engineering services, etc.), office supplies, meals and travel, telephone service, postage, computer services, consultants' charges, employee educational benefits, rents, construction site security, and construction site safety and medical. These are general construction-related costs, not directly assignable to specific projects. Yet these services were necessary for all the projects. An allocation for these costs is also reflected in Progress Energy's damages claim.

As with internal labor, the government argues that these costs are not recoverable because they are "fixed" and not "affected by" the spent fuel activities. The use of these internal resources on the mitigation activities, however, deprived Progress Energy of their use on other projects. When an employee in the warehouse was filling an order for a mitigation activity, for example, he was not able to work for another project or task. A portion of these services were clearly used by and related to the mitigation activities and thus the allocated portion of the costs Progress Energy incurred maintaining these internal resources is properly charged to the mitigation activities, as it is for all capital projects. Moreover, it is commercially reasonable for Progress Energy to allocate the overhead costs in this way. It would have been far more expensive for each project to separately procure required materials or conduct the construction-related activities covered under the CWIP. The allocated costs for these overhead activities, therefore, should be included in Progress Energy's recovery.

**K. Any Costs Still Challenged By The Government At The Time Of Trial On Adequacy-Of-Support Grounds Will Be Established By Progress Energy Under The Applicable Standards**

Pursuant to the Court's Pretrial Order on Damages dated March 23, 2005, Progress

Energy has expended extraordinary resources producing cost and accounting data, responding to literally hundreds of individual audit requests, and assisting the team of government experts, accountants, and lawyers review and analyze tens of thousands of pages of invoices, time records, purchase orders, data base entries, and other documentation, in many cases literally line-by-line. And yet the government still insisted upon comprehensive depositions of Progress Energy employees on cost support issues. As a result of that process, however, the amount and nature of the vast majority of the claimed costs have been established to the government's satisfaction. While the government contests recoverability of various elements of the claim on the grounds described in the sections above, in the main there appears to be no dispute that Progress Energy spent the dollars claimed on the projects identified.

As of the submission of this Memorandum, the government continues to reserve the right to challenge something less than 2% of the claimed damages, mostly relating to costs reflected in certain journal entries associated with transitions of legacy accounting systems. Progress Energy has provided supplemental information to the government, and will continue to attempt to work with the government to reduce or eliminate these remaining issues prior to trial.

To the extent that the government will persist in challenging support for any remaining aspects of Progress Energy's claim, however, Progress Energy will introduce documents and evidence that will be more than sufficient to justify recovery under the applicable standards. It is of course well settled that a plaintiff need not prove the damages claimed with "mathematical precision," and "[i]t is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." *Bluebonnet Savings Bank v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *National Australia Bank v. United States*, 452 F.3d 1321, 1327 (Fed. Cir. 2006). Progress Energy will easily meet that standard for all of its claimed costs.

## IV. CONCLUSION

Judgment should be entered for Progress Energy for those costs incurred as a result of DOE's breaches through December 31, 2005, in the amount of $90,621,190. In its order, the Court should also confirm Progress Energy's right to pursue in subsequent proceedings damages incurred after December 31, 2005, pursuant to the exceptions to the rules of merger and bar set out in the Restatement (Second) of Judgments, §§ 26(1)(b) and (e), as expressly adopted by the Federal Circuit in *Indiana Michigan*, 422 F.3d at 1377.

Respectfully submitted,

s/ Brad Fagg

Brad Fagg
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

Of Counsel:

Paul M. Bessette
David M. Kerr
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

September 12, 2007

CERTIFICATE OF FILING

I hereby certify that on this 12th day of September 2007, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Brad Fagg