IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CAROLINA POWER & LIGHT COMPANY and FLORIDA POWER CORPORATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 04-37C (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

ANDREW P. AVERBACH
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0527
Tel: (202) 305-2118

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
CHRISTOPHER J. CARNEY
LISA L. DONAHUE
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

October 10, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . i

SUMMARY OF ARGUMENT. . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . 6

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT. . . . . . . . 6

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE STANDARD CONTRACT THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER.. . . . . . . . . . 7

A. The Proposed Rule.. . . . . . . . . . 7

B. Public Comments.. . . . . . . . . . 8

C. The Final Rule. . . . . . . . . . 11

III. CPL AND FPC'S EXECUTION OF STANDARD CONTRACTS. . . . . . . . . . 14

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT. . . . . . . . . . 15

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT. . . . . . . . . . 17

VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS. . . . . . . . . . 18

A. The 1987 Through 1990 Annual Capacity Reports. . . . . . . . . . 18

B. The 1991 Annual Capacity Report.. . . . . . . . . . 19

C. The 1992 Through 1995 Annual Capacity Reports. . . . . . . . . . 21

VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY. . . . . . . . . . 22

A. Program Reassessment And 1991 Draft Mission Plan Amendment. . . . . . . . . . 22

B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program.. . . . . . . . . . 23

VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES.. . . . . . . . 24

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

I. PLAINTIFFS BEAR THE BURDEN OF ESTABLISHING ALL ELEMENTS OF THEIR CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY. . . . . . . . . . . . . . . . . . . . . . . 27

A. Plaintiffs Bear The Burden Of Establishing That Their Costs Are Attributable To DOE's Delay. . . . . . . . . . . . . . . . . . . . . . . 27

B. Plaintiffs Should Be Required To Paint A Reasonable "But For" World Against Which Its Damages Can Be Measured. . . . . . . . . . . . . 33

C. Regardless Of Whether The Court Employs A "But For" Or "Substantial Casual Factor" Analysis, Plaintiffs Must Show That Their Costs Would Not Have Incurred Absent The Alleged Breach.. . . . . . 36

II. PLAINTIFFS CANNOT PROVE THAT DOE'S DELAY IN PERFORMANCE CAUSED THEM TO INCUR THE DAMAGES THEY SEEK. . . . . . . . . . . . . . . . . . . . 39

A. Plaintiffs Have Improperly Defined DOE's Obligations Under The Standard Contract And, Thus, Have Failed To Provide A Basis For Comparison To The Actual World. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1. The NWPA Does Not Mandate A Rate Of Acceptance. . . . . . . . 40

2. The Standard Contract Contains No Language Imposing, And Is Inconsistent With, The Rate Requirement That Plaintiffs Propose.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

3. The Documents Upon Which Plaintiffs Rely Do Not Evidence DOE's Intent To Be Bound To Any Rate Of Acceptance, Let Alone The One Plaintiffs Advocate.. . . . . . . . . . . . . . . . . . . . . . . 46

4. The Court Should Not Impose A "Reasonable" Rate Of Acceptance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

a. The Parties Reached An Agreement Concerning The Manner In Which Rate Is To Be Calculated. . . . . . . . . . . 49

b. Plaintiffs' Arguments Would Render The Contract Too Indefinite To Enforce.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

c. The Rate That Plaintiffs Advocate Does Not Satisfy Their Own Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

5. The Rate Of Acceptance Should Be Determined In Accordance With The APR/ACR Process Mandated By The Standard Contract, In Which Plaintiffs Willingly Participated.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

B. Plaintiffs' Claim For Damages Includes Many Expenditures That Were Not Caused By DOE's Delay In Accepting Spent Fuel. . . . . . . . . . . . 60

1. Activation Of Spent Fuel Pools "C" And "D" At CP&L's Harris Plant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

2. Disposal Of Unused Racks And Crud. . . . . . . . . . . . . . . . . . . . . . . . . . . 62

3. Harris "C" And "D"Pool Licensing Expenses. . . . . . . . . . . . . . . . . . . . . . 63

4. Upgrade To The Harris Component Cooling Water System . . . . . . . . . . . 65

5. Rerack At Crystal River. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

6. Railroad Track Maintenance Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

7. Costs Of Cask Loadings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

8. Internal Labor Costs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

9. Overheads. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

10. AFUDC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

# TABLE OF AUTHORITIES

## Cases

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1992). . . . . . . . . . 38

Addison Express L.L.C. v. Medway Air Ambulance, Inc.,
2006 WL 1489385 (N.D. Tex. May 19, 2006).. . . . . . . . . . 38

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) . . . . . . . . . . 73

Affiliated Foods, Inc. v. Puerto Rico Marine Mgmt., Inc.,
645 F. Supp. 838 (D.P.R. 1986) . . . . . . . . . . 32

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004). . . . . . . . . . 28

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) .. . . . . . . . . . 54

Bel Pre Health Care Center, Inc. v. United States,
24 Cl. Ct. 495 (1991), aff'd, 980 F.2d 745 (Fed. Cir. 1992). . . . . . . . . . 52

Bluebonnet Savs Bank. F.S.B. v. United States,
67 Fed. Cl. 231, 237-38 (2005), vacated on other grounds,
339 F.3d 1341 (Fed. Cir. 2003). . . . . . . . . . 34

Bluebonnet Savs. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003). . . . . . . . . . 28

Boeing Co.,
ASBCA No. 18,916, 74-2 BCA ¶ 10.976 (1974). . . . . . . . . . 44

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970). . . . . . . . . . 29

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932).. . . . . . . . . . 48

Campbell v. United States,
661 F.2d 209 (Ct. Cl. 1981). . . . . . . . . . 43

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000), rev'd on other grounds,
309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003). . . . . . . . . . . . 34

City of Tacoma, Dep't of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Commercial Metals Co. v. United States,
176 Ct. Cl. 343 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n,
745 F.2d 281 (4th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

David Nassif Assocs. v. United States,
557 F.2d 249 (Ct. Cl. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

England v. Contel Advanced Sys.,Inc.,
384 F.3d 1372 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Fleet Nat'l Bank v. Anchor Media Television, Inc.,
45 F.3d 546 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Gevyn Constr. Corp. v United States,
827 F.2d 752 (Fed. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Granite Mgt. Corp. v. United States,
74 Fed. Cl. 155 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

J.D. Hedin Constr. Co. v. United States,
456 F.2d 1315 (Ct. Cl. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Julius Goldman's Egg City v. United States,
697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). . . . . . . . . . 41, 59

Krauss v. Greenbarg,
137 F.2d 569 (3d Cir. 1943).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Krofft Entertainment, Inc. v. CBS Songs,
653 F. Supp. 1530 (S.D.N.Y. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Lewis Jorge Construction Management, Inc. v. Pomona Unified School District,
102 P.3d 257, 265 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Lisbon Contrs. Inc. v. United States,
828 F.2d 759 (Fed. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

LTV Aerospace Corp.,
ASBCA No. 17,131, 76-1 BCA ¶ 11,840 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Marshall v. United States,
164 F. Supp. 221 (Ct. Cl. 1958).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Mays v. Trump Indiana, Inc.,
255 F.3d 351 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Modern Sys. Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Myerle v. United States,
33 Ct. Cl. 1 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

National By-Products, Inc. v. United States,
405 F.2d 1256 (Ct. Cl. 1969). . . . . . . . . . 47, 48

Nebraska Public Power District v. United States,
73 Fed. Cl. 650 (2006), permission for appeal granted,
Misc. Docket No. 843, 2007 WL 779291 (Fed. Cir. Mar. 1, 2007).. . . . . . . . . . 2

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985). . . . . . . . . . 53

Northern States Power Co. v. United States Dept. of Energy,
128 F.3d 754, 760 (D.C. Cir. 1997). . . . . . . . . . 2

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006). . . . . . . . . . 63, 64

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006), appeal pending,
No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007). . . . . . . . . . passim

Point Productions A.G. v. Sony Music Entertainment, Inc.
215 F. Supp. 2d 336 (S.D.N.Y. 2002). . . . . . . . . . 37

Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171 (1997),
aff'd, 178 F.3d 1313 (Fed. Cir. 1999). . . . . . . . . . 63, 64

PSEG Nuclear, L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006) . . . . . . . . . . 33

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951). . . . . . . . . . 64, 65

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002). . . . . . . . . . 52

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003) . . . . . . . . . . 39

Selman v. United States,
204 Ct. Cl. 675, 498 F.2d 1354 (1974) . . . . . . . . . . 42

San Carlos Irr. & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1989). . . . . . . . . . 31

Shann v. Dunk,
84 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

TEG-Paradigm Environmental, Inc. v. United States,
465 F.3d 1329 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 76

Transamerica Equip. Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

United States Steel Corp. v. United States,
618 F. Supp. 496 (CIT 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Wilner v. United States,
23 Cl. Ct. 241 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

**Statutes and Regulations**

48 Fed. Reg. 5458 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10 C.F.R. § 961.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 10131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 42

42 U.S.C. § 10132. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 10134. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 10135. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 10139. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 10161. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17

42 U.S.C. § 10162. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 10168. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 58, 59

42 U.S.C. § 10172. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 10221. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 10222. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 23, 41, 42

42 U.S.C. § 10242. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 10250. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Other Materials**

5A Corbin on Contracts §§ 992, 997 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

11 Corbin on Contracts, § 53.31 (rev. ed.. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Keeton et al., Prosser and Keeton On The Law Of Torts, (5th ed. 1984). . . . . . . . . . . . . . . . . . . 37

McCormack, Handbook on the Law of Damages § 73 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . 37

Restatement (Second) of Contracts § 204 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Restatement (Second) of Contracts§ 211(b) (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 56

Restatement (Third) of Torts (Proposed Final Draft) § 26 cmt. j (2006).. . . . . . . . . . . . . . . . . . . 38

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CAROLINA POWER & LIGHT COMPANY and FLORIDA POWER CORPORATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 04-37C (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to this Court's pretrial order dated January 30, 2007, and as subsequently amended, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law.

SUMMARY OF ARGUMENT

This case involves a damages claim by plaintiffs, Carolina Power & Light Company ("CP&L") and Florida Power Corporation ("FPC") (collectively, "Progress Energy"), for more than $90 million in costs that they allegedly have incurred through December 31, 2005, associated with the storage of spent nuclear fuel ("SNF"). Plaintiffs' claim includes costs for constructing a dry storage facility at CP&L's Robinson plant to house SNF, activating certain spent fuel pools at CP&L's Harris plant, and performing a rerack of the spent fuel pool at FPC's Crystal River plant. Plaintiffs contend that the Government is liable for all of these costs because the need for additional storage was caused by the Government's failure to begin accepting SNF from commercial nuclear reactors on January 31, 1998, pursuant to separate versions of the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste"

("Standard Contract") between the Department of Energy ("DOE"), on the one hand, and each of CP&L and FPC, on the other.[1]

---

[1] We have not contested and, at this time, will not contest at trial the existence of a partial breach of the Standard Contract. However, the Government has been specifically enjoined, via a writ of mandamus issued by the United States Court of Appeals for the District of Columbia Circuit, from relying upon the "Unavoidable Delays" clause of the Standard Contract to excuse its delayed performance. See Northern States Power Co. v. United States Dept. of Energy, 128 F.3d 754, 760 (D.C. Cir. 1997). That provision states that "[n]either the Government nor Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A (emphasis added).

The effect of the writ of mandamus upon our ability to defend the liability phase of this case cannot be overstated. The D.C. Circuit has eliminated one of the central provisions of the Standard Contract that governs the parties' liability in the event of delays in SNF acceptance. With this clause, DOE would have had the ability to present an absolute defense to liability in this case. Without it, DOE now faces billions of dollars in damages claims. The writ of mandamus wholly changes the nature of the Standard Contract, essentially and inappropriately creating a contract (one without an "Unavoidable Delays" clause) between the parties to which DOE never agreed, and preventing us from relying upon CP&L's own written acknowledgment that DOE's delays in accepting spent fuel would be "unavoidable." PX 25 at YMP-001-1830.

We have consistently argued that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters). Recently, in Nebraska Public Power District v. United States, 73 Fed. Cl. 650, 673 (2006) (Allegra, J.), this Court determined that the writ of mandamus was void because, in issuing the writ, the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity." This Court subsequently certified its decision for interlocutory appeal to the United States Court of Appeals for the Federal Circuit, Nebraska Public Power District v. United States, 74 Fed. Cl. 762 (2006), and, on March 1, 2007, the Federal Circuit issued an order granting Nebraska Public Power's petition for permission to appeal. Nebraska Public Power District v. United States, Misc. Docket No. 843, 2007 WL 779291 (Fed. Cir. Mar. 1, 2007). The appeal has been fully briefed, and the parties are awaiting oral argument. The Government reserves the right to challenge any determination of liability with respect to the Standard Contract if the writ of mandamus is lifted or otherwise deemed inapplicable.

At trial, plaintiffs bear the burden of proving that their damages were foreseeable, were caused by DOE's partial breach, and are reasonably certain. This legal burden is real, and plaintiffs must do more at trial than simply identify costs that they have incurred in connection with the storage of SNF. Plaintiffs have largely eschewed this burden and, instead, have put the cart before the horse by characterizing all of their claimed costs as "mitigation" expenses and attempting to place the burden on the Government to disprove their reasonableness. However, we do not assert that plaintiffs acted unreasonably. The expenses that plaintiffs characterize as "mitigation" expenses and that are at issue in this case are unrecoverable not because they were incurred unreasonably, but because, for the most part, they would have been incurred irrespective of the Government's delay in performance. Although plaintiffs go to great lengths to attempt to minimize or even eliminate their burden with respect to causation, there is simply no legal standard that permits a finding that event "A" (such as a breach of contract) caused event "B" (such as the expenditure of costs) where, as here, event "B" would occurred even if event "A" had not taken place.

