# Attachment I

**Attachment I**

[1:] - [3:] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**- - - - - - - - - - - - - - - - - - x**
**YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,**
**CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,**
**COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,**
**POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,**
**LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,**
**POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,**
**Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,**
**INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,**
**SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C**
**- - - - - - - - - - - - - - - - - - X**
**(Caption continued on the next page)**

**Deposition of LAKE H. BARRETT**
**Washington, D. C.**
**Monday, April 22, 2002**
**9:31 a.m.**

**Job No.: 11792-4**
**Pages 1 through 272, Volume 1**
**Reported by: Diane Gomez, RPR**

page 2

**DISTRICT; SOUTHERN NUCLEAR :**
**OPERATING COMPANY, et al.; :**
**COMMONWEALTH EDISON COMPANY; :**
**BOSTON EDISON COMPANY; GPU :**
**NUCLEAR, INCORPORATED; WISCONSIN :**
**ELECTRIC POWER COMPANY; POWER :**
**AUTHORITY OF THE STATE OF NEW :**
**YORK; OMAHA PUBLIC POWER DISTRICT;:**
**NEBRASKA PUBLIC POWER DISTRICT; :**
**and TENNESSEE VALLEY AUTHORITY, :**
**Plaintiffs :**
**v. :**
**THE UNITED STATES, :**
**Defendant :**
**- - - - - - - - - - - - - - - - - - X**

page 3

**Deposition of LAKE H. BARRETT, held at the offices of:**

**ARNOLD & PORTER**
**555 12th Street, Northwest**
**Washington, D. C. 20004**
**(202) 942-5000**

**Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.**

[51:17] - [52:17] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 51

**Q In 1986 how many MTUs per year did you attempt to design a system to accept?**
**A I don't recall a specific number, but it was -- I don't recall a specific number. It's in the**

records.
Q Would 3,000 refresh your recollection?

page 52

A That's probably about right.
Q And how did you come to the 3,000 number?
MR. CRAWFORD: Objection, foundation.
A I'd have to go back and look at records, which I have not done. It is the evolution of the design receipt rates for the first repository, second repository, the MRS in the system. My recollection is the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000.
Q That was important, wasn't it, that it be in excess of the generation rate?
MR. CRAWFORD: Objection, vague.
A Well, important? Yes, in my opinion it was significant that you design a system to remove the backlog of materials that were accumulating under the intent of the act.

[53:16] - [57:2] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 53

Q The goal was to make the take rate high enough so that you could eliminate the backlog within a reasonable amount of time without making the rate so high that the complexities would send the cost through the ceiling, correct?
MR. CRAWFORD: Objection, vague. Objection, foundation.

page 54

A In a general sense.
Q Again, what do you mean when you say in a general sense?
A We did not -- you all get into the contract. We did not consider the contract issues at that time, so we were balancing the size of the system, the uncertainties of an MRS would or wouldn't be approved, the repositories, where they might be, how many we would have. So it was a complicated balancing of many interests, and so to -- it would be inappropriate to say that we had a numerical number to move the backlog or anything like that because I don't recall anything like that.
Q You didn't have a numerical number to move the backlog but you had a goal to move the backlog, correct?
A Within a reasonable --
MR. CRAWFORD: Objection, vague.
A Within a reasonable sense, yes. In a general sense I mean.
Q And in establishing these goals you were considering the requirements, of course, of the

page 55

Nuclear Waste Policy Act of 1982, correct?
MR. CRAWFORD: Objection, foundation.
A We knew that the general policy laid out in the act for the federal, you know, intention to dispose of the nation's waste and spent fuel.
Q And you understood the policy behind the act would call for the elimination of the backlog of spent nuclear fuel within a reasonable amount of time, correct?
MR. CRAWFORD: Objection. Foundation.
A Reduction as opposed to elimination. As long as they operate, you don't eliminate it. So reduction, yes.
Q And just explain what you meant by as long as they operate you don't eliminate it?
A Well, when -- when reactors operate, there is always going to be some inventory of spent fuel

there. We were working to minimize the backlog and reduce the backlog that was at the sites.
Q So in order to be able to minimize the backlog, the acceptance rate would have to be at some level higher than the rate at which spent nuclear fuel
page 56
was being produced, correct?
MR. CRAWFORD: Objection to the form. Objection, vague.
A Our intention was to design a system that would reduce the backlog to a reasonable sense.
Q And in order for that to happen, as a matter of mathematics or simple equation, the acceptance rate would have to be something in excess of the rate at which new spent nuclear fuel was being created, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony.
A In a general sense, yes.
Q And in 1986 you believed that the 3,000 take rate that you were targeting at that point would accomplish the goals you have been alluding to, correct?
MR. CRAWFORD: Objection.
Q And the goal I'm referring to is the reduction of the built up backlog.
MR. CRAWFORD: Objection to the foundation. Objection to the extent it mischaracterizes his prior
page 57
testimony.
A Yes.

[58:13] - [59:11] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 58
Q Was the 3,000 MTU take rate related to the Department of Energy's estimate of the utilities' discharge rate?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A I personally don't know. I assume -- I don't know.
Q You assumed what?
A That when they -- the production rate at the time was around 2,000. So I assumed that the
page 59
3,000 that existed was chosen in consideration with the production rate, you know, the cost and the transportation and the other issues involved.
Q So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation.
A Yes.

[116:14] - [122:6] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 116
Q And what acceptance schedule did the standard disposal contract provide for?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A I think the contract references other documents that references things, and I don't specifically know.
Q So is it your testimony that it provided for a schedule but you don't sitting here today know
page 117
what that schedule is?

**MR. CRAWFORD: Objection. Argumentative.**
**A The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.**
**Okay, now regarding your question here about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.**
**Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.**
**A Right.**

page 118

**Q "That's where my focus has always been." Do you recall that testimony?**
**A That's what I just said I think.**
**Q Does that continue to be your focus to this very day, sir?**
**A Yes.**
**Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?**
**MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.**
**A We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.**
**Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?**
**MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.**

page 119

**A That has been our goal to do that.**
**Q And it continues to be your goal today, correct?**
**A Correct.**
**Q And it was your goal in 1985, correct?**
**A Correct.**
**Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?**
**MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.**
**A I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.**
**Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?**
**MR. CRAWFORD: Objection, vague. And foundation.**
**Q I believe your counsel cut you off. What was your answer, sir?**

page 120

**A That has been our intent.**
**Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual**

commitment and a statutory command?
MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.
A As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.
Q And why did you establish that goal for yourself?
A Because --
Q And your department?
A It was set in the law, okay, that our goal was to try to create a facility and to create a system that would meet that goal of January 31st, 1998, to start to receive fuel. And it has always been an important objective and goal.
Q To start to receive fuel on January 31st,
page 121
1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?
MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.
A It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.
Q You base the goal on the statute, correct? That's what you've testified to, correct?
A Yes.
Q Back to paragraph three --
A Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.
Q So why did you set the 3,000 MTU goal?
page 122
A That was a --
MR. CRAWFORD: Objection to the fact that that question assumes facts not in evidence.
A That was in our judgment a reasonable rate, steady state rate to move up to under the circumstances we were in.

[198:1] - [198:10] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 198
Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?
MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.
A Yes.

[217:3] - [217:17] 4/22/2002 Barrett, Lake H., Deposition Vol. 1, 4/22/02

page 217
Q What is a DCS?
A Well --
MR. CRAWFORD: Objection. Asked and answered.
Q I understand the title.
A Delivery commitment schedule.

Q Do you understand what role it played in the overall SNF process?
MR. CRAWFORD: Objection, foundation.
A These were all part of the administrative details of the contract that I did not pay much management policy attention to.
Q So in your view was a DCS what you referred to, Mr. Barrett, I think the term was administrivia?
A That's correct.

[273:] - [275:] 4/23/2002 Barrett, Lake H., Deposition Vol. 2, 4/23/02

page 273

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - - X
(Caption continued on next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Tuesday, April 23, 2002
9:36 a.m.

Job No.: 11792-5
Pages 273 through 526, Volume 2
Reported by: Diane Gomez, RPR

page 274

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - - X

page 275

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez,

**Registered Professional Reporter and Notary Public in and for the District of Columbia.**

[340:17] - [342:2] 4/23/2002 Barrett, Lake H., Deposition Vol. 2, 4/23/02

page 340
**Q How long would the repository have been required to operate in order to reduce the backlog of spent nuclear fuel had the repository design receipt rate been established at 900 MTU per year?**
**MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.**
page 341
**A Longer.**
**Q How much longer?**
**MR. CRAWFORD: Objection. Same objections.**
**A I don't know. I would have to calculate. It would be longer.**
**Q Forever?**
**MR. CRAWFORD: Same objections.**
**A It depends on -- if the removal rate is less than the production rate, then it doesn't close until the reactors close and then it catches up eventually.**
**Q Well, isn't it your understanding as the former acting director of the office and today deputy director that a 900 MTU repository design receipt rate would not be sufficiently high to reduce the existing backlog of spent nuclear fuel?**
**MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.**
**A It's a function of time.**
**Q What do you mean by that?**
**A It would take a much longer time at 900 than say at 3,000 to work off the backlog. When the**
page 342
**reactors run their licensed lifetimes and close, eventually you'll catch up.**

[345:4] - [345:16] 4/23/2002 Barrett, Lake H., Deposition Vol. 2, 4/23/02

page 345
**Q Probably. Now, let's return to the scenario I asked you to consider a few moments ago, that the repository design receipt rate is set at a level of 900 MTUs. Do you recall we discussed that?**
**A Yes.**
**Q And do you recall that you indicated that in order to eliminate the backlog under an annual receipt rate of 900 MTUs, it could take 80, 90, even more years? Do you recall that?**
**MR. CRAWFORD: Objection to the foundation. Objection to the hypothetical.**
**A It will take considerably longer at 900 versus the 3,000.**

[349:8] - [350:11] 4/23/2002 Barrett, Lake H., Deposition Vol. 2, 4/23/02

page 349
**Q To your knowledge, Mr. Barrett, have all TSLCC or fee adequacy studies issued on or after 1982 assumed a 3,000 per annum MTU acceptance rate or a repository design receipt rate?**
**MR. CRAWFORD: Objection to the foundation.**
**A Some had more.**
**Q Some had more? Which ones had more?**
**A Ones that had two repositories in it had rates higher than 3,000.**
**Q What was the highest annual aggregate rate of any of the TSLCC or fee adequacy studies that you're referring to?**

MR. CRAWFORD: Objection. Best evidence.
A Some of the earlier ones, pre-'87, had two repositories at steady state which would run higher at
page 350
nominal 6,000 tons.
Q Per year?
A Per year. All recent ones, since '87 or so to my knowledge are basically steady state at 3,000.
Q And by recent ones -- I'm sorry.
A In the 1990s the TSLCCs had a state steady receipt rate at 3,000 tons per year.
Q And what about the most recent study?
A I believe the most recent ones --
MR. CRAWFORD: Objection, best evidence.
A -- is 3,000 tons per year steady state.

[527:] - [529:] 4/26/2002 Barrett, Lake H., Deposition Vol. 3, 4/26/02

page 527

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**- - - - - - - - - - - - - - - - - x**
**YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,**
**CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,**
**COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,**
**POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,**
**LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,**
**POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,**
**Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,**
**INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,**
**SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C**
**- - - - - - - - - - - - - - - - - X**
**(Caption continued on the next page)**

**Continued Deposition of LAKE H. BARRETT**
**Washington, D. C.**
**Friday, April 26, 2002**
**8:10 a.m.**

**Job No.: 11792-8**
**Pages 527 through 825, Volume 3**
**Reported by: Diane Gomez, RPR**

page 528

**DISTRICT; SOUTHERN NUCLEAR :**
**OPERATING COMPANY, et al.; :**
**COMMONWEALTH EDISON COMPANY; :**
**BOSTON EDISON COMPANY; GPU :**
**NUCLEAR, INCORPORATED; WISCONSIN :**
**ELECTRIC POWER COMPANY; POWER :**
**AUTHORITY OF THE STATE OF NEW :**
**YORK; OMAHA PUBLIC POWER DISTRICT; :**
**NEBRASKA PUBLIC POWER DISTRICT; :**
**and TENNESSEE VALLEY AUTHORITY, :**
**Plaintiffs :**
**v. :**
**THE UNITED STATES, :**
**Defendant :**
**- - - - - - - - - - - - - - - - - X**

page 529

**Continued Deposition of LAKE H. BARRETT, held at the offices of:**

**ARNOLD & PORTER**
**555 12th Street, Northwest**
**Washington, D. C. 20004**
**(202) 942-5000**

**Attachment I**

**Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.**

[581:20] - [583:5] 4/26/2002 Barrett, Lake H., Deposition Vol. 3, 4/26/02

page 581
**Q How did you use the term "four six nine," was it the four-six-nine rate or -- you used it in an earlier answer.**
page 582
**MR. CRAWFORD: Objection. Asked and answered.**
**A It's the rate of 400 tons year number one, year number two 600 tons, year number three 900 tons out to year ten at 900. It's in some table that's attached to something that has to do with the contract, and that's what I meant by the four-six-nine rate.**
**Q To the best of your knowledge how is that four-six-nine rate, as you just explained it, calculated?**
**A It's my recollection that table was established based on the plans of the program in the early nineties with an MRS and linkages stated by statute. Modified by, you know, whatever it had to do with the linkages and then what was thought, reasonably thought linkages could be modified.**
**Q So the four-six-nine rate was based on the assumption, if I understand what you're saying right now, sir, that there would be an MRS and the linkages would be repealed, correct?**
**A Well, not completely repealed, but some --**
page 583
**no, not all linkages would be changed, but reasonable linkages that we thought reasonably could be changed, like build the thing based on a volunteer site. So that's what the four six nine to my recollection is based on.**

[772:4] - [774:14] 4/26/2002 Barrett, Lake H., Deposition Vol. 3, 4/26/02

page 772
**Q We discussed that MRS facility and the assumptions on which the first ten years of operations were based a number of times in this deposition. Do you recall that?**
**A Yes.**
**Q And that MRS facility involved what you have referred to as a volunteer, correct?**
**A Correct.**
**Q And it involved a volunteer, and it would have required the enactment of congressional legislation repealing or modifying the linkages, correct?**
**A Some of the linkages.**
**Q Some of the linkages, correct?**
**A Some of the linkages, yes.**
**Q And had that happened, had you had a volunteer and some of the necessary legislation, the MRS you projected could have gone into effect in 1998, correct?**
page 773
**A Correct.**
**Q And, in fact, page four of this exhibit shows your projected schedule with such an MRS, correct?**

A Correct.
Q And it shows a first-year acceptance rate of 400, second year 600, and years two through ten of 900 MTUs, three through ten of 900 MTUs per year, correct?
A Correct.
Q And that adds up to a total MTU take of 8,200 within the congressional limit at that point of 10,000 MTUs, correct?
A Correct.
Q But, again, this Table 2-1 is based on two assumptions that you -- or perhaps three assumptions that you have discussed throughout this deposition. First, an MRS facility that is based on a volunteer and that Congress deems it appropriate to enact authorizing legislation including the repeal or amendment of certain of the linkages, correct?
MR. CRAWFORD: Objection to the foundation

page 774

for that and objection, it assumes facts not in evidence. And just objection as to vague.
Q Correct?
A Except you used the word "authorized." It's already authorized.
Q That the necessary congressional legislation would have been enacted to modify or repeal the linkages, correct?
A Yes.
Q Now, we also discussed today that by the end of 1993 that type of MRS facility involving a volunteer and the modification or repeal of linkages had become a low probability, correct?
A Yes.

