Energy recommended it, but go ahead.
Q And it was this linkage that caused the ultimate failure of the MRS proposal, correct?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.
A No.
Q It hindered the continuation of the MRS proposal, correct?
MR. CRAWFORD: Objection. Same objections.
A No. I don't think so. Let me rephrase it. I don't think so.
Q I thought you testified this morning that the congressional enactment in 1987 was a large reason why the MRS proposal never was implemented. Is that not correct?
A That is correct.
Q And you indicated that this is similar to one of the linkages Congress enacted, this being the linkage referred to on page 58 of Exhibit 8?
A No.
Q I'm sorry. No, you did not say --
A I'm answering your question no.



Q Okay. I misheard you then. I thought you testified that this linkage was similar to what Congress enacted?
A Yes.
Q You did testify to that?
A Yes.
Q And did this linkage have an effect on the ability to proceed with the MRS proposal?
A In a minor way.
Q And what was that?
A It limited the usefulness, but it was almost immaterial in the change in '94.
Q Was there another linkage that had a more adverse effect on the program?
A Not a linkage.
Q What resulted in the failure to proceed with the MRS program?
A Failure to --
MR. CRAWFORD: Objection, asked and answered.
A Failure to give the grants to the Indian tribes who wanted to pursue a proposal.



Q Had Congress enacted the grants that you just referred to in 1984, when would an MRS facility have been able to commence operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A There were no grants in '84.
Q In '94?
A Now rephrase your question.
Q With respect to the grants that you referenced a few moments ago that Congress failed to enact in 1994, I'm asking you to assume that those grants had in fact been authorized. Had those grants been authorized in 1994, when could an MRS have commenced operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A It was still possible to do it in '98, and that was my testimony in the spring of '93.
Q Your testimony to Congress?
A Yes.
Q And did that testimony give consideration to the linkages in the 1987 legislation?



A I believe it did.
Q And taking into account the linkages imposed by the '87 legislation, it's your testimony that if Congress had enacted -- authorized the grants in 1994 the MRS would have, could have commenced operations by January 31st, 1998, correct?
MR. CRAWFORD: Objection to the foundation.
A I go back here on these things. I think what had to happen was I think they had to change the linkages in the proposal, which is what the plan was with the Mescaleros and the Goshoots, was that they would propose the change to the linkages. So I think the linkages had to be modified for performance in '98. The plan was to do that in the proposal to Congress because it would take Congress to act on it. So the linkages may have had to change. I would have to go back and look at what the linkages were which I don't recall now.
Q So your best recollection is that the 1994 proposal to which you referred would have required two things, that certain grants be authorized and that the linkages enacted in 1987 be amended or repealed?

A Yes. And that was the -- that was the plan. In calendar '93, in the FY '94 budget proposal, that the Indian nations would present a proposal that would change the linkages and be able to operate in 1998. And the denial of Congress to develop those proposals led to -- and there was no chance of modifying the linkages nor getting the site in any practical sense was -- led to the inability or the unlikelihood of meeting the '98 date.

Q But it was your view, am I correct, in 1993 that had Congress acted differently, had Congress authorized the grants, had Congress repealed the linkages, then the MRS facility could have commenced operations on or before January 31st, 1998, correct?

A Correct. That's my recollection.

MR. CRAWFORD: Let's take a break.

MR. CAYNE: Sure.

(There is a recess from the record.)

(Deposition Exhibit Barrett 9 was marked for identification and was retained by counsel.)

Q Mr. Barrett, going back to our previous line of discussion, do you recall that you testified



that the linkages to which we were referring would have had very little effect on the ultimate failure of the MRS proposal? Do you recall that?

A Yes.

MR. CRAWFORD: Objection.

Q To the extent you've refreshed your recollection on that proposal and the implications of the linkages, would you want to amend in any way that answer?

A Refresh me on the two linkages.

Q Well, the linkage that I was referring to was the linkage that was proposed in the DOE report.

A I never knew DOE ever proposed a linkage, but the linkage -- the linkages in my mind are the ones in Congress. There's two of them.

Q I will hand them to you, sir.

A And then we'll come back and clear this -- well, we'll come back to this since your question is on those linkages, though.

(Deposition Exhibits Barrett 10 and Barrett 11 were marked for identification and were retained by counsel.)



Q Mr. Barrett, you've been handed two additional exhibits marked for identification as Exhibit 10, which is a copy of Section 10165 of Title 42 and Exhibit 11, which is a copy of Section 10168 also Title 42. Do you have those two before you?

A Yes.

Q And I understand you're reviewing these copies of the statutes now to refresh your recollection on the linkages about which you've testified?

A Correct.

MR. CRAWFORD: It might help if you would direct him to some part of it.

A On ten?

Q Yes.

A The linkage is B, the secretary may not select the site under subsection A until the secretary recommends a repository.

Q Okay.

A That in a -- and the reason I said that the failure of the grants was the primary reason why we would not do it was the proposal to Congress would be



the Indian nation in that case proposing to be the site, volunteering to be the site which would negate the secretary selecting a site. So the lack of a volunteer, you know, agreed to by Congress was more important than this limitation B.

Q Could I also ask you to look at section little d of Exhibit 11.

A Yeah, I was doing ten and then we'll do -- so that's ten.

And the concept in the proposal would be to modify this linkage as well. If the --

Q This linkage being sub (d)?

A Sub (d), correct.

Q Of 11?

A D of 11, would be to modify these as well, at least -- (d)(1) would be that they would propose to change the one that they could start construction prior to construction authorization for the repository but (d)(2) would remain.

Q What about (d)(3)?

A (D)(3) would remain.

Q With the 10,000 limit?

249

A Right. And (d)(4) would remain. And they were not limiting as to starting in '98. But (d)(1) of Exhibit 11 would be modified by the proposal as would B of Exhibit 10. This was in a proposal to Congress by the Native American nations that would volunteer. But there was never any indication to my recollection that they would change the mass limits of Exhibit 11 (d)(2), (3) and (4). That was the premise that we were working on circa '93 for the proposal.
So I answered the primary reason for the ability to meet the '98 date in early '93 was a proposal to modify those two linkages. So in my mind in my original answer was the lack of -- the congressional refusal to go forward with those proposals was the primary reason that the MRS was not available in 1998. Not the linkages per se. Because if we had a volunteer, in my judgment, those linkages would have been modified by Congress if it was acceptable to the volunteer host.
Q But without modifying linkages that you've identified, the proposal could not have gone forward, correct?

