IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X



Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

938

**executive branch, and we followed that.**
Q So the position advanced by your office was consistent with the administration policy that you just stated, correct?
MS. HERRMANN: Same objections.
A **We accepted that, and we followed that as a member of the administration.**
MR. CAYNE: We're going to the next document. It's 11:55. Why don't we break for an hour lunch now, and we'll return at one.
(There is a discussion off the record.)
(A luncheon recess is taken.)

939

AFTERNOON SESSION
Q Mr. Barrett, between the time of the last session of this deposition and today did you discuss your testimony with any person?
A **No.**
Q Did you review any documents in preparation for today's session of the deposition?
A **No.**
Q Did you have any conversations with counsel following the completion of the last session and the beginning of today's session?
A **Just to set up the date for today.**
Q Do you recall, Mr. Barrett, that you testified today that the obligation rate is not equal to the system operating capacity?
A **Yes.**
Q What is the basis for that testimony?
A **In designing any system, from an engineering point of view you design the system to meet or exceed the system requirements. In this case -- not case. In this situation designing the system -- I don't want to confuse this with legal**

940

**cases. We want to design the system to operate at a rate that exceeds the requirements. The requirements that we have are a combination of many factors, which one of them is in the contract, as I understand, relates to the ACR which is the four, six, 900 number. We want to exceed that by a substantial margin. Which the design rate of -- our present reference rate of four, six, 12, 2,000, 3,000, does that.**
Q Your testimony on that point is inconsistent with the position taken by the Department of Energy in 1987, isn't it?
MS. HERRMANN: Objection. Foundation.
A **Not that I know of.**
Q Your testimony that the obligation rate would not equal the system operating capacity, isn't that inconsistent with the position taken by the department in 1987?
MS. HERRMANN: Objection. Foundation.
A **Not that I know of.**
Q Let me turn your attention to Exhibit 6 of this deposition, page ten, which bears Bates --
A **Hold on now. Six? Do you want me to find**

941

**it?**
Q Yes.
MR. CAYNE: I'll just state for the record that I'm turning the witness' attention to PA-103165.
A **What page number should I be at?**
Q Page ten. Bates 103165.
A **Okay.**
Q Under Section 3.2 there is the following statement: "The waste acceptance schedule presented in this ACR represents the projected WMS capacity available for allocation to the purchasers. The projected WMS capacity equals the system operating capacity," and then you see it continues.
A **I see it.**
Q That statement is inconsistent with the testimony you just gave, is it not?
MS. HERRMANN: Objection. Asked and answered.
A **Yes, I think so.**
Q Who was responsible for issuing this annual capacity report? Was it your predecessor?
A **I don't think it was me. Yeah, Ben Rusche,**

Q What lower receipt rate studies were you just referring to?
**A Oh, I don't know. Some of those ones you had back here.**
Q Could you go through the exhibits and please identify for me which ones you were referring to.
**A Which one is that OMB one that had the -- all the 2007, 2010, 2000 whatevers? Not this one.**
Q You mean Exhibit 42?
**A 43 I think.**
Q 43?
**A I think 43 had some lower receipt rates in it.**
Q And those lower receipt rates in Exhibit 43 were based upon what?
**A Funding constraints.**
Q Funding constraints imposed by Congress?
**A Yes.**
Q Did Congress impose such funding constraints?
**A They certainly have.**



Q When were those funding constraints imposed?
MS. HERRMANN: Can we just give him a minute to get what he's looking at.
**A About every year. For the last five years. We've been funding-constrained by Congress for the last five years.**
Q Those funding constraints had an ability (sic) on your office's capability to begin the acceptance of spent nuclear fuel on a timely basis?
MS. HERRMANN: Objection. Calls for a legal conclusion.
**A They've slowed us down.**
Q Substantially?
**A Months.**
Q Years?
**A If you add them all up, probably a year or so.**
Q Getting back to the ACR, what is the relevance of an ACR with an acceptance rate of 400, 600, 900 MTUs per year in today's environment where there is a stand-alone repository?



MS. HERRMANN: Objection. Vague, calls for a legal conclusion.
**A I don't know.**
Q Is there any?
MS. HERRMANN: Same objections.
**A Only as it relates to the legalities of contracts.**
Q The 400, 600, 900 MTUs standard was pertinent in the context where an MRS would have gone into effect in 1998 and have been in operation for ten to 12 years prior to repository, correct?
**A That's my understanding.**
Q And that's the only circumstance in which a 400, 600, 900 MTU take-rate had any relevance, correct?
**A That was the basis at that time.**
Q At that time, you're referring to what time?
**A Back in the eighties when that was -- late eighties, early nineties when that was established, that's correct.**
Q So in the late eighties, early nineties



when the 400, 600, 900 MTU take-rate was established, the only relevance that take-rate had was in the context where an MRS would commence operations in 1998 and would operate by itself for ten to 12 years prior to the time that a repository, a permanent repository, began operations, correct?
**A Correct.**
Q Back to Exhibit 6. WMS stands for waste management system, correct, on page ten of Exhibit 6?
**A I think so.**
Q And what is the waste management system?
MS. HERRMANN: Objection. Foundation.
Q You've used that term, haven't you?
**A I generally don't.**
Q Have you ever heard it used?
**A Yes.**
Q Do you have an understanding what it means?
**A I think that was the overall -- yes. I think I do. I think it was the overall system as they described it back at that time.**
Q And the overall system as described back at that time involved what?

