IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) (Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C) (Wiese, J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C) (Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C) (Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 243

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 244

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 245

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 246

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 291

based could have caused perturbations really to the utilities, some to us.
That's an example.
Q. Since you raised the subject, exchanges are mentioned here as the fourth issue to be addressed in the APR?
A. Right.
Q. And the first sentence under the issue says purchasers have the right to exchange approved DCSs subject to DOE approval?
A. Correct.
Q. Did you agree with that statement?
A. Yes, I did.
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Sorry. Yes, I do.
BY MR. TOMASZCZUK:
Q. Going back to the first page, the draft briefing paper goes on to state this option, and I presume that's the option of delaying the APR and DCS process, was rejected because of the purchasers' perceived need not to support any action that could be viewed as acquiescing on the 1998 date?
A. Correct.

Page 292

Q. And is that statement consistent with your understanding of the rejection of this option?
A. Yes, it is.
Q. The purchasers were concerned that they not take any action that could be viewed as extending the 1998 date in the contract?
A. Yes.
Q. Do you know why?
MR. BANES: Objection -- lack of foundation.
Calls for speculation.
BY MR. TOMASZCZUK:
Q. Let me go back. Did you have any discussions with utility representatives concerning this issue?
A. I did.
Q. And you understood the utility representatives to advise you that they were not willing to take actions that could be perceived as acquiescing on an extension of the January 31, 1998 date?
A. We referred to the ACR issue resolution process yesterday, and these were basically staff-to-staff technical discussions.

Page 293

We discussed many issues associated with the contract, some of which are listed in this paper.
When we had those discussions with the technical people, as I recall it, they understood, you know, a host of implementation problems, and as I recall it, were sympathetic to the need to try to resolve those, you know, before we moved on.
They went back, as I understand it, after our meetings to their respective management and to their legal counsel, and came back and said something to the order of while we understand, we have been advised not to proceed down that course.
This is many years ago, but that's how I recall the, the events.
Q. And did any of those utility personnel explain that to you or tell you anything further about that?
A. My only recollection is for whatever the reason that I remember, they came back and said there was a group or an individual, I don't recall, that Jay Silberg, they had reviewed the issue with Jay Silberg, and he had advised them

Page 294

in part because of, you know, legal concerns, not to do that, again, to the best of my recollection.
Q. Okay.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. There is a reference here at the bottom of page 1 to an option for dealing with the waste acceptance rate issue as I understand it?
A. Correct.
Q. And it refers to the need or desire to allow the purchasers to cooperatively avoid out-of-pool storage requirements based on RW-859 data?
A. Correct.
Q. Do you see that?
A. Yes, I do.
Q. Was it DOE's intention at the time to structure the program such that purchasers would avoid out-of-pool storage requirements based on RW-859 data?
MR. BANES: Objection -- vague.
THE WITNESS: In my mind, there's a



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 295

fundamental difference between goals and objectives and policy and contractual commitments.
There was no contractual commitment to do any such thing.
Was there a goal to try to avoid additional storage? Sure, but that's separate and apart from contractual commitment.
BY MR. TOMASZCZUK:
Q. So at least in that context, you understood a distinction between contractual commitments and other things?
MR. BANES: Objection. Mischaracterizes prior testimony.
THE WITNESS: Every time I use, whether today or yesterday, every time I use the word goal or objectives, to me, that's separate, distinct and apart from a contractual commitment.
MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit 26 a memorandum dated April 15th, 1991?
And the subject is approval for issuance of a comment draft of the annual Acceptance Priority Ranking.

Page 296

It has on it the Bates numbers HQR-001-1538 through 1539.
(Brownstein Exhibit No. 26 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen the document before today?
A. I have.
Q. Did you draft it?
A. To the best of my recollection, I did, or played a major role in doing so.
Q. All right. Your name appears in handwriting in the upper right-hand corner?
A. That's my name, not my handwriting, but yes.
Q. And this was a memorandum sent through the deputy director of OCRWM to the director, correct?
A. Correct.
Q. And at that time, Mr. Milner was acting as the deputy director?
A. I don't believe that's accurate, no.
Q. But Mr. Milner signed the memo on the

Page 297

second page of it?
A. Yes, that's correct.
Q. And he sent it through RW-2, the deputy director's office?
A. That's correct.
Q. And who would that have been at the time, do you know?
A. We can clearly go back to the charts if I had to.
Q. Can you tell from that initial there next to RW-2 who that might be?
(The witness reviewed the document.)
THE WITNESS: I really can't.
BY MR. TOMASZCZUK:
Q. Okay. Can you tell who approved the action?
A. Yes.
Q. As set forth in the memorandum?
A. Yes, I can.
Q. And who is that?
A. That signature there is J.B., stands for John Bartlett, and a guess, that, that mark may have been Frank Peters.
Q. Okay. And the subject of the memo is the front office approval if you will for

Page 298

issuance of a draft of the APR?
A. Well, for a comment draft of the Acceptance Priority Ranking report, yes.
Q. Do you see in the second paragraph under the heading discussion?
A. Yes.
Q. Can you read the first sentence for me?
A. The publication?
Q. Um-hm.
MR. BANES: You're not limited to that.
THE WITNESS: "The publication of the APR begins the contractually binding waste acceptance process."
BY MR. TOMASZCZUK:
Q. Did you write that?
A. I did, or am responsible for it, yes.
Q. Is it a true statement?
MR. BANES: Objection -- vague, and calls for a legal conclusion.
THE WITNESS: It is, it is accurate in the context that I have testified earlier today and yesterday of how I interpret contractually binding.

