Austria.
Q. And that was attractive?
A. Yes.
Q. Why did you leave the diplomatic post in Austria?
A. Four years was enough time.
Q. You worked your way back to beautiful Tri-Cities?
A. I went to Sante Fe.
Q. Before Chem Nuclear, where did you work?
A. I was the manager of the Richland Operations Office for the Department of Energy in Richland, Washington.
Q. So I'm going to get my dates mixed up. When did you start with the Chem Nuclear position?
A. August 1991 -- 1990. I'm sorry. August 1990.
Q. And when did you become manager of the DOE Richland operations office?
A. June 1984.
Q. What did you do as manager of Richland operations office?
A. I was responsible for all the operations and programs associated with the Hanford site.
Q. Did any of those programs have a relationship to RW?
A. Yes.
Q. Which ones?



A. Up until 1987 -- I forget the month -- Hanford was one of the candidate sites for geological repository for high-level waste and spent fuel disposal for RW.
Q. Other than the connection of Hanford being a candidate site for a geological repository, did your work as manager of the Richland operations office have any other connections to RW?
A. No.
Q. When Hanford was a candidate site, what sort of work did you do involving Hanford's location as a geological repository?
A. Through an assistant manager and divisions and branches under that assistant manager, we were responsible for the characterization of the basalt under the Hanford site to determine if it qualified to be either a finalist or the repository or to be the repository or to disqualify it if the data did not support its selection.
Q. And why did that work stop?
A. Congress in '87 amended the Nuclear Waste Policy Act to focus all attention on Yucca Mountain, and to terminate the other two programs, including the one at Hanford and the one at Death Smith County,



within 90 days.
Q. About how many people did you supervise when you were manager of the Richland operations office?
A. There were about 340 Feds and anywhere between 12,500 to 15,000 contract employees.
Q. Why did you leave that position as manager of the Richland operations office?
A. I was ready for something different and I also felt that the Secretary of Energy, who I reported to, wanted all decisions to be made in Washington, but left the managers in the field responsible for those decisions.
Q. So you were left with the consequences of the decisions that you couldn't make?
A. That's correct.
Q. Who was the DOE Secretary at that time?
A. Admiral James Watkins.
Q. Prior to your work at the -- as manager of the Richland operations office, what was your position before that?
A. I was -- and I'm not sure if the title "acting" was in there or not -- but I was the director of the Nuclear Waste Policy Act Implementation Office at the Department of Energy in Washington, D.C.
Q. The Nuclear Waste Policy Act Implementation



Office, that was the precursor of RW?
A. Correct.
Q. Why did you leave that position as acting director of that program?
A. Two reasons: One, the Nuclear Waste Policy Act required a political appointee to be the director of RW, and one was found and accepted; two, the manager of the Richland operations office was a job that I very much wanted.
Q. Why did you want that job?
A. It would give me the responsibility for carrying out and fulfilling a number of nuclear and scientific programs that were of great interest and challenging.
Q. And how long were you director or acting director of the Nuclear Waste Policy Act Implementation Office?
A. From January of '84 to June of '84.
Q. And prior to January of '84 -- January of '84, what was your position?
A. I was the deputy director of the Nuclear Waste Policy Act Implementation Office and the -- I think it was director of spent fuel storage and transportation programs in the Nuclear Waste Policy Act Implementation Office.

Page 110

Q. Was the objective, then, to -- to come up with an overall strategy that would maximize the public good, so to speak?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: There was a general approach that we wanted to be fair in our handling of this and in a -- for instance, where a reactor -- a utility just wanted to ship their fuel, but they didn't have a pressing need, but they just wanted to ship it, and there was a utility that had a shutdown site that they could permanently shut it down should they be allowed to ship it. We would give preference, in theory and in general, to that utility that could shut their reactor site down once they were allowed to ship it.
Q. (By Mr. Shapiro) Turn to another exhibit, Mr. Lawrence.
(Exhibit No. 5 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what's been marked as Lawrence Exhibit 5. This one is a letter from Northwest Utilities to Mr. Morgan, commenting on the draft contract.

Page 111

Again, let me ask -- not that I would expect that you recollect -- but do you have any specific recollection of this specific letter?
A. No, I really don't.
Q. I'm going to point your attention, first, to the second page. First underlined item refers to "Receipt of Spent Fuel."
Do you see that?
A. Yes.
Q. And the second sentence there -- first sentence refers to the primary goal of the Act is to have a repository in place by the late '90s. And then the second sentence urges that to meet this goal, it is necessary for the spent fuel contract to contain an obligation by the Federal Government to remove specific quantities of spent fuel from each reactor over a specific period of time.
Do you recall utilities asking for that type of specificity?
A. I do recall that -- that some utilities wanted specificity, but that we were in no position to provide that.
Q. And you were in no position to provide that because you didn't know what DOE's capabilities were going to be down the line?

Page 112

A. We had not finalized designs and receipt rates and transport capabilities. Consequently, we were not in a position to commit to a specific receive rate.
Q. There was, again, in -- in Exhibit 5, there's a specific suggestion, in the next sentence, that the specific receipt rate to be put in the contract should be a removal rate equal to the amount of -- of spent feel generated -- or really discharged, I believe is what they meant, but it says generated -- plus an amount that will eliminate the backlog of spent fuel over a five-year period.
Do you have an understanding of what that's referring to? What that sentence is referring to?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: It appears to me, this is what they would desire or like to have. I don't recall whether the Nuclear Policy Act specifically specified that or not.
Q. (By Mr. Shapiro) Do you recall consideration -- regardless of whether or not the NWPA specified that criteria, do you recall within RW consideration as to whether or not to -- to undertake to -- to accept spent fuel at that kind

Page 113

of rate?
A. I don't recall any specific discussions of it. However, based upon my experience, I would -- my belief is is that would put a very great demand on the Department that would be very, very difficult for us to meet.
Q. Why is that?
A. Because of the excess capacity that would be needed to take not only what was being generated daily, annually, plus working off the entire backlog of over 30 years of operation of nuclear plants within a five-year period. That would result in substantial additional cost and capacity which ultimately the ratepayer would have to bear. And it was not -- it's not clear to me now, at least, that that would have been warranted -- why five years would have been warranted; whereas, some other time frame, where you could do it perhaps more economically might be the better way to go.
Q. And we don't have to focus on -- on Exhibit 5 necessarily, because I'm not sure I would interpret it the same way. But do you recall the concept of -- let me ask a slightly different question.

Did DOE ever discuss the possibility of undertaking an obligation to accept spent fuel at a rate such that five years after the -- at five years after 1998, it would then be accepting rate as fast as the rate equivalent to the discharges plus some amount to start working off the backlog? In other words, a slower rate. Not that it would immediately in '98 to be able within five years to work off the backlog, but it would ramp up to a rate within five years to start to do that?
A. I really can't recall that.
(Exhibit No. 6 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you what we've had marked as Lawrence Exhibit 6, which are comments from the Edison Electric Institute on the draft contract.
Again, do you have any recollection of dealing with this particular letter?
A. No, I don't.
Q. Let me point your attention to a particular -- one of the comments being made by Edison Electric Institute. It starts at the bottom of Page 6 of the letter, referring to priorities.



