Page 316

Exhibit 1 is EEI's unsolicited comments on the contract.
Q. Actually, I -- Exhibit 1 is a -- is a marked-up draft that EEI must have received and then made comments on. Is that -- is that correct?
A. I -- I don't know.
Q. Okay.
A. Is your comment reflected -- referred to Exhibit 1?
Q. Exhibit 1, yes, I believe so.
A. And would you repeat the question?
MS. HERRMANN: Off the record for a second.
(Off the record discussion.)

Q. (By Mr. Tompkins) I'd like to refer your attention to Page 4 of Exhibit 1, which is Bates No. SN048687.
A. Uh-huh. (Witness answers affirmatively.)
Q. Section B here states Schedule for Delivery Commitments. And we -- I believe with Mr. Shapiro yesterday you -- you discussed that the statement under B, 1, and the last section of this sentence, "if approved by DOE, shall become a part of this contract. Such delivery commitment shall

Page 317

specify."
Maybe I -- maybe I misheard, but my impression was yesterday you indicated that this was something that you did not want to do and in fact that was why this particular statement didn't make it into this final version of the final contract reflected in Exhibit 7.
MS. HERRMANN: Objection to the extent that it mischaracterizes his testimony. Foundation. Speculation.
THE WITNESS: I don't recall the specific context of the discussion nor the specific answer that I gave at that time. But I believe what I was -- what I was trying to convey was that we weren't in a position in 1983/'84, to commit to a specific delivery schedule; that that was something that would have to be done much later in -- in time, but prior to the opening of the repository. And consequently, a process needed to be described in the contract that would allow as more information became available and -- and we got closer to the actual transfer date, that the -- that the information could be -- could be conveyed and approved such it became a contractual commitment.

Page 318

Q. (By Mr. Tompkins) This particular section in this draft contract is not in the final version of the contract, though, is it?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I'd have to go through the contract as -- as approved in the Federal Register to see what is and what is not in there. I don't know. However, I referred early to a provision in the contract which calls -- which describes a delivery commitment schedule, which seems to serve the purpose of establishing a delivery schedule, and have that schedule as part of the contract.
I also note that from the dates and time frames here, that it envisions that that delivery schedule could only be firmed up or become a reality and part of the contract on an order of a year to several years prior to the actual ability of the government to take -- to take the waste.
Q. (By Mr. Tompkins) I'll refer you to -- I'll refer you to Page 16601 of --
A. Of what?
Q. -- Lawrence Exhibit 7.
A. Okay. What page?
Q. 16601.

Page 319

A. Okay.
Q. In the middle column, beginning on part (b) Article -- Article V, Subpart (b)1.
A. Uh-huh. (Witness answers affirmatively.)
Q. This particular section here does not include the same language stating that the DCS shall become part of this contract; is that correct?
MS. HERRMANN: Objection. The document speaks for itself.
THE WITNESS: I mean, I just know what it says here in the actual contract which was approved.
Q. (By Mr. Tompkins) Right. Does it contain the statement in the approved version?
A. Could you repeat the question?
Q. Does this approved version contain this same language that -- that the DCS will become part of the contracts?
MS. HERRMANN: Objection. Document speaks for itself.
THE WITNESS: Well, Article V, Section (b) is part of the contract, as I -- as I understand it. So I -- as such, I think it's --
Q. (By Mr. Tompkins) I'm trying not to be too confusing, Mr. Lawrence. I'm sorry.

this letter, though, before you signed it. I do see that it has your signature on it.
A. I certainly would have read the letter before signing it.
Q. And would you have agreed with its contents before signing it?
A. Based upon my knowledge at that time, I -- I would believe that whatever I put in this letter and signed would reflect my views or what I reasonably expected to be accurate.
Q. Now, this letter is addressed to Mr. Ben Rusche, a director. Was he the director at this point? You had left, obviously, and gone to Richland, but --
A. Yes, we've already established that he was the first director of the Office of Civilian Radioactive Waste Management, who was, you know approved by the Senate.
Q. Comment No. 2, the second sentence states, "If title to the fuel passes to the DOE on January 31, 1998, as implied in the DOE/utility disposal contracts, the financial responsibility for this post-1997 storage could rest with DOE. This cost has not yet been considered in the Nuclear Waste Fund Fee Adequacy Analysis."
Did this comment reflect your viewpoint at



this time?
MS. HERRMANN: Objection. Calls for a legal conclusion. Relevance. Speculation.
THE WITNESS: This -- reading this section -- or this comment No. 2, it states an implication, therefore not a -- a specific, but an implied or an implication of the contracts. And points out that these are costs that were not in the nuclear waste fund fee adequacy analysis that we, I think, have here as document, Exhibit 17.
Q. (By Mr. Tompkins) This Statement 2, however, does imply that someone at Richland was concerned that DOE would be responsible for storage after January 31, 1998 -- financially responsible?
MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion.
THE WITNESS: It would indicate to me that someone raised the possibility that if the government was responsible for storage after 1998, that the costs would be significant and that cost had not yet been put into the fee adequacy analysis.
Q. (By Mr. Tompkins) Well, the statement specifically implied in the DOE/utility disposal contracts. That's on the top of Page 2.



