# Robert Rosselli

# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs,

vs.

Case Nos. 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

UNITED STATES,

DEFENDANT.

---

VOLUME I
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 15, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,
Plaintiffs,
vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440C
UNITED STATES, 00-697C, 00-703C, 01-115C
01-116C, 01-249C
DEFENDANT.

VOLUME I
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacramento Municipal Utility District
April 15, 2002
---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

Page 1

APPEARANCES

ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY: DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM

Page 2

BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: dcassling@jenner.com
Appearing on behalf of Commonwealth Edison Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov

Page 3

Also Present:
Peter J. Skalaban

Page 4

folks from within the department where we needed help. And we started interacting with utility representatives.
Q. Did the three of you work on the entire contract, or did you divide up the contract and each focus on a different portion or issue?
A. To the best of my recollection, we worked on the total -- totality of the contract. Although, saying that, clearly, Jay Cavanaugh had a focus on the terms and conditions of government contract and sales instruments, because that's where his expertise was.
Elliott Winneck had, you know, the broad band, you know, the legal aspects and how consistent were we with the legislative history and the statute.
And my focus was more, sort of, the bringing in the technical aspects and the programmatic aspects.
Q. You mentioned that you got input from various people within the department as part of this effort. Do you recall who?
A. No, I don't.
Q. If we go back to Exhibit 1, we could look at the chart showing the office of



management. Do you recall getting input from Mr. Yanoksi, or Mr. Head, or Mr. Brandt?
A. To the degree that I can recall, we certainly had interactions with Mr. Head and got input from his particular group.
Q. If we could turn back to the first page showing the organization of the office. Did you receive input from Mr. Bennett?
A. I don't recall specifically whether we got input from Mr. Bennett.
Q. Do you recall specifically whether you received any input from Mr. Bauer?
A. I don't recall specifically that either.
Q. Do you recall whether you received input from Mr. McElvey?
A. I do not recall that either.
Q. Mr. Lawrence?
A. You know, Mr. Morgan and Mr. Lawrence were my supervisors, you know. So certainly, it was probably discussions with them about the form and substance of the contract. Specifically, things we talked about, I could not recall.
Q. But you would have discussed the contract with them?
A. Yes. That would be fair to assume



that, yes.
Q. On numerous occasions? Would that be fair?
A. I cannot recall that.
Q. Sitting here today, can you recall anyone else within the department who was part of this process?
A. No, I can't.
Q. Now, you testified earlier that you recall beginning work on the contract after the act passed. And I'll represent to you that that occurred on January 7th, 1983. I'll also represent to you that the proposed contract was published for public comment in the federal register on February 4th of 1983.
Would that indicate to you that your group spent something less than a month in developing the initial draft of the contract that was published for public comment?
A. I don't recall.
Q. Sitting here today, do you recall spending more than a month on the initial draft?
A. I think it is fair to say that we spent more than a month in developing the standardized contract draft.



Q. The initial draft that was published?
A. Yes.
Q. Do you recall how much time was spent on that?
A. No, I don't.
Q. Can you describe the contract development process for me? How did you go about developing the first draft of the contract?
A. What I remember and the best of my recollection, there was an iterative process that occurred between the government and the utility industry and then -- and with them within the department, the team. So we would have iterations with the industry, and we'd come back and have iterations, you know, among ourselves. And that was the principal method that was used to development the contract.
Q. What was the basis for the first draft of the contract that was developed?
MR. LESTER: Objection, vague.
BY MR. NESLIN:
Q. Do you understand my question, sir?
A. No.
Q. In developing the first draft of the contract, did your group use anything as a

MR. LESTER: Objection, leading.
THE WITNESS: Some, yes.
BY MR. NESLIN:
Q. Mr. Rosselli, what was the process that you followed in attempting to develop a final contract after the publication of Exhibit 3?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, the process was, we received comments on the draft contract. We evaluated those comments. And we framed our final rule.
BY MR. NESLIN:
Q. Who evaluated the comments?
A. The team that I referred to before had the principal responsibility to review the comments.
Q. And that would be you, Mr. Cavanaugh, and Mr. Winneck?
A. Yes, sir.
Q. If I could direct you back to Exhibit 3 for a moment, Mr. Rosselli. You see on the bottom of the first page with a heading for further information contact. First page, sir. The very bottom of the page.
A. Yes.



Q. It references you at the office of terminal waste disposal and remedial action. Is that where you were working at this point in time?
A. No.
Q. Do you know why it would provide that as a reference point for you?
A. I imagine it's just an error.
Q. You were working at OCRWM at that point?
A. Yes, I was.
Q. Let's go back. And you, Mr. Cavanaugh, and Mr. Winneck had reviewed the comments that had been submitted. Correct?
A. Yes.
MR. LESTER: Objection, leading.
BY MR. NESLIN:
Q. You modified the contract in some respects in response to comments?
MR. LESTER: Objection, leading.
THE WITNESS: Yes, we did.
BY MR. NESLIN:
Q. Did you continue to meet or confer with representatives of the utility industry following the public comment period?
A. Yes, we did. To the best of my recollection.



