# Ben Rusche

UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRONIC ) CA NO. 98-126C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
)
)
MAINE YANKEE ATOMIC POWER ) CA NO. 98-474C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
)
)
CONNECTICUT YANKEE ATOMIC ) CA NO. 98-154C
POWER COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
)

Deposition on oral examination of BEN RUSCHE, VOLUME 1, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Thursday, May 16, 2002, at the hour of 9:20 a.m.

Page 2

Appearances:

Representing the Plaintiffs:

JERRY STOUCK, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005-3305

Representing the Defendant:

R. ALAN MILLER, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

Page 3

CONTENTS
(Deposition of Ben Rusche)


| | Page |
|---|---|
| Exhibit Index | 3 |
| Stipulations | 4 |
| Examination by Mr. Stouck | 4 |
| Certificate of Reporter | 301 |
| Verification of Deponent | 302 |
| Errata Page | 303 |


* * * * *

EXHIBIT INDEX


| Exhibits: | | Marked at Page |
|---|---|---|
| (Copy of exhibits attached to each copy of transcript.) | | |
| 1 | Curriculum Vita | 10 |
| 2 | Bates DE-100259 through DE-100266 | 41 |
| 3 | Bates PNL-101-3141 through PNL-010-3145 | 42 |
| 4 | Bates DC-103665 and DC-103666 | 76 |
| 5 | 42 USCA S 10222 | 86 |
| 6 | Bates ZAB-001-0893 through ZAB-001-0902 | 88 |
| 7 | Bates DB-107948 through DB-108009 | 101 |
| 8 | Defendant's Witness List | 118 |
| 9 | Bates PNL-173-2668 through PNL-173-2704 | 136 |
| 10 | Bates SN069588 and SN069599 through SN0069600 | 151 |
| 11 | Bates DER-007-2896 | 165 |
| 12 | Bates CTR-042-1065 through CTR-042-1191 | 168 |
| 13 | Bates CTR-042-1192 through CTR-042-1200 | 196 |
| 14 | Bates PNL-173-1282 through PNL-173-1288 | 202 |
| 15 | Bates DB-105274 through DB-105806 | 221 |


* * * * *

Page 4

This deposition is taken in accordance with the Federal Rules of Civil Procedure.
It is agreed and stipulated by the deponent and respective counsel that the reading and signing of the deposition by the deponent is expressly not waived.
Whereupon:
BEN RUSCHE, being duly sworn and cautioned to speak the truth, the whole truth and nothing but the truth, testifies as follows:
EXAMINATION
BY MR. STOUCK:
Q. Good morning, Mr. Rusche. We have met before, and we greeted briefly before the deposition started. Have you been deposed before?
A. I believe I have.
Q. Okay. Do you recall when?
A. Not for this purpose.
Q. I understand.
A. I think I had -- I was in an arbitration proceeding in the last year.
Q. Within the last year?
A. Yes. For a company which I'm associated with.
Q. Okay. Prior to that had you been

Page 5

deposed?
A. I don't believe so.
Q. Okay. Well, let me just briefly go over some of the ground rules. I'm going to be asking you --
A. May I have a pad in case I want to jot down something?
Q. Sure. Have you got one? Because I've got a spare.
A. I think I've got one.
Q. Okay. If you've been through it within the last year, you're kind of an old pro, but I'm going to be asking you a series of questions. And we want your best answers.
If you don't understand one of my questions or if you need a clarification, please feel free to ask. And if you -- otherwise I'm going to assume that you understand the questions. Okay?
A. Yes.
Q. And it's very informal, as you can tell. So if you would like a break for any reason at any time, just let me know, or if there's anything else we can do for you during the course of the day, we'll try to accommodate you.

Page 10

or any other medication you are on that would prevent you from giving your best answers?
A. Absolutely not. It's purely my choice.
Q. All right. I would like to ask you about your professional experiences. And I happen to have --
MR. STOUCK: Well, can you mark this as, I guess, Exhibit 1 to this deposition.
(Exhibit No. 1 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you've been handed a document that's been marked Exhibit 1. It appears to be a resume or vita for you. It's dated November 1997. Do you recognize this?
A. 19 what?
Q. It's dated at the top of the first page November 1997.
A. Yes, 1997.
Q. Do you recognize this?
A. Yes, I do.
Q. Did you prepare this?
A. Yes.
Q. Okay.
A. It is not current.
Q. Right. I understand that. Let's try to

Page 11

bring it current. We'll try to bring it current in the course of our discussion here, but would you -- I guess on Pages -- there's a chronological -- the first couple pages are qualitative, I'll call it, the first page and a half, but then there's a chronological listing of your positions that starts on Page 2 and continues on Page 3 and continues on Page -- over all the way almost to the very end.
Would you just take whatever time you need to look at that. And I think we can save a lot of time here with questions if you can just tell me that that's either accurate or point out the respects in which it may not be accurate.
A. It's accurate up to the date that it includes.
Q. All right. Well, let's start there with the date that it includes is 1996 dash. It says you were president of Management & Technical Resources, Inc. Is that still your position?
A. It is one of them, yes.
Q. It's one of them. Okay. So you still hold that position. And if you were to update this -- and also it indicates here, it's still an open matter, that you are chairman Law/Spear,

Page 12

S-p-e-a-r, LLC. Do you still hold that position?
A. No. The LLC was closed about six months ago.
Q. All right. And the business no longer exists?
A. Correct.
Q. Okay. So do you hold any other positions besides president of Management & Technical Resources?
A. Yes.
Q. All right.
A. I'm on the board of directors of the Swedish nuclear company called STUDSVIK, S-T-U-D-S-V-I-K, Inc., which is a U.S. subsidiary of a parent corporation, STUDSVIK AB in Sweden.
I'm on the Nuclear Advisory Council for the governor of the State of South Carolina. And it is called the Nuclear Advisory Council.
Q. Okay.
A. As a -- the vehicle Management & Technical Resources, Inc. is my consulting company, and I have several contracts through MTR.
Q. All right. And what -- anything else that you can think of?
A. Let me just think a minute. I think all

Page 13

the other things that I'm doing, I'm doing through MTR.
Q. All right. So I think you just may have answered this question, but this Management Technical Resources you described as your consulting company, would you say generally you are employed in the consulting business?
A. Beg your pardon?
Q. Are you today generally employed in a consulting business? Is that what you do for a living?
A. On a part-time basis, yes.
Q. Part-time basis?
A. Yes. It's far from full-time.
Q. And the other part-time is what? Are you --
A. My wife's husband and my son's father and so forth.
Q. Play golf?
A. I occasionally go out, but some would argue whether I play.
Q. All right. What business is this Swedish nuclear company in? And are they -- is it a generating company?
A. No. They are a waste treatment company.

