Page 290

A. More, but still very little. I think I may have been in the office twice in the last three or four years. And what was the question?

Q. The question was -- well, you just answered it. You know he was acting director during the '90s?

A. Yes. I couldn't remember when he became acting director, but it was several years ago.

Q. Well, he told me, and others have testified, that during that time period at least, the 1990s, funding problems, okay, inadequate funding by Congress was a factor that influenced RW's ability to implement the program. Okay?

Now, my question is whether that factor, namely appropriation shortfalls, was a factor during the time period in which you were the director?

A. I think the answer would have to be yes.

Q. Do you recall any specifics about appropriation shortfalls?

A. It's difficult for me to recall at the moment any particular programmatic element that was the result of -- that suffered as a result of a shortfall.

The thing that stands out in my memory

Page 291

is the number of times I had discussions in the budget cycle with members of the Budget Committee or the Programmatic Committee of the House, but in particular I think the Budget Committees, as I remember, both the House and the Senate, the chairs of both those Committees I became very personally engaged with.

And I can remember, at least when I was there, even two or three years when the budget that we ~~proposed~~ and the administration ~~we~~ proposed was not authorized by Congress or approved.

Q. Okay.

A. And it produced an anomaly that I think is an unfortunate feature in this piece of legislation. It is that the Department, whether you take the 1998 commitment as a commitment or a mandate or whatever you want to call it, it removed -- or the method of financing the program was left to those who had no sense of what was involved to achieve whatever objective might have been there.

Q. Namely Congress?

A. Congress.

Q. All right.

Page 292

A. And there was a little bit of -- and during my time there was a little bit, but almost no problem, that I had with OMB in the White House, but there were many times in which the Budget Committees' chairs would call me since the program was such a visible program. It's not so huge in terms of the DOE budget, but it was still pretty good size, five or six hundred million dollars or whatever.

And I would get calls on the day, and I can remember two or three in which I got a call and the secretary said, "You need to be at your phone over lunch. There's a lunch meeting of the chairmen of the Senate and the House Appropriations Committee, and they need to talk to you."

And get a call and say, "Well, Ben, we looked at everything. We got everything you've got. Can you get by with X?"

And my first reaction would be, "That was not our request. And we think the request was justified to pursue the program that you've mandated."

"Ben, we ain't got very long. Can you get by with X?"

Page 293

I said, "What's the option?"

They said, "A little less than X."

I said, "I'll take X."

Q. Well, the reason I asked you about this, Mr. Rusche, is that earlier when we were talking about -- when you were talking about impediments and complexities and greater appreciation -- you don't like the word obstacles, but whatever it was that was standing in the way of implementing the original program as outlined by the Act, I think is the way you phrased it, you mentioned a number of things.

You did not mention funding shortfalls. And I was curious about that. But I take it from the testimony you've just given, that that was also a factor? Or not? I mean, is it --

A. Yes, it was a factor. It just did not -- at the point I recall our dialogue on that subject I guess I made an inappropriate assumption that the budget and financing were not technical factors per se. And I just didn't introduce it in the discussion at that point.

Q. But it was another factor?

A. It was a factor. I can't point to a specific instance in which if we had $50 million

more, we would have been a year ahead. The program was just not that -- not that explicit, from my recollection.
Q. All right. Well, from your recollection though -- strike that. Do you believe that given adequate funding, adequate funding -- I guess the question I'm about to ask is could money solve the problem?
If given adequate funding, could RW have achieved the objective of accepting -- well, whatever these original objectives were starting by '98?
MR. MILLER: Calls for speculation. Go ahead.
THE WITNESS: I would say that the matters that were the biggest impediment and still are, and they are not amenable to -- funding is not a very effective manner for dealing with them, which is the interaction with the states, the tribes, and so forth.
Q. (Mr. Stouck) Okay. Take a look at Page 385 now, please. And I know it's getting late in the day. I'm going to try to wrap up very promptly.
A. 385?



Q. 385. Under -- there's a -- it says Chapter 10, Costs of Managing Commercial Radioactive Waste. Do you see that?
A. Yes.
Q. And there's apparently a quotation -- no. No. No. Forget the quotation. Under the Introduction, 10.1, it says, "As part of its continuing evaluation of the adequacy of the revenues raised by the Nuclear Waste Fund against the expenses of the waste-management program, the DOE maintains a cost-estimating capability.
The most recent cost estimates for the entire program are contained in a January 1985 report entitled Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program." Do you see that?
A. Yes.
Q. Do you recall, during the time you were there, these total system -- or this or any other total system life cycle cost study?
A. That there were such studies?
Q. Yes.
A. Indeed I do.
Q. You do recall those?
A. Yes. I don't recall the details of it



at the moment, but I recall that they were done.
Q. Would they have come to your attention?
A. Certainly come to my attention from the standpoint of awareness that there may have been an implication of shortfall or something or other in some analysis that was done, but it was so hypothetical at the time that it was -- particularly early on, that it was not a factor that you could really deal with.
Q. Do you know why they were done?
A. For the purpose of -- my perception at the moment was, and I think it was that then, was that it was an attempt to confirm that the mill per kilowatt hour tariff was providing enough funding for the program to proceed as best we could.
And it turns out that there were some cases of circumstances in which that -- early on that that might not have been as clear as it became, but the problem was not the funding. The problem was the appropriations.
Q. Okay. Now, on Page 396 there is a section titled Storage Costs. And it says, "This section presents the cost estimates for the storage activities required in the 5-year and



10-year repository-delay cases." Do you see that?
A. Yes.
Q. All right. Were you aware at the time that your agency, RW, was studying cost impacts on utilities of delays beyond 1998 in implementing the program? Were you aware of that at the time?
A. In a general sense, yes.
Q. Okay.
A. It was not a secret, for sure.
Q. Okay. So you were aware that RW was studying the cost impacts on utilities of delays beyond '98. Okay. What was the reason for that analysis? It wasn't related to fees. What was the reason?
A. The perception was the probability of meeting the '98 date was vanishing.
Q. And so there would be cost impacts on the utilities?
A. Certainly. It's going to extend the time at which the waste acceptance activities and so forth that were programmed in the Act could be implemented.
Q. And that would have a cost impact on utilities?
A. On the whole program. Not just on the

UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRONIC ) CA NO. 98-126C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
______________________________)
)
MAINE YANKEE ATOMIC POWER ) CA NO. 98-474C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
______________________________)
)
CONNECTICUT YANKEE ATOMIC ) CA NO. 98-154C
POWER COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
______________________________)

Deposition on oral examination of BEN RUSCHE, VOLUME 2, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Friday, May 17, 2002, at the hour of 8:28 a.m.

