Page 258

schedules weren't acceptable?
MS. SULLIVAN: Same objection. She can answer as to her opinion.
THE WITNESS: In my opinion I cannot give you a specific section because I haven't looked at this contract in years. I can refer you to the procedures, instructions that were provided to the utilities that were reviewed with the utilities that specifically state that an acceptable DCS is one which does not exceed the individual utility's allocation in a given year.
BY MR. SHAPIRO:
Q. Can you take a look now at the contract and tell me where that would be.
MS. SULLIVAN: Same objection to the extent you're asking for a legal interpretation of the contract.
You can answer the question.
THE WITNESS: You recall that we discussed the identification as part of the ACR issue resolution process, the issue of delivery commitment schedules. Do you recall that? If we need to discuss that again to refresh your memory, I'll be happy to.
One of those issues was delivery

Page 259

commitment schedules. And primarily the issue there was the need for the department to issue instructions on how to complete the form.
One of the issues associated with completing the instructions to complete the form was what is an acceptable DCS. Those instructions as I believe -- I'm not sure, I believe it was exhibit -- maybe it was seven yesterday. It was my handwritten meeting minutes from the standard contract task force.
I attended the meeting, Dave Zabransky I believe chaired that task force, at which we discussed with the utilities the contents of those instructions. So it was recognized by both the industry and DOE that clarification was required and an effort was embarked upon jointly to develop the instructions for completing the form.
Those instructions were formally issued to the utilities. And I base my definition of an acceptable DCS on that entire package which is not just the original contract, it is the supporting documents that are official including the instructions for completing those forms.
BY MR. SHAPIRO:

Page 260

Q. And I certainly understand that and I understand your counsel's objection that you were never the contracting officer. But, if I understand correctly, I mean you just took a little while to look at Yankee Atomic's contract. And looking at it you can't point to a particular clause or combination of clauses that you would have relied upon to say that Yankee Atomic's submitted delivery schedule were not acceptable?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe that the discussion contained in the contract on the acceptance priority ranking and the annual capacity report, when viewed together and in the context of a theoretical acceptance capacity and repository, fairly clearly indicate what the amount of the allocation is for a utility in any given year.
BY MR. SHAPIRO:
Q. But you can't point to a clause in the contract that sets that out?
A. That sets what out?
Q. That sets out that Yankee Atomic's proposed delivery commitment schedules

Page 261

were not acceptable?
MS. SULLIVAN: Same objection.
THE WITNESS: No, I can't, because I'm not the contractual expert.
BY MR. SHAPIRO:
Q. Beth Tomasoni who was the contracting officer at the time of final denial of Yankee Atomic's proposed delivery commitment schedule, she might be able to tell us more specifically what clause of the contract was being relied upon?
A. She might be able to give you the basis for her approval of this letter.
Q. Who else might be able to tell us more specifically what contract provision was being relied upon?
A. That would be someone in the contracting officer's office, perhaps herself or himself at the time, herself and her staff.
Q. How large was the contracting officer's staff?
A. I really do not know.
Q. You didn't work closely with those people?
A. I worked closely with a couple of

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

\- - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

Page 86

of why we have a revision one and why you have not presented me with Rev. 0.
Q. I'll show you what I have got as the other version. Maybe you can offer a further explanation.
(Thompson Deposition Exhibit No. 8 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, I have handed to you what's been marked as Exhibit 8 which has on its title a 1992 ACR with a date of March, 1993. Do you recall this document?
A. Not explicitly, no.
Q. Does this help clear up for you at all the revision one issue that I just asked you about about Exhibit 7?
A. Not at all. In fact, what you have handed me, I can't determine whether or not this is a final or not.
Q. I take it then you don't recall issuing one draft of the 1992 Annual Capacity Report in March and then another one two months later?
A. No.
May I take a moment to read through

Page 87

this?
Q. Sure.
A. Thanks.
(Discussion off the record.)
BY MR. SHAPIRO:
Q. Did you say that you thought that Exhibit 8, the one dated March, 1993, might be a draft? It doesn't have the fancy cover that the other versions had.
A. Right. That's what confused me because this doesn't look like the finals that we have, even the one with the fancier artwork for '95.
No clue; it will remain one of life's mysteries.
Q. Turning to Exhibit 7, the May, 1993 version of the 1992 Annual Capacity Report, again I want to ask you about the acceptance waste projections that are on page 4 of this exhibit.
Do you recall how the acceptance waste -- acceptance rate -- waste projections in Exhibit 7 were developed?
A. No.
Q. I want to go back to the most recent ACR, the 1995 one, for a moment.

Page 88

I believe you testified that those acceptance rates were based in part upon the 10,000 MTU limit on the size of MRS. If that was the concern, why wouldn't it have been appropriate for DOE to accept waste at a faster rate and then have stopped at 10,000 MTU so as to provide more assistance to the utilities who needed waste accepted sooner?
MS. SULLIVAN: Objection, argumentative. Objection, vague. Objection, foundation.
A. My personal opinion, and as we have discussed before, there are numerous factors that would affect the rate at which you would work off delivery of spent fuel from reactor sites, and one of the most important being do you have enough casks in the transportation cask fleet to accept more even if you assumed for a moment that you had a facility that could accept more.
So I'm not entirely sure that you would have had the ability from a transportation cask standpoint to have accepted 10,000 MTU in the first year, for example. What would have prevented you from accepting 10,000 MTU in the first year? Logistically, I don't believe you

Page 89

could have done it. You didn't have the transportation capacity. That makes a lot of assumptions, again, that we had facility, that we had a license to receive and possess, but ...
Q. To what extent were the waste acceptance projections in the 1995 ACR reflective of a desire by the department to limit its commitments to utilities?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion. Objection, foundation.
A. I have no knowledge of anything like that.
Q. You don't recall anybody discussing a desire to have relatively low acceptance projections in the ACR so as to limit the department's commitments to the utilities?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, foundation.
A. No, I do not.
Q. Let's switch subjects to talk about the delivery commitment schedule process. Why don't we turn first to that provision in the contract, which is Exhibit 2. The part that I

fuel in any NRC licensed container, licensed by the NRC for transport?

MS. SULLIVAN: Objection to your characterization of the department's current plans. Objection, vague. Objection, foundation.

You can answer.

A. No, I am not focusing on anything related to transportation.

Q. The regulatory division that you are acting director of doesn't address transportation regulatory issues at all?

A. No, it does not. There is a separate transportation group that does that.

Q. The regulatory issues that your division is involved in are limited to those of the repository?

A. The repository, and I would say those in part two issues, that would be license and process issues.

Q. Has the issue of greater than class C waste come up in your role in the regulatory division?

A. No.

Q. Do you recall any discussion of whether or not to include greater than Class C



waste in the EIS for Yucca Mountain?

MS. SULLIVAN: Objection. Vague.

A. No, I don't.

Q. Has the issue of high-level waste come up in your role in the regulatory division?

MS. SULLIVAN: Objection, vague. Objection, foundation.

A. I'm not sure I understand what you are driving at here. I mean people know generically that we are accepting high-level waste.

Q. Have you ever had -- has the issue ever come up in the regulatory division in any way? Just to give you a couple examples, you know, how we are going to do it, which high-level waste, what form, how are we going to put it in containers. Have you had to actually focus on any issue concerning high-level waste in the regulatory division?

MS. SULLIVAN: Objection. Vague.

A. I am aware of those discussions. My personal involvement at this point is limited, for example, to issues like safeguards and security, which I explained to you before, and whether or not, for example, I need to tamper indicate canisters of high-level waste that are of low



strategic significance.

Q. A government argument that I have heard made at times, and I will ask if you've heard this before, not necessarily from government counsel, have you ever heard an interpretation of the contract that would say that the government would meet its obligation by accepting one fuel element from one utility by January 31, 1998?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. I have never heard that.

Q. Has such an interpretation ever played a role in your work in the waste acceptance division?

MS. SULLIVAN: Objection, foundation. Objection, vague.

