**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLINA POWER & LIGHT COMPANY, et al.** | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-37C (Judge Wheeler) |
| **UNITED STATES OF AMERICA,** | ) | |
| Defendant. | ) | |

**OPPOSITION TO DEFENDANT'S MOTION TO STRIKE PLAINTIFFS' NOTICE OF DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS, REQUEST FOR EXPEDITED CONSIDERATION, AND NOTICE OF SUPPLEMENTAL DESIGNATIONS**

Of Counsel:

Paul M. Bessette
David M. Kerr
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

BRAD FAGG
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiff

November 4, 2007

# TABLE OF CONTENTS

**Page**

I. NO MOTION IS NECESSARY FOR ADMISSION OF PRIOR TESTIMONY PURSUANT TO RULE 801(d), BUT, IN ANY EVENT, PLAINTIFFS IN THE ALTERNATIVE MADE SUCH A MOTION ........ 2

II. THE REQUIREMENTS OF RULE 801(d) HAVE BEEN SATISFIED BY PLAINTIFFS AND ARE NOT IN DISPUTE ........ 4

A. Plaintiffs' original submission satisfied Rule 801(d) ........ 4

B. There is no serious dispute regarding the applicability of Rule 801(d) here. ........ 5

*1. Lake H. Barrett.* ........ 5

*2. Alan Brownstein* ........ 7

*3. Michael J. Lawrence* ........ 8

*4. Ronald A. Milner* ........ 10

*5. Robert M. Rosselli* ........ 12

*6. Ben Rusche* ........ 13

*7. Nancy H. Slater* ........ 14

*8. Victor W. Trebules* ........ 15

III. PLAINTIFFS DO NOT OBJECT TO DEFENDANT'S COUNTER-DESIGNATIONS AND SUBMIT THAT DEFENDANT'S OBJECTIONS GO TO WEIGHT, NOT ADMISSIBILITY ........ 18

IV. CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Globe Savings Bank v. United States*, 61 Fed. Cl. 91 (2004) ........................................3, 5

*Kinser v. Gehl Co.*, 184 F.3d 1259 (10th Cir. 1999).........................................................9

*Long Island Savings Bank, FSB v. United States*, 63 Fed. Cl. 157 (2004). ..............3, 7, 13

*Sacramento Mun. Util. Dist. v. United States*, No. 98-488C (Order, March 16, 2005) ........................................................................................................... *passim*

*Weisgram v. Marley, Co.*, 528 U.S. 440 (2000)................................................................9

*Wisconsin Elec. Power Co. v. United States*, No. 00-697 (Order, August 16, 2007) ........................................................................................................... *passim*

## FEDERAL RULES

Federal Rule of Evidence 801........................................................................2, 3, 5

Rule of the Court of Federal Claims 32(a)...........................................................3

Rules of the Court of Federal Claims, Appendix A, paragraph 15(b) ................................3

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLINA POWER & LIGHT COMPANY, et al.** Plaintiff, v. **UNITED STATES OF AMERICA,** Defendant. | ) | No. 04-37C (Judge Wheeler) |

**OPPOSITION TO DEFENDANT'S MOTION TO STRIKE PLAINTIFFS' NOTICE OF DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS, REQUEST FOR EXPEDITED CONSIDERATION, AND NOTICE OF SUPPLEMENTAL DESIGNATIONS**

Approximately a month ago, counsel for defendant represented that the government would "not necessarily object to the presentation of witnesses through prior testimony," App. 1, but cautioned against the "over designation of testimony." *Id.* As is sensible and allowed under the Rules, plaintiffs designated prior testimony of various government witnesses, which plaintiffs believe to be relevant and which is clearly admissible. Nevertheless, in a motion to strike filed on the Friday afternoon before trial, the government has objected to, and moved to strike, all of plaintiffs' designations. One of the primary grounds for the government's motion is the assertion that the plaintiffs in many instances have not designated enough testimony, *i.e.*, background testimony merely confirming the positions and roles of the various government personnel. This is so even though plaintiffs did, in fact, describe such positions and roles in their notice, even though the government does not challenge the accuracy of those descriptions, and even though the government has admitted those undisputed positions and roles in other cases. The government's objections are not well founded, but are easily cured by the supplemental

designations cited below and included with this opposition.

