**Northern States Power Company v. U.S No. 98-484C November 16, 2006**

**Heritage Reporting Corporation**

**Page 3772 to Page 4082**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3772

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff,) Case No
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D C

Thursday, November 16, 2006
Volume 13

The parties met, pursuant to the notice of the Judge, at 10 43 a m.

BEFORE THE HONORABLE JOHN P WIESE

Page 3773

APPEARANCES

ON BEHALF OF THE PLAINTIFF.
ALEX D TOMASZCZUK, ESQ
DANIEL S HERZFELD, ESQ
Pillsbury Winthrop Shaw Pittman LLP
14th Floor
McLean, Virginia 22102
(703) 770-7940
and
JAY E. SILBERG, ESQ
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, Northwest
Washington, DC 20037-1122
(202) 663-8063

Page 3774

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT.
ALAN J. LO RE, ESQ
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ
STEPHEN FINN, ESQ
ANDREW P AVERBACH, ESQ
JOHN EKMAN, ESQ
U S Department of Justice
1100 L Street, Northwest
Washington, D.C 20530
(202) 305-7562

(Index appears at end of transcript)

Page 3775

P R O C E E D I N G S
- - - - -

THE COURT Let us go on the record Mr Tomaszczuk, do we have any preliminary matters?

MR TOMASZCZUK. Not for the Plaintiff, Your Honor, I think we sorted out the witness availability problem, and so far as Plaintiffs are concerned, we're ready to go forward

THE COURT· Excellent Ms Herrmann?

MS HERRMANN· Good morning, Your Honor, we're ready as well.

THE COURT You're ready as well, so that brings forward Mister?

MS SULLIVAN Mr Morgan, Your Honor

THE COURT. I see we're switching from Mr Leonard.

MS SULLIVAN. Mr. Morgan needs to leave today

THE COURT: We'll have Mr Morgan on the stand very promptly and make sure he leaves today.

MS SULLIVAN Thank you

THE COURT· Please be seated

Page 3900

MR. STOUCK: Unfortunately, Mr. Mills has come quite a distance to be here today.

THE COURT: Oh, and he's leaving.

MR. STOUCK: I'm sure I am creating problems now, Your Honor, I'm not saying he can't come tomorrow, but he's got to drive back across the Bay Bridge, and he's –

THE COURT: I see, I see.

MR. LO RE: Your Honor, perhaps –

THE COURT: Have him back as early as possible, and we'll go, it's 20 minutes to 2:00, we'll come back at say, in an hour, and we'll see where you are. If you're not back then, we'll put Mr. Leonard on, and then as soon as you come back with Mr. Mills, then we'll have Mr. Mills on the stand.

MR. STOUCK: I appreciate that very much, Your Honor.

(Whereupon, at 1:39 p.m., a lunch recess was taken.)

Page 3901

A F T E R N O O N S E S S I O N

(2:45 p.m.)

THE COURT: Mr. Lo Re, have we a change in plan?

MR. LO RE: No change in plan, Your Honor. We have good news. Mr. Stouck apparently was able to get back, and we have Mr. Mills here, and we'd like to call him as our next witness.

THE COURT: Very fine.

MR. LO RE: The government calls Loring Mills to the stand.

THE COURT: Mr. Mills, the witness box is over to the left of the bench. If you would please raise your right hand?

Whereupon–

LORING MILLS

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Please be seated. I'd like you to state your name in full, spell your last name, and give the reporter your home address.

THE WITNESS: My name is Loring E. Mills, M-i-l-l-s, my home address is 132

Page 3902

Eareckson Lane, Stevensville, Maryland, 21666

THE COURT: You may question.

MR. LO RE: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. LO RE:

Q. Good afternoon, Mr. Mills.

A. Good afternoon.

Q. We've met before, I know. My name is Alan Lo Re, I'm from the Department of Justice. Welcome to the western side of the Bay Bridge. Mr. Mills, from 1976 to 1993, you were an executive with the Edison Electric Institute, correct?

A. That is correct.

Q. And that group is also known as EEI?

A. That is correct.

Q. And during your tenure at EEI, you were the nuclear fuel manager, the director of nuclear fuels, the director of nuclear activities, and at the time of your retirement in 1993, you were the vice president of nuclear activities, correct?

A. That is correct.

Q. And EEI is a trade association for investor owned utilities, right?

Page 3903

A. That is correct.

Q. Now, during your tenure at EEI, you were primarily responsible for issues related to the advocacy of nuclear issues on behalf of member utilities, correct?

A. That is correct.

Q. And during the time of the passage of the Nuclear Waste Policy Act and the promulgation of the regulations that became of the standard contract between the Department of Energy and nuclear utilities for the removal of spent nuclear fuel, you represented many privately owned utilities, correct?

A. That is correct.

Q. And EEI administered a group known as the Utility Nuclear Waste Management Group or UNWMG, correct?

A. That is correct.

Q. And you administered, you personally administered UNWMG on behalf of EEI, right?

A. That was one of my responsibilities, yes.

Q. And UNWMG provided comments to the draft standard contract, correct?

A. Both EEI and UNWMG, those were

Page 3904

combined comments, yes.
Q. And when I refer to the standard contract, I'm talking about the standard contract for the removal of spent nuclear fuel. Does that comport with your understanding of standard contract?
A. Yes.
Q. Thank you. Now, UNWMG acted as a clearinghouse for member utilities' comments, as well as a commenter in its own right to the standard contract, right?
A. I would not classify it as a clearinghouse. We shared information among the various members of UNWMG. Each of the individual members made their own comments, or many of them did, I think all of them did, in addition to those that were supplied by UNWMG/EEI.
Q. Now, there were certainly many utilities that endorsed the comments of EEI/UNWMG, correct?
A. Yes, I believe that's the case.
Q. Now, Northern States Power was a member of both EEI and UNWMG, correct?
A. That is correct.

Page 3905

Q. And in fact, Northern States Power's CEO, James Howard, was chairman of EEI in the early 1990s, correct?
A. I'm not sure when he was chairman. He was chairman at one point. We changed chairmans every two years.
Q And was he chairman during your tenure at EEI?
A. During a portion of it, yes.
Q And so the record is clear, when did you leave EEI?
A. I left EEI on March 31st, 1993.
Q. Thank you. Now, Mr. Mills, this is not the first spent nuclear fuel case that you've testified in, correct?
A. That is correct.
Q. You testified in the Yankee Atomic case a couple years ago, 2004, right?
A. That is correct.
Q. And you testified in the PG&E case that happened this past summer before Judge Hewitt?
A. Yes, I did.
Q. Now, in both those cases, you were a paid consultant to the Plaintiff in that case,

Page 3906

correct?
A. That is correct.
Q. Mr. Mills, I'm handing you, or just have handed you a document that's marked as DX-23, and this is a document that is a attachment with a cover letter, and the cover letter is dated February 18th, 1983. The document is on Edison Electric Institute letterhead, and the subject of this document, at least the cover letter, is comments on the draft DOE/utility standard waste disposal contract. Do you see that, sir?
A. Yes, I do.
Q. Now you're familiar with this document, correct?
A. Yes, I am.
Q. And this document was signed by an SP Kraft, that's Steven Kraft, correct?
A. That is correct.
Q. And at this point in time, Mr. Kraft, this is February of 1992, Mr. Kraft was working directly for you, is that right?
A. Yes, he was.
Q. And you were ultimately responsible for the information in this cover letter and in