Importantly, we acknowledge that the Government's failure to begin accepting spent fuel in 1998 pursuant to the Standard Contract has required the plaintiffs here to make substantial expenditures upon the storage of spent fuel. Had DOE begun accepting fuel in 1998 in accordance with the terms of the Standard Contract, plaintiffs would not have been required to spend more than $44 million of the amount they now claim as damages. However, plaintiffs cannot show that the remaining expenditures are incremental to the Government's alleged breach. These expenditures, which range from charges for portions of overhead pools that did not increase as a result of DOE's delay in accepting spent fuel to the replacement of racks in the

spent fuel pool at FPC's Crystal River plant that was necessitated by chemical degradation, were not incurred to "mitigate" the effects of the Government's breach. Rather, they were incurred as part of plaintiffs' regular business operation and would have been incurred irrespective of any breach by DOE. To compensate plaintiffs for these non-incremental expenditures would place them in a better position than they would have occupied had DOE begun accepting spent fuel in 1998.

Finally, ascertainment of whether the costs at issue in this case are incremental to DOE's delay (most notably, the cost of activating the "C" and "D" spent fuel pools at CP&L's Harris plant) will necessarily require consideration of what DOE's actual obligations regarding spent fuel acceptance after January 31, 1998 were and the actions that plaintiffs would have to have undertaken had DOE timely accepted fuel in accordance with those obligations. The Court must then compare those necessary activities and costs against those that plaintiffs are seeking in this case. This does not mean that the Court must ascertain the activities in which plaintiffs would have engaged and the costs that plaintiffs would have incurred had DOE accepted as much fuel as plaintiffs would have liked, or even as much as DOE planned as it began developing a permanent repository for Yucca Mountain in the 1980s. What the Court must consider as a basis for comparison are the activities and costs that would have been necessary if DOE had accepted fuel at a rate that was required by the Standard Contract.

Contrary to plaintiffs' repeated assertions (and as evidenced by the lack of reference in their pre-trial brief to any provision of the Standard Contract containing the rate they advocate), the Standard Contract did not require DOE to accept fuel at a rate that would preclude the need for utilities to make expenditures upon additional storage after January 31, 1998. This rate is

equivalent to (or, at a minimum, would impose a greater obligation upon DOE than) the rate that all the utilities, including plaintiffs, wanted to be included in the Standard Contract and, in fact, requested be included in the Standard Contract, but that DOE unequivocally refused to include in the Standard Contract. Plaintiffs executed the Standard Contract with full knowledge of what that contract required (and did not require) and made the affirmative decision not to challenge the terms of that contract as being inconsistent with the Nuclear Waste Policy Act of 1982 when they had the opportunity to do so. Plaintiffs' argument that the Court should impose what they claim is a "reasonable" rate of acceptance (the so-called "3,000 MTU rate") is an attempt to obtain through litigation what they could not obtain through contract negotiation.

In this case, plaintiffs have admitted that, had DOE performed at the rate of acceptance that was contemplated by the mechanism contained in the Standard Contract to set the rate and to which plaintiffs never voiced a contemporaneous objection (the so-called "900 MTU rate"), they still would have been required to undertake many of the major capital projects for which they seek recovery in this lawsuit (including activating the "C" and "D" pools at CP&L's Harris plant).[2] As a result, identification of a rate of acceptance is a critical component of the dispute. However, no matter which rate of acceptance is applied, the Court still must determine whether the expenses for which plaintiffs seek recovery were incremental to DOE's failure to accept spent

---

[2] Plaintiffs originally acknowledged that, at a 900 MTU rate of acceptance, only $64,969,482 of their damages claim is recoverable. DX 304. They have since voluntarily withdrawn $1,044,902, $1,025,120 would otherwise be recoverable at the 900 MTU rate, leaving $63,944,362 as the total amount plaintiffs seek at the 900 MTU rate. Because of additional disputes concerning the incrementality of other charges contained in plaintiffs' claim, we believe that, at this rate of acceptance, only $44,211,260 is traceable to the delay in DOE's performance and is otherwise recoverable. If the Court accepts plaintiffs' 3,000 MTU rate of acceptance, we believe that the proper measure of plaintiffs' expenditures that are traceable to DOE's delay in performance is $60,763,569.

fuel beginning in 1998. Unless plaintiffs can prove that they would not have incurred these expenses had DOE timely commenced performance and that these expenses were foreseeable and have been proven with reasonable certainty, they must be excluded from damages.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)). In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and high level radioactive waste ("HLW"); establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing a Nuclear Waste Fund, financed by the utilities, to pay for the costs of the DOE program. Id. § 10131(b).

The NWPA defines a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is

an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982).[3]

In addition, the NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE STANDARD CONTRACT THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations under the NWPA, published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining the order in which, and the rate at which, the contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's

[3] By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1).

issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission, and DOE's approval, of Delivery Commitment Schedules ("DCSs") beginning in 1992. Id. at 5462. The proposed Standard Contract also provided for the contract holders' submission of Final Delivery Schedules ("FDSs"), which would take the annual allocation defined in an approved DCS and refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur. Id. at 5463 (Art. IV.C). The term "DOE facility" in the proposed Standard Contract referred to a permanent repository for disposal of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided for written comments to be submitted by March 7, 1983. Id. at 5458.

B. Public Comments

DOE received numerous comments in response to the proposed rule.[4] A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. The Edison Electric Institute ("EEI") together with the Utility Nuclear Waste Management Group ("UNWMG"), utility trade organizations to which both CP&L and FPC belonged, requested as follows:

---

[4] The evidence will show that utilities and their representatives had significant involvement with and input into the NWPA and the Standard Contract and affirmatively requested – and received – certain terms for inclusion in the final Standard Contract, including the term concerning exchanges of approved DCSs. See Pacific Gas & Electric Co. v. United States ("PG&E"), 73 Fed. Cl. 333, 346-48 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007).

> The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.

DX 25.34, Attachment A at 2 (ARC0010334). Specifically, EEI and UNWMG suggested the inclusion of the following language, intended to add an obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

Id. at ARC0010335 (emphasis added).

Other utilities submitted similar comments seeking firm commitments regarding the rate of SNF acceptance. For example, Tennessee Valley Authority ("TVA") submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 25.63 at 5 (ARC0010537). Although TVA recognized that, "under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," it suggested that "[t]his could, however, be done on an industry wide basis." Id.

TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id. DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth in the Mission Plan that DOE was to prepare in accordance with statutory requirements for ultimate submission to Congress, for its review and consideration. For example, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress. DX 25.43 at ARC001 0439.

One of the plaintiffs in this case, FPC, noted in the comments that it provided to DOE that the manner in which the Standard Contract prioritized fuel acceptance rights (that is, the order in which DOE proposed to accept spent fuel from utilities and the amounts that DOE would accept) should be altered so that DOE would accept fuel first at those plants that would otherwise be forced to shut down (or, presumably, to build additional storage) because of a lack of available space to store discharged spent fuel.[5] DX 25.84 at ARC001 0691. Similarly, Jay Silberg, an attorney representing the industry group of which both plaintiffs were members, from whose firm CP&L received advice concerning the NWPA and the Standard Contract, and whom CP&L consulted prior to executing the Standard Contract, specifically noted that a "major objection" to the allocation scheme in the proposed Standard Contract was that no priority was

---

[5] Plaintiffs acknowledge that both CP&L and FPC have the same understanding of the parties' obligations under the Standard Contract. This unity of understanding comports with the rule, expressed by the American Law Institute, that standard contracts be interpreted consistently, regardless of conflicting subjective understandings of different parties to those contracts. See Restatement (Second) of Contracts§ 211(b).

afforded to nuclear plants that otherwise would be forced to shut down before the time that DOE was scheduled to arrive. DX 19 at SMUD-PRIV 0053.

In addition to providing comments concerning the rate of acceptance and the need to alter the prioritization of acceptance rights, EEI and UNWMG also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX 25.34 at ARC0010336. EEI and UNWMG stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id. at ARC0010337; see also DX 25.14 at ARC0010180 (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 25.69 at ARC0010625 ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made certain modifications to the Standard Contract as set forth in the proposed rule. Although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. at 5462, that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the

commencement of "facility" operations. 10 C.F.R. § 961.11, Art. II. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

Critically, DOE did not adopt the suggestion of EEI, UNWMG, and many of the utilities to incorporate into the contract a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. Rather, the Government will show at trial that DOE determined it could not obligate itself to satisfy such a commitment because the number of uncertainties concerning the development of the program, the development of the contemplated disposal facilities, and the potential capabilities for accepting SNF that could be developed by 1998. See PG&E, 73 Fed. Cl. at 349 (finding that DOE expressly did not obligate itself to accept SNF at a particular rate of acceptance because of uncertainties surrounding the waste acceptance program 15 years in the future). Accordingly, DOE specifically declined to create any commitment to accept SNF beginning in 1998 at a specific minimum rate or based upon any mandatory minimum criteria. Instead, the Standard Contract provided that the acceptance rate would be developed in 1991, via promulgation of an

Annual Priority Ranking ("APR") and Annual Capacity Report ("ACR"). See 10 C.F.R. § 961.11, Art. IV, Sec. B.5.

The utilities acknowledged that DOE had rejected their requests regarding the inclusion of a qualitative description of the acceptance rate in both internal memoranda and correspondence with DOE. For example, TVA noted that its request regarding the acceptance rate term had been rejected:

> DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole.

DX 32 at TV1471 (TVA memorandum, dated May 24, 1983); see also DX 44 YDK)23771 (Yankee Atomic memorandum, dated January 20, 1984). Similarly, in a letter to DOE, EEI complained that the Standard Contract as promulgated lacked "standards or milestones for DOE's performance." DX 36 at SN011049.[6]

The final version of the Standard Contract maintained the oldest-fuel first ("OFF") allocation method, pursuant to which DOE was to grant allocations of acceptance rights to utilities in accordance with the sequence in which those utilities permanently discharged fuel from their reactors. The final version of the contract did not provide a priority, as FPC had requested in its comments, for reactors that would need allocations to continue operating. See 10 C.F.R. § 961.11, Art. V, Sec. B.5; id., Art. VI, Sec. B.1

[6] DOE likewise did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 25.43 at ARC00010439.

Finally, the Standard Contract contained an integration clause, which precluded reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.[7]

## III. CPL AND FPC'S EXECUTION OF STANDARD CONTRACTS

On June 3, 1983, CP&L and FPC executed the Standard Contract with DOE. PX 10, PX 11. The contract that CP&L executed covered the SNF generated at the Brunswick, Harris, and Robinson plants, and the contract that FPC executed covered the SNF generated at the Crystal River plant. Each Standard Contract contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983.

Those responsible for executing the Standard Contract upon behalf of CP&L were fully aware of what the contract provided – and did not provide – about the rate of acceptance. One of CP&L's employees, Lou Martin, initialed every page of the Standard Contract, indicating, as was his practice, his understanding of the document and his recommendation that the company execute it. Mr. Martin and his colleague, Robert Kunita, attended and participated in industry group meetings at which comments upon and proposed amendments to the Standard Contract

---

[7] The Standard Contract also included a "Disputes" clause, which provided a mandatory administrative mechanism for the resolution of disputes arising under the contract. 10 C.F.R. § 961.11, Art. XVI.A.

were discussed. For example, on February 10, 1983, Mr. Martin attended an EEI meeting with industry representatives, including Mr. Silberg, that was specifically convened to prepare comments on the DOE disposal contract. It was this meeting that spawned EEI's request to include a "whereas" clause setting forth DOE's obligation to accept fuel at a rate that exceeded the industry generation rate and commenced working off the backlog.

Prior to executing the Standard Contract, CP&L was approached by another utility about challenging the final version of the Standard Contract as being inconsistent with the terms of the NWPA, but opted not to do so. DX 34 at CP_FP00046289. Instead, after conferring with the same industry group attorney, Mr. Silberg, who had opined that the draft contract did not provide a priority for those utilities who might be forced to shut down if they were not high enough on the acceptance queue, CP&L chose to sign the contract. Although the cover letter that accompanied the signed contract that CP&L returned to DOE indicated that the company had signed the contract pursuant to a reservation of rights, the <u>sole</u> reservation related to the calculation of the amount that the utility would be required to pay. PX 12 at CP_FP00063726. Neither FPC nor CP&L voiced <u>any</u> complaint about the fact that DOE had rejected the utilities' request that the Standard Contract include a guarantee that the rate of acceptance exceed the industry generation rate, or about the fact that the prioritization system had not been modified to accommodate FPC or Mr. Silberg's specific concern.

## IV. <u>ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT</u>

In June 1985, DOE issued and submitted to Congress the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program

and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 49 at HQR0031129-30. The schedules contained in the Mission Plan projected annual SNF generation rates from utilities nationwide of approximately 3,000 MTU in 1998 and increasing by 2007 to over 4,000 MTU per year. Id.[8] The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." Id. at HQR0031133. The Mission Plan further advised:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

Id. (emphasis added).

In the 1987 Mission Plan Amendment, submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. The Mission Plan Amendment reflected DOE's recognition that acceptance beginning in 1998 could not begin at a permanent repository. DOE explained that its recommendation was based upon experience gained in the program, a budget decrease for fiscal year 1987, and budget uncertainty for fiscal year 1988.

[8] Today, utilities discharge approximately 2,000 MTU of SNF per year.

However, DOE specifically noted that it could nonetheless begin waste acceptance in 1998 at an MRS facility.[9] DX 59 at HQR0031634. The 1987 Mission Plan Amendment acknowledged the importance of the Annual Capacity Report that would be issued in 1991 – namely, that it would be used in the DCS process. Id. at HQR0031687.