[826:] - [828:] 5/8/2002 Barrett, Lake H., Deposition Vol. 4, 5/8/02

page 826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103
Reported by: Diane Gomez, RPR

page 827

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :

**THE UNITED STATES, :**
**Defendant :**
**- - - - - - - - - - - - - - - - - X**

page 828

**Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:**

**ARNOLD & PORTER**
**555 12th Street, Northwest**
**Washington, D.C. 20004**
**(202) 942-5000**

**Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.**

[948:10] - [949:7] 5/8/2002 Barrett, Lake H., Deposition Vol. 4, 5/8/02

page 948
**Q Okay. And in today's stand-alone repository scenario, what is the relevance of 400, 600, 900 acceptance rate?**
**MS. HERRMANN: Objection. Foundation.**
**A Because of some contractual matter as relates to the contract is my understanding.**
**Q And what contractual matter are you referring to?**
**MS. HERRMANN: Objection. Calls for a legal conclusion.**
**A This gets into the contract issues. There is no technical limit four, six, nine as it relates to the repository.**
page 949
**Q So as it relates to a stand-alone repository, the acceptance rate of 400, 600, 900 MTUs per year have no relevance, correct?**
**MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.**
**Q Correct?**
**A Has no technical design aspect to it.**

[951:19] - [953:7] 5/8/2002 Barrett, Lake H., Deposition Vol. 4, 5/8/02

page 951
**Q Getting back to the ACR, what is the relevance of an ACR with an acceptance rate of 400, 600, 900 MTUs per year in today's environment where there is a stand-alone repository?**
page 952
**MS. HERRMANN: Objection. Vague, calls for a legal conclusion.**
**A I don't know.**
**Q Is there any?**
**MS. HERRMANN: Same objections.**
**A Only as it relates to the legalities of contracts.**
**Q The 400, 600, 900 MTUs standard was pertinent in the context where an MRS would have gone into effect in 1998 and have been in operation for ten to 12 years prior to repository, correct?**

A That's my understanding.
Q And that's the only circumstance in which a 400, 600, 900 MTU take-rate had any relevance, correct?
A That was the basis at that time.
Q At that time, you're referring to what time?
A Back in the eighties when that was -- late eighties, early nineties when that was established, that's correct.
Q So in the late eighties, early nineties
page 953
when the 400, 600, 900 MTU take-rate was established, the only relevance that take-rate had was in the context where an MRS would commence operations in 1998 and would operate by itself for ten to 12 years prior to the time that a repository, a permanent repository, began operations, correct?
A Correct.

[1104:] - [1106:] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1104
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR
page 1105
DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - - X

page 1106
Continued Deposition of LAKE H. BARRETT, held at the offices of:

**ARNOLD & PORTER**
**555 12th Street, Northwest**
**Washington, D. C. 20004**
**(202) 942-5000**

**Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.**

[1163:10] - [1166:7] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1163
**Q But you do disagree with the statement that there is not a clearly documented rationale for 3,000 MTU per year receipt rate, correct?**
**A Correct.**
**Q Because you believe that there is, in fact, a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?**
**A Yes.**
**Q And could you explain to me that rationale that you believe has been clearly documented by the department?**
**A There was one in the old mission plans. It basically was that the rate of 3,000 tons per year**
page 1164
**exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of a thousand tons per year delta. And for where the program was at that time that was sufficient, and I felt that was sufficient at that time.**
**Q Sufficient to do what?**
**A Sufficient as a design basis for the facility. I didn't want to basically put resources, inasmuch as I was involved in this, into further refinements and expenditures of money on fine-tuning when we needed to focus on do we have a site and can we ever do this.**
**Q And fine-tuning, for example, whether it should be higher than 3,000?**
**A Correct.**
**Q And when you just stated "allowed a catchup of a thousand tons per year delta," what did that statement refer to?**
**A The receipt rate of a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take-rate was exceeding the generation**
page 1165
**rate in the nation.**
**Q Why was that important?**
**A Because we would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be.**
**Q Did you consider that to be your mission under this statute, the 1982 Nuclear Waste Policy Act?**
**MS. HERRMANN: Objection. Vague, calls for a legal conclusion.**
**A Repeat the question again.**
**Q You stated "We would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be." Do you recall that statement?**
**A Yes.**
**Q Why would you have liked to have caught up, as you stated in that answer?**
**A Because waste existed in the United States,**

both commercial waste and defense waste, and we were to start, either be it '98 or some other date, there would be an inventory existing, and you wanted to work off that inventory as soon as practicable.

page 1166

Q Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?

A Because I believe that's the intent of the act.

Q By "the act" you're referring to the Nuclear Waste Policy Act of 1982?

A Correct.

[1331:7] - [1331:17] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1331

Q You used a term often in your testimony, the term "generation rate." Do you recall using that term?

A Yes.

Q What does that term mean?

A To me that's the amount of spent fuel that the nation's nuclear power reactors produce per year, which is approximately 2,000 tons per year.

Q Has it always been approximately 2,000 tons per year?

A I think it's been pretty close.

[1332:19] - [1333:16] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1332

Q My understanding from your testimony -- and please correct me if I'm wrong -- was that the 3,000 MTU steady-state rate or receipt rate as you just used that term, was chosen in part because it exceeded the

page 1333

discharge rate or the generation rate by utilities. Is that right?

A Correct.

Q What other factors went into choosing a 3,000 MTU receipt rate?

A The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have -- you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.

[1334:6] - [1335:10] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1334

Q And am I right in understanding that the 3,000 steady-state rate has been used as the steady-state rate in the majority of design documents for the facility that DOE will eventually use to take and emplacement spent nuclear fuel?

A Yes, it's around 3,000.

Q And am I also right in understanding that the 3,000 steady-state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life-cycle costs?

A Correct.

Q With regard to those documents, the documents issued in connection with estimating total system life-cycle costs, what is that document supposed to reflect, the TSLCC document?

A Our best estimates of what the costs would be, you know, year by year for the program. And to
page 1335
determine those you would have some assumption as to what the receipt rate would be, and we used 3,000.
Q And is the receipt rate of 3,000 used because that's what your intention at the time you issued that TSLCC report, is that the intention at that time, to use that rate for whatever facility you would have running when you begin to accept spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
A At steady state, yes.

[1368:10] - [1369:14] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1368
Q My understanding is that one of the goals of the Civilian Radioactive Waste Management Program was to design a system that could take spent nuclear fuel at a rate that would eliminate the need for utilities to provide for additional on-site storage after January 31st, 1998. Is that correct?
A No.
Q What is not correct about that statement?
A I never considered the design of the system to solely try to avoid spent-fuel pool overflows. I tried to design the system to be as large as you could reasonably make it to avoid not only spent-fuel overflows but pool rerackings to allow shut-down
page 1369
reactors to empty their sites. For all those other reasons in addition to. So the way you phrased it I don't think is correct.
Q Thank you for clarifying. It actually did clarify a misimpression I had, so I'm glad I asked the question.
And is it your testimony that prior to you actually coming to the Office of Civilian Radioactive Waste Management DOE had established that a steady-state rate of 3,000 MTUs on an annual basis would achieve all those objectives that you just specified in your prior answer?
MS. HERRMANN: Objection. Foundation.
A In a general sense, yes.

[1369:22] - [1371:14] 5/10/2002 Barrett, Lake H., Deposition Vol. 5, 5/10/02

page 1369
Q But in your tenure at the program did you
page 1370
ever see any evidence that would indicate that that 3,000 MTU rate was not sufficient to address all of those needs as you specified a couple of answers ago?
A I saw no reason nor saw no reports that said 3,000 was a bad choice. There were some studies done in the late eighties, also in the early nineties that, you know, it didn't say there was an obvious better number. That 2,000 was better or 4,000 was better. And 3,000 appeared to be okay. So I didn't pay much attention. So I was satisfied. It wasn't conscious per se. I saw no reason why I should change it. Let's phrase it that way.
Q And I'll take it a step further. Do you believe that the 3,000 annual steady-state rate is a reasonable rate for DOE to plan to use in terms of taking spent nuclear fuel from utilities?
A I think it's a reasonable rate. There may be better rates that if we -- if the nation gets a little clearer that we're going to really perform I think we will refine that number and we may, based on events of September 11th, maybe it will be raised.

Attachment I

Q And would you agree that the 3,000 annual

page 1371

steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?
A Generally so, yes.
Q In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?
A I would think that's low.
Q Why?
A Because that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 -- if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings.

[1:] - [1:] 5/14/2002 Barrett, Lake H., Deposition Vol. 1, 5/14/02

page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff, | Case No. 98-126C, 98-154C, 98-474C |
| vs. | (Senior Judge Merrow) |
| UNITED STATES OF AMERICA, Defendant. | Volume I |

Washington, D.C.
Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

[120:22] - [121:6] 5/14/2002 Barrett, Lake H., Deposition Vol. 1, 5/14/02

page 120

Q. What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract?
MS. HERRMANN: Objection. Foundation.

page 121

Mr. Barrett is not here as a 30(b)(6) witness.
A. We would have operated our system at our plant which was, you know, whatever the operation rate which transiented and leveled out at 3,000 metric tons per year after five years. That's what we were planning to do.

# Attachment II

**Attachment II**

[1:] - [3:] 4/9/2002 Brownstein, Alan, Deposition Vol. 1 April 9, 2002

page 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**- - - - - - - - - - - - - - - - - - - - -x**
**YANKEE ATOMIC ELECTRIC COMPANY :**
**(98-126C)(Merow, S.J.) :**
**CONNECTICUT YANKEE ATOMIC POWER COMPANY :**
**(98-154C)(Merow, S.J.) :**
**FLORIDA POWER & LIGHT COMPANY :**
**(98-483C)(Wilson, J.) :**
**NORTHERN STATES POWER COMPANY :**
**(98-484C)(Wiese,J.) :**
**DUKE POWER, A Division of :**
**DUKE ENERGY CORP. :**
**(98-485C)(Sypolt,J.) :**
**INDIANA MICHIGAN POWER COMPANY :**
**(98-486C)(Hodges, J.) :**
**SACRAMENTO MUNICIPAL UTILITY DISTRICT :**
**(98-488C)(Yock, S.J.) :**
**SOUTHERN NUCLEAR OPERATING COMPANY, :**
**et al. :**
**(98-488C)(Yock, S.J.) :**
**COMMONWEALTH EDISON COMPANY :**
**(98-621C)(Hewitt, J.) :**
**BOSTON EDISON COMPANY :**
**(99-447C)(Allegra, J.) :**
**GPU NUCLEAR, INCORPORATED :**

page 2

**(00-440C)(Bush, J.) :**
**WISCONSIN ELECTRIC POWER COMPANY :**
**(00-697C)(Merow, S.J.) :**
**POWER AUTHORITY OF THE STATE OF NEW YORK :**
**(00-703C)(Damich, J.) :**
**OMAHA PUBLIC POWER DISTRICT :**
**(01-115C)(Bush, J.) :**
**NEBRASKA PUBLIC POWER DISTRICT :**
**(01-116C)(Sypolt, J.) :**
**TENNESSEE VALLEY AUTHORITY :**
**(01-249C)(Bruggink, J.) :**
**Plaintiffs, :**
**v. :Discovery**
**THE UNITED STATES, :Judge:**
**Defendant. :(Judge**
**- - - - - - - - - - - - - - - - - - - - -xSypolt)**

**McLean, Virginia**
**Tuesday, April 9, 2002**

**Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons**

page 3

**Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Tuesday, April 9, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.**

[128:18] - [128:21] 4/9/2002 Brownstein, Alan, Deposition Vol. 1 April 9, 2002

page 128

**MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit No. 9, that's a copy of a letter from Mr. Jedrey to Mr. Kraft dated October 2, 1987?**

**Attachment II**

[129:24] - [130:17] 4/9/2002 Brownstein, Alan, Deposition Vol. 1 April 9, 2002

page 129
**Q. And directing your attention to page 2, under the heading rationale, there is a**
page 130
**sentence slightly more than halfway through that paragraph which states this language, referring to previous language from Article 2 of the contract, could conceivably be read to permit DOE to accept single fuel assembly in 1998 and no more until decades later.**
**Do you see that?**
**A. Yes, I do.**
**Q. Do you agree with that statement?**
**A. No, I don't.**
**Q. And why not?**
**A. We believe that's, that was not the department's intent, and that's a radical view of the contract.**
**Q. And it wasn't your view?**
**A. It was not. It was no one's view at the department.**

[133:19] - [134:25] 4/9/2002 Brownstein, Alan, Deposition Vol. 1 April 9, 2002

page 133
**Q. And Mr. Jedrey is telling Mr. Kraft here in the first sentence of the second paragraph under subheading or under heading one, additional performance standards, quote, "...I can assure you that the Department intends to honor both the letter and spirit of the NWPA and the contract, rather than seek opportunities to**
page 134
**circumvent its obligations"?**
**A. Yes.**
**Q. What did you understand by that language, seek opportunities to circumvent its obligations, to mean?**
**MR. BANES: Objection. Calls for a legal conclusion.**
**THE WITNESS: I believed what it meant was responding to Mr. Kraft's concern about the possibility of us, of the department accepting a single assembly and walking away.**
**That to me is a trick, and I think the contracting officer was trying to indicate that was, that type of gamesmanship is not what the department was all about.**
**BY MR. TOMASZCZUK:**
**Q. And that would constitute circumventing its obligations under the contract?**
**MR. BANES: Objection. Calls for a legal conclusion.**
**THE WITNESS: That's how I interpret it, that sentence.**
**We're responding to his specific concern.**

[136:7] - [138:10] 4/9/2002 Brownstein, Alan, Deposition Vol. 1 April 9, 2002

page 136
**Q. All right. What was your intention or what was the Department of Energy's intention in giving Mr. Kraft that information?**
**What was he supposed to do with that?**
**A. This, this was, this entire paragraph is trying to reflect that the department was not only not trying to game the system by accepting a single assembly and walking away, but by**

demonstrating that the evidence of what our plans were through these other documents clearly showed that we were intending to do something other than take a single assembly.