250

A Without -- these linkages prevent us from going forward without a volunteer to change the linkage.
Q And linkage (d)(1) in Exhibit 11 is similar, is it not, to the linkage proposed by the Department of Energy in the last Exhibit 9 that we were referring to a few moments ago?
MR. CRAWFORD: Objection, vague. Objection, foundation, and objection to assumes facts not in evidence.
A The proposal from the Department of Energy that's in one of these things here which I guess would have been 9. You tell me where it was because that's where we started.
Q I'm sorry. Exhibit 8.
MR. CRAWFORD: The last paragraph or last section.
A 58?
Q Yes.
A I was unaware, and I don't know if this is really true or not, that he did this, although it says it here, that the Department of Energy proposed that.

251

The working hypothesis that I had in '93, because I was not intimately involved in the policy aspects in the eighties, was that this was imposed by Congress, which it was.
Q This being?
A The linkage that you could not -- that the MRS could not start receiving fuel. This was congressionally imposed. There's no number of volumes in here in the DOE -- I didn't know DOE had proposed anything to Congress regarding linkages. I was aware that they had dialogues about a concern that the MRS be -- appear to be a replacement for the repository and that there needed to be ties. I did not know the department went so far as to make a congressional recommendation.
Q You believe that they made that recommendation to make it even clearer that the MRS was not a replacement for the repository?
MR. CRAWFORD: Objection to the foundation. Objection to speculation.
A I don't know. I don't know what those who did this at that time did or didn't do. I was not in

252

a policy role in the 1980s.
Q So prior to today you were not aware, Mr. Barrett, that the Department of Energy had made any proposals to Congress with respect to the linkages we have been discussing, correct?
A That's correct.
Q And sitting here today you do not know why the Department of Energy made the proposal with respect to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?
A I do not know.
Q So my question is correct, yes?
MR. CRAWFORD: Objection. Asked and answered.
A State your question again.
Q I just want the record to be clear, sir.
A Well, state your question again. Let's see if I can try to give a yes or no.
Q And sitting here today you do not know why the Department of Energy made the proposal with reference to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C.
CONNECTICUT YANKEE ATOMIC POWER : 98-154C. 98-474C.
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C. 98-486C.
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C. 99-447C.
Division of DUKE ENERGY CORP.; : 00-440C. 00-695C.
INDIANA MICHIGAN POWER COMPANY; : 00-703C. 01-115C.
SACRAMENTO MUNICIPAL UTILITY : 01-116C. 01-249C

-----------------X

(Caption continued on next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Tuesday, April 23, 2002
9:36 a.m.

Job No.: 11792-5
Pages 273 through 526, Volume 2
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 893-0527

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

397

THE WITNESS: Can we take a break?
MR. CAYNE: Certainly.
THE WITNESS: About 60 seconds.
(There is a recess from the record.)
A **Before we start with the next question, I would like to revisit something.**
Q Mr. Barrett, before you speak, let me ask you, since we broke a few moments ago, have you spoken with your counsel concerning your testimony that you just provided?
MR. CRAWFORD: Yeah.
A **Yes.**
Q Please proceed.
A **Okay. My concern here, I'll give you -- you asked a question; I'll give you an answer. You will restate the questions -- my answers, excuse me, slightly differently. You will introduce words that I did not use. And then you ask me to say yes or no to that. Okay. I don't like your recharacterizing my answer differently than I did. And it puts me in a position I don't want to say yes to something that's slightly different. Now, you may be close but they're**

398

**different. They're yours, not mine. I did not use the word "danger" in that previous series; you did. Okay. But you're recasting them all slightly different, and I think, that's my perception, setting up a record and putting words in this that I don't necessarily agree to. It's going to take a long time if we're going to go on every single phrase that you recast them because you don't like the way I answered it. That's a problem. All right? So I don't know how to work it out but...**
Q I appreciate the lecture, Mr. Barrett. Let me explain to you this is the process of examination in a judicial proceeding. I ask you the questions. The issue is not whether you like or enjoy the question. Your job here today is to provide the best, most honest, most direct answer. If you think I misstated something, you point it out to me. If you don't like the terms I use, you make that clear in your answer. Okay, sir? I am attempting to determine factual issues to be used in the trial of this proceeding, and I have to ask the questions the way I deem best. You have to give me your most direct and

399

honest questions. Do you understand the process, sir?
A **I understand the process.**
Q Thank you, sir.
I would like to turn your attention to page two of the same exhibit.
A **Page two or page two of the attachment?**
Q Page two of the attachment. Can you take a look at the first paragraph on the top of page two.
A **Yes.**
Q Take a moment to read it.
MR. CAYNE: Let me state that Steve Cohn, C-o-h-n, counsel for Sacramento Municipal Utility District has entered the deposition room.
A **So you want me to read the paragraph on top of page two?**
Q Yes. Have you had a chance to read it?
A **Yes.**
Q Do you agree with the statement contained in that paragraph?
MR. CRAWFORD: Objection, vague.
A **The points one, two, and three?**
Q Let's go through it. It states that "the

400

commission recognized the perceived concern that an unlinked MRS facility might be recorded as a de facto repository." Do you see that?
A **I see that.**
Q Did you share that concern at the time of this memorandum?
A **I had no opinion. That was a statement from the commission.**
Q But did you as an individual, sir, as the director or acting director of RW have a concern that an MRS unlinked to a permanent repository might in fact be regarded as a de facto repository?
A **I wasn't the director or the acting director.**
Q In the capacity that you held at this time did you have that concern?
A **I knew that was -- it was a policy issue in the United States Congress.**
Q Did you have a view on that issue of any type?
MR. CRAWFORD: Objection. Asked and answered.

401

A **There was an issue that I knew existed. It was immaterial what I personally felt one way or the other.**
Q Fine. But my question, Mr. Barrett, is whether you personally had a view on that question, not whether or not your view was material to anything.
A **I wished that Congress didn't have such a strong view about it, but that's what they had and that's the way it was.**
Q Why did you wish that Congress did not have such a strong view about it?
A **Because it really restricted our ability to take material into federal responsibility.**
Q You're referring to the linkages imposed by the 1987 amendments to the Nuclear Waste Policy Act of 1982, correct?
A **Correct. That's what this says.**
Q And that was your view?
A **Yes.**
Q Do you understand the statement "and notwithstanding their finding that there is no technical basis for the linkages between the MRS and

402

the repository," do you know what that statement means?
A **I don't know what it means.**
Q You have no idea whatsoever?
A **I can surmise what it means.**
Q Well, what is your professional surmise, sir?
MR. CRAWFORD: Well, objection to the form.
Q Please answer the question, Mr. Barrett.
A **All right. There is no technical reason for linkage other than the perception of the host of the storage facility that it is unfair for it to be there because it will stay for a long time and it may stay there forever, therefore they wanted, from a policy matter, a statutory linkage that prevented it from happening.**
Q Does that mean that there was no technical basis for the provisions of the 1987 amendments to the Nuclear Waste Policy Act that imposed the linkages between the construction and operation of a permanent repository and the construction and operation of an MRS facility?