954

A A repository, a transportation, an MRS.
Q What is system operating capacity?
A I don't know how they used it in this document.
Q How do you use it?
A I use it as that's what you really expect to operate at.
Q Okay. Using the term "system operating capacity" as you just defined it --
A Okay.
Q -- and the term "WMS" as you just defined it also, do you agree with this statement on page ten?
MS. HERRMANN: Which statement?
Q That the projected WMS capacity equals the system operating capacity?
A What was the question, do I agree with it?
Q Yes.
A No.
Q Why don't you agree with that?
A Because I believe that the system operating capacity should exceed the system operating requirement. It would appear to me in this, back in

955

'87 they were setting the system operating capacity exactly equal to the requirement, which I think is the wrong way to design a system.
Q But that is what the Department of Energy did in 1987?
A I don't know what they did in '87. I wasn't involved in this.
Q Did you ever discuss this issue with your predecessor?
A The issue of what?
Q The issue of setting the operating capacity exactly equal to the requirement.
A No. Not that I recall. Let me phrase it that way.
(Deposition Exhibit Barrett 45 was marked for identification and retained by Counsel.)
Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 45, bearing HQR-025-5075 --
MS. HERRMANN: Can I get one of those?
Q -- through 5139.

956

A 50?
Q 5075.
A Down the bottom here?
Q Yeah, bottom right.
A I got 176202.
MS. HERRMANN: We're not looking at the same document.
Q The Bates numbers I just read into the record are wrong. The correct Bates numbers are PA-176202 through PA-176266. The document is called Analysis of Total System Life Cycle Cost of Civilian Radioactive Waste Management Program dated September 1995. Do you have that document before you?
A I do.
Q Would you turn to page five. What was the purpose of this document?
MS. HERRMANN: Objection. Foundation.
A This is the total life-cycle cost analysis that we do periodically to determine -- to estimate the total cost of the system so we can do a fee adequacy report as to the adequacy of the charge to the utilities.

957

Q Now, in 1995, in September 1995 your office in performing the total system life-cycle cost analyses assumed that there would not be a monitored retrievable storage facility, correct?
A I have to check what the time is. September '95 we probably did not assume there was an MRS. I don't know what this document says.
Q Well, I refer your attention to page five, the third-to-the-last paragraph on page five.
A Okay. Does not.
Q Could you turn to page eight.
A Yes.
Q What does Table 1-2 represent?
MS. HERRMANN: Objection. Foundation.
A It says "monitored geologic disposal system receipt/emplacement rates."
Q What were the rates reflected on Table -- how were the rates reflected on Table 1-2 determined?
MS. HERRMANN: Objection. Foundation.
A I don't know.
Q You have no idea?
A No.

962

about the nuclear waste negotiator, correct?
A Yes.
Q And am I correct that the activities of the nuclear waste negotiator were terminated in 1995?
A **I don't know the exact date, but somewhere in the mid-nineties.**
Q Were they terminated at that point?
MS. HERRMANN: Objection. Foundation.
A **I believe the term of office of Mr. Stallings, the last negotiator, expired by statute.**
Q Do you know why his mandate was not renewed?
MS. HERRMANN: Objection. Foundation, speculation, calls for a legal conclusion.
A **No.**
Q What effect did the termination of the Office of Nuclear Waste Negotiator have on the planning activities of your office?
MS. HERRMANN: Objection. Foundation.
A **Not appreciable that I recall.**
Q Did it have any effect on your

963

consideration, for example, of the viability of an MRS facility?
A **No, because -- not to my recollection, because the viability of an MRS facility was, you know, negative based on the budget enactment of FY '94.**
Q So would you agree that the MRS facility was effectively dead prior to the time that the Office of the Nuclear Waste Negotiator terminated?
A **I don't know when the term -- the office actually terminated. So I don't know. You said '95. I don't know when the negotiator officially terminated.**
Q Take a look at page 33 of Exhibit 45. I refer you to paragraph 4.7.
A **Uh-huh.**
Q Does that indicate that the negotiator's activities terminated in 1995?
A **It looks like it.**
Q But based on that would you agree that the viability -- that an MRS facility was nonviable significantly before the time the Nuclear Waste

964

Negotiator's Office terminated?
A **Well, in my opinion the MRS siting was not viable once the Congress act on the FY '94 appropriations prohibiting me from providing grants to the Indian tribes. That's in my mind when it became not viable. Exactly when a negotiator terminated I don't remember.**
Q Do you remember we discussed the 1995 ACR in the last session of the deposition?
A **Not really.**
Q Do you recall discussing it at all?
A **We had -- there were multiple ACRs of different dates. So that much I remember we talked about, but the '95 one versus other dates I don't recall.**
Q You're referring to Exhibit 39?
A **39. I have it.**
Q Take a moment to look through it and see if it refreshes your recollection that we discussed it during the last session of this deposition.
A **What's the question? I see an ACR.**
Q Do you recall that we discussed this ACR?