Page 387

Energy's plans for nuclear waste at Yucca Mountain?
A. What time period are you referring to?
Q. March 14th of this year.
A. No.
Q. Did you ever discuss that testimony with Mr. Barrett?
A. Not that I recall.
Q. Do you know whether Mr. Barrett testified on the Hill on March 14th?
A. I believe he did.
Q. And what do you know about that subject?
A. I wasn't involved in the preparation of that testimony, and I don't believe I actually reviewed, reviewed that testimony. I wasn't involved in that one at all.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Give me just a second, okay?
A. Sure.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Brownstein, at

Page 388

this time, I don't have any further questions for you.
I would like to thank you for your time and your cooperation. I very much appreciate it.
I know it has been a long day and a half, and I need to adjourn the deposition because there are some documents which we believe still have not been produced that may bear upon your testimony, so I reserve the right to call you back if and when those documents are produced, and that includes but are not limited to documents on a privilege log that the government has provided to us, but at this time, I have no further questions, and I adjourn subject to those conditions.
THE WITNESS: Okay.
MR. BANES: We reserve the right to, we reserve the right to object to reopening, so with that, I'm going to ask a few questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. BANES:
Q. So Mr. Brownstein, let's see here if you could just get out Exhibit 1.
It's the contract. It's in there

Page 389

somewhere.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Let's see. Turn to page, there is a Bates stamp number the bottom. It says ADM-001, and then I'm going to use that last four digits if you could turn to page 660 for a moment in Exhibit 1?
A. Okay.
Q. Mr. Tomaszczuk was asking you several questions about the Delivery Commitment Schedules and how they related to the contract.
Do you remember that testimony?
A. Yes.
Q. Turn to paragraph or Article V.B that's located down there on this page 660.
A. Okay.
Q. Was this the paragraph you were talking about earlier that was the basis for Delivery Commitment Schedule instructions?
A. Yes.
Q. Now turning to where it says beginning January 1st, 1992, purchaser shall submit to DOE

Page 390

the Delivery Commitment Schedules or schedule which shall identify all SNF or HLW the purchaser wishes to deliver beginning 63 months thereafter.
Now can you tell me, could you just explain for me how you interpreted that paragraph and how it translated into the Delivery Commitment Schedule instructions?
MR. TOMASZCZUK: Objection. It's compound, calls for a legal conclusion.
(The witness reviewed the document.)
THE WITNESS: I combined that paragraph with Appendix C of the contract.
BY MR. BANES:
Q. Okay. And did you believe that the delivery -- let's take a look at the Delivery Commitment Schedule. Pull that out for a minute. That was Exhibit 34.
A. Yes.
Q. Did you believe that those, Exhibit 34 was consistent with the provisions of the contract regarding Delivery Commitment Schedules?
A. We used the Appendix C as a basis for that, yes.

Q. Okay. Now with respect to when a purchaser would submit a Delivery Commitment Schedule, let's say a purchaser wanted to, pursuant to this paragraph B on the contract, Article V.B., if a purchaser wanted to deliver SNF beginning in say 1998, when would they have to submit a Delivery Commitment Schedule?
A. It's clear in our mind you would have to subtract 63 months from that date.
Q. Okay. Now if they didn't want to, if a purchaser did not want to deliver any SNF in 1998, would they have to submit a DCS 63 months prior to that?
A. No. It states that purchaser shall identify all SNF and/or HLW the purchaser wishes, emphasize wishes, to deliver to DOE beginning 63 months thereafter.
Q. So but was this, was the submission of a DCS a prerequisite, pursuant to the contract in your opinion, was submission of a DCS a prerequisite to acceptance of a purchaser's spent nuclear fuel?
A. In my mind, it was.
Q. And was that pursuant to this, was it a prerequisite 63 months prior to the date they



wished delivery to occur?
MR. TOMASZCZUK: Objection to the form.
I don't know what "this" is.
BY MR. BANES:
Q. Was it, was such a, was such acceptance of spent nuclear fuel a prerequisite, or was submission of a DCS 63 months prior, in your opinion, a prerequisite to DOE's acceptance pursuant to the contract to such spent nuclear fuel?
A. Yes.
Q. All right. Now if a, if a utility decided not to submit a DCS -- well, strike that.
If a utility -- let's see. Prior to, I think you testified earlier prior to acceptance of spent nuclear fuel, who in your opinion was responsible for this, for storage of the spent nuclear fuel?
A. I think it is in my mind, and based on several documents, it is clear that the utilities remained responsible until DOE accepted it.
Q. In the documents you prepared, did you