A. Page 6 of the letter?
Q. Page 6 of the letter, the last three numbers of the Bates number are 881.
A. Gotcha. And where did you say?
Q. At the bottom of the page, dealing with priorities.
A. Okay.
Q. It refers, first of all, to the possibility -- or recognized the possibility that utilities will want DOE to take more spent fuel than DOE can handle. That you recall, that concept? I think we discussed that.
A. Uh-huh, yes.
Q. People have made numerous suggestions for dealing with that. They make a particular suggestion, at the top of the next page, that there be two priorities: One based on the age of the spent fuel, and then they suggest that there be another priority for a utility -- the size of a particular utility's inventory of spent fuel.
Do you recall consideration of those criteria?
MS. HERRMANN: Let me just object to the mischaracterization of the document.
Go ahead and read as much of that as you need



to.
THE WITNESS: (Witness complies.)
In reading this, I see it says the contract itself establishes two priorities -- assuming this is accurate -- one for the age of the fuel and the second is from shutdown facilities. I did not recall that that was in the contract. I assume it is. But then they go on and suggest an alternative.
Q. (By Mr. Shapiro) Let me focus first on the -- on the criteria of age of the spent fuel being a criteria. Do you recall that being a criteria discussed for -- for use in the contract?
A. I now recall that it was a criteria. I did not recall that it was -- at least if this is an accurate representation -- as high a priority as it was.
Q. What's your recollection as to why that was a criteria in the contract?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: The age of the spent fuel is directly proportional to the heat of the spent fuel. The lower the heat, the greater your ability to load it into the repository in a given space. And consequently, it would make the



Department's job easier in loading and processing the fuel or waste.
Q. (By Mr. Shapiro) What about the second concept, the one being suggested by EEI, that -- that another criteria be based upon the size of a utility's spent fuel inventory? Do you recall that criteria being considered?
A. No, I can't say I do. Although, I do note that it says, "We urge the purchaser be allowed to exchange delivery commitments allowing the marketplace to deal with particular utility needs." And as we've discussed, that was something that was accepted.
Q. Let me go back to the -- to the -- the concept of -- the criteria of the age of the spent fuel.
A. And where are you?
Q. I'm actually not particularly focusing on the -- on the words of the letter right at this moment.
A. Okay.
Q. Are you familiar with the -- with the term "oldest fuel first"?
A. Uh-huh. (Witness answers affirmatively.)
Q. What's your understanding of what that term means?
A. It's another way of characterizing that the longest cooled fuel would be received first.

Page 122

THE WITNESS: Upon reading the contract, it does seem to have other dates or time frames in here, such as 12 months prior to delivery date, within 30 days, other things like that, which would indicate to me that there are other interim steps in here. It's just the main feature of the contract was to begin taking the fuel in '98.
Q. (By Mr. Shapiro) Point your attention to further down in the same paragraph that we were talking about, really the next concept, wherein in addition to there not being other milestones -- or at least that's the complaint of Edison Electric Institute -- the letter complains that the contract does not commit DOE to accept any given quantity of -- of spent fuel or -- or high-level waste.
Do you recall that complaint?
A. Where are we here in this --
Q. The top paragraph on Page 8 of Exhibit 6.
A. Uh-huh. (Witness answers affirmatively.) Oh, I see it.
I previously commented that the utilities wanted to know and have more specific information regarding difficulties, but that we were in no position to provide that.

Page 123

Q. Do you recall any discussions with utilities, back-and-forth discussions about that issue?
A. No specific discussions, no.
Q. If RW was not in a position to commit itself to a specific rate, was RW -- did you understand RW, then, to be committing itself to -- to take spent fuel that -- at a reasonable rate that would ultimately develop as you did more work?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: That would be an objective, but by no means were we in any position then to make any commitments regarding that. And it may not ever materialize.
Q. (By Mr. Shapiro) What do you mean, it may not ever materialize?
A. There could be just basic constraints on the ability of the system, receipt capability of the transport system, to move the fuel at a rate equal to or greater than its generation. I mean, I can speculate, but I won't as to what might that cause that -- reasons for that. And so consequently, although it's something that you would like to be able to have, we certainly were in no position to commit to it.

Page 124

Q. And I think I asked about a reasonable rate and you referred to a rate that was equal to or greater than the rate at which spent fuel was generated. Does that reflect your understanding that in an abstract sense, accepting spent fuel --
A. I don't recall the specific context of that. We'd have to go back and look at that.
Q. Okay. Let me just ask what -- what -- what you meant -- would you mean, then, in the abstract, if -- if RW could accept spent fuel at a rate that was -- that was at least equal to the discharge rate that that would be something that would be reasonable.
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony. Speculation.
THE WITNESS: I'm not recalling the context in which we were discussing it before. I would think that you would want to -- it would be desirable if at all possible to not only take the waste that was being generated, but to over a -- some reasonable period of time -- which I'm not sure what that would be -- you could work off the backlog. So it would have to be greater.
Q. (By Mr. Shapiro) And the countervailing pressure on achieving that rate would be the technical

Page 125

ability to do it?
A. Technical and other institutional issues that could come up. For instance, if restrictions were placed on the transport of nuclear material so that you could only move so many shipments in a month or a year, that could put a constraint on the -- on the system, as well.
Q. What sort of restrictions are you referring to?
A. Well, just to give a contemporary example, the Governor of South Carolina is refusing any shipment of plutonium into South Carolina right now. If you face challenges like that or you get states saying, You cannot ship through this state, that presents obstacles and impediments.
Q. What about institutional issues within DOE? Did you view those as something that -- that might keep you from -- from otherwise taking spent fuel at a rate that was at least equal to the discharge rate?
MS. HERRMANN: Objection. Foundation. Speculation. Vague.
THE WITNESS: I know of no institutional issues within DOE and the implementation of the Act.
Q. (By Mr. Shapiro) Let me turn your attention to

Page 126

Page 23 of -- I believe it's Attachment A to Exhibit 6. The last three Bates numbers are 906.
A. Uh-huh. (Witness answers affirmatively.)
Q. Specifically Comment 14 there.
A. Uh-huh. (Witness answers affirmatively.)
Q. Which is asking for more planning information, particularly projection of the rate at which DOE expects that it -- it will be receiving spent fuel. Do you recall that concept?
A. Yes, I do.
Q. What do you recall about that concept?
MS. HERRMANN: Objection. Vague.
THE WITNESS: I recall a concept that said we would share information with you utilities about our ability to accept fuel as that information was developed and we could make reasonable projections and commitments based upon that.
My reading of this indicates that -- if this is an accurate reflection of what's in the contract -- that it appears to me as if we were anticipating being able to provide some such information around the 1991 time frame.
Q. (By Mr. Shapiro) What was your understanding of the purpose of -- of this -- this additional

Page 127

information that DOE would provide?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: That it would allow the utilities to at least estimate some idea of when and how much fuel they may be allowed to ship to DOE.
Q. (By Mr. Shapiro) You didn't view this information as presenting a binding commitment on RW's part or on the utilities part, that this is how much DOE would be receiving?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I recall that we were all very concerned about entering into any binding obligation beyond those specifically required by the Nuclear Waste Policy Act that we -- that we were not in a position of -- of committing to or -- or at least fulfilling.
Q. (By Mr. Shapiro) And even this additional information, which might not start for several years hence into the contract performance period, projecting forecasts of the rate at which DOE would accept spent fuel, your view is that those were simply forecasts and not binding on -- on

Page 128

either party?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Well, just going by what I'm reading here, not going back and looking at its source document in the contract, it appears to me that the criteria are by no means a commitment. Criteria are just factors to be considered in ultimately coming to a commitment. So, you know --
Q. (By Mr. Shapiro) Do you have any recollection of this issue, independent of reading the various exhibits I've shown you, as to what the thought progress was of RW back in 1983 time period?
MS. HERRMANN: Objection. Vague. Compound.
THE WITNESS: Our activities then were set up -- we -- we tried to do things that would be as transparent and as useful to the utilities as we could without unduly obligating and committing the U.S. Government to activities that we didn't have total control over.
Q. (By Mr. Shapiro) Did you ever view this concept of -- of having RW subsequently project its acceptance rate as a means for RW to limit its