A. Uh-huh. (Witness answers affirmatively.)
Q. So this is inferring that -- that DOE has responsibility for these costs under the standard contract?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, I would not characterize it the way you did.
Q. (By Mr. Tompkins) How would you characterize it?
A. I would say if the DOE were to -- I think it means there's an uncertainty here. Because I cannot -- because I would assume all costs that we knew would be incurred would be put into the fee adequacy report. And so they're drawing attention to the fact that there is uncertainty or could be uncertainty about the costs for this additional storage, and therefore drawing attention to Mr. Rusche, that that is something that should be considered.
I'd go further. That my recollection is that although we knew that a goal -- or we established as a goal for the Department was to preclude the need for building additional at-reactor storage after we began accepting the waste, that was a goal which we couldn't guarantee and could not



commit to take the fuel such that that would not occur.
Now, one possible -- and I'm just speculating here -- but one possible explanation is, from the time I left and Mr. Rusche came on board, Mr. Rusche being a -- the -- a full -- fully appointed and approved director of the Office of Civilian Radioactive Waste Management, may have been stating services or capabilities that he now wanted to bring to the program that went beyond what was in our original -- what was in the Mission Plan in April of '84.
And I recall -- I'll call your attention to Exhibit 16, which states, basically he wanted to do something which was further -- or beyond what I was talking about. So consequently, if subsequent to Mr. Rusche being confirmed and coming into position as director, he had contemplated the possibility of the government assuming a contractual responsibility for all fuel and storage post '98, it would seem reasonable to point out what the cost of that assumption or desire could be so that he could factor into -- that into his consideration.
But what it says here doesn't change what's

in the Mission Plan, and it certainly doesn't change what's in the contract.
Q. But this statement specifically says, "as implied in the DOE/utility disposal contract." It doesn't -- it doesn't reference any -- any new policy imposed by Mr. Rusche.
MS. HERRMANN: Is that a question?
Q. (By Mr. Tompkins) Does it?
MS. HERRMANN: Objection. Speculation. The document speaks for itself.
THE WITNESS: Well, I -- I -- I'm going to speculate that the use of the word "implied" is clear and that it doesn't say as "stated in the disposal contract" or "as required in the disposal contract." Implied means that it is something not clearly and specifically spelled out.
If I felt it was a contractual obligation, I do not believe I would have used the word "implied."
Q. (By Mr. Tompkins) And yet someone, either the person that wrote this letter for you or you at this time, recognized that that was the implication from the contract, even if it wasn't clearly stated?
MS. HERRMANN: Objection. Calls for a



legal conclusion. Speculation.
THE WITNESS: I can't recall what -- what would have been going through my mind at this point in time.
Q. (By Mr. Tompkins) Moving to the first enclosure attachment to this letter, enclosure one, which at the top is titled "RL Comments on Draft Mission Plan."
Could you read, for now, just the -- the paragraph under Item No. 3.
A. (Witness complies.) Okay, I've read 3.
Q. Okay. We had talked briefly -- or actually at some length earlier about the -- the goal of precluding the need for additional at-reactor storage. In this first paragraph under No. 3, the third sentence, I believe, in states that "This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998."
Doesn't this statement imply that it was actually the intent and goal of the NWPA to preclude the need for -- the need for additional at-reactor storage and not just a goal of the Department?
MS. HERRMANN: Objection. Calls for a



legal conclusion. Document speaks for itself.
THE WITNESS: I think the statement is rather clear. And I would specifically note the use of the word "intent" rather than "requirement."
Q. (By Mr. Tompkins) Well, certainly in trying to implement the NWPA, DOE was -- and RW was -- was charged with -- was implementing Congress's intent. Is that true?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: Clearly we were charged with carrying out the requirements of the law and, to the degree we possibly could, to meet the intent of the law, to the best we could discern it and the best we could do it.
Q. (By Mr. Tompkins) Well, the intent of the law is reflected in the requirements, is it not?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes. And to the best of my knowledge, the Act does not say it is a requirement of this Act that facilities be provided such that no additional storage capacity is necessary. But I don't recall that specially.



Q. (By Mr. Tompkins) But this intent, as reflected here in this document, conflicts with the requirements of the Act?
MR. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I would have to reread the Act, but I believe this intent goes beyond the requirement of the Act.
Q. (By Mr. Tompkins) There is no provision in the Act, however, that the intent was not to preclude the additional -- was not to preclude the need for additional at-reactor storage?
MS. HERRMANN: Objection.
THE WITNESS: There are too many negatives in there. Could you repeat the questions?
Q. (By Mr. Tompkins) Sure. I'd be glad to.
There's -- there aren't any provisions in the Act which state that the purpose of the Act is not -- is -- I'm sorry. Yeah.
A. Yeah.
Q. This is getting a little out there.
The Act does not contain any provisions which state that the purpose of the Act is anything other than to preclude the need for additional

Page 336

at-reactor storage?
MS. HERRMANN: Objection. Calls for a legal conclusion. Nuclear Waste Policy Act is the best evidence of its contents.
THE WITNESS: There's still too many negatives in your question for me to understand it. I would maybe try to offer some helpful -- it might be easier to say that there is no provision in the Act requiring the Department to ensure that additional storage space is not required by the utilities after 1998.
Q. (By Mr. Tompkins) Well, there's -- there's nothing in the Act that's -- that states that DOE's mission is anything other than to -- to preclude at-reactor storage?
MS. HERRMANN: Objection. Calls for a legal conclusion. Best evidence.
THE WITNESS: My recollection and understanding was that Congress in passing the Act wanted to ensure a system was in place to safely dispose of nuclear waste by 1998. It was also my understanding that many of these supporters of the Act felt that a benefit of doing so would be to preclude the need for additional and costly at-reactor storage to be provided. And therefore,

Page 337

by having a repository in place by '98 and to begin accepting waste by '98, it was hoped that additional storage at reactors could be precluded.
In the Mission Plans, both drafts that we've looked -- talked about, it states that the Department sought to provide capability such that additional storage would not have to be provided. All of those, I think, are reflected in writing in the exhibits we've got here.
But having said that, I saw nothing in those documents that said it was a legal requirement of the Act that that be the case.
Q. (By Mr. Tompkins) This statement here, though, does link up that goal with the Act and the purpose of the Act.
A. It links it up with -- via the word "intent," which to me implies that it was something desirable but not a specific requirement.
My belief is I would have used the word "requirement" because it's a much stronger word and -- and something that -- certainly conveys much more of a commitment or an obligation than the word "intent."
Q. This paragraph goes on to discuss the appropriate acceptance rate to achieve that goal.