Q. Were you meeting with the same representatives that you identified previously?
A. Point of clarity, I didn't identify anybody specifically earlier.
Q. You mentioned that you met with or conferred with EEI. I believe one or two other entities on behalf of –
A. Okay APA and the rules, et cetera?
Q. Yes.
A. To the best of my recollection, yes.
Q. And you continued to meet with them, because you continued to seek to work with them to come up with a final standard contract that would be mutually acceptable to both sides?
MR. LESTER: Objection, leading.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Do you recall any issues where you and Mr. Cavanaugh or Mr. Winneck disagreed over how an issue should be resolved?
A. No, I don't.
Q. Your recollection is that you three were in agreement on the resolution of all of the issues raised during the public comment period?



MR. LESTER: Objection, leading. Misstates his prior testimony.
THE WITNESS: When we published the final rule, we were in agreement, yes.
(Whereupon, a document entitled U. S. Department of Energy memorandum was marked Exhibit-4.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked as Exhibit 4 to your deposition. It's a Department of Energy memorandum entitled, Action Memorandum on Final Rule Making on Standard Contract for Nuclear Waste Disposal dated April 8th of 1983. Are you familiar with this document?
A. Yes.
Q. Did you help to prepare this document?
A. The best of my knowledge, in all probability, yes.
Q. What do you mean by that?
A. I think I did have a hand in preparing this document.
Q. Do you recall who else participated in preparing this document?
A. Not specifically, no.

Q. Would Mr. Cavanaugh or Mr. Winneck have participated in this?
A. To the best of my knowledge, they probably did.
Q. If I could direct your attention to the first page Bates number ZAB-001-0893, under the heading Discussion, the last sentence states, "Eight general policy issues arose from the comments, and we appropriately resolved these issues." Do you know what's meant be, "general policy issues?"
MR. LESTER: Objection. Calls for speculation.
THE WITNESS: Generally, yes.
BY MR. NESLIN:
Q. What's meant by the term, "general policy issues," in this document?
A. It had to do with positions the Department would take with respect to its interactions with the utility community on the contract.
Q. Were these the most important issues?
A. Yes.
Q. And you included this in the briefing memorandum to the secretary so that the secretary



would be familiar with these issues?
A. Yes.
Q. If I could ask you to turn to page ZAB-001-0899 through 0902. So those would be the last four pages of the document. Are these the general policy issues, to your recollection?
A. To the best of my recollection, they are.
Q. Now, I don't see any reference in these issues to the receipt rate at which the Department would receive spent nuclear fuel from the utilities. Do you know why that's the case?
A. To the best of my knowledge, I don't recall that being an issue from the Government's standpoint.
Q. It was not an issue from the Government's standpoint?
A. Yes.
Q. Do you recall it being an issue from the industry standpoint?
A. To my knowledge, no, I don't recall.
Q. You don't recall the issue coming up?
A. Yes. There were -- I mean, I do recall it coming up from the utility standpoint.



Q. You say it wasn't an issue from the Government's standpoint. Why was it not an issue from the Government's standpoint?
A. Because at the point in time of drafting this particular document, the Government wasn't in position to contemplate or set any type of receipt or acceptance rate.
Q. Why do you say that?
A. At this particular point in time, there wasn't a repository site that was selected. The facilities, you know, that would be needed to support the repository, you know, weren't designed or built. It was just too early. There were a lot of technical issues, you know, still on the table that had to be resolved and worked through.
Q. Did the Government have any criteria in mind for the rate at which it would receive spent nuclear fuel at this point in time?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, I do not recall.
BY MR. LESTER:
Q. So would it be your testimony, then, that the Government at this point in time did



not have a view as to the rate it would receive spent nuclear fuel from the utilities?
MR. LESTER: Objection. Vague as to the term -- not defining the word, the Government.
BY MR. NESLIN:
Q. Can you answer my question, sir?
A. Yes, we did not have a view.
Q. If you did not have a view, then, you did not have a position on the rate at which spent nuclear fuel would be received by the Government either. Is that correct?
MR. LESTER: Objection, leading.
THE WITNESS: To the best of my knowledge, that is correct.
BY MR. NESLIN:
Q. Now, one of these issues -- enumerated as issue number seven on page 0901, 0902 refers to utilities' rights to audit the waste disposal fund. Do you want to review that paragraph, sir? Mr. Rosselli, by audit is this issue referring to a financial audit of the fund?
A. It's broader than a financial audit.
Q. What else was encompassed by this issue?
A. It was a management audit.

and said we had to be ready.
Q. If we look down at the next to the last sentence, it states that, "1998 date is called for in the Act, and we believe it to be a realistic date." What's meant by "realistic date?"
MR. MILLER: Objection. Calls for speculation and a legal conclusion. Go ahead.
MR. NESLIN: You may answer.
THE WITNESS: That it's doable.
BY MR. NESLIN:
Q. Did you answer the 1998 date to be doable at that time?
A. Yes.
Q. Did DOE consider the 1998 date to be doable at that time?
A. To the best of my recollection, yes.
Q. What was meant by the statement that, "Our performance will be judged by meeting this date?"
MR. MILLER: Same objections.
THE WITNESS: Whether we would have a repository ready to receive high-level waste or spent nuclear fuel by January 31st