many years at Savannah River.
And waste management at Savannah River from 1953 forward was a major factor. And I had occasion and interest and participation in many of those activities. So the subject was sort of grafted in my memory.
Q (Mr. Stouck) All right So you were aware of it at the transition time?
A. Sure
Q. But it was not something you actively worked on?
A. Absolutely
Q. So, I guess, were you involved -- because in the industry at that time there was this issue of what to do with these kinds of wastes now that reprocessing was not going on in this country, right?
A. Right.
Q So it was a big issue problem -- you know, it was a big issue in the industry and you were interested in it to that extent?
A. And aware of it.
Q And aware of it. Okay. But you did not, or did you, work at all on any legislative activities leading to the enactment of the Nuclear



Waste Policy Act?
MR. MILLER: Objection. Compound.
THE WITNESS. What does that mean?
MR. MILLER: Go ahead Go ahead and answer.
THE WITNESS: I did not, other than being aware with the Secretary that it was a matter that needed urgent attention.
Q. (Mr. Stouck) So during '81, '82 you were aware or is it true that the legislation was being developed at that time, do you know, or --
A. I do not know, but I presume so.
Q. But you weren't working on it?
A. I was not.
Q. Directly?
A. Not directly.
Q Or indirectly?
A. Or indirectly
Q. Okay. Back up to you were appointed as director of OCRWM, I believe, in early 1984; is that right? Do you recall when you started?
A. When I started or when the appointment was?
Q Well, when was the appointment? Let's start with that.



A. I think it was in January of '84 that I visited the White House. And the appointment followed thereafter.
Q. And when did you actually start working?
A. March, I believe, of '84 I was confirmed.
Q. Okay. And can you tell me generally -- we're going to come back to some of these things and go into a little more detail, but from 1984 -- when did you leave the Department? I think you said -- earlier today you said early 1988, I think is what you said?
A. I believe -- I believe that my actual retirement date from the Department was late November of '87.
Q. Okay. Well, starting in March of 1984, you know, when you started as director can you just tell me first generally, and as I say we'll come back to some of these things in more detail, but what were your major duties? What were you working on, let's say, when you first got there? What was the task?
A. I think the most explicit statement that I could refer to would be my confirmation statement.



Q. Okay. You want to take a look at it?
A. No. I know what I said, but that is about as succinct as I -- that's what I understood and knew to be the case and that's what I gave attention to.
Q. Okay. Well, let's take a look at it anyway.
MR. STOUCK: Let's mark it as No. 2.
(Exhibit No. 2 was marked for identification.)
(Off-the-record discussion.)
Q. (Mr. Stouck) You've been handed a document, Mr. Rusche. It says Confirmation Statement, Bernard C. Rusche, May 17, 1984. It's about five pages long. Would you take a look at it. And my first question is going to be what is this? So --
A. It appears to be a copy of my confirmation statement obtained from some source.
Q. Okay. Confirmation statement meaning is this a statement that you submitted to a committee in Congress in connection with your confirmation?
A. It was my oral testimony as well as the document submitted at the hearing for my confirmation.

Page 82

nuclear fuel not later than January 31, 1998," is it your testimony that the Secretary was mistaken?
MR. MILLER: Objection. Calls for speculation and a legal conclusion.
THE WITNESS: It is my opinion that the expression of the Secretary was not founded on information, at least, that I believe was relevant.
Q. (Mr. Stouck) Okay. So you disagree with that statement?
A. I do.
Q. Okay. So the Secretary was mistaken?
MR. MILLER: Objection. Mischaracterizes his testimony.
Q. (Mr. Stouck) You just disagree?
A. I disagree.
Q. You don't know if he's right or wrong? You might be right and he might be right, but you can't both be right?
A. Sure. We both cannot be right.
Q. Okay. And you don't know whether you're right about the legal obligation or whether he's right as we sit here today?
MR. MILLER: Asked and answered.
THE WITNESS: I'm unqualified to speak

Page 83

about the legal obligation.
Q. (Mr. Stouck) Okay. But your understanding, in any event, was different from the understanding in this sentence that I just read to you?
A. Yes.
Q. Okay. And that was true in 1984?
A. Yes. To the best of my recollection.
Q. All right. You haven't followed, I take it from what you told me earlier, the course of this litigation about the -- dealing with obligations with respect to spent fuel?
A. No.
Q. Do you know how long the litigation has been going on?
A. Quite awhile, but I don't have a precise time period. Two or three years I would guess, but that's a pure guess.
Q. All right. Are you aware that a Federal Court of Appeals has ruled in a related case that the Department of Energy's obligation to accept spent nuclear fuel from commercial utilities by January 31, 1998, is "unconditional" and not dependent upon the existence of a repository by that date?

Page 84

A. I am.
Q. You are aware of that?
A. Yes.
Q. Okay. How are you aware of that?
A. I've seen various accounts in the nuclear media.
Q. Okay. Do you review -- nuclear media, does that include like --
A. Nuclear News or something of that sort.
Q. Are those publications that you read today?
A. Maybe once every six months.
Q. Not on a regular basis?
A. I have no access to them regularly.
Q. But that court ruling that I just described to you, would you agree, is also at odds with your understanding that you've just expressed here today?
A. It is indeed.
Q. Okay. Are you familiar with the term standard contract?
A. Yeah.
Q. Okay. What is that?
A. It was an activity in a document to establish the relationship between the Department

Page 85

and the utilities for the acceptance or scheduling of fuel.
Q. All right. When was the first time, Mr. Rusche, that you saw a copy of the standard or a standard contract?
A. To the best of my knowledge, I've never seen a copy.
Q. All right. It was not something you reviewed during the course of your activities as director of --
A. To the best of my knowledge, I did not.
Q. Do you know -- do you know that those contracts were, in fact, executed and entered into with all of the commercial nuclear companies that have spent fuel in the country?
A. I really don't have any recollection of the execution of such contracts. To the best of my knowledge, I've never seen one. And --
Q. Well, is it your understanding that the Act provided that all of the utilities would enter into it?
A. Sure. Indeed. But I just --
Q. You don't have any firsthand knowledge?
A. I just didn't have any firsthand knowledge other than we had programs in which they

Page 86

were being considered, the forms were being developed. And there were ongoing discussions with utilities looking at queueing procedures and all kinds of things of that sort.
Q. That related to --
A. That related to receiving the fuel, if it could ever be done.
Q. Do you know how -- well, let me --
MR. STOUCK: Let's mark this another exhibit, please. This is No. 5, I think.
(Exhibit No. 5 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, the reporter has handed you a document that's been marked Exhibit No. 5. This is a copy -- an excerpt from the United States Code 42 USC Section 10222. It's part of the Nuclear Waste Policy Act.
The section is titled for some reason Nuclear Waste Fund, as you can see, but the subsection that I am interested in and want to ask you some questions about is Subsection A is entitled Contracts.
Okay. Would you -- and I'm particularly interested in under A in the Subsections 5 and 6. So that goes on to the second page of this

Page 87

exhibit, but if you would like, you can review -- please take a couple of moments to review whatever you want to review.
Do you recall this provision of the Act generally, that there was a provision for contracts in the statute?
A. I realize -- yes, I recall that there was a provision. I've never seen this piece of paper before.
Q. Correct. But accept my representation that this is a copy of the relevant section of the statute.
A. Sure.
Q. So when you told me earlier today that you had reviewed the Nuclear Waste Policy Act in preparation for this, was this one of the sections that you would have reviewed?
A. Well, I didn't see --
Q. Not this piece of paper, but whatever copy of the statute you had?
A. I just got a copy of the statute which establishes or states some of the factors that are stated here.
Q. Right. And so in -- actually with this -- let's go ahead and mark another exhibit.