Page 305

Appearances:

Representing the Plaintiffs:

JERRY STOUCK, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005-3305

Representing the Defendant:

R. ALAN MILLER, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

CONTENTS
(Deposition of Ben Rusche)

| | Page |
|---|---|
| Exhibit Index | 306 |
| Stipulations | 307 |
| Continued Examination by Mr. Stouck | 307 |

Page 306

| | |
|---|---|
| Certificate of Reporter | 498 |
| Verification of Deponent | 499 |
| Errata Page | 500 |

* * * * *

EXHIBIT INDEX

Exhibits: Marked at Page
(Copy of exhibits attached to each copy of transcript.)

| Exhibit | Description | Page |
|---|---|---|
| 16 | Bates SP-103944 through SP-104008 | 317 |
| 17 | Bates SN044976 | 337 |
| 18 | Bates SP-103817 through SP-103836 | 345 |
| 19 | Bates CTR-042-1853 | 349 |
| 20 | Bates DE-100958 through DE-101043 | 358 |
| 21 | Bates MNA.19870522.0030.0016 through MNA.19870522.0030.0027 | 366 |
| 22 | Bates HQR-077-0670 through HQR-077-0674 | 389 |
| 23 | Bates HQR-077-2300 and HQR-077-2301 | 395 |
| 24 | Bates YDK-027-111856 through YDK-027-111867 | 401 |
| 25 | Bates PNL-001-1324 through PNL-001-1326 | 408 |
| 26 | Bates PNL-070-0633 through PNL-070-0651 | 414 |
| 27 | Bates YDK-016-0018 | 430 |
| 28 | Bates DB-102705 through DB-102791 | 430 |
| 29 | Bates CTR-037-0307 through CTR-037-0367 | 451 |
| 30 | Bates PNL-169-0836 through PNL-169-0839 | 477 |
| 31 | Bates DA-101226 and DA-101227 | 477 |
| 32 | Bates DC-103767 through DC-103770 | 477 |

* * * * *

This deposition is taken in accordance with the Federal Rules of Civil Procedure.

It is agreed and stipulated by the deponent and respective counsel that the reading and signing of the deposition by the deponent is expressly not waived.

Page 307

Whereupon:

BEN RUSCHE, being duly sworn and cautioned to speak the truth, the whole truth and nothing but the truth, testifies as follows:

CONTINUED EXAMINATION

BY MR. STOUCK:

Q. Good morning, Mr. Rusche.
A. To you too, sir.
Q. And you understand, of course, that you are still under oath?
A. I do.
Q. Now, having thought about and talked about these things at some length yesterday, probably for the first time for you in awhile, is there anything that you've thought about overnight, any of your answers, any things that you've told me, any clarifications, supplementation that you would like to make before we get started?
A. I can't think of anything.
Q. Okay. And have you talked with anyone other than your counsel about your testimony since we last met?
A. My wife asked me whether I was involved. And I did speak to her.

Page 308

Q. Okay. Other than that?
A. No.
Q. Okay. Now, I've been thinking about your testimony yesterday. And I just would like to, you know, try to summarize or at least try to get clear on exactly where we are with this whole business about scheduling and intent and strategy.
So let me see if I understand correctly what you have told me because there's been lots of testimony about it. You understand that the Act, the Nuclear Waste Policy Act, requires the start of waste acceptance by January 31, 1998, right?
A. That's correct.
Q. That's clear?
A. Unmistakable.
Q. Okay. But regarding the intent of the Act with respect to the -- the intent of the Act with respect to the schedule for pick-up after 1998, you don't know what that intent was; is that correct?
MR. MILLER: Objection. Calls --
Q. (Mr. Stouck) The intent of the Act with respect to the schedule for pick-up after January 31, 1998?
MR. MILLER: Objection. Calls for

Page 433

identification, that attempt to identify issues?
MR. MILLER: Objection. Vague.
Q. (Mr. Stouck) Do you recall that there was a process implemented to deal with those issues?
A. I can say in the light of our discussion that I recall that we had discussions in the office, not that I was deeply involved with, but that were aimed at first making proposals, identifying issues, and attempting with our clients, the utilities, to bring a system of receipt of fuel and waste capacity reports or whatever you want to call them into some collectively agreed upon or at least recognized best we could do. It was a very complex process.
Q. Best we could do what?
A. When they have different views from -- I mean, with all the utilities, some had different circumstances, different degrees of spent fuel capacity, and all of these factors that weighed into setting priorities and so forth.
And this was just -- as I recall it, and again I did not have a great deal of specific discussion on the subject, it was -- seemed to me to be a responsible effort we had worked on and it

Page 434

deserved review by those who were affected.
Q. Right. Well, I think we're going to see a term used in some of these documents, issue resolution process, which is kind of a well-recognized term. Is that --
A. And it appears in many places because I -- not only me, but I think most of the people agreed with me that what we were doing was first of a kind.
Q. You recall that process, that there was such a issue --
A. That is a conscious recognition that there were issues that our clients and we would have and that we were not in a position to be unilateral about very many, if any.
Q. Why do you say that?
A. Because we didn't have all the knowledge. The interactive process provided new knowledge to us. And the use of that knowledge was valuable.
Q. All right.
A. And the Department didn't exist for it -- I mean, the office didn't exist for its own benefit. It was an agency or an agency activity that was aimed at serving the interest first of

Page 435

the country and then of those that were involved in the activities.
Q. Okay. Well, a few pages in from this annual -- from this Exhibit No. 28 you'll see another what I will call a transmittal letter. It's a letter signed by you that describes the annual capacity report. Would you take a look at that?
A. I've read it.
Q. You've read it?
A. Yes.
Q. Okay. And so this letter also refers in even more detail to this process?
A. Interactive process, yes.
Q. Now, what was your personal involvement in this interactive process?
A. I was kept aware of what the group of this several group of -- this people that we have identified at least in some form, what they were doing in general. And to the extent that they even needed my view or thought that I could contribute, I was involved, but I was not actively involved.
I don't think I ever attended a meeting of one of this group of people. I was generally

Page 436

kept involved by being made aware of activities, the documents and so forth.
Q. Your time and attention was focused elsewhere, as I think you said yesterday?
A. I think I've said it 50 times.
Q. Right.
A. This is not to say this was unimportant, but it is to say that my ability to contribute there was much less than my ability to contribute in the other areas.
Q. There being in the schedule process?
A. Yes.
Q. Okay. All right. Now, take a look at -- you know, not to get tied up with numbers again, but as you get into this report there's a page that has a No. 2 in the middle at the bottom.
A. I have it.
Q. There's a reference -- do you know -- well, let me ask you just generally do you know what the purpose of the annual capacity report was under the standard contract?
MR. MILLER: Objection. Vague.
THE WITNESS: It seems pretty self-evident to me.
Q. (Mr. Stouck) Okay.