A. I have never heard it, and I don't recall even considering that.

MR. SHAPIRO: That's all the questions I have for you at this time, Ms. Slater Thompson. I appreciate your help.

I should note that there's a small chance that we may seek to talk to you yet again, there is an issue concerning some documents that we may or may not get which may or may not address



issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.

A. I understand. Thank you.

MS. SULLIVAN: I have a couple questions.

EXAMINATION

BY MS. SULLIVAN:

Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?

A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.

Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?

A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.

Q. Do you have or have you ever had responsibility for transportation planning for the program?

Page 150

A. No.
Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?
A. Yes.
Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?
A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.
Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?
A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.
Q. I believe Mr. Shapiro has asked you

Page 151

previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.
Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?
A. I am positive it's in the DCS instructions.
Q. Could you turn to Exhibit 10, please, to your deposition.
Are these the DCS instructions to which you are referring?
A. Yes.
Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?
A. Give me a minute.
Q. Sure.
A. Page 2, number 7E, the last sentence.
Q. Could you read that for me, please?
A. Exceeding the allocation will result in disapproval of the DCS.

Page 152

Q. Thank you.
While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?
MR. SHAPIRO: Objection. Vague.
Q. Do you want me to clarify the question?
A. Please.
Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?
MR. SHAPIRO: Objection. Vague.
A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.
Q. I am not sure whether Mr. Shapiro

Page 153

asked you this specific question. Is it your understanding that the final delivery schedules submitted by purchasers and approved by DOE would be binding on the parties?
A. Are you asking me for my personal opinion?
Q. Yes.
A. My personal opinion is that given that the FDSs are submitted a year before actual acceptance is to start that they are supposed to include the actual reactor, the actual age, discharge date of the fuel, and that that's the basis on which we actually begin to mobilize the system to come get it, yes.
Q. And one final question with regard to multi-element sealed canisters, or MESCs, that we discussed. Do you have an understanding as to whether, while you were in the waste acceptance division, those were considered a standard waste form?
A. My recollection is that they were not.
MS. SULLIVAN: Thank you.
MR. SHAPIRO: I just have a couple follow-up questions for you.
EXAMINATION

# Victor Trebules

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : I
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 241

Page 2

THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

Page 3

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

# Victor W. Trebules, Jr.



Q. Mr. Trebules, if you can specify a date that you were working on the planning for the disposal of radioactive waste and spent nuclear fuel while at the Office of Nuclear Energy Programs, that would be helpful.
A. Let me try to clarify what I think you asked. I don't remember exactly when ERDA switched over to the Department of Energy. My guess, that was sometime in the 1980s. But in 1977, I joined the Office of Nuclear Energy Programs, which may have been part of ERDA or, you know, Atomic Energy Commission or ERDA or Department of Energy. It was 1977 and at that time I was involved in the planning activities for nuclear energy programs, which included breeder reactor development like the Clinch River breeder reactor, and I was responsible for preparing what was called the Fish and Energy Program Plan for the Department of Energy, which included some at that time it was called fuel cycle activities, which included handling of radioactive waste.
Q. Did that planning for the handling of nuclear radioactive waste that you just described, did that



involve planning for the disposal of those wastes in a deep geologic repository?
MR. SHULTIS: Objection, relevance.
BY MR. EIDUKAS:
Q. Generally, when your lawyer objects --
MR. SHULTIS: You still have to answer.
BY MR. EIDUKAS:
Q. You still have to answer unless he instructs you not to, if you're able to.
A. As best as I could remember, we did in the Fish and Energy Program document talk about reactor development and waste activities, and it did include I believe reprocessing at that time. This was prior to the ban on reprocessing and ultimate disposal of radioactive waste.
Q. Did those plans that you worked on go so far as to discuss the design of a repository? Did it get that specific?
MR. SHULTIS: Objection, relevance.
THE WITNESS: As best as I could remember, I don't believe we got involved in the -- at least I didn't get involved in the design of repositories for



the disposal of waste. My primary area of emphasis at that time was on reactor development. As I said, the Clinch River breeder reactor and, for example, Whitewater breeder reactor.
BY MR. EIDUKAS:
Q. At some point did your position at either ERDA or the Department of Energy change?
MR. SHULTIS: Objection, vague.
THE WITNESS: I had a number of activities during my career. As I mentioned, I stayed in the Office of Nuclear Energy Programs for a while and then soon after the passage of the Nuclear Waste Policy Act, about a year or two after the act was passed, then I joined the Office of Civilian Radioactive Waste Management.
BY MR. EIDUKAS:
Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?
A. That's correct.
Q. What was your first position at the Office of



Radioactive Waste Management?
A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.
Q. What did that position entail? What were your responsibilities in that position?
A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.
Q. Was there anything else that your role entailed in that position?
MR. SHULTIS: Objection, vague.
THE WITNESS: That preparation of the mission plan was pretty much a full-time activity for a number of years. So there might have been other minor assignments I was given, but, you know, overall it was primarily the mission plan.
BY MR. EIDUKAS:
Q. Okay. Did there come a time when your position at the Office of Civilian Radioactive Waste Management changed from program analyst working on the mission plan?

MR. SHULTIS: Objection, vague.
THE WITNESS: I had a number of different assignments in the Office of Civilian Radioactive Waste Management over the nearly 20 years that I've worked in that program.
BY MR. EIDUKAS:
Q. I guess what I'm trying to get at is I'd like to have just a brief chronology of the different positions you've been in with dates, if possible.
So you started out as a program analyst in the Office of Civilian Radioactive Waste Management in the approximately 1983-1984 time frame. What I'd like you to do is going forward to the present with dates, if possible, just state the various positions you've held in the OCRWM.
A. Okay. Around the 1984-'85 time frame, as I said, I believe I was a program analyst. I think in 1985 or '86 I became the senior technical adviser and technical assistant to the Director of Office of Civilian Radioactive Waste Management. I don't remember the exact time frame, but when Admiral Watkins became Secretary of Energy, I was detailed to his



office for I think little over half a year as an adviser to the Secretary.
I then came back into the Office of Civilian Radioactive Waste Management I think in 1990 or 1991, and I was the Acting Director of what was called the M&O Management Division with responsibility to bring on board the M&O contractor for the program. I think that was 1991. About the a year or two after that, I became the Director of the Storage Division. The primary responsibility was to work on a proposed monitored retrievable storage facility.
A few years after that, I became the Director of the Program Management Division. And let's see. About four years ago I transferred out to Las Vegas to the Yucca Mountain site characterization office, and I'm currently the Director of the Office of Project Control.
Q. Did you have any involvement in the drafting of the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, asks for legal conclusion.
BY MR. EIDUKAS:



Q. My question was whether or not you had any involvement in actually writing or preparing the text of the Act.
A. Not that I could remember.
Q. At the time that the Act was being -- and when I say the Act, I'm referring to the Nuclear Waste Policy Act of 1982. At the time that Act was being drafted, did you have discussions with people who were involved in drafting that Act?
MR. SHULTIS: Objection, vague.
THE WITNESS: I don't believe so. I obviously talked to people in the department, you know, who were talking to people, you know, involved in nuclear energy activities, but I don't know that I've ever had any conversations with anyone that was actually involved in drafting the Nuclear Waste Policy Act.
BY MR. EIDUKAS:
Q. Okay. Do you have an understanding as to what the intent of the Nuclear Waste Policy Act is?
MR. SHULTIS: Objection, asks for legal conclusion.



THE WITNESS: I'm not sure what you mean by intent of the Nuclear Waste Policy Act. Obviously I was familiar with some of the provisions and some of the requirements. As I said, my main job when I was in the Office of Civilian Radioactive Waste Management was to prepare the mission plan. That was clearly required by the Nuclear Waste Policy Act.
BY MR. EIDUKAS:
Q. I'll try to clarify what I mean. Do you have an understanding of what the primary purpose of the Nuclear Waste Policy Act is?
MR. SHULTIS: Objection, asks for legal conclusion.
THE WITNESS: My understanding of the Nuclear Waste Policy Act is that it laid out a blueprint for this country to follow to provide for the management and disposal of spent nuclear fuel and high level radioactive waste with a number of specific provisions.
BY MR. EIDUKAS:
Q. Are you familiar with the term standard contract?