The government additionally challenges all of plaintiffs' designations on the grounds that a motion was required—it was not, and plaintiffs in any event moved in the alternative for admission of the testimony. The government also challenges all of plaintiffs' designations on the grounds that the preference for live testimony somehow renders Rule 801(d) inapplicable unless the witnesses are unavailable—it does not, and plaintiffs in any event do plan to call multiple live witnesses on the so-called acceptance rate issues that are the subject of the designations, and emphatically do not seek to turn the case into a "document review case without testimony." (11/2/07 Govt. Opp. at 13.) Finally, the government lodges a host of specific objections to almost every individual passage identified by plaintiffs. Those objections are uniformly unfounded but, if anything, go to weight of the matters, not to their admissibility.

This type of prior testimony, and indeed much of this exact testimony, has been properly admitted in multiple previous spent nuclear fuel damages cases before the Court. *See, e.g.*¸ *Wisconsin Elec. Power Co. v. United States*, No. 00-697 (Order, August 16, 2007); *Sacramento Mun. Util. Dist. v. United States*, No. 98-488C (Order, March 16, 2005).

Because the wholesale refusal to admit all prior designations sought by the government could, if granted, affect plaintiffs' determinations regarding which witnesses will be called to testify at trial, plaintiffs respectfully request expedited consideration of the government's motion. For the reasons here described, plaintiffs request that the government's motion to strike be denied, and the designations identified by plaintiffs be admitted.

## I. NO MOTION IS NECESSARY FOR ADMISSION OF PRIOR TESTIMONY PURSUANT TO RULE 801(d), BUT, IN ANY EVENT, PLAINTIFFS IN THE ALTERNATIVE MADE SUCH A MOTION

The government argues that plaintiffs' notice of designations should be stricken because

plaintiffs failed to file a motion seeking their admission. We simply do not understand this complaint—Plaintiffs accompanied their notice with an alternative "motion for leave to admit prior testimony into evidence." In any event, however, it is clear that no motion is required to admit prior testimony pursuant to Federal Rule of Evidence 801(d)(2): "That the requirements of Fed.R.Evid. 801(d)(2) are independent of those of RCFC 32(a) is also indicated in the Court's case management procedures, which specify that a separate motion be filed for admission of a deposition pursuant to RCFC 32(a) but not under Fed.R.Evid. 801(d)(2)." *Globe Savings Bank v. United States*, 61 Fed. Cl. 91, 94-95 (2004).

It appears that the government continues to confuse the requirements of the Federal Rules of Civil Procedure with the Federal Rules of Evidence. When seeking admission under Rule 801(d), a party need not show cause:

> Any party intending to present substantive evidence by way of deposition testimony, ***other than as provided by Fed. R. Evid. 801(d)***, shall serve and file a separate motion for leave to file the transcript of such testimony. The motion shall show cause why the deposition testimony should be admitted and identify specifically the portions of the transcript(s) the party intends to use at trial. See RCFC 32(a)(2) and (3).

RCFC App. A, para. 15(b) (emphasis added). In addition, "Fed.R.Evid. 801(d)(2)(D) does not require unavailability of the declarant as a witness." *Long Island Savings Bank, FSB v. United States*, 63 Fed. Cl. 157, 163 (2004). And "[t]he common law's preference for live testimony has no bearing on the use of party admissions as evidence." *Id.*

Simply stated, Rule 801(d) is <u>independent</u> of Rule 32(a), and the government's "view of the relationship between the Federal Rules of Evidence and the rules of procedure respecting admissions is erroneous." *Globe Savings*, 61 Fed. Cl. at 95 ("Fed.R.Evid. 801(d)(2)(D) and RCFC 32(a) regulate the admissibility of depositions in different ways by allowing admission in

differing circumstances."). And it is a "widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility." *Id.* at 96 (citation omitted).