Page 3907

the report behind it, correct?
A. Yes, I was.
Q. Now, Mr. Mills, I'd like to turn your attention to the second paragraph of this letter. And it says, "These comments were developed by a task group drawn from members of the EEI nuclear fuels committee and the UNWMG high-level waste and spent fuel storage working groups. It is planned to submit them officially as joint EEI/UNWMG comments." Do you see that?
A. Yes, I do.
Q. Now, you were providing these comments to the EEI's nuclear fuels committee in this letter, correct?
A. That is correct.
Q. And you were doing this to keep member companies up to speed as to EEI's and UNWMG's comments on the upcoming, on the draft standard contract, correct?
A. That is correct.
Q. And you were doing this so they could go forward and look at what you had to say, and also, I think you alluded to this earlier, they could make their own comments in addition,

Page 3908

correct?
A. That is correct.
Q. Now, if you could look, Mr. Mills, at the fourth paragraph down, starting with, "We are not asking."
A. I see that.
Q. Thank you It says, "We are not asking for your review and comment on this proposed submittal. However, if you find areas that are particularly troublesome, please let us know by February 28th. We will be working on further refinements in the meantime." Do you see that?
A. Yes, I do.
Q. Now, you were asking the utilities to get back to you with particularly troublesome concerns because you were going to be submitting these comments to DOE shortly after that February 23rd date, right?
A. That is correct.
Q. And, I'm sorry, when I said – I meant to say February 28th date.
A. That is correct.
Q. Thank you. Mr. Mills, do you remember NSP ever coming to you and saying that there

Page 3909

were comments that they were troubled with in this draft?
A. I do not recall. I do not recall that.
Q. Now, if we could look at the next page of this document, and this is a document where the heading is, "Other Significant Issues Addressed in the Comments," do you see that, sir?
A. Yes, I do.
Q. And then there's several bullets, the last bullet says, "Repository receiving rate adequate to cover current generation, plus working off the backlog on a reasonable schedule." Do you see that?
A. Yes, I do.
Q. And this was one of the comments that you ultimately did make to DOE, correct?
A. Not exactly this wording, but the concept, yes.
Q. The sentiment was certainly set forth to DOE in your formal comments, correct?
A. That is correct.
Q. Now, there is an attachment to this document which is a, at page – I'll look at

Page 3910

the Bates numbers here, it's GPE, do you see that, lower right-hand corner of the document?
A. Yes, I do.
Q. And there's a number ending in 324.
A. Yes, I see that.
Q. Okay. And you'll see under the heading whereas clause, if you turn the page, you'll see a number two.
A. I see that.
Q. Thank you. And then below that, it says, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of the SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of the SNF/HLW equal to that year's generation, plus a reasonable share of the backlog." It goes on to say, "While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs." Then below that, it

Page 3911

says, "A new clause should be added," and below that paragraph I just read, there is a clause, and I think it rolls on to the next page?
A. Yes, it does.
Q. And we can probably make it come up on the screen, thank you, and that clause says, "Whereas, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste." Do you see that?
A. Yes, I do.
Q. Okay. And this is what you were proposing to provide to DOE by way of comments and proposed language as of February 18th, 1983, correct?
A. That is correct.
Q. Okay. Now, I'd like to show you another document. Mr. Mills, I've just handed

Page 3912

you what's been marked as –
MR. LO RE: And by the way, Your Honor, at this time, the government would move for the admission of DX-23 into evidence.
THE COURT: That hasn't gotten in previously to be received?
MR. LO RE: No, I believe the final version of this has been received, but not this document, which is a draft.
THE COURT: Very good. Is it Mr. Herzfeld or Mr. Silberg?
MR. HERZFELD: No objection, Your Honor.
THE COURT: Very well, we will receive into evidence Defendant's Exhibit 23.
(Defendant Exhibit Number DX-23 was received in evidence.)
BY MR. LO RE:
Q. Now, Mr. Mills, you have before you what's been marked as Plaintiff's Exhibit 531, and this document is dated March 7th, 1983, again, on Edison Electric Institute letterhead, and the recipient of this letter, cover letter is Mr. Robert Morgan, project director, Nuclear Waste Policy Act project office, Department of

Page 3913

Energy.
And the Re line in this document is, "Standard contract for disposal of spent nuclear fuel and/or high-level radioactive waste," do you see that, sir?
A Yes, I do.
Q. Now, this letter is signed by a Mr. John – is it Kearney?
A. Kearney.
Q. And Mr. Kearney was your supervisor at EEI, correct?
A. He was my immediate supervisor, that is correct.
Q. Now, you prepared this letter on behalf of Mr. Kearney, right?
A. Yes, I had this letter prepared, I was intimately involved in having it prepared, yes.
Q. Okay. Now, this letter is the formalization – or the cover letter represents that the attached documents is the formalized – or are the formalized comments of EEI and WMG submitted together, correct?
A. That is correct. I think it's about 80 pages of comments that were made at that time.

Page 3914

Q And by the time these comments were formalized and formally submitted, was it your understanding that the members of EEI and UNWMG had had a chance to review the comments?
A. They had reviewed some early drafts, as depicted by the prior document that we talked of.
Q. Yes.
A. I'm not sure that that included all of the 80 pages that we have here, so that they would have reviewed a portion of it, but I'm not convinced that they had an opportunity to review all the details.
Q. You had no reason to think they hadn't reviewed that draft we looked at just a moment ago?
A. That is correct.
Q. Okay. Now, I'd like to go right to attachment two this time, and I'd like to take you to the page – I'm going to refer to the upper Bates numbers here, there's a page that's marked with the Bates number ending 278
A. I do not seem to have a Bates number on this copy. I have the number down at the bottom, but I don't have a number at the top.

Page 3915

Q. I'm sorry. I'm using a term of art on you. When I say, "Bates number," it's any stamp that we see. Is there a number in the lower right-hand corner of the document?
A. Yes, there is.
Q. And I think there may be two numbers in the lower right-hand corner, is that right?
A. That is correct.
Q. Let's go with the upper number, okay, and we're going to look for the number that ends in the number 278.
A. Yes, I have that.
Q. Now, this is attachment, A and it says, "Detailed comments on DOE draft disposal contract," and then below there, you'll see again the heading whereas clause, do you see that?
A. Yes, I do.
Q And when I say, "again," I mean this is similar to the whereas clause heading that we saw in the previous draft document, February 18th, correct?
A. Yes.
Q. Now, if you could turn to the next page, under number two, there's a paragraph

Page 3916

that says, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW.

We believe that DOE should be able to take delivery of such SNF/HLW equal to that year's generation, plus a reasonable share of the backlog." Then it goes on to say, "While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs."

Then at the bottom, it says, "A new clause should be added," before we go to that new clause, Mr. Mills, that language I just read into the record is identical to the draft we looked at a moment ago, correct?

A. I would have to put the two side-by-side to verify it, but certainly, the essence is there. It may be identical.

Q. That's fair enough. Why don't we look at the whereas clause, which is the next page?

Page 3917

The proposed whereas clause says, "Whereas, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste." Do you see that?

A. Yes, I do.

Q. Now, that proposed whereas clause is identical to the clause we looked at a moment ago from the February 18th draft, correct?

A. Again, I would have to compare it word-for-word. I do not know if there was a word change, but the essence is the same.

Q. Why don't we go ahead and look at that? Do you have the two whereas clauses?

MR. LO RE Your Honor, if we may have just one moment? Okay.

BY MR. LO RE:

Q. And thanks to our crack trial director operator, we've got the two whereas clauses

Page 3918

here side-by-side, and just so we're clear, the whereas clause that you'll see on the screen in the upper right-hand portion, that is the whereas clause from the draft comments on the standard contract, and the whereas clause that appears in the lower left-hand corner that are kind of diagonal to each other, that is the whereas clause from the final and official comments submitted on March 7th, 1983.