## V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious" and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

[9] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments created two so-called "linkages" between the MRS and the repository. Specifically, the amendments provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). In addition, the amendments provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[10]

VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." Each of these ACRs expressly stated, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 58 at HQR0012713, PX 44 at CP_FP000147085, PX 51 at 1632 ("projections in this initial report are based on

[10] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in January 1995, id. § 10250, without any agreements with any states or Indian tribes.

current plans and best available information; they are not contractually binding"). Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 58 at HQR0012713; PX 44 at CP_FP000147086; PX 51 at 1632.

B. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year, DOE-RW-331P. PX 53 at HQR-002-0803 to 04. The 1991 ACR was significant because it was the last ACR that would be issued before the contract holders were to begin submitting DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." PX 53 at HQR-002-0804. It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id. at HQR-002-0804 and 09 .

As dictated by the Standard Contract, the 1991 ACR specified the rate of acceptance for the first 10 years of the DOE program, beginning in 1998. Specifically, the 1991 ACR specified the following acceptance rate:

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| 2008 | | 900 |
| | TOTAL | 8,200 |

PX 53 at HQR-002-0807. This rate was created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at HQR-002-0806. Instead, "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility." Id. In particular, the rates were "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id. DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be eliminated. Id.

The utility industry recognized the importance of the 1991 ACR in the determination of delivery commitments for performance beginning in 1998. See, e.g., DX 102 at SN169910 (UWASTE memorandum explaining that the ACR and APR "are necessary to properly complete

the DCS forms."); DX 104 at SN170373 (same); DX 61 at YDK038298 (UNWMG memorandum describing the 1991 ACR as "contractually binding.").

C. The 1992 Through 1995 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 115 at HQR-001-2324. The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." Id. at HQR-001-2319. It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id.

In 1995, DOE issued a combined APR and ACR, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to "appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium (MTU)." PX 60 at CP_FP000027508. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance. Id. at CP_FP000027511. The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the

> capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

Id. at CP_FP000027510-11 (emphasis added). The 1995 ACR further provided that the capacity allocations listed in the ACR "form the basis for the Purchasers' submittal" of DCSs. Id. at CP_FP000027508.

## VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY

### A. Program Reassessment And 1991 Draft Mission Plan Amendment

In November 1989, the Secretary of Energy submitted a report to Congress regarding DOE's reassessment of the program. In this report, DOE stated that it would be unable to begin operations at a permanent repository until 2010 because there was insufficient time to perform the scientific investigation necessary. DX 71 at DB0001450-51. However, DOE also stated that it planned "to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel." Id. at DB0001451. DOE further advised that, "if the linkages [were] modified, it [was] likely that waste acceptance at an MRS facility could begin by 1998 or soon thereafter." Id.

In September 1991, DOE issued another Draft Mission Plan amendment, which provided further details upon the "action plan" set forth in the Secretary's 1989 Reassessment. DX 96 at HQR0030799. In accordance with the 1989 Reassessment, the 1991 Draft Mission Plan Amendment reaffirmed DOE's plans to begin performance in 1998 at an MRS:

> To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance

> in 1998. To make this possible, the President's legislative package for the National Energy Strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Amendments of 1987 (Amendments Act). This could also be achieved by congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

Id. at HQR-003-0825. The schedule set forth in the 1991 Mission Plan Amendment showed acceptance by DOE up to the 10,000 MTU limit, beginning in 1998 at the MRS, until the repository began operations in 2010. Id. at HQR-003-1000 to 01.

B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program

DOE's anticipation of performance at an MRS also was reflected in the cost analyses that DOE performed around the time of the issuance of the 1991 ACR to support the adequacy of fees collected for the Nuclear Waste Fund. The fee paid by utilities, 1 mil per kilowatt hour, was established by Congress in enacting the NWPA. 42 U.S.C. § 10222(a)(2). Pursuant to the NWPA, DOE is required annually to assess whether the fees collected pursuant to statute are adequate to fund all of the efforts necessary to implement the NWPA. 42 U.S.C. § 10222(a)(4). The Secretary is to advise Congress if the fee is found to be inadequate. Id. To determine whether the fee is adequate, DOE first prepares a Total System Life Cycle Cost ("TSLCC") report, in which it projects the total cost of the program. This total system cost projection is based upon the projected number of years that the program is estimated to operate, projected transportation requirements, projected interest rates and other factors. See, e.g., DX 81 (1990 TSLCC); and PX 98 (1998 TSLCC). The then-current program plans, including acceptance rate projections, type and location of receiving facilities, and scope of the transportation program, are the basis for the total cost estimate.

In its Preliminary Estimates of the Total-System Life Cycle Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program, December 1990 ("1990 PETSLCC"), DOE utilized a schedule that was explicitly based upon acceptance starting at an MRS. DX 81. The first ten years are identical to the ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSLCC contemplates that 400 MTU rather than 600 MTU of SNF would be accepted. Id. This schedule also shows what DOE anticipated the transition from a repository to an MRS would look like. Id. In year 11 and year 12 of acceptance, 900 MTU would be accepted at a permanent repository. In years 13 through 17, 1,800 MTU would be accepted at a permanent repository. Only in year 18 (2015) would the system accept 3,000 MTU at a permanent repository. Id. [11]

VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

By letter dated March 4, 1992, the DOE contracting officer issued a letter to CP&L, FPC, and other utilities, along with the instructions for the submission of DCSs. DX 106. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment

---

[11] During the course of discovery in this case, the Government conducted a deposition of plaintiffs pursuant to RCFC 30(b)(6), seeking an explanation of the steps that plaintiffs would have taken to address their spent fuel management needs had the Government performed in accordance with the rates contained in the 1991 ACR during the first ten years of performance. So as to enable plaintiffs to provide a complete explanation, we included within our Rule 30(b)(6) notice the acceptance rates after the first ten years of performance. These rates (900 MTU in years 11 and 12, 1,800 MTU in years 13 through 17, and 3,000 MTU thereafter) were based upon the 1990 PETSLCC. See DX 300.

Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." Id. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. The instructions also required that the utilities list upon the DCSs the method of delivery to DOE (truck, barge, or rail) and fuel handling crane capacities.

The DCS instructions were developed with the full participation of the nuclear industry. See, e.g., DX 95 at SN169936 (UWASTE memorandum advising members that DOE had issued the draft DCS instructions and that the Standard Contract Task Force would meet to develop comments); DX 94 (Minutes of Standard Contract Task Force meeting, during which members met with DOE to discuss and provide comments upon the draft DCS instructions); DX 97 at SN169920 (UWASTE memorandum advising members that Standard Contract Task Force had provided comments to DOE upon another draft of the DCS instructions); see DX 73 (Minutes of High-Level Waste/Spent Fuel Storage Working Group Meeting stating that "[b]y 1/1/92, each utility is required to submit a DCS to DOE" and that the task force would be "following this closely."). After DOE issued the instructions, utilities met with DOE again to discuss the instructions. DX 99.

Recognizing the need to submit DCSs to claim allocations, many utilities submitted timely DCSs that were approved by DOE. For example, Wisconsin Electric Power Company ("WEPCO") submitted DCSs for all of its allocations in the first ten years of acceptance in 1992. Eight other utilities also submitted DCSs for all of their allocations in the first ten years of contract performance after 1998. Moreover, every utility with an allocation in 1998 and 1999, with the exception of one utility, submitted a DCS for that allocation. All of those DCSs were approved by DOE. All but two utilities with allocations in 2000 submitted DCSs that were approved by DOE.

The rate identified in the 1991 ACR did not provide either FPC or CP&L with fuel acceptance allocations for 1998, the first year scheduled for DOE performance. However, neither company expressed objection to the rate that DOE had promulgated in the 1991 ACR. On September 29, 1993, CP&L submitted its first delivery commitment schedule for acceptance of 70 metric tons of uranium in 1999 from its Robinson plant. The amount of uranium specified in this initial DCS comported with the annual allocation for 1999 with which CP&L was provided in the 1991 ACR. Compare PX 56 at CP_FP000111082 with PX 53 at HQR-002-0811. The company indicated in the DCSs that the Robinson plant had a maximum lifting capacity of 75 tons and proposed that the cask provided by DOE be suitable for rail (rather than truck or barge) transportation. In submitting the DCS, CP&L did not express any objection to the allocation it received. DOE approved the DCS by letter December 6, 1993. DX 122. CP&L submitted additional DCSs for acceptance of fuel in 2000, 2001, 2002, 2003, and 2004, all of which were based upon the rates and allocations set forth in the most recently issued ACR and APR, and none of which was accompanied by an objection to the acceptance allocation. DX 128

(DCSs submitted October 6, 1994 for fuel acceptance by rail in 2000 at Robinson and Brunswick plants and approved by DOE by letter dated January 23, 1995); DX 135 (DCSs submitted September 25, 1995 for fuel acceptance by rail in 2001 at Robinson and Harris plants and approved by DOE by letters dated February 5 and April 10, 1996, respectively); DX 153 (DCSs submitted September 25, 1996 for fuel acceptance by rail from Robinson and Brunswick in 2002); DX 177 (DCS submitted September 26, 1997 for fuel acceptance by rail from Brunswick in 2003); DX 211 (DCS submitted January 27, 1999 for fuel acceptance by rail from Robinson in 2004). CP&L also submitted an FDS on January 28, 1998, for the acceptance, at Harris and Robinson, of the amount of spent fuel designated in its first DCS. PX 88.[12]

## DISCUSSION

### I. PLAINTIFFS BEAR THE BURDEN OF ESTABLISHING ALL ELEMENTS OF THEIR CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

#### A. Plaintiffs Bear The Burden Of Establishing That Their Costs Are Attributable To DOE's Delay

Plaintiffs seek to recover damages based on their "expectation interest" in the Standard Contracts. See Pl. Pre-Tr. Br. at 12 (citing Restatement (Second) of Contracts § 347)). That is to say, plaintiffs seek to recover expenses that they claim would not have been incurred had the Government begun removing fuel from their reactor sites beginning sometime after January 31, 1998. As plaintiffs acknowledge, the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005),

[12] FPC submitted DCSs, in accordance with the rate of acceptance and allocations set forth in the applicable APR and ACR, for delivery acceptances in 2002, 2004, 2005, and 2007. DX 170, 180.1, 221.1.

provides the proper framework for evaluating such damages in a spent nuclear fuel case. See Pl. Pre-Tr Br. at 12. As described by the Federal Circuit in that case, the fundamental goal in awarding expectation damages is to "place the injured party in as a good a position as it would have been had the breaching party fully performed." Indiana Michigan, 422 F.3d at 1373. Conversely, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet Savs. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)) ("[T]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'"); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 385 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) (same).

Although plaintiffs appear to acknowledge these fundamental precepts of contract law in their brief (see Pl. Pre-Tr Br. at 11-14), they simultaneously disregard their own burden of proof. As parties seeking to recover damages for breach of contract, plaintiffs bear the burden of establishing by a preponderance of the evidence that the Government's breach "caused" them to incur each of the costs that they seek, and that those costs were foreseeable and have been calculated to a reasonable certainty. Indiana Michigan, 422 F.3d at 1376; Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 414 (2004). Yet, in discussing what they perceive to be the appropriate standard for meeting their burden, plaintiffs disclaim any responsibility for showing that the damages they seek to recover from the Government reflect costs they would not have incurred absent DOE's breach. Specifically, plaintiffs contend that, in establishing its damages "a plaintiff does not use a but-for world to estimate his damages . . . but, rather must establish his

actual costs in the real world." Pl. Pre-Tr Br. at 12. According to plaintiffs, because the damages they seek are what they term "mitigation damages," they need not show that the damages were actually "caused" by DOE's breach, but, rather, must only show that they incurred the expenses claimed. Id. at 15-16. Plaintiffs argue that, because "DOE's partial breach clearly resulted in the mitigation activities at issue in this case, it is thus up to the government to try to show that Progress Energy was unreasonable in its mitigation decisions." Id. at 16. The conclusion that plaintiffs seek to draw wholly eliminates their obligation to prove causation.

As an initial matter, plaintiffs' attempt to prove their case by simply offering up evidence of their out-of-pocket costs is contrary to fundamental principles of contract law and remedies. In Boyajian v. United States, 423 F.2d 1231, 1239 (Ct. Cl. 1970), the Court of Claims rejected efforts by the plaintiff to prove its damages by presenting "a schedule, supported by an accountant's testimony," of incurred costs as "not in and of itself acceptable 'proof'" of causation. The Court explained that "recoverable damages cannot be proved by a naked claim for a return of costs even where they are verified. The costs must be tied in to fault on the defendant's part." Id. (emphasis added). Simply put, a plaintiff must do more than merely present a schedule of costs that it claims to have incurred in mitigating its losses. It must prove that these costs were directly caused by DOE's breach.[13]

[13] Plaintiffs are correct that, except with respect to a small number of items about which the parties are still attempting to reach agreement, there is no dispute that Progress Energy has, in fact, expended the amounts claimed. Nonetheless, plaintiffs assert on page 60 of their pre-trial brief that they have been unduly burdened in formulating responses to the Government's audit and fault the Government for having insisted upon "comprehensive depositions of Progress Energy employees on cost support issues." Pl. Pre-Tr. Br. at 60. However, plaintiffs fail to mention that the audit and depositions yielded information that prompted plaintiffs to withdraw a substantial portion of their claims, including charges for security and backfill labor exceeding $1
(continued...)