Q. Was it your intention that the utilities would use or rely on, in any way on that information in preparing their own plans for dealing with their spent nuclear fuel?

A. I believe we addressed that issue in the Annual Capacity Report, and in fact I think it was addressed in the contract itself.

page 137

The contract said to provide this information for planning purposes recognizing that it would change over time, and so if we went back to the ACR, I think you would see relevant language that addressed what we intended that information to be and not to be.

Q. We saw language that says it's for planning purposes, right?

A. Yes.

Q. And I guess my question to you, Mr. Brownstein, is as a practical matter, what does that mean to a utility that gets it?

What are they supposed to do with it?

MR. BANES: Objection. Calls for speculation.

THE WITNESS: Since the contract was, you know, evolved between two parties, we didn't just write the contract.

The utilities signed it. It was a two-party contract. The utilities wanted information, and they wanted it -- the contract, that's a two-party agreement. The utilities wanted the information to understand, you know, down the road, what our plans were so they can begin their thinking process.

page 138

They asked for it for planning purposes, not for binding purposes.

That's what we stated in the contract, and that's what we tried do.

We tried to keep them updated on what our plans, recognizing and as we stated in all the documents that those plans would change as laws changed, as situations changed, as the system evolved in developing a very complex system.

[144:1] - [144:18] 4/9/2002 Brownstein, Alan, Deposition Vol. 1 April 9, 2002

page 144

Q. Were those rates consistent with the letter and spirit of the NWPA and the contract?

MR. BANES: Objection. Calls for a legal conclusion, and vague.

THE WITNESS: The letter and spirit you're referring to in that paragraph was responding to Mr. Kraft's concern of his letter.

His concern was that the department would fulfill whatever its obligations were through accepting a single assembly.

We tried to address that concern in this paragraph in those words, so --

BY MR. TOMASZCZUK:

Q. And as I understand it, acceptance of one spent fuel rod would not be consistent with the letter and spirit of the NWPA in the contract in your mind?

A. I would agree with that statement.

[242:] - [244:] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 242

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**- - - - - - - - - - - - - - - - - - - - - -x**
**YANKEE ATOMIC ELECTRIC COMPANY :**
**(98-126C)(Merow, S.J.) :**
**CONNECTICUT YANKEE ATOMIC POWER COMPANY :**
**(98-154C)(Merow, S.J.) :**
**FLORIDA POWER & LIGHT COMPANY :**
**(98-483C)(Wilson, J.) :**
**NORTHERN STATES POWER COMPANY :**
**(98-484C)(Wiese,J.) :**
**DUKE POWER, A Division of :**
**DUKE ENERGY CORP. :**
**(98-485C)(Sypolt,J.) :**
**INDIANA MICHIGAN POWER COMPANY :**
**(98-486C)(Hodges, J.) :**
**SACRAMENTO MUNICIPAL UTILITY DISTRICT :**
**(98-488C)(Yock, S.J.) :**
**SOUTHERN NUCLEAR OPERATING COMPANY, :**
**et al. :**
**(98-488C)(Yock, S.J.) :**
**COMMONWEALTH EDISON COMPANY :**
**(98-621C)(Hewitt, J.) :**
**BOSTON EDISON COMPANY :**
**(99-447C)(Allegra, J.) :**
**GPU NUCLEAR, INCORPORATED :**

page 243

**(00-440C)(Bush, J.) :**
**WISCONSIN ELECTRIC POWER COMPANY :**
**(00-697C)(Merow, S.J.) :**
**POWER AUTHORITY OF THE STATE OF NEW YORK :**
**(00-703C)(Damich, J.) :**
**OMAHA PUBLIC POWER DISTRICT :**
**(01-115C)(Bush, J.) :**
**NEBRASKA PUBLIC POWER DISTRICT :**
**(01-116C)(Sypolt, J.) :**
**TENNESSEE VALLEY AUTHORITY :**
**(01-249C)(Bruggink, J.) :**
**Plaintiffs, :**
**v. :Discovery**
**THE UNITED STATES, :Judge:**
**Defendant. :(Judge**
**- - - - - - - - - - - - - - - - - - - - - -xSypolt)**

**McLean, Virginia**
**Wednesday, April 10, 2002**

**Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,**

page 244

**LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.**

[278:12] - [278:15] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 278

**MR. TOMASZCZUK: Ms. Reporter, I would like to have marked as Brownstein No. 24 -- I got it right -- the Annual Capacity Report issued in December of 1990.**

**Attachment II**

[282:5] - [282:22] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 282

**Q. Okay. In any event. It is true, is it not, that the conditions for the lower bounding case reflected in Table 2.2 never materialized, right?**
**MR. BANES: Objection. Calls for a legal conclusion.**
**THE WITNESS: Could you clarify what you mean?**
**BY MR. TOMASZCZUK:**
**Q. Sure. There was no MRS?**
**A. That's correct.**
**Q. Right. And the language that you referred to on page 5, it indicates, does it not, that the lower bounding case requires MRS siting, and then refers to the 10,000 MTU storage limitation?**
**A. That's correct. That process never, never materialized.**

[326:20] - [326:25] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 326

**Q. Good afternoon, Mr. Brownstein. I remind you you're still under oath, but she won't redo the swearing process again.**
**I think at the break we were looking at the ACR for December 1991, Brownstein Exhibit 30.**

[331:24] - [333:21] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 331

**Q. And my subsequent question to the effect that, you know, is that consistent with**

page 332

**the linkages, the construction linkages, and I understood you to say yes, and I'm trying to reconcile that testimony and that portion of the document with what appears at page 4, which seems to say that if the linkages are maintained, we can't start until 2007.**
**(The witness reviewed the document.)**
**THE WITNESS: Well, let's go back in pieces.**
**If we had an MRS, we could start accepting at an MRS, you know, as early as 1998.**
**I think that's, there were a series of assumptions associated with that.**
**BY MR. TOMASZCZUK:**
**Q. But I understand you to be saying on page 4 that if the linkages were maintained, you couldn't do that --**
**MR. BANES: Objection. Go ahead.**
**BY MR. TOMASZCZUK:**
**Q. In 1998?**
**MR. BANES: Objection. Calls for a legal conclusion, but you can go ahead.**
**THE WITNESS: Well, let's go back to the paragraph on page 4.**
**Let's read it in its entirety.**

page 333

**BY MR. TOMASZCZUK:**
**Q. Sure.**
**A. The acceptance rates in Table 2.1 do not reflect an MRS facility schedule linkages with the repository development that were imposed by the Nuclear Waste Policy Act, but are consistent with the 10,000 MTU storage capacity limit contained in NWPA for an MRS facility**

**before repository starts operation.**
**Okay. So these acceptance rates assumed commencement, assume commencement of facility operations in 1998.**
**There appears -- I mean there is a series of if then statements for each of these.**
**Independently, I'm comfortable with them. I understand them.**
**I'm just trying to understand where this disconnect is that, that you see.**
**Can we go point out which sentence-by-sentence that you're uncomfortable with?**

[367:14] - [368:25] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 367

**Q. So if a utility today requested delivery 63 months from today, it needed to, it is required to submit its DCS today?**
**MR. BANES: Objection. Calls for legal conclusion.**
**You may answer.**
**THE WITNESS: The, the contract laid out a process of a series of interactions between the government and the utilities that would eventually lead to waste acceptance.**
**It was, it was a choreographed dance if you will.**

page 368

**We provide information. They begin the thinking process, and that included the DCSs, all the way up to the FDSs where the FDSs, both sides got serious in terms of things like what cask to bring, what date we should show up.**
**The contract laid out the terms to, to begin that process.**
**You would not expect the department to commit to a specific date of a specific month, you know, years ahead of time really for the benefit of the utility because you could not have the government, you could not have the utility saying show up at my door on this particular day at this particular time when they in fact may be going, undergoing a fuel outage so they wouldn't want us to show up.**
**Our view of the contract was it laid out that process on how we would interact as two bodies, to come together at an appropriate time.**
**That was the significance in my mind of it, irrespective of a date.**
**It set those, set that series of procedures on, on how we would interact together.**
**That's how I interpret the contract.**

[376:22] - [378:5] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 376

**Q. If the, as I understand these instructions, if the ACR on which the DCSs are based is a planning document, which I understand it to be, are the DCSs also planning documents?**

page 377

**MR. BANES: Objection. Calls for a legal conclusion.**
**THE WITNESS: In my mind, they are. In order to get, if we can just set aside a specific date for a second, in order to get the government with the right equipment to be able to get through the gate of the utility at the right time, there has to be planning that takes**

place.
For example, we need to know years in advance how many BWR and PWR casks we should make sure are available through whatever means.
We ought to know how many truck casks and how many rail casks we ought to have available.
In order to do that, we need to understand whose fuel we're going to accept, so there has to be communication between the utilities and us years in advance in order to, to allow that marriage to occur at the end, irrespective of the date.
I believe -- as you know, I did not negotiate this contract in '83, but I believe that was the intent of the process that was laid which we have talked about the ACR, the APR, the

page 378

DCSs and the FDSs.
I think that, in that sense, that's a planning arrangement. That's a way to respond to your question, but I think that is responsive.

[411:24] - [412:21] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 411

Q. And I think we got into this a little yesterday, but it's your understanding I take it

page 412

that the D.C. Circuit has now held that the DOE was required to begin SNF acceptance in 1998?
A. I have never read the decision, but that's my understanding of it.
Q. And I believe we also had some testimony from you that it was DOE's objective or goal to eliminate the need for utilities to provide on-site storage after the DOE began acceptance, is that correct?
MR. BANES: Objection -- vague.
THE WITNESS: It's correct, and I used the term and testified to such to distinguish between intent and goal and objectives as opposed to a contractual commitment.
BY MR. HIRSCH:
Q. All right, but the DOE goal or objective was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance of spent nuclear fuel, is that correct?
A. That was a goal.

[413:13] - [414:12] 4/10/2002 Brownstein, Alan, Deposition Vol. 2, April 10, 2002

page 413

Q. What was your understanding of the purpose of the mission plans?
A. Really very elementary understanding, that, that the law required that we issue a mission plan.
The purpose of the mission plan was to describe what our goals and objectives were, and describe the program in general terms.
Q. And I take it that at least while you were at the DOE, the DOE made an effort to be as accurate as possible in the mission plans in terms of describing what its current plans and objectives were?

page 414

A. I believe that's true for all the RW documents.
Since the beginning, I think we've

tried as a goal if you will to be an open and transparent program, and to, to try to put as much information out in the public as we could, and make that as accurate as we could.
Q. Okay. So it would be correct to say that the DOE made an effort in the mission plans to be as accurate and informative as possible, is that correct?
A. Yes.

[246:] - [246:] 6/14/2002 Brownstein, Alan, Deposition Vol. 2, June 14, 2002

page 246

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

[423:20] - [427:4] 6/14/2002 Brownstein, Alan, Deposition Vol. 2, June 14, 2002

page 423

Q. Okay. What about at some subsequent time prior to the time that you ceased working on these matters? I'm looking for my notes here. I think it was March 1995. Did you have any discussions with anyone that would have given you, Alan Brownstein, an understanding of the legal significance of approved

page 424

DCSs?
MR. CRAWFORD: Same objection.
THE WITNESS: Not that I recall.
BY MR. STOUCK:
Q. And subsequent to that, in '95, you have had no such discussions; is that right or is that not right?
MR. CRAWFORD: Same objection.
THE WITNESS: I think I testified earlier that I may have reviewed a DOJ, you know, document, a reply.
BY MR. STOUCK:
Q. In this litigation?
A. In this litigation.
Q. Was that subsequent to the last time we were here in this deposition room?
A. No.
Q. It was prior to that?
A. Yes.
Q. Was it prior to your first deposition?
A. Yes.
Q. Do you know whether it was prior to or after the DOJ document was filed in court or was it a DOJ document that was filed in court?

**Attachment II**

MR. CRAWFORD: Objection to the extent it

page 425

calls for speculation.

THE WITNESS: I reviewed it -- a draft DOJ document. And I testified to that before too.

BY MR. STOUCK:

Q. Okay. Again I really apologize.

A. Yeah.

Q. It's been a long deposition, I just did not recall that. I'm not trying to ask you the same questions over.

A. And I believe, you know, that addressed some of that issue. So that's what jogged my memory.

Q. So based on that you have an understanding or at least at the time you read this you had an understanding of what DOJ's current position about the legal significance of this is?

MR. CRAWFORD: Well, objection, asked and answered and to the extent that that may have mischaracterized anything he previously testified to.

THE WITNESS: There was discussion about --

MR. CRAWFORD: And I'm going to instruct the witness not to reveal anything about any discussions with any DOJ lawyers about any kind of matter discussed with respect to this litigation at all.

page 426

THE WITNESS: Okay. Well, that's fine. I think somewhere in that draft there was, you know, some views expressed about what the government's -- Department of Justice's views were with respect to the legal effect of the DCSs. I read those words.

BY MR. STOUCK:

Q. Approximately when was that, do you recall, within the last year?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: Yeah, within a year, within the last year.

BY MR. STOUCK:

Q. Okay. Can you place it any more specifically than that in time?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: No.

BY MR. STOUCK:

Q. But, prior to reading that draft and prior to whatever discussions grew out of that draft, you had no understanding of the legal significance, you had no discussions with anyone who would have given you any other basis for having any understanding of the legal significance of the DCSs; is that right?

page 427

A. That's right. And why I brought that up is because, you know, my reaction was, well, that's interesting, when I read that it was interesting. I never discussed it or thought about that before.