403

A **Yes.**
MR. CRAWFORD: Objection. Foundation.
Q What is the term "technical basis," what do you understand that term to refer to?
A **That there's no scientific nor -- there's no technical or scientific reason that there needs to be a linkage.**
Q So to be blunt, the linkages involve pure politics. Is that what you're saying?
MR. CRAWFORD: Objection. That's not what he's saying.
A **Pure policy.**
Q Pure policy?
A **Policy.**
MR. CAYNE: And I object to counsel for the government advising the witness as to what he has said or hasn't said or how he should testify. That is totally improper.
MR. CRAWFORD: It's proper for me to say when you're mischaracterizing what he said.
MR. CAYNE: It's totally improper, counsel.
MR. CRAWFORD: No, it's not.

404

Q I would like to direct your attention to the next section on page two, "DOE generally agrees with the commission's conclusions." Do you see that?
A **Yes.**
Q The paragraph has a statement, "The commission found that while no single factor could favor an MRS over the no-MRS option, cumulatively" --
A **Excuse me. Are you reading here?**
Q Under "DOE generally agrees with the commission's conclusions" on page two of the exhibit.
A **Halfway down or --**
Q Oh, about five lines down. Do you see that?
A **Right. Start again.**
Q "The commission found that while no single factor would favor an MRS over the no-MRS option, cumulatively the advantages of an MRS would justify the building of an MRS if, one, there were no linkages of between the MRS and the repository." Do you see that?
A **Yes.**
Q Do you agree with that statement?

**wasn't scheduled until after 1998, which would preclude a '98 fuel receipt.**

Q The repository operation wasn't scheduled in 1989 to commence until the year 2010, correct?

**A It says construction authorization.**

Q Well, I just asked you about operation.

**A That's correct.**

Q The operations of the repository were not intended to commence until 2010, correct?

**A That's correct.**

Q And as it was then planned with a 2010 operation date, when was it anticipated that the repository -- the construction of the repository would be authorized?

**A I don't recall, but I think it was something like 2005.**

Q Somewhere between 2005 or somewhere between 2005 and 2007?

**A Somewhere in there. I don't -- 2005 plus or minus a couple of years.**

Q So based on the testimony you just provided, sir, am I correct that, returning your



attention to Exhibit 16, that the MRS facility referenced in the bottom of page two of the attachment to that exhibit, the MRS facility that is referred to there under the law that was in existence at that time could not begin operations until, at the earliest, sometime between the period 2005 and 2007, correct?

MR. CRAWFORD: Objection to the form of the question.

Q Correct, Mr. Barrett?

**A Without any changes to the law, that is correct.**

Q It is correct that the repository -- that the MRS facility could not become operational until sometime in the time frame 2005 and 2007?

**A Under the statute currently in place, without a change.**

Q And the statute currently in place was existing federal law, correct?

**A The statute also provided for a volunteer process that could change the linkages.**

Q And the volunteer process itself would require the enactment of additional federal



legislation, correct, Mr. Barrett?

**A Correct.**

Q And what is the nature of the additional federal legislation that would have been necessary in order to authorize a volunteer -- the siting of an MRS facility at a location owned by a volunteer?

**A It would require proposal from the volunteer to the Congress with their proposal that could change the linkages.**

Q And it would take federal law, an act of the United States Congress to both approve the linkages and to authorize the construction and operation of a facility on the location owned by the volunteer, correct?

**A Basically, yes.**

Q Let me rephrase my last question. And it would take federal law, an act of the United States Congress to either modify or eliminate -- to both modify or eliminate the linkages and to authorize the construction, operation of a facility on the location owned by the volunteer, correct?

**A Close.**



Q What is -- why only close, sir? And let's try to get it right.

**A It's my recollection the facility was authorized by the amendment, so it didn't need to be reauthorized. So it was -- the MRS was already authorized by Congress. It didn't need to be reauthorized. There's something else in your statement that was close but not quite.**

Q The Congress would have been required to either modify, substantially modify or eliminate the linkages, correct?

**A And you used "or." The last time you used an "and."**

Q Okay. Or?

**A If you say it with "or" and "authorize," I agree.**

Q And the volunteer would have to be approved, the siting of the facility at the location of the volunteer, and by volunteer you're referring to a volunteer state or Indian tribe, correct?

**A Correct.**

Q And the location of the volunteer state or

413

Indian tribe would also specifically have to be approved by affirmative federal legislation, correct?
A **I don't know if the actual site had to. They had to change the linkages. They had to change the linkages. I'm not sure they actually had to approve the site.**
Q You used the term "authorize." What did you mean by authorize?
A **If you read the -- my recollection is if you read the amendments act of '87, they specifically authorize the construction of an MRS that did not exist in the '82 act. But then they put a limitation in the linkages that basically prevented us from ever building. But actually the construction was authorized in the amendments act. You can read it as a matter of record I believe.**
Q Now, I believe you testified that an MRS would have been authorized or was authorized under the '87 legislation provided that the statutorily mandated links were satisfied, correct?
A **That's my understanding.**
Q And I'm referring to the links to the

414

repository, you understand that?
A **Yes.**
Q But did the '87 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendments to the Nuclear Waste Policy Act of 1982?
MR. CRAWFORD: Objection, best evidence.
A **I think the way you phrased that the answer is no.**
Q Did you not understand the question?
A **Your phraseology had a double negative in it, so I think the answer was no.**
Q Let me try to ask the question again, because we want the record clear. Did the 1987 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendment to the NWPA?
A **No.**
MR. CRAWFORD: Objection. Best evidence.
Q So you agree with me that such an MRS was