965

A **Yes.**
Q What was the purpose of the 1995 ACR?
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A **Something that relates to the contract.**
Q Do you have any more knowledge about the purpose of the 1995 ACR?
A **No.**
Q Did your office use the 1995 ACR for any purpose?
MS. HERRMANN: Objection. Asked and answered.
A **I'm sure people in the office used it, okay.**
Q For what purpose?
A **For whatever they used it for. I don't know.**
Q You didn't use it for any purpose?
A **Does this have the table in it that I do use?**
Q Which table are you referring to?
A **The only thing I'm familiar with in this is**

**page six, Table 2. That's the only thing I ever personally used out of this document.**
Q The only thing you ever used is the summary of the purchaser's annual allocations?
**A Right.**
Q And for what purpose did you use that chart?
**A I used that to have an understanding of which utilities had what allocations in the year one, year two, year three, year four. For policy reasons is why I wanted to know.**
Q What policy reasons?
**A Just if I ever have to talk to various executors from various companies where they stood in the queue.**
Q Look at page four, please.
**A Yes.**
Q Did you use the table on page four for any purpose?
**A No.**
Q None at all?
**A No.**



Q What was your position in March 1995?
**A I think I was the deputy director.**
Q Who prepared the table on page four?
MS. HERRMANN: Objection. Foundation.
**A I don't know. Some people in the waste acceptance area.**
Q People who worked for you?
**A Yes.**
Q For what purpose?
MS. HERRMANN: Objection. Foundation.
**A Part of what they consider the business of the office, which I agreed with.**
Q You agreed with what?
**A Them doing what they felt they needed to do.**
Q In March 1995 you did not expect to be picking up spent nuclear fuel at the rates referenced in Table 1, correct?
MS. HERRMANN: Objection. Vague.
**A Repeat the question again.**
Q In March 1995 you did not expect that the Department of Energy would be picking up spent nuclear



fuel at the rates reflected on Table 1?
MS. HERRMANN: Same objection.
**A It was my desire and intention that we would pick up in year two, three, four a rate higher than this.**
Q But there was no, in 1995 there was no expectation in the Office of Civilian Radioactive Waste Management that spent fuel would, in fact, be picked up at the rates reflected at Table 1, correct?
MS. HERRMANN: Objection. Foundation.
**A Did you say no expectation?**
Q Right. In March 1995, at which time, as you've testified, the MRS was not viable, your office did not expect that spent fuel would be picked up at the rates reflected on Table 1, correct?
MS. HERRMANN: Same objection.
**A I ask you to clarify the word "expect." I didn't know what to expect. It was our intention and desire with all our energies to pick it up at a rate that we desired to pick it up, which was a higher rate than this.**
Q That was the rate that moved up to 3,000



MTUs per year, correct?
**A That was our desire, that was our goal, and we strived to do that. What actually would happen we did not know. So my expectation was very uncertain.**
**So you asked to say what I expect. The expectation, I have to say that I don't know what to expect. We were trying to run it as high as we could run it.**
Q But you had various -- your office, the Office of Civilian Radioactive Waste Management Control, had various plans that it followed pursuant to which your activities were conducted, correct? You had various plans?
**A We had plans and goals in trying to achieve the intent of the act.**
Q Right. And in 1995, March of 1995, there was not a plan in effect that would have called for the acceptance of spent fuel at the rates reflected in Table 1, correct?
**A Correct.**
Q In fact, the plan that was in place in 1995 called for the acceptance of spent fuel at a rate that

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

1148

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A No.
Q Do you understand the term "derate"?
A **I understand the term as I use it. How the author is using it I don't know.**
Q How would you use it?
A **It is to reduce the design capacity or reduce the output.**
Q And do you understand the term "short-cooled fuel"?
A **Yes.**
Q What does that mean?
A **Lower megawatt days per metric ton on the fuel.**
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A **No.**
**(Deposition Exhibit Barrett 57 was marked**

1149

**for identification and was attached to the transcript.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A **I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.**
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A **Correct.**
Q Do you know a person named R.W. McKee?
A **No.**
Q Have you ever heard of that person?
A **I've heard the name.**
Q Are you familiar with Pacific Northwest

1150

Laboratory?
A **Yes.**
Q What is Pacific Northwest Laboratory?
A **It's a contractor in Richland, Washington.**
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A **We use them as advisors and analysts for the waste management system.**
Q Do you continue to so use them through today?
A **No.**
Q Through when did you use them?
A **Through the late eighties.**
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A **No.**
Q Did you ever rely on the work of Pacific Northwest Laboratory?