convey that to the purchasers?
A. I did.
Q. All right. Now let's take a look at --
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. With respect to, with respect to the rates, acceptance rates contained in each of these documents we have looked at, I think that you testified earlier that they were subject to a whole host of assumptions, is that correct?
A. Yes.
Q. Now so let's take a look at Exhibit 6 and go to Table 2 dash 1 or 2.1 on page 7.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Now on page 7 of this document, there is a, there is what purports to be called illustrative waste acceptance schedule.
And then at the top there, it says the waste acceptance schedule, or excuse me -- this



schedule is only an approximation, approximation of how the system may operate and is subject to uncertainties that are recognized in the mission plan.
Why did you include that language in this Annual Capacity Report?
A. We knew that there were, you know, at different times in the program, you know, whether there were legal restrictions, we certainly knew that there were challenges, and we wanted to make it clear to the utilities and everyone understood that we were at the early stages, and these were our best projections at the time, and we tried to be clear over the years of why, and, and that they were subject to change.
Q. In your opinion, with respect to Table 2 dash 1, would it be appropriate to read 2.1 in this 1987 Annual Capacity Report without reading the entire document?
A. Well, I believe it's always inappropriate to pull out any excerpt from a document.
A document's prepared. All words have meaning, and should be read in the context of

Page 395

the document.
Q. And is that because in other portions of the document, the assumptions upon which the rates on page 7 are based are described?
MR. TOMASZCZUK: Objection -- leading.
THE WITNESS: In each of the ACRs, and we reviewed several of them here, there were a number of caveats concerning the waste acceptance schedule.
They were in different places in different, different documents as the document evolved, but they were there.
We didn't put them in the same place in the same time.
They were always there somewhere.
BY MR. BANES:
Q. Let's see. Mr. Tomaszczuk showed you Exhibit 2, which was the 1985 mission plan.
Before we get to that, let me ask you a couple of questions.
Did the, in your opinion, did the Nuclear Waste Policy Act require the Department of Energy to accept spent nuclear fuel at any particular rate from the purchasers?
MR. TOMASZCZUK: Objection -- lack of

Page 396

foundation.
THE WITNESS: There was no rate in the Nuclear Waste Policy Act.
BY MR. BANES:
Q. Okay. And with respect to the standard contract, which is located at Exhibit 1 --
A. Yes, I have that.
Q. Did the standard contract require the Department of Energy to accept spent nuclear fuel from the purchasers at any particular rate of acceptance?
A. There was no rate in the standard disposal contract.
Q. Now going back to the mission plan, which is Exhibit 2, to your knowledge, was the mission plan or any portion thereof ever incorporated into the contract?
A. No.
Q. All right. Now Mr. Brownstein, Mr. Tomaszczuk was asking you about the 1991 APR, which is Exhibit 30. He was referring to page --
A. Wait a second.
Q. I'm sorry. Did you find it?

Page 397

A. No -- Number 30?
Q. Exhibit 30.
MR. HANDWERTER: The ACR.
BY MR. BANES:
Q. Was that the ACR? Excuse me. The ACR is the one I want to talk to you about.
A. I'm sorry. I don't have these things in order.
Okay.
Q. Page 4 for a second of the document under 2.0, waste acceptance projections?
A. Yes.
Q. Mr. Tomaszczuk was asking you whether the rates reflected in Table 2 dash one or 2.1 -- excuse me -- assumed the existence of an MRS facility or a DOE facility.
Do you recall that question?
MR. TOMASZCZUK: Object to the form.
THE WITNESS: Yes.
BY MR. BANES:
Q. All right. And do you recall that you responded to that yes, it did assume the existence of a DOE facility for acceptance of spent nuclear fuel?
A. Yes, an MRS facility, yes.

Page 398

Q. Now with respect to every, in every document that you, that contained a rate that you worked on, did, did all of those projected rates assume the existence of some type of repository, either repository or MRS, prior to the acceptance of spent nuclear fuel?
MR. TOMASZCZUK: I'm going to object to the form of the question.
I don't understand it.
THE WITNESS: I can still answer?
BY MR. BANES:
Q. Sure, if you understand it, you can.
A. I made the statement in all the documents, as I have testified -- I'm looking at page 4 -- that assumed the commencement of facility operations.
Q. Okay.
A. And I defined facility as either an MRS or a geologic repository.
Q. So in any document in which you would have incorporated a rate, is it fair to say that you would have assumed the, an operational facility being either an MRS or a repository?
A. Yes.
(There was a pause in the

Page 399

proceedings.)
MR. BANES: Okay, sir. Just a second here.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Turn to Exhibit 26 for a minute, sir?
A. I really need to organize this. If these are going to be the subjects of questions, I have to get them in some order.
Twenty-six, I've got it.
Q. Okay. Okay. All right. Turn to Exhibit 26.
Let's go back to that paragraph you were discussing with Mr. Tomaszczuk. It starts the publication of the ACR, APR.
If you would just read that entire paragraph for me?
You don't have to read it outloud. You can read it to yourself.
A. Thank you.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. BANES:

Page 400

Q. All right. Now in the statement there, I think Mr. Tomaszczuk asked you what you meant by the publication of the APR begins the contractually binding waste acceptance process.
Does the remainder of that paragraph refresh your recollection what, why that word begins is there?
A. Well, in my mind, the contract laid out a process, as I have testified, beginning with the ACR, ACR following with the APR, to be followed by the DCS to be followed by the FDS.
That's what I was referring to.
Q. Okay. And all right. So as far as this contractually binding waste acceptance process, were you referring to all of that process, or just the APR?
A. No. Begin the process, the APR was the sort of the second step, well, the first step in the process leading to the FDSs, which is the last step leading to the, to the actual acceptance.
Q. And with respect to the process, while it hasn't been marked as an exhibit, Mr. Tomaszczuk showed you the what has been kind of referred to as the Starship Enterprise chart?

Page 401

A. Yes.
Q. Did that, did that chart lay out what this process, this process was supposed to be from the beginning of the contract all the way to acceptance and delivery?
A. That was, that was its intent.
Q. And looking at this, we just I guess won't mark it, but --
MR. TOMASZCZUK: I'm going to come around.
THE WITNESS: If we're going to do it, could we move it closer?
This is not the easiest thing in the world to read.
Can you see it from here?
(A discussion was held off the record.)
BY MR. BANES:
Q. All right. Now I wanted to ask a little bit about the mechanics of the chart?
A. You understand I haven't seen this in, I haven't looked at this in years.
Q. Can you tell where the Annual Priority Ranking first appears, or that let's start with the Annual Capacity Report.

Page 402

Where is that?
A. That's right there.
Q. Let the record reflect that the witness is pointing to a box that has the number 060 in the upper left-hand corner.
And on the far left of the chart, towards the far left of the chart, now there is a dark line here.
A. Right.
Q. What is that dark, what is that dark line supposed to represent? Annual Capacity Report and Annual Priority Ranking?
A. The dark line under the legend indicates the optimum path.
The whole chart is divided basically into two parts which is, which is the first part is if everything went right, this is, this is how the process would go.
And then there were, there were other possibilities, other things that could go, other things that could happen, and what I had asked the contractor to do was to lay out all those other things that could happen and contingencies, and that's what they tried to do here.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 468

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
:Discovery
v.
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 470

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 471

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 548

proceedings.)
BY MR. BANES:
Q. Okay. Let's see here. Turning back to Exhibit 43, Mr. Brownstein --
MR. HIRSCH: Which one is 43?
MR. BANES: I think that's one of the, one of these vugraphs.
MR. HIRSCH: Off the record.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Now let's see if you could open to Exhibit 43, page 262 -- I just asked him to hold Exhibit 42, page 43 exhibit, or page 262 open for a moment.
And then let's see. I have got now Brownstein Exhibit 36.
Now yesterday we were talking about the, with Mr. Tomaszczuk, we were talking about at what point we are in, the DOE and the purchasers are in the process of the standard contract for setting a rate?
A. Right.
Q. Do you recall that testimony now?
A. Yes, I do.

Page 549

Q. And I think you testified that the, that the point of the process that we're in is in the, in the DCS?
We're still in the DCS process, is that correct.
A. Yes.
Q. Now the utilities and the utilities and the -- to, to your recollection, have you, the utilities and DOE ever agreed upon a mutually acceptable schedule?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Some utilities have submitted the DCSs, and we have approved them.
BY MR. BANES:
Q. Okay. And for those that you haven't approved, what's the process for after disapproval occurs?
MR. HIRSCH: Objection -- vague, no foundation.
Calls for a legal conclusion.
THE WITNESS: I don't know how to identify these boxes.
This exhibit shows the path. If -- once we have completed our review, which is

Page 550

indicated in the box.
BY MR. BANES:
Q. The number in the upper left-hand corner?
A. 005; if we disapprove it and it goes to box 025, then it lays out a series of steps.
We, we disapprove it. We notice the utility of that disapproval, and then the utility is supposed to revise their DCS and submit it to us.
We then go through another review process, and again, we then have two options.
We can approve the DCS, or we can disapprove it.
If we disapprove it again, there is, appears to be two links.
We notify purchaser, and the purchaser -- or we can then propose a DCS to the purchaser. That's a little different than the first one, and I believe that's consistent with the contract.
Do you want me to continue on with the steps?
Q. Sure.
MR. HIRSCH: I'm going to make the