Page 129

obligation to accept spent fuel from utilities at a particular rate?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: At this particular point in time, I wouldn't feel as if we were limiting anything because we weren't making an obligation with regard to acceptance rate. The only obligation we felt we were making was to begin accepting waste or spent fuel beginning in '98.
Q. (By Mr. Shapiro) Now, I know you've testified that it was your understanding that eventually things would get -- at least utilities would get additional information from RW as to how fast we would be able to deliver spent fuel to RW.
Did you foresee a time when the government would be obligated to accept a certain amount of spent fuel from utilities within a particular amount of time?
MS. HERRMANN: Objection. Calls for a legal conclusion. Speculation.
THE WITNESS: Yes, I think we always anticipated that when it was clear what our capabilities were, and we felt confident enough in those capabilities, that we could commit that we



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 162

would say that we needed to have the flexibility and judgment to determine what we could and could not do, as the time got closer and we knew our capabilities.
Q. (By Mr. Shapiro) Was the intent, then, to have the acceptance of failed fuel depend on DOE's abilities to actually take the failed fuel as the time approached when DOE was actually taking spent fuel?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: We needed more information to knowing our capabilities, the impact, before we could commit to such an acceptance of failed fuel. And certainly in 1983, '84, we weren't in that position.
Q. (By Mr. Shapiro) Provided that DOE had the technical capability to handle the spent fuel, was it intended that DOE would -- would take it consistent with the -- the rate at which it was taking other spent fuel?
MS. HERRMANN: Foundation. Speculation. Calls for a legal conclusion. Asked and answered.
THE WITNESS: Yeah, I -- you know, I can't add any more than what I've already said

Page 163

about that.
Q. (By Mr. Shapiro) I'd like you to answer that question, if -- if you can.
A. Would you rephrase the question?
Q. Provided that DOE had the technical ability to accept the failed fuel at a point in time in the future, was it DOE's intent that it would take that failed fuel at a rate consistent with which it's taking other spent fuel at that future time?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion. Asked and answered.
THE WITNESS: I really can't speak to what the intent was other than to say that ultimately we would take the failed fuel, but it would be difficult -- not impossible -- to say in what relation to other fuel that we would be accepting.
Q. (By Mr. Shapiro) Is part of the reason for your difficulty in speaking to the intent is that right now you don't have a recollection as to what the intent was specifically with respect to the contract for failed fuel?
A. That certainly is part of it. The other part is as -- if I were in that position, I would want to

Page 164

maintain sufficient flexibility in my acceptance planning to allow me to deal with any circumstances that might come up 10, 15, 20 years hence. And I have no idea what those might be.
(Exhibit No. 8 marked for identification.)
Q. (By Mr. Shapiro) Mr. Lawrence you've been handed what's been marked as Lawrence Exhibit 8, which appears to be an agenda for a seminar on the Nuclear Waste Policy Act. This one is from May of 1983. The second page of this document you're listed as -- as giving a presentation on the implementation of the provisions of the Nuclear Waste Policy Act and describing the spent fuel storage program.
Do you recall this -- this presentation?
A. Not at all.
Q. Do you recall making presentations like this?
A. Yes.
Q. In fact, I think you said at a break that you made a presentation like this in Hawaii to some state attorneys general.
A. Not -- not to this degree of specificity, but, yes.

Page 165

Q. What do you tell people in sessions like -- like the one that is depicted here in Exhibit 9? I'm sorry, Exhibit 8.
MS. HERRMANN: Objection. Vague.
THE WITNESS: At this particular point in time, we probably were just saying what we were doing in -- in -- in implementing the Act.
Q. (By Mr. Shapiro) Do you recall any questions or concerns being voiced by participants in this program or similar programs?
MS. HERRMANN: Objection. Vague.
THE WITNESS: Yeah, that was very vague.
Q. (By Mr. Shapiro) Do you recall at any of these sessions where you gave oral presentations to interested parties on the Nuclear Waste Policy Act, particular concerns voiced by participants about how the Department was implementing the Act?
MS. HERRMANN: Objection. Vague.
THE WITNESS: In a very general sense, I recall that there was a desire to get the government to commit to and be as specific as possible, which we, or I necessarily, was reluctant to do because the technical basis and the information to allow us to do so just were not there. And I could not and would not commit the

Page 166

government to something which we may not be able to deliver on.
Q. (By Mr. Shapiro)
(Exhibit No. 9 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've had marked as Lawrence Exhibit 9, which has a cover letter and then has a Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-level Radioactive Waste.
Do you recall this report?
A. Not specifically, no, I don't.
Q. Do you recall it generally?
A. Yeah. The -- the title rings a bell, Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-level Radioactive Waste.
Q. What was the purpose of this report, to the extent that you recall?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: My recollection was that the utilities needed to get this money added -- the fee added to their rate base -- or the charges added to their rate base, and they needed some

Page 167

basis or documentation to take to the Public Utility Commissions to allow that to occur.
And I don't know if this is the report or whatever. But we -- if we were going to collect the fee, we needed to provide some basis for how the numbers were arrived at.
Q. (By Mr. Shapiro) So this report was intended to -- to show the relationship between the costs of the disposal program and the 1.0 mill per kilowatt fee?
A. I can't say that that's specifically what that report was doing. I was speculating to that.
Q. Let me point you to that cover letter signed by Mr. Rosselli. The second paragraph there, second sentence of that paragraph says the report "Demonstrates the methodology which will be used to evaluate whether the revenues resulting from the mandated 1.0 mill per kilowatt hour fee will be sufficient to offset the costs of disposal of commercially generated spent nuclear fuel and solidified high-level radioactive waste."
A. Uh-huh. (Witness answers affirmatively.)
Q. Does that refresh your recollection at all as to what --
A. Yeah, I think that adds -- it speaks for itself.

Page 168

Q. Is that statement consistent with your recollection of what the purpose of this report was?
A. No, it's somewhat different --
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: No, it's -- it's somewhat different than what I was implying. Although, they may still have had the same -- may have been used by the utilities for that purpose, of justifying a rate.
Q. (By Mr. Shapiro) The statement in the cover letter, does that imply to you that the purpose of this report, Exhibit 9, is more for an internal DOE purpose, to see if the 1.0 mill per kilowatt fee is in fact going to cover the costs?
MS. HERRMANN: Objection. Foundation. Speculation. The document speaks for itself.
THE WITNESS: Yeah, I -- I do not believe this was a strictly internal document. And obviously, the fact that it was sent out to the public means it did serve a broader purpose.
Q. (By Mr. Shapiro) Would you have had any role in the preparation or review of this report?
A. Yes.

Page 169

Q. What would your role have been?
A. Most likely to review it, make sure it was reasonable, the assumptions were reasonable, the basis was reasonable, and the conclusions were properly characterized.
Q. Do you have any recollection today of -- of that review and -- and any of the issues that might have come up during that review process?
A. No, I don't have any specific recollections of the report.
Q. Let me point your attention, again, to one item of interest to us. On Page 9 of the report --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- there is a table numbered Table 3-1, Key Reference Case Assumptions. The third one down refers to "Repository design receipt rates - first 5 years at 1,800 MT per year. Next 21 years at 3,000 MT per year."
Do you recall assumed design receipt rates at those levels?
A. The -- assuming this is accurate, I'd say this means we were planning on a designed capacity receipt rate of 3,000 metric tons per year for the repository. The earlier first five years, I believe that was just for illustrative calculation

Page 170

purposes here to look at the fee. It was not a -- a commitment on our part.
Q. We previously discussed the concept of a -- of a ramp-up. Would it be fair to say that the first five years at 1800 -- MT stands for metric tons, I believe -- per year. Does that first five years at 1800 metric tons represent a ramp-up?
A. No. It represents a realistic assumption that you will be less than full capacity in the first five years. And for economic analysis or financial analysis purposes, if you assume 1800 tons per year for five years, that says the initial years could be far less, the succeeding years far more, but it would average out to 1800, which might be reasonable.
Q. So over five years, a reasonable ramp-up might b 9,000 metric tons, but it wouldn't necessarily be 1800 MTU per year each of those five years?
A. Most certainly it wouldn't be.
Q. Do you have any recollection as to how these receipt rate assumptions were developed?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: No, I really don't.
Q. (By Mr. Shapiro) Are these receipt rate assumptions consistent with your recollection of