Page 338

A. Uh-huh. (Witness answers affirmatively.)
Q. Again, it states that the acceptance rate should start at 2800 MTU per year and increase to 2500 MTU per year in six years rather than starting at 400 MTU per year and increasing to 3,000 MTU per year.
A. Uh-huh. (Witness answers affirmatively.)
Q. Are you aware of where these numbers would have been generated or how they would have been calculated?
MS. HERRMANN: Objection. Foundation and speculation.
THE WITNESS: I don't recall specifically, but that is the type of information that we relied upon PNL to provide. And consequently, since the '84 Mission Plan -- Draft Mission Plan had the acceptance rate, which we've previously discussed, at the buildup, this would have been drawing attention to the fact that what was in the Mission Plan, and the stated objectives in the Mission Plan, resulted in an -- in an inconsistency.
Q. (By Mr. Tompkins) It implies that the -- the ramp-up in the Mission Plan, which started at 400 MTUs, was insufficient to preclude more at-reactor

Page 339

storage during the first five years.
MS. HERRMANN: Objection to the characterization of what's written in the document. The document speaks for itself.
THE WITNESS: This statement is commenting on a draft plan and saying that based upon the analysis that was conducted by individuals here, they felt that it was insufficient.
Q. (By Mr. Tompkins) The -- the second paragraph, first sentence, makes a reference to selective acceptance of spent fuel only from reactors having difficulty maintaining a full core reserve.
A. Uh-huh. (Witness answers affirmatively.)
Q. What is full core reserve?
A. Full core reserve is the amount of space that the utility needs available in its spent fuel storage basin to accommodate the capability to discharge all the fuel that is in the core of the reactor at any given time. It is considered a desirable but not essential capability. Its impact, if not available, is that a utility could have a protracted outage if it needed to remove the fuel from its reactor to do any repairs or work necessary. And it was therefore something that

Page 340

many utilities sought to have as somewhat of an insurance policy.
Q. We discussed earlier that RW would be inclined to grant priority to an operating reactor that had some sort of emergency that would preclude it from continuing to operate. Would maintaining full core reserve be this type of emergency that we were speaking about earlier?
MS. HERRMANN: Object to the mischaracterization of prior testimony.
THE WITNESS: No, I would not view that as being an emergency situation.
Having said that, my recollection -- and I'm not certain of this; I -- it's been too long. But I believe there might have been a situation, an isolated situation, or certainly a limited number of situations, where perhaps the -- the operating procedures of a reactor called for full core reserve capability or a requirement of operation costs. But in general, that was not the case, and therefore it would not constitute an emergency.
Q. (By Mr. Tompkins) Moving to the final paragraph. I'll give you a chance to read it first.
A. I have read it.
Q. Okay, you've read it.

Page 341

The second sentence here says, "Assuming DOE would be financially responsible for the additional spent fuel storage after 1997, as reflected in the 17 year excess in the 'remaining backlog' of Table II-1, something on the order of one billion 1983 dollars would be required for this additional interim storage at power reactor."
Do you know if this estimate back in 1983 was accurate?
MS. HERRMANN: Objection. Beyond the scope of this deposition. Objection. Calls for a legal conclusion. Objection. Speculation. Foundation.
THE WITNESS: Based upon the fact that that number is in an enclosure to a document that I signed and sent in, I have no reason to doubt that it was a reasonable estimate based upon the assumptions stated in the paragraph.
Q. (By Mr. Tompkins) Like the text of the letter that we looked at just a little while ago, this comment here also evidences someone's recognition that DOE could be financially responsible for additional storage required after 1997; is that correct?
MS. HERRMANN: Objection. Calls for a

Page 342

legal conclusion. Asked and answered.
THE WITNESS: Could you repeat the question?
Q. (By Mr. Tompkins) This statement evidences that someone at RW, or at the Richland Operations Office, was concerned about the cost of additional at-reactor storage at reactors after 1987, if -- if the '98 date wasn't -- wasn't met, and reflected DOE's potential responsibility for that -- for that amount.
MS. HERRMANN: Same objections and now it's compound.
THE WITNESS: That would not reflect my -- the way I would characterize that. I would -- I would say that this is drawing attention to a potential cost based upon certain assumptions. It is not stating anything in definite or absolute terms whatsoever.
Q. (By Mr. Tompkins) But your interpretation of this comment is reflected in the -- in the cover letter you sent along in -- in Comment No. 2. Again, I don't mean to go back to this again and again, but it says, the fuel passage -- "as implied in the DOE/utility disposal contracts."
MS. HERRMANN: Is that a question?