1998.
BY MR. NESLIN:
Q. And that would be the standard for determining whether DOE was complying with the contract?
MR. MILLER: Objection. Calls for speculation and a legal conclusion.
BY MR. NESLIN:
Q. In your opinion, sir?
A. Yes.
Q. And so to comply -- in your opinion to comply with the contract, DOE would have to be receiving spent nuclear fuel under the contract by the 1998 date?
MR. MILLER: Same objections.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Mr. Rosselli, what in your opinion was the purpose of the contract?
A. The purpose of the contract was to document the provisions of the statute, and basically, it was for the return for the utilities providing one mill per kilowatt hour. The Department would have a repository in place ready to receive spent nuclear fuel or high-level



waste by January 31st, 1998.
Q. And why was that important?
A. A question for clarity, why the date was important or the instrument?
Q. Why was the date important? Well, let me back up. Why was the receipt of spent nuclear fuel by the Department important?
MR. MILLER: Objection, vague.
THE WITNESS: First of all, it was a statutory date that we had to comply with.
Second of all, there was a growing concern within the utility community that they were running out or soon would be running out of space for on-site storage.
And thirdly, that could very well impact the continued utilization of nuclear energy.
BY MR. NESLIN:
Q. So would it be fair to say that one of the purposes of the contract was to prevent utilities from having to shut down?
MR. MILLER: Objection. Mischaracterizes his previous testimony and calls for a legal conclusion.



THE WITNESS: No.
BY MR. NESLIN:
Q. No. Well, you earlier testified that there was a growing concern that utilities were accumulating spent nuclear waste. Was there a concern that this may cause individual utilities to have to shut down because of the accumulation of waste?
A. No. There were other avenues available to the utilities to grow with their increased inventory of spent nuclear fuel, re-racking being an example of a potential option.
Q. Or on-site storage?
A. Or dry storage. On site would be another example.
Q. What's your understanding as to why congress decided to adopt this arrangement in which the utilities would provide delivery of the waste to the Department, and the Department would assess a fee in return for that?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I wasn't a party to what was addressed, so I can't answer that.
BY MR. NESLIN:



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Q. Let me back up then. What was the importance of the 1998 date for you as you understood it?
MR. MILLER: Objection, vague. And I believe asked and answered. Go ahead.
THE WITNESS: That was the date specified in the statute that the Government would have a repository available to accept spent nuclear fuel or high-level waste.
BY MR. NESLIN:
Q. Did that date enable utilities to plan for the disposal of their spent nuclear fuel?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I don't know.
MR. LESTER: Lacks foundation.
THE WITNESS: I don't know the answer to that from a utility perspective.
BY MR. NESLIN:
Q. You don't know whether having a specific date by which the Department would begin accepting spent nuclear fuel would allow utilities to make plans regarding the disposal of their fuel?
MR. MILLER: Same objections.



THE WITNESS: Having a repository available on January 1st, 1998 was only one step having to do with delivery of it. You had to have a rank ordering. You had to, you know, develop a delivery commitment schedule. All things that would occur after or just before. I guess, there was a timetable when they would first do it, so much better planning would come subsequent, you know, to this contract signing.
BY MR. NESLIN:
Q. There would be additional planning?
A. Right.
Q. But was it still intended in developing this contract, did you anticipate that the Department would begin receiving spent nuclear fuel from the utilities in January of 1998?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
MR. NESLIN: You may answer.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And isn't that, in fact, what the utilities were receiving in return for the fees they were paying to the Department?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And they were paying hundreds of millions of dollars to the Department. Correct?
A. Yes.
Q. And in return, the Department was to begin picking up their spent nuclear fuel January of 1998. Correct?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
(Whereupon, a document entitled Department of Energy and signed by Rovert M. Rosselli was marked Exhibit-7.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's marked as Exhibit 7 to your deposition. It's a cover letter from you, and attached to it is a report on financing the disposal of commercial spent nuclear fuel and processed high-level radioactive waste. Do you recall this document?
A. Yes.



Q. Was this document prepared as part of the fee-adequacy assessment?
A. I don't recall.
Q. Do you recall why it was prepared?
A. Yes.
Q. Why was it prepared?
A. To evaluate the income that would be received into the fund from the utilities for the amount of spent nuclear fuel or high-level waste that was generated based on the amount of electricity that was produced against the estimated programmatic cost to characterize, design and build the repository associated facilities, waste forms, et cetera.
Q. How did that differ from the fee-adequacy assessment process?
A. I don't recall if there was much difference. I really don't.
Q. If I could direct your attention to Bates numbered page PNL02802022. Do you generally recall the process that was followed in this document in estimating the cost of operating the waste management system programmatically?
A. Do I recall?
Q. Generally, the process that was followed?



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

keeping with the Department of Energy's continuing commitment to inform public utility companies and other interested parties of all aspects of DOE's civilian radioactive waste management program."

Was this letter and the attached report, in fact, forwarded to utility companies?

A. To the best of my knowledge, it was.

Q. And was it sent for the purpose of informing them of all aspects of DOE civilian radioactive waste management programs?

MR. MILLER: Objection -- withdrawn.

THE WITNESS: That was the stated intent, yes.

BY MR. NESLIN:

Q. Is that your recollection?

A. That was my recollection, yes.

Q. If we could go back to Exhibit 12, the cover memo from Mr. Williamson. The first sentence states that, "Attached is a revised Mission Plan strategy overview based on the discussions in our last planning session."

Do you recall whether you and others in the Department had planning sessions to



work on the Mission Plan or the Mission Plan strategy?