Page 88

I want to ask you about both of them together or maybe more than two.
MR. STOUCK: This one would be No. 6, I guess. Keep that section of the statute handy, please.
(Exhibit No. 6 was marked for identification.)
Q. (Mr. Stouck) Do you know, Mr. Rusche, whether these contracts were entered into -- whether or not they were entered into prior to your arrival at the Department in early 1984?
A. No.
Q. Don't know whether they were?
A. No.
Q. Okay. Take a look at what's been marked now as Exhibit No. 6. Actually when you say -- my question was, I believe, you don't recall or was do you know -- I think my question was do you know.
Are you telling me that you don't recall whether they were or that you recall and you know they were not, I guess is my question?
MR. MILLER: Objection. Compound.
THE WITNESS: I don't recall any discussion on the subject that would have provided

Page 89

information one way or the other.
Q. (Mr. Stouck) Okay. So they may have been entered into before you got there and they may not have?
A. Correct. That is correct that I don't know and they may or may not have been entered into, but of my own knowledge I do not know whether they have been entered into.
Q. Before or after?
A. Either.
Q. Is that a matter of recollection?
A. Yes.
Q. Okay. So you don't recall whether they were?
A. Correct.
Q. At the time you got there in 1984 when you were working at the Department you would have known whether or not they had already been signed?
A. It was furthest on my list when I got there in 1984.
Q. Well, do you think you would have known?
A. No.
Q. Okay. Why do you say it was furthest on your list?
A. There was so many factors that needed to



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 158

1998, I have never seen or heard in my recollection.
Q. Okay. And so does that mean that that was not your understanding at the time you joined the Department in 1984?
A. That there would not have to be any further storage?
Q. That that was the strategy?
A. Wait a minute. Well, strategy --
Q. See, the sentence here says, "The strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
A. I never was a party to such a statement, so far as I know. You may find something to the contrary, but I cannot -- I never recall that being the case.
Q. Okay. And you don't recall there being a strategy to facilitate utilities avoiding additional storage in 1998?
A. Certainly that was a -- that was an intent or a strategy in a sense, but strategy needs to be put in the context of some reality. And in my -- in my time and my awareness that

Page 159

would -- that was just a completely unreasonable expectation.
Q. Okay. When you say it was a strategy --
A. In my own mind.
Q. Fine. Thank you. You say it was a strategy in a sense. In what sense was it a strategy?
A. Because the statute said we'll begin receiving fuel in 1998. In that sense then I can't deny that.
Q. In that sense there was a strategy of allowing utilities to avoid additional storage on site?
A. I think this statement is trying -- is attempting to say that that strategy was the one that was then being applied or being -- that was understood as the objective of the operation.
Q. Okay. And my question is simply was that your understanding at the time in 1984 that that was the strategy?
A. In 1984 in my mind?
Q. That that was the strategy?
A. Yes, I can agree that was the strategy.
Q. Okay. And what about the next sentence here, "During the first year of operation of

Page 160

repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location," do you agree that that or do you not agree that that was part of the strategy at the time you were there?
A. In my perception and recollection, I can never remember that being a discussed point or strategy.
Q. Okay. Well, but you do agree that the prior sentence or at least you do agree, I think, in connection with discussion with the prior sentence that there was a strategy of -- tied to the '98 date and commencement of activities, there was a strategy of allowing utilities to avoid additional on site storage? I thought --
A. No.
Q. You didn't agree with that?
A. No. I thought I said that the strategy that I see articulated here and in the context of the Act, as I understood it, that it's not inconceivable that one would say that it was the strategy of the Department to begin receiving fuel at an unidentified rate.
And the sentence earlier on, one fuel,

Page 161

kind of sounds ludicrous, one fuel element, but it was clearly not -- and I cannot recall ever having -- a discussion that would say that the purpose of the 1998 date was to preempt the necessity for any future storage capacity in any of the utilities.
Q. That was not your understanding in 1984?
A. That's right.
Q. So avoiding some additional on site storage capacity after '98 was part of the strategy, but preempting any possible on site storage facility for utilities after 1998 was not part of the strategy? Is that the distinction you're drawing?
MR. MILLER: Objection. Mischaracterizes previous testimony.
Q. (Mr. Stouck) I'm just trying -- I'm really just trying to understand where the lines are here. Because I thought you had agreed -- I thought you had agreed -- and I may be wrong. So I'm trying to find out.
But I thought you had agreed that a part of the strategy was, at least as reflected in the prior sentence, to allow utilities to not have to provide any additional storage facilities on site? I thought you had agreed that you did have

Page 162

an understanding that that was the strategy?
MR. MILLER: Mischaracterizes previous testimony.
THE WITNESS: The sentence that you read and that I agreed with was that if we accepted one fuel element in 1998, we would be technically in accordance with the Act.
Q. (Mr. Stouck) Okay.
A. I would probably agree with that as a technical statement.
Q. Okay.
A. I don't -- I don't think that -- and I agree with the following sentence that said we did not believe that meets the intent of the Act.
Q. Okay.
A. But whether that means the extreme statement you just made, that that implied that there would be no need for any future discussion, any future storage capacity, and so I think there's a big gulf between those two statements, in my opinion.
Q. Okay. Well, that's helpful. Thank you. That clarifies it for me. And so again, if I understand, there was an intent, a strategy to help utilities avoid some amount of on site

Page 163

storage facilities by commencing operations in 1998, but perhaps not to avoid all possibility that there would be additional on site storage facilities? Is that what you're saying?
A. Yes.
Q. Okay.
A. Although I would say that in the context of the statement by Mr. Morgan, which is what we are referring to, we've had earlier discussion in which I have -- I think I've said even today, and I would be -- I think I would say it again, that when I had the discussions with Senator Johnston and had been there long enough to have had a chance to review to some extent what the circumstances were, the contract and these conditions were far down on the list of things that I was giving attention to.
And in that sense I don't want to mis-convey that that 1998 date in the Act was the thing that was a target on my door. It was not. It was finding a place to put at the earliest possible time, under appropriate conditions, fuel from not only the utilities, but from the Department.
Q. I understand. But in pursuing that

Page 164

objective you were acting to implement the Nuclear Waste Policy Act, correct?
A. Yes.
Q. Okay. Now, do you know whether the mission plan that we referred to earlier, I think it was mentioned in this document we just looked at, was required by the Nuclear Waste Policy Act? Do you recall whether the statute required that the mission plan be prepared?
A. I really don't. When I got there I believe a mission plan was in process or being worked on and it made good sense. I have not looked back at the Act ever to say was that required or just good judgment.
Q. Okay.
A. In the first case I would say it was good judgment, that we needed to have some sort of -- some sort of basis for creating an awareness for the part of all the constituents that were interested in the program as to what was -- what we were about. And in that sense I think that makes good sense or good judgment.
Q. But whether it was required by the statute, as we sit here right now you just don't recall?