A. But I don't recall a standard definition of something that was tacked up on the wall somewhere.

The annual capacity report was intended, as I recall, to make the utilities aware of the then best estimate of the receipt, sequence, and capacities of fuel that would be considered for acceptance at the repository at sometime in the future.

Q. And why was the Department informing the utilities of --

A. Because they were contract holders.

Q. Well, okay. Any other -- I mean, why would they need or want that information? Why was it --

A. Well, if I were a utility, I would like to know what the prognosis was for moving fuel from the basin.

Q. Okay. Why?

A. Well, there's capacity in the first place, capacity in the basin.

Q. Okay.

A. That would be a pretty important objective, if I were a utility executive.

Q. Okay. I'm just trying to understand



why.

A. Let's see. How can I say why capacity is not an important element in a utility executive's or his operating organization's conduct of the operations at the site?

Q. To help plan for management of fuel in the future?

MR. MILLER: Calls for speculation.

THE WITNESS: There are many reasons it would be useful. That's certainly one you could identify. Capacity has two connotations, capacity at the site as well as capacity at the repository.

Q. (Mr. Stouck) Right. Well, I thought you were referring to capacity at the site?

A. Well, I was for that particular purpose, but it -- but these are highly interactive. And that's why the Department needed the benefit of the interaction with the sites.

Q. Right. But I was just trying to explore your understanding of why it is that the utilities would be interested in having information about the capacity at the sites.

A. Because it was a presumption unwarranted, but if I had been a utility



executive, I would certainly want to have known about it.

Q. Right. You said that before. And I'm just trying to explore why.

A. I can't tell you any more than -- we've discussed the interactive elements of the thing.

Q. Okay. Take a look at the bottom of Page 2.

A. Yes.

Q. There's a sentence that starts on the next to last line, "DOE also expects to develop and report on procedures for submittal and criteria for approval of Delivery Commitment Schedules, exchanges of approved Delivery Commitment Schedules, Final Delivery Schedules, and criteria for evaluation of requests for emergency deliveries and changes to the acceptance priority." Do you see that?

A. I do.

Q. Okay. Do you have an understanding of the term delivery commitment schedules?

A. I hope I do, but my impression of delivery commitment schedules would be the schedules on which a particular party would be -- would anticipate delivering fuel from the site to



the repository or whatever was the next available step.

Q. Do you know whether these delivery commitment schedules are provided for in the standard contract, whether or not they are?

A. I don't -- no, I don't.

Q. You don't?

A. I don't know.

Q. Okay. Is that something that you would -- okay.

A. The standard contract could -- and this is not firsthand knowledge. The standard contract could say there are delivery schedules which would be provided on some such time scale for this purpose.

Q. But you don't know whether they do or not?

A. I don't know.

Q. Is that something you would have known at the time you were at RW?

A. I doubt it.

Q. All right. Same question for this -- there's actually -- you have to sort of piece together the sentence, but I think -- well, let me just ask.

# Nancy Slater (Thompson)

**Page 1**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------- X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
: --------------- X
Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

**Page 2**

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U S. Department of Justice
1100 L Street, N.W
Room 10150
Washington, D.C. 20530
(202) 307-6289

**Page 3**

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 4 |
| Afternoon session - 94 | |


E X H I B I T S


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Letter dated 3/1/99 | 50 |
| 2 - Letter dated 4/28/87 | 82 |
| 3 - Memo dated 6/29/87 | 95 |
| 4 - Letter dated 10/2/87 | 97 |
| 5 - Letter dated 11/10/87 | 99 |
| 6 - Standard Contract Issue Resolution Process | 122 |
| 7 - Preliminary Draft dated 12/19/92 | 152 |
| 8 - Handwritten documents dated 8/29/91 | 161 |
| 9 - Memo dated 6/18/92 | 171 |
| 10 - Preliminary Draft dated 12/22/92 | 175 |
| 11 - Preliminary Draft dated 12/19/92 | 177 |
| 12 - Fax dated 9/1/93 | 181 |
| 13 - Spent Fuel Acceptance Scenarios devoted' to Shutdown Reactors dated 10/89 | 185 |
| 14 - Letter dated 1/26/93 | 191 |
| 15 - Fax dated 6/2/94 | 194 |
| 16 - Memo dated 7/25/94 | 199 |


**Page 4**

P R O C E E D I N G S

Whereupon,

NANCY H. SLATER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF
BY MR. SHAPIRO:

Q. Would you state your name for the record, please.
A. Nancy H. Slater.
Q. Ms. Slater, my name is Robert Shapiro, we're here for your deposition. Have you ever had your deposition taken before?
A. No.
Q. Do you have some understanding of what's going to happen today?
A. Yes.
Q. What do you understand is going to happen today?
A. I understand that I'm going to be a factual deponent and that you're interested in asking me questions about my knowledge of the waste acceptance area during the time I was in

Page 29

instance, DOE's obligations under the contracts?
A. Actually I can give you an example of what I would have looked at that might clarify this a little, and that is utilities are entitled to deliver five-year-old fuel. If the requirements document were to say ten-year-old fuel, I would have to call that out as something that needed to be corrected. So that's the kind of thing that you would have looked for, the inconsistencies between the contract and the requirements documents.
Q. Let me go back to that again. Suppose your contracts required you ultimately to take 100,000 MTU and you see that the system is only calling for 70,000. Wouldn't that be an inconsistency?
A. I don't believe that it would be. You understand that the 70,000 MTU is legislatively mandated. So, therefore, you understand that there is no flexibility to change the capacity of the repository willy-nilly.
But, if you've read the legislation, I'm sure you also understand that at one point a second repository was contemplated. So no, I could not do anything about 100,000 MTU limit

Page 30

because I cannot change legislation.
Q. Again so I understand the difference is that you were really looking at things for which there might be some flexibility to change, those were the kinds of things that you were examining, to see if those items were consistent with the contract?
A. Right, or there were some items that might have been inflexible and someone made an error and transposed a number. So we were looking at a lot of things, again with the ultimate goal of assuring that the contract was consistent with program documents, no new requirements imposed indirectly.
Q. But, if there was a legislative limit such as the 70,000 K limit, you weren't going to look at that to see how that would fit in with the contracts?
A. No. And I don't believe that the 70,000 limit is discussed in the contract.
Q. When you were looking at these kinds of requirements, did you ever look at the time frame called for in the contract for starting waste acceptance and how that fit in with the system requirements?