Page 41

just re-ask the question. Do you know whether it is the Department of Energy's position that it entered into contracts with utilities to begin accepting waste in 1998 on the basis that it would have a repository available for permanent waste disposal in 1998?

MR. SHULTIS: Same objections.

THE WITNESS: As I understand your question, the Department of Energy did enter into contracts and the date I believe you indicated was correct, 1983, on the basis that it planned to have a repository or it was planning to have a repository in operation by 1998.

BY MR. EIDUKAS:

Q. I'm done with that document. If you want to put that aside. You just want to turn it over. That way.

MR. SHULTIS: Keep in order.

BY MR. EIDUKAS:

Q. Keep in order if you have to refer back to something in the future.

Do you know what the parties to the standard contract intended with respect to how fast spent

Page 42

nuclear fuel would be taken by the Department of Energy?

MR. SHULTIS: Objection. It asks for a legal conclusion, vague, asks for speculation.

THE WITNESS: Yeah. I do not know what the parties had intended in terms of the rate of waste acceptance. If you're referring to the utilities, I do not know that.

BY MR. EIDUKAS:

Q. Okay. Do you know what the DOE intended with respect to the rate of waste acceptance?

MR. SHULTIS: Objection, asks for a legal conclusion, speculative.

THE WITNESS: I would have to answer that as follows. I know what the plans were that the Department of Energy was working on to develop the facilities because I was primarily responsible for developing those plans. We had planned or our objective was to try to have the facilities, primarily the repository, online in operation by 1998. But, again, those were plans.

BY MR. EIDUKAS:

Page 43

Q. And I'm sorry, were you done with your answer?

A. Yes.

Q. Okay. When you're referring to working on those plans in that answer, what time frame are you talking about?

A. The early schedules that we prepared indicated that we had hoped to have the repository in operation by 1998, but we clearly I guess the word would be identified caveats or issues or uncertainties associated with that because we, again, as I had indicated before, we recognized the schedules were optimistic and success oriented was the phrase we used to describe them. And we had also identified, as I think I indicated before, schedules for the MRS facility, if that were to eventually be authorized by Congress, that showed that that could go into operation at least by 1998, perhaps a year or two earlier.

Q. Okay. I think -- well, I think I may have misphrased my question. What I was trying to get at was: What was the time frame that you were working on the plans you had referred to? Are you referring to the mission plan, or is this something earlier than

Page 44

that?

A. It was the mission plan again. We worked on that in 1984, and I think we published it after a round of public review and comment. I think we published it in June of 1985.

Q. Okay. And I think you said that you personally at least were primarily involved in the planning for the designing of the facility. Did I understand you correctly?

A. No, not the design. I was responsible for developing the overall plan, which included design, included some of the siting issues, some of the permitting issues, some of the institutional issues that we had to deal with, as well as the bulk of the activity at that time, though, was the scientific programs that we had to conduct.

Q. Okay. Do you have knowledge as to he what rate of acceptance of spent fuel the repository was designed to operate at this time?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: Again, going back to the

remember. His name was Tom Longo, who wrote a lot of the geology and hydrology sections of the mission plan, and then we had a support service contractor and I think at that time their name was Weston.
BY MR. EIDUKAS:
Q. And do you recall what Weston worked on for the mission plan?
A. Well, they were, again, support service contractors under DOE direction. They were drafting up various sections of the plan, you know, for DOE review. DOE had final approval and authority over the content of the mission plan, and I was responsible for a lot of the individual sections myself.
Q. I'm sorry. When you say responsible, do you mean to review what Weston had drafted?
A. Yes.
Q. Who else was responsible for reviewing sections of the mission plan drafted by the contractor?
A. Well, it was always DOE individuals within the organization that had to review and give final approval of anything that went out as part of the mission plan. Again, I don't remember the names of many of the



people, other than perhaps Tom Longo or Charlie Head or Bob Rosselli that were involved in the review.
And I believe during the time we issued the draft to when we issued the final in June, we actually went through an organizational change. And I think when the June '85 version was issued, I actually ended up working in a different group and that was probably called the office of -- Office of Policy and Institutional something or other, and people there that were involved were people like Tom Isaacs, Roger Gale and Ben Easterling.
Q. Do you recall what their involvement was?
A. Ben Easterling was my immediate supervisor at that time in June of '85 I believe and Tom Isaacs was the director of that office, and I think Roger Gale was the deputy.
Q. I'm going to go back to -- so when you first started, you said your first supervisor was Charlie Head and then when this reorganization occurred, it became Ben Easterling.
Was there anyone in between those two people to whom you reported to?



A. Not that I can remember.
Q. Did you have final say over approving the sections of the mission plan that you were responsible for, or did you have to take that to your supervisor for them to have your decision approved?
MR. SHULTIS: Objection, compound.
THE WITNESS: Yeah. Did I have final say. I would say no. I had to get approval of several layers of my management at the time, starting with Ben Easterling, Roger Gale, Tom Isaacs, and ultimately the director of the program had to approve release of the document.
BY MR. EIDUKAS:
Q. So Ben Easterling -- after this reorganization occurred, is that when Ben Easterling became your supervisor?
A. I don't remember the exact time, but I think when we issued the document in June of '85, he was my immediate supervisor.
Q. Okay. And to whom did he report?
A. To Roger Gale and Tom Isaacs.
Q. Did Mr. Gale report to Mr. Isaacs or vice



versa, or were they kind of at the same level of management?
A. I'm trying to recollect. I believe Roger Gale was the Deputy of the Office of Policy and Institutional, whatever it was called, and Tom Isaacs was the director. So, in a sense I believe Roger Gale reported to Tom Isaacs.
Q. Okay. And then did Tom Isaacs report to the director of the program?
A. Yes, I believe so, and I think that was Ben Rusche at the time.
Q. You had said I think that you had drafted some of the sections of the mission plan. Is that correct or am I --
A. Yes, I wrote or drafted some of the sections of the mission plan.
Q. Could you just briefly list or describe which of the sections you were responsible for drafting?
A. The one in particular was I think what was called Chapter 1, which was an introduction, which I remember clearly we discussed the kinds of radioactive waste that we intended to deal with, and we put in a

Page 77

picture of a person standing next to a fuel assembly before it got inserted into a reactor. I essentially wrote that first chapter.

I was heavily involved in the second chapter, which was sort of the strategy, which we talked about before, laid out the authorized system and the improved performance system. Although I remember Tom Isaacs provided a lot of the direction as to how that chapter should be structured and what it should say.

I compiled the table of assumptions that went into that second chapter. Sort of give people an understanding of the magnitude of the issue that we were dealing with. It talked about the quantities of spent fuel, the modes of transportation, the number of repositories, you know, some of the parameters. The waste acceptance schedule, that was also included in Chapter 2.

And then I wrote a lot of the response to comments in the comment response document that we prepared, and again all these had to be reviewed by my management, and ultimately the director of the program before it got published.

Page 78

MR. EIDUKAS: Mark this as 4.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 4.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I have marked as Exhibit 4 -- this version doesn't have Bates stamps on it. This is a December 20, 1983 marked as "Draft, Civilian Radioactive Waste Management Program Mission Plan, Volume 1, Overview and Current Program Plans." This appears to be a December 20, 1983 draft of the mission plan. Are you familiar with this document?

A. Could I have a few minutes to look at it?

Q. Sure, sure.

A. (Pause).

MR. SHULTIS: Ted, ours has Bates numbers.

MR. EIDUKAS: Let me read it into the record. For the record, the Bates stamp of the exhibit is CTR-042-1065 through 1190. Thank you.

(Counsel and witness conferring).

MR. EIDUKAS: There's a question pending. If you want to ask questions of the witness, you can ask them on the record, but I prefer you don't have

Page 79

these consultations while there's a question pending.

MR. SHULTIS: What is the question pending?

MR. EIDUKAS: Are you familiar with this document, and you'll have a turn to ask questions of the witness when I'm done.