II. THE REQUIREMENTS OF RULE 801(d) HAVE BEEN SATISFIED BY PLAINTIFFS AND ARE NOT IN DISPUTE

A. Plaintiffs' original submission satisfied Rule 801(d).

As noted above, on September 26, 2007 counsel for defendant stated that "[w]e do not necessarily object to the presentation of witnesses through prior testimony," and cautioned against "over-designating." Now, however, the government opposes all of plaintiffs' designations of prior testimony upon the grounds that plaintiffs have not designated enough. And what is more, the "missing" designations are to establish facts that are uncontested. For example, defendants contend that plaintiffs did not designate testimony to show that Lake Barrett, Alan Brownstein, Ronald Milner, Robert Rosselli, Nancy Slater and Victor Trebules were "employed by the Department of Energy at the time of the testimony." (11/2/07 Govt. Opp. at 6.) Yet, they indisputably were so employed, and in *Wisconsin Electric Power Company v. United States*, No. 00-697C (August 16, 2007 Order), the government conceded that all of these witnesses "were employed by DOE or the Nuclear Regulatory Commission ("NRC") at the time of their trial or deposition testimony."[1] Plaintiffs' original submission simply presented the undisputed facts, consistent with the government's prior concession to this Court (and its stated concern against "over-designation"), and that presentation was more than sufficient for this Court to "make a proper determination as to whether the testimony is properly admissible." (11/2/07 Govt. Opp. at 6.).

[1] As the government knows, for efficiency and other reasons the plaintiffs in this case heavily relied on the discovery taken in prior spent fuel cases. The same depositions admitted as admissions in *Wisconsin Electric* are now at issue in this case.

Nonetheless, to the extent that it is deemed necessary and to remove any possible doubt on this issue, Plaintiffs hereby supplement their designations to address the issues raised by the government. The following section elaborates on the roles of the government witnesses, and identifies the supplemental testimony confirming those matters.

B. There is no serious dispute regarding the applicability of Rule 801(d) here.

As stated in plaintiffs' notice of designations, to be admissible under Rule 801(d)(2)(D), a statement must: (1) be offered against a party, (2) concern a matter within the scope of employment for the party, and (3) be made during the existence of the declarant's relationship with the United States. *Globe Savings*, 61 Fed. Cl. at 94-95. All designations are being offered against the government. (For purposes of admissibility, there is no "against interest" requirement. *Id.*) Below plaintiffs set forth in more detail how each designation concerns a matter within the scope of the witness' employment and was made during the declarant's relationship with the government.

1. LAKE H. BARRETT

Plaintiffs have designated testimony from three depositions of Mr. Barrett taken in April and May 2002 in Washington D.C. As conceded by the government in the *Wisconsin Electric* case, at the time he was deposed, Mr. Barrett was an employee of the Untied States Government:

> Q What is your current position, Mr. Barrett?
> A I'm the deputy director of the Office of
> Civilian Radioactive Waste Management.
> Q For how many years have you been employed
> by the Department of Energy?
> A Since mid-'85 in various different
> positions.
> Q And prior to 1985 what was your position?
> A I worked for the Nuclear Regulatory
> Commission since the end of '74 in various positions.

Deposition of Lake H. Barrett (Volume 1) April 22, 2002 page 10:21 through 11:8.

When Mr. Barrett worked at the NRC, before joining DOE, he was responsible for "engineering aspects of repository reviews" and he worked with officials at DOE. *Id.* 38:14 through 40:2. In 1985, when he moved to DOE, Mr. Barrett was involved designing the spent fuel acceptance system:

> Q What was your initial position at the Department of Energy?
> A Division director, systems and transportation or something to that effect.
> Q And what did that position involve?
> A I was responsible for the development of the transportation systems to move spent fuel and high-level waste to the DOE facilities from their current locations was the primary job, and also for the systems engineering for the entire program.
> Q Entire program you're referring to what?
> A The civilian and all the different sites that we were looking at, the systems engineering requirements documents and the systems engineering structure for all of the civilian radioactive waste management program.