Now, looking at those two whereas clauses, Mr. Mills, I'll be happy to read one into the record while you read the other, if you'd like, but that looking at those two clauses, they're identical, aren't they?

A. They appear to be identical, yes.

Q. Now, Mr. Mills, the whereas clause that DOE requested, excuse me, the whereas clause that DOE – strike that.

The whereas clause that EEI requested was not incorporated in the standard contract, correct?

A. That is correct.

Q. And in fact, DOE did include a whereas clause that included that expeditiously as practicable language, right?

Page 3919

A. That is correct.

Q. Now, let's look at, still looking at PX-531, let's look at page eight of the cover letter that you submitted on behalf of EEI and UNWMG. Now, I'd like to look specifically at the paragraph starting with, "although," it's the top paragraph?

A. I see that.

Q. It says, "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent – DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31st, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included, nor does the contract commit DOE to accept at any given quantity of SNF/HLW, and of most significant to the utilities, the contract provides no specific remedies in the event that DOE fails to meet the 1998 deadline." Do you see that?

A. Yes, I do.

Q. Then it goes on, I'm going to skip a

Page 3920

line, and then it says, "we recognize," do you see that?
A. Yes, I do.
Q. The letter says, "We recognize that these issues are complicated ones not easily resolved. On the other hand, they deserve serious study, even if their resolution comes after the draft contract has been promulgated." Do you see that?
A. Yes, I do.
Q. And when you're referring to "after the draft contract has been promulgated," you mean if the contract has been formalized through the rule-making process, correct?
A. That is correct.
Q. "We would therefore strongly urge that DOE meet with purchasers to negotiate a mutually acceptable solution to these open items." Do you see that?
A. Yes, I do.
Q. Now, among the issues that EEI wanted to address or discuss after contract formation was the rate of acceptance, correct?
A. Yes.
Q. And in fact, after the contract was

Page 3921

formed and after the contracts were actually signed by the utilities, EEI did engage in multiple internal discussions and discussions with DOE regarding a possible rule-making to include a rate of acceptance into the standard contract, correct?
A. There were many elements of potential proposed regulations, none of which went forward, but it did include that rate request similar to the whereas clause that we looked at a moment ago.
Q So to be clear, the lines of communication remained open with respect to a myriad of issues or a host of issues, including the rate of acceptance, correct?
A. That is correct.
Q. I've handed you what's been marked as PX-286.
MR. LO RE: And by the way, for the record, Your Honor, the exhibit we just looked at, PX-531, is in fact admitted.
BY MR LO RE.
Q. And, Mr. Mills, I'm showing you an excerpt of a document that has been marked as PX-286.

Page 3922

MR. LO RE: And for the record, Your Honor, this entire document has been admitted into evidence. We are just going to discuss a portion of it with Mr. Mills.
BY MR LO RE:
Q. Now, Mr. Mills, are you familiar with this document?
A. Yes, I am familiar with it.
Q. And this document is entitled, "Proceedings of the 1983 Civilian Radioactive Waste Management information meeting, December 12th through 15th, 1983," and the date on the document is actually February 1984. Do you see that?
A. Yes, I do.
Q. Now, Mr. Mills, this document is a transcription of the meetings and proceedings that occurred in late 1983 between DOE utilities and other parties, such as EEI after the standard contract had been promulgated, is that right?
A. That is correct. It's an open information meeting. It was not a dialogue between them.
Q. That's fair enough, open information

Page 3923

meeting, that's fine. And you attended these meetings and in fact spoke at one of the meetings, is that correct?
A. That is correct.
Q. Now, let's look at the second page of this document, which is the Bates number ending in 599, and it says, "program overview," do you see that?
A. Yes, I do.
Q. I'm sorry, I misspoke. I meant to draw your attention to the following document, which is the page ending in 9619. It's also page 31, stamped at the bottom of the two columns.
A. Yes, I see it.
Q. Okay. And this document or portion of the document is entitled, "Nuclear Waste Fund management," do you see that?
A. Yes, I do.
Q. And this is a transcription of a talk that you gave during the open information meetings in December of 1983, correct?
A. That is correct.
MR. LO RE: If we may just have one moment, Your Honor.

Page 3924

BY MR. LO RE:
Q. Now, Mr. Mills, I'd like to draw your attention to the second column of this document. There is a paragraph starting with, "there are some who are concerned," do you see that?
A. Yes, I do.
Q. And this paragraph says, "There are some who are concerned about the equity associated in the contracts, but we are pleased to have them They provide the lubrication to get the job done. We were never really under an illusion that we would get a fair and equitable contract with DOE with firm commitments and detailed performance standards." Do you see that?
A. Yes, I do.
Q. And then it goes on, oh, maybe two-thirds of the way down, and it says, "Because several concerns were not handled satisfactorily, we fully expect to see the petition initiated for rule-making to achieve a more reasonable understanding of several issues. The money question is not involved. It is a matter of some of the performance

Page 3925

assurances to include some of the things we heard this morning, which were not embodied in the contract." Do you see that?
A. Yes, I do.
Q. Now, Mr. Mills, one of those performance standards was the ratings acceptance, right?
A. While it may have been – yes, there was one, yes.
Q. And in fact – well, let's go to another part of this. I'd now like to turn your attention to page 32 of this document, which is the next page. And in the second column, lower right-hand paragraph, starting with, "now," do you see that?
A. The last paragraph?
Q. Yes, sir.
A. Yes, I see that.
Q. It says, "Now, look at the progress of DOE over the past year. Much has been achieved. While some may consider the effort inadequate, you must not forget that dramatic changes were required by the Act. Those that perceived that the Act codified what DOE had been doing and how they were doing it were

Page 3926

plainly incorrect. A new approach was necessary. Hopefully, the new approach is coming about. Most of the problems are political and institutional, which is why we had to have legislation. Yes, there are many technical problems to be resolved, but the main problems are political and institutional elements." Do you see that?
A. Yes, I do.
Q. And you believe that to be true when you made this statement in 1983, correct?
A. Yes, I do – did.
Q. Now, I'd like to talk about the performance standards that we talked about a moment ago. As a follow up to the comments that you made at this meeting regarding performance standards, your staff worked on a potential rule-making in early 1985 addressing, among other things, the inclusion of a rate of acceptance into the standard contract, correct?
A. Yes.
Q. Mr. Mills, I've handed you what's been marked as DX-44. This is a document, it says, "Draft," at the top, and it's dated March 18th,

Page 3927

1985, and it is – we've got a caption on it, "United States of America, Department of Energy, standard contract for disposal of spent nuclear fuel and/or high-level radioactive waste memorandum in support of petition for rule-making," do you see that, sir?
A. Yes, I do.
Q. Now, this is a document that your staff put together, isn't that right?
A. Either my staff or members of the utilities or our consultants who are working with us.
Q. But ultimately, it was a document that you felt you had responsibility for, correct?
A. Yes. This was one draft. I believe there were a very large number of drafts, and none was ever submitted.
Q. I'm not surprised there were a number of drafts. Now, let's go to – and, again, I'm going to refer to the Bates number on this document. I'd like to go to, there's a Bates number that ends in the number 14894, do you see that? And it's actually page six also of the document.
A. Yes, I see that.