More specific to the spent nuclear fuel context, plaintiffs' efforts to shift responsibility for establishing that their damages were, in fact, caused by DOE's delay in performance should be rejected as contrary to the standard established by the Federal Circuit in Indiana Michigan. In Indiana Michigan, the Federal Circuit defined the scope of a spent nuclear fuel plaintiff's burden with respect to damages. In that case, as in this one, the plaintiff sought damages for its efforts to expand its storage capabilities and, specifically, the costs that it incurred for a rerack and expansion of its spent nuclear fuel pool. 422 F.3d at 1372. In addressing these costs, which (like plaintiffs in this case) the plaintiff characterized as "mitigation damages," the Federal Circuit explained that "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Id. at 1376. Critically, in Indiana Michigan, the Federal Circuit upheld the trial court's decision not to award any damages, based in part upon its finding that the utility could not show that its actions were caused by DOE's breach and that these actions would have taken place even in the absence of a partial breach. Id. at 1376.

The Federal Circuit's holding in Indiana Michigan dictates the appropriate framework for the resolution of the issues presented in this case. For this reason, the question is not, as plaintiffs repeatedly and mistakenly contend in their pre-trial brief, simply whether the decision to build dry storage was a "reasonable" business judgment made in an effort to limit their damages. Indeed, characterizing the costs that they incurred as "mitigation damages" puts the

[13](...continued)
million, and have enabled us to understand which charges are (and are not) incremental to the delay in performance. Plaintiffs' complaints ignore the fact that, in seeking more than $90 million in alleged damages from the Federal Government, they, literally, bear the burden of proof.

cart before the horse. As a threshold matter, plaintiffs must prove, as a means of demonstrating that the costs that they incurred were "caused" by the partial breach, that they would not have incurred these so-called mitigation costs absent any delay. See San Carlos Irr. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1989) ("A plaintiff must show that but for the breach, the damages alleged would not have been suffered."); Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822, 831 (1961) ("[T]he measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract. Were this not true, the doctrine of mitigation of damages would lose much of its significance.").

As the United States Court of Appeals for the First Circuit recognized in rejecting a position similar to that taken by plaintiffs, the fact that an entity characterizes its damages as "mitigation damages" does not somehow eliminate the causation requirement that the entity prove, "as an element of its case, the extent to which it was damaged by the . . . breach." Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 560-62 (1st Cir. 1995) (emphasis in original). The First Circuit specifically found that characterizing claimed costs as mitigation damages prior to connecting them to the breach inappropriately assumes causation:

> The doctrine [of mitigation] thus presupposes, as a threshold matter, the existence of a causal nexus between the damages sought and the breach or tort, looking at whether and to what extent an intervening cause (i.e., a plaintiff's own negligence) may have contributed to these damages. Here, the question is not whether and to what extent Anchor's own conduct contributed to its damages; it is, rather, the threshold question of whether the damages Anchor sought were caused by the conduct of which Anchor complained. Accordingly, the doctrine of mitigation of damages is completely inapposite.

Id. (emphasis in original); see also Affiliated Foods, Inc. v. Puerto Rico Marine Mgmt., Inc., 645 F. Supp. 838, 839-40 (D.P.R. 1986) ("[I]t is a mistake to think that by merely placing the 'mitigation' label on any expense incurred an injured party is entitled to recover it. Plaintiff cannot escape the burden of proving that the losses sought to be avoided were caused, or would have been caused, by defendants' breaches.").

As such, the label that plaintiffs have chosen to attach to their claimed damages is of no moment. Plaintiffs' characterization of their claim as one for "mitigation damages" does not change their burden, nor does it eliminate the requirement, established by the Federal Circuit in Indiana Michigan, that the damages it seeks be costs that would not have been incurred absent a breach. 422 F.3d at 1376. Where, as in Indiana Michigan, the projects for which plaintiffs seek reimbursement are ones "which [they] would have had to pursue irrespective of DOE's partial breach," plaintiffs are not entitled to recover those costs. Id. This is true even if, as plaintiffs contend, their actions had some ameliorative effect on their spent fuel storage needs.

Only after plaintiffs have established that their expenses are directly attributable to DOE's breach does the burden shift to the Government to show that plaintiffs' mitigation efforts were not reasonable. Although plaintiffs spend pages of their pre-trial brief discussing legal standards for mitigation, this discussion is irrelevant until they have met their burden with respect to causation (and would only be relevant if, after plaintiffs met their burden, we actually challenged the reasonableness of plaintiffs' actions). Contrary to plaintiffs' assertions, we are not masquerading our arguments under the guise of causation to shift the burden of proof. Pl. Pre-Tr. Br. at 12. Instead, we simply argue that many of those costs for which plaintiffs seek compensation are ones that plaintiffs would have needed to incur even if DOE commenced

accepting fuel in 1998 at the rate established by the mechanism in the Standard Contract and are, therefore, not appropriately claimed as damages. Even the most eminently reasonable expenditure is not recoverable in a breach of contract action if it was not caused by the defendant's breach.

B. Plaintiffs Should Be Required To Paint A Reasonable "But For" World Against Which Its Damages Can Be Measured

Requiring plaintiffs to depict an accurate "but for" world is crucial to the Court's ability to evaluate whether certain items claimed as damages are costs that would have been incurred even if DOE had begun accepting spent fuel in 1998. This Court's decision in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007), recognizes the general principle that, when seeking expectancy damages, a plaintiff must establish a plausible "but for" world against which to measure causation. Specifically, the Court stated that "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." Id. at 386 (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see id. at 406 ("[t]o derive the proper amount for the damages award, the cost resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach" (quoting Bluebonnet, 339 F.3d at 1345)). The Court further clarified that PG&E's alleged expectancy damages could only be measured by reference to a world where DOE performed and that, without reference to the performance world, the measure of plaintiff's damages would be "irrelevant." Id. at 375 n.38; see PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006) ("Any issues related to the types of damages permitted under

the contract, if any, and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations." (emphasis added)).

The principle upon which the Court relied in PG&E is not unique to SNF cases or to cases involving the so-called "mitigation costs" that plaintiffs seek here. As a matter of well-established contract law, the failure of a plaintiff to prove that certain costs would not have been incurred in the "but for" world precludes a finding that the incurrence of costs was "caused" by the breach. See, e.g., Granite Mgt. Corp. v. United States, 74 Fed. Cl. 155, 169 (2006) (plaintiffs bear burden of propounding realistic "but for" scenario); Bluebonnet Savs Bank. F.S.B. v. United States, 67 Fed. Cl. 231, 237-38 (2005), vacated on other grounds, 339 F.3d 1341 (Fed. Cir. 2003); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been"). Requiring a plaintiff to demonstrate a "but for" world is simply another way of stating that a party cannot recover as damages from the Government any costs that it would have incurred in the absence of a breach. See Bluebonnet Savs. Bank, 339 F.3d at 1345; see also Indiana Michigan, 422 F.3d at 1376. Without establishing a "but for" world in which no partial breach occurred, plaintiffs leave the Court with no mechanism by which to determine whether its claimed costs were incremental to the delay in fuel acceptance, or whether they would have been incurred regardless of any delay.

In fact, plaintiffs' own claim for damage in this case is premised on their representation that the damages they seek are for activities that would not have been undertaken had DOE performed. Logically, for a plaintiff to represent that it would not have taken certain actions

absent a breach, it must know what actions it would have taken. More still, plaintiffs have provided Government with a very precise offset of $1,087,280 to their claimed damages, representing the cost of a hypothetical modification to the spent fuel pools at Harris that CP&L concedes would have been necessary to accommodate CP&L's storage needs if DOE had accepted fuel at the 3,000 MTU acceptance rate that they seek to impose on DOE. Undoubtedly, plaintiffs have included this adjustment because of their recognition that an accurate assessment of any damage caused by breach of the Standard Contract requires them to prove of a "but for" world in which certain expenses would have been incurred, and in which certain others would not.[14]

The truth is that courts routinely must resolve what would have happened had a breaching party performed: "[t]he position that one would have occupied if history had been different is purely hypothetical. And yet that is the problem that the trial court . . . [is] required to solve . . . The working rules of law by which court[s] are directed are never capable of exact and perfect application." 11 Corbin on Contracts § 53.3 (rev. ed. 2005) (emphasis added) (cited in PG&E, 73 Fed. Cl. at 397). Simply put, although it is true that the "but for" world has never occurred, that is true in all breach of contract cases. Yet, absent consideration of such a world, plaintiffs will be placed in a better position than had the contract been performed. See PG&E, 73 Fed. Cl. at 397.

[14] For this reason, plaintiffs' reliance upon Lisbon Contrs. Inc. v. United States, 828 F.2d 759 (Fed. Cir. 1987), is misplaced. Plaintiffs bear the burden of demonstrating what the world would have looked like in the absence of DOE's delay. To the extent that the world they paint fails to take into account major expenditures that they have avoided in the actual world (such as the cost of the pool modification), they have failed to sustain their burden of proof.

C. Regardless Of Whether The Court Employs A "But For" Or "Substantial Casual Factor" Analysis, Plaintiffs Must Show That Their Costs Would Not Have Incurred Absent The Alleged Breach

Plaintiffs assert that the Court should employ a "substantial causal factor" test rather than a traditional "but for" analysis See e.g. Pl. Pre-Tr Br. at 12. However, plaintiffs do not elaborate upon what they perceive to be the fundamental difference between these two tests. Implicit in plaintiffs' arguments, though, is the notion that, somehow, the "substantial causal factor" standard sets a lower threshold for them to meet and that this test obviates the need to paint a plausible picture of the actions that they would and would not have undertaken had DOE timely commenced accepting fuel. This argument does not accurately reflect plaintiffs' burden.

In Indiana Michigan, the Federal Circuit, in discussing the standard for proving damages, identified the requirement that the plaintiff utility show that "the breach is a substantial causal factor in the damages." However, it did not relieve the plaintiff from its obligation to show that its costs were ones directly attributable to DOE's partial breach, as opposed to an independent "business judgment." Indiana Michigan, 422 F.3d at 1373, 1376. In fact, the Federal Circuit affirmed the trial court's finding that the utility had failed to meet its burden of proof because the utility would have made the same business judgment to rerack its spent fuel pool even had DOE timely commenced performance. As Indiana Michigan illustrates, merely labeling the inquiry as the "substantial causal factor" test does not mean that a plaintiff can recover as damages costs that it would have incurred in the absence of a breach.

In fact, plaintiffs' endorsement of a "substantial factor" test of causation only serves to obscure the causation issue. The traditional causation standard in breach of contract cases in the Federal Circuit requires the plaintiff to prove that the claimed damage "was attributable solely to,

and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (Ct. Cl. 1972). The "substantial factor" test, by contrast, originated in tort law to analyze concurrent cause cases. See Keeton et al., Prosser and Keeton On The Law Of Torts, 266-68 (5th ed. 1984). However, even in tort cases, the substantial factor test has not "replaced the need for each liable defendant to be a but-for and substantial contributor to the indivisible injury," Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988), and the courts have made clear that, when the claimed damages could have resulted from multiple factors, the plaintiff "must establish that the breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Productions A.G. v. Sony Music Entertainment, Inc. 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002); see Columbia First Bank v. United States, 60 Fed. Cl. 97, 105 (2004) (under the substantial factor test, plaintiff required to show that the breach "directly and primarily" caused the alleged loss); Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943) (defining substantial factor to mean the "predominating" factor).[15]

---

[15] A concurrent causation issue was addressed in Krofft Entertainment, Inc. v. CBS Songs, 653 F. Supp. 1530 (S.D.N.Y. 1987). There, Krofft claimed that CBS breached a licensing agreement which caused Krofft to be unable to obtain financing to produce a Broadway play. CBS maintained that there could be no causation if it established that, even if it had not breached the license agreement, Krofft would still have been unable to obtain financing. The district court agreed. In addressing the law of causation, the district court cited McCormack, Handbook on the Law of Damages § 73 at 261 (1935), for the proposition that in a breach of contract case a breaching party's act or omission ordinarily can only be considered a "substantial factor" in causing the damage "where the damage would not have occurred 'but for' the alleged wrongful act or omission . . . ." Id. at 1534. Similarly, the court cited 5A Corbin on Contracts §§ 992 at 6-7, and 997 at 21 (1964), for the proposition that "[i]t must be shown that but for the breach" the damages would not have been incurred. Id. "Corbin concludes that a plaintiff cannot charge the other party with losses and disappointments that would have occurred in the absence of any breach by the other party, since such losses were 'not caused by the other party's breach of duty.'
(continued...)

The Federal Circuit has recognized that the "substantial factor" test and the "but for" test "generally yield identical results." Abbott Labs. v. Brennan, 952 F.2d 1346, 1352-53 (Fed. Cir. 1992). Indeed, in Abbott the Federal Circuit observed that, if anything, the "substantial factor" test is more rigorous than the "but for" test and further explained that, with the exception of a few particular classes of tort cases, "no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it . . ." Id. (citing Prosser & Keeton, The Law of Torts 268)).[16] A recent district court decision explains why, as applied to a breach of contract claim, the "substantial factor" test can be more exacting than a simple "but for" inquiry. See Addison Express L.L.C. v. Medway Air Ambulance, Inc., 2006 WL 1489385 (N.D. Tex. May 19, 2006) (cited as a "noteworthy" case in 11-55 Corbin on Contracts Supp. to § 55.9 (2007)). In that case, the court recognized that, "to be a substantial factor of causation, conduct must do more than 'furnish a condition' that makes an injury possible." Id. at * 5 (citations omitted). The court found that, although the plaintiff's injury might not have occurred

---

[15](...continued)
Id. § 992 at 6." Id.