[427:16] - [428:5] 6/14/2002 Brownstein, Alan, Deposition Vol. 2, June 14, 2002

page 427

Q. So, therefore, you had no understanding of what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process contemporaneous with this document in August of '91; is that right?

A. That's right.

Q. And you had no understanding about those matters as of the time you stopped working on waste acceptance matters in March 1995?

A. That's accurate.

**Attachment II**

page 428

**Q. And you had no understanding about those matters at least prior to the time that whatever understanding you gained by reading this draft that you just referred to?**

**A. That's correct.**

# Attachment III

**Attachment III**

[1:] - [1:] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**YANKEE ATOMIC ELECTRIC COMPANY, et al., Plaintiffs, vs. UNITED STATES, Defendant.**

**No. 98-126C**

**DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME I**

**May 20, 2002**
**Richland, Washington**

[60:23] - [64:21] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 60

**Q. Let me focus on that -- the concept of a contract for -- what was your understanding as to the significance of the fact that the NWPA mandated**

page 61

**that utilities and the Department of Energy enter into contracts?**
**MS. HERRMANN: Objection. Calls for a legal conclusion.**
**THE WITNESS: Contract was necessary to collect the fee, and would allow us to establish contractual commitments in terms of when services would begin to be available.**
**Q. (By Mr. Shapiro) These would be contractual commitments on the part of the Department of Energy to make the services available?**
**MS. HERRMANN: Same objection.**
**THE WITNESS: Commitments as to when services would begin to be available.**
**Q. (By Mr. Shapiro) What do you mean by "begin to be available"?**
**A. Well, the Act called for us to begin accepting nuclear waste in 1998, so our goal was to have a facility to begin accepting nuclear waste in 1998. We knew then that the rate and the ability to accept waste then or whenever it became available would be constrained. So consequently, we wanted to provide as much information as we could to utilities to assist them in their planning process so they could ensure that they could keep their**

page 62

**fuel up until that time, until when they could eventually ship to a repository, whenever that might be.**
**Q. And so I'm sure I understand or try to make clear my understanding what you've just said: So that because DOE understood that the rate at which it would accept spent fuel and even its ability to accept spent fuel might be constrained, part of what it wanted to put into the contract was a mechanism to provide utilities with as much information as possible about those issues?**
**MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.**
**THE WITNESS: I will -- I wouldn't agree**

with that.
Q. (By Mr. Shapiro) Okay.
A. At the time we were signing or proposing and signing contracts, we were very, very early in the process. We did not have a facility designed and subsequently -- consequently, we also did not know what our ability to accept waste and fuel would be. So we knew there would be information that the utilities would like but we were in no position to provide. Nevertheless, to get general obligations down, begin accepting in '98, being

page 63

the primary one, we needed to sign contracts which would allow the utilities to start putting the 1.0 mill per kilowatt hour into the Waste Fund.
Q. So DOE understood that the utilities would have liked the contracts to have firm terms as far as the -- the rate of spent fuel acceptance after 1998, but DOE just didn't have a means of specifying something at that time, at the beginning of 1983?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: That's an accurate representation.
Q. (By Mr. Shapiro) And because DOE didn't have a means of specifying something in 1983, you left that -- that term in the contract open?
A. I don't recall how that was covered in the contract, per se. I do recall in either general discussions with the utilities or when they would talk to us, we made it clear to them that we certainly wouldn't be able to accept everything that they wanted to ship to us right away, but that we would try to provide information which would help them get a better feel for where -- where and when they might be able to ship as the program developed.

page 64

Q. And when you say it was clear that DOE wouldn't be able to take everything right away, you meant right away, in 1998?
A. Correct. Or ever. Couldn't take everything -- there were physical constraints with how much you could accept in any given year.
Q. Why did -- let me ask a different question.
How did you know that utilities would have wanted DOE to accept more spent fuel in any given year, certainly by 1998, than was going to be your capability to do so?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: In our discussions with utilities, it was clear that they had a liability for the spent fuel while it remained in their possession. If they could transfer that spent fuel to us, and therefore this responsibility and liability for that fuel, then it would rest with the government. It was in their best interest to get rid of as -- as much of it as they could, as quickly as they could.

[77:2] - [78:4] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 77

Q. You referred a couple of times to negotiating the contract. Was there a real negotiation or was it a matter of the Department of Energy simply setting out the terms of the contract?
MS. HERRMANN: Objection. Vague. Compound. Foundation.
THE WITNESS: To the best of my recollection, there was only going to be one contract for all utilities. We were interested in

**Attachment III**

finding out their views on the contract via
drafts, meetings, whatever. Prior to formalizing
the contract and whether that was through some
process, I just don't recall.
So, you know, we were interested, just as we
were interested in our ability to live up to the
contract. We wanted to know the views of the
utilities about the contract before finalizing it.
Q. (By Mr. Shapiro) My understanding, you wanted to
know their views. I'm trying to get a sense of
the extent to which there was negotiation. How
would you characterize what a negotiation is?
A. I recognize -- I used the term "negotiation"
because normally in a contract, that's what one
does. In this case, I think it's probably a --
page 78
the wrong phrase to use. More appropriately, it
would be to get their comments and views on the
contract before we finalized our -- the contract
we would offer to the utilities.

[131:1] - [131:16] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 131
Q. The delivery commitment schedule process that you
just referred to, did you view those as creating
binding commitments, then, to the parties?
MS. HERRMANN: Objection. Calls for a
legal conclusion.
THE WITNESS: I wouldn't use the term
"binding commitments."
Q. (By Mr. Shapiro) What term would you use?
A. Good faith efforts to work with the utilities and
share information so that they could get a
reasonable approximation of when they would be
able to ship and how much they would be able to
ship.
Q. So you viewed the delivery commitment schedule
process as more of a planning tool?
A. That's my recollection.

[142:10] - [143:9] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 142
Q. (By Mr. Shapiro) Did you have discussions with
Hill staffers or anyone within RW about the
concept of acceptance of one fuel element in 1998
technically meeting RW's obligations?
A. No. I'm certain -- I feel quite certain I didn't
have discussions along those lines, because it
wasn't our intent.
Q. What was your intent, then?
A. Our intent would have been able to begin accepting
it and continue accepting the -- the waste or
spent fuel at a rate that over some reasonable
period of time, number of years, would have gotten
up to whatever the design capacity of the
repository was to be. I don't believe at that
point in time we had a firm repository rate in
mind, although that could -- maybe we did. I
page 143
don't know. I just don't recall it. But that --
that we would, over a period of time, be able to
get up to that.
We -- we weren't interested in playing games
and just taking one and declaring victory. But in
terms of commitments, we knew we weren't in a
position to commit to any specific quantity that
first year or second year, at that particular
point in time.

**Attachment III**

[166:7] - [167:6] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 166
Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've had marked as Lawrence Exhibit 9, which has a cover letter and then has a Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-level Radioactive Waste.
Do you recall this report?
A. Not specifically, no, I don't.
Q. Do you recall it generally?
A. Yeah. The -- the title rings a bell, Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-level Radioactive Waste.
Q. What was the purpose of this report, to the extent that you recall?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: My recollection was that the utilities needed to get this money added -- the fee added to their rate base -- or the charges added to their rate base, and they needed some
page 167
basis or documentation to take to the Public Utility Commissions to allow that to occur.
And I don't know if this is the report or whatever. But we -- if we were going to collect the fee, we needed to provide some basis for how the numbers were arrived at.

[181:16] - [181:22] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 181
Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've had marked as Lawrence Exhibit 10. First page of which seems to be a memorandum, subject line is Mission Plan Strategy, dated in March -- I'm sorry -- the date at the top is September 15th of 1983. There is also a received date by someone in March of '84.

[187:15] - [189:3] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 187
Q. Can we turn back to Exhibit 10 that we were just talking about, that -- the same page and the -- and the next heading is called Waste Acceptance Schedule.
The second dashed entry says that "The central criteria for this schedule is: An acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998."
Do you recall that concept?
A. I don't specifically recall the concept, but it's
page 188
consistent with my recollection of how we wanted to implement the Act.
Q. And the next dashed entry is an acceptance rate after the first five years equivalent to the actual rate of utility discharge of spent fuel each year. Do you recall that concept?
A. I would say the same thing I did about the last one: it's consistent.
I would emphasize that this says -- this is our planning base. This is what we'd like to do. And that's how our Mission Plan would -- would lay this out. So it represents, you know, what our plans would be.
Q. And I think, if I recall correctly from your prior testimony, your review of -- of the Mission Plan for issues such as insuring it was consistent with

**what you thought was actually doable; that these criteria were not simply pie-in-the-sky hopes, but actually your reasonable expectations of what you would be able to do.**
**MS. HERRMANN: Objection. Foundation. Speculation. Vague.**
**THE WITNESS: As a planning basis, it's what we originally set out with the intent -- with the hopes of doing. We may find out during the**
page 189
**course of technical work and design that it's not possible to achieve that. So this is just a planning basis.**

[194:19] - [195:6] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 194
for identification.)

**Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've marked as Exhibit 11, which is a Draft Mission Plan.**
**A. This is not the one I was referring to.**
**Q. I will later show you another Draft Mission Plan.**
page 195
**We've got two.**
**A. I don't believe this one was ever issued publicly.**
**Q. This one, referring to Exhibit 11, is dated December 20th, 1983. Do you recall this -- this draft?**
**A. Vaguely.**

[197:19] - [198:15] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 197
**Q. Let me point your attention to the page after the table of contents of Exhibit 11, Page 1-1. The bottom of the page, the last sentence actually, this sentence seems to have the same concept that we talked about earlier, that the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage and ultimately**
page 198
**remove from at-reactor storage all waste that is more than five years old.**
**A. Uh-huh. (Witness answers affirmatively.)**
**Q. Does the fact that this concept is in the December 20th draft, does that refresh your recollection at all as to the significance of that concept?**
**MS. HERRMANN: Objection. Vague. Speculation.**
**THE WITNESS: I have to admit, I doubt if there is something that could refresh my memory from something this long ago. But certainly the concept described here is consistent with my recollection of how we were trying to implement the Act so as to preclude unnecessary additional storage and unnecessary additional expense.**

[201:11] - [201:21] 5/20/2002 Lawrence, Michael J., Deposition Vol. 1, 5/20/02

page 201
**Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you what we've had marked as Lawrence Exhibit 13, which is titled "Statement of Michael Lawrence, Accounting Director, RW." It's dated February 22, 1984.**
**Do you recall this statement?**
**A. I remember a number of Congressional hearings, not necessarily this specific one.**
**Q. Is it fair to say that this document represents**

**your written testimony to the committee?**
**A. Yeah.**

[227:1] - [227:21] 5/21/2002 Lawrence, Michael J., Deposition Vol.2, 5/21/02

page 227

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**YANKEE ATOMIC ELECTRIC COMPANY, )**
**et al., )**
**)**
**Plaintiffs, )**
**vs. ) No. 98-126C**
**UNITED STATES, )**
**Defendant. )**

**DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME II**

**May 21, 2002**
**Richland, Washington**

[301:20] - [305:4] 5/21/2002 Lawrence, Michael J., Deposition Vol.2, 5/21/02

page 301

**Q. Mr. Lawrence, if you would take out Exhibit 13 for me, which is your statement dated February 22nd, 1984, before the Subcommittee to Energy Conservation and Power.**
**A. (Witness complies.)**
**Q. If you would turn to Page 2, which is Bates Page**

page 302

**228.**
**A. (Witness complies.)**
**Q. And I know you discussed this with Mr. Shapiro briefly yesterday, but I just wanted to direct your attention to the statement in the middle of the page, "These activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982."**
**A. Uh-huh. (Witness answers affirmatively.)**
**Q. Do you see where I'm reading?**
**A. Uh-huh. (Witness answers affirmatively.)**
**Q. Do you know where you would have taken this fundamental objective of the NWPA from?**
**A. Well, the quote is from the Nuclear Waste Policy Act.**
**Q. And that quote is "to accept high-level radioactive waste for safe management, storage and permanent disposal on a firm schedule beginning not later than January 31st, 1998."**
**A. That's were the quote is taken from. I'm sure there is context around that quote about having a geologic repository licensed and constructed and in operation.**
**Q. But you believed this was the fundamental objective of the NWPA, as demonstrated by your**

page 303

**testimony to the House Committee, in Exhibit 13, correct?**
**MS. HERRMANN: Calls for a legal conclusion.**
**THE WITNESS: A fundamental -- the term "fundamental objective" represents my judgment at that point in time, my opinion. It doesn't necessarily mean it was the fundamental objective.**

Q. (By Mr. Macdonald) In your view, it was the objective?
A. Yes. But in the context that we were requesting an appropriation of a quarter of a billion dollars for a geologic repository, I think that had to be factored -- that was pretty big objective, as well.
Q. Having the repository was a pretty big objective?
A. Having a repository was the primary means of which that objective could be met.
Q. Your statement goes on to say that "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31st, 1998."
Do you see where I'm reading?
page 304
A. I see that.
Q. Did you anticipate that DOE would meet the fundamental objective of the NWPA?
MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion. Asked and answered. Mischaracterization.
THE WITNESS: It was our goal to have a repository selected, constructed, licensed and in operation by January 31, 1998. That was our objective. That was our goal.
Was I certain it was going to happen? No.
Q. (By Mr. Macdonald) Did you believe that DOE would meet this fundamental objective of the NWPA, when you were acting director in 1984?
MS. HERRMANN: Same objection. Asked and answered like 18 times yesterday.
THE WITNESS: I believed that we could meet that objective.
Q. (By Mr. Macdonald) And if you met that objective, it would preclude the need for additional at-reactor storage, correct?
A. If we achieved that objective, and the ramp-up and acceptance rates were as anticipated and the -- and the spent fuel storage arising at the utilities were as projected, it would preclude the need for additional storage capacity.
page 305
Q. Additional storage capacity after January 31st, 1998?
A. That's correct.