415

not lawful in 1989, correct?
MR. CRAWFORD: Objection. Asked and answered.
A **The answer is yes.**
Q And in fact --
A **I do.**
Q And, in fact, such an MRS never became lawful under the laws of the United States, correct?
A **Yes.**
Q Turn your attention to page four of Exhibit 16, please. The second full paragraph, Mr. Barrett. Are you there?
A **Yes.**
MR. CRAWFORD: What page?
MR. CAYNE: Page four of the attachment to Exhibit 16.
MR. CRAWFORD: Which paragraph are we on?
MR. CAYNE: The second full paragraph.
Q It starts, in conclusion number four, "The commission found that an MRS link as provided in the current law would not be justified, especially in light of uncertainties in completion time for the

416

repository." Do you agree with that statement or did you agree with that statement in 1989?
MR. CRAWFORD: Objection. Relevance.
A **I don't recall what I felt in '89, but I basically agree with that.**
Q And then it proceeds, "As a result of that conclusion the commission does not recommend a linked MRS as required by the current law." Do you now or did you then agree with that recommendation?
A **Basically, yes.**
Q Turn your attention to page five of the same document, the final paragraph. Towards the middle of the paragraph. And you can take your time again to read any part of this page or any part of this entire document that will assist you in responding to my inquiry. The part of the paragraph I'd like to focus your attention on is towards the middle. It states, "The capacity limit would be reached within a few short years, assuming any sort of reasonable acceptance rate for the waste management system." Do you see that statement?
A **Yes.**

**consternation about what constitutes an emergency. So neither of those in my recollection did I consider practical. And we didn't pursue them.**

Q What did you mean by the last statement, "The MRS review commission recommendations are viewed as an interim solution to a problem that requires long-range planning and thought"?

A **That their recommendations didn't make any sense but we were being nice about it.**

**(Deposition Exhibit Barrett 17 was marked for identification and was retained by counsel.)**

Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 17, which is encaptioned Nuclear Waste. Is there a need for federal interim storage by the U.S. monitored retrievable storage review commission? November '89, bearing Bates numbers PA-172230 through PA-172270. Do you have that document before you?

A **Yes.**

Q And let me tell you that this document is an excerpt from the entire -- of the entire report issued by the U.S. monitored retrievable storage



review commission.

Did you ever have an opportunity to review this document in the course of the performance of your duties as an official at the Department of Energy?

A **I believe so.**

Q Let me turn your attention to page bearing Bates number PA-172244.

A **Okay.**

Q I'd like to ask you to read the passage, the paragraph that begins at the very bottom of the left-hand column of that page starting, "However, the schedule linkage." Do you see that?

A **Yes.**

Q Could you read that paragraph up to including number five.

A **I've read that.**

Q Okay. Let me ask you to focus your attention to the first statement of that section, specifically, "However, the schedule linkage presently in the NWPAA (MRS construction may not begin until the Nuclear Regulatory Commission issues a license with a construction of a repository) would make it impossible



for an MRS to be operational more than three years before the repository." Do you see that statement?

A **Yes.**

Q Do you agree with that statement?

MR. CRAWFORD: Objection. Asked and answered.

A **In general, yes.**

Q Do you agree with it as stated here to be accurate and correct?

A **It's a judgment call.**

MR. CRAWFORD: Same objection.

A **I don't disagree with it -- I don't disagree with that statement.**

**(Deposition Exhibit Barrett 18 was marked for identification and was retained by counsel.)**

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 18. Do you have that before you?

A **Yes.**

Q This document is the report to Congress on reassessment of the civilian radioactive waste management program dated November 1989 issued by the



U.S. Department of Energy, Office of Civilian Radioactive Waste Management bearing Bates numbers PA-163156 through PA-163188. Did you have any role in the preparation of this report?

A **I think so.**

Q What was your role, Mr. Barrett?

A **I don't specifically remember the details. I remember we did this. This was part of Admiral Watkins', you know, review of this. So I know I was involved in it. I don't remember what my title was then. I was one of the acting office directors. Not the entire program office but one of them.**

Q Do you know whether you would have been a drafter or a reviewer of this document?

A **I did not draft it. I was a reviewer. I was a participant in its generation and development.**

Q In your position would you have been required to approve of or sign off on this document prior to its final issuance?

A **I don't remember if I signed this or not.**

Q You might have?

A **I might have. I wasn't the final, because**

429

I was not -- November '89. I was still there but I was not the act -- Sam Ruosso would have been the director, so Sam would have signed this.

Q But would it be a fair statement that it is likely that you would have been the person who would have had to sign off on this document prior to its final issuance?

MR. CRAWFORD: Objection to foundation.

A Sam ran things administratively loser than I do. I don't know if I would have signed this or not. I mean, under my regime I would have to sign it. I don't know if I signed it, but I was a participant in it.

Q You might have signed it?

A I might have signed it. But I might not have.

Q I would like to turn your attention to page -- you see page ten?

A Yes.

Q In connection with your participation in the preparation of this report, would you have reviewed and analyzed the content of this referenced

430

schedule for restructure program, Figure 1?

A I would have been involved in it. So, yeah, I would have reviewed it probably, yes.

Q And would you have been in agreement with its contents before this report was issued?

A Organizationally I would have been. I'm not sure what my personal opinion was versus the organization's. I just don't recall. I don't recall I had a big disagreement or anything with it.

Q So you believe that as an organizational matter you would have signed off on the contents of Figure 1, correct?

A I would have supported it, yes.

Q Let's just walk through -- first, can you explain to me what this Figure 1 represents?

A In '89 we reviewed the program, where it was in light of the amendments act, in light of the MRS commission report, and basically restructured the program to a degree around the new repository date which now went to 2010 whereas before it had been 2003. We reviewed that and this was the new, the new revised adjusted program based on those events.

431

That's my recollection of what it was.

Q How did the MRS commission report that we just reviewed affect your analysis with respect to your review of Figure 1 on page ten?

MR. CRAWFORD: Well, let me just -- I'll object to the foundation of that and to the form of the question about the statement made by counsel that we just reviewed the MRS commission report. I mean, you certainly asked the witness questions about it.

MR. CAYNE: I object to counsel's testimony and speaking objections. They're improper.

Q Could you please respond to the question, Mr. Barrett.

MR. CRAWFORD: I was speaking to you.

A Repeat the question, please.

Q Certainly. How did the report issued by the MRS commission affect your analysis of what appears in Exhibit 18 as Figure 1?

MR. CRAWFORD: Objection, foundation. Objection, vague.

A What the primary premise in this Figure 1 is is a volunteer MRS that would have a proposal to

432

Congress which would change the linkages which would allow us to receive waste in 1998. It does not have in it the user-funded facility. It does not have in it the emergency facility that they recommended.

Q You said it would have a proposal to Congress.