1151

MS. HERRMANN: Objection. Vague.
A **I used it as input.**
Q For what purposes?
A **For advice on systems analysis.**
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A **I don't remember me personally, but my staff did.**
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A **Yes.**
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A **Yes.**
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A **I see it.**
Q Is that your writing?
A **No.**

answered.
A It was, you know, a relatively small amount. We had also gotten information -- we also put the transportation RFP which had the higher rates in it, and we thought we could get that extra out of the system. So we have always strived to perform at this high-as-possible, high-as-practicable rate we could operate at, so that's why.
Q Is it your testimony that the highest practicable rate that you could perform at for year 2011 would be 600 MTUs on an annual basis?
A We didn't really look hard to try to raise -- to see if we could raise that or the 1200 to 1300. I felt that was a lower priority item and didn't try to push it much. Didn't push it at all.
Q Do you know whether the acceptance rates that are included in this document are the same acceptance rates that are included in the 1995 TSLCC report?
MS. HERRMANN: Objection. Best evidence.
A I thought we just described it a little bit. The 300 to 400. Other than that, I think



they're the same.
Q If you would take a look at Barrett Exhibit 45, which is the 1995 TSLCC document. And in particular I direct your attention to page eight.
A Yes.
Q And I think you're absolutely right that these rates are almost exactly the rates in the 1998 TSLCC but for the 2010 where you accurately noticed that it's 300 MTUs in the 1995 TSLCC.
When this document was issued in 1995, was this DOE's intention with regard to the acceptance rate it would implement when it began to take spent nuclear fuel from utilities in 2010?
MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness.
A Restate that question again, please.
MS. HEWITT: Can you read it back.
(The record is read.)
MS. HERRMANN: Same objection.
A This was a cost report. The primary focus was, you know, to do a cost estimate for total life-cycle cost. This was not primarily a waste



acceptance operating-type document. It should reflect what the system was at that time.
Regarding when we reviewed this document, when I reviewed the document, I was not paying much attention to if it was 300, 400, 600, or whatever. This should reflect what the repository design numbers were, and I just don't know what they were at the time. So the only reason I'm going through this is you asked this was the primary DOE document for acceptance rates. It really wasn't. It should have been the systems requirements documents for the repository of whatever were in place in 1995. If there was 100 percent alignment between those documents I honestly don't know.
Q Table 1-2 that we're talking about is entitled MGDS Receipt/Emplacement Rates. What does the acronym MGDS stand for, do you know?
A Mine geologic disposal system I believe.
Q Do you know whether or not the rates that are included in this document are different from the rates that were included in the 1995 APR ACR that was published around the same time?



MS. HERRMANN: Objection. Best evidence.
A I think that the '95 ACR has the four-six-nine constant in it.
Q I think you're right, but if you would like to look at it, that's Exhibit 39.
A Well, that's different than these.
Q It is different?
A Yes.
Q Why was there a difference in rates published in two separate documents that were published around the same time?
A This is a performance document on what we thought we could perform at. That has something to do with the contract.
Q So is it your testimony that DOE could perform at a rate that's different than what it was supposed to perform under the contract?
MS. HERRMANN: Objection. Relevance.
A Yes.
Q Why don't you take a look at Exhibit 39, which is the 1995 APR ACR.
A Okay.

Q I'm going to refer your attention to Table 1 on page four.
A **Yes.**
Q The table is entitled Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel. My first question is -- and you've used this term quite a bit as well -- what does the term "nominal" mean when the DOE uses it in its documents?
A **Not an exact number. To me the word "nominal" -- I don't know what the authors of this document meant. When I hear the word "nominal" or when I use the word "nominal" it's sort of an average number. It might be more; it might be less, but it's in that order of magnitude.**
Q Now, this table sets forth projected waste acceptance rates for a period of ten years, correct?
A **It appears to.**
Q Do you know why it only sets forth projected acceptance rates for ten years?
A **No.**
MS. HERRMANN: Objection. Speculation.
Q Do you know what the acceptance rate would



have been in year 11?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you have any understanding of whether or not this ACR APR indicates that DOE will take spent nuclear fuel from utilities at a steady-state rate of 900 MTUs per year for the life of the program?
MS. HERRMANN: Objection. Best evidence. Speculation.
A **Repeat the question, please.**
**(The record is read.)**
A **I don't know a relationship between this table and what we'll actually perform at.**
Q Well, do you know what the purpose of issuing this table was?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Would an annual acceptance rate of 900 MTUs, if implemented by DOE, preclude the need of utilities to make arrangements for additional on-site storage after 1998?
MS. HERRMANN: Objection. Speculation.