Page 551

same objection I made to the previous question.
THE WITNESS: There is another review process.
Once again, you can end up with an, with approved DCS or, or we could then disapprove what the purchaser proposed, which leads into negotiations between DOE and the purchasers.
BY MR. BANES:
Q. Okay. Now let's go to, let's go to the contract for a minute, Exhibit 1.
A. Okay.
Q. All right. And turn to page 660 of the Exhibit 1.
A. Okay.
Q. And is the process you have just described located, contained somewhere in the contract here?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. BANES:
Q. And where is that?
MR. HIRSCH: Same objection.
THE WITNESS: Under Article V.B.1 and



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 150

Q. Okay. Can I ask, do you know an answer to my question without telling me the answer?
MR. CRAWFORD: He's asking you if you know an answer to his question.
THE WITNESS: I'm going to ask it to be repeated so I can answer you accurately.
MR. STOUCK: Let's have it read back.
THE REPORTER: "Question: Have you reviewed, Mr. Brownstein, any briefs or legal filings by the government in this litigation?"
MR. CRAWFORD: The pending question is different than that.
BY MR. STOUCK:
Q. Right. Your counsel has instructed you not to answer that question. I'm just asking in your mind, without telling me the answer, do you know an answer to that question?
A. Yes.
Q. Do you know the position that the Department of Justice has taken in these cases, I'm talking now about the Yankee cases, about the significance under the standard contract of delivery commitment schedules? Do you know the Department of Justice's position?
MR. CRAWFORD: Objection, vague,

Page 151

overbroad, and to the extent it calls for a legal conclusion.
THE WITNESS: I think I do.
BY MR. STOUCK:
Q. Okay. What is your understanding of the Department of Justice's position with respect to the significance under the standard contract of delivery commitment schedules?
MR. CRAWFORD: Same objection or objections. And let me add one, foundation.
THE WITNESS: I think Justice believes that the extent of damages or breach is determined by approved DCSs.
BY MR. STOUCK:
Q. Okay. Is that the same thing as saying that -- is it your understanding that the Department of Justice has taken the position in this litigation that the Department of Energy has no obligation to accept any spent fuel that is not described in an approved delivery commitment schedule? Do you know whether the Department of Justice has taken that position?
MR. CRAWFORD: I'm going to object, vague, foundation, to the extent it calls for speculation, to the extent it calls for a legal conclusion, and

Page 152

overbroad.
THE WITNESS: I really don't know.
BY MR. STOUCK:
Q. You don't know one way or the other?
A. No.
Q. Okay. Well, do you believe that the Department of Energy -- or do you know whether the Department of -- let me ask it this way, without regard to whatever position the Department of Justice has taken, do you know whether the Department of Energy has an obligation under the standard contracts to accept spent fuel that is not described in an approved delivery commitment schedule?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and foundation since he's not a 30(b)(6) witness.
THE WITNESS: That's an issue in question. I always viewed that both parties had to do the steps required in the contract. The DCSs are -- there's another step in the process which is the final delivery commitment schedules.
So you're asking about DCSs. Where I'm going to ask you for clarification is you're asking me about what happens if there's an approved DCS but there never is an approved FDS.

Page 153

BY MR. STOUCK:
Q. I believe you testified that is the situation we're in, correct?
A. Yes.
Q. There are no approved final delivery commitment schedules that I'm aware of. Are you aware of any?
A. There are not to my knowledge.
Q. Okay. So do you know whether -- well, I don't know if that clarifies the question. But my question is, with respect to spent fuel, commercial spent fuel, utility spent fuel that's out in the world somewhere in the United States that is not described in a delivery commitment schedule that has been submitted by a utility and approved by the Department of Energy, okay, you agree there is such spent fuel out there?
A. Yes.
Q. Okay. With respect to that spent fuel that's not described in a delivery commitment schedule that has been submitted to the Department of Energy and approved by the Department of Energy, do you know whether or not DOE is obligated under the standard contract to accept that spent fuel for disposal at some point in time? The question does

Page 154

not involve a time frame of when they are obligated to accept it, just whether they are obligated to accept it?

MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.

THE WITNESS: I'm going to try to ask a clarification.

BY MR. STOUCK:

Q. Sure.

A. Are you saying -- let me try this again. Are you saying, if there is an approved DCS, irrespective of anything else, do we have an obligation, does the department have an obligation to accept that fuel? Is that what you're asking me?

Q. Actually the question I just asked was about all of the fuel that's not described and approved.

A. Okay.

Q. The fuel that's not described in an approved DCS, do you have an obligation under the contract as DOE to accept that spent fuel for disposal?

MR. CRAWFORD: Same objections.

THE WITNESS: I really don't know because

Page 155

that's a situation that we never looked at. You know, the expectation is that both sides would complete the contractual requirements for both the delivery commitment schedules and then final delivery schedules, you know, as we did the dance to the waste acceptance -- you know, to actual waste acceptance. I don't recall ever addressing the question of what happens if, you know, a utility did not do that. So the answer is I don't know.

BY MR. STOUCK:

Q. So would it be fair based on that answer to say that, during your tenure at RW, when you had responsibility for these waste acceptance matters which as we've said or I have said many times I think is from 1985 to March of '95, during that time you did not have any understanding one way or the other about whether or not DOE was obligated under the standard contract to accept spent fuel that was not described in an approved delivery commitment schedule; is that right? I thought you said you never thought about it.