Page 171

what RW's intent was as to how fast it would ultimately start taking spent fuel?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: This document's purpose, as stated on the cover letter and title and everywhere else, was to report on the financing disposal. And I think the assumptions, as I see them here, were there to allow a financial analysis to occur. It does not reflect any contractual obligations or commitments on our part. It was just to allow a financial analysis, economic analysis.
Q. Right now I'm not asking about contractual obligations. I'm just asking for what your recollection of -- was regarding the intent as to how DOE would actually operate once it started accepting spent fuel.
And is your recollection of that intent of how fast it would start accepting spent fuel in 1998 consistent with the receipt rates that we see on this Table 3-1?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: I do not believe that

Page 172

would represent intent.
Q. (By Mr. Shapiro) Did DOE intend to take spent fuel in 1998 at a lower rate than what's shown on Table 3-1?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: In general, we would take the fuel at the rate we could safely receive, handle, and -- and dispose of it. That theoretically could be as much as 3,000 tons per year in the first year. But our experience with the start-up of any complicated nuclear facility is that you never achieve design throughput initially.
Q. Sure.
A. And it only occurred over time and as problems are resolved. So our desire would be to take it as rapidly as we could, consistent with health and safety concerns, but our realistic expectations were that it was going to be at a much lower rate initially and only over time reaching its design capacity.
Q. Let me focus, then, on the 3,000 MTU per year rate that -- that here -- starts in the 6th year. Was that 3,000 MTU rate linked to a -- to a design

Page 173

concept?
MS. HERRMANN: Objection. Foundation. Speculation. Asked and answered.
THE WITNESS: I don't recall the specific number, but assuming, the way it's written here, it is accurate, but I'm assuming we -- we were specifying at that point in time that our acceptance rate -- our design basis would be 3,000 tons per year. And that would by necessity have to assume certain things in terms of failed fuel, high-level waste from Defense purposes, and other things.
So it would be very difficult to translate that one number into a rate that utilities could ship to the repository.
Q. (By Mr. Shapiro) You referred to the -- you referred in your prior answer, I believe, to the expectation that DOE would take the spent fuel as fast as it reasonably could, given technical constraints, health and safety, that sort of thing. And that experience showed that it takes a number of years to get up to the -- the full design capacity. What -- what experience are you referring to?
A. Historical experience in the operation of nuclear

Page 174

facilities, which would go back to, for instance, the ability of the West Valley Nuclear Fuel Services reprocessing plant to receive and process fuel or our DOE nuclear facilities to get up to design capacity.
Q. How much time are we talking about, rough order of magnitude, to get up to design capacity?
MS. HERRMANN: Objection. Vague. Speculation.
THE WITNESS: I'd say anywhere from three to five years would be a reasonably successful start-up period, but, you know, there are examples where it's taken far longer.
Q. (By Mr. Shapiro) Are there any examples where it's taken less time?
A. Not that I can think of.
Q. What examples do you have in mind that have taken far longer than five years?
A. The -- the Defense waste processing facility at Savannah River, which is supposed to process their Defense liquid waste and put it into glass logs, has been in operation close to ten years now and it still hasn't reached its design capacity, to the best of my knowledge.
Q. Mr. Lawrence, I want to now turn your attention to

Page 175

Page 35 of this study. Page 35 there is a Table 6-2. It says, "Comparison of Key Parameters." There seems to be, other than this report, two other studies that are referenced, one in 1978 and one in 1980. And I'm focusing on the receipt rate issue.
Each of these have different receipt rate assumptions with them. At least -- let me start with the 1978 study. It says, "Preliminary Estimates of the Charge for Spent-Fuel Storage and Disposal Services."
Do you have any recollection of that report?
A. I don't recall that specific report.
Q. Would that report have been prepared by the office that -- where you were director of storage and transportation back in that time frame?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: It would have been prepared by the office that I was in, the broad office, and that dealing with the spent fuel storage and transport part would have fallen under my area of responsibility. But it was 24 years ago, and I don't remember it.
Q. (By Mr. Shapiro) The -- the number on that

Page 176

report, by the way, it's -- it begins DOE/ET.
A. Energy Technology.
Q. That was the broader office that you were part of?
A. Well, yeah. It would have been under -- they were one of the -- it was Assistant Secretary for Energy Technology that would have fallen into that.
Q. Do you have any recollection whether that receipt rate referenced for that 1978 study, 1800 metric tons for the first five years and then 5,000 metric tons per year afterward, any recollection of how that was derived?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I would speculate that it was based upon looking at the needs and requirements at that particular point in time, but also recognizing we had no authority or responsibility to take it at that point in time.
Q. (By Mr. Shapiro) Am I understanding correctly, that you think that -- speculating, that the rates in the 1978 report might have reflected needs of utilities at that time as compared with, let's say, the 1983 report, which is more focused on the then-current design plans for repository?

Page 177

MS. HERRMANN: Objection. Foundation. Speculation. Mischaracterization of the prior testimony. Assumes facts not in evidence.
THE WITNESS: In 1978, we were still involved with anticipate -- continuing growth of nuclear power and anticipated shutdown of commercial plants if additional storage capacity was not provided. So it was probably -- and I'm speculating -- looking to see how you could prevent that. But I have also testified that we found that every time we did this, you wait a year and the picture didn't get worse, it actually got a little better. So... (Pause.)
Q. (By Mr. Shapiro) Then the 1980 report, the one titled "Report on Fee for Spent Nuclear Fuel Storage and Disposal Services," do you have any recollection of that report?
A. Not specifically.
Q. Would that report have been prepared in the office that you were in at that time, in 1980?
A. Yes.
Q. And the number for that report starts DOE/SR. Do you recall what the SR would have stood for?
A. I would guess that it stood for Savannah River.
Q. Would you have had any role in developing that

Page 182

overview proposal that starts on the next page?
Do you recall that overview proposal?
A. No, I don't.
Q. Let me stick to the first page for just a moment, to the -- to the distribution list, to see if I can understand who the various players are.
The distribution list on that starts with Bob Morgan and then yourself.
A. Uh-huh. (Witness answers affirmatively.)
Q. Is that list of names, is that consistent with your recollection of who would have been involved in the preparation of the Mission Plan?
A. I -- I would not characterize it necessarily involved in the preparation. These were key program and policy people who would -- you know, are responsible for aspects of the implementation of the Act and so they would have been involved in certainly reviewing this document and making sure it made sense and having a hand in preparing the Mission Plan.
Q. The name one up from the bottom, Keith Klein, do you recall what his role was?
A. Keith was -- was working on the geologic repository group under Bill Bennett, was my recollection.

Page 183

Q. Let me turn your attention to a couple of concepts on the next page of the Exhibit 10. It's the Overview Proposal. It refers to the central focus of the program is that DOE will begin accepting spent fuel in significant quantities in 1998.
Do you have any recollection of that statement?
A. No, I don't recall any of the specifics of this document.
Q. Do you have any idea what would have been meant by the term "significant quantities"?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Well, in -- in reality, I would -- I would say it -- it is -- it is a clear indication that we weren't talking about just accepting one spent fuel element for disposal, but that we did intend to accept as much as we'd reasonably and safely could leading up to eventually reaching capacity, the design capacity.
Q. (By Mr. Shapiro) And there are four dashes under that -- that central focus. The third one says that "The lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel."