Page 343

Q. (By Mr. Tompkins) So RW was recognizing that this financial responsibility may -- may rest on DOE and not the utilities?
MS. HERRMANN: I'm just going to object because the two -- to the mischaracterization, because the two passages don't appear to have anything to do with each other.
But if you can, go ahead and answer.
THE WITNESS: I'm having some difficulty because what this document represents are comments provided by individuals and organizations, not part of RW commenting on a document that RW put out. And consequently, the people making these statements, including the fact that I signed it, are comments by people who clearly are looking at potential situations or possibilities, and drawing consequences or -- or results from those assumptions to the attention of the people in RW who do have responsibility for the program.
Nothing that's said here changes what's in the law or what's in the contract or what the commitments are. It says -- and as we've already established, I think, in the Mission Plan, its stated desires, this is the way we wish to implement the program, and it goes beyond the

actual requirements of the Act. It says, This is what we plan to be able to do. And so that goes beyond any commitments, legal or contractual.
And this document, then, is people not with the authority to do it, but with -- commenting on -- on that -- on that plan, stating what they believe the impact and consequences would be.
So I don't see how anything in here changes what our legal or contractual -- what the legal or contractual requirements of the Department of Energy and the Office of Civilian Radioactive Waste Management is or were.
Q. (By Mr. Tompkins) Well, these contractors would be providing comments at the direction of RW and DOE, wouldn't they? They wouldn't just provide comments just to provide comments. They would have been requested at some point?
MS. HERRMANN: Objection. Relevance.
THE WITNESS: That -- no, you're right. But being -- the whole -- the public was asked to provide comments. So everyone was asked to provide comments. Certainly the contractors wanted to provide comments. But providing a comment doesn't establish an obligation. And that -- that's where my difficulty is.



If -- if in signing this document, sending in the comments of the Richland office and contractors to Mr. Rusche -- I can assure you that if the document that I was sending was anywhere binding or a commitment, it would have had far greater review, each line, each word, for accuracy and relevance than a transmittal letter sending comments on a Draft Mission Plan. Consequently, there might be, you know, some casual language in here or language that maybe does not accurately reflect the true commitments and obligations of the Act. Likewise, I would imagine that comments came in on the Mission Plan saying, don't do this and don't do that, a number of things commenting on the plan.
So I -- I'm just having a very difficult time seeing how commenting on the plan could establish any responsibility or any commitments beyond what was in -- in either the law or the contract.
Q. (By Mr. Tompkins) Well, it may not establish a commitment itself, but it does reflect someone's reading of those commitments, doesn't it?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I can assure you from all of the many people working on the Nuclear Waste



Policy Act, that there were many interpretations of the Act. And I can generally recall some from antinuclear groups that completely changed the intent of the Act.
So just because people had different impressions, didn't really change anything. The law is the law and the contract is the contract.
MR. TOMPKINS: I'd like to mark as Lawrence Exhibit 22 -- 23 --
(Exhibit No. 23 marked for identification.)
Q. (By Mr. Tompkins) Mr. Lawrence, do you recognize the handwriting in this letter?
A. No, I don't. It -- let me put it this way: It's not mine.
Q. It's not yours?
A. It's pretty good, though. Wish it were mine.
Q. The -- under this heading, Background --
A. Excuse me. Can I -- let me just --
Q. Oh, sure.
A. -- go through it.
MS. HERRMANN: While he's reading, can we get an identification of this on the record?
MR. TOMPKINS: Sure.



This also came from RIS-Web. And the Bates number at the top, on the first page, is MOV.1999 -- I don't know if that's an 8 or a 0 -- 831.0058.
THE WITNESS: Are there multiple Page 6s?
Q. (By Mr. Tompkins) Well it looks like there is three separate Page 6s. Two of them were crossed out and one I believe --
A. Are the -- the first two that are crossed out, are they the same?
Q. They look identical, but they came through on the fax as two separate pages, so I kept the document together as I thought it originally was. But it may have been a fax error.
A. Okay. Go ahead.
Q. On the -- on the first page, the second-to-last paragraph states, "The first schedule appeared in the December 20th, 1983 draft of the Mission Plan and was based on preliminary analysis of repository emplacement capabilities and spent fuel discharge projections."
Would if be correct to assume that this is referring to the December 1983 draft that we discussed earlier, which is marked as Exhibit 11?

# Ronald Milner

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 5

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

MR. SHULTIS: Objection -- vague.
THE WITNESS: I don't know that I could call out any particular area.
BY MR. TOMASZCZUK:
Q. Are there aspects of the Civilian Radioactive Waste Program with which you're not familiar?
MR. SHULTIS: The same objection.
THE WITNESS: Probably.
BY MR. TOMASZCZUK:
Q. Do you know what they are?
A. I would be hard pressed to call it out.
Q. The reason I ask the question, Mr. Milner, is you have been in the office of OCRWM for a long time, and I'm trying to find out areas where you might have particular expertise and knowledge, and if there are some, it would I think speed things along if you could identify those for me.
If you can't, then I will have to assume that all areas are fair game and I'll proceed accordingly.
Are there any areas that you feel you have particular expertise or knowledge in?



A. No, I wouldn't say so.
Q. In preparation for your deposition here today, did you review any documents?
A. No, I did not.
Q. Did you speak with anyone concerning your deposition?
A. Very briefly with the two Justice Department attorneys.
Q. Other than counsel for the Department of Justice, did you speak with anyone concerning your deposition?
A. No, not concerning the deposition.
Q. Did you speak with anyone at OCRWM concerning their deposition?
A. No.
Q. Did you speak with anyone at OCRWM concerning any topics or issues on which you thought I might ask you about?
A. No.
MR. SHULTIS: Objection -- asked and answered.
BY MR. TOMASZCZUK:
Q. Are you familiar with the standard contract for disposal that's at issue in these cases, for disposal of spent nuclear fuel and



high-level radioactive waste?
A. Yes.
Q. Did you have any role to play in the drafting of this, what I'll refer to as the standard contract?
A. No, I did not.
Q. It had already been executed at the time you became an OCRWM employee?
A. Correct.
Q. At the time you became an OCRWM employee, did you have occasion to read the contract?
A. Yes.
Q. At the time that you became an OCRWM employee, did you read any other documents?
A. I'm not sure I understand that question.
Q. Okay. I understood you became a branch chief at OCRWM in, in or about 1984?
A. Um-hm.
Q. Right. And you have testified you have read the standard contract?
A. Um-hm.
Q. At or about that time, correct?
A. Um-hm.