A. I do not recall.

Q. Do you recall meeting with the individuals listed, under distribution on this memo, with respect to the Mission Plan strategy?

A. I do not recall.

Q. Assuming that planning sessions were held regarding the Mission Plan strategy, would it have been your practice or the Department's practice to prepare minutes of those planning sessions?

A. Based on my personal experience, you know, normally, you don't have minutes of meetings that you hold, no.

Q. Would there have been any documentation prepared regarding such meetings?

A. I don't recall.

(Whereupon, a document entitled Civilian Radioactive Waste Management Program Mission Plan was marked Exhibit-13.)

BY MR. NESLIN:

Q. Mr. Rosselli, you've been handed Exhibit 13 to your deposition. It's a document entitled, Civilian Radioactive Waste Management



Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983. And it includes in large type "draft." You were still at OCWRM in December of 1983. Correct?

A. Yes, I was.

Q. Do you recall a draft of the Mission Plan being produced on or about December 20th of 1983?

A. No, I don't.

Q. Do you recall when the first draft of the Mission Plan was prepared?

A. No, I don't.

Q. Can you think, is there any documentation that might refresh your recollection as to when the first draft of the Mission Plan was prepared?

A. Only this Exhibit 13.

Q. If you would turn to page 1-1 of the exhibit, under introduction, the third paragraph. Could you review that paragraph to yourself?

Mr. Rosselli, the first sentence states that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management,



storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."

Was it your understanding that that was OCRWM's fundamental objective?

A. Yes.

Q. What do you mean by firm schedule?

MR. MILLER: Objection. Calls for speculation and a legal interpretation and legal conclusion.

MR. NESLIN: You may answer.

THE WITNESS: Oh --

MR. MILLER: Oh, I'm sorry, yes. Please. Remember you can answer, except when I tell you don't answer that.

THE WITNESS: Okay. Firm schedule, based upon my recollection, would be the delivery commitment schedules.

BY MR. NESLIN:

Q. So your recollection that the reference to "firm schedule" refers to the delivery commitment schedules?

A. That's correct.

Q. The next sentence states that, "The waste acceptance schedule will initially preclude

Q. If we could turn to page PNL-173-0228. If I could ask you to review the last -- point you to the last paragraph of the text of this page which states that, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule" -- well, let me back up. The preceeding sentence states that, "The programs activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982, which is: to accept high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."

The next sentence goes on to say, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and ultimately, remove all eligible waste from at-reactor storage." Do you see that language?
A. Yes.
Q Would you agree with that language?
A. Yes.



Q. Did that language state the Department of Energy's position in February of 1984, to your knowledge?
A. Yes.
Q. Would it be fair to say that as of February 1994, the Department believed that an appropriate waste acceptance schedule would preclude the need for additional at-reactor storage after January of 1998?
A. Yes.
Q And would it be fair to say that the Department believed that such a schedule would reflect the intent behind the Act?
MR. MILLER: Objection. Calls for a legal conclusion, speculation.
THE WITNESS: What do you mean by the word "intent?"
BY MR. NESLIN:
Q. The intent of congress. Well, let me -- the intent of congress in enacting the Act?
MR. LESTER: Same objection.
THE WITNESS: The intent of congress was what?
BY MR. NESLIN:
Q In enacting the Act?



A. Was what?
Q. To provide that the utilities would not need to store additional waste at reactors after January 1998? In other words, that the Department would be responsible for addressing the waste generation following January of 1998?
MR. MILLER. Same objection, vague.
THE WITNESS: I need to clarify a point on this. And maybe it extends back to some of the previous discussions we had on the Mission Plan. I think it's important to recognize it was the intent of the Mission Plan, okay? In terms of how we -- and the Mission Plan was to define how we would carry out the provisions of the Nuclear Waste Policy Act. So it was the intent of the plan that described how we were going to accommodate the needs of the utilities.

In no way, shape, or form was it a contractual intent that we would make all the things happen that was in the Mission Plan.
BY MR. NESLIN
Q. But it reflected the Department's intent at that point in time?



MR MILLER· Objection. Same --
BY MR NESLIN
Q. In administering the program?
MR. MILLER. Same objection.
THE WITNESS· Again, I have to go back, and in your definition, it was an intent of the Mission Plan, not a contractual intent And I think we have to go back to previous questions that you asked me on this. I think the distinction is extremely important here.
BY MR. NESLIN.
Q. Let me back up That intent reflected, whether you call it a plan or contract, it reflected what the Department intended to do as of that point in time Do you understand my question?
MR. MILLER: Same objections.
THE WITNESS: The intent of the plan in terms of how we would carry out the Nuclear Waste Policy Act, was to have a repository in place in 1998 and begin receiving spent nuclear fuel from reactors on a schedule that would preclude -- that would match their

generation rate and, you know, which would then preclude them from having to build additional on-site storage capacity. That's different from contractual intent.
BY MR. NESLIN:
Q. What do you mean by contractual intent?
A. What do I mean by contractual intent?
Q Yes, sir.
A. Contractual intent was, I guess, the quid pro quo between, you know, two parties that in exchange for the utilities paying us one mill per kilowatt hour, we would provide a disposal facility to receive and dispose of their spent nuclear fuel.
Q And what's the basis of that understanding? Where does that understanding come from, sir?
A. That understanding came out of the Department and negotiation of the contract.
Q So what was, in your mind, the contractual intent? Do you recall that issue?
MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.
BY MR NESLIN:
Q. What were the utilities receiving in