Page 165

A. I just don't recall, but the value made it required, whether it was in the Act or not.
Q. I see.
A. In my mind.
Q. I understand. Excuse me. And I apologize sometimes for turning to get a document. I'm listening, even if I turn away from you.
MR. STOUCK: Let's mark this one as No. 11, please.
(Exhibit No. 11 was marked for identification.)
Q. (Mr. Stouck) All right. Mr. Rusche, you've been handed a document which is marked Exhibit No. 11 on United States Department of Energy memorandum stationery, date October 7, 1983, subject Review of OCRWM Mission Plan Working Draft.
The copy is not very good, but I think it says to Phillip Craig, director of Commercial Spent Fuel Management Program Office. And on the back it's signed by Mike Lawrence, correct? That's the document you have?
A. Yes.
Q. And it says --

Page 166

A. That's interesting. That's the first time I can recall seeing Mike's title.
Q. Acting deputy director. And this, of course, is prior to your arrival?
A. Yes. But I was not completely unaware of the fact that there was something there and that Secretary Edwards and I had been very, what shall I say, if not instrumental, at least had a strong view that this course -- that there needed an RWM or something of that sort.
Q. Right. Because, as you said before, it was a big issue, a big problem for the industry?
A. No question about that.
Q. All right. Now, the first sentence here says, "The attachment to this memo," which, of course, is not attached. This is just the cover memo.
A. Sure.
Q. It says, "The attachment to this memo is the latest working draft of the Mission Plan for the Office of Civilian Radioactive Waste Management." Do you see that?
A. Yes.
Q. And it goes on, "This draft is far from the finished product that we will make available for public review and comment."
This indicates that the -- obviously that the mission plan drafting process was in process before you arrived?

Page 167

A. Certainly.
Q. Were you aware of that?
A. Yes.
Q. Okay. When you got there you were aware that it was in process?
A. I was aware that there was an activity -- there was a document called a mission plan and an activity associated with it.
Q. Okay. In the second paragraph this document asks the -- whoever the distributees were to review it and return comments to Mr. Head. Do you see that?
A. Yes.
Q. Does that refresh your recollection at all about what his role was?
A. Well, it doesn't refresh it so much as tell me.
Q. Okay. Okay. You don't know any more than what you see on this paper?
A. I remember his name.
Q. Okay.

Page 168

A. I did not -- until I see this here, I didn't realize that's what he was doing. At least I don't recall realizing it, if I did.
Q. Okay. And then just the last sentence in that paragraph, it says, "If any areas exist in which the portions of the program discussed in the Draft Mission Plan for which you are responsible do not meet the requirements of the Act, please identify proposed corrective actions wherever possible, or provide as convincing a rationale as possible to support the action we propose to take." Do you see that?
A. Yes.
Q. So you would agree that that suggests that there was an objective here to have the mission plan meet the requirements of the Act?
A. Yes.
Q. All right. Okay. Well, let's move forward in time a little bit and take a look at --
(Off-the-record discussion.)
(Exhibit No. 12 was marked for identification.)
Q. (Mr. Stouck) Okay. We've now handed you a document that's marked Exhibit No. 12, Mr. Rusche.

Page 169

A. Yes.
Q. It's stamped Draft on the front. It says, "Civilian Radioactive Waste Management Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983."
A. Yes.
Q. Bates number CTR-042-1065 through 1191. Is that what you have?
A. I believe that's right.
Q. Okay. Now, this is dated a couple of months after the memorandum we just reviewed. So I think it's fair to say it's unclear whether this was the draft that was forwarded with the memo, but it may not have been certainly. Probably wasn't, but may have been.
My question though is this is getting pretty close to the time -- not terribly close. If you joined RW in May '84, it's getting closer in time to your arrival, but my question is looking at this, through this, whether you believe that when you did join RW and started working you saw this draft?
A. I really -- I can't recall any specific instance in seeing it. I can't deny that I -- somebody may have showed it to me at some point,

Page 170

but if you'll recall, in our discussion in December of 1983 I was not either involved, nor identified for involvement.

And if indeed I saw it, it would have been maybe somebody handed me a stack of documents and said, "These are things you might ought to look at sometime."

Q. When you arrived in May?

A. When I arrived in May.

Q. Okay. But you have no recollection?

A. I don't have any recollection of it.

Q. Okay. Let's take a look though at the very first page of text, I think, under Introduction.

A. Okay.

Q. The last paragraph on that page. It says that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.

Further, the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and" --

Page 171

ultimately misspelled -- "utimately, remove from at-reactor storage all waste that is more than 5-years old." Do you see that?

A. I do.

Q. Okay. Seeing this in this draft mission plan, do you now recall that that was a fundamental objective of the nuclear waste program at that time?

A. I can't say with respect to the program. I can say that it seems consistent with the Act.

Q. Okay.

A. But I really don't have any basis for guessing whether the -- I think -- excuse me. May I answer in a slightly different way?

You say was it consistent with the -- was the program consistent with that statement, I believe is the question you asked, or would you care to rephrase that?

Q. Why don't we have it re-read just to be perfectly clear.

A. All right.

MR. STOUCK: What was my last question?

(The Court Reporter read the record as requested.)

Page 172

MR. MILLER: Objection. Calls for speculation. Go ahead.

THE WITNESS: What I was going to say was that there's no question in my mind that the mention of the January 31, 1998, date is consistent with the Act.

As to whether or not it is -- the program at that moment was designed or aimed or stated to have confidence in being able to meet that, I can't really say. I have an opinion about it, but there's no point in giving you my opinion.

Q. (Mr. Stouck) Okay. Let's put the opinions aside at least for a moment. Maybe we'll come back to it.

But my question is this paragraph that I just read refers to the mission plan and the activities specified in the mission plan being targeted toward one fundamental objective. And then it --

A. Yes.

Q. -- describes what the objective is.

A. Yes.

Q. And then there's a further sentence also. I'm simply asking whether this paragraph refreshes your recollection about whether or not

Page 173

this, meaning what's stated here in this paragraph, was at that time a fundamental objective of the program?

MR. MILLER: Objection. Calls for speculation.

THE WITNESS: I can only respond by saying this is what those who were there wrote.