Page 31

A. I'm not sure I understand the specific point you're trying to get at with that question.
Q. Well, you understand the contract called for --
A. January 31, 1998, right.
Q. Called for waste acceptance that began on that date?
A. Right.
Q. Did you ever look at whether or not any of the system requirements called for waste acceptance to start at a later point in time, would you have looked at that kind of issue?
A. I would have looked at that kind of issue. And my recollection at the time I was there is that the documents were consistent with the contract.
Q. The system requirements documents called for waste acceptance to begin by January 31, 1998?
A. I believe so.
Q. Do you recall how the system planned to start taking spent fuel in '98?
A. No, I don't.
Q. The system requirements documents, when

Page 32

you looked at them, in the '91 to '95 period, they didn't call for taking spent fuel by 1998 in a repository, did they?
A. I think the subject of acceptance, transportation, storage, and disposal was in the main addressed independent of date. The same activities have to be performed no matter the date you start them.
Q. Do you recall looking at any discussions in the system requirements documents of taking spent fuel at a location other than the one repository?
A. No.
Q. So the system as we've been talking about, as you've been referring to it, was the system for the one repository?
A. Yes.
Q. And earlier you had mentioned that there was some discussion that the system might include two repositories?
A. No. There was legislation that discussed the second repository.
Q. Let me go back to your background. Prior to 1991, when you joined DOE, what was your prior position?

Page 33

A. I worked for the Edison Electric Institute in two positions. Lastly in the fossil power area, managing two committees, prime movers and chemistry. But prior to that, when I joined the institute, I was program manager for the Utility Nuclear Waste Management Group.
Q. What was your job title when you were working in the fossil fuel area?
A. Program manager.
Q. And how long were you in the fossil fuel area?
A. My recollection is perhaps a little over two years.
Q. How come you left EEI to go to the government?
A. Oh, this will sound like one of those idealistic answers, but truthfully I grew up in the generation that was taught that you do not solve problems from the outside, you solve them from the inside, you have to be part of the solution. And I was on a "mission from God".
Q. What do you mean you were on a "mission from God"?
A. It's a line from the Blues Brothers. I was very committed to the whole concept of

Page 34

disposal.
Q. When you say the issue of disposal, you mean spent fuel disposal?
A. Yes, nuclear waste disposal, whether it's spent fuel or high level waste.
Q. And we've covered the period when you were with the fossil fuel group. When did you start with the nuclear waste group?
A. That would have been in 1991, April -- no, actually sorry about that, April of '86, because I was with EEI for roughly five and a half years.
Q. So roughly '86 to '89 you were in the nuclear waste of EEI and then '89 to '91 the fossil fuel area?
A. Right.
Q. How come you moved in '89 from the nuclear area to the fossil fuel area?
A. Truthfully because I had a manager who was the most obnoxious person I have ever worked for. And it is just as important to me who I work for as what I do.
Q. You had an obnoxious manager in the nuclear area?
A. Nuclear area.

Page 35

Q. Who would that have been?
A. Steven Kraft.
Q. What was Mr. Kraft's position?
A. He would have been the director.
Q. Director of the Utility Nuclear Waste Management Group?
A. Right. There were two program managers, one handled low level waste and I handled spent fuel and high level waste.
Q. I'm not sure how EEI was organized. What was the level above Mr. Kraft?
A. It would have been a vice president.
Q. And who was that?
A. Loring Mills.
Q. During the two years you were with the fossil fuel group, did you have any residual involvement at all in the nuclear side of things?
A. None. I was asked to come back and I refused.
Q. Who asked you to come back?
A. Steve Kraft.
Q. What sort of issues did you work on with the Utility Nuclear Waste Management Group from '86 to '89?
A. As I recall we were routinely involved

Page 36

in assessing the adequacy, both financial and technical, of DOE's program. We would visit the sites. I remember at that time there were three.
We would meet with department personnel to discuss issues that were of interest to us. And we were also involved in an effort that related to the standard contract. And involved identifying issues that might require clarification.
Q. Did this group have any involvement in legislation?
A. Not directly, no.
Q. What about indirectly?
A. Indirectly as you know EEI is a trade association and dealt with -- I'm not sure what it stands for, ANEC which would have been the lobbying arm. And so that's how any legislative connection would have been made. But I have no personal knowledge of that.
Q. Now, if I understand correctly, did this part of EEI, the Utility Nuclear Waste Management Group, what happened to that group?
A. Well, let's see. Ultimately I believe they were absorbed by NEI, but I can't tell you

Page 81

A. Mr. Kraft rarely attended the working group meetings and tended to focus his efforts more on what was going on in the legislative front. And the day-to-day operations for the group were left to me.
Q. You said there was a long list of issues that the utilities looked at that they thought might need some benefit or need some clarification that are in this standard contract. Do you recall any others besides these three?
A. Let's see. The term domestic origin, for example, I do recall that one.
Q. What was the nature of that issue?
A. What does -- what is fuel domestic origin, is it fuel that's mined in this country or is it fuel that's burned in this country. And as you know utilities buy their fuel from a variety of places. And so one of the things that needed to be interpreted and clarified was that it means fuel burned in a reactor in this country.
Q. Did the group reach closure on that issue?
A. Oh, yes, they did. And subsequently,

Page 82

when I came to DOE, I wrote the letter that answered the question yet again for one of the utilities.
Q. Which way did you answer the question?
A. Burned in a U.S. reactor.
Q. Just to rephrase, DOE agreed that, as long as the fuel is burned in a U.S. reactor, it was considered fuel of domestic origin?
A. Domestic origin, right, right.
Q. Do you recall the utility working group looking at the issue of the rate at which DOE would accept spent fuel?
A. Not really. And only in the sense that whatever DOE came up with the utilities obviously wanted more.
(Slater Exhibit No. 2 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, if you would take a look at a document that we've had marked, Slater Exhibit 2. Do you recognize this document?
A. Let me look through it.
Yes, I do.
Q. Can you tell us what the document is?
A. You'll remember that I said that there

Page 83

were issues that were identified based on review that both DOE and the utility group believed needed to be resolved. Some of the issues were coincident, some were not.
And this represented the utility group's effort to not only request a clarification but influence the outcome of the clarification because only the contracting officer had the ability to opine on the standard contract.
Q. Now, you'll see in the last page of this document that it's signed by Mr. Kraft. Do you recall, would you have written this document for him?
A. No, I would not.
Q. Were you involved in the creation of this document?
MS. SULLIVAN: Do you need to take time to review the document before you answer any further questions?
THE WITNESS: Yes, I was involved.
BY MR. SHAPIRO:
Q. What was the nature of your involvement?
A. Explaining issues to the individuals