THE WITNESS: I'm ready to answer.

BY MR. EIDUKAS:

Q. Sure. I believe the question was: Are you familiar with this document?

A. To be honest with you, I don't remember specifically seeing this document before. I believe this was probably prepared before I joined the Civilian Radioactive Waste Management Program. However, I'm very familiar with some of the material in here and the reasons why we changed it in the eventual mission plan that got published in June of 1985.

Q. Okay. Would you describe what was changed --

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. -- that you're referring to in your earlier answer.

Page 80

A. Just very briefly, in looking at Chapter 1, for example, just skimming through it, this only has, for example, two pages and I believe in the version that I was responsible for, the one that got issued in June of '85, we had a much more extensive discussion in Chapter 1 on, as I indicated before, the types of wastes. We had a picture of the fuel assembly, you know, as to what it looks like, you know, before going into a reactor. We talked about other kinds of waste that we might have to deal with. The high level waste that came from the DOE operations.

Chapter 2, for example, looks like an early, early version of the strategy, which I think bears no resemblance to the one that ultimately got published in June of '85 where we talked about the authorized system and the improved performance system. This does have an early version of a waste acceptance schedule, but it's got numbers that were changed significantly from the one that got published in June of '85.

So, again, I mean, it's obviously an early version of the mission plan. I can't say for certain whether this is the one that was issued for public

# Victor W. Trebules, Jr.

Page 81

review and comment. I would think not, but it's significantly different than the one that got published in June of '85.

Q. I can't recall if you answered this or not. Do you know whether or not -- do you know who prepared this version, this draft of the mission plan?

A. No.

MR. SHULTIS: Objection.

THE WITNESS: I do not know specifically who prepared this.

BY MR. EIDUKAS:

Q. Okay. And I think this follows from what you testified, but do you know whether or not this draft of the mission plan was used in any way in preparing the later drafts and the final mission plan?

A. I don't know. I don't remember how it was used. I mean, normally the process is, you know, drafts evolve, you know, through successive iterations. I'd only be guessing, but I'd assume that is what happened with this one.

Q. When you referred to Chapter 2, you said this was an early version of the strategy and didn't include

Page 82

the authorized plan and the approved performance plan, but the final version of the mission plan did. Do you know why that was changed?

MR. SHULTIS: Objection, calls for speculation. Asked and answered.

THE WITNESS: I believe, as I indicated, Tom Isaacs was the primary author or inventor of the approach in that strategy chapter where we felt we had to clarify, as the names imply, what the department currently had authorization to execute. At the time that was the first repository in the transportation system, and we included discussion in the improved performance plan as to how that system could operate if we proposed and Congress accepted our recommendation on incorporating a monitored retrievable storage facility.

So we wanted to expand on and clarify that discussion, which I don't see in this document that you've provided me, the one dated December of '83.

BY MR. EIDUKAS:

Q. And you referred to a waste acceptance schedule. Is that the -- were you referring to the table that appears on page 2-3?

Page 83

A. Yes.

Q. Okay.

MR. SHULTIS: You want to identify the Bates number?

THE WITNESS: CTR-042-1072.

BY MR. EIDUKAS:

Q. Is that the schedule that you were referring to?

A. Yes.

Q. Okay. And you said that this was changed in the eventual mission plan that was published?

A. Yes. This table doesn't look familiar to me, and I think the one that got published in the version of the mission plan in June of '85 was -- is different.

Q. So I take it you don't know the source of this waste acceptance schedule on page 2-3?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: I don't remember the source. I don't know.

BY MR. EIDUKAS:

Q. And I think you said you don't recall seeing

Page 84

this schedule before?

MR. SHULTIS: Go ahead.

THE WITNESS: I don't specifically recall it. I may have, but I don't -- I mean, I don't recollect it at all.

BY MR. EIDUKAS:

Q. Why don't we put this one aside for now. I may come back to this one later.

A. Okay.

MR. EIDUKAS: Would you mark this as Exhibit 5.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 5.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I've had marked as Exhibit 5 a document titled "A Mission Plan for the Radioactive Waste Management Program, Volumes 1 and 2 of Two Volumes, Overview and Current Program Plans." This appears to be -- and it's dated April 1984 up in the right-hand corner. It says that it's a draft that was reprinted in July of 1984. Feel free to take a look at this.

# Victor W. Trebules, Jr.

Page 85

My first question is going to be: Are you familiar with this document? I can also say for reference that this was the same document that was marked as Exhibit Number 11 of Mr. Robert Morgan's deposition.

MR. STOUCK: Can you give us Bates numbers?

MR. EIDUKAS: There are no Bates numbers on the document.

THE WITNESS: (Pause). All right.

BY MR. EIDUKAS:

Q. Are you familiar with this document?

A. Yes, I am.

Q. Is this a draft of the mission plan that you worked on?

A. Yes, it is.

Q. Okay. Turn to page Section I-Introduction. It has in the upper right-hand corner page 1-1. Is this a section that you drafted?

A. That I don't remember.

Q. I guess I'll back up a second. On this particular draft that is marked as Exhibit Number 5,

Page 86

what specifically was your role in preparing this document?

A. Well, that's tough to answer. Again, when I got there, the mission plan work was underway. I don't remember exactly when or where I picked up because, you know, this is like 16, 17 years ago. I do remember, I believe this is the document that went out for public review and comment. As the cover letter indicates, signed by Mike Lawrence. As I indicated, the comments were due back to Charlie Head, who was my supervisor at the time.

Once we -- and I remember, you know, after this document much clearer that when the comments came back in, we revised some of these chapters and I did write the next version of this Chapter 1, for example, which was much more extensive with the pictures in it and the waste sites. To be honest, I may have been involved in structuring some of these words back then, but this is just about the time when I was, you know, coming into the program to work on it.

We made a lot of changes in response to those comments such as Chapter 1. We changed the strategy

Page 87

chapter significantly, and I remember very clearly working on, you know, writing sections of the document after this version. To be honest with you, I don't remember exactly what I did with this document because this was the one that had been under work and went for public review and comment.

Q. Okay. Do you know who drafted this Section I of this draft?

MR. SHULTIS: Objection, asked and answered. Calls for speculation.

THE WITNESS: No, I don't remember specifically who might have drafted this.

BY MR. EIDUKAS:

Q. If you look down that second paragraph, page 1-1, the last sentence says, "The program developed by the department to fulfill the requirements of the Act is described in this mission plan."

A. I see that.

Q. Okay. Do you agree that the mission plan describes the program developed to fulfill the requirements of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal

Page 88

conclusion.

THE WITNESS: I believe that's the case, but I would point out, though, that this was a draft document that went out for public review and comment and does not reflect the final version of the mission plan, which was the June '85 version of the plan.

BY MR. EIDUKAS:

Q. Okay. The sentence in that paragraph says, "Specifically, the following program objectives have been identified to implement the Act," and then it lists five numbered program objectives.

Is it your understanding that these program objectives would fulfill or would implement and fulfill the requirements of the Act?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Give me a second to review them, please.

BY MR. EIDUKAS:

Q. Sure.

A. As I recollect, these are the objectives that the department identified, which they thought would

Page 101

and then the other 70,000 metric tons would go in a second repository.

It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate that that repository would operate for about 25 years as this table shows.

And then the second repository would be in operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel to be generated by the nuclear power plants in operation at that time.

BY MR. EIDUKAS:

Q. Okay. Referring to -- I think other witnesses have called it the steady state rate or the

Page 102

maximum rate. The 3,000 that's carried out for the most of the years on this schedule for the repository. Does that represent a limitation on how fast the repository was designed to accept waste?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: I'm not quite sure how to answer your question. You said does it. You could design the repository to operate in a number of different ways, and if money or schedule or no object, you could increase its capacity. Although you complicate the operations.

I believe we again established various goals or objectives and operating parameters which we thought were reasonable based on the experience to date because you also had to consider, for example, the transportation requirements to service these repositories. And in 3,000 metric tons per year, that equates to a large number of truck shipments or, you know, somewhat lesser number of train shipments. And, again, you're looking for the reasonable accommodation of all these interrelated factors.