Deposition of Lake H. Barrett (Volume 1) April 22, 2002 page 44:5 through 44:20.

Mr. Barrett's testimony that DOE in 1986 was designing a system to accept spent fuel at around 3,000 Metric Tons Uranium ("MTU") per year from the domestic nuclear industry is therefore clearly within the scope of his employment:

> Q In 1986 how many MTUs per year did you attempt to design a system to accept?
> A I don't recall a specific number, but it was -- I don't recall a specific number. It's in the records.
> Q Would 3,000 refresh your recollection?
> A That's probably about right.

Deposition of Lake H. Barrett (Volume 1) April 22, 2002 page 51:17 through 52:1.

The government argues that plaintiffs have failed to establish the proper foundation for Mr. Barrett's testimony because the 3,000 MTU pick up rate was "developed before Mr. Barrett

joined the program in 1985." (11/2/07 Govt. Opp. at 14.) The fact that DOE developed the 3000 MTU pick up rate before 1985, of course, does not bar him from testifying about the rate and its application in 1986. Moreover, as noted above, prior to working at DOE, Mr. Barrett worked at the NRC in a position related to spent fuel acceptance, and during that time worked with officials from DOE. And "[t]here is no requirement that the particular agency at which a deponent was employed at the time of the deposition match the subject matter of the admissions. The party-opponent is the United States, not a particular agency." *Long Island*, 63 Fed. Cl. at 157. The government is free to counter-designate portions of Mr. Barrett's testimony to support its effort to counter its import, but, like the line-by-line objections lodged by the government, such matters go to the weight to be afforded such evidence, not its admissibility.

2. <u>ALAN BROWNSTEIN</u>

Plaintiffs have designated testimony from two depositions of Mr. Brownstein taken in April and June 2002 in McLean, Virginia. As conceded by the government in the *Wisconsin Electric* case, at the time he was deposed, Mr. Brownstein was an employee of the United States Government:

> Q. Mr. Brownstein, would you state your name for the record, please?
> A. Alan Brownstein.
> Q. And by whom are you employed, sir?
> A. Department of Energy.
> Q. And what is your title?
> A. I'm a director of the Regulatory Coordination Division, and I'm on detail right now as a special advisor to the, special, senior policy advisor to the director.

Deposition of Alan Brownstein (Volume 1) April 9, 2002 page 9:18 through 10:2.

Between 1985 and 1995, Mr. Brownstein was responsible for implementing the Standard Contract, including the development of the Annual Capacity Reports. *Id.* 33:7 through 36:6. Mr.

Brownstein's testimony about implementing the Standard Contract is clearly within the scope of his employment. For example, Mr. Brownstein's testimony that the acceptance rates in the 1991 Annual Capacity Report are consistent with the 10,000 MTU storage capacity limit contained in the Nuclear Waste Policy Act is clearly within the scope of his employment. Deposition of Alan Brownstein (Volume 1) April 10, 2002 at page 331:24 through 333:21.

3. MICHAEL J. LAWRENCE

Plaintiffs have designated testimony from a deposition of Mr. Lawrence in May 2002. At the time of his deposition, Mr. Lawrence was an associate laboratory director for Energy Science & Technology, a government contractor, at DOE's Pacific Northwest National Lab. Deposition of Michael J. Lawrence (Volume 1) May 20, 2002 page 13:15 through 13:18. At the deposition, Mr. Lawrence was represented by government counsel:

> Mr. Lawrence, are you represented by the government counsel today?
> A. Yes.

*Id.* at 11:21 through 11:23.

In early 1981, Mr. Lawrence was deputy director of the DOE program for geologic storage and disposal. *Id.* at 25:15 through 26:15. In January 1983 he became deputy director of the Nuclear Waste Policy Act Implementation Office. *Id.* And from January 1984 to June 1984, Mr. Lawrence served as acting director of the Nuclear Waste Policy Act Implementation Office. *Id.* In this role, Mr. Lawrence testified at numerous Congressional hearings on behalf of DOE concerning the Standard Contract. *Id.* at 201:11 through 201:21.