Page 3928

Q. And this is under the heading, "The contract should include additional performance standards by which DOE's progress may be evaluated," do you see that?
A Yes, I do.
Q. Now, I'd like to go two pages forward under that heading, and there's a paragraph that starts with, "while the contract is very clear."
A. I see that.
Q. It says, "While the contract is very clear in establishing the purchasers' obligation to make payments, it is correspondingly silent on the standards for DOE's performance in accepting spent fuel from purchasers. If DOE fails to commence receipt of significant amounts of fuel by January 31, 1998, the purchasers – including many of the members of EEI/UNWMG – could be subject to substantial expense and considerable operational constraints."
Now, the next paragraph says, "Accordingly, EEI/UNWMG proposes that DOE provide for a minimum receiving rate for SNF – an annual receiving rate not less the rate at

Page 3929

which SNF is being discharged – and that DOE commit to accept the entire backlog of SNF over a 10-year period." Do you see that?
A. Yes, I do.
Q Now, I think you said this earlier, this draft was not formalized and submitted to DOE, correct?
A. That is correct.
MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-44 into evidence.
MR HERZFELD: Your Honor, I think we're going to object to this, perhaps even move to strike this testimony. I mean, we're talking about a draft that was never submitted to DOE. We're talking about internal comments that may or may not have actually reflected EEI's feelings on this matter. It was never submitted to DOE.
I mean, we know their feelings about drafts, that were prepared by their contractors, I think the same goes for the industry, and certainly, it's never been shown that, necessarily, this was shown to anybody at NSP.

Page 3930

THE COURT: What do you say to that, Mr. Lo Re?
MR. LO RE: First, if what's good for the goose is good for the gander is going to apply, then I think that to the extent that Mr. Herzfeld is arguing that this is a draft of a contractor, I'm afraid for the Plaintiffs, that train has left the station. They have made the argument repeatedly that contractor documents are somehow admissible. So based on that alone, the documents should come in. Secondly, and more substantively, Your Honor, this document shows that the group, that NSP was clearly a member of UNWMG, was considering this issue from the time that the contract was signed throughout a long period of time. And whether or not this document was submitted, Your Honor, is really of no moment because it reflects the recognition on the parties that these terms were not a part of the contract. So, frankly, whether or not this document was ever submitted formally doesn't matter, and there's a third answer, Your Honor. And what we're about to show is that there were

Page 3931

formal comments, formalized, very much along these lines, so what I'd like to do is move this document into evidence to show, again, it stands on its own. The utilities had this consideration, and then, in fact, they formalized that, which we will show in a moment.
THE COURT: Subject to that offer to connect it up, I'll accept the document.
MR. HERZFELD: Your Honor, once again, there's no evidence that NSP ever saw this document, and if he's got a formal final document that should stand on its own, I don't understand why we need to get a draft in here, and furthermore, if he's also going to trade the contract documents, we look forward to them not arguing this point ever again in these spent nuclear fuel cases.
THE COURT: I'm only going to address the management of the issues in this case. Subject to the offer that this document will be connected up with later proofing, at this point, we conditionally receive the document.
MR. LO RE: Thank you, Your Honor, and I would say, for the record, the document does,

Page 3932

we believe, speak on its own of what the
parties understood, certainly what the
utilities understood.
THE COURT: What the utilities
understood?
MR. LO RE: That's correct, Your
Honor.
MR. HERZFELD: Your Honor, there is no
evidence that anybody outside of EEI saw this
document, none.
THE COURT: We will see the truth or
not of that proposition in a moment.
(Defendant Exhibit Number DX-44 was
received in evidence.)
BY MR. LO RE:
Q. Now, Mr. Mills, Mr. Herzfeld stole my
thunder a little bit. In fact, the substance
of the comments we just looked at were
formalized and submitted to DOE by UNWMG in
1987, correct?
A. I don't have a document in front of me
that would verify that. I do not know.
Q. Let's take a look, shall we?
Mr. Mills, you have before you what's been
marked as Plaintiff's Exhibit 240. This is a

Page 3933

document dated April 28th, 1987 to
Mr. Christopher Jedrey, contracting officer,
U.S. Department of Energy, and you'll see this
document is on UNWMG letterhead, do you see
that, sir?
A. Yes, I do.
Q. And I would draw your attention
three-quarters of the way down – no, halfway
down on the left-hand side, you'll see Northern
States Power, do you see that?
A. Yes, I do.
Q Now, at this time, Northern States
Power was a member of UNWMG, correct?
A. That is correct.
Q. Now, let's turn to the second page of
this document, the heading is A, and it says,
"A, the contract should be interpreted,
clarified, or amended to include additional
performance standards by which DOE's progress
may be evaluated." Do you see that?
A. Yes, I do.
Q. And then it says, a little further
down, it says, "The performance standards
should be based on DOE's rate of receiving
spent fuel. The requirements of article IV,

Page 3934

section B, paragraph 1, should be interpreted,
clarified, or amended to include the following:
Commencing no later than January 31st, 1998,
DOE shall accept SNF at an annual rate not less
than the annual rate at which SNF is being
discharged from civilian nuclear power
reactors, subject to this and other such
contracts with DOE.
By no later than January 31st, 2008,
DOE shall have accepted all SNF which has been
discharged from reactors and has been stored
for at least five years." Do you see that?
A. Yes, I do.
Q. Now, Mr. Mills, this document is
signed by SP Kraft, that is Steven Kraft,
correct?
A. That is correct.
Q. Mr. Kraft was still working for you at
this time?
A. That is correct.
Q. And ultimately, you were responsible
for the submission of this document?
A. Yes, I was. You will notice this is
not a petition for rule-making.
Q. What do you consider this document to

Page 3935

be, sir?
A This was an information document.
Q. Requesting that DOE enter into a
rule-making process, correct?
A. To request the Department, to issue a
ruling interpreting, clarifying, or amending,
it's not the way you start the rule-making
process.
Q And you were asking DOE to –
A. Reconsider these items.
Q. Just to be clear, you were asking DOE
to issue a ruling, correct? That's what this
document does, does it not?
A. Issue a ruling?
Q. Right. That's what you were asking
DOE to do, is that right?
A. Issue a ruling?
Q. Correct.
A. That is not rule-making.
Q. Understood, but just to be clear, so
the record is clear, you were asking DOE to
issue a rule-making?
A. Yes.
Q. Now, the substance of the paragraph
that I read proposed clarification or amendment

Page 3936

or interpretation, the substance of that is captured in that draft letter, that draft memo for rule-making we looked at a few minutes ago?

A. A portion of this captures this, and it's amazing we are consistent.

Q. That's good.

A. But it goes on and asks for other things too.

Q. But the portion that is consistent is the annual rate is – that the acceptance shall be at an annual rate not less than the annual receipt and that no later than January 10th, January 9th, 2008, that is 10 years, DOE will have accepted all fuel that will have worked off the backlog, correct?

A. And that is not consistent with what we had asked for earlier, that is over and above.

Q. Let's look at that. This is DX-44, page ending in 14896, and that's a paragraph that starts with, "accordingly."

A. Excuse me, which page?

Q. It's the Bates number ending in 14896. It's also page eight of the document.

A. Yes, I see that.

Page 3937

Q. Okay. Now, this document, or this portion of the document does ask that, one, DOE provide a minimum receiving rate at a receiving rate not less than the rate at which SNF is being discharged, but it's also asking for a commitment to accept the entire backlog over a 10-year period

Now, that's asking for the same thing, it's just stated in a different way. One says you'll take all the backlog in a 10-year period. The other document which is, so we're clear, DX-240, says DOE shall take all the spent nuclear fuel by 2008. That's 10 years, assuming that performance begins in January 1998, correct?