[16] Recently, the drafters of the Restatement (Third) of Torts have announced their intention to abandon the "substantial factor" test in tort cases because of its widespread misapplication by courts. They specifically concluded that "some courts have accepted the proposition that, although the plaintiff cannot show the defendant's tortious conduct was a but-for cause of harm by a preponderance of the evidence, the plaintiff may still prevail by showing that the tortious conduct was a substantial factor in causing the harm," but that this "proposition is inconsistent with the substantial-factor standard adopted in Restatement Second of Torts § 431, Comment a." Restatement (Third) of Torts (Proposed Final Draft) § 26 cmt. j (2006). As the drafters recognized, "[t]he [causation] element that must be established by whatever standard of proof is the but-for or necessary-condition standard of this Section." Id. Accordingly, the proposed final draft of section 26 of the Restatement (Third) of Torts provides the following test for causation, in place of the "substantial factor" test: "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct."

"but for" the defendant's conduct, the resultant injury was too attenuated from that conduct to be deemed a "substantial factor." Id.

As this discussion makes clear, the label attached to the standard of causation does not change what the Federal Circuit held in Indiana Michigan – a case that, it bears noting, involves the same type of damage claims that are at issue in this case, for breach of the same contract that is at issue in this case. To establish causation in this context, Indiana Michigan requires plaintiffs to show that, at a minimum, had DOE begun accepting fuel in 1998, plaintiffs would not have incurred the costs they now seek as damages. Imposition of this requirement is necessary to ensure that plaintiffs are restored to the position they would have occupied in the absence of DOE's delay in performance, and are not reimbursed for costs that they otherwise would have been required to incur.

## II. PLAINTIFFS CANNOT PROVE THAT DOE'S DELAY IN PERFORMANCE CAUSED THEM TO INCUR THE DAMAGES THEY SEEK

### A. Plaintiffs Have Improperly Defined DOE's Obligations Under The Standard Contract And, Thus, Have Failed To Provide A Basis For Comparison To The Actual World

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original); see PG&E, 73 Fed. Cl. at 375 n.38 (damages can be determined "[o]nly by determining the scope of plaintiff's performance obligation"). Although plaintiffs contend that the NWPA and the Standard Contract required DOE to accept fuel at a rate that would eliminate the need for additional expenditures upon spent fuel storage after 1998 and therefore ask the Court to identify

a "reasonable" rate that satisfies this test, there is no basis in either the NWPA or the Standard Contract for such a test. In fact, the 3,000 MTU rate that plaintiffs have identified, and upon which they have based their damages claim, does not even satisfy this test. By arguing that DOE was obligated to perform at the rate that they deem to be reasonable, plaintiffs are asking the Court to rewrite a contract using terms to which the parties not only never agreed, but that were expressly rejected during the course of the parties' negotiations. Such terms are neither a part of the parties' contract nor, under the circumstances, "reasonable."[17]

1. The NWPA Does Not Mandate A Rate Of Acceptance

Plaintiffs go to great length to argue that the "objectives" of the NWPA support imposition of the rate of acceptance that they advocate. However, they fail to point to a single provision of that legislation that sets forth that requirement. The reason for this omission is simple: the NWPA is devoid of any requirement that DOE begin acceptance at any particular level. Indeed, as the Court concluded in PG&E,

> Plaintiff fails to cite, and the court has not discovered, any provision in the NWPA, or any statement in the legislative history of the NWPA (if the court could consider it – which plaintiff does not address), that indicates that Congress intended to obligate DOE to collect spent fuel at a rate sufficient to prevent utilities from having to incur any additional costs after January 31, 1998 for at-reactor storage. Rather, the plain language of the NWPA clearly states the Act's "purposes," none of which is to eliminate the need for additional at-reactor storage at utilities after January 31, 1998.

[17] As described in the next section, the parties' dispute over the rate of acceptance required by the Standard Contract is more than theoretical. As plaintiffs acknowledge, many of the expenditures for which recovery is sought in this lawsuit are recoverable only if plaintiffs can establish that DOE was obligated to accept fuel at the rate they advocate. These expenditures would have been necessary even if DOE had begun accepting fuel in 1998 at the rate established pursuant to the mechanism in the Standard Contract and, therefore, are not incremental to DOE's delay in performance.

PG&E, 73 Fed. Cl. at 389 (citing 42 U.S.C. § 10131(b)). The Court's conclusion in PG&E should apply with equal force in this case.

Plaintiffs assert that the NWPA requires DOE to accept fuel "as expeditiously as practicable." However, the Act, by its terms, only imposes this requirement after repository operations have commenced. 42 U.S.C. § 10222(a)(5)(a). Further, the NWPA did not require DOE to have an operating repository by January 31, 1998. See Indiana Michigan, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Instead, it permitted DOE to begin acceptance at a "facility," which could be either a repository or an interim storage facility. As a result, the "expeditiously as practicable" language in the NWPA is irrelevant until DOE accepts spent fuel at a repository.

The only specific deadline or obligation imposed by the NWPA that is relevant to the case is the requirement, set forth in Section 302(a) of the NWPA, 42 U.S.C. § 10222(a)(5)(B), that any contracts between the Secretary of Energy and generators and title holders of spent nuclear fuel provide that DOE dispose of SNF "beginning not later than January 31, 1998." DOE satisfied this obligation by promulgating the Standard Contract. Although plaintiffs now contend that inclusion of a contractual acceptance rate that does not preclude the need for additional at-reactor storage costs after January 31, 1998, would be "inconsistent with both the express terms and primary goals of the NWPA," Pl. Pre-Tr. Br. at 25, they were specifically afforded the opportunity to join in a proposed challenge to the Standard Contract as being inconsistent with the terms of the NWPA, but chose not to do so. See DX 34 at CP_FP00046289. Plaintiffs' pre-litigation actions speak louder than their words, and their current arguments that their expectations were based upon the terms of the NWPA ring hollow. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983).

("A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy.").

Plaintiffs include in their pre-trial brief, and apparently intend to designate at trial, the prior testimony of various DOE witnesses concerning their understanding of the scope of the NWPA. Reliance upon these statements is inappropriate because even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985). The opinions of DOE personnel are similarly inadmissible. PG& E, 73 Fed. Cl. at 390 ("The court therefore declines to afford any weight to 'after-the-fact' statements made by DOE officials about the intent of Congress in passing the NWPA.").[18]

---

[18] Plaintiffs refer in their brief to their obligation to pay fees as a quid pro quo, apparently rooted in the NWPA, for the acceptance rate that they advocate. Pls' Pre-Tr. Br. at 29. However, the portion of the NWPA that established the fee amount says nothing about DOE having any obligation to preclude additional at-reactor storage in exchange for a fee, and merely requires that contracts for spent fuel acceptance call for the commencement of performance or before January 31, 1998. See 42 U.S.C. § 10222(a)(2) & (3); see also Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (recognizing a "quid pro quo," pursuant to which the utilities paid for a guarantee that DOE would begin disposing of SNF by a day certain," but not mentioning the rate at which DOE is required to accept fuel.). Indeed, the stated purposes of the NWPA, set forth at 42 U.S.C. § 10131(b), indicate that the Act was designed to ensure the public health and safety rather than the economic interests of the utilities.

(continued...)

### 2. The Standard Contract Contains No Language Imposing, And Is Inconsistent With, The Rate Requirement That Plaintiffs Propose

In their pre-trial brief, plaintiffs never cite to any language in the Standard Contract that requires DOE to accept SNF at a rate designed to preclude utility at-reactor storage after 1998. The reason for this glaring omission, of course, is that the Standard Contract does not impose such an obligation. Standing alone, this fact should foreclose any argument that such a requirement – which would impose billions of dollars upon the United States without even the faintest glimmer of textual support – is consistent with the parties' intent.

Although analysis of the unambiguous terms of the contract should end the inquiry, plaintiffs' arguments do not fail simply because of the lack of contractual language supporting such a requirement. Where a contract includes an integration clause, "it is a fair bet that the parties agreed to no more than they said." Campbell v. United States, 661 F.2d 209, 218 (Ct. Cl. 1981). Here, the Standard Contract's integration clause provides that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." 10 C.F.R. § 961.1, Art. XXII. It is for precisely this reason that, in PG&E, this Court found that "[t]he existence of the integration

---

[18](...continued)

Plaintiffs also assert, through citations to various fee adequacy studies, that DOE has assessed the adequacy of the fees charged the utilities under the Standard Contract upon the basis of a 3,000 MTU steady-state rate of acceptance. However, as we will demonstrate at trial, the purpose of these analyses was to determine the cost for the entire waste acceptance program (which was designed to store spent fuel for 10,000 years) rather than the cost associated with a particular rate of acceptance during the first few years of performance. It is simply incorrect to assume that, as plaintiffs apparently do by relying upon a quid pro quo argument, that the utilities were "paying" for a particular rate of acceptance.

clause in the Standard Contract . . . militates strongly against modifying or supplementing it by adding a specific acceptance rate term." PG&E, 73 Fed. Cl. at 385.

Moreover, the rate that plaintiffs have asked the Court to incorporate, though perhaps "reasonable" in the eyes of the utilities that requested such a term, is wholly inconsistent with the intentional omission from the Standard Contract of any qualitative rate standard and the history of the parties' negotiations. In construing the terms of a contract, it is appropriate to consider evidence that the parties understood its plain language. See, e.g., TEG-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329 (Fed. Cir. 2006) (relying upon pre-award discussions between Government and bidders, in which the plaintiff participated, to confirm that the plaintiff's understanding of the contract comported with its plain language). In fact, because the Standard Contract was promulgated through notice-and-comment rulemaking in which both plaintiffs participated, there is a substantial administrative record containing industry comments and requests regarding the originally proposed contract terms that can assist in interpreting the Standard Contract. See, e.g., LTV Aerospace Corp., ASBCA No. 17,131, 76-1 BCA ¶ 11,840 (1976) (analyzing regulatory administrative history in interpreting contract clause developed through notice-and-comment rulemaking); Boeing Co., ASBCA No. 18,916, 74-2 BCA ¶ 10.976 (1974) (same). This record conclusively demonstrates that DOE unequivocally rejected a rate that was equivalent to, or more restrictive than, the rate that plaintiffs now seek to import and confirms that plaintiffs fully understood the clear implications of this rejection.

As described above, in response to DOE's February 4, 1983 proposed rule, which contained no rate of acceptance, utility groups of which plaintiffs were members specifically requested that DOE add a two-part minimum acceptance rate obligation in the Standard Contract

that would contractually obligate DOE to accept SNF at a rate "[1] commensurate with the amount of [SNF] then being generated together with [2] the accumulated backlog of [SNF]."[19] DX 25.34 at ARC 001 0334. The evidence will show, that despite this request – and others – to include specific obligations in the Standard Contract, DOE elected not to obligate itself to satisfy any particular rate of acceptance or qualitative test in the contract. See PG&E, 73 Fed. Cl. at 348 (acknowledging that "DOE did not adopt the suggestion of EEI and many of the utilities . . . to incorporate into the Standard Contract a firm commitment from DOE regarding the rate of DOE's acceptance of SNF from utilities"). As Robert Morgan, at the time the director of DOE's Office of Civilian Radioactive Waste Management, is expected to testify (and has repeatedly testified), uncertainties surrounding the waste acceptance program that was to commence 15 years in the future would have made it "unconscionable" for DOE to commit to any particular rate of acceptance.[20] Instead of including a rate of acceptance or qualitative test in the contract, DOE included a provision that obligated DOE to begin issuing an APR and ACR as the date for commencement drew closer. Plaintiffs thus understood, as evidenced by their active involvement in the notice-and-comment process, "that the ACR/APR and DCS/FDS scheme was the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery schedule[] would be determined." PG&E, 73 Fed. Cl. at 399.

---

[19] As described above, the rate that plaintiffs advocate is equivalent to, if not more restrictive than, the rate proposed by EEI and UNWMG.

[20] The parties recognized as much in the body of the Standard Contract, and specifically agreed that its terms "had been developed in the light of uncertainties necessarily attendant upon long-term contracts." 10 C.F.R. § 961.11, Art. XV.

Moreover, the evidence will show that, even after the promulgation and execution of the Standard Contract, representatives of EEI and UNWMG continued to request that DOE add to the Standard Contract an obligation concerning the rate of acceptance and that DOE did not accept any industry request for a minimum receiving rate for SNF. Despite the repeated rejection of its request for inclusion of a rate into the Standard Contract, EEI continued to press the matter. Even as late as December 1992, EEI continued to advocate that contract holders request the inclusion of a rate of acceptance in the Standard Contract These repeated requests, and DOE's rejection of the requests, is unequivocal evidence that the terms were not included in the contract. Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n, 745 F.2d 281, 289 (4th Cir. 1984) (unilateral statements of position before an integrated contract is entered do not become part of contract when party arguing for their inclusion was unable to secure adoption of statements in contract).

3. The Documents Upon Which Plaintiffs Rely Do Not Evidence DOE's Intent To Be Bound To Any Rate Of Acceptance, Let Alone The One Plaintiffs Advocate

Beginning on page 31 of their pre-trial brief (and in a series of bullet points beginning on page 37), plaintiffs assert that certain "contemporaneous" documents manifest DOE's understanding that it was required, under the terms of the Standard Contract, to accept spent fuel at least at the rate that they advocate. However, there is nothing contemporaneous about these documents. Moreover, none of the statements upon which plaintiffs rely demonstrate an understanding of DOE's obligations under the Standard Contract.

First, noticeably absent from plaintiffs' laundry list of evidence is any document that pre-dates the execution of the Standard Contract. The oldest documents that plaintiffs cite are a

September 1983 Draft Mission Plan and the statements that Mr. Morgan made in December 1983 as part of the Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting. Of course, both of these statements were made after the Standard Contract was signed and, therefore, cannot be evidence of any "meeting of the minds." See, e.g., PG&E, 73 Fed. Cl. at 383 n.41 ("[D]espite plaintiff's statement that 'the parties understood from the time of contracting . . . that a reasonable acceptance rate should accomplish [the two part obligation," not one of the numerous citations provided by plaintiff in support of this statement is contemporaneous with or antecedent to the execution of the Standard Contract between the parties on June 30, 1983").