[307:17] - [309:20] 5/21/2002 Lawrence, Michael J., Deposition Vol.2, 5/21/02

page 307
Q. But you did testify that you were trying to provide utilities with as much information so that they could plan themselves, as far as how much fuel they were going to have on-site?
A. I believe what I said is we intended to provide them as much information as early as possible. But basically nothing we had in the '83/'84 time frame could provide a reasonable basis for planning. That would all be subsequent to that.
page 308
Q. Now, a utility who was looking into the future and seeing what their storage needs were, they would need some sort of lead time to be able to plan to add additional storage if it was anticipated that pickup would begin at a lower rate or wouldn't begin at all in 1998?
A. That's correct.
Q. Do you know how long that lead time would be for a utility if they wanted to add additional dry storage on their site, for example?

**Attachment III**

MS. HERRMANN: Objection. Speculation.
THE WITNESS: It's difficult to say with any accuracy what that would be, because it would require licensing actions and -- and other activities. But this -- in general, we knew we wouldn't be in a position to give them more information until sometime in the '90s, assuming a '98 opening, and that they would have to plan accordingly prior to that time. And even once we did give them that information, they needed to plan accordingly.
Q. (By Mr. Tompkins) So the utility could be in a position where they should plan for additional at-reactor storage that they never build?
A. Yes.

page 309

Q. Was this ever communicated to the utilities?
A. I don't have a specific recollection, but I know that we felt and I -- and I believe communicated, but I have no specific recollection, that, you know, the utilities were responsible for the fuel up until the time we took title to it and they had to plan accordingly and provide sufficient storage to -- for the continued operation of their reactors.
Q. The utilities and the Department, however, were aware of a date that -- 1998 that was set in the Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I assume. We certainly were aware of the date set in the Act, but a date set in the Act did not mean that the physical, you know, repository would in fact be in place by then. That was our intent and that was our plan. Everyone in this business knows that plans can often change.

[325:1] - [328:10] 5/21/2002 Lawrence, Michael J., Deposition Vol.2, 5/21/02

page 325

Q. (By Mr. Tompkins) I'm showing you, Mr. Lawrence, Exhibit No. 22.
Exhibit 22 is a document that we pulled off of RIS-Web. And I was just looking for a Bates number to put in the record; however, it doesn't look like there is one except for the number on the side, which is 90002 and then it's 2008.
Mr. Lawrence, is this a letter that you wrote?
A. (Examination of documents.) Although I don't recall -- recall this specific letter, that is my signature. The letter itself appears to have been written by a person with the initials RDH, and I don't recall who that was.
Q. This letter is dated July 23rd, 1984. Had you moved to Richland by this point?
A. I couldn't recall the exact date, but it's obvious that I was the manager on that date, because I signed it as such.
Q. Okay. Am I correct in interpreting the letter that they're commenting from the Richland office about the Draft Mission Plan that we had looked at previously, dated April 1984?
A. The third page here is entitled "RL Comments on the Draft Mission Plan Dated April 1984." And I

page 326

assume that reflects the fact that these are RL's comments, or Richland Operations comments. And as stated here -- I guess that's enclosure one.
Q. What role would the Richland Operations Office have had in reviewing the -- the Draft Mission Plan?

A. The Mission Plan called for a process to select a repository site and also to provide for taking both commercial and Defense wastes into the repository. Richland would have had two primary areas of interest.
One, Richland was at that time under consideration for a geologic repository. So it would have been appropriate to comment on the site -- the siting and the site selection process.
Rockwell, who was our contractor at that time, was managing the program at Hanford, looking at the basalt under the Hanford site for a repository.
The other aspect, the second aspect that we would have been interested in, would have been the fact that Pacific Northwest Laboratory was responsible for tracking the spent fuel storage needs of the utilities and so, consequently, they would have -- or could have provided comments.

page 327

And according to this letter, I assumed they and Rockwell did provide comments on. But NPL would have provided comments on the commercial spent fuel storage needs.
Q. On the first page of this letter, it states, "The most significant comments, some of which are discussed in detail" below "are as follows:" Number one, it states, "It should be noted that to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU, depending upon the extent Federal Interim Storage is utilized."
Do you know if this 2,800 MTU plus some amount is sufficient -- is sufficient to eliminate the need for additional at-reactor storage?
Perhaps more precisely, do you have any reason to doubt the adequacy of this forecast?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: If I -- you know, I signed this letter, so I -- I know no reason why to doubt that estimate.
Q. (By Mr. Tompkins) You said you didn't remember this specific letter. Would you have reviewed

page 328

this letter, though, before you signed it. I do see that it has your signature on it.
A. I certainly would have read the letter before signing it.
Q. And would you have agreed with its contents before signing it?
A. Based upon my knowledge at that time, I -- I would believe that whatever I put in this letter and signed would reflect my views or what I reasonably expected to be accurate.

[329:11] - [334:5] 5/21/2002 Lawrence, Michael J., Deposition Vol.2, 5/21/02

page 329

Q. (By Mr. Tompkins) This Statement 2, however, does imply that someone at Richland was concerned that DOE would be responsible for storage after January 31, 1998 -- financially responsible?
MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion.
THE WITNESS: It would indicate to me that someone raised the possibility that if the government was responsible for storage after 1998, that the costs would be significant and that cost had not yet been put into the fee adequacy analysis.

Q. (By Mr. Tompkins) Well, the statement specifically implied in the DOE/utility disposal contracts. That's on the top of Page 2.
page 330
A. Uh-huh. (Witness answers affirmatively.)
Q. So this is inferring that -- that DOE has responsibility for these costs under the standard contract?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, I would not characterize it the way you did.
Q. (By Mr. Tompkins) How would you characterize it?
A. I would say if the DOE were to -- I think it means there's an uncertainty here. Because I cannot -- because I would assume all costs that we knew would be incurred would be put into the fee adequacy report. And so they're drawing attention to the fact that there is uncertainty or could be uncertainty about the costs for this additional storage, and therefore drawing attention to Mr. Rusche, that that is something that should be considered.
I'd go further. That my recollection is that although we knew that a goal -- or we established as a goal for the Department was to preclude the need for building additional at-reactor storage after we began accepting the waste, that was a goal which we couldn't guarantee and could not
page 331
commit to take the fuel such that that would not occur.
Now, one possible -- and I'm just speculating here -- but one possible explanation is, from the time I left and Mr. Rusche came on board, Mr. Rusche being a -- the -- a full -- fully appointed and approved director of the Office of Civilian Radioactive Waste Management, may have been stating services or capabilities that he now wanted to bring to the program that went beyond what was in our original -- what was in the Mission Plan in April of '84.
And I recall -- I'll call your attention to Exhibit 16, which states, basically he wanted to do something which was further -- or beyond what I was talking about. So consequently, if subsequent to Mr. Rusche being confirmed and coming into position as director, he had contemplated the possibility of the government assuming a contractual responsibility for all fuel and storage post '98, it would seem reasonable to point out what the cost of that assumption or desire could be so that he could factor into -- that into his consideration.
But what it says here doesn't change what's
page 332
in the Mission Plan, and it certainly doesn't change what's in the contract.
Q. But this statement specifically says, "as implied in the DOE/utility disposal contract." It doesn't -- it doesn't reference any -- any new policy imposed by Mr. Rusche.
MS. HERRMANN: Is that a question?
Q. (By Mr. Tompkins) Does it?
MS. HERRMANN: Objection. Speculation. The document speaks for itself.
THE WITNESS: Well, I -- I -- I'm going to speculate that the use of the word "implied" is clear and that it doesn't say as "stated in the disposal contract" or "as required in the disposal contract." Implied means that it is something not clearly and specifically spelled out.

**Attachment III**

If I felt it was a contractual obligation, I do not believe I would have used the word "implied."
**Q.** (By Mr. Tompkins) And yet someone, either the person that wrote this letter for you or you at this time, recognized that that was the implication from the contract, even if it wasn't clearly stated?
MS. HERRMANN: Objection. Calls for a
page 333
legal conclusion. Speculation.
THE WITNESS: I can't recall what -- what would have been going through my mind at this point in time.
**Q.** (By Mr. Tompkins) Moving to the first enclosure attachment to this letter, enclosure one, which at the top is titled "RL Comments on Draft Mission Plan."
Could you read, for now, just the -- the paragraph under Item No. 3.
**A.** (Witness complies.) Okay, I've read 3.
**Q.** Okay. We had talked briefly -- or actually at some length earlier about the -- the goal of precluding the need for additional at-reactor storage. In this first paragraph under No. 3, the third sentence, I believe, in states that "This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998."
Doesn't this statement imply that it was actually the intent and goal of the NWPA to preclude the need for -- the need for additional at-reactor storage and not just a goal of the Department?
MS. HERRMANN: Objection. Calls for a
page 334
legal conclusion. Document speaks for itself.
THE WITNESS: I think the statement is rather clear. And I would specifically note the use of the word "intent" rather than "requirement."

[336:12] - [337:23] 5/21/2002 Lawrence, Michael J., Deposition Vol.2, 5/21/02

page 336
**Q.** (By Mr. Tompkins) Well, there's -- there's nothing in the Act that's -- that states that DOE's mission is anything other than to -- to preclude at-reactor storage?
MS. HERRMANN: Objection. Calls for a legal conclusion. Best evidence.
THE WITNESS: My recollection and understanding was that Congress in passing the Act wanted to ensure a system was in place to safely dispose of nuclear waste by 1998. It was also my understanding that many of these supporters of the Act felt that a benefit of doing so would be to preclude the need for additional and costly at-reactor storage to be provided. And therefore,
page 337
by having a repository in place by '98 and to begin accepting waste by '98, it was hoped that additional storage at reactors could be precluded.
In the Mission Plans, both drafts that we've looked -- talked about, it states that the Department sought to provide capability such that additional storage would not have to be provided. All of those, I think, are reflected in writing in the exhibits we've got here.
But having said that, I saw nothing in those documents that said it was a legal requirement of the Act that that be the case.

Q. (By Mr. Tompkins) This statement here, though, does link up that goal with the Act and the purpose of the Act.
A. It links it up with -- via the word "intent," which to me implies that it was something desirable but not a specific requirement.
My belief is I would have used the word "requirement" because it's a much stronger word and -- and something that -- certainly conveys much more of a commitment or an obligation than the word "intent."

# Attachment IV

**Attachment IV**

[1:] - [3:] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

```
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY           :
(98-126C)(Merow, S.J.)                   :
CONNECTICUT YANKEE ATOMIC POWER COMPANY  :
(98-154C)(Merow, S.J.)                   :
FLORIDA POWER & LIGHT COMPANY            :
(98-483C)(Wilson, J.)                    :
NORTHERN STATES POWER COMPANY            :
(98-484C)(Wiese,J.)                      :
DUKE POWER, A Division of                :
DUKE ENERGY CORP.                        :
(98-485C)(Sypolt,J.)                     :
INDIANA MICHIGAN POWER COMPANY           :
(98-486C)(Hodges, J.)                    :
SACRAMENTO MUNICIPAL UTILITY DISTRICT    :
(98-488C)(Yock, S.J.)                    :
SOUTHERN NUCLEAR OPERATING COMPANY,      :
et al.                                   :
(98-488C)(Yock, S.J.)                    :
COMMONWEALTH EDISON COMPANY              :
(98-621C)(Hewitt, J.)                    :
BOSTON EDISON COMPANY                    :
(99-447C)(Allegra, J.)                   :
GPU NUCLEAR, INCORPORATED                :
```

page 2

```
(00-440C)(Bush, J.)                      :
WISCONSIN ELECTRIC POWER COMPANY         :
(00-697C)(Merow, S.J.)                   :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.)                    :
OMAHA PUBLIC POWER DISTRICT              :
(01-115C)(Bush, J.)                      :
NEBRASKA PUBLIC POWER DISTRICT           :
(01-116C)(Sypolt, J.)                    :
TENNESSEE VALLEY AUTHORITY               :
(01-249C)(Bruggink, J.)                  :
          Plaintiffs,                    :
v.                                       :Discovery
THE UNITED STATES,                       :Judge:
          Defendant.                     :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
```

**McLean, Virginia**
**Wednesday, May 1, 2002**

**Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons**

page 3

**Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.**

[65:21] - [65:25] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 65

**MR. TOMASZCZUK: Ms. Reporter, I would like to mark as Milner Exhibit 4 the draft Mission Plan overview dated December 20, 1983, and this is an excerpt from that document in the interest of killing a few less trees.**

[69:14] - [69:24] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 69
**Q. The next page of this document, 2-2, under the heading waste acceptance schedule, and this paragraph states that the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the program will accept beginning in 1998.**
**This schedule is presented in Table 2-1, and then turning to Table 2-1 whenever you're ready --**
**(The witness reviewed the document.)**

[72:21] - [73:22] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 72
**Q. Okay. This table goes on to, under the column remaining backlog MTU, do you see that?**
**A. Yes.**
**Q. In the right-hand side? It shows a**
page 73
**pre-1998 backlog of 40,809 metric tons?**
**A. Yes.**
**Q. Correct? And that number basically decreases over time, and the table shows a backlog as of 2020 of 23,775 metric tons, right?**
**A. Correct.**
**Q. Showing that the backlog is being reduced over time?**
**A. Correct.**
**Q. And was that a fair statement of DOE's intentions at or about this time, to work off the backlog of spent nuclear fuel that utilities were storing?**
**MR. SHULTIS: Objection. Calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.**
**THE WITNESS: Well, at this specific point in time, I don't know what the department's intent was.**
**At the point I joined the program, my understanding of the intent was to work off the backlog.**

[84:17] - [85:24] 5/1/2002 Milner, Ronald A., Deposition Vol. 1, 5/1/02

page 84
**Q. Can I direct your attention to the page 29 of the June '85 Mission Plan?**
**A. Page 29?**
**Q. Page 29 should be the last page.**
**A. Um-hm.**
**Q. Of this excerpt.**
**A. Um-hm.**
**(The witness reviewed the document.)**
**BY MR. TOMASZCZUK:**
page 85
**Q. This page 29 appears to identify for DOE objectives for a waste acceptance system, and it lists them one, two, three, four?**
**A. Um-hm.**
**Q. Right?**
**A. Correct.**
**Q. And the first states accept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear power plants, recognizing that the oldest spent fuel will have the highest priority for acceptance consistent with the DOE's current**

contracts with the waste generators?
A. Yes.
Q. All right? What is your understanding of the phrase in that quote that will allow the utilities to maintain orderly operations of their nuclear power plants?
A. My personal opinion of that was that given the limitations of the spent fuel pools of various utilities, that in essence we would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down.