A Right.

Q A proposal to Congress would not be sufficient to allow the overall process referenced in Figure 1 to go forward, correct?

A A proposal from a volunteer site where the proposer agreed to the linkages, where the linkages were invented to protect the MRS site would surely have been approved by Congress in my opinion. So if we had a volunteer site, I thought it would be very easy -- Congress would readily approve the change in the linkages if it was satisfactory to the volunteer.

Q So you are confident that federal legislation would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting of an MRS facility on its property?

**A Did I use the word "confident"?**
Q That's my question, sir.
**A No, I'm asking you, did I use the word "confident"?**
Q I don't recall. My question is are you confident that federal legislation in fact would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting and operation of an MRS facility on its property?
**A I would say --**
MR. CRAWFORD: Objection, vague.
**A -- high probability of success. I would not use the word "confident."**
Q What do you base your conclusion that there would be a high probability of success? Let me ask this, have you ever participated in the legislative process?
**A Yes.**
Q By providing testimony to Congress?
**A Yes.**
Q And in 1987 did you -- you are aware in



1987 that there was an effort to obtain legislation that failed, correct? An effort to obtain legislation by the Department of Energy that failed when Congress imposed linkages that the Department of Energy did not like, correct?
**A Correct.**
Q But, nevertheless, you sitting here today are confident that if you went back to Congress for legislation to approve a volunteer that came along that was willing to allow the siting of an MRS repository, that Congress would enact and the President would sign into law legislation that would authorize that siting and operation in a form that you would find satisfactory?
MR. CRAWFORD: Objection. Vague.
**A I believe that would have a reasonably high chance of success, because the difference being between the two cases is the MRS was proposed to be in Tennessee, which was vigorously opposed by the State of Tennessee and its elected officials, whereas if we had a volunteer site, the premise is that they would not be opposing it because they wouldn't have**



**volunteered. So there would be a very different legislative outcome of the two cases.**
Q What states -- an Indian tribe could have been a volunteer, correct?
**A Correct.**
Q And would it have been just Indian tribes located in certain states?
**A No. It could be an Indian tribe federally recognized.**
Q Are you aware that there are Indian tribes today located in the State of Connecticut?
**A Yes.**
Q And are you aware that the Indian tribes in the State of Connecticut run gambling casinos?
MR. CRAWFORD: Objection. Relevance.
Q Are you aware of that?
**A Yes, I am.**
Q Well, let me ask you to assume that the Indian tribe in the State of Connecticut receives investment advice from its Wall Street bankers that you guys can make more money siting an MRS facility than competing with Donald Trump in Atlantic City. Do



you understand the situation I'm posing to you?
**A Yes.**
MR. CRAWFORD: I object to that.
Q And let me assume the Indian tribe came into your office and said, Mr. Barrett, we're here to volunteer. Let's get moving. We want to set up an MRS facility in our tribe location, which is within spitting distance of Stamford, Westport and Greenwich, Connecticut. But it's our land, our property and we think we would be doing good for the United States of America so we're ready to move. If you had a proposal like that, that would be the type of volunteer you're talking about, correct? The tribe would be volunteering to enter into an agreement with the United States to site and operate an MRS facility on its sovereign land in the State of Connecticut. That would constitute a volunteer under your hypothetical, correct?
**A No. You invented some totally hypothetical, incredible situation and I wouldn't consider that credible.**
Q I'm asking you if a tribe from the State of

calls for speculation.
A I believe they could have and would have.
Q And do you believe then that the political establishment, using your phraseology, of the State of New York, would also support the siting and operation of an MRS facility in the Adirondack Mountains in New York State?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A They may not have vigorously opposed it.
Q And on what do you base that testimony?
A Since you're asking me to speculate on these line of questions, it's my opinion based on working with organizations and political establishment.
Q Do you know who the senators were of the State of New York at the time of the proposals referenced in Exhibit 18?
A I don't know specifically, but it was Senator Moynihan I think and I forget the other one. I think a republican.
Q And do you believe that Senator Moynihan,



Senator D'Amato would have supported the establishment and operation of an MRS facility in the Adirondacks in 1989 or after?
MR. CRAWFORD: Objection. Speculation.
A I didn't use the word "support." I said not vigorously oppose. I don't think they would support it.
Q Do you think they would not vigorously oppose it?
A I think it would have been more difficult for them to oppose a sovereign Indian nation who volunteered to do a national service arrangement. I think it would have been a better situation certainly than was in Tennessee.
Q And why would it be better than Tennessee?
A Because you would have a sovereign Indian nation standing up and saying I would go along with this.
Q Have there been any sovereign Indian nations in Nevada or elsewhere that have offered or expressed interest in the siting of an MRS facility or a permanent repository?



A Yes.
Q And where did that occur?
A New Mexico, Oregon and Utah.
Q And were those -- have those proposals been advanced -- are those proposals still under consideration?
A No.
Q And why not?
A Because Congress didn't provide the funding in FY '94 to go forward and develop it.
Q And did the local politicians of each one of those states that you just referenced, New Mexico, Oregon and Utah, oppose the siting of an MRS or repository within their state borders?
A Not to my knowledge.
Q You don't think the state officials challenged it?
MR. CRAWFORD: Objection. Asked and answered.
A I don't recall them.
Q Why did Congress not provide funding?
A The -- I don't know who started it, but



clearly the Senate and House of Representatives canceled the funding before it got going.
Q What was the proposal before the Congress in 1994 that was not funded?
A The proposal was to provide grants to those three -- the tribes to develop proposals to Congress, and Congress did not provide that funding for us to be able to do that.
Q When did the process begin that led to the consideration of those proposals? Was it in '92 or '93?
A It started in, you know, earlier than that. Probably '89, '90. '89 I think.
Q Was there ever a time between '89 and '94 when Congress failed to provide the funding that you believed that those three proposals or one of those three proposals would likely be approved by the United States Congress?
A Say that again.
Q Did you ever believe that any of the three proposals involving the States of New Mexico, was it Utah, and Oregon would be approved by Congress?