A **I don't know.**
Q How would you figure that out?
A **You would need to -- to calculate that you would need to project what the pool overflow rates would be, would know performance. You would need to then figure out how would the 900, or whatever rate we were going to perform at, how that would be allocated under the contract relationships. And then you could determine who had pool overflows and who did not.**
Q Does DOE have information on what you call pool overflow rates?
A **We have data reported by utilities in their 859 reports that you could derive that from.**
Q Do you know whether or not that consideration, pool overflow, quote/unquote, was a factor in arriving at acceptance rates in this document?
A **I don't know. I don't think so.**
Q Do you know whether pool overflow was a consideration in developing any acceptance rate in any of the acceptance capacity reports issued by DOE?
A **Not that I know of.**



Q Were pool overflow rates a consideration in developing the 3,000 steady-state rate used for the design of the repository?
MS. HERRMANN: Objection. Speculation.
A **Not specifically, but in a gross national sense, yes.**
Q And how in a gross national sense?
A **By setting the performance rate of nominally 3,000 being higher than the production rate of 2,000, that would give a thousand tons per year working off the backlog which should re-present if there was appropriate distribution amongst the contract holders' pool over -- anymore pool overflows.**
Q Do you have an understanding of whether DOE ever established a minimum acceptance rate that would accomplish the need for eliminating pool overflow by utilities after 1998?
A **Not specifically. The only reason I'm pausing, as I recall somewhere having a discussion with staff that the pool overflow rate in the teens, you know, post-2010, was something in the neighborhood of 500 tons per year if there was no -- if we did not**

1348

perform at all.
Q And do you recall at all what that figure of 500 tons was based on?
A **Based on somebody's guesstimate of what they realistically thought the pool overflows would be in the 2010 to 2015 time frame.**
Q And was the pool overflow figure that was cited to you, 500 metric tons per year, did that reflect an aggregate number based on all the utilities, do you know?
A **My recollection was that was a national number. You couldn't really do it on a -- we didn't have the data to do it on a utility-by-utility number very clearly.**
Q Well, did the utilities report individually with respect to them this data on their RW 859 documents that they submitted to DOE?
A **I don't know exactly what's on an 859. I think that's being derived from the 859s.**
Q We spoke a little earlier today about the viability assessment. Do you recall that conversation?

1349

A **Vaguely.**
Q And the conversation centered around a reference case for a repository that would be available in 2010 that was actually described in the viability assessment that was published I think by DOE in 1998. Is that correct?
A **I believe so.**
Q And if I remember correctly, the reference case is a repository that is -- I think you described as a nonmodular system. Is that right?
A **Correct.**
Q What are the major milestones that are left between now, May 2002, and 2010 that have to be accomplished before the repository and nonmodular repository can take spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
A **Have to prepare the license application, go through the licensing process of the NRC, receive a construction authorization, construct it, receive an operating license, build the transportation system, both the hardware aspects of it and the institutional aspects of the transportation system, and then be**

1350

**ready to operate in 2010.**
Q What is a reasonable estimate of time that it would take to construct a nonmodular repository?
MS. HERRMANN: Objection. Speculation.
A **Under normal circumstances a building like that would be approximately five years.**
Q And what's a reasonable time or a reasonable estimate of time that it would take to get your license approved to build such a facility?
MS. HERRMANN: Same objection.
A **The statute says three years.**
Q Do you consider that reasonable?
A **It could be tight.**
Q Why?
A **Well, I think the hearings will be difficult for the NRC to complete within that time period, but it's doable.**
Q And I believe you said in addition to the licensing and the construction there are concerns about building a transportation system as well and getting an operating license. Is that correct? Those are two additional milestones?

1351

A **Two additional milestones. I didn't use the word "concerns."**
Q But they are two additional milestones?
A **They are milestones, yes.**
Q And is the time to get an operating license the same as the time to get your -- for a licensing procedure, is that the same milestone or are those two separate actions?
A **What I refer to in a general sense as the operating license is actually an amendment to our license that we would receive when we get the construction authorization. So it's a license amendment, which should take less time than the original licensing proceeding itself.**
Q And how long would that licensing amendment take?
MS. HERRMANN: Speculation.
A **It will take a couple of years. The actual operating license proceeding will probably start just about when the construction authorization is given.**
Q From what you said it does not appear likely that DOE will accomplish all these milestones

# Alan Brownstein

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Tuesday, April 9, 2002
Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Tuesday, April 9, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 5

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 58

A. I do not recall. This is, the date is June '85. It was before my time.
Q. I appreciate that. Do you recall whether you read this document at or about the time you became a DOE employee or shortly thereafter?
A. I believe I read excerpts from it.
Q. Did you use the document to implement the terms of the standard contract?
A. I used -- yes, in part.
Q. And what parts did you use?
A. I used the waste acceptance rates. Hesitation in the response is whether I used the '85 or the subsequent mission plan.
I don't recall which, but I certainly used the mission plan or its predecessor documents for the waste acceptance rates.
Q. Do you know whether there was an earlier version of this mission plan?
A. I don't believe there was.
Q. The reason I ask, sir, is because I believe you used the term this document or its predecessor. I was trying to --
A. Subsequent documents; it's amended documents after. I'm sorry.

Page 59

Q. Let me hand you, Mr. Brownstein, I'm going to have this marked as Brownstein Exhibit 3, what appears to be Volume 1 of a draft mission plan dated December 20, 1983.
(Brownstein Exhibit No. 3 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you ever seen that document before?
A. I cannot recall ever seeing this document.
Q. Can I direct your attention to page 2-1 under the heading II, program strategy?
I would direct your attention to the first paragraph under that heading, program strategy.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you see the last two sentences of that paragraph?
A. Yes.
Q. It states, "The waste materials will be accepted in accordance with a Waste

Page 60

Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year."
That's what is stated there, correct?
A. Correct.
Q. Was that DOE's policy at the time you became an employee?
A. I've never seen this document.
MR. BANES: Objection -- vague.
THE WITNESS: And I do not believe it reflects the policy.
BY MR. TOMASZCZUK:
Q. It does not reflect the policy?
A. I do not believe it does.
Q. It was not DOE's policy under the contract to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?
MR. BANES: Objection -- asked and answered.