A. Yeah. As I recall my assumption was that both sides would do it. What happens if somebody did not do it? I don't -- I don't believe we ever really had that discussion.

Page 156

Q. So you had no understanding one way or the other about that subject during the time you were responsible for these matters; is that a fair statement?

A. I just want to take time and think about the question.

Q. Okay. I did not mean to rush you.

MR. CRAWFORD: Same objections as to the original question.

THE WITNESS: We never -- if we had a discussion about that, we never took that to its logical conclusion. In other words, we always said, you know, we needed to do this, whether it's publishing the ACR, APR, and the DCSs, and the utilities had these responsibilities in order to do it.

And we may have made some statements in these documents indicating that the utilities, you know, needed to do it or are required to do it, I don't know the exact words. But I don't recall a discussion where we said, well, if a utility did not do this, how would you balance them not meeting a specific term of that contract with the ultimate responsibility, irregardless of time, if they paid their fees, that we would have to accept their waste.

Page 157

You know, that's a much broader question. Does that help?

BY MR. STOUCK:

Q. That does help. I think what that means is you did not have any understanding one way or the other on this question during the time you were working on these matters; is that right?

MR. CRAWFORD: Objection.

THE WITNESS: I think, if you boil it all down, that would be fair. I mean that's a complex situation.

MR. STOUCK: Can we go off the record.

(Discussion off the record.)

MR. STOUCK: Can you mark this?

(Brownstein Exhibit No. 82 was marked for identification.)

BY MR. STOUCK:

Q. Mr. Brownstein, I must ask you, while you were off the record you had a conversation with your counsel?

A. Yes.

Q. Anything else you want to tell me about our recent exchange?

A. No.

Q. Okay. Do you know what this is?

Page 166

didn't have a facility, with respect to the first caveat; with respect to the second, what would happen if they had an approved DCS but took no action to submit an FDS, we never really addressed that, I never really addressed that.

You know, every stage -- you know, whether it was the APR or the DCSs, I know in correspondence we urged -- we told the utilities this was consistent with the contract, but we never said -- well, we never did the what-if questions.

BY MR. STOUCK:

Q. So you didn't have any understanding one way or the other about my question which is you have the DCS, but you don't have anything subsequent, you just never thought about it, never focused on it; is that fair?

MR. CRAWFORD: Same objections.

THE WITNESS: I did not think we had a binding obligation with respect to my first caveat which is because the commencement of facility operations. We never really addressed the second caveat situation, where we had that and it stopped.

BY MR. STOUCK:

Q. You never formed that understanding?

A. No.

Page 167

Q. You agree with my statement, never formed an understanding?

A. Yes.

Q. And you expected that utilities, you expected them in the course of the processes discussed in the standard contract, that at some point in time utilities would submit final delivery schedules, that's the way you thought about it?

A. I had every reason to expect that utilities, you know, participated, if you will, in both the ACR, in the development of the APR, and in responding to our instructions on the DCS.

Q. Okay. So you did expect that there would be FDSs for all spent fuel described in a DCS?

A. I did.

Q. And do you know whether it would be possible for DOE to accept spent fuel from a utility if that utility had submitted a DCS to DOE, proper DCS, completely filled out, but had not submitted an FDS? And, just to amplify my question, is there enough information specified in the DCS to allow DOE to accept spent fuel for disposal even if DOE does not subsequently get the additional information specified in the FDS?

MR. CRAWFORD: Objection, compound, vague,

Page 168

and to the foundation and to the extent it calls for a legal conclusion.

THE WITNESS: Not necessarily. Let me try to give you an example. And frankly I would have to go back and review, it's been a long time, whether it's a real example or not. But let's say a utility owned a couple reactors and say one -- a couple examples, one was a PWR and one was a BWR or one facility could accommodate rail and one facility can only do truck.

In the DCS they may put a range of fuel down that encompassed both situations. Under that situation we would not necessarily have enough information whether to show up with the right type of cask, whether it be a BWR, PWR, or a rail or a truck cask. So that's not -- that's why I said not necessarily.

BY MR. STOUCK:

Q. Okay. So there are circumstances such as the examples you just gave me where, in the absence of the additional information set forth in the FDS, DOE would not be in a position to accept spent fuel just on the basis of the information set forth in a DCS with respect to the same fuel?

MR. CRAWFORD: Objection, asked and

Page 169

answered.

THE WITNESS: If that was the only information we have, that could be a problem.

BY MR. STOUCK:

Q. Well, would it be a problem in at least some circumstances, maybe not all, but at least some?

MR. CRAWFORD: Same objection.

THE WITNESS: I would expect it would be a problem especially in the initial years, whenever those initial years were, as we were -- we would be -- we would be ordering casks, for example, we would understand -- the vision was that we would understand what casks of what type we would need and what year.