Page 184

Do you recall that concept?
A. No, I can't say that I do.
Q. What about the next dashed concept, that "This posture is designed to ensure that all utilities will have firm planning schedules for the disposition of their nuclear wastes sufficiently early to determine their on-site interim storage needs during the 1990s"?
Do you recall that concept?
A. I think this is in keeping with what I said earlier, that we wanted to be transparent and work with the utilities and give them as much information when we could. The time frame stated in this -- in here, by the 1990s, during the 1990s, we would have selected a repository -- the repository site for the first repository. Basically either we would be in the final licensing process or close to it and we would have a design. So we could start working with the utilities in the '90s had we been able to maintain the schedules envisioned at this particular point in time.
Q. Do you have any understanding of what the connection would be between not letting the lack of existence of a particular type of facility have

Page 185

with enabling utilities to have a firm planning schedule for the disposition of their spent fuel?
MS. HERRMANN: Objection. Foundation. Speculation. Assumes facts not in evidence.
THE WITNESS: We had always envisioned a concept where once the repository was under -- was approved and was either under construction or to be constructed, that you would need a receipt in handling capacity or a buffer storage, as referred to here, to -- between the time the fuel actually comes in and the time it goes down the shaft into the repository. So if there were some delay in some subsequent handling capability, you could still begin accepting in the buffer storage facility, but that buffer storage facility was tied to the geologic repository.
Q. (By Mr. Shapiro) Would the buffer storage facility be something at the repository itself or -- or something apart from that?
A. It would --
MS. HERRMANN: Objection. Speculation.
THE WITNESS: It was always envisioned that it would be at the repository site so you wouldn't have to transport things twice.
Q. (By Mr. Shapiro) During earlier parts of today,



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 198

remove from at-reactor storage all waste that is more than five years old.
A. Uh-huh. (Witness answers affirmatively.)
Q. Does the fact that this concept is in the December 20th draft, does that refresh your recollection at all as to the significance of that concept?
MS. HERRMANN: Objection. Vague. Speculation.
THE WITNESS: I have to admit, I doubt if there is something that could refresh my memory from something this long ago. But certainly the concept described here is consistent with my recollection of how we were trying to implement the Act so as to preclude unnecessary additional storage and unnecessary additional expense.
Q. (By Mr. Shapiro) Again, this time pointing your attention to Page 2-1, two more pages into the document. The second paragraph there says that "The Department does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998."
Do you recall that intent?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I -- I did not recall this

Page 199

provision or this portion of the -- of the strategy. Even though I would say it's consistent with my understanding of what we were trying to -- or hopeful of doing. But even as it states here, that was -- probably went beyond the original Nuclear Waste Policy Act and called for additional Congressional approval to make it possible.
Q. (By Mr. Shapiro) You needed additional Congressional approval because you might need some additional facilities?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Some of the things we were proposing, we did not have the legislative authority to do.
(Recess 4:34 - 4:54 p.m.)

(Exhibit No. 12 marked for identification.)

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, you were just handed what we've marked as Lawrence Exhibit 12. It's titled "Proceedings of the 1983 Civilian Radioactive

Page 200

Waste Management Information Meeting, December 1983." The document is dated February of '84.
Do you recall this meeting at all?
A. No, I wasn't there.
Q. Do you recall Mr. -- helping Mr. Morgan prepare for this meeting?
A. No, I don't.
Q. Let me turn your attention to the second page of this exhibit. It says, at the bottom, actually, 12. It's -- last three numbers, Bates No. 600. And the second paragraph that starts on that page says, "We are concerned with the schedule on the repository is extremely optimistic for getting to 1998."
Do you recall that concern?
A. Yes.
Q. Is that consistent with your recollection? Were you concerned that having a repository operational by 1998 was extremely optimistic?
A. I -- I've previously stated that it required a number of things to occur and the possibility that any or all of those could be delayed would jeopardize the date. So I mean, this is consistent with what I've said.
Q. I know there were things that would jeopardize the

Page 201

repository happening, but do you think it was likely that the repository would be operational by 1998 or did you think that was extremely optimistic thinking?
MS. HERRMANN: Asked and answered several times.
THE WITNESS: The '98 date was doable.
(Exhibit No. 13 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you what we've had marked as Lawrence Exhibit 13, which is titled "Statement of Michael Lawrence, Accounting Director, RW." It's dated February 22, 1984.
Do you recall this statement?
A. I remember a number of Congressional hearings, not necessarily this specific one.
Q. Is it fair to say that this document represents your written testimony to the committee?
A. Yeah.
Q. I want to turn your attention, Mr. Lawrence, to the -- I guess it's the third page of the document, although it says 2 at the top. The last three numbers are the Bates No. 228. The last

paragraph on that page says, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998."
Is it fair, then, to say that as of February 22, '84, the plan was still to accept spent fuel at a rate that would preclude the need for additional at-reactor storage after January 31, 1998?
A. Assuming we had a repository in place by January 31, 1998.
Q. And that was also part of the plan, to have a repository operational by 1998?
A. Well, the statement you're referring to says, by achieving this fundamental objective, which was beginning to accept it no later than January 31, 1998. So I was just linking those two thoughts. You can't decouple them.
Q. I think you just referred to having a repository operating by 1998 and I don't quite see that in this statement.
A. I'm sorry. You're right. It says we're beginning to accept high-level radioactive waste for safe



management, storage, and permanent disposal on firm schedule, beginning not later than January 31, 1998.
Q. So as of February of '84, taking this spent fuel as of 1998 to -- fast enough to preclude the need for at-reactor storage was not necessarily linked to having a repository operating.
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: I believe, but I would need to go look at the Act, that there were certain things that had to occur before you could start shipping and accepting waste. Although I don't recall exactly, I think it might have been things like you had a license to construct the repository. You had selected the site. A number of things had been approved.
So this statement here, in quotes, would -- I think has a number of other activities that have gone on before it that would have had to have occurred.
It then says, By achieving this objective, meaning all those predecessor events would have occurred, it says, "this will initially preclude the need for additional at-reactor storage" and



"ultimately remove all eligible waste." That -- that to me indicates some uncertainty of whether or not it would always preclude the need for additional storage.
Q. (By Mr. Shapiro) Turn your attention, Mr. Lawrence, to Page 13 of this -- of this statement. The third paragraph says that when finalized in mid 1984, the Mission Plan will be submitted to Congress. I'll represent to that you the Mission Plan was not finalized until midyear 1985. Do you recall what caused the delay in -- in finalizing the Mission Plan?
A. No, I don't. All I -- I -- I believe -- and I'm sure you can check this -- that we issued the draft -- well, I've been saying the Draft Mission Plan in May, but sometime while I was the director of the Office, which would have been between January and July.
Q. Well, I'll represent to you that it was -- it was dated April of '84.
A. Okay.
Q. And there is a --
A. So I mean --
Q. -- there is a transmittal from you dated May 2nd of '84, so you're right on.