Q. Did you read any other documents relating to OCRWM or its programs at that time?
A. Relating to OCRWM, yes.
Q. Okay. And what were they?
A. The most recent total system life cycle cost report, final draft of the Mission Plan, most recent fee adequacy analysis report.
Q. Why did you read those documents?
A. Those are items under my responsibility.
Q. Do I understand it correctly that at the time you became the branch chief, a total systems life cycle cost report had already been prepared?
A. Yes.
Q. All right. I'm going to refer to that as a TSLCC report.
A. Much easier.
Q. Right -- certainly easier to say. And what was the -- you said, I believe you have testified that you had read the final draft of the Mission Plan.
Had a final Mission Plan been prepared at the time you became the branch chief?
A. No, it had not.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

year, I believe it was 400 metric tons, second year, 600 metric tons, the third year, 900 metric tons, and I believe the following year, it went up to 1200.
Q. And any understanding beyond that?
MR. SHULTIS: Same objection.
THE WITNESS: I recall that peaks at 2000.
BY MR. TOMASZCZUK:
Q. Your understanding is that it peaks at 2000, and then does it stay at 2000 for a number of years?
A. I believe so.
MR. SHULTIS: Same objection.
THE WITNESS: I believe so.
BY MR. TOMASZCZUK:
Q. Do you know if that understanding is reflected in any documents?
MR. SHULTIS: Objection -- vague.
THE WITNESS: I believe it is.
BY MR. TOMASZCZUK:
Q. Okay. Can you identify for me the documents -- when I say documents, I'm referring to DOE or OCRWM documents -- can you identify for me the documents that reflect the acceptance



rates you just referred to?
A. I don't know that I can recall all of the documents that's reflected in.
Q. Any of them?
A. It's reflected in the ACR. It's reflected in the program plan.
Q. And in what year was the ACR that you just referred to in your last answer published, do you know?
A. I don't recall.
Q. Do you know when the last ACR was published by OCRWM?
A. No, I don't.
Q. If I said 1995, would that sound about right to you?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Roughly.
BY MR. TOMASZCZUK:
Q. With what, with which support contractors do you work most closely now in your role as COO?
A. Booz Allen Hamilton.
Q. Over the course of your career at OCRWM, have there been any personnel employed by



contractors with whom you have worked particularly closely?
A. Yes.
Q. Can you state for me their names?
A. Not all of them.
Q. Okay. Those that come to mind?
A. Charles Metzger.
Q. Metzger you say?
A. Metzger; Richard Goffi, Robert Bauer, probably those would be the closest.
Q. Are those individuals employed by Booz Allen?
A. Robert Bauer is not.
Q. But Mr. Goffi and Mr. Metzger are?
A. Correct.
Q. And who is Mr. Bauer's employer?
A. He was employed by the former support service contractor at OCRWM -- Weston.
Q. Did you ever have occasion to work with a support contractor that I'll refer to as PNL?
A. Yes.
Q. And when was that?
A. That would have been in mid-'80s.
Q. Did you ever have occasion to work



with or speak with Pat McDuffie?
A. No. I don't recall that name.
Q. What role have you had in DOE's administration or implementation of the standard contract?
MR. SHULTIS: Objection -- vague.
THE WITNESS: A variety of roles.
BY MR. TOMASZCZUK:
Q. Okay. Can you explain that for me or detail that for me?
A. At various positions or during various positions that I held, administration of the standard contract again was done by an element under my supervision.
Q. Is that one of your roles or duties today?
A. In a very rough sense, yes.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. When is the last time you had occasion to read the standard contract?
A. It's probably been several years since I have read it in its entirety.
Q. And when you last read it in its

Page 66

(Milner Exhibit No. 4
was marked for
identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. Very vaguely. This would appear, judging by the date, to be an early draft.
Q. Early draft of a Mission Plan?
A. Yes.
Q. And is this a document that you read at or about the time you became an employee of OCRWM?
A. I don't believe I would have reviewed this draft.
Q. You would have reviewed another draft?
A. Subsequent draft.
Q. A later draft do you think? And why do you say that?
A. Only judging by the date; I'm assuming that drafts would have occurred between December '83 and April of '84.
Q. And why do you make that assumption?
A. Typically over that intervening period, the document would have been refined and

Page 67

further drafts produced.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. At the time you became an OCRWM employee, was it a goal of OCRWM to provide an acceptance rate in the first five years such that no utility would have to provide additional storage capacity after January 31, 1998?
A. I don't recall that being a goal.
Q. Could I direct your attention to page 2-1 of the document under the heading program strategy?
A. Oh, 2-1.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Do you see the last two sentences of the first paragraph on page 2-1?
A. Yes.
Q. It states in part the waste materials would be accepted in accordance with the waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?