Page 161

return for paying the one mill? Making the one mill payment?
MR. MILLER: Objection. Asked and answered.
THE WITNESS. Disposal services.
BY MR. NESLIN.
Q. Disposal services beginning in January of 1998?
MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.
BY MR. NESLIN:
Q Is that correct?
A. Yes
Q. And disposal of substantial amounts of spent nuclear fuel?
MR. LESTER: Same objections.
THE WITNESS: That doesn't talk about the amounts at all.
BY MR. NESLIN:
Q. Well, sir, you -- if we go back to Exhibit 14, second column.
A. Page?
Q. Page SNO69599. Mr. Morgan's testifying or a portion of Mr. Morgan's presentation in which he talks about the fact that he did not

Page 162

believe that accepting one spent fuel element would meet the intent of the Act. Do you see that language?
A. Yes.
Q. And you would agree with that. Correct?
A. Based upon the plan I would agree with that
Q. Mr. Rosselli, did you discuss any of your prior testimony with your counsel during the last break?
MR. MILLER: Don't answer that Objection. Calls for privileged communication.
MR. NESLIN: I'm not asking what was said I'm simply asking whether he discussed his prior testimony.
MR. MILLER: The substance of our discussions with Mr. Rosselli are subject to attorney/client privilege, and don't answer that.
MR. NESLIN: You're instructing the witness not to answer?
MR. MILLER: That's correct.
(Whereupon, a document entitled Battelle, Human Affairs Research Centers was marked Exhibit-17.)
BY MR. NESLIN:

Page 163

Q Mr. Morgan, Exhibit 17 is a memorandum from Thomas Overcast and Susan Carney at Battelle to Emmett Moore?
MR. LESTER. I think it's Mr Rosselli
MR. MILLER: Yeah, you misspoke and said Mr. Morgan.
MR. NESLIN: Mr. Rosselli. Excuse me. I'd like to direct you to page 2 of that document. PNL-117-3152 under heading 3.0, DOE Considers Temporary At-reactor Storage. Would you read those two paragraphs please?
BY MR. NESLIN:
Q. Mr Rosselli, in the first paragraph, it refers to you speaking at, "An Atomic Industrial Forum Conference in Atlanta." Do you see that?
A. Yes.
Q. Do you remember participating in such a conference?
A. No, I don't.
Q. Do you recall during the time that you were at OCRWM making any presentations to outside groups on the waste management program?
A. Yes, I do. I remember being in the the same forum as the conference that Mr. Morgan

Page 164

# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs,

vs.

UNITED STATES,

DEFENDANT.

Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440C
00-697C, 00-703C, 01-115C
01-116C, 01-249C

---

VOLUME II
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 16, 2002
- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9:07 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

NAEGELI REPORTING CORPORATION

Portland, OR (503) 227-1544
Spokane, WA (509) 838-6000
Seattle, WA (206) 622-3376
Coeur d'Alene, ID (208) 667-1163

National: (800) 528-3335
www.naegelireporting.com
Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,
Plaintiffs,
vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
UNITED STATES, 98-621C, 99-447C, 00-440C
00-697C, 00-703C, 01-115C
01-116C, 01-249C
DEFENDANT.

VOLUME II
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 16, 2002
---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9:07 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

Page 186

APPEARANCES
ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY; DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: Daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM

Page 187

BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: Kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: Dcassling@jenner.com
Appearing on behalf of Commonwealth Edison Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and R. ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov

Page 188

Also Present:
Peter J. Skalaban, Jr.

Page 189

RICHLAND, WASHINGTON,
APRIL 16, 2002,
9:07 a.m.

EXAMINATION
BY MR. NESLIN:

Q. Mr. Rosselli, I remind you that you're still under oath from yesterday. Do you understand?
A. Yes.
Q. And we'll follow the same ground rules that we discussed in the beginning of your deposition yesterday, okay. Do you recall?
A. Yes.
Q. Have you discussed your deposition with anyone since the time that we broke yesterday and this morning?
A. No.
Q. I'd like to clarify one point that we discussed yesterday afternoon with respect to Exhibit 13, the December 20, 1983 draft of the Mission Plan. Mr. Rosselli, am I correct that this draft does reflect the intent of the Department, as you understood it at the time it was issued?
A. The intent of the Department as it



relates to its plans to fulfill the requirements of the statute, yes.
Q. It reflects how the Department expected to fulfill it's requirements under the statute?
A. Yes.
(Whereupon, a document entitled Mission Plan for the Civilian Radioactive Waste Management Program, dated April of 1984 was marked Exhibit-24.)