Q. (Mr. Stouck) Okay. So beyond that, you have no answer to my question?

A. I don't know how I can answer any further.

Q. Okay. Do you have an opinion about whether -- you mentioned opinion, and I don't remember exactly in what context, but do you have an opinion about whether this was a fundamental objective to the program at the time you arrived, these sentences we just read?

A. Well, you're asking for do I have -- did I have an opinion. In the light of what I then knew about the Act and the program when I arrived, I had serious questions as to whether that statement could be justified, that is -- that is was there enough data or information that would give confidence that a statement like that was even rationale.

Page 174

Q. Are you done?
A. Yes.
MR. STOUCK: Can we go off the record.
(Off-the-record discussion.)
Q. (Mr. Stouck) When you say you had series doubts or series questions about whether that statement could be justified, you're referring to whether the objective could be achieved, right?
A. Yes.
Q. Okay. But that's a -- is that -- I'm not asking whether it could be achieved. I'm asking whether it was an objective, whether it was a fundamental objective of the program at that time, as stated here, to do these things in this paragraph; in other words, to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998. Was that a fundamental objective of the program at the time you got there, regardless of its achievability?
MR. MILLER: Asked and answered.
THE WITNESS: I would -- I would only suggest that it needs to be put alongside the

Page 175

verbiage in the Act itself. And I'm speaking from my memory that the statement in the Act is not nearly that expansive. I think the Act literally says begin receiving fuel in January, whatever it is, of 1998.
Q. (Mr. Stouck) Right. But you joined the Department of Energy as the head of the program office that was charged with implementing the Act, right?
A. Yes.
Q. And in the course of implementing the Act there was -- we're going to get to the final mission plan, by the way. A mission plan was developed, which you testified was important. Whether or not it was required by the statute --
A. Yes.
Q. -- you had to have it or it was a good idea to have it in order to guide your mission?
A. Yes.
Q. Okay. So you were implementing the statute. And I'm not asking you at this point about what the statute may or may not have required as a legal matter.
What I'm asking you is whether there was an objective, a fundamental strategy -- or

Page 176

fundamental objective, excuse me, is the term used here.
Was there a fundamental objective of the program that included the elements that are stated here? Is it -- you know, do you recall? Is it your understanding? What can you tell me about that? Do you know? Do you not know?
MR. MILLER: Objection. Calls for speculation. Asked and answered.
THE WITNESS: I think the only thing I can say is that this statement is more expansive than I would have guessed one would have made at that time, but I have no knowledge of it.
The Act was the piece of paper that was put in front of me when I was invited to consider taking the position.
Q. (Mr. Stouck) Okay. Just let me clarify the question. This statement, you say, is more expansive than I would have guessed. As we sit here today?
A. Yes.
Q. Okay. But you weren't at -- you weren't there at the time this was written?
A. I certainly was not.
Q. And I could probably find out more from

Page 177

the people who did write this?
A. That's correct. And, for that matter, this is the first time that I recall that I have seen this. It certainly preceded my then imminent arrival.
Q. Okay. Let's turn to Page -- a couple of pages. At the top it says 2-1, Program Strategy. Would you please take a couple of moments or whatever time you need to review the first -- well, to review what's on this page.
A. Okay.
Q. All right. Let's go through this again slowly and see what you recall about it. The first sentence says, "The objective of the Department's radioactive waste management strategy is to accept high-level wastes for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."
Very similar, if not identical, to the statement on the preceding page we looked at, right?
A. Uh-huh.
Q. And so again do you recall whether -- now seeing this repeated here, do you recall

Page 178

whether at the time you joined the Department some months after this document was prepared that was an objective of the Department's radioactive waste management strategy?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: I think the simple answer is I do not recall either having someone make that statement to me and telling me that, "This is what you have inherited," or when you read the Act this is undoubtedly what you would say was the objective.
When I joined the Department there was so much -- so much stuff going on that related to this kind of statement or objective, that the objective itself was not a very important consideration.
Q. (Mr. Stouck) Well, when you joined the Department in May of 1984 was there a strategy for implementing the Act?
A. You mean that somebody handed me when I got there or I saw or whether it was my strategy?
Q. Well, I -- it's two different questions, I understand. I was -- let's start with the first one. Was there a strategy in place that you

Page 179

inherited, do you recall?
A. I can't answer that other than to say that all of these documents, some of which you're showing me for the first time that I can recall ever seeing, would suggest that there was a strategy, but it was not one that I inherited or that I accepted the job on the grounds that this was my strategy.
Q. Okay. Once you took the job and were working there for sometime, did you participate in the development of a strategy to implement the Act? I mean, did there come a time when there was a strategy that you were a part of?
A. No doubt there was, but, goodness, I don't know -- I'm not familiar enough or can't remember well enough all of the documents that might have been there as to whether or not there was a specific document that made that statement.
I would say that it was clear to me that whatever the strategy was, and obviously I was familiar with the Act itself, that the most important activity that we could engage in was to find a site either for an MRS or for a repository.
And no matter what you said about what you thought you ought to do, that that activity

Page 180

paled in significance until there was some way to have a chance to realize it.
Q. Okay.
A. And I focused my attention on the execution end rather than trying to be -- what shall I say? Trying to dot I's and cross T's from either a legal or a programmatic standpoint.
And I think some of my early testimony, at least as I recall, made those points. Whether it can be found or not, I don't know, but it was clear to me that the 1998 date was a major target.
Q. Okay. But you -- so are you saying that your recollection is that insofar as Ben Rusche was concerned, your predominant strategy was to identify an appropriate disposition site, disposal site?
A. Yes.
Q. That was your predominant --
A. Site or --
Q. -- strategy you were --
A. -- means, yes.
Q. Excuse me for speaking over you. That's what you recall as the predominant strategy for --
A. From my standard. As my own expression, yes.

Page 181

Q. Okay. Now, with respect to the strategy that's outlined in this draft mission plan that we're looking at, Exhibit 12, I think you said that undoubtedly there was a strategy in place when you got there. And this --
A. That's one that --
Q. -- seems to reflect it?
A. Yes.
Q. But are you saying that you just don't recall this strategy being in place at the time you got there?
A. That's clearly the case.
Q. Okay. All right.
A. In fact, I never recalled seeing this document.
Q. Okay. Then let's not spend an undue amount of time on it, but let's, nevertheless, go forward a couple more pages. Actually the top of the next page says, "Waste Acceptance Schedule." Do you see that?
A. That's page what?
Q. 2-2.
A. 2-2, yes.
Q. And it says, "Based on the criteria described above, the Department has prepared a