Page 84

who would have been responsible for drafting this response, this request.
Q. Who would have drafted this letter?
A. To the best of my knowledge, it would have been individuals like Jay Silberg at Shaw, Pittman, Potts & Trowbridge and Mike Bauser at Newman, Holtzinger.
Q. So it would have been drafted by outside counsel for the Utility Nuclear Waste Management Group?
A. With some support from perhaps technical contractors if it dealt with technical issues.
Q. I see you looking through the document. Do you want some more time to look through it?
A. No.
Q. Just a moment ago, you said something, and I didn't understand what you said. You had said that utilities had looked at issues and DOE had looked at issues that might need clarification, you said some were coincident and some were not. I guess I'm not sure what you mean.
A. DOE, for example, might not have

Page 105

DOE didn't have any viewpoint?

A. Priority for shutdown reactors was a classic.

Q. Any others?

A. I don't recall specifically. I remember that one in particular because it was so contentious within the industry.

Q. What about issues on which DOE did have a viewpoint, which of those do you recall being worked on?

A. I know we had a viewpoint as DOE on final delivery schedules and what information those FDS's should include. And I know that DOE based that on operational considerations, similar to the safeguards and security operational considerations I explained to you earlier this morning.

Q. Let me make sure I've got the right time frame in mind. We're still talking about the time when you were working for the Utility Nuclear Waste Management Group?

A. Yes.

Q. And during that period do you recall any other issues coming up where DOE was proposing a clarification?

Page 106

A. Not specifically.

Q. What about when you actually started working with Mr. Brownstein over at DOE, this process was still ongoing?

A. It was still ongoing.

Q. And then you sort of reversed roles in some respects and you started working on that process from the DOE side?

A. Yes.

Q. What did you do in this process on the DOE side?

A. For example, on -- I continued to work on developing positions on issues where DOE felt it had an interest, communicating with the utility group.

Q. Which issues do you recall working on once you joined DOE?

A. Delivery commitment schedules, delivery commitment schedule exchanges, final delivery schedules, standardized canisters, oldest fuel first. I don't remember whether domestic origin was one of those issues or not. There were a significant number of issues.

Q. You mentioned delivery commitment schedules. What was the nature of the issue with

Page 107

respect to delivery commitment schedules?

A. Delivery commitment schedule had to be -- the instructions for completing the DCS had to be developed, the DCS itself had to be approved by is it OMB or -- OMB. The DCS's had to be transmitted, actual forms had to be transmitted to the utilities.

Q. What was the issue as part of the ACR resolution process that was trying to be resolved with respect to delivery commitment schedules?

A. One of the issues that I recall, and this was from the utility side, the DCS asks for the discharge date on the fuel. Now, the department would have liked to have had a very specific discharge date because it tells them a lot about the characteristics of the fuel. It lets them plan very accurately.

The utilities didn't want to do that. The utilities wanted to give them a range of discharge dates that might have been for ten years, because they wanted -- they believed they needed to preserve their flexibility to reach into that pool of fuel, pull it out, and give them anything they felt like giving them. And that was the issue. DOE wanted specific

Page 108

discharge date, they wanted broad discharge dates.

Q. Do you recall how that issue got resolved, did it get resolved?

A. By default it did because the DCS's were submitted with a range of discharge dates. And on my side on DOE I recognized that, in the final delivery schedule, I would get the specific discharge dates. So, in fact, it ceased to be an issue.

Q. Do you remember any other issues coming up in this ACR resolution process with respect to delivery commitment schedules?

A. Not that I recall.

Q. What about delivery commitment schedule exchanges, what was the issue there?

A. Do you wish me to address that from the utility side or from the DOE side?

Q. Well, let's start with the utility side.

A. From the utility side, the issue there centered around let's assume that two utilities wanted to make an exchange. Could a utility that had BWR, boiling water reactor, fuel exchange with a utility that had pressurized water reactor

Page 161

address one issue, that you would go to rulemaking to address the entire suite of issues, some of which could take longer to resolve than others. So a timing issue.

Q The timing issue being that DOE wanted to wait before going further on this issue until other issues were more ripe?

A. Until we completed the effort, the ACR issue resolution process, and been able to go to rulemaking with a more complete set of changes.

(Slater Exhibit No. 8 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what we've had marked as Slater Exhibit 8 Do you recognize this document?

A. No. I don't recall this. This is my handwriting. And these appear to be the meeting minutes from a standard contract task force that would have been a utility group task force in August 29, 1991, five days after I joined DOE.

And it looks like it focuses on completing DCS's. And I believe you will note in item 3 that we discussed that range of discharge dates which was one of the issues that was

Page 162

unclear

Q You said that Slater Exhibit 8 that you're looking at looks to be minutes of a meeting of utilities. Why would you have attended the meeting if you were already at DOE at that point?

A. You recall that we discussed instructions for completing the DCS form. Prior to formalizing the instructions for completing the DCS form, we would have met with the standard contract task force; the utilities, because we had provided them with a copy of the instructions and asked them to review it, asked them if they had any questions, and agreed to discuss the form with them so that we were not imposing something that was unclear and would not work.

And this meeting appears to have done just that, because, if I am reviewing this correctly, starting at item 4, page 3, paragraph 1, page 3 paragraph 3, page 4 at the top, these are all what appear to be pages of the procedure.

Q Let me also confirm something that I think you said earlier, that Slater Exhibit 8, the first page of it looks to be a sign-in sheet for a meeting?

Page 163

A. Yes.

Q. And the subsequent pages appear to be your own minutes or notes of that meeting?

A. My notes for suggested changes, because, in fact, if you look, it says page 4 at the top, article VB, spell it out. And what does approval mean, it has to be signed. So this is exactly what this one is. This was to receive the comments that the utilities had on the DCS procedure and the form itself and go back and review them and then incorporate them.

Q. When you say the DCS procedure, you mean the instructions given to --

A. Instructions.

Q. Given to utilities on how to complete the DCS?

A. Right.

Q. On the second page of Slater Exhibit 8, you have it looks like certain items or issues 1, 2, 3, 4. Could you tell me what the second one is talking about?

A. Let me read it for a moment.

Okay. Submission of the first DCS's was timed, it's explicitly mandated in the contract, 63 months prior to the delivery year,

Page 164

and assumes that delivery would commence in 1998, January 31, '98.