Page 103

But I think my earlier answer is still pertinent that the overriding objectives were, again, to develop two repositories. The first with the capacity suggested by the Nuclear Policy Act of 70,000 metric tons with an acceptance rate that would accommodate the expected spent fuel generation rate from nuclear power plants in operation. So when you balance all those design factors, you know, for the engineering solution, you get something I think that was represented at the time by the parameters in this Table 2.1 in Exhibit 5.

Let me point out, though, that this is not our current approach because there have been subsequent actions by Congress which essentially have postponed any work on the second repository. So we knew at the time when we published the mission plan back in the '84-'85 time frame that there were a lot of things beyond our control and, again, this was just a plan. These were just objectives we were trying to meet, and we knew we'd have to accommodate a lot of, you know, prohibitions and hiccups as we began to execute the program.

Page 104

BY MR. EIDUKAS:

Q. Okay. You had set forth the two objectives and the second was that you wanted the rate to reach -- to basically reach -- you wanted to basically reach a rate that would equal the waste generation rate. So that the need for additional reactor storage would be either minimal or zero.

My question is: What was the source of that objective? Why was that an objective you had?

A. Okay. Could you give me a minute --

Q. Sure.

A. -- to review some of these previous documents. Because I think there were words in one of those that I remember being presented to me when I joined the program. Let me just... Is it Bob Morgan?

Q. It's Number 3.

A. Yes. Let me quote from Exhibit 3, page 11, column 2, the large paragraph in that column about halfway through the paragraph. There's a sentence that begins "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage

any discussion. To my recollection, at that time I'm sure the answer was yes, but I don't remember any of the details of the discussions. I mean, again, I was fairly new to the program back in 1984. My primary involvement was on developing the numbers that went in the waste acceptance schedule that seemed to make sense, you know, from an operational standpoint.

Again, meeting the two criteria talked about before. You know, beginning in 1998 trying to get up to an acceptance rate that would preclude the utilities from having to add additional on-site storage. In looking at the combination of the two repositories, that would eventually reduce the backlog and accommodate all the waste. I'm sure there were discussions, but if there were discussions, I don't remember the details of them, you know, at this time.

BY MR. EIDUKAS:

Q. And when you were working, to the extent you were working on developing these waste acceptance schedules, did you view yourself as trying to meet a requirement that waste be taken as expeditiously as practicable as set forth as an obligation in the



contract? Did you have that in your mind when you were developing these schedules?

MR. SHULTIS: Objection, asks for a legal conclusion. Asks for speculation.

THE WITNESS: I'm trying to remember, you know, again, what was in my mind back at that time. I honestly don't remember if we in the planning group, you know, looked upon that as a, as you say, as a requirement. We're trying to establish what we thought were possible schedules, you know, based on assumptions, strategies, objectives that we thought we could meet. Again, they were -- we were concerned about those becoming fixed dates. We were concerned about that. We put caveats in there.

Some of this documentation shows, you know, we said the schedules may change, you know, as other developments occur. I remember fairly clearly the concern of some people -- and I'd have a hard time remembering exactly who the people were, but the answer that I came up with to address that was incorporating key words in our explanation of the waste acceptance schedules as illustrative. You know, they were



examples. They were ways the system could be operated.

You know, we put in words like that to sort of caveat, you know, being overly committal on what we thought we could do. And as you saw the words in some of these other documents, it said that the schedules may change, you know, and if they change, you know, we will have to change.

So, back to your original question, did I consider it as a requirement we were trying to meet? I don't believe so. It was a planning objective more than anything, and I think -- even as this cover letter that transmitted Exhibit 5 and I think I was involved in writing this. The one that starts off "Dear Recipient."

BY MR. EIDUKAS:

Q. Okay. I see that.

A. Signed by Mike Lawrence.

Q. Yes.

A. It states right in the first paragraph that: "The purpose of this report is to provide an informational basis sufficient to permit informed



decisions to be made in carrying out the repository program and the research development demonstration programs required under the Act." Again, it was an informational basis sufficient for decision making. So we didn't want to, you know, overly commit or prescribe to anything.

You know, we knew there were a lot of issues that we would deal with. And, in fact, I think as we discussed before, if you compare Exhibit 4 to Exhibit 5, there were significant changes just from that early draft to this May 1984 draft. I mean, we were making changes, you know, in response to comments, you know, and the development of the planning activities at that time.

Q. Okay. In referring to that letter, when you talked about the document being provided as an informational basis that would allow use of people to rely or make decisions upon it, who are you referring to as making those decisions?

A. It would have primarily been the decision-makers in the Department of Energy, you know, who are charged by Congress with responsibility for

# Victor W. Trebules, Jr.

Page 121

of those objects being that it would ramp up to equal, at least equal the waste generation rate. So that it would either eliminate or, you know, reduce to either minimal or zero the need for utilities to build additional on-site storage after 1998?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, as best as I can remember, we had two overriding objectives. One was to begin acceptance in 1998 and the other one was to ramp up, you know, as fast as realistically possible, you know, with all the engineering constraints to preclude the need for utilities to add additional on-site storage. But we did anticipate that the schedules would change and, in fact, in Exhibit 5 on page 2-1, just quickly looking at the section that's entitled "(A) Waste Acceptance Schedule."

BY MR. EIDUKAS:

Q. Yes.

A. The second paragraph begins by saying that: "This waste acceptance schedule will eventually be further developed to show not only the aggregate

Page 122

acceptance schedule, but also an acceptance program ranking by utility and fuel element." So we anticipated that these waste acceptance schedules would continue to evolve, you know, would change based on, you know, new or updated information.

The next sentence goes on to read: "The schedule will serve as a planning base, which will be updated annually, with responsible latest projections." So, again, we anticipated that they would be updated.

Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?

MR. SHULTIS: Objection, looking for a legal conclusion.

THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections

Page 123

that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.

BY MR. EIDUKAS:

Q. Sure.

A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under construction was dropping. Some were being canceled.

And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we

Page 124

wanted to make sure we could accommodate that.

Q. Okay. To your knowledge, was the objective of having a rate that would meet the generation rate, did that objective ever change over time?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: I think we tried to maintain that as an objective and that sort of became institutionalized with this 3,000 metric tons per year, you know, acceptance capability for one repository, and again when the second one would come online with an additional 3,000 metric tons, then we'd be able to reduce the backlog. That remained a planning objective or assumption for a number of years but got seriously set back when Congress I believe in 1987 pretty much put the second repository program on hold. So, at that time we sort of had to regroup and figure out what we were going to do.

BY MR. EIDUKAS:

Q. Looking again at the schedule in Exhibit 5, it provides for schedules for the first and second repository, but there's no acceptance schedule in this

included and doesn't include Volumes II and III of the entire mission plan.
Q. I also was going to refer there was a page out of order. There was like a cover page for part 2 of Volume I.
A. Oh, it's the one that was in place at page 13 in the front section.
Q. Right. So the page that's Bates numbered CE 14820 is out of place. It should go later in the document and then, in addition to that, I've also represented and the witness has confirmed I believe that Chapter 11 of this volume, Volume I, is not present and Volume II and Volume III of the mission plan are also not present and part of this exhibit.
Is that an accurate statement of what --
MR. SHULTIS: That's consistent with my understanding. Mr. Trebules found the discrepancy. So...
THE WITNESS: I think that covers it.
MR. SHULTIS: Okay.
BY MR. EIDUKAS:
Q. Okay. With all of those caveats and



clarification as to what is present in Exhibit 6 for this deposition, is what is present here, those portions here, are they from the June 1985 mission plan that you worked on?
A. I believe so, yes.
Q. If you could turn to page 3. It's titled Chapter 1 Introduction and that section appears to go through page 13 that we added to this document. Is this the chapter that you testified to earlier as being the author of?
A. Yes.
Q. If you could turn to pages 6 and 7, and in particular on page 7 there's a section that starts: "The following specific program objectives have been established to implement the provisions of the Act. They evolve from the previously mentioned policy goals."
And then the third objective listed here says "To insure the acceptance of waste for disposal by January 31, 1998 in accordance with the acceptance schedule provided for in the DOE standard disposal contracts and in conformance with the Act."