The government argues that the testimony by Mr. Lawrence is not a party admission because he was not employed by the government at the time of his depositions. (11/2/07 Govt. Opp. at 8.) Mr. Lawrence, however, clearly had authority to speak for the government when he

was a senior official at DOE, and his continuing work for the government with a government contractor at a DOE lab is independent and sufficient evidence that this relationship continues. *See Kinser v. Gehl Co.*, 184 F.3d 1259, 1275 (10th Cir. 1999) (holding that consulting work and subsequent contact constitute independent and sufficient corroboration that retired vice president could still speak for former employee on events and policies occurring during his employment), *abrogated on other grounds by Weisgram v. Marley, Co.*, 528 U.S. 440 (2000).

Indeed, actions and statements by the government acknowledge the continuing relationship and mutuality of interests. DOJ attorneys represent Mr. Lawrence. Also, in the *Wisconsin Electric* case, the government identified Mr. Lawrence in response to an interrogatory seeking "DOE Personnel" with knowledge of the Standard Contract. *Wisconsin Electric Power Company v. United States*, No. 00-697C (August 16, 2007 Order) ("He was also identified in response to interrogatories in this case, among 'DOE Personnel' who were 'involved with and may have knowledge of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste.' "). Mr. Lawrence's prior testimony was admitted in the *Wisconsin Electric* case pursuant to Rule 801(d). *Id.* ("They held high-level positions, and the court assumes the testimony tendered concerns their work done within the course and scope of those positions. For example, the deposition designation of Mr. Lawrence concerns his congressional testimony in 1984 after the contracts in issue were signed."). *See also, Sacramento Mun. Util. Dist. v. United States*, No. 98-488C (March 16, 2005 Order).

Plaintiffs have designated portions of Mr. Lawrence's testimony regarding the formation of the Standard Contract and the purpose of some of its provisions, such as the Delivery Commitment Schedules:

> Q. The delivery commitment schedule process that you just referred to, did you view those as creating

> binding commitments, then, to the parties?
> MS. HERRMANN: Objection. Calls for a legal conclusion.
> THE WITNESS: I wouldn't use the term "binding commitments."
> Q. (By Mr. Shapiro) What term would you use?
> A. Good faith efforts to work with the utilities and share information so that they could get a reasonable approximation of when they would be able to ship and how much they would be able to ship.
> Q. So you viewed the delivery commitment schedule process as more of a planning tool?
> A. That's my recollection.

*Id.* at 131:1 through 131:16. These issues are clearly within the scope of his duties at the time he was serving as deputy director of the Nuclear Waste Policy Act Implementation Office.

4. RONALD A. MILNER

Plaintiffs have designated testimony from two depositions of Mr. Milner in May 2002 in McLean, Virginia and his trial testimony from the *Yankee Atomic Electric v. United States*, No. 98-126C, trial in August 2004 before this Court. Mr. Milner was an employee of the United States Government both at the time he was deposed:

> Q. And where are you employed, Mr. Milner?
> A. U.S. Department of Energy.

Deposition of Ronald A. Milner (Volume 1) May 1, 2002 page 9:20 through 9:22, and when he testified in this Court:

> BY MS. SULLIVAN:
> Q Good afternoon, Mr. Milner.
> A Good afternoon.
> Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?
> A Yes, I am.

Trial Testimony of Ronald A. Milner on August 11, 2004 in *Yankee Atomic Electric. v. United*

*States*, No. 98-126 (Volume 21) at 4711:20 through 4712:1.

Mr. Milner has worked at the OCRWM without interruption since 1984. Deposition of Ronald A. Milner (Volume 1) May 1, 2002 page 15:16 through 15:24. Mr. Milner's duties during his 23 year tenure at DOE have included preparing documents about the spent fuel program regularly published by OCRWM:

> Q. All right. What was your title when you joined OCRWM in 1984?
> A. I was a branch chief, but I can't recall the exact title.
> Q. What were your duties?
> A. I was responsible for preparation of the total system life cycle cost analysis, fee adequacy analysis, preparation of the original Mission Plan.