A. Yeah, these two are in agreement.

Q. Okay.

A. I thought you asked a different question.

Q. What I mean is –

A. The question you asked is whether it agreed with our comments on this draft contract.

Q. No, I'm sorry if I confused – the agreement is between this draft memorandum for

Page 3938

rule-making, which has been marked as DX-44, and the request for an issuance of rule-making, which has been marked as PX-240?

A. Request for ruling, yes.

Q. The substance of those two are consistent?

A. Yes, they are.

Q. With respect to the acceptance rate?

A. Yes, they are.

Q. Okay Thank you. Now, DOE did not issue a rule-making along the lines that UNWMG was suggesting in response to this April 28th, 1987 letter, correct?

A. That is correct. They never responded at any point to that particular suggestion.

Q Mr. Mills, I've handed you what's been marked as DX-47.

A. 57?

Q. DX-57. And this is a letter on Department of Energy letterhead dated October 2nd, 1987, to a Mr. SP Kraft, director of utility nuclear waste management group, from Mr. Christopher Jedrey. Do you see that?

A. Yes, I do.

Q Now, Mr. Mills, I understand this was

Page 3939

a long time ago, but despite what you said a moment ago, this letter is a response to the UNWMG request that DOE issue a rule-making, correct?

MR. HERZFELD: Objection to the extent it mischaracterizes prior testimony.

THE COURT: I'm sorry, Mr. Herzfeld, I don't understand the objection.

MR. HERZFELD: I'm not sure that characterized Mr. Mills' testimony.

THE COURT: Mr. Mills said there was no response received to the request for ruling as set forth in the letter of April 28th, 1987, and the document we now have in front of us starts out by saying, "Thank you for your letter of April 28th, 1987."

MR. HERZFELD: I'm sorry I had understood him to be responding to a more narrow question. Maybe I'm wrong, or maybe he can clarify.

THE COURT: Can't just get much narrower than that. You may proceed.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Mr. Mills, and I will draw your

Page 3940

attention to the paragraph that the Judge pointed out a moment ago, the first paragraph of this letter says, "Thank you for your letter of April 28th, 1987 requesting interpretations, clarifications, or amendments to the standard contract for disposal of spent nuclear fuel and/or high-level radioactive waste." Do you see that?

A. Yes, I do.

Q. And this letter is in fact a response to the request for rule-making that UNWMG provided to DOE on April 28th, 1987, correct?

A. You keep using the word "rule-making."

Q. I'm sorry for that, and I will fix it because I want to be clear about this. This letter that we're looking at, which is DX-57, is a response from DOE responding to the request by UNWMG that the Department of Energy issue a ruling with respect to the standard contract, correct?

A. Yes.

Q. Now, let's look at the second page of this document. There's a heading here that says, "Additional performance standards," do you see that?

Page 3941

A. Yes, I do.

Q. And then the second paragraph starts, "however," do you see that?

A. Yes, I do.

Q. It says, "However, with respect to your concern that DOE could, in theory, meet its contractual obligation to begin the waste acceptance process by accepting a single assembly in 1998 and no more until decades later, I can assure you that the Department intends to honor both the letter and spirit of the NWPA and the contract, rather than seek opportunities to circumvent its obligations" Do you see that?

A. Yes, I do.

Q. Now, you had no reason not to believe the representations that Mr. Jedrey was making in this letter, correct?

A. That's correct.

Q. He was being honest with you, as far as you knew, correct?

A. As far as I knew, yes.

Q. And then it goes on, it says, "The ACR details the annual aggregate and individual acceptance rates for the first 10 years

Page 3942

following commencement of the WMS facility operations based on current projections," do you see that?

A. Yes, I do.

Q. And the ACR in that sentence refers to the annual capacity reports that DOE was issuing at that time, is that right?

A. That is correct.

Q. Okay. And there are some rates set there, and then below that, it says, "As required by the contract, these schedules will serve as the basis for developing contractual binding delivery commitment schedules in 1991," and it goes on and says, "While they are currently below projected SNF discharge rates, they provide clear evidence that DOE does not intend to meet its contractual obligation by accepting a single assembly." Do you see that?

A. Yes, I do.

Q. And, again, you took Mr. Jedrey at his word regarding his statements here, correct?

MR. HERZFELD: I'd just like to hold on and lodge a foundation objection, and maybe I missed it, but I don't know that we actually know that Mr. Mills has seen this letter before

Page 3943

today, and Mr. Lo Re continues to ask him what Mr. Jedrey's thoughts and feelings were about this. And I just want to confirm if there's a foundation, I don't know that I heard it. Maybe I just missed it.

THE COURT: Mr. Mills, would you have been provided with a copy of, of this letter?

THE WITNESS: I probably was, but as I see it here, it's the first time I have seen it in a long time, if I did.

BY MR. LO RE:

Q. You have no reason to believe that it wasn't received by Mr. Kraft. And if Mr. Kraft received it, that you would have seen it in the normal course of business, correct?

A I would have in a normal course, yes.

MR. HERZFELD: Thank you, Your Honor.

BY MR. LO RE:

Q. Now, Mr. Mills, why don't we look at the top of this paragraph, and it says, "to-date," starting with, "to-date"?

A. Yes.

Q. It says, "To-date a specific repository site has not been selected nor sufficient operational details in part

Page 3944

depending on the sites selected and on the system configuration been developed. Both of these factors are likely to have a major impact on optimum receipt rates. In addition, OCRWM," and that's the Office of Civilian Radioactive Waste Management, correct?
A. That is correct.
Q. "Is awaiting Congressional action on its mission plan and its monitored retrievable storage proposal." Do you see that?
A. Yes. You left out the word "amendment," but it is mission plan amendment.
Q. Thank you. Now, you understood at this time that DOE was considering the performance with the use of a monitored retrievable storage system, correct?
A. Yes, they were. They were considering it.
Q. And in fact, they had submitted a proposal to Congress with respect to that, the MRS, correct?
A. I believe they had done that in early 1987, but that would have to be confirmed. I don't have a document that would confirm that.
Q. That's fine. Now, there was a

Page 3945

reference in this letter a moment ago that we looked at that referred to the ACRs or annual capacity rates. Do you remember that?
A. In this response?
Q Yes.
A. Yes, in that second paragraph, starting, "however," down about the sixth line.
Q. And DOE did issue ACRs in 1991, correct, an ACR in 1991?
A I think they did. Again, I don't have the document in front of me.
Q. That's fine.
A. But I believe they did
Q. Mr. Mills, I'd like to shift gears a little bit.
THE COURT: Still staying with the same exhibit?
MR. LO RE No, Your Honor.
THE COURT: Well, we have still pending the question of whether we wish to receive the admission of the memorandum, the draft.
MR. LO RE: That's fine.
THE COURT: And I've been trying to follow closely – I don't know why you need it

Page 3946

in, Mr. Lo Re, you have something a lot better than a draft.
MR. LO RE: Well, Your Honor, again, we would move for the admission of the draft for several reasons, one of which is, and I think the most important, substantively, is it indicates there was, in the mind of Mr. Mills' group, of which NSP was a member, this understanding in 1985 that the rates were not in the contract.
THE COURT: Yeah, but that point is proven so much the better by a letter two years later.
MR. LO RE: Absolutely, true, Your Honor, and I'm not going to quibble, but I will say there have certainly been drafts admitted into evidence, DOE drafts. For instance, one that comes to mind is the draft mission plan from 1983.
MR. HERZFELD: Required by Congress in the NWPA.
THE COURT: Well, unless there's a draft that's required by Congress.
MR. LO RE: That's exactly right, Your Honor.