Further, the documents upon which plaintiffs rely do not reflect DOE's understanding of its obligations under the Standard Contract. In National By-Products, Inc. v. United States, 405 F.2d 1256 (Ct. Cl. 1969), the Court of Claims recognized that, "[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." Id. at 1263. The Court rejected a plaintiff's effort to collect damages for the Government's failure to satisfy hopes and goals that were never made contractual obligations:

> Under these principles, for a government representation that a right-bank levee would be built to be binding as a contractual obligation, it must have been in the form of an undertaking rather than a mere prediction or statement of opinion or intention. . . . If . . . the Government's statement was subject to two reasonable interpretations, one that it was an undertaking, the other that it was a prediction, and the parties chose opposite ones, then there is no contract covering that representation, unless one side either knew or should have known the meaning attached to it by the other. The Government prevails, in other words, if we find that the parties arrived at a contract which provided for no right-bank levee, or that they reached no mutual agreement at all on this issue.

Id. at 1264 (emphasis added).

The Court in National By-Products determined that, although the Government's representative had represented during contract negotiations "that in its then view the right-bank dike would eventually come into being," such "a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built." Id. at 1270. "Rather, the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur." Id. at 1270; see id. at 1269 ("we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem . . . and not to any feeling of contractual liability" (emphasis in original)). Accordingly, the Court found that the plaintiff had not established "any contractual obligation on the part of the Government to build, or have built, a right-bank levee" upon which a damages award could be based. Id. at 1272; see also Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("[T]he Railroad's historical practice – which has not been incorporated in any written pronouncement for the information of the public – could not modify the plain language of the sales contract between the plaintiff and the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose").

In this case, even plaintiffs' own descriptions of the documents upon which they rely demonstrate that the statements that DOE officials made merely reflected their plans for the waste management system, rather than DOE's obligations under the Standard Contract. See, e.g.,

Pl. Pre-Tr. Br. at 31 (describing how DOE's Draft Mission Plan reflected how it "planned to implement the program") (emphasis added); id. at 33 (relying upon the Robert Morgan's statements in December 1983 concerning the "basic strategy . . . outlined in the mission plan." (emphasis added)). Beyond the fact (which plaintiffs do not address) that consideration of statements made by DOE officials as a means of interpreting the Standard Contract would directly contravene the contract's integration clause, these statements are not probative of DOE's understanding of what was required under the Standard Contract. Rather, the documents to which plaintiffs cite consistently indicate that they are merely plans or strategies, that they are not contractually binding, and that it is the ACR process contained in the Standard Contract that will be the means through which a firm delivery schedule is to be reached. As this Court explained in examining the litany of documents that the radioactive waste management program has generated during the last 20 years and upon which plaintiffs now rely, "the court's role is not to enforce and impose on DOE an obligation to carry out a strategy as it was envisioned at that time in the absence of a contractual understanding." See PG&E, 73 Fed. Cl. at 391. Simply stated, "examples of predictions, hopes, goals, or aspirations . . . do not amount to binding promises that can be enforced by the court through the award of contract damages." Id. at 393.

4. The Court Should Not Impose A "Reasonable" Rate Of Acceptance

a. The Parties Reached An Agreement Concerning The Manner In Which Rate Is To Be Calculated

Despite the unrefuted evidence that DOE specifically considered – and rejected – the requests of various interested parties, including plaintiffs, that DOE obligate itself contractually to satisfy qualitative acceptance rate standards, plaintiffs contend that the Court should determine

a "reasonable" acceptance rate based upon those proposed standards because the acceptance rate is an "omitted" term. This argument is misguided.

We agree that, in appropriate circumstances, if a term of a contract "which is essential to a determination of [the parties'] rights and duties" has been omitted from a contract, "a term which is reasonable in the circumstances may be supplied by the court." Restatement (Second) of Contracts § 204 (1981). However, an "omission" occurs where "[t]he parties to an agreement . . . entirely fail to foresee the situation which later arises and gives rise to a dispute" or whether they "have expectations but fail to manifest them either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse." Id. § 204 cmt. b. "Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention" when negotiating the contract. Id. § 204 cmt. d.

In this case, none of these circumstances described in Restatement (Second) of Contracts § 204 is present. As this Court found in PG&E, the acceptance rate was a contentious and important issue carefully considered by all parties involved in the nuclear industry. PG&E, 73 Fed. Cl. at 339. As a result, it cannot plausibly be argued that the parties failed to foresee the situation that later arose and gave rise to the dispute, or that any other of the circumstances identified in Restatement for imposing a reasonable term are applicable. Simply stated, the parties squarely considered, and reached resolution upon, the method by which the rate of acceptance would be reached. To insert a "reasonable" term would render superfluous the terms upon which the parties did agree.

Plaintiffs' reliance upon the Court of Claims' decision in David Nassif Assocs. v. United States, 557 F.2d 249 (Ct. Cl. 1977), is, for this reason, misplaced. In David Nassif, a construction contract failed to specify the size of a contractually-required cafeteria, or even the manner in which the size would be determined. See David Nassif Assocs. v. United States, 644 F.2d 4, 5 (Ct. Cl. 1981). During contract negotiations, "the parties never discussed the matter of the cafeteria's size" and, "[e]ven more than that, it was quite literally an issue to which neither party ever gave any thought." David Nassif, 557 F.2d at 258 n.5 (emphasis in original). The Court observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." Id. at 258. That, however, was because, "by mutual oversight, the matter of the cafeteria size was never focused upon, either in the negotiations or in the subsequent lease agreement itself." David Nassif, 644 F.2d at 5. Accordingly, the Court assumed the task of determining the size of the cafeteria "that the parties would have agreed upon at the time of their initial lease negotiations . . . ." Id. at 7.

Nassif is distinguishable because, in that case, the parties never considered the issue that the Court was required to insert. By contrast, and as the Court explained in PG&E, in this case, "DOE specifically chose not to obligate itself to a firm acceptance rate, and [] all parties to the Standard Contract recognized that choice, even if they had hoped a rate would be specifically provided for." PG&E, 73 Fed. Cl. at 382. Based upon the request of the utilities, DOE placed into the final version of the Standard Contract the contractual mechanism by which acceptance allocations would be determined – namely, the 1991 ACR/APR. It simply cannot be said that the parties, through "oversight," did not think about the rate during contract formation. To the

contrary, the Court's imposition of its own rate would create a contract that the parties did not create themselves.

In this regard, plaintiffs' concession on page 25 of their pre-brief that "Congress chose not to implement the NWPA by exercising its regulatory and taxing powers, but rather required that its provisions be implemented by contract," is significant. At bottom, the parties' dispute centers upon, and jurisdiction before this Court is grounded upon, the existence of a contract. As long as this is the case, any arguments about what is "reasonable" must focus not upon not what is a reasonable legislative solution to the problem of spent fuel storage, but upon what is reasonable in light of the plain terms of the Standard Contract and the express rejection of the utilities' request to include an acceptance rate in the Standard Contract.

b. Plaintiffs' Arguments Would Render The Contract Too Indefinite To Enforce

In Nassif, the Court of Claims expressly limited the trial court's ability to supply its own term to those agreements that are "otherwise sufficiently specific to be enforceable." Nassif, 557 F.2d at 258. A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have . . . sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree upon those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[I]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the

agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("Where an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result. ").

"Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001); Shann v. Dunk, 84 F.3d 73, 81 (2d Cir. 1996) ("We believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term.").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." Nassif, 644 F.2d at 7. However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed.

In this case, to the extent that plaintiffs truly believe that the Court should abandon the only contractual mechanism for determining acceptance rate obligations and simply impose its own rate based upon its own selected standards, its arguments would empower the Court to

create the central term of the parties' contract. The enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with the our demonstration that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of a reasonable schedule term. A rejection of our position would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . But essential contract terms may not be supplied by a court. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[21]

---

[21] It is true that the a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

c. The Rate That Plaintiffs Advocate Does Not Satisfy Their Own Criteria

Plaintiffs assert throughout their pre-trial brief that the Court should accept 3,000 MTU rate of acceptance because it is "reasonable." Presumably, they have selected this number because it comports with many of the planning documents that DOE generated in the early phases of the waste management program and, thus, appears to cloak their theory with legitimacy. However, plaintiffs never account for the fact that this rate, although undeniably higher than a 900 MTU rate, does not achieve the goal of eliminating the need for expenditures upon additional at-reactor storage after 1998. This infirmity is evidenced by the fact that the 3,000 MTU rate that plaintiffs propose does not exceed the industry-wide generation rate until the fifth year of the program. Plaintiffs themselves acknowledge the need, at the 3,000 MTU rate, not only to perform a rerack at one of spent fuel pools at the Harris plant, the cost of which exceeds $1 million, but also the need to transship 782 assemblies to the Harris plant (the cost of which, using plaintiffs' own methodology, approaches $7 million, see PX 137, DX 304). Simply stated, the rate that plaintiffs propose not only is not contained in the Standard Contract, but does not even satisfy the qualitative test that they have proposed because it requires them to make substantial expenditures to store fuel after January 31, 1998. Thus, even if plaintiffs' request that the Court insert a "reasonable" rate of acceptance into the Standard Contract were appropriate, it is evident that they have failed to provide such a rate and have, therefore, failed to sustain the burden of proving a plausible "but for scenario."[22]

[22] Truly eliminating, upon an industry-wide basis, the need for expenditures upon additional at-reactor storage after January 31, 1998, would have required either the commencement of fuel acceptance prior to 1998 (which is not required by the Standard Contract) (continued...)

5. The Rate Of Acceptance Should Be Determined In Accordance With The APR/ACR Process Mandated By The Standard Contract, In Which Plaintiffs Willingly Participated

Although plaintiffs ask the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, to do so, the Court would have to ignore the actual language of the Standard Contract. That language, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that ultimately allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). Pursuant to this scheduling mechanism, DOE issued the 1991 ACR and requested DCSs from utilities, many of which it then approved, thereby defining the schedule of performance beginning in 1998. If the Court disregards these provisions and the actions of the parties in accordance with these provisions, the Court is left with no method by which to assess damages arising from DOE's delay. Indeed, as the Court explained in PG&E:

> If the court were to insert a firm acceptance rate obligation of 3,000 MTU/year in the Standard Contract, or if it were the understanding of the parties that the Standard Contract continued a firm acceptance rate obligation that the court should somehow enforce, then the ACR provision would be rendered "inexplicable, inoperative . . . , insignificant, meaningless, [or] superfluous." If

---

[22](...continued)
or acceptance at a rate that is far higher than the rate that plaintiffs advocate. In apparent recognition of the fact that the rate that they champion does not satisfy the understanding that they claim to have, plaintiffs refer to the 3,000 MTU rate as being the "most" reasonable rate. Pl. Pre-Tr. Br. at 42. Ostensibly, a rate is "reasonable" from plaintiffs' perspective if neither CP&L nor FPC would be required to make expenditures upon at-reactor storage after January 31, 1998, even if that rate would not prevent other utilities from having to make such expenditures. Given that the Standard Contract was executed by all members of the industry, this interpretation cannot possibly be correct. See Restatement (Second) of Contracts§ 211(b) (requiring standardized contracts to be interpreted uniformly amongst all contract holders).

> there existed a firm acceptance rate obligation, there would be no need to "project[ ]" the "annual receiving capacity for the DOE facility" and update such projections annually.

PG&E, 73 Fed. Cl. at 387 (citations omitted).

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract recognizes the uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the

parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later.[23] Id.

DOE and the utilities acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. As we will establish at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at an MRS prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010.

DOE then drafted, with the assistance of the utilities, the instructions for the submission of DCSs. After the instructions were issued, numerous utilities, including plaintiffs, submitted DCSs that were based upon the rates contained in the 1991 ACR, which were in turn approved by DOE. In full compliance with this procedure, plaintiffs timely submitted DCSs (and even an FDS) for DOE approval, never once objecting to the amount or order of allocations that they

---

[23] If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE. 10 C.F.R. § 961.11, Art. V.B.2. The contract holder may then submit its dispute to the contracting officer for a decision, the contracting officer issues a decision on the schedule, and the contracting officer's final decision upon the DCS "shall be final and conclusive" until, within 90 days, the contract holder appeals to the Energy Board of Contract Appeals. Id., Art. XVI.A.

received. In fact, on numerous occasions, plaintiffs engaged in detailed correspondence with the contracting officer in an effort to ensure that there was no miscommunication about when, where, and how DOE would accept spent fuel from plaintiffs. The facts that plaintiffs had an open line of communication with DOE, did not object to the rates promulgated during the ACR/APR process, and were active and willing participants in that process is proof positive that the rate contained in the 1991 ACR was well within the parameters of plaintiffs' understanding of DOE's obligations under the Standard Contract. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). For this reason, plaintiffs' attempt to impose a higher rate should be rejected.