[197:] - [199:] 5/2/2002 Milner, Ronald A., Deposition Vol. 2, 5/2/02

page 197

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED : 0198

page 198

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons 0199

page 199

Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings

**being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.**

[327:22] - [327:24] 5/2/2002 Milner, Ronald A., Deposition Vol. 2, 5/2/02

page 327

**MR. TOMASZCZUK: I have now the 1991 ACRs. It's amazing.**
**Can we mark it as Exhibit 42?**

[334:20] - [335:11] 5/2/2002 Milner, Ronald A., Deposition Vol. 2, 5/2/02

page 334

**Q. Mr. Milner, the rates contained at page 5 of the 1991 ACR, Milner Exhibit 42, those rates are based on use of an MRS, correct?**
**A. That's correct.**
**Q. And that MRS, one of the assumptions is that MRS also has placed on it certain 335**

page 335

**statutory linkages or restrictions?**
**A. That's correct.**
**Q. At the time that this document was prepared, December 1991, OCRWM had other documents reflecting the design capacity of the geologic repository, is that right?**
**A. Correct. I believe so.**
**Q. And those documents reflected a steady-state spent nuclear fuel acceptance schedule of 3,000 MTU?**
**A. I believe that's correct, yeah.**

[403:] - [404:] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 403

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**- - - - - - - - - - - - - - - - - - - - - - X**
**YANKEE ATOMIC ELECTRIC COMPANY, (98-126C)**
**CONNECTICUT YANKEE ATOMIC POWER COMPANY(98-154C)**
**MAINE YANKEE ATOMIC POWER COMPANY (98-474C) :**
**FLORIDA POWER & LIGHT COMPANY(98-483C) :**
**NORTHERN STATES POWER COMPANY (98-484C) :**
**DUKE POWER, A Division of DUKE ENERGY CORP. (98-485C) :**
**INDIANA MICHIGAN POWER COMPANY (98-486C)**
**SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C) :**
**SOUTHERN NUCLEAR OPERATING COMPANY, et al., (98-614C):**
**COMMONWEALTH EDISON COMPANY (98-621C) :**
**BOSTON EDISON COMPANY (99-447C) :**
**GPU NUCLEAR, INCORPORATED (00-440C) :**
**WISCONSIN ELECTRIC POWER COMPANY, (00-697C):**
**POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C) :**
**OMAHA PUBLIC POWER DISTRICT (01-115C) :**
**NEBRASKA PUBLIC POWER DISTRICT (01-116C):**
**TENNESSEE VALLEY AUTHORITY (01-249C) :**
**Plaintiffs, v. :**
**UNITED STATES OF AMERICA, :**
**Defendant.**
**Washington, D.C. Friday, May 3, 2002**
**Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for**

page 404

**Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.**

**Attachment IV**

[411:7] - [411:13] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 411

**Q. Mr. Milner, you recall, we had the March 1995, APR, ACR out late in the day yesterday?**
**A. I do.**
**Q. And if I could direct your attention to page 4 in the document. This is the table with the projected acceptance rate for spent nuclear fuel?**
**A. Correct.**

[412:3] - [412:22] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 412

**Q. This table as I understand your testimony yesterday reflects the, and adopts the MRS capacity limits, correct?**
**A. I believe it does, yes.**
**Q. And those MRS capacity limits are essentially imposed on the geologic repository here, is that right?**
**MR. SHULTIS: Objection as to characterization.**
**THE WITNESS: I can't answer -- I don't know.**
**BY MR. TOMASZCZUK:**
**Q. I mean, we know as of this point in time there was no MRS in the works, correct?**
**A. I believe we had determined yesterday that this particular APR ACR did assume an MRS.**
**Q. But did we also not determine that as of this point in time all work at DOE on an MRS siting had stopped?**
**A. That's correct.**

[555:8] - [556:12] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 555

**Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?**
**A. I believe that was the request or recommendation of the local community at the time.**
**Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to being able to move additional waste from the MRS and start feeding into the repository?**
**A. It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.**
**Q. But over the course of that five years, would this limit on the capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?**
**A. It certainly would have been a constraint.**

page 556

**15,000, I believe, was the limit wherein the capacity could never exceed that of the MRS.**
**Q. However, if divided over the course of five years, this capacity doesn't exceed amounts that the DOE had previously projected that it was going to be receiving on an annual basis?**
**A. That's correct.**
**Q. In fact that would equal exactly 3,000 metric tons a year which had previously been the steady state operation under previous projections?**
**A. That's correct. Whether that was a mathematical coincidence, I don't know.**

[572:25] - [574:18] 5/3/2002 Milner, Ronald A., Deposition Vol. 3, 5/3/02

page 572
**Q. Sure, under prior planning with the MRS**
page 573
**facility that started in 1998, a utility would have submitted a DCS form assuming a 900 ton metric rate?**
**A. For the fifth year of operation.**
**Q. For the fifth year of operations, right?**
**A. Correct.**
**Q. Now, in reality, there's actually going to be, in the fifth year of actual operations as currently projected, beginning in 2010 there's going to be 3,000 metric tons that are accepted.**
**MR. SHULTIS: Objection, mischaracter -- assumes facts not in evidence and Chris, I'm having a hard time with your question insofar as you're asking about in reality and about projections. They're two different things. Can you help me out there?**
**BY MR. TOMPKINS:**
**Q. Sure. Current projections for forecasts and what utilities are planning, or rather, the Department is currently planning on receiving in the year 2010 is 3,000 metric tons for the fifth year of operation of the repository. This 3,000 metric tons is higher in the fifth year of operations than under prior plans?**
**A. Correct.**
**Q. So because of this difference, when the**
page 574
**Department goes and prepares an APR, all the allocations for the fifth year will be different than they were originally in the '90s?**
**A. Yes, okay.**
**Q. Okay. So a utility that submitted a DCS for an allocation based on the rates in the early '90s may have a different allocation under current forecasts?**
**MR. SHULTIS: Calls for speculation.**
**THE WITNESS: I would assume, yes.**
**BY MR. TOMPKINS:**
**Q. Okay. Do you know what the Department is, or the program OCWRM is currently planning on doing about the fact that the allocations may be different with the DCS forms? Are they going to go back and have utilities prepare a new DCS form based on these rates?**
**A. Actually we've not addressed that yet.**

[1:] - [1:] 5/7/2002 Milner, Ronald A., Deposition Vol. 1, 5/7/02

page 1
**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

```
- - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY      )
(98-126C)(Merow, S.J.)              )
CONNECTICUT YANKEE ATOMIC POWER     )
COMPANY                             )
(98-154C)(Merow, S.J.)              ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY)  Washington, D.C.
(98-474C)(Merow, S.J.)              ) Tuesday
               Plaintiffs,          ) May 7, 2002
               v.                   )
 THE UNITED STATES,                 )
               Defendant.           )
- - - - - - - - - - - - - - - - - - -)
```

**Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of**

**Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.**

[31:4] - [32:11] 5/7/2002 Milner, Ronald A., Deposition Vol. 1, 5/7/02

page 31

**Q. I mean, assuming then, that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report, then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages in the Nuclear Waste Policy Act?**
**MR. SHULTIS: Objection. It calls for a legal conclusion.**
**A. You're talking schedule linkage?**
**BY MR. SKALABAN:**
**Q. Yes, sir.**
**A. Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time there was a possibility of that schedule linkage being removed.**
**Q. But it was -- but the schedule linkage was there?**
**A. Yes.**
**Q. And so as the law then existed and as it exists now, because I don't believe -- scratch that.**
**As the law then existed, the DCSs were based on a waste acceptance schedule that was**

page 32

**inconsistent with the Nuclear Waste Policy Act's schedule linkages as they existed at this time?**
**A. Sitting here today looking at that, that would be my opinion.**
**Q. And to your knowledge, the schedule linkages have never been changed. There's -- I'm sorry.**
**Let me ask a more artful question.**
**There hasn't been a change in the law removing those schedule linkages?**
**A. No, there has not.**

[4614:1] - [4614:20] 8/11/2004 Yankee Atomic Electric Trial Transcript Vol. 21

page 4614

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY,**
**Plaintiffs,**
**v.**
**THE UNITED STATES,**
**Defendant.**

**Case Nos. 98-126C 98-154C 98-474C**

**Courtroom Number 5**

**National Courts Building**
**717 Madison Street, Northwest**
**Washington, D.C.**

**Wednesday, August 11, 2004**

**VOLUME 21**

[4749:16] - [4750:6] 8/11/2004 Yankee Atomic Electric Trial Transcript Vol. 21

page 4749

**Q Now, it's true that the Department of Energy's intentions with respect to the repository design receipt rates had stayed constant pretty much to the present day, 3,000 MTU per year?**
**A I'm sorry, would you repeat that?**
**Q It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year?**
**A Yes, uh-huh.**

page 4750

**4750**

**Q And that -- that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?**
**A As far as the steady-state rate, yes.**
**Q And that's a reasonable rate?**
**A Yes, I think so.**

# Attachment V

**Attachment V**

[1:] - [2:] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 1

**1**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE ATOMIC POWER COMPANY MAINE YANKEE ATOMIC POWER COMPANY FLORIDA POWER & LIGHT COMPANY NORTHERN STATES POWER COMPANY DUKE POWER, A Division of DUKE ENERGY CORP. INDIANA MICHIGAN POWER COMPANY SACRAMENTO MUNICIPAL UTILITY DISTRICT SOUTHERN NUCLEAR OPERATING COMPANY, et al. COMMONWEALTH EDISON COMPANY BOSTON EDISON COMPANY GPU NUCLEAR, INCORPORATED WISCONSIN ELECTRIC POWER COMPANY POWER AUTHORITY OF THE STATE OF NEW YORK OMAHA PUBLIC POWER DISTRICT NEBRASKA PUBLIC POWER DISTRICT TENNESSEE VALLEY AUTHORITY,**
**Plaintiffs, vs.** **Case Nos. 98-126C, 98-154C, 98-474C 98-483C, 98-484C, 98-485C 98-486C, 98-488C, 98-614C 98-621C, 99-447C, 00-440C UNITED STATES, 01-116C, 01-249C DEFENDANT.**

___________________________

**VOLUME I DEPOSITION OF ROBERT M. ROSSELLI**
**Taken on behalf of Sacrament Municipal Utility District April 15, 2002**
**- - -**

**BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton**
page 2
**Inn, 486 West Bradley, Richland, Washington.**

[134:23] - [135:5] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 134
**Q. Mr. Rosselli, you've been handed Exhibit**
**13 to your deposition. It's a document**
**entitled, Civilian Radioactive Waste Management**
page 135
**Program Mission Plan, Volume I, Overview and**
**Current Program Plans, December 20, 1983. And**
**it includes in large type "draft." You were**
**still at OCWRM in December of 1983. Correct?**
**A. Yes, I was.**

[139:24] - [140:10] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 139
**Q. The last sentence on this page, page**
**2-1, "Until 1998, each utility will be**
page 140
**responsible for providing its own additional**
**on-site interim storage, unless the utility**
**applies for and is certified for the federal**
**interim storage program." Do you see that?**
**A. Yes.**
**Q. Was it your understanding that after**
**1998, the Department of Energy would become**
**responsible for providing or eliminating the need**
**for additional on-site storage?**
**A. Yes.**

[147:15] - [149:17] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 147
**Q. But my question was, would the**
**Department receiving a -- with the Department**
**accepting a single spent fuel element in 1998,**
**would that have complied with the Department's**
**obligations under the Act, as you understood**
**them?**
**MR. MILLER: Same objections.**
**THE WITNESS: Well, technically,**

I would assume that our obligation was to start accepting spent fuel by 1998, January 1998. So if we took one, we would be meeting our
page 148
obligation under the Act.
BY MR. NESLIN:
Q. Is that all the Act required the Department to do, is to accept one spent fuel assembly, sir?
MR. MILLER: Same objection.
THE WITNESS: I do not believe that the Act was specific in terms of one or many.
BY MR. NESLIN:
Q. But I'm asking you about the intent behind the Act. You had an understanding of the intent behind the Act in preparing the contract and working on the Mission Plan, didn't you?
A. Yeah. I don't think the intent was that if we only accept one. And I think that Mr. Morgan stated that here in a public address.
Q. You would agree with what Mr. Morgan said here?
A. Yes. Yes, I would.
Q. It goes on to the say that, "The basic strategy which we've outlined in the Mission Plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site." Is that a true statement?
page 149
A. That is.
Q. And was that, in fact, what the utilities were paying for?
MR. MILLER: Objection. Calls for speculation and a legal interpretation.
BY MR. NESLIN:
Q. Do you understand my question, sir?
A. I think the utilities were paying for disposal services.
Q. And were they paying for disposal services sufficient that they would not have to add additional storage on site?
MR. MILLER: Same objections.
THE WITNESS: After 1998, yes.
BY MR. NESLIN:
Q. You would agree?
A. Yes.

[176:9] - [176:15] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 176
Q. Mr. Rosselli, Exhibit 23 is a document captioned, The Mission Plan: Volume I, Overview and Current Program Plans by Robert M. Rosselli. Four Fuel Cycle Conference '84, Atomic Industrial Forum, Inc., Westin Peachtree Plaza, Atlanta, Georgia. April 3, 1984. Could you review the first three pages?