445

A **If the process was allowed to proceed, yes, I had -- I believed it could happen.**
Q You believe what?
A **I believed it could happen, it could be approved.**
Q And you believed that firmly enough to invest a lot of personal energy and energy of your department and office in pursuing those possibilities, correct?
MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.
Q Correct?
A **Yes. Yes, that was the only alternative I had under the act to be able to meet the '98 date, so I pursued it with all the energy I could.**
Q And you thought you had a reasonable possibility of success, correct?
A **Yes.**
Q And you thought wrong, didn't you?
A **History turned out that that wasn't the way it's going to be.**
Q It's not easy to get fair legislation, is

446

it?
MR. CRAWFORD: Objection to the vagueness of that.
A **That particular issue never even got to be considered. I think you're surmising that if the proposal had been laid before Congress what was going to happen and you're speculating on that. But I wouldn't speculate like you are.**
Q But what you saw is sometimes you can't even get your proposal before Congress?
A **That's correct. That was cut off before the proposal was ever given to them.**
Q Not only do you have to get Congress to approve your proposal, you have to get Congress to look at it, right?
A **Say that again.**
Q Let me ask you, on page ten of Exhibit 18, you see on the top column under program element, it goes out to 2010.
A **Yes.**
Q Does it go out to 2010 because that was the projected date of repository -- the first date of --

447

the projected date of repository operations?
A **Yes.**
Q What was the process that led to the extension of that date, the delay of that date out to 2010?
A **I don't remember the details as to what happened with the schedules, but it's my recollection that when you put together the site characterization plan implementation and the processes spelled under the act, and that it was going to take until 2010 to emplace fuel.**
Q Was there a formal process within the Department of Energy that was undertaken that led to the determination that this projection should be delayed to 2010?
A **There was a review done by the staff in the program that came up with the schedule you see on Figure 1.**
Q And who would have been involved, what offices would have been involved in that review?
A **Pretty much all the offices in the program.**
Q Who would have signed off on that

448

determination to delay the projected start date of the permanent repository?
A **You know, Mr. Ruosso, who I think was the acting director at the time; Mr. Peters, who was the deputy director. I was involved. I might have signed off on it. Then there were dozens of other staff people involved.**
Q Let me ask you to look, it's towards the middle of this document. 1997 it states "start construction 1/1/97." Do you see that?
A **Yes.**
Q You see that that refers, does it not, to the start -- what type of construction is that referring to? Construction of what?
A **That's the MRS facility.**
Q And how long does this Figure 1 indicate it would take for the completion of that facility from start to finish?
A **Construction?**
Q Yes. Construction and to be placed in a position that it would be ready to receive spent nuclear fuel.

Q And the premise that I put on it you understand to be that the law remained as it stood on February 5th -- federal law remained as it stood on February 5th, 1990, correct?
MR. CRAWFORD: Objection. Vague.
**A Under that premise what you say is true.**
Q What I say is that under that premise the MRS could not begin to accept spent nuclear fuel until approximately October 2006 according to your calculations, correct?
MR. CRAWFORD: Objection. Asked and answered.
**A With your assumptions, yes.**
Q The only -- when you say your assumptions, what are you referring to? Are you simply referring to the fact that -- strike that. What assumption are you referring to?
**A You make the statement there would be no change in the linkages. The premise that we had for January '98 was that there would be a change in the linkage which could accompany any year with the appropriations process, and it could be changed. In**



**that time period, in the 1990s and eighties it was very -- relatively simple to change statute regarding this program, because Bennett Johnston ran both authorized and appropriations committee and that's how he made the amendment in '87. And he could have done it like that.**
Q You're confident of that?
**A Confident? I believe that that was a very plausible scenario, and that's why we adopted that as an approach for the program.**
Q Was Senator Johnston able to push through the legislation desired by the Department of Energy in 1987?
**A No.**
Q He was unsuccessful that time around?
**A Correct. Because it wasn't done in appropriations.**
Q You believe that the congressmen, senators should have followed different legislative procedures in order to accomplish the goals of the Department of Energy at that time, correct?
**A No. There's a lot of flexibility for the**



**legislative branch to do what they wish to do.**
Q Let me ask you, back to Exhibit 19. You indicated that this projection was based on the premise that federal law would be amended, correct?
**A Correct.**
Q And specifically the linkages would be repealed or modified, correct?
**A Correct.**
Q If that assumption was being made, why was there not also a proposal to increase the statutory MTU limit of 10,000 to a higher figure such as 15,000 or greater?
**A I don't recall exactly why the program at the time chose to deal with the linkage and not with the mass limits.**
Q You have no knowledge of that issue?
**A Say your question again.**
Q I'm asking why -- let me step back. The projections and proposals referenced on Exhibit 19 assume the enactment of federal legislation, correct?
**A Correct.**
Q In light of the fact that your office was



assuming that the law was changed, why wasn't your office also assuming that that change in law would increase the MTU limit that I believe that the Department of Energy had initially opposed in 1987?
**A My -- I don't know if it's speculation, but my belief, okay, when this was discussed was that there had to be a balance in the eyes of the volunteer that they had some protections. We did not make it an issue to remove all elements like the metric tonnage limits as well as the time linkages, because the thing that was most important to us was that we start moving materials of reasonable quantity, of which 10,000 tons was a reasonable quantity, as soon as we could with '98. So we did not -- my recollection is we did not try to remove everything because it would have been harder to ever get a volunteer or to get it through the political process, that we chose to leave the linkages and not make the linkages a statutory initiative like we did the time linkages, because it was secondary and would have detracted our ability to ever get it approved by Congress as you asked earlier.**
**So in my mind, as I recall this, was we**

**chose not to try to force the tonnage, as we chose to really address the time linkage. Because it was a secondary -- of secondary importance relative to the time. So that is why we left the metric tonnage there. Although we initially never wanted the metric ton limits, they were a fact and they were law at that time, period. So we were trying to make the best of a bad statutory situation we found ourself in with the '87 amendment.**
Q Did the Department of Energy have a congressional lobbyist in 1990?
A **We don't have lobbyists.**
Q Do you have officials whose primary duty is dealing with the federal legislature?
A **We have an Office of Congressional Affairs.**
Q And who was that office run by in 1990?
A **I don't recall.**
Q Do you frequently deal with that office?
A **No.**
Q Did you deal with that office in 1990?
A **Probably.**
Q But maybe not?