Page 61

THE WITNESS: It may have been a goal. I mean I was not with the program and had not seen this document.
May have been a goal, but in terms of the policy with respect to the contract, I don't believe that reflects that.
BY MR. TOMASZCZUK:
Q. And it's your testimony that you haven't seen this document before today as best you can recall?
A. As best I recall, I have not seen this document.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Let's go back to Brownstein Exhibit 2, which was the June 1985 mission plan.
And I believe you testified if I understood it, Mr. Brownstein, that you used the waste acceptance schedules in the mission plan to implement the terms of the contract?
A. And --
MR. BANES: Objection. Go ahead.
BY MR. TOMASZCZUK:
Q. I understood that to be your

Page 62

testimony?
A. In the mission plan or the mission plan amendments.
Q. Okay. And how did you go about doing that?
Explain to me what you mean by that.
A. My responsibilities did not include developing a waste acceptance rate that was done by other parts of the program, and in order to complete the things that I was responsible for, we needed a waste acceptance rate, and I used documents available elsewhere in the program.
Q. Who was responsible for developing the waste acceptance rates reflected on page 26 of Exhibit 2?
A. I don't recall. As I testified, this document came out before I was an employee, so I don't know who, who was responsible for that.
I don't recall who was responsible for that.
Q. What office within DOE was responsible for preparing this data, do you know?
A. OCRWM.
Q. Was there a division or branch within OCRWM that was responsible for preparing the

Page 63

waste acceptance schedule at page 26 of Brownstein 2?
A. There probably was, but I just don't recall.
Q. Do you see the first sentence of this section under the heading 2.7, waste-acceptance schedules, on page 25?
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. It says, "The DOE is committed to accept waste from the signatories of the standard disposal contracts on a firm schedule that begins no later than January 31, 1998"?
A. Yes.
Q. Is that an accurate statement?
MR. BANES: Objection. Calls for a legal conclusion.
It's vague.
BY MR. TOMASZCZUK:
Q. I'm not asking for your understanding as a, as an attorney.
A. The statement is what it is. You read it correctly.
Q. Is it an accurate statement? Do you

Page 64

understand my question?
A. I don't.
MR. BANES: Same objection.
BY MR. TOMASZCZK:
Q. Well, is it true that DOE under the contract is committed to accept waste from the signatories of standard disposal contracts on a firm schedule that begins no later than January 31, 1998?
MR. BANES: Objection. Calls for a legal conclusion.
Go ahead.
THE WITNESS: I don't believe that. I believe that this is a, a goal.
I don't believe that it accurately represents what the contract calls for.
BY MR. TOMASZCZUK:
Q. Did you ever discuss that view with anyone?
A. I'm sure that I must have, but I don't recall specifically who or circumstances.
Q. You would at least agree the first sentence doesn't talk about goals, does it?
MR. BANES: Objection -- vague, argumentative.

Page 65

THE WITNESS: The word goal is not used in the first sentence.
BY MR. TOMASZCZUK:
Q. Do you know to whom this mission plan was disseminated?
A. The document was public. It was all -- it was public, all interested parties, all interested people.
I don't know the mailing list.
Q. Do you know why it was prepared?
A. I believe, I believe it was required under the NWPA.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. There are two tables which appear near the end of this excerpt on pages 26 and 27.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. And are you familiar with these two tables?
A. I have seen them before, generally familiar with them.
Q. Do you know what they purport to

Q. For the first repository; sitting here today, do you recall what, if anything, changed between the original mission plan in 1985 and this mission plan amendment in June 1987 which caused the data on these tables to change a little bit?
MR. BANES: Objection -- lack of foundation.
Go ahead.
THE WITNESS: Section F.2 talks about the key changes between the rates in the two documents you talk about, so there is a list of --
BY MR. TOMASZCZUK:
Q. All right.
A. Causal factors if you will.
Q. Did you prepare any of this, any of the items on this list at F.2 that you just alluded to?
A. I'm going to review the list.
Q. Absolutely.
A. One more time.
Q. Please, take your time.
(The witness reviewed the document.)
THE WITNESS: I, I do not believe that