And we would begin to order that, you know, in an efficient manner from the manufacturers. It wouldn't be a -- we viewed it not as a prudent use of nuclear waste fund dollars to take a look at what we would need over ten years and order that on day one.

So, in the initial years, we may have a limited number of truck and rail casks and those orders would, in fact, be based in part on information that was exchanged in both the DCS and the FDS. That's the basis for how I'm giving you the

# Michael Lawrence

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME I

May 20, 2002
Richland, Washington

Page 10

BE IT REMEMBERED that on Monday, May 20, 2002, at 1550 George Washington Way, Richland, Washington, at 9:31 a.m., before SHAUNA L. BEACH, CCR, RMR, CRR, Notary Public in and for the State of Washington, appeared MICHAEL J. LAWRENCE, VOLUME I, the witness herein;
WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

MICHAEL J. LAWRENCE,having been first duly sworn by the Notary, deposed and testified as follows:

EXAMINATION
BY MR. SHAPIRO:
Q. Would you state your name for the for the record, please.
A. Michael J. Lawrence.
Q. Mr. Lawrence, have you had your deposition taken before?
A. I don't really recall.
Q. Well, let me explain since -- maybe it's been a while, let me explain just very briefly what we're

Page 11

going to be doing today. Hopefully speed up the process.
It's really basically a conversation. I'll be asking you questions. You'll be answering. It's a bit more formal than a typical conversation. We have a court reporter who is taking down everything that's said.
Counsel for the government may be making objections after I ask questions that may say the word "objection" and say a few other things that's for the written record. But would you -- unless something unusual happens, you will be expected to answer.
If I ask a question that you're confused about, I'm not sure what I'm really asking, please ask me to rephrase it, since it's not helpful to anybody to try to answer a question that's unclear to you.
Do you understand what we're doing today?
A. Yes.
Q. Mr. Lawrence, are you represented by the government counsel today?
A. Yes.
Q. When did you ask for representation by the government?

Page 12

A. It was about three weeks ago.
Q. And before you asked for representation by the government, did you discuss potentially giving a deposition today with anyone?
A. No.
Q. Have you prepared for your deposition today in any way?
A. Yes.
Q. How have you prepared?
A. I discussed with government lawyers last Thursday, the process.
Q. When you say "the process," what do you mean?
MS. HERRMANN: Objection.
Don't discuss what we talked about in our meeting.
Q. (By Mr. Shapiro) I'm just asking what you mean by "process."
MS. HERRMANN: I'm telling you not to answer.
Q. (By Mr. Shapiro) Did you discuss what -- what the procedures are for a deposition?
MS. HERRMANN: Don't answer the question.
Q. (By Mr. Shapiro) Are you not answering the question?

Page 13

A. We did not discuss anything of merit in the case. It was the formality of questions and answers. That was all.
Q. And other than your conversation with government counsel, have you discussed potentially testifying with anybody else?
A. No.
Q. Did you review any documents to prepare for testifying today?
A. No.
Q. Let me ask about your background. It might help me understand just where you -- you fit in. Why don't we start from your current position and work backyard.
What is your current position?
A. I'm associate laboratory director for Energy Science & Technology at the Pacific Northwest National Lab.
Q. What do you do as associate director for Energy Science & Technology?
A. I'm responsible for the energy programs, the information science programs, and material science programs that the laboratory conducts for the Department of Energy and industry.
Q. How long have you been in this position?

Page 14

A. Since April 1st.
Q. Of this year?
A. This year.
Q. In this position, do you do any work for the Office of Civilian Radioactive Waste Management?
A. Not to the best of my knowledge.
Q. How many people come under your supervision as associate director?
A. 620.
Q. That's a lot of people. There may be somebody involved somewhere doing something for Civilian Radioactive Waste Management but you may not be personally aware of?
A. That's correct.
Q. And before April 1st, what was your prior position?
A. I was the manager of Nuclear Safety & Technology at Pacific Northwest National Lab.
Q. When did you start that position?
A. I don't recall the specific date.
Q. Just approximately.
A. January 2001.
Q. What kind of work did you do when you were manager of Nuclear Safety & Technology?
A. In general, I was responsible for our nuclear

Page 15

technology programs at PNNL.
Q. And in that position, did you do any work for the Office of Civilian Radioactive Waste Management?
A. I don't believe so.
Q. You didn't do any work personally for Civilian Radioactive Waste Management?
A. That's correct.
Q. By the way, I've been using the long name, Office of Civilian Radioactive Waste Management. Are you familiar with the abbreviated acronym RW?
A. Yes.
Q. Can we use the term RW to abbreviate for Office of Civilian Radioactive Waste Management?
A. Yes.
Q. Prior to your position of manager of Nuclear Safety & Technology, what was your position before that?
A. Manager of International Nuclear Programs.
Q. What did you do in that position.
A. I was responsible for our international nuclear work.
Q. What do you mean by "international"? What sort of international nuclear work were you responsible for?
A. We have international nuclear safety programs. We

Page 16

have projects with international nuclear organizations. I was responsible for developing and carrying out that work.
Q. And when did you start that position as manager of International Nuclear Programs?
A. July 2000.
Q. And prior to July of 2000, what was your position?
A. I worked for British Nuclear Fuels, Limited.
Q. What was your position at British Nuclear Fuels, Limited?
A. I was executive vice-president and manager of the waste treatment plant project.
Q. When did you start that position?
A. April of 1999.
Q. You say manager -- executive vice-president and manager of the waste treatment program. What sort of waste treatment? What sort of waste were you treating?
A. It was to build a treatment plant for the defense wastes that's buried at the Hanford site.
Q. And why did you leave the BNFL position?
A. I had a serious disagreement with the way BNFL was managing -- handling that project and responding to problems on that project.
Q. What sort of disagreement?