A. Okay. Okay. Yeah, I left the program to come out here in the end of June 1984, so I -- and I really don't have any recollection or experience with what caused the delay in getting it out.
(Exhibit No. 14 marked for identification.)
Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what has been marked as Lawrence Exhibit 14, which is a memorandum on Battelle letterhead dated April 26, 1984, and subject line is MRS Institutional Report.
I want to turn your attention, first, to the third page of the document. The paragraph in the middle of the page under subject "Domenici Asks DOE to Address Environmentalists' Demands." It says, "Michael Lawrence, acting director of the waste program, said that he had discussed the same points raised by Domenici in an interview with Berick but Lawrence still says DOE believes that the 'key thing to maintain is the 1998 date as a commitment.'" That "even if full-scale operation cannot be achieved by 1998, some initial capacity could be available to receive spent fuel."
Do you recall that statement?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME II

May 21, 2002
Richland, Washington

Page 252

version of the standard contract set forth in Exhibit 7?
MS. HERRMANN: Objection. Foundation. Speculation. Standard contract is the best evidence of its contents and speaks for itself.
THE WITNESS: I'd have to read the contract to find out what the contract says. As I read this comment, however, I can understand why the utility would feel that way. But I also believe -- my belief now and I believe it would have been then, that we would not have been able to accommodate that contract, because it says to take title to the fuel as expeditiously as practicable upon request of the generator or owner. And my belief is that the Nuclear Waste Policy Act, which we were operating to fulfill, said we'd take title to it once we had an operating repository.
Q. (By Mr. Macdonald) If you would look at Exhibit 7, Page 16600, the second "whereas" clause --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- we just looked at, states that DOE has the responsibility to take title to the spent nuclear fuel as expeditiously as practicable upon the request of the generator or owner of such waste or

Page 253

spent nuclear fuel, correct?
A. Uh-huh. (Witness answers affirmatively.)
Q. Is that not the same language set forth in Exhibit 18, as requested by Alabama Power?
MS. HERRMANN: Objection. Both documents are the best evidence of their contents and speak for themselves.
THE WITNESS: No, I don't believe that accurately reflects what's in document 18, because it's -- it's preceded document -- item -- Exhibit 7, says, "following commencement of the operation of a repository to take title to the spent fuel." That provision -- that comment is not included in Alabama's comment.
Q. (By Mr. Macdonald) I believe you testified yesterday that it was DOE's intent, expectation, that a repository be operational by January 31, 1998. Is that correct?
A. That's correct.
Q. And in fact, if you would look at Lawrence Exhibit 2, the February 4, 1983, published version of the draft standard contract, if you will look at second page of Exhibit 2, the third --
A. What page is that?
Q. That's page 5458. I know the print is a little

Page 254

bit hard to read, but if you would look at the third column, about middle of the page, the last paragraph -- the last sentence of the paragraph that begins, "The proposed standard contract would establish." The last sentence of that paragraph states, "the Act directs DOE to begin repository operations no later than January 31, 1998."
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you see where I'm reading?
A. Yes.
Q. Do you agree with that statement that the Act directs DOE to begin repository operations no later than January 31st, 1998?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That is one of many things that the Act directs the DOE to do, but it also directed it to get approvals and -- and a number of other actions, prior to that occurring, which could make that impossible to do.
Q. (By Mr. Macdonald) I understand it could be impossible --
A. Yeah.
Q. -- for a variety of reasons. But you would --
A. Otherwise, it does direct the Department to do

Page 255

so -- to have a repository in operation by January 31st, 1998.
Q. And based on what we just discussed in Exhibit 7, final version of the standard contract, DOE also obligated itself to take fuel as expeditiously as practicable once that repository was operational, correct?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion. The document speaks for itself. Asked and answered.
THE WITNESS: I think the "whereas" clause we're referring to is fairly clear in what it says. Including the phrase "as expeditiously as practicable," which implies a number of considerations.
Q. (By Mr. Macdonald) I appreciate that "as expeditiously as practicable" means -- could mean a variety of things. But you would agree that, as we just discussed in Lawrence Exhibit 2, the Act directed DOE to begin repository operations by January 31st, 1998. And as set forth in Exhibit 7, DOE also is obligated take fuel as expeditiously as practicable once that repository was operating, correct?
MS. HERRMANN: Objection. Calls for a

Page 256

legal conclusion. Now it's compound. Asked and answered.
THE WITNESS: To the extent that you just quoted two statements from two documents that -- they appear to be, you know, what the documents say. But the documents themselves are -- you know, clearly state those positions.
I -- I -- I'm just -- I'm wondering how we go from a draft document to a final document. I would think that the only applicable document is the final, which is Exhibit 7.
Q. (By Mr. Macdonald) What do you understand "as expeditiously as practicable" to mean?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: That the Department would not unduly restrict or delay receipt and transfer of fuel; that it would -- if it had the ability to do so, it would begin accepting waste according to the priorities and the -- the acceptance criteria that was to be laid out, and would do so once it knew just what its capabilities, in terms of receipt, were.
Q. (By Mr. Macdonald) When you say, "it would not unduly delay receipt and transfer of fuel," do you

Page 257

mean -- I guess, what do you mean? Where there would be no technical barriers to the receipt of fuel?
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: Would you repeat the question.
Q. (By Mr. Macdonald) You testified a minute ago that you understood "as expeditiously as practicable" to mean that the Department would not unduly restrict or delay receipt and transfer of fuel. Do you recall that testimony?
A. Yes.
Q. I'm just trying to understand what you mean by the Department would not unduly restrict or delay receipt and transfer of fuel.
A. As an example, if a fuel shipment was very low on the priority list and there were higher priority shipments out there, that would -- that would classify as higher priority shipments would be out there, but for whatever reason they weren't going to be shipped, then the government would move to -- to -- to go down on the priority list and take fuel earlier.
Q. Was it DOE's intention to accept fuel once the

Page 258

repository was up and running at its design rate?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion. Asked and answered.
THE WITNESS: I've already testified that the design rate was something we knew would not be achieved initially and it would take time to get to it. And no matter what the design rate was, it was always our -- our receipt would always be driven by our physical capability to safely receive and -- and process the waste.
Q. (By Mr. Macdonald) I understand you testified about a reasonable ramp-up period that you characterized, if I remember from yesterday, around three to five years. Is that correct?
A. That was -- that was an estimate that we used for planning purposes only. But that was used.
Q. Did you believe that a three- to five-year ramp-up was a reasonable ramp-up period?
MS. HERRMANN: Objection. Foundation. Speculation. Asked and answered repeatedly yesterday.
THE WITNESS: Based upon technical judgment some 15 years ahead of the fact, it appeared at that time a three- to five-year ramp-up was a reasonable amount of -- rate of

Page 259

time.
Q. (By Mr. Macdonald) Did you understand DOE to have an unconditional obligation to begin accepting spent fuel on January 31st, 1998?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: As I understand the question, absolutely not.
Q. (By Mr. Macdonald) And why do you say that?
MS. HERRMANN: Same objections.
THE WITNESS: Because I felt the Department could only receive the waste once we had a repository licensed and in operation.
Q. (By Mr. Macdonald) So in your view, until DOE had a repository licensed and in operation, it had no obligation to accept spent fuel?
MS. HERRMANN: Objection. Calls for speculation.
THE WITNESS: It was my belief that the contract which we signed did commit the government to begin accepting title to the fuel and take responsibility -- begin taking title to the fuel by January 31st, 1998. But we did not know then at what rate that could be or what that would ultimately entail.

Page 260

Q. (By Mr. Macdonald) When you say "begin accepting title to the fuel," are you positing that that would have been done possibly at the reactor site?
MS. HERRMANN: Objection. Speculation. Asked and answered yesterday.
THE WITNESS: That was a possibility.
Q. (By Mr. Macdonald) And you felt that was a possibility consistent with the Nuclear Waste Policy Act and the standard contract?
MS. HERRMANN: Same objections. And now it calls for a legal conclusion.
THE WITNESS: I would have to state I believe the contract has to speak for itself. My personal views and opinion don't alter anything in the contract. I did believe then and now that when we entered into these contracts, we were committing to have a capability or take responsibility by '98. But I also was concerned then, as I am now, that we could not and did not make any commitment as to the rate at which we would be able to begin taking responsibility and ownership of the fuel.
Q. (By Mr. Macdonald) I'm not sure that answers exactly the question I asked. And I'll rephrase it because I'm not sure you liked the question,

Page 261

but I'll --
With respect to the standard contract, did you believe that taking title of the spent fuel at the reactor site was consistent with the Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, I don't believe that was consistent with the intent of the Nuclear Waste Policy Act. The intent of the Nuclear Waste Policy Act, in my opinion, was for us to have a repository in operation by January 31st, 1998. And all of the other provisions of the Act and subsequently the contract were based upon that premise.
MR. MACDONALD: Take a five-minute break?
MS. HERRMANN: Sure.
(Recess 10:27 - 10:35 a.m.)
(Exhibit No. 19 marked for identification.)