Page 68

A. Um-hm.
Q. And you disagree that that was an intention of DOE at or about this time?
MR. SHULTIS: Objection. Mischaracterizes the prior testimony.
Calls for calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. I didn't mean to mischaracterize your testimony.
I understood it to be that you did not agree with that statement.
A. I did not recall that that was a goal at that time.
Q. Okay. Having read it, do you now recall that that was a goal?
A. I don't recall whether that language was in the final Mission Plan.
Q. Okay. Even if it wasn't, was that a goal of DOE at or about this time?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: I don't recall it.
BY MR. TOMASZCZUK:
Q. The text of this paragraph goes on to

Page 69

state subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.
At or about this time, did DOE intend that the acceptance rate would be equal to or greater than the actual discharge rate of spent fuel each year?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I didn't recall that.
BY MR. TOMASZCZUK:
Q. The next page of this document, 2-2, under the heading waste acceptance schedule, and this paragraph states that the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the program will accept beginning in 1998.
This schedule is presented in Table 2-1, and then turning to Table 2-1 whenever you're ready --
(The witness reviewed the document.)
BY MR. TOMASZCZUK:

Q. Do you recall seeing this Table 2-1 before today?
A. I don't recall it, no.
Q. It shows under the column first repository acceptance, a spent nuclear fuel acceptance rate starting in 1998 of 1800 metric tons?
A. Correct.
Q. And maintaining at that 1800 metric ton rate for five years, correct?
A. Correct.
Q. And then ramping up to 3,000 metric tons?
A. Correct.
Q. And then continuing at a steady-state rate of 3,000 metric tons for roughly 20 years I think?
A. Correct.
Q. And does that column accurately reflect DOE's intentions at this time with respect to spent nuclear fuel acceptance rate commencing in 1998?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Also Mr. Milner is not a 30(b)(6)



witness.
MR. TOMASZCZUK: I don't want my silence to be construed as acquiescence in the notion that I can't ask him these questions because he is not a 30(b)(6) witness.
I don't know what --
MR. SHULTIS: You're asking about DOE's intention or position.
Mr. Milner has not been designated as a witness who is qualified to speak to DOE's position.
MR. TOMASZCZUK: Oh, I understand that Mr. Milner has been at OCRWM for 18 years and is the Chief Operating Officer, and if he is not qualified to answer these questions, I don't know who would be, but in any event, your objection is noted for the record.
MR. SHULTIS: The people we designated for those responses is qualified, but you can answer.
THE WITNESS: At the point this draft was prepared, December of 1983, I was not with the program.
I don't know what the department's intent was.



BY MR. TOMASZCZUK:
Q. Did you have any understanding about the data reflected on this table at or about the time you read it?
MR. SHULTIS: Same objections.
THE WITNESS: I don't understand the question.
BY MR. TOMASZCZUK:
Q. Did you have any understanding as to what information was being conveyed by the data on this table at or about the time you became an OCRWM employee and looked at this document?
MR. SHULTIS: The same objections -- asked and answered.
The document speaks for itself.
THE WITNESS: I don't recall seeing this specific table.
I can look at it now and see what's on it.
BY MR. TOMASZCZUK:
Q. Okay. This table goes on to, under the column remaining backlog MTU, do you see that?
A. Yes.
Q. In the right-hand side? It shows a



pre-1998 backlog of 40,809 metric tons?
A. Yes.
Q. Correct? And that number basically decreases over time, and the table shows a backlog as of 2020 of 23,775 metric tons, right?
A. Correct.
Q. Showing that the backlog is being reduced over time?
A. Correct.
Q. And was that a fair statement of DOE's intentions at or about this time, to work off the backlog of spent nuclear fuel that utilities were storing?
MR. SHULTIS: Objection. Calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, at this specific point in time, I don't know what the department's intent was.
At the point I joined the program, my understanding of the intent was to work off the backlog.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Milner, I'm going

Page 130

speculation, and compound.
THE WITNESS: I have personal opinions in some regards.
BY MR. TOMASZCZUK:
Q. Okay. And I'm anxious to hear about those.
Would you tell me what your personal opinions in that area are?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Well, one opinion is that in some areas, I do believe it is incomplete.
One example would be that the contract doesn't clearly define how you would deal with non-standard fuel.
It doesn't clearly define how you deal with non-fuel bearing components of the fuel assembly.
BY MR. TOMASZCZUK:
Q. Any other opinions that fall within these four areas?
MS. HERRMANN: Objection -- vague.
THE WITNESS: No.
(There was a pause in the proceedings.)

Page 131

MR. TOMASZCZUK: Ms. Reporter, would you mark as Milner Exhibit 11 another document entitled briefing for OCRWM Executive Committee dated November 1986, disposal contract and Annual Capacity Report?
(Milner Exhibit No. 11 was marked for identification.)
MS. HERRMANN: Do we get one?
MR. TOMASZCZUK: Oh, I'm sorry -- absolutely.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today, Mr. Milner?
A. Not that I recall, no.
Q. Did you participate in any briefing of the OCRWM Executive Committee in November of 1986 concerning the disposal contract and Annual Capacity Report?
A. Not that I recall.
Q. Can I direct your attention to Bates page number PNL-102-1182?
And this appears to be a listing of bullet points relating to the purpose and background for the Annual Capacity Report?