BY MR. NESLIN:

Q. Mr. Rosselli, you've been handed what's been marked Exhibit 24 to your deposition. This document is entitled Mission Plan for the Civilian Radioactive Waste Management Program dated April of 1984. Would you have been responsible for the preparation of this document, sir? And let me clarify that this is not the entire document. It's simply, I believe, the first two chapters of a much lengthier document.
A. Given the fact that the Mission Plan was under my responsibility, I would conclude, yes.
Q. And you were still at OCRWM as of April 1984?
A. Yes, I was.
Q. Would you have reviewed this before it



was published in this form?
A. I don't recall.
Q. Sir, as you've testified that you would have been responsible for the preparation of the Mission Plan, apparently a Mission Plan, this April draft, was prepared, was published. Pages 1 and 2 indicate that it was circulated to various parties by the Department. Based upon that, would you believe that you would have reviewed it before it was circulated?
A. The transmittal letter on this thing is dated May 2nd, '84. And I do not recall when I started to actually disengage. If memory serves me correctly, I was here in Richland in the first part of May. And so I don't recall the extent and degree of my actual review of this before it went out.
Q. Do you recall reviewing drafts of the Mission Plan subsequent to December 20th of 1983?
A. Yes, I did. I have reviewed those documents. Those are per all your documents.
Q. And I'm talking about drafts after, that were prepared after Exhibit 13?
A. No, I don't recall that. I just don't recall.



Q. Do you recall the process that the Department followed in going from the December 20th, 1983 draft to the April 1984 draft?
A. Specifically, no, I don't recall the exact process.
Q. Do you recall anything about the process?
A. No, I don't.
Q. Do you recall who was involved in attempting to revise the plan?
A. Specifically, no.
Q. I believe you testified yesterday that the Mission Plan work was coordinated by Mr. Head in the operations division?
A. That's correct.
Q. Would Mr. Head have been involved in the preparation of the April 1984 draft?
A. Yes. I can only assume, you know, at this point in time, given the functional responsibilities of that organization and the fact that it fell under my responsibility that, you know, there was a process, and those players were involved from the initial draft to the second draft to the final.
Q. If I could direct you to page 2-1 of



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

the April 1984 draft. If you could look under heading A, Waste Acceptance Schedule. If you could review that portion of the document. Do you see the table 2-1, Mr. Rosselli?
A. Yes.
Q. Do you recall reviewing this table?
A. No, I don't.
Q. At or about March or April of 1984?
A. I don't recall it specifically, no.
Q. Do you know whether this table reflected the Department's intended rate for receiving spent nuclear fuel as of April 1984?
MR. LESTER: Objection. Calls for speculation and a legal conclusion.
MR. NESLIN: You may answer if you can.
THE WITNESS: Yes. I believe that in the earlier version, it showed 1800 as the initial acceptance rate for the first five years. And I believe in further thought and discussion, the department felt that they couldn't start at that higher rate, so they made some adjustments to it and they, sort of, prepped for operation and full scale on a different schedule. And that's what I remember



as the terms of why there are changes in the numbers from the previous Mission Plan.
BY MR. NESLIN:
Q. This table reflects the receipt rate of 400 metric tons beginning in 1998, increasing to 900 metric tons in 2001, 1800 metric tons in 2002, and then 3000 metric tons thereafter for the first repository. Correct?
A. Yes.
Q. And a second repository beginning in, I believe, 2005 at 1800 metric tons receipt rate, increasing to 3000 metric ton receipt rate in the year 2010. Correct?
A. Yes.
Q. Did that reflect the Department's expectation as of April 1984, as you recall?
A. Yes.
Q. Mr. Rosselli, was the change to a 400 metric ton receipt rate in 1998, was that because returns repository development was slipping?
A. No. It was much more associated with start-up of a new operation and what was doable relative to the start-up.
Q. Concerns that you could not immediately



begin performing at 1800 MTU?
A. Right.
Q. Even if the facility were operating in 1998?
A. Right. It was as they were starting to look at it, you know, the feeling was that starting at 1800 was too big a number for an initial acceptance rate. And they had to start on a smaller scale and work through the procedures that were in place and get comfortable with them before they got to a steady state operation of 3000. It would take them some time to get there, which is a normal start-up situation, by the way, in anything.
Q. Who at the department was involved in making that change? Do you recall?
A. I don't recall that.
Q. Do you recall who at the department had concerns about the Department's ability to begin receiving waste at the rate of 1800 MTU in 1998?
A. I don't recall that.
Q. Do you recall -- if I could direct you back to Exhibit 1. Do you recall whether that reflected input from the geologic repository



deployment section?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. Do you recall whether it reflected input from the storage and systems development?
MR. LESTER: Same objection.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. Is there anything that you can think of that you might look at that would refresh your recollection on this issue?
A. Not off the top, no.
Q. Can you think of who else would be knowledgeable about this issue?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Specifically, no.
(Whereupon, pages of a document from the Justice Department to Mr. Rosselli were marked Exhibit-25.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 25 is a series of pages, the first page of which bears the



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

vs. No. 98-126C, 98-145C, 98-474C

UNITED STATES OF AMERICA,

Defendant.

VOLUME III
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of the Plaintiff
April 16, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 10:30 a.m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington.

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000

Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

National: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,
Plaintiff,
vs No 98-126C, 98-145C, 98-474C
UNITED STATES OF AMERICA,
Defendant.