Waste Acceptance Schedule which specifies, in the aggregate, the quantities of commercial nuclear wastes that the program will accept beginning in 1998." Do you see that?
A. Yes.
Q. This schedule is presented in Table 2-1, which is on the next page?
A. Yes.
Q. Do you recall, Mr. Rusche, that at the time whether -- do you recall that at the time you joined the Department in May of 1984 there were in existence schedules similar to the ones shown here -- similar in the sense of specifying actual quantities and being more than just conceptual, that there were schedules in existence that outlined a plan for acceptance of spent nuclear fuel?
A. At the time that I believe you're referring to I don't believe I had an impression that there were acceptance schedules then existing.
It is clear in the months to follow and the years to follow that acceptance schedule was one of the elements of a strategy or a plan or whatever you want to call it and that there were



contracts and as the second paragraph points out on that Page 2-2.
But from my personal standpoint and the leadership of the program, such statements to me were just absolutely hollow, unless there was some way to anticipate some mechanism for accomplishing it. And it was pure rhetoric.
Q. The first step was to find a disposal site or --
A. Absolutely.
Q. And after that you would figure out what the schedule was?
A. Well, it was not -- there was nothing wrong with thinking about it, but to make the kind of absolute statements that these make or -- and I don't mean to be putting words in your mouth, but I think you may be looking for from your personal -- your client's standpoint, that's exactly what I would think you would be doing.
But from the functional standpoint, the mission plan and doing this documentation did nothing to advance the program to achieve the objective which must be met in order for these to even have reality.
Q. And that objective is?



A. Find a site and get it in operation.
Q. Well, isn't there -- wasn't the objective to find a site for disposal of the waste that was all around the country?
A. Yes.
Q. So there eventually had to be a plan for getting the waste to the site? If you accomplished Step 1 and find a site, then --
A. Yes. Oh, yeah. And I didn't object to it. And I was told when I got there that this was an exercise that had been begun, I don't know whether it was the first day or the first six months, and that the acceptance schedule and the queuing and the capacities of the receiving basins and so forth were all factors.
And I was made aware of it. And I recognized it, having loaded a few basins here, there, and yonder, but they were so speculative in the absence of the reality or even the potential reality of finding a site, particularly for permanent disposal and the MRS consideration.
And we've talked about my perception even at the time I was confirmed perhaps gives some voice to that fact; namely, that this stated objective then in the Act was so unrealistic, and



these are my words at the moment, but I think they were my thoughts at the time, that we just had to do something else to attempt to even move in the direction of accomplishing that objective.
I had no objective -- no difference or no -- what shall I say? I think the Act was a marvelous step forward in political science, if I can call it that, and that it certainly was much more political than it was science.
Now, that's a long answer, but I think I -- it just gives me the chance to try to be more complete. I'm not sure I'm communicating with you.
Q. Well, I'm -- we've got your testimony. I think the question was were you aware at the time you joined the Department whether schedules like this were in existence. And I think the answer is yes?
A. Yes. Yes.
Q. Now, did you have an understanding at the time you joined the Department about what -- excepting your testimony that it might have been premature to have a specific schedule for the moment, excepting -- I think that's the import of what you're saying. It's premature to specify in

Page 186

detail what the schedule would be? Is that what you're telling me?
A. That's certainly an element.
Q. Okay. Excepting that for the moment, did you have an understanding at that time when you joined the Department of what kinds of principles or objectives ought to govern the development of the scheduling?
A. Only in a very crude sense based on some of my own experience in NRC and my experience in the industry earlier on, factors that I could relate in a fairly general way that related to capacities of fuel pools and heat removal capacities and transportation considerations and so forth.
So in that sense, yes, I had some sense as to what the value was, but, very frankly, those details seemed to me to be, at least as I perceive my -- that I recall my recollection, were minor in consideration with where were we going to have a facility physically.
And that exerts a huge influence on sequences and so forth from the shipping and so forth, those kind of standpoints, and whether we could find one, find a site.

Page 187

And so it was not -- it just was not very high on my personal recognition of priorities as to how you dealt with the receiving schedule, acceptance schedule, because it was so speculative.
Q. Okay. But the Act required two repositories, right?
A. It requires that we consider two repositories. There was a first repository and a second repository to be investigated.
Q. Okay. The Act required one repository? Is that your --
A. That's my recollection.
Q. Okay.
A. But there was clearly a provision in the Act to look for a site, a second site for a second repository, if and when it might be needed, as I recall.
Q. And do you recall the capacity of those repositories listed as --
A. I don't recall the relative capacities.
Q. Do you recall if it was 70,000 tons?
You don't recall?
A. I just don't remember that.
Q. Okay. Would you agree that these

Page 188

objectives of -- this objective, which is stated here both on Page 1.1 and 1.2, of precluding the need for additional at-reactor storage after January 31, 1998, would you agree that that objective would be relevant in developing an acceptance schedule?
A. Sure, it would be relevant.
Q. Okay.
A. But the question as to relevance would also -- a relevant consideration in that same context would be whether whatever might be developed, MRS at one or two sites, what capacities and what accessibilities and so forth were there. So it was a highly interactive kind of consideration.
And in my -- whatever you want to call it. My thought process was that those details were just very premature until we knew whether we were going to have one large repository, two smaller repositories, an MRS, or what, and that any of those combinations could drastically affect what kind of receiving schedule or shipment schedule you chose and where they were located and factors of that sort, which I just didn't give much attention to.

Page 189

Q. Was it your understanding at that time in 1984 that it was premature to even have this objective stated of --
A. No.
Q. It was not premature to have the objective --
A. No.
Q. -- of precluding the need for additional at-reactor storage?
A. That was a reasonable objective to state, but to make a promise that the -- or a commitment that this program was going to meet that objective in the very, very preliminary state of knowledge that we were in, in my opinion, was premature, to say the least.
Q. Okay. And that's why you think it was ludicrous for the government to sign these contracts in June of 1983? That's one of the reasons?
A. I don't think I said --
MR. MILLER: Objection.
Mischaracterizes previous testimony.
THE WITNESS: I didn't say ludicrous, I don't believe. It was -- if I did, I'll stand corrected, but I think it was clearly premature.

Page 218

feeling for the timing primarily from the regulatory involvement.
Q. Is it your testimony that -- I mean, to summarize some things you've said, is it your testimony that at the time you took the job at RW in your view the prospects for achieving the objective of starting fuel acceptance in 1998 were highly uncertain?
A. Highly unlikely.
Q. Highly unlikely? That was your view when you took the job?
A. Yes.
Q. And the reasons it was highly unlikely were?
A. Well, excuse me. I should re-answer that. When I took the job, the moment I got there I did not have the insight that I did after I had been there awhile. And so I really ought to put that context slightly different.
Q. What do you mean by awhile? How long did it take you to get this insight?
A. A couple years.
Q. Okay.
A. Primarily because of the relationships of the states.