If 1998 were not the year when delivery commenced, utilities would have submitted DCS's for 1998. The question was do they get to go back now and revise their DCS's or are they just overcome by events, are they calendar year specific or year one, is it 1998 or year one.

Q. Year one of what?

A. Of any range of dates. So, if it were year one, no one would have to revise anything. If it's 1998, do I make them go back and revise all their DCS's, do I -- if they have to go back and revise their DCS's, can I revise a DCS or would I have to treat it as an exchange in a given year. So there were procedural questions about that, and that's what this issue is discussing.

Q. You say year one, you mean year one of DOE's acceptance of spent fuel under the waste acceptance system?

A. Yes.

Q. The instructions for the delivery commitment schedules, did they require utilities to not request delivery of more spent fuel than

Page 165

was provided for in their allocation in the published annual priority report?

A. Yes, that would have been the basis for rejection of the DCS.

Q. Was there any discussion of that instruction at this meeting?

A. I don't specifically recall that.

Q. You don't specifically recall that instruction being discussed at any such meetings?

A. No, because I know that, when I was on the utility side, we clearly understand that you weren't supposed to go ask for more than you were entitled to.

Q. What was the point then of the delivery commitment scheduling process if everyone was entitled to a certain amount and everyone knew what that amount was and you couldn't ask for more than that amount? Couldn't DOE have just written -- they knew what the delivery commitment schedules were going to be requesting, didn't they? What was the point of the process?

A. Again, because it's not as clear as you think it is, if there were no DCS exchange process, you might perhaps be correct. But, assuming that people could exchange positions in

Page 166

the queue, could exchange BWR fuel for PWR fuel, could exchange ten-year-old fuel for five-year-old fuel, it could make a very great difference to how you manage your acceptance process.

The DCS was supposed to be a heads-up from the utilities about the type of fuel they would be delivering to us. The utilities didn't want to do that. They did not want to commit themselves to a specific discharge date because they were concerned that, if they did that, they would lock themselves in and there would be no opportunity to deliver anything else.

So in the end it wasn't much of a heads-up because they had tremendous ranges. In fact, there was a discussion that they would like to include in that range of discharge dates fuel that had not even been discharged at the time the form was submitted because obviously five years later, if it were four-year-old fuel, now it would be nine-year-old fuel.

So again, you know, the heads-up that it was supposed to be in the end turned out to be not much of a heads-up at all. But by completing the DCS -- you had to have a signed DCS in order

Page 167

to exchange. So, by completing and filing the DCS, you were providing yourself with a future instrument to adjust your position in the queue.

Q. But, other than actually coming up with a formalized signed piece of paper, pretty much anyone looking at the process could have predicted what any given utility's DCS was going to look like?

A. I would say that I could predict looking at the APR who was going to deliver -- this is absent an exchange process. Who was going to deliver and how much they were going to deliver. I couldn't predict what they were going to deliver, the age of it. that was just not possible.

Q. As far as the age, what you're saying is most of the utilities were fairly vague as to indicating how old the fuel was that they intended to deliver anyway?

A. They provided a tremendous range so that they would have the flexibility to pick what they wanted when it came time to deliver. And for us, you know, we wanted to know because there are limits. There's the certificate of compliance for each cask and there are I believe

Page 168

thermal load limits, radiation level limits. And that is dependent on the age and burnup of the fuel.

So, if you're trying to schedule acceptance of fuel, you to a certain extent arrive at the number of casks you need to deliver by the type of fuel you're going to pick up. So we had thought we would get a heads-up on what we would be picking up and that would permit the department to plan out its transportation program. It didn't quite work out that way.

Q. The DCS process would also I guess have allowed a utility to request delivery of less fuel than their allocation?

A. Yes. Let's assume that someone -- I don't believe this was the case. But let's suppose someone was permitted to discharge -- to deliver one fuel assembly in year one. Remember, every time you deliver fuel, you disrupt your operations in order to do that. So the utility would likely ask themselves is it worth it to me to deliver one assembly.

Q. Do you recall, did any utility submit proposed delivery commitment schedules requesting delivery of less than their full allocation?

Page 173

and there.

Q. And the bottom paragraph talks about a marathon session and mentions comments from others, you are mentioned and then the next entity is PNL. Is that Pacific Northwest Labs?

A. Yes.

Q. What would the nature of their involvement have been?

A. PNL was involved in -- as a contractor in originally drafting -- helping to draft the standard contract. Now, precisely what their involvement was I don't know. And in this capacity they may have been consulting for Billy Cole.

Q. So PNL would have been a subcontractor of TRW?

A. I think, I'm not sure.

Q. And then the next entity referred to is M&O Transportation?

A. That's TRW, that's management and operating, their transportation group. And the next organization would be the M&O MRS, monitored retrievable storage design group.

Q. What would the nature of those two organizations have been in the process of

Page 174

finalizing those issues?

A. If there were any design considerations for which we were unaware, because, remember, we were focusing on contractually based issues. If there were design considerations that we needed to consider or that we had overlooked, it would be their opportunity to inform us.

Q. At the top of the memo, there's a cc list with a number of people. These people were all individuals involved in DOE's resolution of these issues?

A. Some directly, some indirectly. Alan Brownstein, of course, was my boss. Jim Clark was M&O, the supervisory level, I don't know how directly he was involved. E.R. Johnson is the managing officer of JAI, and I don't know how directly he would have been involved.

M.C. Klose I don't recall. Ernie Leonard, a staffer to the M&O. Nora McDonald, M&O, data manipulation. Doug Williamson, M&O, nuclear engineering background. And Glen Vawter, I don't have the vaguest idea of why he's on this distribution list, he's M&O.

Q. What do you recall Mr. Vawter's position being with the M&O group?

Page 175

A. I don't recall his position with the M&O.

(Slater Exhibit No. 10 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been given what we've had marked as Slater Exhibit 10. Do you recognize it?

A. Yes. I would like to look it over, but it is another OCRWM position on one of the 35 issues, this one dealing with the identity of the amount of waste to be identified on the DCS.

Yes. This is a simple issue, simple. The language at the time in the contract implied that ad infinitum, when it became time to submit on that first opportunity of DCS, that you would have to tell us everything you were ever going to deliver.

So the confusion was do I need to submit ten DCS's, 50 DCS's, do I put it all on one DCS, and what is the amount I'm supposed to submit. This was a simple issue in the sense that what we told them was that the DCS is year specific. It's not to include more than one year.

Page 176

You have a DCS for every year. And the amount you put in the DCS for one year is the amount that you're allocated for that year. So there was confusion about how many DCS's did they have to submit for all ten years, could they submit for all ten years if they wanted to.