My question is: When you wrote this section, what did you mean by "the acceptance schedule provided for in the DOE standard disposal contracts"?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: This is on page 7 with the introductory sentence that says, again, "The following specific program objectives have been established." So, again, this was an objective for the program. It was a goal or a target. And we identified the five objectives. One of our objectives was to insure the acceptance of waste. It says for disposal by January 1998. Again, this is one of our objectives.
"In accordance with the acceptance schedule provided in DOE standard disposal contract." My understanding was that the contracts that the government entered into with the utilities at some point in the future would have more detailed schedule information, and I believe that was to be provided after, you know, later. It was to come after this mission plan and when those specific schedules were developed, that's what we would -- that's what the



government would target to meet.
BY MR. EIDUKAS:
Q. The language you used here does say that "the acceptance schedule provided for in the DOE standard disposal contracts" and I would just, if you could tell me, what it is, what are you referring to in the contracts in this passage?
MR. SHULTIS: Objection, calls for legal conclusion.
THE WITNESS: Again, I was not the person that worked directly on the standard disposal contracts. My understanding was that they were to -- I'm trying to think of the terms. There were going to be documents issued later in the late 1980s or early 1990s and I think they were related to -- and these are documents I'm not familiar with -- the annual capacity report, annual priority rankings that were to be -- I think they were going to be negotiated with utilities and those would become the specific schedules that the government would try to meet in terms of accepting spent fuel.
BY MR. EIDUKAS:

waste, in addition to spent nuclear fuel.
Q. Do you know why was that added? Why was that added in the final mission -- in this schedule that appears in the final mission plan, if you know?
A. I need a second to check one thing before I answer.
Q. Sure.
A. Has to do with Section 8. Okay. Between the time that the April 1984 draft of the mission plan was issued and the publication of the June 1985 version, we completed an evaluation under Section 8 of the Nuclear Waste Policy Act, which basically said unless there are compelling reasons, which basically required us to look at whether or not a separate repository needed to be constructed for the disposal of high level waste from the defense activities in the Department of Energy from the weapons activities.
We completed that evaluation and we made a recommendation to the President that we did not need to construct a separate repository. That it could be combined with the repository for spent nuclear fuel, and the President completed his evaluation and he then



directed the Secretary to proceed for the combined repository option in conformance with the Act.
So, based on that study, we then started incorporating in our waste acceptance schedules provisions for high level waste disposal, in addition to spent nuclear fuel. So you'll see in Table 2.2 of the June '85, Exhibit 6 version, high level waste acceptance beginning around 2003 I guess. So we then combined the total metric tons on an equivalent basis of the spent fuel and the high level waste for the total acceptance at the repository. Up to that same limit of 70,000 metric tons, which meant that there's less spent fuel going in the first repository. Okay?
Also, by this time another key difference in these waste acceptance schedules between Exhibit 5 and Exhibit 6 is that the cumulative amount of spent fuel that we expected to have to deal with in 1984 was still 140,000 metric tons. By 1985, that number was down to 130,000 metric tons. There are a few other differences, but they're relatively minor compared to those. For example, the annual spent fuel generation rate numbers are different in the two versions. The



early one starting out at 2,700 metric tons in 1998. The later one showing 2,900 metric tons in 1998.
Q. But with those changes that you've identified or those differences between the acceptance schedule on page 26 of the 1985 mission plan and the acceptance schedule in Exhibit 5, which was the 1984 draft of the mission plan, just looking at the rate, the ramp-up rate for the acceptance of spent fuel, there does not appear to be a change between those two documents; is that correct? It's 400, 400, 400, 900, 1800, 3,000 for spent fuel in both documents?
A. Right, the early ramp-up rates are the same.
Q. And the steady state rate of 3,000, looking at the first repository, is also the same?
A. I don't believe so.
Q. Well, in terms of maybe not the duration, the number of years at which fuel is accepted at that rate, but it's the same maximum or steady state? The rate itself 3,000 is the same?
A. That's true, but I think the duration is different.
Q. Right. Is that a function of both the



difference in spent fuel generation projections and the acceptance of high level waste?
MR. SHULTIS: Objection, compound.
THE WITNESS: It's primarily a function of the 70,000 metric ton capacity, and now that you're adding high level waste to the spent fuel, you reach that 70,000 metric ton capacity with a combination of the two, which means there's less spent fuel in the first repository.
BY MR. EIDUKAS:
Q. With the determination that there would also begin to be acceptance of high level waste beginning in 2003 at a rate of 400 metric tons per year, in addition to the steady state rate of 3,000 metric tons of spent fuel per year at the repository, did there need to be a change in the design of the repository because of that additional, the additional acceptance of high level waste?
MR. SHULTIS: Objection, vague.
THE WITNESS: I'm not the best person to ask that question of. My intuition says yes, but I can't give you any specifics.

BY MR. EIDUKAS:
Q. Okay.
A. There's obviously a different heat load that the repository has to accommodate and the size of -- which is why we put the pictures in the document. The size of the waste forms we're dealing with are significantly different. If you look at the spent fuel picture on page 9, okay? We would design waste packages to accommodate multiple fuel assemblies, you know, from reactors. The spent fuel assemblies.
The high level waste is in the form of the picture on page 11, you know, which is a different geometry. So, I mean, to me it's obvious. There's got to be some differences in the design now that you're going to accommodate a different waste geometry, waste form, waste heat load, but I can't give you any of the specifics of what those design changes would be.
Q. Okay. But the decision was made apparently that there might be a design change, but there was not going to be a difference in what the steady state rate of accepted spent fuel range was going to be?
MR. SHULTIS: Objection, vague, assumes



facts not in evidence.
THE WITNESS: As best as I could remember, again our objectives were to try to reach a steady state rate, you know, along the lines that we talked about to preclude for need for utilities to add storage, which, you know, was still estimated to be around 3,000 metric tons per year. And that's still supported by the spent fuel generation column on both waste acceptance schedules. There's still around 3,000 metric tons per year in the early years of repository operation.
BY MR. EIDUKAS:
Q. So, even after it was determined that you were going to start accepting the high level waste in addition to spent nuclear fuel, the objective to continue accepting at the 3,000 rate or because of the objective you've identified, you didn't decrease the 3,000 steady state rate in order to accommodate the additional need to accept high level waste. Is that a fair statement?
A. I believe that's a fair statement.
Q. Okay. Turning to the -- you're looking at



the next. Do you need a break? We've been going for a while.
A. I'm okay.
Q. Going to the next page, waste acceptance schedule on page 27. This is for the improved performance system or plan that we've discussed today, correct?
A. Right.
Q. Okay. Did you work on developing this acceptance schedule?
A. Yes.
Q. And is this the first acceptance schedule involving an integral MRS facility that the DOE published?
A. To the best of my recollection it is.
Q. So, because we didn't see an acceptance schedule like this involving an MRS in the earlier drafts of the mission plan, right?
A. The reason I'm hesitating is I don't know if there were any presentations like that one meeting you referred to. You had the handout from that one meeting. I don't know if there were any others at the



time where DOE might have, you know, released some preliminary numbers. This is the one first one I'm aware of.
Q. Okay.
A. I can answer it that way. This is the first one I'm aware of.
Q. So one of the additions, changes here is that there's a column for MRS acceptance, which is the third column. What's the basis or how was this rate for the MRS facility determined?
A. The best answer I could give you is that we, again, had as -- it can sound repetitive, but we again had as our objective to accept spent fuel to preclude the need for additional at-reactor storage, which again was 3,000 metric tons per year at that time. That was our projection. In 1984-'85 we were trying to anticipate what the spent field generation rate would be, you know, some 13, 14 years into the future. So, again, based on the EIA projections, it looked like it would be about 3,000 metric tons per year based on the number of nuclear power plants online. So that was our design target for the MRS. Okay.