*Id.* at 16:21 through 17:4. His testimony regarding the acceptance rate used in documents published by OCRWM is therefore clearly within the scope of his employment:

> Q Now, it's true that the Department of Energy's intentions with respect to the repository design receipt rates had stayed constant pretty much to the present day, 3,000 MTU per year?
> A I'm sorry, would you repeat that?
> Q It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year?
> A Yes, uh-huh.
> Q And that -- that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?
> A As far as the steady-state rate, yes.
> Q And that's a reasonable rate?
> A Yes, I think so.

Trial Testimony of Ronald A. Milner on August 11, 2004 in *Yankee Atomic Electric v. United States*, No. 98-126 (Volume 21) at 4749:16 through 4749:6.

5. ROBERT M. ROSSELLI

Plaintiffs have designated testimony from a deposition of Mr. Rosselli taken in April 2002 in Richland, Washington. Mr. Rosselli was deputy manager for business services in DOE's facility in Richland, Washington at the time he was deposed. Deposition of Robert Rosselli (Volume 1) April 15, 2002 page 21:14 through 22:4. Mr. Rosselli was substantially involved in waste management issues for the Government from around 1980, before the Nuclear Waste Policy Act passed, until around 1984, after the Standard Contract was signed. *Id.* at 16:18 through 19:7. His testimony about his understanding of the program when the first draft of the Mission Plan was published is therefore within the scope of his employment:

> Q. Mr. Rosselli, you've been handed Exhibit 13 to your deposition. It's a document entitled, Civilian Radioactive Waste Management Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983. And it includes in large type "draft." You were still at OCWRM in December of 1983. Correct?
> A. Yes, I was.
>
> . . .
>
> Q. The last sentence on this page, page 2-1, "Until 1998, each utility will be responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the federal interim storage program." Do you see that?
> A. Yes.
> Q. Was it your understanding that after 1998, the Department of Energy would become responsible for providing or eliminating the need for additional on-site storage?
> A. Yes.

*Id.* at 134:23 through 135:5 and 139:24 through 140:10.

The fact that Mr. Rosselli transferred to Richland, Washington and was no longer directly

involved in implementing the Standard Contract does not mean that his statements are not admissions. First, he continued to have involvement in waste management issues. *Id.* at 22:5 through 22:11. Second, "[t]here is no requirement that the particular agency at which a deponent was employed at the time of the deposition match the subject matter of the admissions. The party-opponent is the United States, not a particular agency." *Long Island*, 63 Fed. Cl. at 157.

6. BEN RUSCHE

Plaintiffs have designated testimony from a deposition of Mr. Rusche in May 2002. At the time of his deposition, Mr. Rusche was president of Management & Technical Resources, Inc., a consulting company. Deposition of Ben Rusche (Volume 1) May 16, 2002 page 11:17 through 11:21; 13:3 through 13:12. At the deposition, Mr. Rusche was represented by government counsel. *Id.* at 5:21 through 6:3.

In January 1984, Mr. Rusche was appointed by the President as Director of OCRWM.

> Q. Okay. Back up to you were appointed as director of OCRWM, I believe, in early 1984; is that right? Do you recall when you started?
> A. When I started or when the appointment was?
> Q. Well, when was the appointment? Let's start with that.
> A. I think it was in January of '84 that I visited the White House. And the appointment followed thereafter.
> Q. And when did you actually start working?
> A. March, I believe, of '84 I was confirmed.

*Id.* at 39:19 through 40:6. He retired from that position in November 1987. *Id.* at 40:7 through 40:15.

The government argues that the testimony by Mr. Rusche is not a party admission because he was not employed by the government at the time of his depositions. (11/2/07 Govt.