Page 3947

THE COURT: Apart from the fact of demonstrating that somebody within the organization, and by that, I mean EEI, is concerned about the need for clarification of the contract and proposes – or had the thought of doing that rule-making, apart from that fact and the date, which I thought was –
MR. LO RE: That's correct, Your Honor.
THE COURT: – 1985, I don't think the document can give you anything, Mr. Lo Re, I'll admit it for that very limited purpose.
MR. LO RE: I appreciate that, Your Honor.
THE COURT: But it's been massively overtaken by a formal submission that makes the point three times over because, look here, now, it's 1987, and there's still concerns at issues that were present at the time the contract was formed.
MR. LO RE. Understand, Your Honor, and with that, we have no more comments on the admission of that exhibit.
THE COURT: All right. But, now, do we have 287 – 240, I beg your pardon, 240 in

Page 3948

evidence?
MR. LO RE: 240 has previously been admitted in evidence.
THE COURT: That was back in Minneapolis, okay.
MR HERZFELD: Your Honor, I just wanted – that was not our only point. The point is there was no linkage back to – NSP had never seen that draft document. That was another one of our concerns.
THE COURT: Well, that may, that's probably correct, I just don't know what to make it – we have NSP on record in a letter that we looked at earlier, whereby it's endorsing the statements that EEI made at the meeting that was held by Mr. Morgan, so I don't know what you're trying to get out from under with this memorandum.
MR. HERZFELD: It's just –
THE COURT: There's no question that Northern States utilities knew exactly what was going on. Nothing was authored by EEI that didn't cross Mr. Howard's desk, and it would have been a massive breach of this association's responsibility to have submitted

Page 3949

formal documents without corporate approval or without any members' approval
MR. HERZFELD: Also, Your Honor, just to clarify, Mr. Howard was not at NSP.
THE COURT: Well, the document was received earlier, we received it through a witness who we established was responsible in Northern States for the receipt of documents that came to him from the association, of which his company was a member. I don't see why you're fighting this issue, other than simply cluttering the record with facts that can't conceivably be contested.
The Court will make a finding here and now that Northern States utilities is aware of all the comments that were made by the Edison Electric Institute and/or the Nuclear Waste Management Group, to the extent those – submissions from either of those organizations were formal submissions sent an official at DOE.
MR. HERZFELD: Thank you, Your Honor.
BY MR. LO RE:
Q. Now, Mr. Mills, you were a member of a group called ACORD or the American Committee on

Page 3950

Radioactive Waste Disposal, correct?
A. No, I was not a member of that, I was a staff person in support of that group.
Q. Fair enough. And that group, ACORD, is that right?
A. That is correct.
Q. ACORD is a group that consisted of CEOs of several utilities that owned nuclear power plants, correct?
A. That is correct.
Q. And indeed, when he was CEO of NSP, James Howard was a member of ACORD, correct?
A. I do not recall, the membership did shift, and I do not recall whether Mr. James Howard was a member of that group.
Q. Okay. Now, the mission of ACORD was to provide overall guidance to EEI and to utilities, members of utilities regarding interface issues and the interface with DOE, correct?
A. That is correct.
Q. And you were, I think you mentioned this a moment ago, you were the senior staff person for ACORD, correct?
A. That is correct.

Page 3951

Q. And your work included substantive work for the group and providing briefings to the group on issues?
A. That is correct.
Q Now, Mr Mills, in 1992, you briefed ACORD on the goals that the group was trying to achieve for the following year, 1993, correct?
A. I believe I did. I don't have a document in front of me that says that, I recall there was something of that nature, yes.
Q. And one of the goals that you briefed to ACORD in late 1992 for consideration in 1993 was a potential rule-making, correct?
A. I don't have the document in front of me.
Q. That's fine. We will be happy to show it. Now, Mr. Mills, I'd like you to take a look at the document I've placed in front of you.
MR. LO RE: Your Honor, the document is not marked as an exhibit, so I will just show it to Mr Mills to refresh his recollection.
BY MR. LO RE:
Q. And I would direct your attention to

Page 3952

the first page of the document, Mr. Mills, and then also the last page – I'm sorry, the third to the last page, which is the document Bates number ending in 349.
A. I am looking at this page, and I notice it is labeled, "early draft," with no name on it. I do not know whether I prepared this draft or someone else prepared this draft or how this came about.
Q. Okay. Mr. Mills, looking at this document, does this refresh your recollection that you briefed ACORD in late 1992 about a potential rule-making?
A. I believe we addressed a number of items which may have included potential rule-making.
Q. And one of those items under potential rule-making was the possibility of requesting a rule-making whereby DOE established a spent fuel minimum acceptance rate, correct?
A. May I take a moment to look at this and see?
Q. Absolutely, by all means, sir.
A This document, perhaps you can point it to me, this document does not appear to talk

Page 3953

about the delivery rate. It talks about penalties, and it talks about a number of things, compensation, but I don't see where it talks about delivery rate.
Q. Sure. Let me draw your attention. The Bates numbers, there's a number starting with PPGE, do you see that in the lower right-hand portion of the document?
A. Yes, I do.
Q. Now, if you would turn to the Bates number ending in 13349?
A Yes.
Q. And it says, "rule-making industry goals," do you see that?
A. Yes.
Q. And then if you look on the left hand column, it says, "DOE performance"?
A. Yes.
Q. Number five says, "Establish a minimum spent fuel acceptance rate," do you see that?
A. Yes, I see that.
Q. And looking at this, Mr. Mills, does this refresh your recollection that, as of 1992, you were briefing ACORD on the potential of a rule-making process whereby, among other

Page 3954

things, there would be the establishment of a minimum spent fuel acceptance rate under the standard contract?
A. I believe that was discussed at that time.
Q. Now, you mentioned that ACORD discussed many items. In the 1989 timeframe, it's your belief that ACORD probably discussed the possibility of suing DOE for breach of the standard contract, correct?
A. I do not know whether ACORD considered that. They may have. That thought had been available and discussed throughout the time period.
Q. And to be clear, it wasn't ACORD that would bring the lawsuits, it would be the utilities whose members were members of ACORD?
A. That's correct because ACORD was not a contract holder.
Q. And during your tenure at EEI, there was no, as far as you know, there was no lawsuit brought by any utility for breach of the standard contract, was there?
A. There was a lawsuit with regard to the gross versus net.

Page 3955

Q. Yes, but other than –
A That was, and that was ruled in favor of the utilities.
Q. Other than that lawsuit, there was no lawsuit for a breach of the standard contract for nonperformance by DOE to begin accepting spent fuel?
A. I do not recall.
Q. Thank you. Now, Mr. Mills, we talked a little bit about the MRS. The MRS concept was something that was discussed at the 1983 symposium or open issues – the information meeting that we talked about a while back?
A. Yes, the MRS would be talked about in many forms, yes
Q. Okay. Now, Mr. Mills, with respect to the MRS, and I think you said your recollection there was a submittal to Congress – strike that. I'm going to start again.
I think you testified that it was your understanding that DOE provided a proposal to Congress for an MRS in 1987, correct?
A. That is my recollection, yes.
Q. Now, Mr. Mills, as of 1989, ACORD, EEI, and UNWMG concluded that an MRS unlinked

Page 3956

to a repository could be a vehicle for DOE to meet its 1998 obligation under the standard contract, correct?
A. I don't have the document in front of me that would confirm that, but I believe that probably was the case.
MR. LO RE: Okay. And, again, Your Honor, this is to refresh
BY MR. LO RE:
Q. Mr. Mills, I would turn your attention to this document, and the first page of the documents, there are bullets on the left-hand side, and the bottom bullet, I'd like you to read that for yourself, and you tell me when you've had a chance to do that.
A. Yes, I have read that.
Q. And having read this bullet that I just pointed out, does this confirm – refresh your recollection that as of 1989, ACORD, EEI, and UNWMG believed that an MRS unlinked to a repository could be a vehicle for DOE to meet its 1998 obligation under the standard contract?
A. I do not know whether they believe that because I don't know who prepared this