Plaintiffs argue in their pre-trial brief that the rates contained in the 1991 ACR reflect a "minimalist" interpretation of DOE's obligations under the Standard Contract or, alternately, were prohibited by the 1987 NWPA Amendments Act because they violated the statutory "linkage" that prevented construction the MRS facility prior to the issuance of a license for the construction of a repository. See 42 U.S.C. § 10168(d)(1) . The Court can easily dispense with these arguments. First, the evidence will show that, when it promulgated the 1991 ACR, DOE was aware that a repository would not be ready by 1998 and, instead, was making a good-faith effort to secure performance at an MRS. Far from seeking to manipulate its obligations under the Standard Contract, DOE promulgated the rates contained in the 1991 ACR as part of its plan to begin performance at a repository in 1998 at as great a rate as existing law would permit. As the evidence will demonstrate, and as DOE publicly explained, DOE believed that the best strategy for finding a party to host an MRS would be to leave the linkages in place, thereby alleviating concern from a potential host that the MRS would become a de facto repository. Once a

repository host was located, DOE intended to seek congressional authorization to lift the construction linkage, a change in law that DOE believed would be easier to obtain after an MRS host had been located. This change in the law is just one of several ways that the performance world would have differed from the world that exists today. However, it does not make DOE's plan "illegal" or demonstrate that the agency somehow acted in bad faith.

B. Plaintiffs' Claim For Damages Includes Many Expenditures That Were Not Caused By DOE's Delay In Accepting Spent Fuel

In their pre-trial brief, plaintiffs have identified 11 separate areas of disagreement between the parties about which expenditures are attributable to, and which losses plaintiffs have avoided as a result of, the Government's failure to accept spent fuel on or before January 31, 1998. We agree with plaintiffs' identification of the issues that require the Court's resolution and set forth our position with respect to these issues below.[24]

1. Activation Of Spent Fuel Pools "C" And "D" At CP&L's Harris Plant

Whether the cost of activating pools "C" and "D" at Harris is traceable to the delay in the Government's performance depends exclusively upon what was required of DOE pursuant to the Standard Contract. At a 3,000 MTU rate, CP&L asserts that it would not have been required to activate these pools. However, CP&L acknowledges that, had the Government performed at the rate contained in the 1991 ACR (the 900 MTU rate), the company still would have been required to activate these pools. Resolution of whether plaintiffs are entitled to the cost of activating the pool therefore requires a determination of a rate of acceptance under the Standard Contract. If the Court adopts the 900 MTU rate, plaintiffs will have failed to show that the costs of "C" and

[24] In an effort to analyze related issues together, we have presented the issues in a different order than the order contained in plaintiffs' brief.

"D" pool activation would not have been incurred irrespective of a breach, and the costs therefore will not be recoverable.

Beyond the issue of rate, one additional issue remains with respect to the activation of the "C" and "D" pools at Harris. Plaintiffs acknowledge that, at the 900 MTU rate of acceptance, they would have been required to activate the Harris "C" and "D" pools and install a complement of four boiling water reactor ("BWR") racks in the "C" pool. DX 329. For this reason, they have reduced their damage claim at the 900 MTU rate to account for these activities. Plaintiffs' own analysis also concludes, however, that six additional pressurized water reactor ("PWR") racks would be needed at the 900 MTU rate, yet, for some reason, fail to make a monetary adjustment for the cost of placing these six racks into use. The evidence will show that, because the "A" and "B" pools were already full (in part because of plaintiffs' acknowledged need to install, at the 900 MTU rate, a BWR rack into the only empty space in the "A" or "B" pool), these six racks would have to be installed in the "C" pool. Plaintiffs installed 14 racks in the "C" pool in the actual world for which they seek damages, and acknowledge they would have been required to install a total of 10 racks (four BWR racks and six PWR racks) at the 900 MTU rate. It follows that, at the 900 MTU rate, only four of the 14 racks are incremental to DOE's delay and that the cost of installing the six racks in question must be deducted from plaintiffs' damages claim. Using the methodology that plaintiffs have employed to calculate the cost of the racks that they have installed in the actual world, our accounting expert, Larry Johnson, will testify that the cost of these six racks – $2,296,806 – should therefore be deducted from plaintiffs' damages claim. When combined with the cost of the single BWR rack added to the "B" pool ($227,500), Mr.

Johnson will testify that the total deduction for the costs of racks that would have needed to be installed at the 900 MTU rate is $2,524,326.

2. Disposal Of Unused Racks And Crud

Plaintiffs contend that they are entitled to recover the costs they incurred to clean up "crud" that had accumulated in the Harris "C" and "D" Pools and also to dispose of certain unused storage racks. According to plaintiffs, these actions would not have been necessary had DOE begun accepting fuel in 1998 because the crud and racks could have remained where they were.

Plaintiffs' argument fails for two reasons. First, as described above, plaintiffs assume a performance rate that is not required under the Standard Contract. CP&L admits that, had DOE arrived at the 900 MTU rate, the company would have been required to dispose of the unused crud and racks in the same manner as it did in the actual world. DX 304. Accordingly, the costs of the crud cleanup and the rack disposal are not recoverable if the Court adopts the 900 MTU rate.

Second, our technical expert, Gregory Maret, who has extensive experience in nuclear power plant operations, will also testify that, regardless of the rate of acceptance, the same cleanup and disposal activities would be required upon the decommissioning of the Harris plant and that these activities and the associated costs would be the same at the time of decommissioning as they are today. Because, again, these costs would be incurred irrespective of any breach, they are not recoverable in this case.[25]

---

[25] Plaintiffs appear to argue that the costs of these activities should not be deducted from their damages claim because they involve losses that CP&L will avoid in the future. This (continued...)

3. Harris "C" And "D"Pool Licensing Expenses

Plaintiffs contend that they are entitled to the cost of legal expenses to defend CP&L in connection with an intervenor's challenge to CP&L license request and to the cost of communications activities incurred in connection with the intervenor's challenge to the activation of the "C" an "D" pools. These charges are not recoverable for two reasons.

First, as plaintiffs acknowledge, CP&L would have been required to incur these costs had DOE accepted fuel at the 900 MTU rate. DX 304. Because, for the reasons discussed above, the Standard Contract does not require to pick up spent fuel at a faster rate, these expenses should not be deemed incremental to any breach.

Second, even if the Court were to adopt a 3,000 MTU rate of acceptance, the legal and communication costs for which plaintiffs seek recovery were necessitated by the actions of literally, an intervening party. They are therefore not a direct result of the delay in performance and not recoverable.

The requirement, articulated in Indiana Michigan, that a loss be foreseeable requires a showing that the loss be more than a "merely remote or possible" consequence. Old Stone Corp. v. United States, 450 F.3d 1360, 1375 (Fed. Cir. 2006) (considering proximate causation in connection with its foreseeability analysis), cert. denied, 127 S. Ct. 1831 (2007). For this reason, plaintiffs bear the burden of introducing clear proof that it was injured as a direct result of DOE's

[25](...continued)
argument does not make sense. In challenging CP&L's claim for reimbursement for crud cleanup and rack disposal costs, we are not suggesting that the Government is entitled to an offset. Rather, we are simply arguing that the cost of cleaning up crud and removing racks from the "C" and "D" pools are activities that CP&L would ultimately have been required to perform, "irrespective of" any breach. Under Indiana Michigan, these costs cannot be deemed to have been caused by the alleged breach and are, therefore, are not recoverable as damages.

delay in accepting its SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897); Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951); see Quiman, 39 Fed. Cl. at 171. In other words, "[t]here must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27.

The Federal Circuit's discussion of foreseeability and proximate causation in Old Stone confirms the continuing viability of the directness requirement. In support of its statement that losses must be proximately caused by the breach, the Court selected as an illustrative example a state court case from California, Lewis Jorge Construction Management, Inc. v. Pomona Unified School District, 102 P.3d 257, 265 (2004). In a parenthetical, the Federal Circuit described Lewis Jorge Construction as having held that a "breach did not 'directly or necessarily cause [the contractor's] loss,' where [the] contractor alleged [that the] breach caused the contractor's surety to reduce [the] contractor's 'bonding' rating, and that reduction in bonding rating caused [the] loss of other prospective contracts." Old Stone, 450 F.3d at 1375. As the Federal Circuit's description of Lewis Jorge Construction indicates, the loss claimed by that contractor in that case was not proximately caused by the breach because the chain of causation between the breach (the termination of a construction contract by a school district) and the adverse consequences (the contractor's loss of future contracts) was interrupted by the intervening actions of a third party – specifically, the surety's decision to reduce the contractor's bonding rating.

Plaintiffs' claim for reimbursement for their legal and communication costs represent costs that, as in Lewis Jorge Construction, were incurred as a result of the efforts of an

intervening party – namely, the intervenors who challenged the activation of the Harris pools. These costs were not costs, such as licensing fees to the Nuclear Regulatory Commission, that plaintiffs necessarily would be required to pay to activate the pools pursuant to an existing regulatory scheme. Instead, they are costs that would not have been incurred without the affirmative, independent decision of a third party to challenge the activation. As a result, they cannot possibly have flown "inevitably" from the delay in performance. Ramsey, 121 Ct. Cl. at 434, 101 F. Supp. at 357. The conduct of the interveners necessarily breaks the chain of direct and proximate causation between DOE's delay in performance and the damages for which plaintiffs seek recovery. These damages are, therefore, not recoverable as a matter of law.

4. Upgrade To The Harris Component Cooling Water System

Contemporaneously with its activation of the "C" and "D" pools, CP&L upgraded the component cooling water ("CCW") system at its Harris plant by installing new pump impellers. Plaintiffs now seek to recover the costs of this project. Their claim fails for two reasons.

First, as described above, plaintiffs acknowledge that, had DOE begun accepting fuel at the 900 MTU rate, CP&L would have been required to activate the "C" and "D" pools at Harris to store additional fuel. If, as plaintiffs assert on page 48 their pre-trial brief, "the CCW upgrades were necessary for the C and D pool activation," then it necessarily follows that the cost of this project would have been incurred had DOE performed at the 900 MTU rate and that such costs are not incremental to any breach.

Second, the evidence will show that, for business reasons that are wholly independent of the pool activation project, CP&L embarked upon an effort to perform a "power uprate" and to replace the steam generators at the Harris plant. As Mr. Maret will testify, and as CP&L's

contemporaneous documentation will demonstrate, these projects, in and of themselves, required the same pump impeller upgrades that CP&L performed. Once again, this work would have been performed "irrespective of" any partial breach by DOE, Indiana Michigan, 422 F.3d at 1376, and are, therefore, not recoverable.

Curiously, plaintiffs assert on pages 48 and 49 of their pre-trial brief that "[w]hether or not Progress Energy would have had to upgrade the CCW for unrelated reasons is simply not relevant to the bargain it struck with DOE." This argument is a misstatement of the law. As discussed in detail above, Indiana Michigan unequivocally held that a spent nuclear fuel plaintiff cannot prove the requisite element of causation where, as here, the project for which it seeks compensation is one that the company would have pursued "irrespective of DOE's partial breach." Indiana Michigan, 422 F.3d at 1376. Reimbursing plaintiffs for expenditures they would have incurred even if DOE had timely commenced accepting spent fuel would violate a cardinal principle of awarding expectation damages – that a plaintiff should not be placed in a better position than they would have occupied in the absence of a breach. As long as plaintiffs would have been required to incur this cost even had DOE timely commenced fuel acceptance, that cost cannot be attributed to the delay in performance and is not recoverable as a matter of law.

5. Rerack At Crystal River

Plaintiffs' damages claim includes the cost of replacing degraded racks in one of the two spent fuel pools at the FPC's Crystal River plant. This portion of plaintiff's claim fails because FPC would have reracked the spent fuel pool to resolve the long-term problems caused by the degradation of the racks, irrespective of whether the DOE began to accept spent nuclear fuel in

1998. Any increased spent fuel storage space gained by the rerack was incidental to resolving the more substantial issues related to rack degradation due to the presence in the racks at the Crystal River spent fuel pool of a substance known as Boraflex.

Boraflex is a neutron absorbing material used in some older spent fuel storage racks to control nuclear reactivity in the spent fuel pool. When exposed to sufficient doses of radiation, the Boraflex becomes brittle. Because of this brittleness, the Boraflex may shrink, resulting in gaps and cracks in the material. In addition, contact with water causes the irradiated Boraflex to dissolve, releasing silica into the spent fuel pool. These characteristics of Boraflex can have two major effects upon a spent fuel pool. First, the cracks and gaps reduce the ability of the Boraflex to control reactivity. Second, when spent fuel pool water containing elevated amounts of silica mixes with reactor coolant water, elevated silica levels occur in the reactor core. At the intense heat levels of the reactor core during operation, silica has been known to form deposits on the fuel assemblies, complicating reactor operations.

In 1995, FPC management identified and assigned a team of employees to address the issue of Boraflex degradation in the Crystal River racks. By the end of December 1997, FPC management decided to replace all of the Boraflex racks with new racks, thereby resolving the Boraflex problem permanently and modestly supplementing the spent fuel storage capacity of the pool. After the decision to rerack was made, further analysis demonstrated that a greater number of storage spaces could be obtained. DX 182, 226.

Plaintiffs' contention that the Department of Energy's delay in the acceptance of spent nuclear fuel was caused by FPC's decision to rerack is belied by the reports and analysis unequivocally calling management's attention to the need for a permanent solution to the

Boraflex problem. As was the case with respect to the "mitigation" costs deemed unrecoverable in Indiana Michigan, FPC employed its reasonable business judgment to permanently resolve a chronic and serious operational problem. See Indiana Michigan, 422 F.3d at 1376. The evidence will show that any increase in storage space attributable to the rerack was, at best, an incidental benefit that in no way affected the decisionmaking process. In fact, when FPC made its decision to perform a rerack, the increase in storage capacity that it anticipated was significantly less than the even the modest gain that it actually achieved.

Finally, plaintiffs' argument that FPC would have elected to address the problems with alternative methods trivializes the impact that Boraflex degradation imposed upon Crystal River operations. As Mr. Maret will testify, these alternatives would not have resolved the problems that FPC's own management acknowledged needed to be cured. Moreover, the alternative methods that plaintiffs propose not only would have required FPC to incur substantial direct costs, for which plaintiffs have made no allowance in calculating their damages, but, more importantly, could easily have delayed the restart of the reactor after a refueling outage, at a cost of approximately $850,000 per day.