[179:9] - [181:2] 4/15/2002 Rosselli, Robert M., Deposition Vol. 1, 4/15/02

page 179
Q. The top of page 6, the last sentence in the carry-over paragraph, "This approach is designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes early enough to determine their on-site interim storage needs prior to 1998." Those, too, were your words?
A. Yes.
Q. You consider those to be accurate, at

the time you wrote them?
A. Yes.
Q. What did you mean by, "utilities establishing firm planning schedules?"
A. Delivery commitments.
Q. And it was your expectation that this would enable them to on-site interim storage

page 180

needs prior to 1998?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And by prior, you're referring to the period prior to 1998?
A. Yes.
Q. After 1998 the Department would either begin receiving such waste or would implement some interim measure, such as interim storage or a monitored retrievable storage facility?
MR. MILLER: Objection. Mischaracterizes the document.
MR. NESLIN: You may answer, sir.
THE WITNESS: It was in the Department's plan that after 1998 they would provide some capability, whether it was at the reactor site or some other means to store the waste.
BY MR. NESLIN:
Q. So that in any event, the utilities would not have to provide additional waste on-site after 1998?

page 181

A. Additional storage capacity on-site after 1998, yes.

# Attachment VI

[1:] - [1:] 5/16/2002 Rusche, Ben, Deposition Vol. 1, 5/16/02

page 1

**UNITED STATES COURT OF FEDERAL CLAIMS**

**YANKEE ATOMIC ELECTRONIC COMPANY, ) CA NO. 98-126C**
**PLAINTIFF, )**
**VS. )**
**THE UNITED STATES, )**
**DEFENDANT. )**
**MAINE YANKEE ATOMIC POWER COMPANY, ) CA NO. 98-474C**
**PLAINTIFF, )**
**VS. )**
**THE UNITED STATES, )**
**DEFENDANT. )**
**CONNECTICUT YANKEE ATOMIC POWER COMPANY, ) CA NO. 98-154C**
**PLAINTIFF, )**
**VS. )**
**THE UNITED STATES, )**
**DEFENDANT. )**

**Deposition on oral examination of BEN RUSCHE, VOLUME 1, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Thursday, May 16, 2002, at the hour of 9:20 a.m.**

[152:22] - [153:5] 5/16/2002 Rusche, Ben, Deposition Vol. 1, 5/16/02

page 152

**Q. Okay. Take a look at what's been marked as Exhibit No. 10, please. And this is an excerpt from, as it says on the front cover, Proceedings of the 1983 Civilian Radioactive Waste Management**

page 153

**Information Meeting, December 12-15, 1983.**
**The date of the document, at least as shown on the front cover, is February 1984. It says that these proceedings were sponsored by the U.S. Department of Energy.**

[158:19] - [159:23] 5/16/2002 Rusche, Ben, Deposition Vol. 1, 5/16/02

page 158

**Q. Okay. And you don't recall there being a strategy to facilitate utilities avoiding additional storage in 1998?**
**A. Certainly that was a -- that was an intent or a strategy in a sense, but strategy needs to be put in the context of some reality. And in my -- in my time and my awareness that**

page 159

**would -- that was just a completely unreasonable expectation.**
**Q. Okay. When you say it was a strategy --**
**A. In my own mind.**
**Q. Fine. Thank you. You say it was a strategy in a sense. In what sense was it a strategy?**
**A. Because the statute said we'll begin receiving fuel in 1998. In that sense then I can't deny that.**
**Q. In that sense there was a strategy of allowing utilities to avoid additional storage on site?**
**A. I think this statement is trying -- is attempting to say that that strategy was the one that was then being applied or being -- that was understood as the objective of the operation.**
**Q. Okay. And my question is simply was**

that your understanding at the time in 1984 that
that was the strategy?
A. In 1984 in my mind?
Q. That that was the strategy?
A. Yes, I can agree that was the strategy.

[243:21] - [247:14] 5/16/2002 Rusche, Ben, Deposition Vol. 1, 5/16/02

page 243
Q. (Mr. Stouck) Okay. What I want to talk about now is what you mean when you talk about the program as originally outlined in the Act before experience and whatever else led to these changes, consideration of change, revision, revised,
page 244
whatever. Go back to your -- I want to talk about your understanding of what the program originally outlined in the Act, what you meant when you referred to that.
Okay. Now, would you agree that the statements that we looked at in some of the prior documents about -- let me refer specifically -- the draft mission plan in December 1983 about --
A. Yes.
Q. -- an objective of -- on Page 1-1 to accept commercial -- each activity specified in the mission plan, at least this draft, is targeted toward one fundamental objective, to achieve -- to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.
Further, the waste acceptance schedule will initially preclude the need for additional at-reactor storage after January 31, 1998, and ultimately remove from at-reactor storage all waste that is more than five years old. You recall those kinds of statements we talked about at some length?
A. I do.
page 245
Q. Would you agree that those statements are consistent with what you referred to as the program originally outlined in the Act before these changes that we've more recently been talking about in this deposition?
A. I think some of the details are not mentioned in the Act, but I think the thrust of those discussions, those statements, to me seem to be more a statement or recitation of what the Act says than what the staff, if I can use that term, concluded ought to be done.
Q. Later?
A. Later.
Q. After these changes?
A. Or at any time. That is the Act -- the Act is not a very detailed prescription of what is to be done. There's a lot of stuff of how things have fit together and so forth, as I recall it, but the prescription in the Act, as acts, I think, generally want to be, is objective oriented, not implementation oriented.
Q. Okay. And these statements, like the one I just read to you and we discussed earlier, would you agree are consistent with the --
A. To some extent --
page 246
Q. -- objectives in it?
A. -- they are consistent with what was then visualized in the Act as important objectives.
Q. Initially?

**Attachment VI**

A. Yes.
Q. Okay. But as time went on the implementation got more complicated?
A. Well, not only the implementation got more complicated, but the ability to even achieve the objectives, I think, was called into question.
Q. Even by the time you joined?
A. By the time I -- certainly by the time I had been there when this occurred.
Q. Meaning the draft mission plan?
A. Yes.
Q. Okay.
A. And this, I think, was an attempt to try to -- try to preserve as much as of the original inferences drawn from the Act as could be while further stating or giving voice to some of the exigencies that have become more evident as the program unfolded.
Q. Okay. So would you agree then with this, that if we were interested in learning or

page 247

getting the best understanding that we could get of the original objectives of the Act, that we should look to documents and statements that are pretty close in time to the enactment of the Act, that is 1983, such as some of the ones that are out on the table here, and that as time went on the interpretations of the objectives of the Act got, I'll use the word, clouded by these other considerations of complexities and difficulties and eventually anathema? Would you agree with that?
A. I think I probably would agree with that statement. I might have used shaped rather than clouded.

[304:] - [304:] 5/17/2002 Rusche, Ben, Deposition Vol. 2, 5/17/02

page 304

UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRONIC ) CA NO. 98-126C
COMPANY, )
PLAINTIFF, )
VS. )
THE UNITED STATES, )
DEFENDANT. )
MAINE YANKEE ATOMIC POWER COMPANY, ) CA NO. 98-474C
PLAINTIFF, )
VS. )
THE UNITED STATES, )
DEFENDANT. )
CONNECTICUT YANKEE ATOMIC ) CA NO. 98-154C
POWER COMPANY, )
PLAINTIFF, VS )
THE UNITED STATES, DEFENDANT. )

Deposition on oral examination of BEN RUSCHE, VOLUME 2, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Friday, May 17, 2002, at the hour of 8:28 a.m.

[376:20] - [377:6] 5/17/2002 Rusche, Ben, Deposition Vol. 2, 5/17/02

page 376

Q. Okay. Now, without going back a whole couple of days of testimony, don't you agree that an objective of the program at the time you were there was to avoid adding additional -- avoid

**Attachment VI**

**additional operator burdens and complexity at the reactor sites consistent with these findings of --**

page 377

**you know, that are quoted here, that that was an objective of the program, to avoid adding additional operator burdens and complexity? And how would they be avoided? Through the movement of fuel. That that was an objective?**

**A. Yes.**

# Attachment VII

**Attachment VII**

[1:1] - [1:23] 4/21/1999 Slater, Nancy H., Deposition Vol. 1, 4/21/99

page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - X
Washington, D.C.
Wednesday, April 21, 1999
Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

[161:14] - [162:1] 4/21/1999 Slater, Nancy H., Deposition Vol. 1, 4/21/99

page 161

Q. Ms. Slater, you've been handed what we've had marked as Slater Exhibit 8. Do you recognize this document?
A. No, I don't recall this. This is my handwriting. And these appear to be the meeting minutes from a standard contract task force that would have been a utility group task force in August 29, 1991, five days after I joined DOE.
And it looks like it focuses on completing DCS's. And I believe you will note in item 3 that we discussed that range of discharge dates which was one of the issues that was

page 162

unclear.

[163:18] - [164:22] 4/21/1999 Slater, Nancy H., Deposition Vol. 1, 4/21/99

page 163

Q. On the second page of Slater Exhibit 8, you have it looks like certain items or issues 1, 2, 3, 4. Could you tell me what the second one is talking about?
A. Let me read it for a moment.
Okay. Submission of the first DCS's was timed, it's explicitly mandated in the contract, 63 months prior to the delivery year,

page 164

and assumes that delivery would commence in 1998, January 31, '98.
If 1998 were not the year when delivery commenced, utilities would have submitted DCS's for 1998. The question was do they get to go back now and revise their DCS's or are they just overcome by events, are they calendar year specific or year one, is it 1998 or year one.
Q. Year one of what?
A. Of any range of dates. So, if it were year one, no one would have to revise anything. If it's 1998, do I make them go back and revise all their DCS's, do I -- if they have to go back and revise their DCS's, can I revise a DCS or would I have to treat it as an exchange in a

**given year. So there were procedural questions about that, and that's what this issue is discussing.**
**Q. You say year one, you mean year one of DOE's acceptance of spent fuel under the waste acceptance system?**
**A. Yes.**

[206:1] - [206:22] 4/22/1999 Slater, Nancy H., Deposition Vol. 2, 4/22/99

page 206

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**- - - - - - - - - - - - - - - X**
**YANKEE ATOMIC ELECTRIC :**
**COMPANY, :**
**Plaintiff, : Case No. 98-126C**
**v. : Senior Judge**
**: Merow**
**THE UNITED STATES, :**
**Defendant. :**
**- - - - - - - - - - - - - - - X**
**Washington, D.C.**
**Thursday, April 22, 1999**
**Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.**

[244:5] - [246:4] 4/22/1999 Slater, Nancy H., Deposition Vol. 2, 4/22/99

page 244

**Q. So it was not intended that the delivery commitment schedule process be a gotcha process?**
**A. A static process.**
**Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?**
**A. That's correct, it was not our intention to do that.**
**Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?**
**A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the**

page 245

**fuel that earned you the slot.**
**So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.**
**So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.**
**So it wasn't as clear as looking at the**

**Attachment VII**

**APR. The DCS was intended to provide a little bit more sound information for planning purposes.**
**Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?**
**A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they**
page 246
**were allocated because of the equity issue. There's only so much system capacity. If I accept more from someone else, I accept less from someone else.**

[1:] - [1:] 6/13/2002 Thompson, Nancy Slater, Deposition 6/13/02

page 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**- - - - - - - - - - - - - - - - - X**
**YANKEE ATOMIC ELECTRIC :**
**COMPANY, MAINE YANKEE ATOMIC :**
**POWER CO., and CONNECTICUT :**
**YANKEE ATOMIC POWER CO., : Case No. 98-126C**
**Plaintiffs : 98-474C, 98-154C**
**-v- : (Senior Judge**
**: Merrow)**
**UNITED STATES OF AMERICA, :**
**Defendant :**
**- - - - - - - - - - - - - - - - - X**

**Washington, D.C.**
**Thursday, June 13, 2002**

**Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.**

[94:16] - [99:6] 6/13/2002 Thompson, Nancy Slater, Deposition 6/13/02

page 94
**Q. A little while ago you referred to the ACR as a planning document. What did you mean by that?**
**MS. SULLIVAN: Objection. The documents speak for themselves.**
**You may answer.**
**A. As we have discussed in my prior deposition and previously in this deposition, the ACR represents a planning basis. The acceptance rates are subject to influences by future budget**
page 95
**constraints, lack of a facility, unavailability of transportation casks.**
**For example, no one would have contemplated at the time that I did these that we would have an RSA, Regional Services Agreement, that would in fact contract out with someone else to provide the transportation which would have financial effects and could have scheduling and capacity effects. It's a planning document. And in fact when I sat on the utilities side of the table the industry recognized that not only was the ACR for planning purposes only, but that in**

fact their DCSs were for planning purposes, and they filled DCSs out consistent with that planning presumption because providing a range of discharge dates which might be over a 10-year period certainly doesn't permit a system to do more than plan.
Q. A couple sentences before the end of your answer, you said it was understood by the industry that both the ACRs and the delivery commitment schedules were for planning purposes only. By using the word "only," did you mean to exclude -- what did you mean to exclude?
A. That we viewed the DCSs as fungible,
page 96
and we have been through that in prior deposition as well; that the industry recognized that in fact they wouldn't be providing us with specifics about what they wanted us to accept until they submitted a final delivery schedule; and the final delivery schedule actually does represent the commitment on their part to this reactor, this time, this amount of fuel, this age fuel, so greater specificity with the FDS, ball park with the DCS.
It was important for the utilities to give us DCSs because of their very fungibility. If you didn't submit a DCS, you couldn't exchange your slot in the cue, and given that those exchanges were possible, I don't know how one would perceive a DCS as anything other than for planning purposes.
Q. Let's go back first just to the ACRs and the statement that they are for planning purposes only.
When you say that ACRs were for planning purposes only, does that mean that the ACRs were not meant to be binding on the Department of Energy?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal
page 97
conclusion.
A. I can't speak to that legal issue or speak for a contracting officer. In my estimation, that's a question you would have to ask someone else.
Q. When you published the 1995 ACR, did you understand that you were committing the Department of Energy to accept the amount of spent fuel noted in the waste acceptance projections in that document?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague.
A. My understanding is entirely consistent with the sentence at the bottom of page 1 in the -- I guess this would be Exhibit 3, which is the 1995 ACR. As specified in the Standard Contract, the ACR is for planning purposes only, and this is not contractually binding on either DOE or the purchasers. And so were I to reason this out and not make a legal decision, I would have to say as a simple engineer my clear reading of that language would say if it's in the contract, everyone, including the utility, would be well aware of that.
page 98
Q. What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?
MS. SULLIVAN: Objection to the extent

it calls for a legal conclusion. Objection, vague.

A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.

Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery

page 99

commitment schedules were binding on either industry or the department?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.