A **I don't remember.**
Q Do you recall whether in 1990 you sought advice from that office on the likelihood of federal legislation being enacted to modify or amend the statutory linkages?
A **I don't remember the Office of Congressional Affairs really ever being in tune with much of this at all. This was done primarily with Secretary Watkins' office.**
Q But the Office of Congressional Affairs did deal with congressmen, senators on a daily basis, correct?
A **I don't know what they did.**
Q You don't know the function?
A **I know -- no, I don't.**
Q And I take it you never involved that office in discussions relating to efforts to cause Congress to consider the repeal or amendment of the linkages, correct?
MR. CRAWFORD: Objection. Foundation.
A **There were probably some congressional affairs staffers around at meetings.**



Q But you're not sure?
A **I'm not sure.**
Q And you don't recall ever having a conversation with the head of that office or any staffer relating to the likelihood of congressional legislation -- the likelihood that congressional legislation would be enacted to modify or repeal the statutory linkages, correct?
MR. CRAWFORD: Objection to the foundation. Objection to the form of the question.
Q Correct?
A **I don't recall any ones that I did. Sam Ruosso or Frank Peters, who were my superiors, might well but I didn't. That I recall. I know there were staffers around. I never recall having a meaningful discussion with somebody from that office who really knew anything.**
Q And don't recall ever having such a conversation in 1990 or any other time, correct?
MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.
A **You're talking about 1990.**



Q Did you ever have a conversation with anyone from that office concerning the issue of congressional legislation to amend or repeal the linkages at any time, 1990 or at any time prior to or subsequent to 1990?
MR. CRAWFORD: Objection to the form and foundation.
A **Probably did in '93ish. But not in 1990. I don't recall any in 1990, '89 or 1990.**
Q Can you recall a specific discussion in '93ish?
MR. CRAWFORD: Objection to the form. Objection to the foundation.
Q Or do you just think you might have had such conversations?
A **No, I know in '93, '93 was different because I was now -- a change of time. I was acting director in '93. So I can't remember who it was but there was -- and I did have discussions with that office regarding all my testimony and dealing with stuff with Secretary O'Leary, so, yeah, I worked with that office but I don't remember like who was in**

8K



527

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, April 26, 2002
8:10 a.m.

Job No.: 11792-8
Pages 527 through 825, Volume 3
Reported by: Diane Gomez, RPR

528

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT; :
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

529

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

530

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
JEFFREY L. HANDWERKER, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

need to find out if you have an understanding of what's in this document, sir.
This morning you testified that DCS stood for delivery commitment schedule. Do you recall that?
A **Yes.**
Q What, without looking at the document, are you able to tell me is the purpose of a DCS?
A **I believe they were something to do with the planning for the receipt of material into our system in the future, ten years or something in the future. And it related to the contract.**
Q Why did you view it as administrivia?
A **Because I did not consider it pertinent to the primary business, which was to determine if the repository site was suitable so we can get on to build the facility to be able to receive it.**
Q What consideration did you personally give to the data produced by a DCS?
A **What?**
Q What consideration did you give to the data produced on a DCS?
MR. CRAWFORD: Objection, vague.



Objection, foundation.
Q Did you give any?
A **What consideration -- repeat the question again.**
Q A DCS form contains certain data, correct?
A **I really don't know if it has data in it or not.**
Q Let me ask you to look at item number two on the first page, "Who should submit." Do you see that item?
A **Yes.**
Q Why does that item provide that the DCS should be submitted by all purchasers with allocations in the '91 annual capacity report?
MR. CRAWFORD: Objection, foundation, vague.
A **I don't know.**
Q Do you know why the '91 annual capacity report was a report that was chosen?
MR. CRAWFORD: Objection, foundation.
A **No.**
Q Could a nuclear utility that submits a DCS



or submitted a DCS request an allocation amount that was different than the amount specified in the 1991 annual capacity report?
MR. CRAWFORD: Objection, assumes facts not in evidence. Objection, foundation.
A **I don't know.**
Q Let's turn to page two. Can you read, take a look at entry 7C.
A **Okay. I've read it.**
Q Now, you see that it states that the DCS -- do you know what FWMS stands for? Is that federal waste management system?
A **I think so.**
MR. CRAWFORD: Objection, best evidence.
Q You see the statement that "The process described herein assumes that the federal waste management system will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the ACR"?
A **I see that.**
Q Based on your testimony earlier today, as of what date in your opinion would that have been an



unreasonable assumption that spent fuel acceptance would be beginning in 1998? Did you indicate earlier today that that projection became unreasonable sometime in mid to late 1993?
MR. CRAWFORD: Objection. Mischaracterizes his prior testimony.
A **In late '93 it became, you know, in my mind unlikely to happen.**
Q Do you know why this instruction form for completing DCSs contains that assumption?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A **No.**
Q Do you know what the relevance of that assumption was in connection with the DCS process?
MR. CRAWFORD: Objection, foundation, vague, and objection to the extent it calls for any kind of a legal conclusion.
Q Let me strike that question and ask you to -- subparagraph C, it says "In the event that such circumstances change" -- referring to the assumption that you and I just discussed, Mr. Barrett. Do you

715

**the contract holders for some equitable arrangement regarding our inability to have a facility capable to move the fuel. So that offer to work out some sort of arrangement was there for many years.**

Q Turn to page six. Under Interim Storage Issues, do you see that?

**A Yes.**

Q There's an entry "What role, if any, should the department play in the development of private interim storage facilities." Can you describe for me the department's deliberations on that point?

**A I don't remember deliberations about that question in this thing.**

Q Was there any consideration of that proposal after this release went out for comment?

**A Not that I recall. We must have said something about it in the final.**

Q But you don't recall any internal discussions about that point?

**A No.**

Q Why is there the reference to, further down, "should the department pursue" -- why was the

716

suggestion that the department should pursue with Congress the elimination of existing restrictions on MRS site construction and operations? Had you not already pursued that with Congress at this point?

MR. CRAWFORD: Objection, vague.

**A I don't remember why that's there.**

Q This is basically what Congress had already shot down, correct? When the grants were denied.

**A Well, they stopped the volunteer process for purposes of putting grants in. Doesn't mean you still couldn't try to do it, and at this time -- this is circa '94 -- I think they were starting -- there was discussions starting about interim storage.**

Q Well, at the time on May 25th, 1994, when this notice of intent went out, was there any question in your mind, Mr. Barrett, that for all practical purposes the MRS proposal was dead?

MR. CRAWFORD: Objection, mischaracterizes prior testimony.

**A No, I wouldn't say it was dead. I didn't use that word, "dead." I said it was unlikely. It wasn't dead.**

717

Q Was part of your program plan waste management system at that time an MRS facility?

**A I'm not sure of the timing, but we basically shifted from site-specific MRS to generic, and so we submitted a topical report to the Nuclear Regulatory Commission so that if a site could be developed through some process, you could expedite the licensing much faster and ran on line as quickly as possible close to 1998. And that's why we did that, spent money on that topical report. So hopefully there could have been maybe a breakthrough with a volunteer who didn't need grant money or some other arrangement through some other designating process that I don't know what it would have been, but could have been.**

Q But at this point you did not expect it to happen, correct?