I wrote any of these.
BY MR. TOMASZCZUK:
Q. Okay. Did someone tell you to use the data in these tables in the preparation of the ACR?
A. When you say tell you, you mean like nobody ordered me to do it.
I discussed what I was going to do with, with my superiors and peers, so I think, you know, discussing it is the better acronym.
Nobody told me.
Q. Okay. And with whom did you discuss that subject?
A. In '87, I certainly would have discussed it with Mr. Brandt.
I certainly would have discussed it with Mr. Milner.
I'm sure I discussed it with the then director, who I believe was Rusche at the time, and there was a reporting chain above me, so you know, those people that I knew that were going to have to concur in the document, you know, I coordinated with them beforehand, so I spoke to a number of people about that.
Q. Was it your decision to use the data



in the mission plan amendment in the first ACR, or was it someone else's within DOE?
A. I believe it was my recommendation that others concurred on.
Q. And why did you use the data in Table F-1 to prepare the first ACR?
A. I have not looked at the ACR in a long time, so I'm assuming based on your statement that, that I did.
I mean I need to review it to make sure.
Q. That's fair. And I base my statement on what I understood your testimony to be.
A. Okay.
MR. BANES: Objection -- lack of foundation.
THE WITNESS: In implementing the terms of the contract, the, I didn't view -- there are many factors that go into the waste acceptance rate that are not contractual.
There are logistical. There are engineering. There are other concerns that, responsibilities of other parts of the office, not mine.
I needed a waste acceptance rate in



order to carry out my responsibilities in the contract.
It was not my responsibility to, to do, to put that together, so I took information that the department was publishing at the time and used that.
It was, it was more simple as opposed to more complicated in terms of the decision.
BY MR. TOMASZCZUK:
Q. In or about June of 1987, Mr. Brandt was your immediate supervisor?
A. Yes.
Q. Okay. And where was Mr. Milner in the supervisory chain?
A. To the best of my recollection, in June of '87, he was not in my supervisory chain.
He was, he was I believe a division director in another division within one of the offices within RW, so he was someone that I regularly consulted with on a number of issues associated with the contract.
Q. Okay, but you, just so I understand your testimony, you didn't report to him directly at that time?
A. At that time, I did not.

Page 126

impression that you had that they were positioning themselves for quote, unquote, future action, right?
A. Yes.
Q. What about the conversation left you with that impression?
A. I testified before I didn't, don't recall.
This is the best reflection of what I believed at the time, and I have no reason to either add to it or take away from it.
I mean that's what I wrote, and that's what I believed at the time.
I don't recall anything else.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Was it your common or regular practice to prepare memos to file like this?
A. I did it on occasion. It was not common, and it was not regular.
Q. Do you recall other occasions where you prepared such memoranda?
A. In terms of memos to the files?
Q. Yes, like this.

Page 127

A. Irregardless of the subject?
Q. Well, I guess yes is the answer to my question?
A. Yes, on occasion.
Q. And do you recall the topics with which they dealt?
A. I recall several that dealt with personnel-related matters.
Q. Do you recall any dealing with spent nuclear fuel disposal or acceptance?
A. I do not. I do not even recall this one.
Q. Do you know whether you prepared a memo to file after each of your meetings with Mr. Kraft or not?
A. I am, I am sure that I did not. This was a rare -- I can't, I cannot testify it was the only, but it was rare.
I met with Steve Kraft regularly.
Q. And sitting here today, you don't recall why you prepared this memo after this meeting and follow-up discussion?
A. My conjecture is that this was a formal letter he sent into the contracting officer, and that since it was, it was, it was

Page 128

dealing with something a little informally submitted that I wanted to be careful since it dealt with legal issues as well as contractual and policy issues that I memorialized that conversation, so it was different than other conversations that I had with him.
Q. Correct me if I'm wrong, but did you not always deal with him on legal and contractual and policy matters?
What else would you have dealt with him on?
A. Well, the distinguishing point of that list was that he had sent in, you know, formal letter to the contracting officer, so because of that distinguishing feature, I'm guessing now that that's why I decided to treat that conversation differently.
MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit No. 9, that's a copy of a letter from Mr. Jedrey to Mr. Kraft dated October 2, 1987?
(Brownstein Exhibit No. 9 was marked for identification.)
THE WITNESS: I'm anxious to read it.

Page 129

MR. TOMASZCZUK: I'm sure all the warm and fuzzy feelings are coming back!
THE WITNESS: Yes, sir.
(The witness reviewed the document.)
THE WITNESS: Okay. Before we get into this, I'm going to ask for a five-minute break.
MR. TOMASZCZUK: Absolutely.
THE WITNESS: And then I'll read it.
MR. TOMASZCZUK: That's fine. Any time you want a break, just speak up.
THE WITNESS: Okay. Thank you.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, I actually want you to go back and look at Exhibit No. 7 for just a moment.
That's the April 28, 1987 letter from Mr. Kraft to Mr. Jedrey.
A. Um-hm.
Q. You should have that handy.
A. Yes.
Q. And directing your attention to page 2, under the heading rationale, there is a

Page 130

sentence slightly more than halfway through that paragraph which states this language, referring to previous language from Article 2 of the contract, could conceivably be read to permit DOE to accept single fuel assembly in 1998 and no more until decades later.
Do you see that?
A. Yes, I do.
Q. Do you agree with that statement?
A. No, I don't.
Q. And why not?
A. We believe that's, that was not the department's intent, and that's a radical view of the contract.
Q. And it wasn't your view?
A. It was not. It was no one's view at the department.
Q. Going back to Brownstein Exhibit No. 9, and I think we took a break just as I was going to start asking you some questions about this one, do you recall this document?
A. It's, it's been 15 years. I didn't when you asked me before, but I certainly do now.
Thank you for jogging my memory.