Page 17

A. I -- there was a serious cost overrun, which they would not acknowledge responsibility for, and they would not go along with my recommendation to provide the government with an alternative way of getting the job done.
Q. So you left as a matter of principle?
A. Yes.
Q. When did you start at BNFL?
A. July 1995.
Q. In April of '99, you were executive vice-president and manager of the waste treatment program. What was your position at BNFL before that?
A. Immediately prior to that, I was chief operating officer and executive vice-president of BNFL in Fairfax, Virginia.
Q. When did you start that position?
A. January '98, I believe.
Q. What did you do as chief operating officer and executive vice-president?
A. I was responsible for the execution of a number of the projects that BNFL was conducting for the Department of Energy or private industry.
Q. You referred to BNFL, you were chief operating officer. Was that BNFL United States operations?
A. Yes. It's BNFL, Inc.

Page 18

Q. And then you reported to someone in Great Britain?
A. No, I reported to the CEO of BNFL, Inc.
Q. Why did you switch positions from chief operating officer to become manager of the waste treatment program?
A. There were two reasons: One, there were, I felt, a very strong influence on our operations in the U.S. by the British parent that made it difficult at times to carry out the programs the way I felt they should be; and two, I really looked for an opportunity to return to the Tri-Cities.
Q. Before you were chief operating officer, what was your prior position?
A. I was president and CEO of Bajarito Scientific Corporation. Would you like me to spell that?
Q. I'm sure the court reporter would.
A. B-a-j-a-r-i-t-o.
Q. What did that company do, when you were president?
A. Bajarito was a subsidiary of BNFL, Inc. It had been acquired in 1995. It was located in Los Alamos, New Mexico. And it developed and provided scientific instrumentation for the classification of nuclear waste.
Q. Scientific instrumentation for the classification of nuclear waste. Can you explain a little bit

Page 19

more just what that means?
A. The Department of Energy has a number of drums of wastes that are called transuranic wastes, which have to be disposed of in a geologic formation of which the waste isolation pilot plant in Carlsbad, New Mexico, was to be the final disposition site.
In order to be eligible for disposal, the waste had to meet certain criteria and composition. Our system allowed a drum to be measured to determine whether or not it met those criteria.
Q. When did you start that position with Bajarito?
A. July 1995.
Q. And prior to that position, what -- what was your employment?
A. From October 1991 until July 1995, I was counselor for nuclear policy for the United States State Department at the United States Mission to the Vienna International Organizations in Vienna, Austria.
Q. What did you do in that position?
A. I was responsible on a day-to-day basis for the United States representation to the International Atomic Energy Agency, which was located in Vienna.
Q. Did the International Atomic Energy Agency deal

Page 20

with civilian radioactive waste management issues?
A. Yes.
Q. What sort of issues were you involved in dealing with civilian radioactive waste management, when you were counselor?
A. The IAEA sets very broad, general international guidelines or standards for a number of nuclear activities, including the management, disposal of nuclear waste. And so consequently, I would be -- could be involved in discussing criteria, requirements for waste disposal.
Q. In that position, as counselor for nuclear policy at the State Department, did you have a relationship with RW?
A. No.
Q. So there was no attempt at the State Department to make sure that its policies were consistent with what RW was doing?
A. Not that I ever saw.
Q. And prior to that position, as counselor for nuclear policy, what did you do?
A. I was director of waste operations for Chem Nuclear Environmental Services in Golden, Colorado.
Q. And what did you do as director of waste

Page 21

operations for Chem Nuclear?
A. Tried to develop business with either government or industry for the management, storage, treatment, or disposal of various types of nuclear wastes.
Q. What was Chem's capability? What sort of business were you trying to develop for them?
A. We were attempting to have the Department of Energy look at a concept called privatization, where we would actually build -- finance and build and provide services to treat or manage nuclear waste in return for a fixed unit price by the government.
Q. Why were you trying to develop this business through the Department of Energy?
A. Because the government had a number of obligations to meet in the cleanup of their sites. And their budgets were insufficient to allow them to meet all their requirements.
Q. You referred to the government having obligations to clean up its own sites. Did you ever try to develop business through RW?
A. No.
Q. Why did you leave the Chem Nuclear position?
A. I was offered a diplomatic post in Vienna,