EXAMINATION (Continuing)
BY MR. MACDONALD:
Q. Mr. Lawrence, I've had marked for identification

Page 262

as Exhibit 19 a draft memorandum to Michael J. Lawrence and it is from Robert M. Rosselli, and the subject is "Use of Reference Case Assumptions as the Technical/Costing Baseline for OCRWM's Program." Is that document before you?
A. Yes.
Q. I appreciate that this is a draft document. And if you turn to Page 4, 5, and 6 you'll see some handwritten notations. And at the top it states, "Rosselli Comments, Version 2 of 24 February '84." And in parentheses, "(Editorially revised by Head)."
Do you see that --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- notation?
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you know if those are Robert Rosselli's handwritten comments?
A. Umm, I can't -- I can't say whether those are Bob's or not. I get the impression they're Charlie Head's, but that would just be a guess on my part.
Q. What gives you that impression?
A. Well, for one thing it says, "Editorially revised by Head." And I am going to speculate that

Page 263

whoever did that made the -- was Head and made these comments.
Q. Did Charlie Head work for Bob Rosselli?
A. Yes, he did.
Q. As of February of 1984, did Bob Rosselli work for you?
A. Yes, he did.
Q. Do you recall whether you've ever seen Exhibit 19 before?
A. I can't say that I do recall having seen this before.
Q. Having now looked at the document, do you understand what purpose Exhibit 19 was intended to serve?
MS. HERRMANN: Objection. Foundation. Speculation.
Take as much time as you need to read the document.
THE WITNESS: (Examination of documents.)
My reading of the document would lead me to believe that it was to provide assumptions for -- that were then used in what ultimately resulted in Exhibit 17, "Nuclear Waste Fund Fee Adequacy: An Assessment. Second Annual Report."

Page 264

Q. (By Mr. Macdonald) So you believe that Exhibit 19 was an effort to set forth the baseline assumptions that would govern the July 1984 fee adequacy assessment?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Exhibit 19 states that OCRWM is obligated to produce a Congressionally mandated fee adequacy report by July 7, 1984. And so consequently, this paper does appear to be establishing the baseline for that report or seeking approval of assumptions used in preparing that baseline report.
Q. (By Mr. Macdonald) Is it consistent, based on your experience in RW, that before a report like Exhibit 17, the 1984 fee adequacy assessment, was distributed, that a set of assumptions would be circulated to you as acting director?
MS. HERRMANN: Objection. Vague.
THE WITNESS: It would be -- I would expect that the assumptions used in that report would have been presented to me in some form, either verbally or in written memo, for my agreement prior to proceeding with all of the effort necessary to produce that report.

Page 265

Q. (By Mr. Macdonald) And before they -- before the assumptions for the report like the July '84 fee adequacy assessment were publicly distributed, you would have agreed or signed off on those assumptions?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I would have felt that in a general sense, they were -- the assumptions were adequate for the purpose of the fee adequacy report.
Q. (By Mr. Macdonald) So the record is clear, the Bates numbers on Exhibit 19 are MOV.19990831.0061.
MS. HERRMANN: So the record is more clear, I don't think the official exhibit or my copy have a Bates number.
MR. MACDONALD: It's at the top center of the document.
MS. HERRMANN: Thank you.
MR. MACDONALD: And I believe that Bates notation is only on the first page, which is how the document was produced to us.
Q. (By Mr. Macdonald) If you would turn to Page 2 of Exhibit 19, Mr. Lawrence.
A. (Witness complies.)
Q. The first sentence states that "These proposed

Page 266

reference case assumptions have been reviewed by all of the OCRWM offices and each concurs that these assumptions accurately represent the current program baseline."
Do you see where I'm reading?
A. Yes.
Q. Just a moment ago you testified that the assumptions would be adequate for the purpose of the fee adequacy report. Do you remember that?
A. I believe I prefaced that by saying "in general."
Q. Does this suggest that the assumptions would represent the current program baseline?
MS. HERRMANN: Objection. Foundation. Speculation. The document speaks for itself.
THE WITNESS: I really can't answer that because this is a draft memo that never -- at least -- I don't know what the final version said. And it's -- without some indication of concurrence from the other, that might be what they're saying here, but it may not actually represent the facts. So I -- I have no way of -- of assessing that.
Q. (By Mr. Macdonald) Do you understand or have any reason to believe that the assumptions that ultimately went into Exhibit 17 were not the current program baseline as of the date of

Page 267

publication of the fee adequacy report, July of 1984?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: In looking at Exhibit 17, I see at least one thing which would lead me to believe it was -- numbers used there as assumptions were not the programmatic baseline, but may have been used for economic analysis purposes.
Q. (By Mr. Macdonald) And what numbers suggest that to you? What aspect of Exhibit 17, the assumptions -- and for the record, we're looking at Page 3 of Exhibit 17.
A. In particular, and as I testified yesterday, the receipt rates stated in that document. Assuming 1,800 metric tons yearly for the first five years, I do not believe represent an accurate or a practical ramp-up of receipt rates. But also, as I testified yesterday, my assumption or speculation was, is that they were -- these numbers were used here to be the same as numbers used in a previous economic analysis and would be sufficient for the purpose of this document, which was just to assess the adequacy of the fee.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 292

A. Uh-huh. (Witness answers affirmatively.)
Q. It then states, "In the event of a delay in the availability of the repository, the Department plans to provide the capability to accept waste at the reactor site in accordance with the waste acceptance schedule so that utilities will not be required to continue adding additional storage capacity beyond 1998."
A. Yes.
Q. Do you see that?
A. Uh-huh. (Witness answers affirmatively.)
Q. And I know we've just been talking about this concept, but, again, there's no suggestion here that DOE believed this was unauthorized, is there?
MS. HERRMANN: Objection. The document speaks for itself. Compound.
THE WITNESS: You know, I don't want to get into semantics, but it does say "plans to provide" instead of "the Department will provide." And that does indicate some ambiguity on my part -- on the part of this document as to what would occur. Because as I've previously testified, and I remain thinking, I do not believe we had the authority to do that.
Q. (By Mr. Macdonald) If DOE didn't have a

Page 293

repository available in 1998, were there any options available to DOE absent Congressional action to deal with the storage problem?
MS. HERRMANN: Objection. Vague. Calls for a legal conclusion.
THE WITNESS: It's my opinion that at that point in time, there was no option to it.
Q. (By Mr. Macdonald) DOE had no other options except the repository absent Congressional action?
MS. HERRMANN: Calls for a legal conclusion. Asked and answered.
THE WITNESS: That's my recollection and understanding.
(Exhibit No. 21 marked for identification.)
Q. (By Mr. Macdonald) Mr. Lawrence, I've had marked as Exhibit 21 excerpts from Volume II of the 1984 Mission Plan. I believe we already have marked as another exhibit, Exhibit 15, excerpts from Volume I of the Mission Plan.
Do you have that document before you?
A. Yes, I do.
Q. And again, this was the document that you were responsible for issuing when you were acting

Page 294

director, correct?
A. That's correct.
Q. And if you would turn to Table 9.2. It's on Page 9.5.
A. (Witness complies.)
Q. This table contains a waste acceptance schedule that we've discussed previously; is that correct?
A. That's correct.
Q. And that waste acceptance schedule shows a ramp-up beginning in 1998 of 400, 400, 400, 900, 1,800, 3,000; is that correct?
A. That's correct.
Q. I believe yesterday you testified that you reviewed the Draft Mission Plan to ensure that it was reasonable, practicable, and doable. Do you recall that testimony?
A. In general I recall that testimony. But I also recall saying for a planning document.
Q. But for a planning document, you believed that the rates contained in here were reasonable, practicable, and doable at the time as of --
A. At that time --
Q. -- April of 1984?
A. At that particular point in time. But also as I testified yesterday, in terms of acceptance rate,