Page 132

A. To my understanding, yeah.
Q. Was it your understanding that the ACR was intended to lead to contractually binding waste acceptance commitments starting in 1992?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My recollection is not so much the timeframe, but yes, they would lead to a binding commitment.
BY MR. TOMASZCZUK:
Q. At the time the ACR was issued, was it binding?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My personal opinion was that no, it was not.
As indicated here, it was for planning purposes.
BY MR. TOMASZCZUK:
Q. But the ACR issued for planning purposes in your understanding would lead to a mutually binding commitment on the parties?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would have been my

Page 133

understanding.
BY MR. TOMASZCZUK:
Q. And is your understanding today?
A. Yes.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Let's mark as Milner Exhibit 12 the Annual Capacity Report dated June 1987.
(Milner Exhibit No. 12 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Actually, Mr. Milner, before I ask you about that, I had a couple of questions on the OCRWM Executive Committee I forgot to ask you about.
Were there any minutes of the meetings of that committee do you know?
MS. HERRMANN: Objection -- foundation, speculation.
THE WITNESS: None that I can recall. I simply don't know on that one actually.
BY MR. TOMASZCZUK:
Q. Do you know insofar as the meetings



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)

McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

BY MR. TOMASZCZUK:
Q. Is it possible that they would constitute GTCC from a technical standpoint?
A. It's possible.
MS. HERRMANN: Objection. Calls for a legal conclusion, speculation.
BY MR. TOMASZCZUK:
Q. Could I ask you to look at page 2 of your letter?
At the top of this page, there is the phrase as we proceed with final cask design, then you go on to request assistance from Mr. Zabransky in developing and implementing a plan to obtain data.
Was OCRWM at this point in the process of final cask design?
A. Yes, that's correct.
Q. Did that task get completed?
A. In one instance, it did, yes.
Q. And what instance is that?
A. There were essentially three cask designs that were being worked on.
Two of the designs were for a truck cask, and one was for PWR assemblies. One was for BWR assemblies, and at that point in time,



another was rail cask.
My recollection was that as a result of these discussions indicated here, we dropped the rail cask design, and I believe, I can't recall for certain whether the department actually completed the final design or whether the contractor completed the design on their own because at some point in time, one of the appropriations acts, the Congress basically directed us to cease cask design work.
Q. Is cask design work ongoing today at OCRWM?
A. No, it's not.
Q. It's being held in abeyance for some reason?
A. It's not being accomplished. Congress directed us to stop cask design activity.
Q. Okay.
A. And we did, have continued to stop it.
Q. Do you know why Congress made that direction?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: I have no idea.
BY MR. TOMASZCZUK:



Q. Would these assemblies with channels that you described in your testimony a few moments ago constitute non-fuel components at that time as used in the contract?
A. Yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: They would, in my opinion.
MR. TOMASZCZUK: Let's mark as Milner Exhibit 37 a memorandum dated April 15th, 1991, signed by Mr. Milner concerning approval for issuance of a comment draft of the annual Acceptance Priority Ranking.
(Milner Exhibit No. 37 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recognize this document, Mr. Milner?
A. Offhand, I do not, no.
Q. That's your signature that appears at the second page of it, right?
A. That's correct.
Q. Is that also your handwriting that



appears on this second page next to the third paragraph and in the third paragraph?
A. It does not appear to be my handwriting, no.
Q. You understand what I'm asking you about?
A. Yes.
Q. The marginalia there?
A. Yes.
Q. Turning back to the discussion set forth in the memo at the first page, second paragraph starts off by saying publication of the APR begins the contractually binding waste acceptance process system.
Is that a true statement in your view?
A. In my view, yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. The next sentence says the ACR will be used in conjunction with waste acceptance rates to be published in the 1991 Annual Capacity Report as the basis for purchasers to submit Delivery Commitment Schedules beginning in January 1992 for the department's approval.

Page 302

Do you know who made the decision to use the 1991 ACR as the basis for purchasers to submit Delivery Commitment Schedules?
A. No, I don't.
Q. Did you make that decision?
MS. HERRMANN: Objection -- asked and answered.
BY MR. TOMASZCZUK:
Q. Did I just ask you that question? I'm sorry if I did.
I thought I asked you if you knew who did, but maybe I misspoke.
Do you know who made the decision to use the 1991 ACRs as the basis for purchasers to submit Delivery Commitment Schedules?
A. No, I don't.
Q. Would Mr. Brownstein have made that decision, or would that have been somebody higher up in the chain than him?
MS. HERRMANN: Objection -- asked and answered.
He told you he doesn't know.
MR. TOMASZCZUK: I asked him a different question.
THE WITNESS: I don't know who would

Page 303

have made the decision.
Could have been Mr. Brownstein. Could have been the director of the program. Could have been the deputy director of the program.
BY MR. TOMASZCZUK:
Q. You have absolutely no recollection?
A. I have no recollection.
Q. Could it have been a contractor?
A. No, sir.
MS. HERRMANN: Asked and answered.
BY MR. TOMASZCZUK:
Q. It would have had to have been somebody within DOE?
A. That's correct.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. The last sentence of that paragraph says in turn, purchasers will have the opportunity to exchange approved DCSs also subject to departmental approval.
Was that an accurate statement of the department's position at the time with respect to the exchange of DCSs?
MS. HERRMANN: Objection -- foundation.

Page 304

Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: In my opinion, that was an accurate statement.
BY MR. TOMASZCZUK:
Q. The next paragraph states in part it is of utmost importance that the information on which the APR is based is accurate and not subject to continual modification.
Why was that of the utmost importance?
A. Well, since the APR played a role in the, an important role in the binding waste acceptance process, if the information that, upon which that was based was not accurate, the APR would not be accurate, the process would not be accurate.
MR. TOMASZCZUK: Want to take a break?
MS. HERRMANN: Sure.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, on Exhibit 37, there is a reference in the first page in the second paragraph to a contractually binding waste acceptance process.
Do you see that?