VOLUME III
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of the Plaintiff
April 16, 2002

---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 10.30 a m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington



APPEARANCES
SPRIGGS & HOLLINGSWORTH
BY. PETER J. SKALABAN, JR.
1350 I Street, N W.
Washington, D C. 20005-3305
202-898-5821
E-mail pskalaban@spriggs com
Appearing on behalf of Yankee Atomic Company

U S DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY HAROLD D LESTER, JR and R. ALAN MILLER
1100 L Street, N W
Washington, D C 20530
202-616-0383
E-mail harv lester@usdoj.gov
alan miller@usdoj gov
Appearing on behalf of the United States



RICHLAND, WASHINGTON,
APRIL 16, 2002,
10.30 a m
ROBERT M. ROSSELLI,
having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY-MR SKALABAN
Q. Hello, Mr. Rosselli My name is Peter Skalaban I represent Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company. This deposition has been noticed in Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Main Yankee Atomic Power Company versus the United States under the numbers 98-126C, 98-153C and 98-474C Could you state your full name for the record?
A Robert Michael Rosselli
Q Procedurally, how this deposition will work is, I'll be asking you a series of questions, and you will be expected to answer the questions The court reporter is taking everything down, and we will get a written transcript of everything that's said today. Do



you understand that?
A Yes, I do
Q Please respond verbally, so that the court reporter can get your answers So if possible, please avoid shaking of the head Is that okay?
A Yes, it is
Q If I ask you a question and you don't understand one of my questions, or you're not sure what I'm asking, will you let me know, so I can rephrase it?
A I will
Q And if I ask you a question and provide an answer and later on in the deposition you realize that answer is incorrect or incomplete, will you let me know, so that we can correct or complete your answer?
A Yes, I will.
Q. Thank you Sir, where were you born?
A Youngstown, Ohio
Q And when were you born?
A May 8, 1944
Q Did you grow up in Youngstown, Ohio?
A No I grew up, basically, in Murray, Ohio which is a southwest suburb of Cleveland

Object to the form. Object because it calls for speculation

THE WITNESS: I have no basis to respond to that question

BY MR. SKALABAN

Q Is it reasonable to expect that some utilities under an OFF schedule would not have enough of an allocation to meet their storage needs?

MR LESTER Objection, vague Objection, doesn't define the time period. Objection, calls for speculation And I object to the form.

THE WITNESS I have no basis to respond to that question

BY MR. SKALABAN

Q When you say you have no basis to respond to my last two questions, you just don't have an understanding of the issue?

A I don't know what would happen in 1998 It's total speculation So I have no basis to comment upon that

Q Well, when you were involved in drafting the contract in 1983, did you have any expectations of how that would work in the

Page 263

future?

A No

Q In terms of OFF and exchanges?

A No We were setting up a mechanism that would provide for the disposal of spent nuclear fuel based on oldest first

Q And that's how you expected it would work in practice?

A Yes. And there was the exchange provision to address, if for some reason a deviation surfaced.

Q And that reason would not be to reallocate the acceptance allocations to each utilities in an efficient way?

MR LESTER: Objection Asked and answered both in this deposition and in the last one Calls for a legal conclusion I object to the form as well

THE WITNESS I do not recall.

BY MR. SKALABAN

Q In your mind if exchanges would allow for the reallocation of spent fuel acceptance allocations in a manner that was efficient and saved utilities money, would that be a desirable outcome?

Page 264

MR. LESTER: Objection, vague Calls for speculation

THE WITNESS. I don't recall

BY MR. SKALABAN.

Q But even sitting here today, would that be a desirable outcome to increase under efficiency?

MR. LESTER Same objections.

THE WITNESS I don't recall.

BY MR SKALABAN

Q. Again, Mr Rosselli, I'm not asking for your recollection. I'm just asking you for your opinion If exchanges would allow for utilities to realize cost savings by reallocating among themselves, acceptance allocations, would that be desirable?

MR LESTER Objection, vague Calls for speculation

THE WITNESS. You're asking me to comment on something that I don't recall was a consideration at the time of the formation of the contract

BY MR SKALABAN:

Q But sitting here today, you have no opinion on whether that would be desirable or

Page 265

not?

A No, I don't

Q I'd like to call your attention to paragraph 112 on page 24 of this document That paragraph states, "Under the Yankee Atomic Contract, DOE is required to undertake all reasonable steps necessary for the development, licensing and construction of all transportation casks necessary for use in the spent fuel/HLW program established by the NWPA "

Do you agree with that paragraph, Mr. Rosselli?

MR LESTER Objection, vague Doesn't define the term reasonable Calls for a legal conclusion The standard contract is the best evidence of its contents

THE WITNESS I don't recall

BY MR SKALABAN

Q Do you have any recollection of any discussions, at all, from the January 1983 time period through June of 1983 regarding DOE's provision of the transportation casks necessary for use in the spent fuel program?

MR. LESTER: Objection, vague.

THE WITNESS: I don't recall

Page 266

MR. LESTER. Objection, vague, compound Calls for speculation
THE WITNESS I have no basis to respond to that
BY MR. SKALABAN·
Q And in the next paragraph it states that, "The movement of spent fuel from a spent fuel pool at an operating plant can be disruptive of the normal electricity generation activities at the plant " Do you see that, sir?
A. Yes, I do
Q Do you have any reason to disagree with that statement?
MR LESTER Objection, calls for speculation
THE WITNESS I have no basis to respond
BY MR. SKALABAN:
Q I'd like to call your attention to Rosselli Exhibit 3 which is the standard contract If you could please take a moment to read -- I'll give you the Bates number of the page It's HQ0016689
A Okay



Q If you could take a moment to read Article B
A. Excuse me what article?
Q I'm sorry Article 5, paragraph B, entitled Delivery Commitment schedule and paragraph C, entitled Final Delivery Schedule
A Okay
Q During the time of contract formation, what was your understanding of how Article 5, subparagraph b, Delivery Commitment Schedule would work in operation?
MR LESTER Objection Calls for a legal conclusion and asked and answered in the prior coordinated discovery depositions.
THE WITNESS. In the development of the contract, we were preparing a process, was an enabling process I don't recall giving much thought in terms of how it would actually work, because it was so far out into the future
BY MR SKALABAN
Q. So at the time of contract formation, you hadn't thought through all the details of how the process would work and operation --
MR LESTER. Objection, form.