Page 219

Q. So after a couple of years it was your view that it was highly unlikely that the '98 date could be achieved?
A. Yes. In fact, early on it was -- it just seemed like a heroic effort to start with, but after those two years it just became, to me, fairly clear.
Q. Okay. But that was not your view at the time you took the job?
A. I did not have that experience at the time.
Q. At the time you took the job did you believe it was an achievable goal?
A. My objective was to do the best I could.
Q. Okay. Did you have any understanding about the achievability of the '98 date objective when you took the job?
A. Well, I believe so in that I placed emphasis in my testimony at the confirmation hearing that I thought an MRS was absolutely essential to have a chance to meet any of those kinds of commitments.
Q. So your view when you took the job was that with an MRS there was a chance?
A. There might be a chance.

Page 220

Q. There might be a chance?
A. Yes.
Q. Okay.
A. And I can't put a probability on it.
Q. Okay. Well --
A. But it certainly enhanced the likelihood of meeting the objectives of the Act.
Q. Did it make it more likely than not?
A. Yes.
Q. If you could get an MRS?
A. Yes.
Q. And that was your view?
A. In my opinion.
Q. In your opinion at the time you took the job?
A. Yes.
Q. Okay. Did you have an opinion at the time you took the job about the likelihood of achieving the '98 date without an MRS?
A. I had an opinion. And my opinion was it was highly unlikely.
Q. Okay. And those opinions were formed from experiences obviously that you had before you took the job, just from an awareness of the industry?

Page 221

A. And largely -- in large extent that's correct.
Q. Okay. Unfortunately, this is a big one, but let's mark it anyway. This is the final mission plan. We finally get to the real --
A. Which I'm sure I haven't seen. What date is that?
Q. June 1985.
A. June '85?
Q. Yeah.
A. Well, I should have seen that one.
Q. Right.
A. I probably even signed it.
Q. Let's find out.
MR. STOUCK: Why don't you mark it for me.
(Off-the-record discussion.)
(Exhibit No. 15 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you have been handed -- actually this is only Volume I of the mission -- it's titled Mission Plan for the Civilian Radioactive Waste Management Program, Volume I, which on the front cover, as it indicates, Overview and Current Program Plans.

Page 230

answer? I'm trying to interpret this successor to the --
A. Successor to me meant it came after that plan. This was not a virgin document.
Q. Okay.
A. It certainly depended on the earlier documents to some extent, and the extent of which I'm not able to describe at the moment.
Q. Okay.
A. But we certainly did not start from scratch.
Q. When you got there?
A. Right.
Q. It was a process that was already in place?
A. Yes.
Q. Okay. Now, you did approve this mission plan?
A. I did indeed.
Q. As the director?
A. I did indeed.
Q. And you were responsible for its contents?
A. I am -- was.
Q. You were?

Page 231

A. I was.
Q. All right. Let's look at your letter.
A. All right.
Q. On the first page or whatever page it is.
A. All right.
Q. You can read the whole thing, if you want. I'm just going to ask you about a couple of sentences. Would you like to read the whole thing?
A. Give me a couple minutes anyway.
Q. Sure.
A. Okay.
Q. Okay. You see in the first paragraph it says, "This document presents our best estimate at the present time of the objectives and the strategy of the Civilian Radioactive Waste Management Program and of the facilities, institutional activities, management approach and information needed to implement the program." Do you see that?
A. I do.
Q. Okay. So this document, unlike the prior documents, is one which you personally endorsed as containing the best estimate at the

Page 232

present time of the objectives and strategy of the program?
A. I think my signature carried that connotation.
Q. Okay. And then at the very bottom of this page you say that, "I am confident the program will succeed." Do you see that?
A. Uh-huh.
Q. Now, this was June 1985?
A. '85, yes.
Q. And you were confident at that time that the program would succeed?
A. Yes.
Q. So these doubts and uncertainties that you testified about previously as a result of your experience as director of the program that led you to conclude at some point that it was unlikely to succeed, those occurred later than this?
A. No.
Q. No?
A. No.
Q. Okay. Well, then --
A. Success is a fairly general term.
Q. All right.
A. I did not intend to imply at that point,

Page 233

nor would I today, that success in this sense is other than that we find a place to put spent fuel and defense waste.
Q. That's what you think you meant when you said here, "I'm confident the program will succeed," that you would find a site?
A. Yes.
Q. Not necessarily that you would meet the '98 date?
A. I surely did not.
Q. Not necessarily that you would achieve --
A. Unless we had the MRS. If we had the MRS -- that caveat or that factor was significant in my testimony. And if you happen to have been around, you would have seen the huge amount of effort that we put to the MRS, to finding a site for the MRS and to moving ahead.
This is neither the time nor the place; but I could relate huge discussions with members of Congress on this subject. It's not relevant to our discussion, nor is it -- I don't think it's -- it's not contained in here either.
Q. Well, it's relevant, I think, probably to the '87 amendment. So we might get to it

Page 270

two sets of words would be the more specific inclusion of MRS as a feature which gave flexibility to the program and perhaps had schedule implications that were valuable.
Q. As part of the improved performance?
A. As part of the improved performance as compared to the authorized plan.
Q. Okay. Well, you want to take a moment to see if reviewing these sections, you know, confirms that?
A. I think that just this quick read would confirm that that was -- my quick read of this compared to this is that the -- particularly the inclusion of the MRS, and perhaps even making more questionable the second repository and so forth, but particularly the MRS from a functional standpoint just added a feature to the system that, in effect, was adding in an electrical sense capacitance to smooth out the ripples and that this was -- this would enhance or lead to improved performance.
Q. There's certainly reference in the section that talks about improved performance, reference to the MRS?
A. Yes.

Page 271

Q. Now, was it your view at the time you joined the Department in May of '84 that the MRS was a feature that should be added to the system?
A. I think my testimony was about as explicit as it could be.
Q. I think you told me that earlier too, right?
A. Yes.
Q. So from the moment you started promotion of the MRS, if you will, or advancement of that concept was something that you thought was a good idea?
A. Yes.
Q. Okay. And that was -- why was that?
A. Why?
Q. Yeah.
A. Because it was certainly more technically achievable. It involved far less uncertainties from the standpoint of design and operation. And it was clearly an interim activity, not a permanent facility.
Q. Do you recall whether the Department of Energy made a recommendation to Congress about approval of an MRS during the time that you were director?