The questions from the industry were all over the map. Some people thought they didn't have to, some people thought they did. It was just confusion.

Q. Was part of this issue also the notion that the delivery commitment schedules called for the utility not to request more than their allocation; the utilities' statement of how much spent fuel they would like to deliver, if they had complete flexibility, it was constrained by their allocation?

A. Right, absolutely. That was an implicit assumption. And, when I was in the utility side of the business, it was always understood that the DCS's were not to be completed for more than what you had as an allocation.

Q. And DOE shared that understanding?

A. And DOE shared that understanding.

Page 206

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------- X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

--------------- X

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 207

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
SUSAN SACHS, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289

Page 208

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| NANCY H. SLATER | PLAINTIFF |
| By Mr. Shapiro | 209 |


EXHIBITS


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 17 - Memo dated 8/5/94 | 209 |
| 18 - Memo dated 5/16/90 with attachments | 215 |
| 19 - Letter dated 2/10/95 with attachments | 221 |
| 20 - Memo dated 6/24/93 | 233 |
| 21 - Letter dated 6/24/93 | 249 |
| 22 - Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated 6/22/83 | 254 |
| 23 - Acceptance Priority Ranking & Annual Capacity Report dated March 1995 | 275 |
| 24 - Complaint | 306 |


Page 209

PROCEEDINGS

Whereupon,

NANCY H. SLATER,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF - RESUMED
BY MR. SHAPIRO:

Q. Ms. Slater, we're here for the continuation of your deposition. You understand you're still under oath?
A. Yes.
Q. Do you understand that?
A. Yes, I do.
Q. You may recall at the end of yesterday we were talking about exchanges of approved delivery commitment schedules?
A. Yes.
Q. I want to just have a few more questions on that subject. Let me have another document marked and show it to you.

(Slater Exhibit No. 17 was marked for identification.)

BY MR. SHAPIRO:

Page 242

have an allocation in this year or, B, you've exceeded the allocation to which you're entitled, you need to provide me with a DCS that is consistent with the terms and conditions of the standard contract, and we understand those to mean.

Yankee resubmitted and submitted identical DCS's. So this is discussing that second letter, because that would -- from the department. The second letter from Yankee submitting the same DCS's would have kicked us into let's sit down and talk about this and try to understand why we don't seem to be able to come to closure on this issue.

So this was at the end of that process. There is a formal response required. And it is a final decision, if you will.

Q. Now, I want to point your attention to the second page of this memorandum, one of the points in the middle, where it says submitting acceptable DCS's would not preclude their rights under the contract should the department subsequent to rulemaking grant such priorities. Do you see that?

A. Yes.

Page 243

Q. What was meant there?

A. Oh, I recall that precisely. Yankee's concern as expressed to us was that, well, suppose I submit a DCS to you, suppose I have a ten MTU allocation in the first year, I don't recall what it was precisely. I really want to empty my site in five years.

And that would mean that I need to submit a DCS to you for 100 MTU. If I go ahead and submit a ten MTU DCS to you now, does that mean after rulemaking, if everyone could agree that priority should be afforded to shutdown reactors, that I could still only deliver ten MTU.

And our response to them was no. Submitting an accurate DCS now does not preclude you from availing yourselves of the opportunity to ship additional fuel, more than ten MTU, were the decision made that priority should be afforded to shutdown reactors.

And the reason for doing this in rulemaking is again, as I have stated over and over again, this is a utility equity issue. And both, while I was at the utilities and at the DOE, I was personally involved and personally

Page 244

aware that the utility industry did not support priority for shutdown reactors. In fact, their stated consensus position was that priority should not be afforded to shutdown reactors.

Q. So it was not intended that the delivery commitment schedule process be a gotcha process?

A. A static process.

Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?

A. That's correct, it was not our intention to do that.

Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?

A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the

Page 245

fuel that earned you the slot.

So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.

So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.

So it wasn't as clear as looking at the APR. The DCS was intended to provide a little bit more sound information for planning purposes.

Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?

A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they

Page 246

were allocated because of the equity issue.
There's only so much system capacity. If I accept more from someone else, I accept less from someone else.
Q. And then briefly I want to point your attention to the next sentence on page 2 of Slater Exhibit 20 that says they have the contractual right to exchange allocations with other interested utilities, what was that referring to?
A. That's the DCS exchanges. They have the contractual right to exchange their slot in the queue with someone else in the queue and conceivably either obtain the ability to deliver in a year in which they weren't originally scheduled to deliver or obtain the ability to deliver more than they were scheduled to deliver.
Q. And so the availability of the right to exchange was being offered to the director of the program as another justification as to why it was appropriate to deny the priority request that Yankee Atomic was making, because they had the right to accomplish what they wanted through the exchange process?
A. Yes.

Page 247

Q. Perhaps if you could turn to page 3 of Slater Exhibit 20. And, on the right-hand side, it has that long list of concurrences. Could you run down that and tell me what was the role of the various people in that concurrence chain.
A. You know my role, I'm the originator, the technical lead, if you will. Alan Brownstein would have been the branch chief. Jim Carlson would have been the -- I think we called them divisions then, division director.
Q. It says RW-43, that was his division, Mr. Carlson's division?
A. Forty-three, right.
Q. What division would that have been?
A. I don't recall the name specifically. We've shifted names so many times.
Q. But approximately what --
A. Waste acceptance and transportation perhaps. Ron Milner would have been the office director.
Q. And that RW-40 is the designation for that office?
A. For that office. Dick Nelson and Jerry Saltzman would have been in what we called the front office as support directly to the director

Page 248

of the program.
Q. And their office is indicated as RW-2?
A. Yes. And Lake Barrett as RW-1, and I cannot make out the last one, I can't make the last one out. I believe it's Charlie Smith. And again that would have been front office support, support directly to the director of the program.
Q. So the director is the only one with RW-1?
A. Yes.
Q. And his support people are RW-2?
A. Yes. The deputy director of the program, for example, would be an RW-2 and there are usually two or three others who are support directly to the director.
Q. And you had pointed out previously an indication noting that you were the originator of the document. And there's a line below that, Correspondence Reviewer. What's the role of the correspondence reviewer?
A. I don't recall.
Q. And the concurrence line, there's no indication of a review by the contracting officer. Why would that have been?
A. That depends on the version of this

Page 249

that you pulled from the files. In fact, I have right now unrelated to this case a version of a document to review. I have a concurrence sheet and I will be concurring for myself and for the division director. It will be an attachment to a separate records package that, when put together with this, will form a complete picture.
Q. So there may have been another version of this memo with a concurrence by the contracting officer?
A. It would have been the same version of this memo that would have gone over separately for concurrence in another office because that would speed the process.
(Slater Exhibit No. 21 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 21. If you could take a look and tell us if you recognize this document?
A. Okay. I believe this is the letter that would ultimately have been sent to Yankee, to Mr. Buchheit, that would have been the result of the director's approval to communicate with

**Page 250**

Yankee that we could not accept.