Page 181

Q. So, before you go on, so, is it fair to say that that objective, which you've stated several times now, that objective was the basis for the design rate of the MRS you were anticipating at the time of this document?

A. That's correct. If you look at the column on page 27, column 4, MRS Acceptance, you'll see that it starts out at 2200 metric tons first year, 3,000 metric tons the second year and stays at 3,000 metric tons. Again, remember, that was our design target, our design objective. You could have probably designed a smaller MRS, you could have designed a bigger MRS, but this was our designed target.

Inventory at MRS is the next column, column 5, which increases the first couple of years but then in 1998 starts to discharge to the repository. So it continues to increase until its rate of receipt equals its rate of discharge where then it stays constant, you know, until the MRS ceases operation and then the MRS eventually unloads into the repository. Okay?

Let me caution you one thing about this Table 2.3. The first year was 2200 metric tons does not

Page 182

necessarily mean that in 1998 we would have accepted 2200 metric tons. That column is entitled, if you look over on the far left, Pre-1998 and, again, it looked like there was a chance we could get the MRS into operation in 1996. So it would be '96, '97, '98 the total of those three years that would have gotten us up to 2200 metric tons. Again, we thought we needed a ramp-up during that period before we reached a steady state rate of 3,000 metric tons.

Q. Okay. And would that ramp-up rate be similar to what would be the ramp-up rate that was proposed for the repository in the other schedule; the 400, 400, 400, 900, 1800?

A. I don't remember what the exact numbers are.

Q. Okay.

A. I mean, the only thing I could refer you to was the number in the table where it says pre-1998, you know, 2200.

Q. And as this proposed system would work, would there be -- would the MRS -- would any of the spent fuel accepted at the MRS be accepted or moved to the second repository, or was it planned that waste would

Page 183

be received directly at the second repository from the utilities?

A. I need a second because I believe we talked about that as an option, but I don't remember where. (Pause). All right. Let me refer you to page 25. The bottom paragraph, the one starts: "On the basis of the integrated system approach described in the approved performance plan, the DOE has identified many possible waste acceptance schedules."

Again, one of the caveats, this is only an illustrative schedule that we're talking about. There were many others, you know, with all the questions and uncertainties. Depending on the size and operating characteristics of the system facilities. That's MRS and the repository. One such waste acceptance schedule that illustrates -- and again illustrates was the word we coined to try to, again, sort of serve as caveat.

That illustrates the quantity of waste that we feel we could accept beginning in 1996 with the completion of the integral MRS facilities presented in Table 2-3. The schedule assumes that one MRS facility

Page 184

services the first repository. Other scenarios are possible, such as a larger MRS facility servicing part or all of both repositories or two MRS facilities serving two repositories.

Again, a lot of different ways you could design and operate the system. The schedules we presented were illustrative only for those two concepts. But we indicated that, again, there were lots of different ways to do the job.

Q. Even though that -- so, if these are illustrative schedules and as this section indicates that the DOE has in effect many possible ways to do acceptance schedules, to your knowledge, were all those schedules, though, consistent with the objective you've identified of ramping up to a steady state rate that would act to eliminate the need for additional at-reactor storage?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: There are a couple of places in this chapter. If I had more time I could probably find better words, but let me just show you a few that

Page 185

I think get to your question. On page 24 under Section 3. Assumptions about an MRS facility.
BY MR. EIDUKAS:
Q. Okay.
A. If you look down to B, waste receipt rate. "The waste acceptance rate will be approximately 3,000 metric tons per year of spent fuel or equivalent high level waste." Again, the 3,000 was based on the EIA projection of the amount of spent fuel we thought would be generated in that time frame. So, again, that was sort of like our target. That was a design objective.
If you also look on page 28, for example. These are just some I can find relatively quickly. Down at the bottom of the page, it's got numbers 1 and 2.
Q. Yes.
A. Number 1 says, if you look at the sentence: "The rate at which an integral MRS facility would accept spent fuel is based on two major considerations. The need to relieve the utilities of on-site fuel storage pressures that could result in the disruption of orderly nuclear reactor operations after January

Page 186

1998." Again, the need to relieve utilities of on-site fuel storage pressures. Those were some of our considerations, our planning objectives. Our targets that, you know, we incorporated into the plan.
Jumping ahead, the unfortunate thing about all these references to the MRS facility is that when we proposed it to Congress, they didn't accept it.
Q. Or didn't they accept it with certain linkages that made it possible to --
A. We proposed a specific site and a design for the MRS. We proposed the Clinch River breeder reactor site down in Tennessee with a number of different design concepts. Congress said, if I remember right, we accept the concept of an MRS, but don't build it at Clinch River. You know, go find another site. And then they put linkages on it, too, like it couldn't begin until a repository goes into operation or it passes a certain licensing phase, which made it impractical. I mean, the real one is you got to have a site to build it, okay, and that's a whole other story with the nuclear waste negotiator, the volunteer siting process and all that other stuff.

Page 187

MR. EIDUKAS: Okay. Why don't we take off record.
(Recess, 3:30 to 3:43 p.m.)
BY MR. EIDUKAS:
Q. Mr. Trebules, we've looked at Chapters 1 and 2 of the section of the '85 mission plan that's contained in Exhibit 6. What other, if any, portions of what's in Exhibit 6 here did you have involvement in preparing yourself? You know, if it would be easier, if you want to look at the table of contents, if that would help.
A. Yeah, I think so. For example, at page 55, the small section on sub-seabed disposal, I was involved in probably writing or getting the information from the other office in DOE that was in charge of that activity to put it in the plan.
I think the easiest way to answer this was my job was to coordinate the preparation of the mission plan, which meant I had to write individual sections if there was no one else in the program that was the recognized expert, or I had to make sure that we had people assigned to these other areas to draft up the

Page 188

material. In most cases, I would review and comment on their input to make sure it was consistent in content and style and level of detail with other parts of the plan.
There were probably some other individual sections that I wrote, but I'd have to go through sort of page by page to try to remember which those are. But, for example, Chapter 9 and 10 of Volume II, the waste generation rates, requirements for disposal of past or repository schedules, I believe I wrote or compiled, you know, much of that information directly.
Chapter 10, cost of managing the program. I played a substantial part in that. Chapter 11, which is not even in this exhibit, I contributed to that. Probably the list of acronyms and abbreviations, which, you know, is a very important. I probably put that together. And the other two volumes that aren't in here, the responses to comments, you know, I wrote many of those sections individually. In general, that was my responsibility with this document at that time.
Q. Turning to -- you said you did some work on Chapter 9. I just want to direct your attention. We

Page 242

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : II
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :242 - 396

Page 243

THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144459

Page 244

April 18, 2002
9:30 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 245

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

need for storage beginning in 1998, but a utility with an immediate need for additional storage in 1998 did not have an allocation for that year?
MR. SHULTIS: Objection.
BY MR. NESLIN:
Q. Wouldn't that exchange allow those utilities to exchange their rights for that year?
MR. SHULTIS: Objection, calls for speculation. Lack of foundation.
MR. NESLIN: Let me finish my question, counsel.
BY MR. NESLIN:
Q. And would that not assist the system in meeting the objective of avoiding the need for additional storage beginning with that year?
MR. SHULTIS: Same objection, and asked and answered.
THE WITNESS: Yeah, it sounds possible. That's the best way I could answer it now. It sounds reasonable.
BY MR. NESLIN:
Q. You never thought about that before?