Opp. at 8.) It is undisputable that Mr. Rusche had authority to speak for the government when he was a senior official at DOE. He was the first director of OCRWM to be appointed by the President. The government's representation of Mr. Rusche acknowledges the continuing relationship and mutuality of interests. In other cases this Court has admitted Mr. Rusche's testimony as Rule 801(d) admissions. *See Wisconsin Electric Power Company v. United States*, No. 00-697C (August 16, 2007 Order) ("That these gentlemen were authorized agents, deposed after that agency ended, but about that agency, goes to weight of those statements, not their non-hearsay character."); *Sacramento Mun. Util. Dist. v. United States*, No. 98-488C (March 16, 2005 Order).

Plaintiffs have designated testimony, such as the following example, by Mr. Rusche regarding implementation of the Standard Contract:

> Q. Okay. Now, without going back a whole couple of days of testimony, don't you agree that an objective of the program at the time you were there was to avoid adding additional -- avoid additional operator burdens and complexity at the reactor sites consistent with these findings of -- you know, that are quoted here, that that was an objective of the program, to avoid adding additional operator burdens and complexity? And how would they be avoided? Through the movement of fuel. That that was an objective?
>
> A. Yes.

Deposition of Ben Rusche (Volume 2) May 17, 2002 page 376:20 through 377:6. Testimony like this is clearly within the scope of his employment as director of the OCRWM. May 16, 2002 at page 133:22 through 134:4.

7. <u>NANCY H. SLATER</u>

Plaintiffs have designated testimony from two depositions of Ms. Slater taken in April 1999 and June 2002 in Washington D.C. Ms. Slater was an employee of the government when

she was deposed in 1999:

> Q. I appreciate that. Where do you work?
> A. At the U.S. Department of Energy in the
> Office of Civilian Radioactive Waste Management
> in the Regulatory Coordination Division.

Deposition of Nancy H. Slater (Volume 1) April 21, 1999 page 5:25 through 6:3, and was still an employee of the government when she was deposed again in 2002. *See* Deposition of Nancy Slater Thompson June 13, 2002 page 5:2 through 5:4.

During the period 1991 to 1993 Ms Slater was an industrial specialist in the OCRWM involved in preparation of the annual capacity report, the acceptance prior ranking and the delivery commitment schedules ("DCS"). April 21, 1999 at page 19:21 through 20:18. Ms. Slater's testimony regarding the purpose of the DCS:

> Q. Focusing just on quantity then, the DCS
> was not intended to indicate what quantity the
> utility really wanted to deliver, it was limited
> to the allocation provided in the APR?
> A. Right. Now, theoretically they could
> have delivered -- they could have said, jeez, I
> don't want to disrupt my operations and I'm not
> going to deliver at all. But they could not ask
> for -- they could not have more than what they
> were allocated because of the equity issue.
> There's only so much system capacity. If I
> accept more from someone else, I accept less from
> someone else.

Deposition of Nancy H. Slater (Volume 2) April 22, 1999 page 245:17 through 246:4, is clearly within the scope of her employment.

8. VICTOR W. TREBULES

Plaintiffs have designated testimony from a deposition of Mr. Trebules taken in April 2002 in Washington D.C. When he was deposed Mr. Trebules worked for DOE as director of the Office of Project Control at the Yucca Mountain Site. Deposition of Victor W. Trebules

April 17, 1999 page 17:7 through 18:17.

Earlier in his career at DOE he helped prepare the Mission Plan under the Standard Contract.

> Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?
> A. That's correct.
> Q. What was your first position at the Office of Radioactive Waste Management?
> A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.
> Q. What did that position entail? What were your responsibilities in that position?
> A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.

*Id.* at 15:17 through 16:9.

Testimony about the source of the acceptance rate set forth in the April 1984 draft mission plan, on which he worked, is clearly within the scope of his employment:

> Q. Referring to the acceptance schedule in Exhibit 5 that you have in front of you, how was that prepared?
> MR. SHULTIS: Objection, vague.
> BY MR. EIDUKAS:
> Q. And what I mean by how was it prepared, I don't mean how was it typed. I mean, how were these numbers decided upon? How was this schedule developed?
> MR. SHULTIS: Objection, vague. Asks for a legal conclusion.
> THE WITNESS: As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.
> As Table II-1 in Exhibit 5 shows, in the

> second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.
>
> So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would more than the generation rate from all the nuclear plants.
>
> We did recognize, though, at that time we still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.
>
> Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog, which is indicated in the column on the far right.
>
> You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.