Page 3957

document. This document may have been distributed to them as information. I don't know whether they ever responded to this, as you indicated that they concurred with it, I don't know that.
Q This document certainly though comports with your understanding at the time regarding an MRS?
A. That is correct.
Q. Now, we talked about the ACR issuance. After the issuance of the 1991 ACR, EEI engaged in discussions with DOE and utilities regarding how they might fill out their DCS or delivery commitment schedules in response to the '91 ACR, correct?
A. Again, I don't have something in front of me that defines that, but very likely, there were meetings that shared information in that regard.
Q. And, Mr. Mills, I've handed you what's been marked as DX-111 – excuse me.
A. 113?
Q. 113. And this is document on Edison Electric Institute letterhead entitled, "UWASTE report," dated December 23rd, 1991, and it

Page 3958

says, "key developments." Do you see that?
A. Yes, I do. May I clarify something?
Q. Absolutely.
A. You will notice UWASTE is a new acronym.
Q. UNWMG went by the wayside?
A. Yes, they are synonymous.
Q. And that's because nobody could pronounce UNWMG, I bet.
A. It was changed.
Q. Okay. And, Mr. Mills, you were ultimately responsible for this UWASTE report that we're looking at, correct?
A. I was looking for a signature. There are inputs here from several people.
Q. Yes.
A. Steven Kraft, Mike Alissi, Jimmy Jordan.
Q. Let's talk about Mr. Kraft. We've talked about him before. He was still working for you at EEI at this time, correct?
A. That is correct.
Q. And what about Mr Alissi, who is that?
A. He was working in that group also.

Page 3959

Q. So ultimately, these gentleman, Mr. Kraft and Mr. Alissi at least, were reporting to you?
A. That's correct.
Q. And in that regard, you were responsible for the comments that they made in this UWASTE report, correct?
A. That is correct.
Q. Now, if we look on the second page of this document, under standard contract, it says, "delivery commitment schedule," do you see that?
A. At the top, yes, I see that.
Q. And then it says under that heading, it says, "The standard contract with DOE calls for the submission of completed DCS forms starting on January 1st, 1992. DCSes covering a spent fuel allocation for a utility (as listed in the annual capacity report) must be submitted to DOE at least 63 months prior to the year in which the allocation occurs. This means that utilities with allocations in the first year of spent fuel acceptance (1998) must submit DCSes against those allocations by September 30th, 1992." Do

Page 3960

you see that?
A. Yes, I do.
Q. Now, the reason you are, that Mr. Alissi and that you are telling UWASTE members this is because they need to fill out the form so that the process can begin for the fuel to actually be accepted from DOE or by DOE, correct?
A. This was one step.
Q. One step.
A. In the process.
Q. Yes. Okay. Now, if you look at the paragraph below, it says, and to be clear, EEI was in the business of helping the utilities, and one of the things that EEI was going to help the utilities with was filling out this first step in the process of accepting fuel?
A. I wish a clarification there.
Q. Absolutely.
A. EEI would help share information among the utilities. EEI did not assist the utilities in filling out the forms.
Q. Okay.
A. Simply shared information among them, to assist them in how they would go about

Page 3961

filling out the forms.
Q. Understood. They certainly didn't go filling out the forms, but they provided and shared information so that the utilities could then use that information to fill out the forms?
A. Yes.
Q. Okay. The next paragraph says, "The DCS instructions and forms (as submitted by DOE to OMB for approval) are expected to be sent to utilities in January 1992. Also, the acceptance priority ranking, APR, is currently being printed and should be available at the end of this year, while the annual capacity report, ACR, will probably be available during mid to late January. These documents are necessary to properly complete the DCS forms." Do you see that?
A. Yes, I do.
Q. And what you're telling the utilities there is that you need to have these two documents, the ACR and the APR and the data within those documents, so that you can properly fill out your DCS forms, correct?
A. Yes

Page 3962

Q. Okay. Now, the next paragraph, starting with, "EEI/UWASTE," it says, "EEI/UWASTE is planning to organize a workshop where utility personnel designated to complete the DCS forms will have the opportunity to resolve questions with representatives from DOE.
The workshop will be held soon after the APR/ACR and DCS instructions are completed and in the hands of utilities for review (probably in February, March or April)." Do you see that?
A. Yes, I do.
Q. Now, in fact, EEI did hold such workshops, correct?
A. We held them on, a number of them on a periodic basis. I don't know which one might have related to this, but there were workshops, yes.
Q. And there certainly were workshops related to submission of the DCS forms, to your knowledge, correct?
A. I believe there was.
Q. Okay. And to your knowledge, member utilities, UWASTE member utilities did in fact

Page 3963

submit DCSes in response to the 1991 APR and ACR, correct?
A. I do not know that.
Q. You don't know that?
A. I don't know that.
Q. And just to close the loop on this, the UWASTE is the group that took over for UNWMG?
A. Yes.
Q. Okay. And the reason you don't know with respect to whether they were, the DCSes were submitted is because your job finished when you provided information to the utilities, it was up to the utilities to then take that information and submit or not submit a DCS form?
A. That's correct.
Q That was outside the purview of what you, EEI, thought?
A. That's correct.
MR. LO RE: Okay. Thank you. One moment, Your Honor. Thank you, Mr. Mills, I appreciate your time. I have no further questions.
THE COURT: Is it Mr. Herzfeld or

Page 3964

Mr. Silberg, who will be doing the questioning?
MR. SILBERG: Mr. Herzfeld Your Honor.
(Whereupon, a short recess was taken.)
THE COURT: You may cross-examine, Mr. Herzfeld.
CROSS-EXAMINATION
BY MR. HERZFELD:
Q. Good afternoon, Mr. Mills.
A. Good afternoon.
Q. Since we didn't really get a chance to go through that, I was hoping you could give us a little bit about your educational background.
A. I was granted a Bachelor of Science in civil engineering from union college in Schenectady in 1950, and I also received an MBA degree from University of Washington, Seattle, Washington, in 1962.
Q. And if you could just give us a little bit more about your employment background? I think you talked a little bit about your time with EEI, but if you could fill in from educational background up through when you retired?
A. My first year after college was 1950 with the New York Central Railroad, then two

Page 3965

years with a small organization called Bentley Weldering, Incorporated, in Syracuse, New York. And then I was asked by the General Electric company to join their research activities in the research laboratory in Electronics Park in Syracuse, New York. I participated in research there for five years, and General Electric asked me to transfer to the Hanford Laboratory in Richland, Washington, which was a laboratory of the Atomic Energy Commission, of which General Electric was a prime contractor. It was there that I first began my work on nuclear energy in the research area on a program of plutonium recycle program. I was transferred by General Electric to Bloomington, Illinois in 1963. In 1967, the Kerr McGee Corporation asked me to join them in Oklahoma City as a project manager to design, construct, and operate a plant for the production of nuclear fuel components. In 1971, a nuclear fuel service corporation asked me to join them to assist them in building a similar facility. It was going to be at the west valley