To reimburse FPC for a decision that the company would have made even absent any DOE delay would place the company in a better position that the company would have occupied had DOE timely commenced accepting spent fuel. The cost of the Crystal River rerack should therefore be removed from plaintiffs' damages claim.

6. Railroad Track Maintenance Costs

Plaintiffs' damage claim includes the cost of performing railroad track maintenance at CP&L's Robinson and Harris plants. The inclusion of this claim ignores the fact that, in

completing its DCSs, CP&L specifically expressed a preference that DOE accept spent fuel by rail (rather than by truck or by barge). There is simply no reason to think that, had DOE performed, it would not have accommodated plaintiffs' request that its spent fuel casks be shipped by rail (a method that is standard in the industry for shipping fuel and that plaintiffs had used for their own transshipment campaigns).[26] Moreover, plaintiffs themselves acknowledge that, at the 900 MTU rate of acceptance, CP&L would have been required to transship casks by rail to Harris through 2004.[27] Plaintiffs simply cannot prove that they would not have made expenditures upon railroad track maintenance (and that they would have permitted the existing rail lines to deteriorate) if DOE had commenced accepting fuel in 1998. For this reason, the costs they have included for railroad track maintenance are not recoverable.

7. Costs Of Cask Loadings

There is no dispute that loading fuel into the casks that DOE provides pursuant to the Standard Contract will require a substantial amount of labor by nuclear power plant operators. Our technical and accounting experts will testify that, had DOE performed at the 900 MTU rate using the rail casks that CP&L specifically requested (and that CP&L had used to perform its own transshipments), CP&L and FPC would have been required to load 132 casks through 2005,

---

[26] Neither Robinson nor Harris is accessible by barge. Although, conceivably, CP&L might have changed its request to have its fuel shipped by truck, Mr. Maret will testify that shipping casks by truck is less efficient because the amount of spent fuel that can be transported in a truck cask is less than the amount that can be transported in a rail cask. As a result, using a truck cask would require CP&L to spend substantially more employee time loading casks, an expense that would easily exceed the relatively small amount that CP&L was required to spend on railroad maintenance. This loss in efficiency explains plaintiffs' acknowledgment on page 50 of their pre-trial brief that "there would have been advantages to using" rail casks.

[27] At the 3,000 MTU rate, these transshipments would have continued through 2001.

and that the labor cost associated with these loadings, based upon the labor costs that plaintiffs have employed in this case to compute their own cost to transship fuel, would be $4,427,726.[28] This amount, which reflects a series of conservative assumptions, represents a cost that plaintiffs have avoided having to expend as a result of DOE's breach. Much like the cost of the rack installation at the Harris plant that CP&L was not required to perform because of DOE's delay in accepting fuel (the cost of which CP&L has calculated down to the dollar), these costs represent costs that plaintiffs have avoided and should be deducted from any award of damages.

Plaintiffs contend that, because the cask loading costs are dependent upon the type of cask that DOE provides, this offset is too speculative to compute. This argument is of no avail because, as noted above, it represents the most conservative calculation of the expenditures that would be required to support loading to DOE. First, CP&L specifically requested that DOE provide a rail cask for each of its plants.[29] There is simply no reason to believe that the company would have requested a cask that did not minimize its expenditures upon labor costs.

Second, the use of casks other than the ones that CP&L requested either would have required substantially more labor (and thus greater expenditures) or would have required the company to make expenditures upon plant modifications that would substantially have exceeded the cost of loading these casks. Conceivably, CP&L could have used truck casks or rail casks

---

[28] At the 3,000 MTU rate, plaintiffs would be required to load 310 casks, at a total cost of $9,818,462.

[29] A feasibility study of the fuel handling area and floors of the spent fuel pool at FPC's Crystal River plant determined that these areas were not capable of accommodating a 120-ton cask drop during cask loading, but that the areas were acceptable for truck casks weighing up to 40 tons. DX__. Mr. Maret will testify that, to accommodate a heavier cask, the Crystal River facility, including the crane, would have to be upgraded (at substantial cost to FPC). For this reason, our experts have assumed the use of the a truck cask at Crystal River.

that were heavier than the 75-ton casks that it requested that DOE provide. However, because truck casks cannot carry as much fuel as rail casks and are therefore more expensive to load on a per-fuel-assembly basis, our calculation of the loading costs that have been avoided is less than the amount that plaintiffs would have been required to spend had they chosen to load exclusively by truck. Further, although DOE might conceivably have provided a heavy rail cask (weighing 100 or 125 tons), Mr. Maret and Mr. Johnson will testify that the use of these casks would have required plant modifications which, at the Robinson plant alone, would have required the expenditure of nearly $6 million.[30] Thus, the cost of loading casks to DOE may be difficult to predict to the very last dollar, in can safely be said that the cask loading costs that plaintiffs have avoided through 2005 as a result of the delay in DOE performance is not less than $4,427,726.

Plaintiffs also contend that an offset is inappropriate because they will incur costs to transfer fuel to DOE in the future. This argument is unavailing. Plaintiffs have dictated the terms of this litigation by choosing to sue for a partial breach of the Standard Contract. The only issue before the Court is the calculation of the difference between the amounts that plaintiffs have actually spent on fuel storage through 2005 and the amount they would have had to spend (including any costs they have actually avoided) had DOE timely commenced performance. If, as plaintiffs contend, they will incur costs in the future to load casks to DOE, that expenditure can be included in the calculation of damages in future litigation. However, if the Court does not award an offset at this time, there is no mechanism that guarantees the right of the Government to recover an offset in the future for costs that CP&L has unquestionably avoided. In fact, it is

---

[30] The $6 million expenditure represents the cost of the plant modifications that CP&L performed, in the actual world, to load 100-ton canisters to its dry storage facility at its Robinson plant.

entirely likely that at some point in the future the loading cost adjustment will outstrip the incremental costs that plaintiffs claim as damages. In that situation, plaintiffs will have every incentive to decide not to bring a subsequent lawsuit – leaving the Government with no ability to require plaintiffs properly to account for the costs they have avoided. Simply put, the Government's ability to require plaintiffs to account for its costs avoided should not be tied to plaintiffs' unilateral decision as to whether it should bring future lawsuits.

Moreover, plaintiffs' own expenditures on casks at its dry storage facility at Robinson are inconsistent with their litigation position. CP&L purchased and loaded for its dry storage facility at Robinson a set of canisters that are suitable not only for fuel storage, but also for fuel shipment (thereby increasing the price). We have not challenged this expenditure as being unreasonable. However, fundamental fairness dictates that the Government should not both be required to pay for the extra cost of canisters that are suitable for shipment and be prevented from asserting as an offset the cost that CP&L has avoided because the company may one day have to transfer fuel to a DOE shipping cask.

Finally, as noted above, in the actual world, CP&L has expended in excess of $6 million to upgrade its Robinson facility so as to accommodate the loading of 100-ton casks to its dry storage facility. The Government is not contesting responsibility for the cost of this upgrade. However, because loading larger casks is more efficient than loading smaller ones, the enhanced capacity of the Robinson facility will substantially reduce the loading costs that CP&L will incur in the future at the Robinson plant. For this reason, the cost of loading casks has not simply been deferred, as plaintiffs contend. It has, in substantial part, been avoided, and the effects of this avoidance should be included in the calculation of any damages.

8. Internal Labor Costs

Plaintiffs' claim includes more than $15 million in internal labor charges, representing time spent by their employees working on projects that we acknowledge are attributable to DOE's delay in accepting spent fuel. We acknowledge that the vast majority of the labor charges that plaintiffs have been required to incur – approximately $13 million – would not have been incurred had DOE timely commenced accepting fuel and are therefore incremental to the alleged breach. Included within this $13 million are the efforts of CP&L and FPC employees who worked overtime to perform breach-related activities, who were paid by the hour to perform these activities, or who spent more than half of their time in any one calendar year working on these activities. We do not dispute the inclusion of these charges as damages.

Beyond this point, however, reason must set in. Plaintiffs should not be able to recover work performed by salaried employees at no additional cost to the company. See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked "but for" the delay); Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). It is for this reason that our accounting expert, Larry Johnson, will opine that the work of the employees that do not fall into the categories listed above – who collectively averaged working less than two hours per week on breach-related projects, and many of whom have worked less than ten hours in total on breach-related projects – was not incremental to the

breach. Compensating plaintiffs for the cost of these hours would pay them for labor costs that would have been incurred in the absence of any breach by DOE, and would place them in a better position than they would have occupied even had DOE commenced performance in 1998.

Plaintiffs assert on page 55 of their pre-trial brief that the company has been damaged because, by working on breach-related projects, its employees forewent other opportunities. However, plaintiffs have not identified a single foregone opportunity occasioned by the largely de minimis amounts of work performed by the employees in question. In addition, plaintiffs cannot identify any evidence that they would have employed fewer of these employees – whether upon an employee-by-employee basis or on a position-by-position basis – as a result of the alleged breach. Plaintiffs bear the burden of proving that the amounts that they expended are traceable to the breach, and there is no evidentiary basis for simply assuming that either CPL or FPC has been injured merely because some of their salaried employees were required to expend a few extra (non-overtime) hours a week working on breach-related projects.

9. Overheads

Plaintiffs' damage claim also includes two components of overheads – $2,336,679 in "stores overheads," which represent the cost of Progress Energy's warehouses, and $1,895,031 in "indirect overheads" for capital projects – that were allocated to breach-related activities. We do not dispute, and our accounting expert will not challenge, the legitimacy of these allocations from an accounting perspective. However, plaintiffs have provided and will provide absolutely no evidence that the pools from which these overhead charges were calculated in any way affected by DOE's delay in performance. Rather, the evidence will show that, imagined as a pie, the size of the pools from which the overhead charges were calculated stayed essentially the

same. The only effect that plaintiffs' performance of breach-related activities had upon these pies was to change the size of each of the slices – that is, the amount of the overhead pool allocated to each individual project with a separate code in plaintiffs' accounting system. Seen from this perspective, it becomes clear that there is no evidence that plaintiffs suffered any measurable damages, let alone the staggering amounts of costs that they include their claim, in the form of increased overheads. At a minimum, the amounts of any increases in overhead costs attributable to the breach cannot be proven with reasonable certainty. For these reasons, the overhead charges they have included in their claim are not recoverable.

10. AFUDC

Allowance for funds used during construction ("AFUDC") is an accounting mechanism, established by regulation, that utilities, including plaintiffs, use to account for the time value of money associated with capital expenditures. As we have acknowledged with respect to plaintiffs' overhead calculations, we do not dispute that, for purposes of internal cost accounting, plaintiffs are entitled to record AFUDC. However, the mere fact that AFUDC is permitted by regulation does not change the fact that it is, at bottom, designed to permit plaintiffs an opportunity to obtain compensation for the loss of the time value of money expended upon construction projects. This allowance is precisely the sort of pre-judgment interest that is not recoverable against the Federal Government absent a waiver of sovereign immunity, and no accounting regulation alters that conclusion. See 28 U.S.C. § 2516(a) (1976); England v. Contel Advanced Sys.,Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004).

Plaintiffs rely upon this Court's decision in Tennessee Valley Authority v. United States, 69 Fed. Cl. 515, 541-42 (2006), to support their argument that AFUDC is recoverable as

damages. As an initial matter, in TVA the Court awarded AFUDC costs based upon the erroneous premise that "a contractor may recover interest actually paid on funds borrowed" even in the absence of a waiver of sovereign immunity. TVA, 69 Fed. Cl. at 541 (citing Wickham Contracting Co. v. United States, 12 F.3d 1574, 1582-83 (1994)). This ruling conflicts squarely with governing precedent. "[L]ike interest on substantive claims against the government, '[i]nterest on bank loans made because of financial stringency resulting from a breach by the Government of a contract between it and the borrower is not recoverable.'" England, 384 F.3d at 1379 (Fed. Cir. 2004) (quoting J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (Ct. Cl. 1972)); see Marshall v. United States, 164 F. Supp. 221, 224 (Ct. Cl. 1958) ("[I]nterest on borrowed money is not recoverable in suits against the Government unless it is called for in the contract itself or in the governing statute."). For this reason alone, the Court's conclusion in TVA should not be followed.

Moreover, even if it were the case, as plaintiffs contend, that "interest as a claim" is recoverable against the United States without a waiver of sovereign immunity, this would only be the case where the cost for which plaintiffs seek recovery can be "be directly traced to a specific loan or a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the Government." Gevyn Constr. Corp. v United States, 827 F.2d 752, 754 (Fed. Cir. 1987) (emphasis added). Plaintiffs will not and cannot make any such showing, and their request to be compensated for having recorded AFUDC in connection with the projects undertaken in this case should therefore be denied.[31]

---

[31] In TVA, the Court deemed this requirement satisfied, ostensibly because the utility owner was a public quasi-governmental corporation that had no equity and therefore was (continued...)

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court require plaintiffs to satisfy their burden of proof and eliminate from plaintiffs' claim all damages that are unforeseeable, uncertain, or not directly caused by the Government's breach, or are otherwise not recoverable as a matter of law.

[31](...continued)
required to fund all capital projects through cash flows or debt. TVA, 69 Fed. Cl. at 42. No such circumstances, of course, exist in this case.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Andrew P. Averbach
ANDREW P. AVERBACH
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0527
Tel: (202) 305-2118

Attorneys for Defendant

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
CHRISTOPHER J. CARNEY
LISA L. DONAHUE
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

October 10, 2007

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 10th day of October, 2007, a copy of the foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Andrew P. Averbach