A. No, I don't.

# Attachment VIII

**Attachment VIII**

[1:] - [3:] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 1

```
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X YANKEE ATOMIC ELECTRIC COMPANY
(98-126C)(Merow, S.J.) :CONNECTICUT YANKEE ATOMIC POWER COMPANY
(98-154C)(Merow, S.J.)  : MAINE YANKEE ATOMIC POWER COMPANY          :
(98-474C)(Merow, S.J.) :FLORIDA POWER & LIGHT COMPANY              :
(98-483C)(Wilson, J.)  :NORTHERN STATES POWER COMPANY              :
(98-484C)(Wiese, J.)  : DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :  INDIANA MICHIGAN POWER COMPANY             :
(98-486C)(Hodges, J.): SACRAMENTO MUNICIPAL UTILITY DISTRICT      :
(98-488C)(Yock, S.J.)  : SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) : COMMONWEALTH EDISON COMPANY                :
(98-621C)(Hewitt, J.) : BOSTON EDISON COMPANY                      :
(99-447C) (Allegra, J.)  GPU NUCLEAR, INCORPORATED                  :
(00-440C)(Bush, J.) : WISCONSIN ELECTRIC POWER COMPANY           :
(00-697C)(Merow, S.J.) : POWER AUTHORITY OF THE STATE OF NEW YORK   :VOLUME
(00-703C)(Damich, J.)  :  I OMAHA PUBLIC POWER DISTRICT                :
(01-115C)(Bush, J.) NEBRASKA PUBLIC POWER DISTRICT             :Discovery
(01-116C)(Sypolt, J.)  :Judge: TENNESSEE VALLEY AUTHORITY   :(Judge
(01-249C)(Bruggink, J.)                    :Sypolt)
               Plaintiffs,                 :PAGES
V.                                         :1 - 241
```

page 2

```
THE UNITED STATES,                         :
               Defendant.                  :
-------------------------------------------X
```

**Deposition of Victor W. Trebules, Jr.**
**Washington, DC**
**Wednesday, April 17, 2002**

**Reported by: Denise Dobner Vickery, RMR, CRR**
**JOB NO. 144458**

page 3

**April 17, 2002**
**9:32 A.M.**

**Deposition of Victor W. Trebules, Jr., held at the offices of:**

**Jenner & Block**
**601 13th Street, NW**
**12th Floor**
**Washington, DC 20005**

**Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.**

[44:17] - [45:17] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 44

Q. Okay. Do you have knowledge as to he what rate of acceptance of spent fuel the repository was designed to operate at this time?
MR. SHULTIS: Objection, asks for legal conclusion.
THE WITNESS: Again, going back to the
page 45
mission plan of some 17 years ago, we had put in the mission plan what were called waste acceptance schedules, which were again planning targets of what we thought the system could do if it were developed, you know, in total as we had laid it out. Starting in 1998 with one repository operating. We had laid out what we thought were practical waste acceptance rates.
What I mean by that is it allowed for a ramp-up. I think the number that we started with was for the first repository, for example, 400 metric tons and then it increased. I don't remember the other numbers, but it increased 400 to 600 up to a rate of about 3,000 metric tons per year for a single repository, but at that time we also had authorization to pursue a second repository. That was a provision in the Nuclear Waste Policy Act that we laid out waste acceptance schedules for that two-repository system.

[52:11] - [54:4] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 52
Q. When you worked in the program, do you know whether or not it was the intent of DOE to receive fuel at a rate beginning in 1998 that no utility would have to add any further storage facilities?
MR. SHULTIS: Same objections and relevance.
THE WITNESS: When I started working in the program on the mission plan, I remember that we discussed the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage. That was our objective or planning target.
page 53
I believe what happened early on was that when we sent the draft mission plan out for public review and comment, we got a number of comments that said our schedules were too optimistic and we, I believe, revised those schedules in the actual document that went out in June of 1985 to the point where it didn't quite meet the intent of the words described here.
We started out as best as I could remember with a number like 400 metric tons in 1998, and we incorporated a ramp-up period that after four or five years or so we would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time.
And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage. And then when the second repository came into operation, then we could, when that one reached full capacity, be able to reduce the backlog.
So, again, I'm speculating that when this
page 54
was written that was the intent, but that was changed after we got comments on those early draft versions of the mission plan. We adjusted those waste acceptance schedules a bit.

[57:15] - [60:14] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 57

**Q. Okay. The sentence and this paragraph goes on to say, "Technically, the act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."**

**Do you recall having any discussions back when**

page 58

**you were working on the mission plan as to regarding whether or not accepting one spent fuel element in 1998 would be in accordance with the Nuclear Waste Policy Act?**

**MR. SHULTIS: Objection, calls for speculation. Asking for a legal conclusion.**

**THE WITNESS: As I understood your question, do I recall having discussions, the answer is yes. I was involved in many discussions or speculation as about what that meant and would accepting only one fuel assembly satisfy the intent of the act. And as best as I can remember, I don't know that we ever got a clear determination, you know, from those involved that that was the case.**

**BY MR. EIDUKAS:**

**Q. Did you personally draw any conclusions regarding that?**

**MR. SHULTIS: Objection, relevance. Calls for a legal conclusion.**

**THE WITNESS: Again, would you repeat the question. Did I?**

**BY MR. EIDUKAS:**

page 59

**Q. I'm sorry. You had said that you recall there being discussions regarding whether or not accepting one spent fuel element in 1998 would comply with the Nuclear Waste Policy Act.**

**My question was whether or not you personally reached a conclusion as to whether or not accepting only one spent fuel element in 1998 would comply with the act?**

**MR. SHULTIS: Same objection.**

**THE WITNESS: I'm not quite sure how to answer that because at the time I was, you know, a fairly low level staff person. I was given an assignment. So I'm not sure if my conclusion would have mattered much. I mean, I'm not trying to be frivolous, but I don't know that I consciously thought of the implications of that at the time. I mean --**

**BY MR. EIDUKAS:**

**Q. Have you -- I'm sorry. I was going to ask you whether or not you have since come to such a conclusion or thought about the implications.**

**MR. SHULTIS: Same objections and relevance.**

page 60

**THE WITNESS: I think I would personally feel that one could argue since the Act was not specific, if we only accepted one fuel assembly, you know, we met the intent of the words. However, I also would be sympathetic to the additional phrase in here that where it says, "However, we did not believe that that meets the intent of the Act."**

**I believe the intent of the Act was for the government to develop the facilities to solve the nuclear waste problem, which isn't accepting just one assembly, and we were to develop the facilities. And we were trying to do that as expeditiously as we could, you know, to really deal with the overall problem of the accumulation of spent fuel.**

**Attachment VIII**

[96:19] - [101:19] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 96

Q. Referring to the acceptance schedule in Exhibit 5 that you have in front of you, how was that prepared?

MR. SHULTIS: Objection, vague.

page 97

BY MR. EIDUKAS:

Q. And what I mean by how was it prepared, I don't mean how was it typed. I mean, how were these numbers decided upon? How was this schedule developed?

MR. SHULTIS: Objection, vague. Asks for a legal conclusion.

THE WITNESS: As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.

As Table II-1 in Exhibit 5 shows, in the second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.

page 98

So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would more than the generation rate from all the nuclear plants.

We did recognize, though, at that time we still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.

Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog,

page 99

which is indicated in the column on the far right.

You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.

BY MR. EIDUKAS:

Q. Okay. So, just looking at the -- let's take the first repository acceptance rate that starts at 400 and ramps up to 3,000 and then stays at 3,000 until it looks like 2025 or 2026 where it goes to has 100 and then stops.

I guess, how were those numbers actually -- how did you actually come up with those numbers? Was there a source or a basis for the actual numbers you have here in this for that schedule?

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. I mean, do you understand what I'm asking? I

**mean, in other words, is this representing a physical limitation that was projected or recognized? Were these numbers picked out and then the idea was to design repository around them? I guess what I'm**

page 100

**trying to get at what, I guess, first the source for these numbers?**
**A. Okay.**
**MR. SHULTIS: Objection, compound.**
**THE WITNESS: It's a compound answer. It's somewhat complicated, but again my recollection is that going back to the Nuclear Waste Policy Act, which indicated that the country planned on developing two repositories, and there were various reasons for that, but the plan was to develop two repositories. And based on the projections at the time, again, the source that I'm familiar with is the Department of Energy's Energy Information Administration, which projected we'd have a total of about 140,000 metric tons of spent nuclear fuel to accommodate or dispose of.**
**There was a provision in the law that said the first repository could not emplace more than 70,000 metric tons until the second repository goes into operation, and I think there were various reasons for that. But that was sort of a guideline that we used that said the first repository should be designed, if the geology permits, to accommodate 70,000 metric tons**

page 101

**and then the other 70,000 metric tons would go in a second repository.**
**It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate that that repository would operate for about 25 years as this table shows.**
**And then the second repository would be in operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel to be generated by the nuclear power plants in operation at that time.**

[104:2] - [107:6] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 104

**Q. Okay. You had set forth the two objectives and the second was that you wanted the rate to reach -- to basically reach -- you wanted to basically reach a rate that would equal the waste generation rate. So that the need for additional reactor storage would be either minimal or zero.**
**My question is: What was the source of that objective? Why was that an objective you had?**
**A. Okay. Could you give me a minute --**
**Q. Sure.**
**A. -- to review some of these previous documents. Because I think there were words in one of those that I remember being presented to me when I joined the program. Let me just... Is it Bob Morgan?**
**Q. It's Number 3.**
**A. Yes. Let me quote from Exhibit 3, page 11, column 2, the large paragraph in that column about halfway through the paragraph. There's a sentence that begins "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage**

Attachment VIII

page 105
facilities on-site."
It goes on to say, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location." And if you look at the progress of these documents, this one dated --
Q. February '84?
A. -- February '84 but reflecting a meeting in December of 1983, and Exhibit 4 in the draft mission plan dated December 20, 1983, which had that more optimistic waste acceptance schedule with the higher numbers. Starting in 1998, 1800 metric tons for a few years. Then rising to 3,000 metric tons.
You can see how that realization that that might have been too optimistic evolved because in the exhibit, the last exhibit you gave me, Exhibit 5, those numbers have been adjusted downward. You know, the ramp-up rate to the numbers, you know, showing beginning at 400 metric tons ramping up to 900, 1800, 3,000 metric tons. But that was an objective, you know, to try to accommodate the nuclear power plants
page 106
and not have them generate or not have them have to add any on-site storage.
Q. I think you said when you started, someone gave you that language or told you that language. Do you know who it was?
MR. SHULTIS: Object.
THE WITNESS: I don't remember specifically, but it's similar to what, you know, appeared in that other exhibit.
BY MR. EIDUKAS:
Q. Robert Morgan?
A. And that became sort of a program -- again, it was a program objective that we were trying to meet.
Q. Okay. Do you know why that was a program objective?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: Yeah. I would be speculating. I mean, I'm inclined to answer and say that, you know, we were trying to accommodate the utilities, who are in fact our customers. That's what the program was designed, you know, to deal with, which
page 107
is the spent fuel being generated by nuclear power plants. And we knew it would be a financial burden for them to add on-site storage. So we were trying to develop a program, again, to accept waste in 1998, but again with all the caveats that that was optimistic and success oriented.

[109:18] - [111:15] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 109
Q. Okay. I was referring back to that sentence we've been looking at here. It seems to be suggesting that the acceptance rate that's found on the next page in the schedule is based -- it says, you know, based on the emplacement capacity currently projected.
page 110
I guess what I'm trying to understand is whether or not this rate reaching the steady rate of 3,000, is that based on, you know, taking the design the way that the repository was designed at this time and determining what this sentence called the emplacement capacity was. In other words, how fast could they accept waste there and that's how the schedule was developed.
MR. SHULTIS: Objection, asked and

answered.
THE WITNESS: Yeah. I think I indicated as best as I could what we considered or what the objectives were in developing the waste acceptance schedules, and then that in turn would be used as input to the designers who design the facilities to meet or, you know, accomplish those objectives. You could design the facilities to operate at different rates if that was required, but these waste acceptance schedules would be used as designed input into that process for those facilities.
BY MR. EIDUKAS:
Q. I guess maybe that's what my question is
page 111
getting at. What came first, the objective or the design in terms of these rates. Was the objective given and then the design built around that objective, or did you take what the design was and then back out what can this design accommodate?
MR. SHULTIS: Objection, asked and answered.
BY MR. EIDUKAS:
Q. If you know.
A. I honestly don't know. I mean, I would probably have to research that, you know, to see what we talked about in the design area of the repositories. Again, my familiarity is working on the waste acceptance schedules, you know, to accomplish the two objectives that I previously talked about.

[120:9] - [124:2] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 120
Q. And I believe you testified -- and if I'm mischaracterizing your testimony, please correct me -- that you were talking about and you were comparing Exhibits 4 and 5 in this schedule, the waste schedules there, and talked about how caveats were given as to whether or not these schedules might change. I believe you testified to that. It was possible these schedules, these specific schedules right here might change.
Am I correct in understanding that that was your testimony?
A. Yes.
Q. Okay. But it is also fair to say that the objective of these schedules remained constant, and one
page 121
of those objects being that it would ramp up to equal, at least equal the waste generation rate. So that it would either eliminate or, you know, reduce to either minimal or zero the need for utilities to build additional on-site storage after 1998?
MR. SHULTIS: Objection, calls for legal conclusion.
THE WITNESS: Again, as best as I can remember, we had two overriding objectives. One was to begin acceptance in 1998 and the other one was to ramp up, you know, as fast as realistically possible, you know, with all the engineering constraints to preclude the need for utilities to add additional on-site storage. But we did anticipate that the schedules would change and, in fact, in Exhibit 5 on page 2-1, just quickly looking at the section that's entitled "(A) Waste Acceptance Schedule."
BY MR. EIDUKAS:
Q. Yes.
A. The second paragraph begins by saying that: "This waste acceptance schedule will eventually be further developed to show not only the aggregate
page 122
acceptance schedule, but also an acceptance program

ranking by utility and fuel element." So we anticipated that these waste acceptance schedules would continue to evolve, you know, would change based on, you know, new or updated information.
The next sentence goes on to read: "The schedule will serve as a planning base, which will be updated annually, with responsible latest projections." So, again, we anticipated that they would be updated.
Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?
MR. SHULTIS: Objection, looking for a legal conclusion.
THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections
page 123
that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.
BY MR. EIDUKAS:
Q. Sure.
A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under construction was dropping. Some were being canceled.
And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we
page 124
wanted to make sure we could accommodate that.
Q. Okay. To your knowledge, was the objective

[177:18] - [178:11] 4/17/2002 Trebules, Victor W., Jr., Deposition 4/17/02

page 177
Q. Okay. But the decision was made apparently that there might be a design change, but there was not going to be a difference in what the steady state rate of accepted spent fuel range was going to be?
MR. SHULTIS: Objection, vague, assumes
page 178
facts not in evidence.
THE WITNESS: As best as I could remember, again our objectives were to try to reach a steady state rate, you know, along the lines that we talked about to preclude for need for utilities to add storage, which, you know, was still estimated to be around 3,000 metric tons per year. And that's still supported by the spent fuel generation column on both waste acceptance schedules. There's still around 3,000 metric tons per year in the early years of repository operation.