**A It was less likely than it was likely.**

MR. CRAWFORD: Objection.

Q Excuse me?

**A It was less likely than it was likely.**

Q It was a lot less likely than it was likely

718

at this point, wasn't it, Mr. Barrett?

MR. CRAWFORD: Objection, asked and answered.

**A I don't know what "a lot" is, but I said it was unlikely.**

Q We're saying it was unlikely that an MRS facility would be operational, be pursued and made operational, correct?

MR. CRAWFORD: Objection, vague. Objection --

**A It was unlikely is what I said.**

Q Was it part of your program plan waste management system at this time in mid-1994?

MR. CRAWFORD: Objection to form.

**A I think the MRS was still there. We didn't take it out.**

**(Deposition Exhibit Barrett 35 was marked for identification and was retained by counsel.)**

Q The court reporter has handed you a document marked for identification as Exhibit 35. It is a predecisional draft, Volume 3 of the Waste Acceptance Storage and Transportation Project

**readiness for earlier transportation should a site for federal interim storage become available sooner than a repository." I believe that's the only part in here on the MRS.**

Q You believe that's the only reference in this document to an MRS?

A **My quick scan here, my recollection was I don't remember anything else. Somebody else may have read it closely.**

Q Turn your attention to page one, Bates 174286.

A **I'm sorry, page one?**

Q Page one on the bottom, paragraph one.

A **Okay.**

Q On the end of the introduction section it states that "By 1993 it became clear that continuation of the program in accordance with the then-current approach was no longer a viable option." Do you see that?

A **Yes.**

MR. CRAWFORD: Where is that?

MR. CAYNE: Last sentence of the



introduction.

A **Yes, I see it.**

Q What was the then-current approach that's being referred to in that statement?

A **That was the volunteer MRS that would -- had a reasonable chance of success for 1998. That was no longer a viable option.**

Q So that was no longer a viable option?

A **I would have used the word "unlikely," but it's certainly not the central premise for waste acceptance anymore.**

Q The department used the word "viable," correct?

A **That's what it says.**

Q And you would have seen this document before it was issued, correct?

A **Yes.**

Q And I assume you were in the chain of command that had to approve this document?

A **I was responsible, I'm sure. I don't know if I ever signed it off or not.**

Q You would have been satisfied with the



language of this document, correct, before it became final?

A **Yes.**

MR. CRAWFORD: Objection, asked and answered. Argumentative.

A **I would have accepted those words there.**

Q The words being "no longer a viable option," correct?

MR. CRAWFORD: Objection, asked and answered. Argumentative.

Q Correct?

MR. CRAWFORD: Objection, asked and answered, argumentative.

A **Correct.**

Q Page four, please, bottom of page four. The first sentence. "When the Nuclear Waste Policy Act was enacted, it was envisioned that the department would have had a facility available in 1998 to accept waste for disposal, and the department entered into contracts with utilities on that basis." Do you see that?

A **Yes.**



Q What does that mean, that the department entered into contracts with utilities on the basis that it would have a facility available in '98 to accept waste for disposal?

MR. CRAWFORD: Objection to the extent it calls for speculation.

A **Just what it says.**

Q Do you understand what that means?

A **The act says we should have a contract within the time frame, and they put those contracts together under the limited time there in '83, '84. The base operating premise was it would have a facility ready to accept in 1998.**

Q The time the contract was signed or contracts were signed in 1983, that is what the government and the nuclear utilities intended?

MR. CRAWFORD: Objection --

Q Correct?

MR. CRAWFORD: -- to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.

A **I wasn't there. I wasn't involved in a**

743

**program then, so I don't know what they envisioned.**
Q But is that your understanding?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.
**A Yes.**
Q Page nine, please. Under Waste Acceptance Storage and Transportation Approach, towards the bottom of the page it says, The main aspects of the approach for waste acceptance storage and transportation are to" -- and it gives then six separate entries on pages nine and ten. Do you see that?
**A Yes.**
Q And specifically on the top of page ten, the first line it says "Because more detailed work would not be useful until a specific site has been selected, no development work is included in the current plan." Do you see that?
**A Yes.**
Q Is that referring to an MRS facility?
**A Site-specific MRS facility is what that**

744

**refers to.**
Q And again by "site-specific MRS facility," specifically what are you referring to?
**A The actual siting of a facility. If we did generic work was the previous sentence. We did generic work for a generic facility. It could be sited anywhere. So if a site develops through some political process, we would be able to quickly build such a facility to receive fuel as quickly as possible.**
Q And at this time the department did not think that to be a viable option, correct?
MR. CRAWFORD: Objection. Best evidence.
**A There was a low probability.**
Q Low probability did you say?
**A Yes.**
Q And, in fact, such a specific site never did become available through today?
**A Correct.**
**(Deposition Exhibit Barrett 37 was marked for identification and was retained by counsel.)**
Q Exhibit 36, under Fiscal -- on page 14,

745

under Fiscal Year 2000 it states that "The site recommendation will be submitted in a report to the President in 2000." Correct?
MR. CRAWFORD: Objection, vague.
**A Yes, it says that.**
Q And the page before to which that refers, the caption of that page is Major Milestones for Program Success. Do you see that, page 13?
**A I see the chart.**
Q So according to this chart, the recommendation, the site recommendation to the President was one of the major milestones for program success, correct?
**A Yes.**
Q And that milestone, in fact, has occurred two years later than planned for in the radioactive management program plan set forth in Exhibit 36, correct?
**A Close.**
Q What's close? It occurred two years after the date, correct?
**A Including FY '02, but depending on when in**

746

**the year, a little less than two years.**
Q Is it fair to say that as of now the program is at least a little less than two years behind schedule, as reflected by the major milestones for program success?
**A As defined back in '94, yes.**
Q The court reporter has handed you a document marked for identification as Exhibit 37. It is a memorandum, Subject: Total life cycle cost 1995 assumptions package from Ronald A. Milner, Director, Office of Program Management and Integration, bearing Bates HQR-057-1493 through HQR-057-1569. Do you have that document before you?
**A Yes.**
Q Could you please turn to page Bates number 14 -- oh, this is -- it says RW-30 in the top left corner. Do you see that?
**A Yes.**
Q Could you please refer to Bates 057-1498. First, what would your involvement in this, in the preparation or review of this document have been?
**A I would have signed off on a final total**