Page 131

Q. And this document appears to be the DOE contracting officer's response to Mr. Kraft's earlier letter, right?
A. It is.
Q. Okay. Did you help prepare this response?
A. Yes, I did.
Q. Did you draft it?
A. Large parts of it, not the entire thing.
Q. Can you identify sitting here today what parts you drafted?
A. How about if I do it the other way, the parts that I know that I did not?
Q. Okay. That's fair. I'll take it that way.
A. I know that I was not the primary author on No. 4 beginning on page 3, nor on No. 5.
Q. So it would be fair to assume then that you had a significant hand in drafting responses delineated 1, 2 and 3?
A. I just -- I want to be clear on one thing.
Q. Of course; take your time.

Page 132

(The witness reviewed the document.)
THE WITNESS: Not solely, but, but had a large hand in the others, yes.
BY MR. TOMASZCZUK:
Q. Okay. And the first paragraph, the last sentence states, "The Department shares your desire to ensure that the Contract is fair and equitable and that it accurately reflects the intent of the contracting parties."
Do you see that on page 1, first paragraph.
A. Oh, yes.
Q. Last sentence?
A. Yes. I'm sorry. Yes.
Q. And does that accurately reflect a desire of the department at that time?
A. Yes.
Q. What was the intent of the parties at that time concerning the spent nuclear fuel acceptance rate?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Well, in, I believe as I testified behalf before, in the broadest of terms, the utilities were responsible for

Page 133

funding the system, and that we were responsible ultimately to accept their fuel.
BY MR. TOMASZCZUK:
Q. Directing your attention to page 2 of the document --
A. Um-hm.
Q. Under the heading No. 1, additional performance standards?
A. Yes.
Q. Do you see that? Would you look at the second paragraph under this heading?
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. Do you recall sitting here today whether you drafted this language in this paragraph?
A. I am sure I played a major role in it.
Q. And Mr. Jedrey is telling Mr. Kraft here in the first sentence of the second paragraph under subheading or under heading one additional performance standards, quote, "...I can assure you that the Department intends to honor both the letter and spirit of the NWPA and the contract, rather than seek opportunities to

Page 134

circumvent its obligations"?
A. Yes.
Q. What did you understand by that language, seek opportunities to circumvent its obligations, to mean?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: I believed what it meant was responding to Mr. Kraft's concern about the possibility of us, of the department accepting a single assembly and walking away.
That to me is a trick, and I think the contracting officer was trying to indicate that was, that type of gamesmanship is not what the department was all about.
BY MR. TOMASZCZUK:
Q. And that would constitute circumventing its obligations under the contract?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: That's how I interpret it, that sentence.
We're responding to his specific concern.

Page 135

BY MR. TOMASZCZUK:
Q. Could you look at the last sentence of this same paragraph under the heading additional performance standards?
A. Yes.
Q. Last phrase in pertinent part says they provide clear evidence that DOE does not intend to meet its contractual obligation by accepting a single assembly?
A. Yes.
Q. Do you see that?
A. Yes.
Q. Is that a true statement?
MR. BANES: Objection. Calls for speculation.
BY MR. TOMASZCZUK:
Q. You can disagree.
A. I do not disagree. I agree with that sentence.
Q. In the intervening language in this paragraph, there's a discussion about schedules illustrating a planned acceptance rate of 1200 MTU for each of the first five years and then an acceleration to 2,650 metric tons thereafter.
Do you see that?

Page 136

A. I do.
Q. And if my recollection is right, I believe those are the figures that were used in the first ACR which had been published a couple of months prior to this October 1987 letter?
A. They are.
Q. All right. What was your intention or what was the Department of Energy's intention in giving Mr. Kraft that information?
What was he supposed to do with that?
A. This, this was, this entire paragraph is trying to reflect that the department was not only not trying to game the system by accepting a single assembly and walking away, but by demonstrating that the evidence of what our plans were through these other documents clearly showed that we were intending to do something other than take a single assembly.
Q. Was it your intention that the utilities would use or rely on, in any way on that information in preparing their own plans for dealing with their spent nuclear fuel?
A. I believe we addressed that issue in the Annual Capacity Report, and in fact I think it was addressed in the contract itself.

Page 137

The contract said to provide this information for planning purposes recognizing that it would change over time, and so if we went back to the ACR, I think you would see relevant language that addressed what we intended that information to be and not to be.
Q. We saw language that says it's for planning purposes, right?
A. Yes.
Q. And I guess my question to you, Mr. Brownstein, is as a practical matter, what does that mean to a utility that gets it?
What are they supposed to do with it?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: Since the contract was, you know, evolved between two parties, we didn't just write the contract.
The utilities signed it. It was a two-party contract. The utilities wanted information, and they wanted it -- the contract, that's a two-party agreement. The utilities wanted the information to understand, you know, down the road, what our plans were so they can begin their thinking process.