Page 295

we would really not be able to firm that up until we had designs and more information in place and anticipated that would be -- and I believe the contract indicated -- that would be something that would be done later in the process.
Q. Do you know if the design rate for the repository -- the design receipt rate after ramp-up is still 3,000 MTU?
MS. HERRMANN: Objection. Foundation. Mr. Lawrence is not a 30(b)(6) witness.
THE WITNESS: Yeah, I have no idea what the current assumptions are.
Q. (By Mr. Macdonald) If you would turn to Page 9.6 of Exhibit 21.
A. (Witness complies.)
Q. And Paragraph 9.4 is entitled "Waste-Acceptance Schedule and the Need for Interim Storage. And it states that "Waste acceptance at the first repository is scheduled to start in 1998. The waste-acceptance schedule for the first and the second repositories is given in Table 9.2."
And you recall that was the acceptance rate and Table 9.2 is what we just discussed?
A. Uh-huh. (Witness answers affirmatively.)
Q. The statement continues, "The at-reactor storage

Page 308

Q. Now, a utility who was looking into the future and seeing what their storage needs were, they would need some sort of lead time to be able to plan to add additional storage if it was anticipated that pickup would begin at a lower rate or wouldn't begin at all in 1998?
A. That's correct.
Q. Do you know how long that lead time would be for a utility if they wanted to add additional dry storage on their site, for example?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: It's difficult to say with any accuracy what that would be, because it would require licensing actions and -- and other activities. But this -- in general, we knew we wouldn't be in a position to give them more information until sometime in the '90s, assuming a '98 opening, and that they would have to plan accordingly prior to that time. And even once we did give them that information, they needed to plan accordingly.
Q. (By Mr. Tompkins) So the utility could be in a position where they should plan for additional at-reactor storage that they never build?
A. Yes.

Page 309

Q. Was this ever communicated to the utilities?
A. I don't have a specific recollection, but I know that we felt and I -- and I believe communicated, but I have no specific recollection, that, you know, the utilities were responsible for the fuel up until the time we took title to it and they had to plan accordingly and provide sufficient storage to -- for the continued operation of their reactors.
Q. The utilities and the Department, however, were aware of a date that -- 1998 that was set in the Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I assume. We certainly were aware of the date set in the Act, but a date set in the Act did not mean that the physical, you know, repository would in fact be in place by then. That was our intent and that was our plan. Everyone in this business knows that plans can often change.
Q. (By Mr. Tompkins) In that case, what was the intent of putting a date in the statute? I mean, was -- was it your view or the Department that in passing the Nuclear Waste Policy Act in 1982, Congress, at the very least, put the Federal

Page 310

Government in a position where a policy was disposal would begin in 1998?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: The date in the Act was clearly a date that Congress wanted the Department of Energy to meet. But the Congress also put a number of provisions and activities and precursor events that had to occur, I assume with full recognition that if those dates weren't met, that it would make it difficult to meet the '98 date. But they were all prerequisites.
Q. (By Mr. Tompkins) I'd like to go back to Lawrence Exhibit 13. Back on Page 2 again, which is Bates No. PNL-173-0228, I believe you previously testified this quote here in the middle of this page was something that came from the Nuclear Waste Policy Act.
A. That's my assumption.
Q. What is your interpretation of what a "firm schedule" means, as -- as it appears in this quote?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: I can't say for certain

Page 311

what Congress meant when they wrote "firm schedule," but in our reading of that, we wanted to lay out a schedule which was expeditious but doable; that we had every intent when we wrote the schedule or the plan of being able to meet.
Q. (By Mr. Tompkins) I'd like to call your attention back to Lawrence Exhibit 15, which is the April 1984 Draft Mission Plan, Volume I.
A. Uh-huh. (Witness answers affirmatively.)
Q. Back on Page 2-1, we already talked about the first paragraph quite a bit. The first sentence in the second paragraph states that "This approach is designed to ensure that all of the owners and generators of spent nuclear fuel and high-level wastes will be able to establish firm planning schedules for the disposition of their radioactive wastes sufficiently early to determine their on-site interim storage needs."
The reference to "firm planning schedules" in this paragraph, would your interpretation be that -- that this is -- this is the same firm schedule that is being referred to in the excerpt that we just talked about of Lawrence Exhibit 13?
A. No, I would not.
Q. Why is that?

Page 312

A. Well, in the earlier case, the quote from the Nuclear Waste Policy Act was calling for a firm schedule for the siting and -- and licensing and construction and operation of a repository. And this is referring to a firm planning schedule for the actual actions of -- the utilities would have to take leading up until the time they could deliver it -- or it would be taken into custody for disposal.
Q. This statement in quotes on Lawrence Exhibit 1[illegible] however, does begin with the statement, "to accep[illegible] high-level radioactive waste"?
A. But the subject of these two activities are different. In the one case, it's for the government to establish a schedule for a repository. And this is to allow the utilities to have a schedule for the management of their waste. So even though the end date or objective is the same, the activities which those parties would have to take are different and therefore their plans would be different.
Q. What would be different about those activities?
A. Well, the activities that -- that the Office of Civilian Radioactive Management was to do was t[illegible] have site -- site selection process and then, you

Page 313

know, go through what is actually occurring right now with nominating a site and the state vetoing it and overcoming the objections and then completing a design and submitting a license application.
All of those -- and leading up to then, construction, cold testing, hot testing, final license and then opening. Okay? Those are -- are some of but not all of the steps necessary in the plan that were to be laid out to have a repository in place by January -- by January 31st, 1998, and would be part of the firm plan -- planning schedule it referred to in the Nuclear Waste Policy Act.
In this document, the firm planning schedule for the disposition of their radioactive waste, referring to -- here the subject is the owners and generators of spent nuclear fuel and high-level waste -- the actions they would have to take are to ensure that they had adequate and sufficient interim storage capacity up until the time based upon their contract and their -- the waste acceptance -- or the waste delivery schedule established in the contract that they could expect the government to take the waste and transport it

Page 314

to a repository.
So they are two very different set of actions.
Q. You just referred to the waste delivery schedule that was established in the contract. Where -- where would a utility go to find this -- this information?
A. This may take a while.
MS. HERRMANN: I'm going to object that the standard contract is the best evidence of its contents.
THE WITNESS: (Examination of documents.) Well, at least in part, in the standard contract that's included in Exhibit 7, under Article V, Paragraph B, Delivery Commitment Schedule, it discusses a delivery commitment -- delivery commitment schedule and a process for submitting and approval of such schedule. And it is that delivery commitment schedule and -- and, ultimately, if the approved and agreed-to delivery commitment schedule, which would dictate what the utility had to do to provide for adequate storage up until the time it could ship fuel according to this schedule.
Q. (By Mr. Tompkins) I thought you testified

Page 315

yesterday that delivery commitment schedules in your opinion were for planning purposes and that even at this date, as specified in the contract, the Department was still not willing to commit to specific rates or allocations of -- of fuel acceptance.
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: Yeah, what I recall I said was we were certainly in no position in 1983 or '84 to commit to a schedule. But what I'm reading from here, in the contract, that talks about a process that will happen and it anticipates beginning on the order of 63 months after the time this is established.
The contract speaks for itself and clearly talks about a process in the future whereby a delivery commitment schedule would be established.
Q. (By Mr. Tompkins) Didn't you testify yesterday -- and I'm sorry, I don't have a copy of all of the exhibits, however, there was a draft contract yesterday that we discussed. And it actually had a definition of delivery commitment schedules. Do you recall that? I think it's Exhibit 1.
A. I think it's Exhibit 2. Standard contract --