Page 305

A. Yes.
Q. What is your understanding of that term?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My own understanding of it is that begin the process using priority ranking, capacity reporting.
Ultimately utilities would submit and have approved a Delivery Commitment Schedule which would have been the binding agreement.
BY MR. TOMASZCZUK:
Q. Binding on both the government and the utility?
A. Correct.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. And that understanding that you just articulated is based on your review of the contract, or some other source of information?
A. It would have originally stemmed from my review of the contract, yes.
Q. And have you discussed that view with others at OCRWM?
A. I can't specifically recall, but yes,

should work off the same assumptions.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 40 a memorandum dated December 20, 1991, authored by Mr. Milner?
And it's an action memorandum approval for publication of the 1991 ACR.
(Milner Exhibit No. 40 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. I don't specifically, no.
Q. Did you prepare it?
A. It's unlikely that I would have prepared it.
Q. Somebody prepared it for you and you viewed it and approved it?
A. That's correct.
Q. Do you know who prepared it?
A. No, I don't.
Q. As of this point in time, December 20, 1991, did you still believe that a MRS facility



could be cited?
A. Yes, I did.
Q. Was the MRS team still working at this time?
A. I don't believe it was, no.
Q. Who was working on siting an MRS at this point?
A. My organization.
Q. And when you say your organization, you mean the Office of Storage and Transportation?
A. That's correct.
Q. I may have misunderstood, but -- and if I did, correct me -- I thought I heard you say yesterday that when the MRS team was disbanded, that that effectively ended DOE's plans to site an MRS.
Did I misunderstand that?
MS. HERRMANN: Objection to the extent that it mischaracterizes prior testimony.
BY MR. TOMASZCZUK:
Q. I don't want to mischaracterize what you said.
I want to understand it correctly.
A. If, if I said or alluded to that, I



was in error.
The MRS team was disbanded I guess essentially at the time that I became the acting associate director for storage and transportation.
I don't recall specifically. That may have been incident to organizational change, but nonetheless, the Storage and Transportation Office subsumed the duties of the MRS team, and volunteer MRS siting effort continued at that time.
Q. And that effort was ongoing as of December 20, 1991?
A. I believe it was, yes.
Q. Who in your office was working on that issue?
A. I believe Victor Trebules was, Jeffrey Williams.
Offhand I don't recall the rest of the employees there.
Q. Were you working that issue as well?
A. I was.
Q. How much of your time were you spending on DOE's efforts to site an MRS?
MS. HERRMANN: Objection -- vague.



THE WITNESS: I would have to estimate 40 to 30 -- 30 to 40 percent of my time.
BY MR. TOMASZCZUK:
Q. And that level of activity continued until when?
A. Probably some time later, until 1992 perhaps.
I don't recall precisely -- approximately six months after the administration changed.
Q. When you say the administration changed, you're referring to a Presidential election?
A. Correct.
Q. So six months after a November election roughly?
A. Roughly six months after a January swearing in.
Q. Okay.
A. But very approximate.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. In this memo, under the heading discussion, the last sentence of the first

Page 318

paragraph states the ACR applies a waste acceptance rate to the APR resulting in individual allocations to the contract holders of FWMS capacity.
Do you know who made the decision to utilize the ACR, in this instance, the 1991 ACR, to apply a waste acceptance rate to the APR?
A. I don't know that there was an individual that made that decision.
It was the process basically. The ACR was simply an annual capacity of the system's acceptance, an estimate without regard to which utilities were first, second and so forth, and how much was the first utility going to deliver and so forth, so as this indicates, the capacities listed in the ACR were applied to the priority ranking in the APR.
The result was that you had a priority listing by utility and by fuel quantity in the different years what the estimated acceptance rate would be.
Q. The memo goes on to state at the bottom of the page, the last paragraph, the 1991 ACR differs from the previously published ACRs for two reasons. First, while the information

Page 319

in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules by the contract holders.
Do you know who made the decision to use the allocations in the 1991 ACR as the basis for submission of DCSs by the contract holders?
A. No, I don't.
Q. Do you know whether that decision was authorized by or set forth in the standard contract itself?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Standard contract is the best evidence of its contents.
THE WITNESS: I'm fairly certain that the standard contract doesn't specify a 1991 ACR.
BY MR. TOMASZCZUK:
Q. Does it specify using the allocations in any ACR as the basis for submission of DCSs do you know?
MS. HERRMANN: Same objections.
THE WITNESS: Best of my recollection,

Page 320

it does.
BY MR. TOMASZCZUK:
Q. It does?
A. It does.
Q. Could you identify for me where in the contract you find that language or direction?
A. I could try.
Q. Thank you.
MS. HERRMANN: Could you give him an exhibit number?
MR. TOMASZCZUK: I can -- No. 3, Milner deposition Exhibit No. 3.
(The witness reviewed the document.)
MS. HERRMANN: While he's looking, let me just object again it calls for a legal conclusion, and best evidence.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. If it helps you at all, Mr. Milner, Delivery Commitment Schedules are addressed in Article V. Maybe that's where you're looking, but --
A. Yes, that's where I'm looking.
(The witness reviewed the document.)
THE WITNESS: And I do not see ACRs

Page 321

referenced there.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Have you finished your answer, Mr. Milner, or do you want more time?
A. Another minute.
Q. Sure.
(The witness reviewed the document.)
MS. HERRMANN: Could we have the question read back just so that I'm clear?
THE REPORTER: Question: "Could you identify for me where in the contract you find that language or direction?"
MS. HERRMANN: If it speeds things up at all, could I refer him to another section?
MR. TOMASZCZUK: Sure.
MS. HERRMANN: Or are we just hunting? Do you want him to hunt?
MR. TOMASZCZUK: No, I don't want him to hunt.
MS. HERRMANN: Okay -- right before Article V.
THE WITNESS: Yes. Actually I was just reading that paragraph 5.
Yes, it references both the ACR and