BY MR. SKALABAN.
Q -- down the line?
MR. LESTER. Objection, form. Mischaracterizes his testimony.
THE WITNESS Yes And at the time of, you know, formulation, I mean, there were still a lot of technical and financial questions that had to be resolved So we were putting together based on the contract, on the legislation, the instrument that would define the process in terms of how this would all work when all these things got resolved
MR SKALABAN I'm sorry Could you read back the last answer
(Record read )
BY MR. SKALABAN
Q. Now, I'm sorry, what did you mean by the instrument of the process? I'm not sure if I followed your answer to that?
MR LESTER. Objection, vague
BY MR. SKALABAN·
Q Could you clarify that for me a little bit?
A The contract was the instrument and that contract outlined the process that would be used



once all the issues were resolved, and we were starting to implement the contract
Q And so what did you understand that process to be?
MR LESTER Objection, vague
THE WITNESS As outlined right here in the article, that utilities would propose The Department would either accept or reject their proposals If they were rejected, they were given an opportunity to re-propose or revise.
BY MR SKALABAN
Q Now, what did you understand the criteria to be on whether a DCS was acceptable or not?
MR LESTER Objection. Calls for a legal conclusion Asked and answered in the last deposition
THE WITNESS I don't remember
BY MR SKALABAN
Q And did you anticipate that the exact operation of this provision and this process would be flushed out in the future?
MR. LESTER. Objection. Calls for a legal conclusion

THE WITNESS I don't recall
BY MR. SKALABAN
Q. Do you have any understanding of what the provision that says, "Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus 20 percent and the delivery schedule up to two months until the submission of the final delivery schedule." Do you have an understanding of what that provision was intended to do?
MR. LESTER Objection. Calls for a legal conclusion
THE WITNESS: I don't recall.
BY MR. SKALABAN:
Q Do you have an understanding of what the effect would be if the delivery commitment schedule process was halted or suspended?
MR. LESTER. Objection Calls for a legal conclusion
THE WITNESS. I have no basis to respond to that
BY MR. SKALABAN
Q So at the time of contract formation, you hadn't thought of the possible effects of that? Of a halting or suspense in the process?



MR LESTER Objection, form. Mischaracterizes his testimony
THE WITNESS I don't recall.
BY MR. SKALABAN.
Q Do you have any understanding of what the effect of final delivery commitment schedule was intended to be? A final delivery schedule, what the intent -- I'm sorry. Let me rephrase that, maybe, to be a little clearer.
Article 5, paragraph C, refers to final delivery schedule. Do you have any recollection of what DOE's intent was regarding how that provision would operate?
MR. LESTER: Objection. Calls are a legal conclusion. Vague.
THE WITNESS: This was the instrument that the utilities could propose what they finally would be giving the Department according to their acceptance ranking And it would be the basis upon which future plans would be, you know, made to receive and ultimately dispose of their spent fuel.
MR. SKALABAN: I'd actually like to take to break, Mr. Lester, if that's acceptable to you, because I don't think I have



that much longer to go And if I can organize things then --
MR. LESTER. Sure.
(Recess.)
MR. SKALABAN: I'd like to mark as Rosselli Exhibit 6 the May 7, 1983 EEI comments
(Whereupon, a document entitled Edison Electric Institute dated March 7, 1983 was marked Exhibit-6.)
MR. LESTER I'm sorry. You mean to say March rather than May?
MR. SKALABAN March 7, 1983 EEI comments
BY MR SKALABAN
Q Mr. Rosselli, if you can look at page 7 of these comments. First of all, do you recognize these comments?
A Specific form, I mean, I don't But I do recognize that we got comments from EEI
Q Does this --
MR. LESTER Maybe we could stop the deposition until taping stops
MR SKALABAN. Yeah, off the record



(Off the record.)
BY MR SKALABAN
Q Does this appear, Mr Rosselli, to be the comments that you would have received from EEI?
MR LESTER Objection Calls for speculation
THE WITNESS To the best of my recollection, yes
BY MR. SKALABAN.
Q I'd like to call your attention to page 7 in the letter It's YDK-026-103882.
A Got it
Q Do you see in the first full paragraph beginning, "To remedy these shortcomings?"
A Yes
Q EEI states, "We also urge the purchasers be allowed to exchange delivery commitments This will allow the marketplace to deal with particular utility needs." Do you see that, sir?
A. No. "To remedy these shortcomings?"
Q Yeah, it's in that paragraph If you could take a moment, please.
A. Okay.



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Spokane, WA (509) 838-6000
Seattle, WA (206) 622-3376
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204