Page 272

A. Sure. I think we did.
Q. Okay.
A. Much discussion on the subject. And this is not the place to get into it, but I had two sides of Congress that I was dealing with that were -- that I must have spent literally days' worth of hours, many days' worth of hours almost negotiating between, "We've got to have it and it's got to be this," and, "You can't have it unless it's this."
Q. Okay. Let's just explore that for a second. What was the, "Got to have it and it's got to be this," cant? I mean, what was --
A. The Senate.
Q. The Senate? Okay. And so -- and the Senate leadership, or at least the people you were dealing with, had some specific views about how the MRS should be implemented?
A. Less views, but agreement on the essential nature or essential value of having it.
Q. The concept?
A. Yes.
Q. Okay. What about location?
A. That was not -- that was not a Congressional consideration, as far as I could

Page 273

tell at the moment.
Q. Okay. And I take it then from what you said, on the House side there was opposition?
A. Not opposition, but constraint.
Q. All right.
A. The great concern was that it not become an excuse for not having the repository or an excuse that could be used for slowing it down or in any way taking away from the absolute essential character of having a repository.
Q. And you spent a good deal of time speaking with members of the House and their staffs explaining -- I presume, since you were advocating the MRS concept, explaining your view and the Department's view that it would not be a substitute for the repository?
A. Right. Exactly.
Q. And do you recall the outcome of that legislative discussion?
A. Well, from this distant view I think there was some agreement reached that the capacity of the facility was going to be limited.
Q. Okay.
A. I'm not sure if I remember the number, but it was limited to a couple thousand tons or

Page 274

something of that sort or somewhere in that region.
Q. All right.
A. For the explicit purpose from that side of the Congress that it not become so effective and so useful that it became a substitute for either the repository or a reason for delay of the repository.
Q. Okay. Do you recall the term linkage in connection with the capacity?
A. Yeah, I guess I remember hearing that term.
Q. Okay. Do you recall whether -- and are we referring now to the '87 amendments to the Nuclear Waste Policy Act?
A. Well, that occurred after this time, but at this time --
Q. No, I'm not talking about -- this time meaning June '85?
A. Yes.
Q. Okay. At this time is when you were having these discussions with Congress?
A. Yes. They started even then.
Q. I see. So the discussions went on for a couple years before we got the '87 amendments?

Page 275

A. You bet.
Q. Okay. But nothing happened in Congress until the '87 amendments, right? Nothing passed?
A. That's right.
Q. Okay. And you would --
A. That's why the program -- I mean, that's why I characterize the program as I do.
Q. Well, explain that to me.
A. I mean, to make adjustments in the program, particularly conceptual adjustments, there were just very strong points of view in different parts of the Congressional bodies.
And they had to be addressed. And sometimes they come slowly. That is, it takes a lot of negotiating and a lot of persuading. And I did it. I mean, that's what I did.
Q. And this is an example -- remember we looked back at the description of the testimony that the Department of Justice thought you might be able to give in this or you would be able to give, if asked, in this case.
And there was a reference there to political obstacles to the implementation of the Nuclear Waste Policy Act. Do you recall that in one of these exhibits?

Page 276

A. I remember the use of those words.
Q. Is this an example of what we are talking about, of that phrase?
A. I would be inclined to call it political considerations that had to be factored in.
Q. Oh, right. You didn't like the word obstacle before either?
A. No. And both parties said, "It's a great idea, but" --
Q. What was the "but" on the Senate side?
A. It was -- there was less "but" there than there was on the House side, but I think that there was still a reservation that an MRS too successful might give rise to a public view that it was unnecessary to proceed at pace with the repository.
Q. You did not share that view?
A. No.
Q. Do you recall -- so when -- the only legislation that was ultimately enacted was the '87 amendments?
A. So far as I know.
Q. Right. And those amendments, to your recollection, contained this capacity limitation on the MRS?

Page 277

A. Yes.
Q. Do you recall whether the '87 amendments to the Nuclear Waste Policy Act also linked the commencement of operations of the MRS to the grant of a construction license for the repository?
A. I haven't looked at it in awhile, but I have some recollection that there was an interaction that -- again that the MRS not give license to delay or to proceed at other than the best possible pace with the repository, which that connotation would exist.
Q. Did you believe that the '87 amendments to the Nuclear Waste Policy Act -- what was your impression about the impact of that legislation on the prospects for implementation of the program?
A. I think a number of the features were very positive. I think that -- and I would have to go back and look at it. I have not -- I don't remember it even as well as I do the original Act, but I think the -- the fact that these kinds of considerations had been sort of put on the floor, namely that you could trade a little bit of this and you might be trapped into taking this if you don't take this, much, much more political consideration emerged from that exercise, in my

Page 286

was ongoing some level of effort in developing these schedules.
Even though you may not have been involved in it, even though you may have not thought it was timely, it was going on somewhere in RW?
A. Oh, yes. And I was aware of it. I mean, it was not a clandestine activity. I was aware of it, but it was not an item that was on my agenda every day or that I got frequent briefings on.
Q. Okay. For all the reasons we've discussed?
A. Yes.
Q. You were focused on finding a site?
A. Yes.
Q. That's what your time was spent on?
A. Well, I was aware of these other things.
Q. Right.
A. But they were not in trouble, as far as I could tell. They didn't need my attention.
Q. Well, it was more than that, I thought, according to your earlier testimony. That may have been part of it, but it was also -- I thought you told me that in your view it was in some sense

Page 287

premature to get too specific about it?
A. Yeah, it was. That's all included in the statement I just made. There was just not an urgency, nor a defined -- definitive problem, that it was a matter of logistics and negotiation as it were.
Q. Do you or did you then have a view about at what point in time it would become more of a front burner item?
A. Well, today I can tell you what I think I would have -- I would have answered that question then.
Q. All right.
A. And it was that if the repository system or the receiving system was long delayed, that the transportation system would be more highly challenged. That is, it would -- there would be more -- it would be a heavier load to take.
Q. Okay. Because of greater quantities?
A. Because of greater quantities.
Q. All right.
A. And that the best solution for that was to get the MRS and the repository in operation. In fact, there was not much other alternative.
Q. Okay. I guess what I was driving at was

Page 288

at what point in time in the development of the overall program do you think that the specifications of the schedules, further specification of the schedules, would have been in order, I mean, if you --
A. This is purely today's view.
Q. Okay. You don't recall if you had a view then or what it was?
A. Well, I don't recall any perception of urgency at the time.
Q. Later that was your view?
A. It was later than that, but when the elements of the system had become clear or the lack of elements in the system created a perception that there was a greater challenge than we thought. And neither one of those were -- the lack of a system was everywhere.
So it was the dominant factor that I thought we should be dealing with. And these secondary factors, though important, we just didn't have a basis for dealing with.
MR. STOUCK: Could we go off the record for one second.
(Off-the-record discussion.)
Q. (Mr. Stouck) On Page 264 of this

Page 289

mission plan that we're looking at, Exhibit No. 15, Mr. Rusche.
A. Excuse me. Do you have a Page 266?
Q. No.
A. Okay. I just --
Q. It may be blank. The Bates numbers are consecutive.
A. Yes.
Q. You see there's a reference to Financial Uncertainty and Adequacy of Funds?
A. Uh-huh.
Q. We were off the record for a moment, and I mentioned to you that I had recently taken a deposition from Lake Barrett.
A. We are off the record?
Q. We are on the record now. When we were off the record I told you that, and I'm telling you now on the record. And do you know what his role in the program has been during the 1990s?
A. Well, I've had relatively little contact with the program.
Q. Okay.
A. More in the last couple years since Lake has been the acting director.
Q. You have had more contact?