Q. So, after the director would have proved Slater Exhibit 20, then Slater Exhibit 21 would have gotten drafted?

A. Actually does this have a date on it? I cannot determine whether this is the letter that would have gone with the original DCS's that were incorrect or subsequent to the negotiations. If I were to do a cold reading of this --

Q. You asked about the date. Let me point your attention to the last page on the left, where there's that indication of you as originator that you pointed out in the previous document. It appears to be a date 6/24/93.

A. This would have been the final letter. I've read enough in the letter to know that it's the final letter.

Q. And, in fact, it appears that Slater Exhibit 20 and Slater Exhibit 21 were at least originated by you on the same day?

A. Actually not necessarily originated on the same day. But it was standard practice, when you submitted a memo like this to the director, to provide him with the opportunity to see the

**Page 251**

letter itself so he knew what he was likely to be recommending be signed by the contracting officer. And that's what this would have been. So the total concurrence package would have contained both.

Q. So there would be no disconnect between the approval memo and the actual product that went out of the office?

A. Yes. And I cannot determine whose comments these would be on here.

Q. That was going to be one of my questions. There's some handwriting on the second page of Slater Exhibit 21. And you don't recognize that handwriting?

A. No, I don't.

Q. It's not your handwriting?

A. Certainly not mine. Mine would have been an absolutely clean copy. And actually --

Q. Can you tell from the concurrences, does that give you any clue as to whose writing it would have been?

A. No.

Q. Let me point your attention to the last paragraph of this draft letter, the second sentence in that paragraph that says, if an

**Page 252**

acceptable year one DCS is not received within 30 days, the contracting officer will issue a decision regarding the status of YAEC's year one allocation. What was meant by that sentence?

A. You would have to question the contracting officer particularly concerning that. My recollection is that, if a utility does not submit an acceptable DCS, one of the concerns I do know, I do recall from the utility days is, if they decided not to submit an acceptable DCS, did that mean that then they were relinquishing their right to an allocation in that year.

And the utility's understanding at the time I was in the industry was that that's precisely what it meant. And this letter stopped short of saying, guys, the contract has requirements, you signed the contract. You need to behave consistent with the contract.

So I don't know precisely what the contracting officer envisioned as the ultimate consequence of not submitting an appropriate DCS. But I recall from the utility days that that's one of the things utilities were concerned about.

Q. So it would have been a fair

**Page 253**

interpretation on Yankee Atomic's part on receiving that letter that this is saying submit the delivery commitment schedule we want or we're not going to give you any allocation at all?

A. No. It would be a fair interpretation to say submit the delivery commitment schedule that you were contractually obligated to submit, not the one we want, contractually obligated to submit, or we will have to make a further determination about where we go from here.

Q. Who would have drafted this particular language, would that have been you?

A. It could have been me, it could have been Alan Brownstein, it could have been Beth Tomasoni, it could have been Nick Graham.

Q. Who was Nick Graham?

A. I do not particularly remember drafting that paragraph. Nick Graham supported Beth Tomasoni. He would have been my equivalent, if you will, in terms of I reported to Alan, Nick reported to Beth.

Q. Now, you said the intent of that sentence that we just discussed was to tell Yankee Atomic to submit a delivery commitment schedule consistent with their obligations under

Page 254

the contract. Can you tell us what part of the contract you were referring to?
A. I can't recall the specific article number. But, if you go to the standard contract, you will find a section that is labeled delivery commitment schedules.
And under that section you will find that there are certain steps that must be executed by both the department and the purchaser. And there are timetables associated with each of those steps. And that's in there.
(Slater Exhibit No. 22 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 22. Would you take a look and tell us if you recognize this document?
A. I recognize this generally to be the contract executed by Yankee with the Department of Energy consistent with the standard contract. Knowing that these contracts were subject to individual modifications, for example, payment of fees, the schedule in which fees might be paid, I can't tell you what the particulars are.

Page 255

Q. But generally the terms of the contracts were largely the same?
A. Standard.
Q. Can you point us to the language of the contract you were just referring to as far as Yankee Atomic's obligation with respect to the delivery commitment schedule?
A. Yes, if you turn to page 11, it's Article V B.2., DOE shall approve or disapprove -- actually let's go to B.1., DOE shall approve or disapprove such schedules within three months after receipt. This is the initial submittal. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval, which we discussed, and request a revised schedule from the purchaser to be submitted to DOE within 30 days after receipt of DOE's notice of disapproval.
DOE shall approve or disapprove such revised scheduled within 60 days after receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule. If these are not acceptable to the purchaser, the parties shall promptly seek to

Page 256

negotiate mutually acceptable schedules.
The terms and conditions for this process, this iterative process are very clear. And, in fact, you know, we did engage in the negotiations. In fact, another letter came back that said no.
Q. But what in the contract says that after the parties try to come up with a mutually agreeable result, it says that if they can't come up with something that both agree on, that the contracting officer gets to decide the issue?
MS. SULLIVAN: Objection. You're asking her for an interpretation of the contract. And Ms. Slater is not a lawyer. If you would like to ask her a question about her opinion or whether she finds guidance to that effect, that's fine. But her interpretation of the contract, she's not the contracting officer or an attorney.
BY MR. SHAPIRO:
Q. Answer the question.
A. That's why I stated earlier that I have no personal knowledge of how the last paragraph of Exhibit 21 which was the letter to Mr. Buchheit at Yankee Atomic was drafted,

Page 257

because it appears to me that that portion of the letter would have been drafted by the contracting officer or their staff. And I have no knowledge of what led them to those statements.
Q. So you can't point to a clause of the contract from your knowledge and experience working with it that says that the contracting officer gets to resolve those disputes that the parties can't agree upon, that the contracting officer gets to resolve that herself?
A. No, I can't point to anything in the contract that tells me where we go once the utility has repeatedly refused to honor the terms and conditions of the contract.
Q. You said when a utility refuses to honor the terms and conditions of the contract. What term and condition of the contract are you saying that Yankee Atomic wasn't honoring?
A. Submit an acceptable delivery commitment schedule.
MS. SULLIVAN: Give me a chance to object before you answer the question.
BY MR. SHAPIRO:
Q. What part of the contract tells you that Yankee Atomic's delivery commitment