MR. SHULTIS: Objection, relevance.
THE WITNESS: I probably have. I don't remember specifically at this time, you know, thinking about it in detail or in-depth, but, you know, I'm sure over the course of 20 years I probably, you know, thought about it to some extent.
BY MR. NESLIN:
Q. Do you recall in your work on the mission plan in 1984-1985 any consideration of exchanges as part of the mission?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm fairly certain back in the '84-'85 time frame I probably didn't consider it at all. It was probably subsequent to that.
BY MR. NESLIN:
Q. Mr. Trebules, can you explain to me how you would meet this objective if utilities did not exchange allocations?
MR. SHULTIS: Objection, vague.
THE WITNESS: I'm not sure I --
BY MR. NESLIN:



Q. Do you understand my question, sir?
A. If you can repeat it again, please.
Q. How would the department meet the objective of avoiding the need for utilities to have to add storage beginning in January of 1998 if utilities did not exchange -- did not have the right to exchange allocations?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I'm not sure I'm able to answer that question at this time. Again, as I indicated earlier, our primary objectives when we put together those initial schedules were to twofold. To begin accepting by 1998 and in a grosser aggregate sense to preclude the need for the utilities to add additional storage. Because we based our planning on the EIA projections, which looked at utilities as a whole and came up with that number of about 3,000 metric tons per year.
I don't remember that we focused on particular storage capabilities at individual utilities, you know, within that context of, you know,



they would be producing 3,000 metric tons per year. I don't think I ever got into those kind of considerations.
BY MR. NESLIN:
Q. Well, sir, if the objective was that utilities would not have to add additional storage after 1998, wasn't that objective intended to apply either at a gross or at an individual level? You understand my question?
MR. SHULTIS: Objection, vague, and I think he's answered the question.
MR. NESLIN: No.
BY MR. NESLIN:
Q. You may answer, sir.
A. Again, our objective was to try to accept once we reached the steady state operation of 3,000 metric tons, which we thought would be about the generation rate from the utilities as a whole, and I believe we were assuming that up until we reached that point, it was the utilities' responsibility in the aggregate to provide for the storage of the fuel up to 1998 and to continue to add storage up until the time we reached

Page 382

that 3,000 metric tons per year.

So we didn't look at -- at least I never looked at individual utilities' capabilities. We just assumed that they would, you know, provide the required storage until we reached that steady state operation. Now, I think your question says now beyond that some utilities might be generating more and not have additional capability. Others may have additional storage capability that they may not need and they were going to try to mix and match. Okay.

But as far as my involvement in the planning process went, I never got into those kind of considerations when we put together our plans, which were, you know, plans sort of in the aggregate.

Q. Do you recall in your work on the planning documents any consideration of exchanges and shutdown reactors?

MR. SHULTIS: Objection, asked and answered. Calls for speculation.

THE WITNESS: Again, I don't remember specifically considering exchanges. I know there were discussions on trying to respond to what I thought were

Page 383

requests from particular utilities to give priority to shutdown reactors, but I don't know that the department ever reached a clear policy decision on how to handle that. I remember people continuing to talk about the basic approach of oldest fuel first.

BY MR. NESLIN:

Q. Do you remember the department receiving requests for priority from shutdown reactors?

A. I believe I heard people talk about -- I was never involved directly in any specific request, but I believe there were discussions within the department about receiving indications or requests from some utilities for that.

Q. Do you know who was involved in those discussions?

A. Again, not specifically. I can't trace it to a particular meeting or particular group of people, other than the ones that I've already mentioned before that were more involved in those issues than I was.

Q. Do you recall the time period that those discussions would have occurred?

A. I can't be specific, you know, other than

Page 384

during my, you know, 18 years of involvement. It was probably in the latter stages more so than the earlier stages. I mean, again back in the time of the early mission plans, the '84 draft, the '85, I don't have any recollection at that time because I maybe didn't understand the issue. But, you know, after I had some experience in the program, I remember that became a topic of discussion.

Q. So, would you be talking about the 1990s, the late '80s?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Again, I can't pin it down other than maybe I just understood it more so, you know, in the '90s rather than the '80s.

BY MR. NESLIN:

Q. Do you recall which utilities were involved in those requests?

A. I remember I believe one of the Yankee plants being mentioned more than others, and I think there was another -- well, there were various plants that were shut down, you know, for whatever reason. I think in

Page 385

addition to the Sacramento Municipal District Plant, the Trojan plant I think was shut down. Most of the time I think I heard of -- and I don't know which of the Yankee plants, but it was one of the Yankee plants I think.

Q. Do you recall how that issue was resolved?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Yeah. As I think I indicated, I don't remember a clear policy decision on the part of the DOE, other than the oldest fuel first principle, sort of what we were talking about earlier.

BY MR. NESLIN:

Q. Let's come back to exchanges. Mr. Trebules, did you participate in developing any agency guidance or procedures for the agency's review of exchange requests by utilities?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: No, none that I could remember.

BY MR. NESLIN:

A reference, which I think is where the data is from.
If we were to look at current estimates, you don't know whether or not they'd be similar, more, less, the same?
A. No, I don't.
Q. Okay. But I believe you also testified that the current plans today, in your job today, the current plans -- it's not written down anywhere, but the thinking is that if and when the repository begins operation, the annual acceptance rates will, at least at the steady state, the ultimate steady state rate, will be approximately 3,000 tons a year; is that right?
A. I think that's one of our design objectives still, yes, that's right.
Q. And is that also related in some way to an objective of being able to accommodate all of the aggregate industry wide annual generation of spent fuel?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm hesitant because when we prepared these schedules back in 1985, we were considering the two-repository system and, remember,



our objective was to try to reach 3,000 metric tons with the first repository. And then when the second repository came online with its added capacity, we would begin to reduce the backlog. Because of the evolution of the program, the fact that Congress told us to delay work on the second repository, you know, our current design objectives are for a single repository. Again, I think at about the 3,000 metric ton rate, which has impacts on future generation.
BY MR. STOUCK:
Q. Okay. I didn't understand the last part. Why does it have impacts on the future generation?
A. Well, again, as I just mentioned, I don't know what the current projections are, but if you look at Table 2-2.
Q. Yes.
A. Spent fuel generation, okay? Around 1998-2000, the spent fuel generation rate was about 3,000 metric ton per year, which the one repository system could accommodate, but this shows that the numbers continued to grow, okay, to, you know, in the 4,000 range, you know, or higher and obviously the one



repository system wouldn't be able to accommodate that.
Q. Okay. And so --
A. I thought your question had to do with, you know, if our current plans enough to accommodate --
Q. Right.
A. -- the current spent fuel generation rates.
Q. Okay. What you're saying, you don't know?
A. Yeah, I don't know.
Q. But if they're the same generation rates, --
A. Right.
Q. -- then it would not be able to accommodate because the number is smaller than these numbers here?
A. Exactly.
Q. Okay. I see. And so that suggests to me that I think it just follows that the three -- well, what is the 3,000 ton? So it seems to follow that the 3,000 ton a year acceptance rate that is in the current planning, current as of today planning, thinking for this program when it starts operating, it sound like is not based on a consideration of the actual annual discharge rates in the future and an ability to accommodate them. Would you agree with that?



MR. SHULTIS: Objection, mischaracterizes --
BY MR. STOUCK:
Q. At least to your knowledge it's not based?
MR. SHULTIS: -- prior testimony.
THE WITNESS: Again, I haven't kept up on the current generation rates. I do believe, though, that the total amount of spent fuel that was expected to be generated has continued to shrink substantially. We're no longer considering 130,000 metric tons as the '85 mission plan did. I think the number in total is down to around 90,000 metric tons.
BY MR. STOUCK:
Q. Okay.
A. Of spent fuel generated.
Q. Okay.
A. So there are significant changes, you know, that would have to be looked at to update this table, and I'm just not familiar with all the current numbers.
Q. That's fine. All I'm saying is, you are familiar with what the current planning and thinking is about the annual acceptance rates once the repository

CERTIFICATE OF FILING

I hereby certify that on this 2nd day of November, 2007, a copy of foregoing "DEFENDANT'S MOTION TO STRIKE "PLAINTIFF'S NOTICE OF DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS OR, ALTERNATIVELY, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE" AND, IN THE ALTERNATIVE, MOTION *IN LIMINE* TO PRECLUDE RELIANCE UPON THOSE DESIGNATIONS AS SUBSTANTIVE EVIDENCE PURSUANT TO RCFC 32(a) AND FEDERAL RULE OF EVIDENCE 801(d)(2)," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Marian E. Sullivan