*Id.* at 96:19 through 99:5.

## III. PLAINTIFFS DO NOT OBJECT TO DEFENDANT'S COUNTER-DESIGNATIONS AND SUBMIT THAT DEFENDANT'S OBJECTIONS GO TO WEIGHT, NOT ADMISSIBILITY

The government has made objections and counter-designations in case the Court allows the designated testimony. Plaintiffs have no objections to defendant's counter-designations. With regard to defendant's objections, they are generally baseless. For example, defendants object to the following designation from Mr. Barrett's testimony for lack of foundation:

> Q In 1986 how many MTUs per year did you attempt to design a system to accept?
> A I don't recall a specific number, but it was -- I don't recall a specific number. It's in the records.
> Q Would 3,000 refresh your recollection?
> A That's probably about right.
> Q And how did you come to the 3,000 number?
> MR. CRAWFORD: Objection, foundation.
> A I'd have to go back and look at records, which I have not done. It is the evolution of the design receipt rates for the first repository, second repository, the MRS in the system. My recollection is the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000.

Deposition of Lake H. Barrett (Volume 1) April 22, 2002 page 51:17 through 52:10. As explained above, it appears that the basis for this objection is that the 3000 MTU rate was developed before Mr. Barrett joined the program. (11/2/07 Govt. Opp. at 14.) The specific question posed and answered, however, is how did Mr. Barrett, when exercising his responsibilities and designing the spent fuel acceptance system in 1986, come to the 3000 MTU number, <u>not</u> how did DOE originally come to that number.

In another example, the government objects to the following designation of Mr. Barrett's testimony for lack of foundation and mischaracterization of prior testimony:

Q What is a DCS?
A Well --
MR. CRAWFORD: Objection. Asked and answered.
Q I understand the title.
A Delivery commitment schedule.
Q Do you understand what role it played in the overall SNF process?
MR. CRAWFORD: Objection, foundation.
A These were all part of the administrative details of the contract that I did not pay much management policy attention to.
Q So in your view was a DCS what you referred to, Mr. Barrett, I think the term was administrivia?
A That's correct.

Deposition of Lake H. Barrett (Volume 1) April 22, 2002 page 217:3 through 217:17. The question of whether Mr. Barrett understood what role the DCS played in the spent fuel process was merely aimed at finding out what he knew, and thus it is difficult to see how it lacked foundation. The “mischaracterization of prior testimony” objection was curable but not made at the time of the deposition and is thus waived; however, defendant may counter-designate any related prior testimony and allow the Court to determine whether Mr. Barrett was accurate when he referred to the Delivery Commitment Schedule paperwork associated with the Standard Contract as “administrivia.”

If the Court decides to admit plaintiffs’ designations only after it rules on all of defendant’s objections on a line-by-line basis, plaintiffs respectfully request an opportunity to address each one. Plaintiffs, however, respectfully submit that defendants’ purported objections are more properly considered in connection with assessing the weight of the testimony, as opposed to its admissibility.

## IV. CONCLUSION

Plaintiffs’ designations clearly satisfy the requirements of Rule 801(d) of the Federal

Rules of Evidence. Indeed, the factual foundation for admission of the designated testimony under Rule 801(d) is not in dispute but, to the extent additional designations are deemed necessary to establish the necessary "foundation," plaintiffs respectfully request that the additional designations here identified be so admitted.

For the foregoing reasons, Plaintiffs respectfully ask the Court to deny defendant's motion to strike, and accept plaintiffs' designations into evidence. Plaintiffs respectfully request expedited consideration of these matters.

DATED: November 4, 2007

Respectfully submitted,

s/ Brad Fagg
Brad Fagg
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

Of Counsel:
Paul M. Bessette
David M. Kerr
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

**CERTIFICATE OF SERVICE**

I, Brad Fagg, hereby certify that on this 4th day of November, 2007, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

____/s Brad Fagg _____
Brad Fagg