Page 3966

reprocessing plant in New York. In 1976, I was asked to join Edison Electric Institute to participate in support of their nuclear programs. And that continued until 1993, so I had 43 years of experience, most of it devoted to nuclear energy in the production of electricity.
Q. Thank you. What was your involvement in the development of the Nuclear Waste Policy Act?
A. I was a technical resource that responded to questions that were raised about it by staff members on the Hill. I also prepared testimony, I'm going to say dozens because that was developed over a four-year period from 1988 really to – 1978 to 1982, it was over a four-year period. And during that period, we had a large number of opportunities for utility executives to testify before the environment and energy committees in both the House and the Senate. And I drafted much of that testimony, and we invited the CEOs to actually present it to the committee hearings.
Q. What was your involvement in the

Page 3967

development of the standard contract?
A. As the vice president of nuclear activities at that point, I was the point person in the Edison Electric Institute working with the utilities and trying to provide a contract, reasonable contract that would satisfy the requirements of the Nuclear Waste Policy Act
Q. And do you have an understanding of what DOE's performance obligation was at the time the standard contract was promulgated?
MR LO RE: Your Honor, I'm going to object on the grounds this calls for a legal conclusion.
THE COURT: Well, I'm going to allow the question, Mr. Lo Re, for the same reason that I allowed that same question when Mr. Morgan was on the stand, and that is that while, ultimately, what is being asked for is a legal conclusion, it's of interest to the Court to know how those who are involved in the formation of this contract viewed the obligations that this contract was giving rise to.
MR. LO RE: Thank you, Your Honor.

Page 3968

THE WITNESS: Could I have the question repeated, please?

MR. HERZFELD: If I could have the court reporter do that?

(The reporter read the record as requested.)

THE WITNESS: I personally had an understanding of what DOE was planning to do, both before the Nuclear Waste Policy Act was completed and during the period in which the contract was drafted, yes.

BY MR. HERZFELD:

Q. And what was your understanding of that performance obligation?

MR. LO RE: Excuse me, Your Honor, I'm going to object on the grounds that that mischaracterizes the witness' testimony.

THE COURT: Well, I think it does

MR. HERZFELD: Oh, I'm sorry.

THE COURT: It certainly wasn't an intentional misstatement. Let's go back to the witness' – let's go back to your question and restate it.

MR. HERZFELD: My original question?

THE COURT: Yes.

Page 3969

BY MR. HERZFELD·

Q. Do you have an understanding of what DOE's performance obligation was at the time the standard contract was promulgated?

A. Yes

Q. What was –

THE COURT: Could you explain that answer?

BY MR. HERZFELD:

Q. Could you explain that answer, please?

A. I was in frequent contact with Department of Energy employees, specifically Mike Lawrence, Frank Coffman, Shelby Brewer, and others at the Department of Energy during the development of the Nuclear Waste Policy Act, and during the time that the nuclear waste contract, standard contract was being prepared, up until February 4th, we had an open window up until February 4th to be communicating in that regard.

We knew that the DOE facility to receive spent fuel had a design criteria of 3000 metric tons per year.

Q. You –

THE COURT: He's not finished. Are

Page 3970

you, sir?

BY MR. HERZFELD:

Q. If you've got more, please, I'm sorry, I did not mean to cut you off.

A. And we also knew that the amount of spent fuel that would be discharged from the nuclear power plants in 1998, we have to keep these things in the timeframe recognized, in 1983, we knew about how much was going to be discharged in metric tons from the total number of nuclear power plants that were operating, how much would be discharged in 1998, and that was a number somewhere between 2000 and 2500 metric tons.

So we observed that DOE was designing their facility at 3000 metric ton. The amount of spent fuel being discharged at the time of the 1998 commitment period was less than the 3000 metric tons, so, yes, we had an understanding that there was a match.

Q. You mentioned several people that you spoke with at the Department of Energy, if you could, just for the Court's benefit and actually for my benefit as well, who are these people?

Page 3971

A. Specific titles, Shelby Brewer was the assistant Secretary for nuclear energy. Mike Lawrence worked within the nuclear energy department. I'm not sure what his title was.

Q. Do you know if he ever became the acting director of OCRWM?

A. In the January/February timeframe of 1984. And the other gentleman, Frank Coffman, was working for Shelby Brewer on the nuclear waste issues and responsible for that program that was going on prior to the completion of the Nuclear Waste Policy Act or initiation of the standard contract.

MR. HERZFELD: I don't think we have any further questions, Your Honor.

THE COURT: Thank you, Mr. Mills.

REDIRECT EXAMINATION

BY MR. LO RE:

Q. Mr. Mills, you talked about a match with Mr. Herzfeld a moment ago. That match is not included in the standard contract, is it?

A. There are no words to that effect, that's correct.

Q. And in fact, we looked at a lot of documents with you on direct examination

Page 3972

regarding requests for a minimum amount of fuel to be accepted. That minimum amount of fuel to be accepted reflects the match that you talked about with Mr. Herzfeld, correct?
A. That is correct.
MR. LO RE: Thank you. Nothing further.
MR HERZFELD: No further questions, Your Honor.
THE COURT: Mr. Mills, we thank you very much for your testimony. It was excellent. We appreciate having you as a witness.
MR. GARDNER: Your Honor, may we call our next witness – I guess I should say recall our previous witness. The government would recall Mr. John Leonard to the stand.
THE COURT: Mr. Leonard, would you come forward, sir? Mr. Leonard, I remind you that you remain under oath.
Whereupon–
JOHN LEONARD
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

Page 3973

THE WITNESS: Yes, sir.
THE COURT: Please be seated.
THE WITNESS: Thank you, Your Honor.
DIRECT EXAMINATION (Resumed)
BY MR. GARDNER:
Q. Good afternoon, Mr. Leonard.
A. Good afternoon, Mr. Gardner.
Q. I think when we left off yesterday, we were talking about your position as chief nuclear officer at Long Island Lighting Company, do you recall that?
A. We talked a lot.
Q. Fair enough. To maybe go back a little bit, what were your responsibilities at Long Island Lighting Company while you were the chief nuclear officer?
A. My primary responsibility was to get the Shoreham Nuclear Plant licensed for operation, but the subsequent, you know, the other responsibilities under that were making sure the plant, when it was properly staffed, operated correctly, and staffing was another responsibility. When I arrived, we had something like 593 consultants serving in staff positions.

Page 3974

We moved them out, saved about 150 million a year, which the chairman of the board was happy about. We were responsible for all the contracts that the plant had locally, snow removal, things like that We were responsible for the maintenance of the plant. We were responsible for dealing with the nuclear fuel system contractor, which was General Electric. The whole responsibility ultimately came to me I had a very fine staff that worked for me.
Q. Now, the Shoreham plant, where was that located?
A. It was located on Long Island, about 60 miles from New York City, on the north shore.
Q. Now, Mr. Leonard, if I understand your previous testimony. When you first assumed the role of chief nuclear officer for Long Island Lighting Company, Shoreham had not yet received an operating license?
A. That is correct. It had just received a – or maybe it had not yet received, but it was in the process of receiving what was called a fuel load license, where the attorneys that represented us fought long and hard to get

Page 3975

permission to put fuel in the reactor in preparation for later operation.
Q. Did there come a time when Shoreham ultimately received an operating license?
A. Yes, we received a low power license followed by, after much litigation, a full power operating license.
Q. Was that while you were the chief nuclear officer?
A. Yes, it was.
Q. Now, did you have any responsibilities related to spent fuel management while you were the chief nuclear officer at Long Island Lighting?
A. Well, we didn't have very much spent fuel, unlike the Fitzpatrick plant that regenerated and refueled several times. We had low power operation, where we ran at four-and-a-half percent power for 24 hours to prove that we could, you know, get our plant on the line, and then we did that, I think, twice, and then we shut down and, waited for the full power license, which we achieved but we never operated it at full power.
Q And why didn't you operate at full