**Attachment 1: Designated Testimony of Christopher Kouts**

Pacific Gas & Electric Co. v. United States,
No. 04-74C (Fed. Cl.) (Hewitt, J.) (June 13-14, 2006)

Sacramento Municipal Utility District v. United States,
No. 98-488C (Fed. Cl.) (Braden, J) (March 29, 2005)

Southern Nuclear Operating Co. v. United States,
No. 98-614 (Fed. Cl.) (Merow, S.J.) (October 26, 2005)

System Fuel and Energy Arkansas Inc. v. United States,
No. 03-2623 (Fed. Cl.) (Lettow, J.) (April 12, 2007)

Boston Edison Co. and Entergy Nuclear Generation Co. v. United States,
No. 99-447C, 03-2626 (Fed. Cl.) (Lettow, J) (June 18, 2007)

**Pacific Gas & Electric Company v U.S No. 04-74C June 13, 2006**

**Heritage Reporting Corporation**

**Page 2286 to Page 2632**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2286

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------x

PACIFIC GAS & ELECTRIC :
COMPANY :No. 04-74C
Plaintiff. :
vs. :
THE UNITED STATES,
Defendant. :

-----------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, June 13, 2006

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:03 a.m.

BEFORE THE HONORABLE EMILY C. HEWITT

Page 2287

APPEARANCES

ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L SHAPIRO, ESQ
DAVID CALLET, ESQ
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue Northwest, Suite 500
Washington D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ
ALAN LO RE, ESQ.
HEIDE HERRMANN ESQ.
SCOTT R DAMELIN, ESQ
SHARON A SNYDER, ESQ
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street Northwest
Washington, D C 20036
(202) 514-2000

Page 2288

APPEARANCES (Continued).

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***

Page 2289

PROCEEDINGS

-----

THE COURT: We continue with the Plaintiff's case, the last witness, Dr. Cornell. Before we turn to that, are there any housekeeping matters at this time?

MR. EKMAN: Your Honor, the government just wanted to inform the Court that the deposition of Mr. David Duke is scheduled for today at 2:00 by telephone.

THE COURT: All right. And how does that impact the schedule in court? Do you have other persons who are working with that?

MR. EKMAN: Indeed, we do.

THE COURT: Thank you. Plaintiff can call its next witness.

MR. STOUCK: Thank you, Your Honor. Plaintiff calls Professor Brad Cornell.

THE COURT: Mr. Cornell, good morning, sir. When you arrive at the witness chair to my left, before you sit down, if you would indicate that you're ready to take the oath by raising your right hand?

Whereupon--

BRADFORD CORNELL

Page 2582

MR. LO RE: Certainly, Your Honor.
THE COURT: Mr. Christopher Kouts?
THE WITNESS: Yes.
THE COURT: Good afternoon, sir.
THE WITNESS: Good afternoon.
THE COURT: When you arrive at the witness chair, before you sit down and when you're ready to take the oath, please indicate by raising your right hand.
Whereupon–
CHRISTOPHER KOUTS
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Thank you, sir. Please state your full name for the record.
THE WITNESS: Christopher Alexander Kouts.
THE COURT: Mr. Lo Re to examine on direct examination.
DIRECT EXAMINATION
BY MR. LO RE:
Q. Good afternoon, Mr. Kouts.
A. Good afternoon.
THE COURT: Please pour yourself a glass of water, if you'd like.

Page 2583

THE WITNESS: Okay. Thank you.
BY MR. LO RE:
Q. Mr. Kouts, where are you currently employed?
A. I am currently employed with the Office of Civilian Radioactive Waste Management within the U.S. Department of Energy.
Q. What is your title there, sir?
A. I am director of the Office of Waste Management.
Q. And how long have you been in that position?
A. I've been in that position since we reorganized recently, for approximately a month.
Q. Prior to that, what was your title?
A. I was director of the Office of Systems Analysis and Strategy Development.
Q. How long were you in that position?
A. On an acting basis, since October 2002, and on a permanent basis, I believe July of 2003.
Q. Now, what did your responsibilities include when you were in your previous position?

Page 2584

A. They're essentially the same as they are now. I am responsible for the waste acceptance component of the waste management system, which includes management of the standard contracts with utilities and all the activities associated with that, such as testifying in court on certain issues.
The other pieces of my responsibilities include systems analysis for the program, making sure that the various components of the program, the repository, the transportation component, and the waste acceptance component, work effectively and efficiently.
In addition to that, I'm primary coordinator for other DOE programs within the Department, the Office of Environmental Management, that manages most of the defense waste that the country has and also the Naval Nuclear Propulsion Program, which is responsible for providing essentially nuclear power to our nuclear fleet, plus other activities, including safeguards on security policy and other activities as assigned.
Q. And I think you touched on this in your prior answer, but can you describe for the Court how your responsibilities relate to the execution of the standard contract for the acceptance of spent nuclear fuel and high-level waste?

Page 2585

A. Yes. When the Department chooses a date for the, that it intends – or year, if you will, that it intends to receive spent fuel from utilities for the purposes of disposal, the process associated with the contract, the delivery commitment schedules, and the final commitment schedules, that would all be managed in my office.
I have several staff who support me in that area. Mr. Zabransky, who's here in court, is a contracting officer, Mr. Pollog also, who will be testifying later. And in that process, any contractual aspects associated with that would be managed through my office.
Q. And to whom do you report at the Department of Energy, sir?
A. I report to the principal deputy director of the program, Mr. Paul Goalen.
Q. And to whom does Mr. Goalen report?
A. Mr. Goalen reports to the recently

Page 2586

named director of the program, Ward Sproat.

Q. And to whom does Mr. Sproat as the director of OCRWM report?

A. He reports to the Undersecretary and the Secretary of Energy and the Deputy Secretary, I should say.

Q. Mr. Kouts, when did you first join – I'm going to refer shorthand, for the Office of Civilian Radioactive Waste Management, as OCRWM, if that's okay?

A. Sure.

Q. When did you first join OCRWM?

A. I joined in June 1985.

Q. And can you briefly go through your various jobs that you had with OCRWM?

A. I'll endeavor to be brief. My first assignment when I joined the program was to develop the monitored retrievable storage proposal that was a requirement of Section 141 of the Nuclear Waste Policy Act. I worked on that for several years, until that was submitted in 1987. At which point, I worked on integration activities and then was subsequently appointed to be head of our transportation program.

Page 2587

After that, in that position about three years, I was appointed to a division that – actually, no, I worked for the director's office on contingency planning and strategic planning for a period of time. Then I moved into a division that dealt with interactions, primary interactions with the Nuclear Regulatory Commission and regulatory affairs for the program.

From there, I went to a position that supported the director of the program at that time for all his activities associated with development of testimony, policy papers, and so forth, director of division of the planning division for a few years. Then I accepted a different division, which was responsible for developing an interim storage design, a topical safety analysis report that was to be submitted to the Nuclear Regulatory Commission.

And that was in anticipation that the Department would receive interim storage authority from Congress which was being considered at that time. After that position –

THE COURT: I'm sorry. What time

Page 2588

frame was that in?

THE WITNESS: That was in the mid-90s, from about '95 to about '97.

THE COURT: Thank you.

THE WITNESS: At that point in time, I then accepted a position working essentially for the director's office and for the director of Yucca Mountain project as a liaison, as a technical and policy liaison, and I was responsible essentially for making sure that policy products that were produced and technical products that were produced by the project at that point were acceptable to the Department.

The first was the liability assessment, which was a Congressional deliverable, which we submitted in 1998, and then subsequent to that, I worked on, for several years, until its completion, the site recommendation for Yucca Mountain.

That specific activity required me to be the primary interface with the Secretary's office and the Undersecretary's office in that regard. I was the point person for the program and dealt with virtually all the issues that

Page 2589

occurred up until the point of the Secretary's recommendation.

After the Secretary recommended it to the President on February 14th, then the Secretary and the President subsequently recommended the site to the Congress. I was involved in preparing the Secretary and the Undersecretary for hearings, which were called by Congress. In addition to that –

THE COURT: February 14th of what year.

THE WITNESS: I'm sorry, 2002. The way the Nuclear Waste Policy Act is set up, once the site was recommended, the governor of Nevada had an opportunity to disapprove the site, if he disagreed with it, which he subsequently did.

As a result, there were a series of hearings by Congress to consider the state's veto. And, again, I supported the Secretary and the Undersecretary in those activities up until the point of the President signing the joint resolution of Congress in July of 2002, which essentially affirmed the site selection.

Subsequent to that, shortly

Page 2590

thereafter, I was appointed an acting, excuse me, an acting position to the Office of Systems Analysis.

BY MR. LO RE:

Q. And that's the position we talked about at the beginning of your testimony?

A. That's correct.

Q. Mr. Kouts, could you provide the Court with your educational background after high school?

A. I have a Bachelor's and a Master's degree in engineering, and I'm also a licensed professional engineer.

Q. And where is your degree from, sir?

A. George Washington University.

Q. Are you familiar with the term "M&O contractor"?

A. Yes, I am.

Q. And what does that mean?

A. It means management and operating contractor.

Q. And do the M&O contractors play any role with respect to the way OCRWM establishes the standard contract, executes the standard contract?

Page 2591

A. They serve as the primary support contractor for the program's contractual activities, and I say contractual in the manner -- they're a prime contractor, and the reason we have an M&O contractor is that there was a great deal of criticism at the time in the early years of this program that we had many different contractors and we couldn't manage them all.

So as a result, we went to more of a mission oriented management and operating contractor concept, so most of our money is spent through that for the various activities of the program, including the repository, transportation, and some in the waste acceptance area.

Q. Is there one M&O contractor under the standard contract?

A. Yes, there's one M&O contractor that we have.

Q. And who is that, what entity is that?

A. It's Bechtel SAIC Corporation.

Q. You touched on this, I think, a moment ago, but can you describe what Bechtel's responsibilities are as the M&O contractor?

Page 2592

A. On an annual basis, we give them an annual plan, a task plan, and they conduct activities under that task plan for the next fiscal year. In addition, if there is additional work that we need done in any one year, we give a technical direction letter, which then they perform that work and provide deliverables to us.

Q. Now, in the jobs that you've described that you've had with OCRWM, how have you used M&O contractors and their subcontractors?

A. We ask them specifically in my area to do, for instance, in a systems area, we'll ask them to do systems analyses and have them conduct those analyses for us, and then we'll review their deliverables after they finish their work.

Q. Now, you mentioned deliverables a moment ago. In what form are the deliverables from the M&O contractors?

A. They're typically in the form of paper reports that are provided under Bechtel stationery.

Q. And how does DOE regard those forms, those written, that written work product?

Page 2593

A. They are deliverables in the view of the contractor, essentially on that specific activity.

Q. Now, is there a process by which DOE makes a determination to adopt a position by a contractor?

A. If the Department chooses to accept the views of the contractor and chooses to make a statement about it publicly, it will issue a Departmental document or something under the Departmental letterhead in order for that to become a Departmental position.

Q. Now, is there a particular process that DOE goes through to put its imprimatur on a document?

A. Yes. A document has to go through a clearance process and will have to be accepted by the federal employees within the program, and at that point in time, when it's accepted, it can become a DOE document.

Q. Now, is there somebody within OCRWM who is responsible for setting policy with respect to a document?

A. The primary policy officer within the program is the director of the program.

Page 2594

Q. Now, Mr. Kouts, while we were talking about your various jobs, you mentioned the MRS. I want to go back to that and spend a little time with that.
A. Okay.
Q. Can you describe what you did with respect, or what you have done with respect to the development of the MRS under the standard contract?
A. As I indicated earlier, my first position in the program was to help develop the monitored retrievable storage proposal to Congress that was required by Section 141 of that Act. There are a variety of requirements for the report or the proposal that Congress wanted in relation to that facility.
And part of that was the need for and feasibility of such a facility. In addition to that, we did an environmental assessment, environmental evaluation, and we also provided a program plan. I was responsible, as a staff person back in June of 1985, for the needs and feasibility analysis of the MRS.
Q. Now, when you started working on the MRS project, how did DOE foresee the use of an

Page 2595

MRS, if you know?
A. Yes, I do remember. The vision of the director at that time, Mr. Ben Rusche, was that the, it takes some explaining, but I'll do it briefly, that a geologic repository for the disposal of high-level radioactive waste was going to be a very difficult, a difficult animal to accomplish.
So his view was that the MRS, the monitored retrievable storage facility should be more than just a storage facility. It should be an integral component of the system and should actually do the packaging of the materials for the repository. The idea was to have the MRS centrally located, where the vast majority of fuel from reactors would be sent to it.
The fuel would then be repackaged at that time. We were thinking of consolidating fuel rods, taking the fuel assemblies apart, consolidating them and putting them into disposal ready containers, which would go to whatever repository was selected.
At that time, at that point in time, we were looking at three different repository

Page 2596

sites. We were looking at the basalt site in Hanford, Washington. We were looking at the Yucca Mountain site in Nevada, on the Nevada test site. And we were also looking at a bedded salt deposit in Deaf Smith County, Texas.
So the idea was, whichever of those repositories was selected, that the MRS would do the packaging, acceptance of the fuel from the reactors, from primarily the eastern reactors, and then that would be packaged. And then in disposal ready containers or canisters, those would be transported to the repository. And then the repository would then put those underground and for permanent isolation.
Q. Now, Mr. Kouts, I'd like to show you an exhibit. This is PX-82.
MR. LO RE: If I may approach, Your Honor?
THE COURT: Yes.
MR. LO RE: This is, as counsel points out, this is an excerpt of PX-82, which I believe is in evidence, Your Honor.
BY MR. LO RE:
Q. And just one housekeeping note,

Page 2597

Mr. Kouts, we are going to be providing you with hard copy exhibits. What we're looking at, our technical staff will also have the document on the screen for you to look at, whatever you prefer.
A. Okay.
Q. This document is entitled, "The mission plan for the Civilian Radioactive Waste Management Program." It's dated June 1985. Mr. Kouts, are you familiar with this document?
A. Yes, I am.
Q. And what is it?
A. This was a requirement of the Nuclear Waste Policy Act, that the program develop a mission plan in terms of its concept of how it was going to implement the Nuclear Waste Policy Act and also generate the general schedules that we were going to be implementing.
Q. And you said that you came on to the program just around this time, is that right?
A. That's correct.
Q. And did you take any action with respect to this exhibit, this document?
A. Well, this, yes, this document became the primer for the program for several years,

Page 2598

and familiarity with it was absolutely essential to understanding where the program was going.

Q. Now, I'd like to turn to the page that's Bates-numbered, and I'll refer to that uppermost Bates number to be clear, that's Bates-numbered, ends in 5305, and it's under the heading, "IV, assumptions about geologic repositories." Do you see that? I'm sorry, it's page five – I'm sorry, page 25 of the document.

And I'm afraid, I think that the copy you're looking at – I lied. I think the copy you're looking at doesn't have Bates numbers, so we're going to go with page 25 of the document.

Let's look at that heading IV and everything below it. It says, "Assumptions about geologic repositories," and all the bullets below. Again, the heading here was, "Assumptions about geologic repositories." What was the significance of this clause, sir?

A. This was the planning basis for the program. At that time, we were basically planning and implementing to geologic

Page 2599

repositories and specifics about them.

Q. And under C, under repository start-up dates for the authorized system?

A. Yes.

Q. Do you see that? Now, there is no reference here to the MRS. Do you know why that is?

A. At this point in time, this was the only – the only thing that the program had authorized were repositories. Therefore, that's why this is referred to as the authorized system. If you go back to the Nuclear Waste Policy Act, the first repository was authorized, therefore, and the second repository was implied.

So the thoughts were that you were only allowed to build geologic repositories at this point in time.

Q. Now, if you look under 2.7, which is just below there, it says, the heading is, "Waste Acceptance Schedule." Do you see that?

A. Uh-huh.

Q. The first sentence says, "The DOE is committed to accept waste from the signatories of the standard disposal contracts on a firm

Page 2600

schedule that begins no later than January 31, 1998." Do you see that?

A. Yes, I do.

Q. And what was your understanding of that sentence?

A. It kind of speaks for itself. The Department was committed to accepting spent fuel under the contract no later than January 31,1998.

Q. Now, there are two schedules we're going to talk about that are set out below there, there's table 2-2 and table 2-3. Do you see that?

A. Yes, I do.

Q. How did those schedules relate to your understanding of DOE's obligations under the standard contract?

A. Well, essentially, it was the planning basis, at that time, as to the amount of acceptance that we were going to be taking in any one year at one facility.

Q. And how did they relate to your contractual obligation, if you know?

A. Well, there's, in terms of a contractual obligation, there are no

Page 2601

requirements for the amount of spent fuel, as far as I'm aware, that the Department needs to take. The Department understands it needs to take all this fuel that the utility generate, but the rate at which the Department does that is subject to the Department's interpretation of what it can do and what it can't do.

Q. Now, there's a reference below here to, the last paragraph in this sentence, "on the basis of the integrated system approach described in the improved performance plan," do you see that?

A. Yes, I do.

Q. It says, and in that Section 2.3, "The DOE has identified many possible waste acceptance schedules," then it goes on. What is that reference there, the improved performance plan, what is your understanding of that?

A. The improved performance plan basically refers to a system that not only has repositories in it, but also a monitored retrievable storage facility.

Q. Now, talk about 2-2 and 2-3, let's start with 2-3, which is the improved

Page 2602

performance system, and that's page 27 of this document. Now, what was your understanding of the status of the authorization, Congressional authorization for this schedule at this time, 1985?

A. As I mentioned earlier, in 1985, the only authorized facility we had was the repository, was really the first repository, and therefore, the acceptance at that, at an MRS was, again, would have to be approved by Congress, in terms of the facility would have to be authorized.

Q. Now, there's a reference here both to a first repository, and that comes online in 2000, I guess it's 1998, and then there's a reference to a second repository coming online later, do you see that?

A. Yes, I do.

Q. What was the status, if you know, of the authorization of the second repository at this time?

A. I don't believe the second repository was authorized. The Act clearly indicated that it was Congress' intent that there should be multiple repositories because, essentially,

Page 2603

they placed a 70,000-ton limit on the first repository until the second repository was in operation.

Q. Now, if you look in the upper left-hand corner of this document, it says, "pre-1998," do you see that, this very top line? And then it says, "MRS acceptance," do you see that?

A. Yes, I do.

Q. Very hard to read, I apologize. What is your understanding of what was to happen under this contract, vis-a-vis the MRS, and when?

A. The early planning for the MRS had it operational in the 1996 time frame, so what that line, that pre-1998 line reflects is the amount of spent fuel that would be received at the MRS prior to the time that the repository was operational.

Q. And how did that pre-1998 performance comport with your understanding of DOE's obligation under both the Nuclear Waste Policy Act and the standard contract?

A. It was over and above that level of performance required, as I read it.

Page 2604

Q. Now, you'll see that on the right-hand side, there is a column that says, "spent fuel backlog," on this chart?

A. Yes, I do.

Q. And, again, this is a bit of an eye test, but if you look at – first of all, what is your understanding of what the spent fuel backlog is?

A. That was an estimate at the time of the amount of spent fuel that would have been discharged from reactors up until that specific year.

Q. And so looking at that first entry, it looks like 39,900, do you see that?

A. Mine says 37,000, but that's –

Q. Okay. I'm sorry. I misread it. It's 39, 37,9. Looking at that and looking at this chart, when does the backlog begin to get reduced on a steady state basis?

A. Well, it seems to go up to a peak of 38,600 in the – and it's kind of hard to read across, but I'll do my best. In the year 2005 and then subsequent to that, it's drawn down.

Q. Now, one other, hopefully, your eyes can bear with me.

Page 2605

A. Actually, excuse me, I think it's 2006.

Q. Thank you. Hopefully, your eyes can bear with me for one more question on this chart. If we look at the MRS acceptance column, and that's four columns in, when do you reach the 3,000 rate?

A. You reach it in 1998. You're essentially accepting 3,000 metric tons at the MRS in 1998.

Q. Okay. Now, let's flip back to table 2-2 for a moment, and this refers on the heading as, "Waste Acceptance Schedule Authorized System." Do you see that?

A. Yes, I do.

Q. Okay. And what was the significance of that to you?

A. Again, this was the only system that the program perceived that it was authorized from Congress at this time.

Q. And, again, this has the first repository coming online in 1998, correct?

A. That's correct.

Q. No MRS?

A. That's correct.

Page 2606

Q. And then there's a second repository coming online, when is that?
A. It looks like 2006.
Q. Okay. Let's just look at that first repository for a moment. You'll see beginning in 1998 that – and it's under the column, "Spent Fuel." Do you see that?
A. Yes.
Q. What is the amount of fuel that's being accepted in 1998 on this second, on this table 2-2?
A. 400 metric tons.
Q. Now, when does the rate of 3,000, when is that achieved on this chart?
A. On this chart, it's in the sixth year of operation, which would be in 2003.
Q. Now, what is the steady state rate for the first repository here?
A. The steady state rate, as far as I can tell, is 3,000 metric tons.
Q. Okay. Now, let's bring on the second repository. That comes online, I think you said in 2006, is that right?
A. Let me say that it's 3,000 tons of spent fuel, if you will, commercial spent fuel,

Page 2607

and then there's high-level waste, which are essentially defense materials, which are in addition to that, so the acceptance rate of the total rate is 3,400, the commercial spent fuel rate is 3,000.
Q. Thank you for the clarification. And actually, before we talk about the second repository, I want to ask you something else that I missed.
A. Sure.
Q. And that is, do you know why the repository doesn't begin accepting spent nuclear fuel at a rate of 3,000 MTU per year in 1998?
A. As I remember, the intent there was to walk before you can run, and the idea was that the facility needed to ramp-up in a reasonable sense, so that you build up to your maximum capacity. You don't have – although you may have capability on day one, you only operate in order to get your procedures straight. And it's just good sense to start up a nuclear facility, essentially, at a relatively lower rate, just as nuclear power plants would be done. They start off at low power, then

Page 2608

they build up to higher power. This is a reflection of just an engineering, if you will, concept, that you would slowly ramp-up with the repository to its maximum capability here in year six.
Q. To your knowledge, has that mind-set of walking before you run, or concept, has that changed during your tenure at OCRWM?
A. No, that's been pretty consistent. There have been different concepts about how much, how long the ramp-up should take, but that general concept has been fairly consistent throughout my involvement in the program.
Q. Now, let's talk about that second repository on table 2-2, comes online, I believe it's 2006, and I'm looking at the column, left column that says, "Spent Fuel," under the second repository. When does that repository reach its steady state rate?
A. It looks like that reaches its steady state rate in its seventh year of operation.
Q. And what is that steady state rate?
A. 3,000 metric tons.
Q. And so once the second repository comes on, once the second repository is

Page 2609

accepting at a steady state rate, what is the acceptance rate, according to this chart, between the two repositories?
A. For commercial spent fuel?
Q. For commercial spent fuel, yes.
A. It would be 6,000 metric tons per year at the maximum rate.
Q. Now, let's look at that backlog column on this chart, which is the one on the far right. Looking at this chart – and I think it might be a little easier to read, maybe not.
A. Mine's harder to read.
Q. Can you tell when the backlog begins to get reduced on this chart, which is 2-2, table 2-2?
A. It looks like it reaches a peak of 51,900 in the year 2006 and then goes down after that year, starting in 2007, I believe. Let me just read, take one more look at that.
Q. Sure.
A. Yeah, it's 2006 that it reaches a peak, and after that, it goes down.
Q. And, again, performance begins on this chart in what year?
A. In this chart, it's 1998.

Page 2610

Q. Okay.
THE COURT: Is 51,900 the peak, 51,900?
THE WITNESS: That's what it appears to me, yes.
THE COURT: We're on 2-2, right?
THE WITNESS. Correct.
THE COURT: And that's the –
THE WITNESS: That's the point –
THE COURT: That's the ninth item down that chart?
MR. LO RE: Your Honor, if this is helpful, I think that DX-81 –
THE COURT: Okay.
MR. LO RE: Or, actually, excuse me, PX-81 is a better, a more legible copy.
THE COURT. I'm just going to suggest to you we need to check when we get to that, that 2005, it could be the year we just need to check.
MR. LO RE: Okay. That's fine.
THE COURT: And the same is true on table 2000 – 2-3?
THE WITNESS: You're right. It might be 2005. I'm sorry.

Page 2611

THE COURT: We just need – it's around there, but I think it may be a higher year.
MR. LO RE: Your Honor, if it's okay, maybe we could do it now, if I could just show the witness what I think is a clearer version?
THE COURT: Sure, sure.
BY MR. LO RE:
Q. I'm going to hand you –
MR. LO RE: If I may approach, Your Honor?
THE COURT. Yes, that's fine.
MR. LO RE: Thank you. This is PX-81, and no need, I don't think we need to move this into evidence because it is, it is a duplicate, and unless the Court prefers, whatever the Court prefers.
THE COURT: Well, I'm going to move this in. PX-81 is admitted.
MR. LO RE: Thank you.
THE COURT: Is that – okay, because –
MR. LO RE: It might be easier for everybody after the fact.
THE COURT: Yes.

Page 2612

(Plaintiff Exhibit Number 81 was received in evidence.)
THE WITNESS: It's 2005, that's correct.
BY MR. LO RE:
Q. So just so we're clear, 2005 in table 2-2?
A. That's correct.
Q. Is when the backlog begins to be reduced?
THE COURT: And then look at table 2-3 also and see if.
THE WITNESS: Okay.
THE COURT: I think that's the same.
THE WITNESS: All right. That's also 2005.
BY MR. LO RE:
Q. And then just while we're looking at a clearer copy, when does that second repository come online, what year is that? Is it easier to read on this? And, again, I'm sorry. This is, now, I'm talking about 2-2, when the second repository comes online.
A. It would be year 2006.
Q. And then just to close the loop on

Page 2613

that, if we're looking at table 2-3, what year does the second repository come online?
A. Also 2006.
Q. Okay. Thank you. Now, Mr. Kouts, I'd like you to turn to page 28 of this document, the second full paragraph starting with the word "included."
A. Yes.
Q. "Included in tables 2-2 and 2-3 are possible acceptance schedules for defense high-level waste." And then below, it says, "These schedules are for illustrative purposes only at this time. The amount of defense waste to be disposed of in the repository and the actual acceptance rates have not yet been determined by DOE." What does that mean, if you know?
A. That's essentially indicating that this was an estimate and that it was not in any way a commitment, that it was the amount of materials we were going to be taking, there was a lot of uncertainty at this point in the program of the amount of waste and where we were headed and so forth.
Q. At the bottom of the last page, the

Page 2614

very, very last paragraph, it says, "The representative waste acceptance schedule for the improved performance system," do you see that?
A. Yes, I do.
Q. And then it rolls over to the next paragraph, last paragraph of the bullets, starting with, "it should be emphasized."
A. Yes.
Q. Okay. And could you read that into the record, please?
A. "It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses."
Q. And what was your understanding of that phrase, sir?
A. Essentially, exactly what it indicates, is that at this point in the program, we were uncertain about what the system would look like, the size of it, the amount of fuel and the materials we were going to be accepting, and we wanted to put everyone

Page 2615

on notice that this was our best guess at that time.
Q. Now, if you look at the paragraph, two paragraphs below, there's a paragraph starting with, "the DOE"?
A. Yes.
Q. And halfway down, maybe three-quarters of the way down, it says, "under the terms." Do you see that sentence?
A. Yes, I do.
Q. Could you read that into the record, please?
A. "Under the terms of the contracts for disposal services that had been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987."
Q. Could you go on, please, next sentence?
A. "In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations."
Q. And, Mr. Kouts, what was your

Page 2616

understanding of those two sentences?
A. My understanding was that in terms of implementing the contract and making commitments for the Department, in terms of what it would receive in spent fuel or acceptance of spent fuel from utilities, that we were going to be following the process identified in the standard contract, and we would start the delivery commitment schedule process in 1991 in anticipation of 1998 waste receipt from utilities.
Q. Thank you. Mr. Kouts, I'd like to show you another document. This is DX-107.
MR. LO RE: If I may approach, Your Honor?
THE COURT: You may.
BY MR. LO RE:
Q. This document is dated March 1987 and is entitled, "Monitored Retrievable Storage Submission to Congress." Mr. Kouts, are you familiar with this document?
A. Yes, I am.
Q. What is it, sir?
A. It's volume I of the proposal that the Department submitted to Congress in fulfillment

Page 2617

of the requirements of Section 141 of the Nuclear Waste Policy Act to submit a proposal on monitored retrievable storage to the Congress.
Q. Were you involved in the development of this proposal, sir?
A. Yes, I was.
Q. How was that?
A. Essentially, I was actively involved with this volume of the second volume, which was the needs and feasibility analysis and the environmental assessment of the sites and also in the program planning, that was volume III of this.
Q. Now, Mr. Kouts, I'd like to turn to – I hope you have Bates numbers on this one – what is marked as the Bates number 311. This is the executive overview, and if you would turn now to the second page of this executive overview, now looking at the paragraph that starts with, the first full paragraph that starts, "The DOE's proposal"?
A. Yes.
Q. It says, "The DOE's proposal was ready for submittal to Congress in February 1986, but

Page 2618

litigation has delayed the submittal for more than a year. Since the planned submittal date, the DOE's Civilian Radioactive Waste Management Program, CRWM, has progressed and undergone various changes.

These changes range from the programmatic changes and proposals outlined in the January 1987 draft mission plan to further refinements of the program's analytical database." Then it goes on, there's a sentence starting with, "the programmatic change." Do you see that?

A. I was following you up to a point. Okay.

Q. And if you could just –

A. I see it, yes.

Q. Through 1998, if you could just read that sentence through the phrase that says, "the first quarter of 1998," could you read that into the record, please?

A. "The programmatic change that most affects the DOE's planning for the MRS facility is an extension of the date for the start of operations at the first repository. This date is extended from January 31, 1998 to 2003 to

Page 2619

allow time to carry out necessary technical program activities and to provide additional opportunity for consultation and cooperation with affected states and Indian tribes.

The revised schedule shows that the DOE expects to receive from the Nuclear Regulatory Commission a construction authorization for the repository by the first quarter of 1998."

Q. Mr. Kouts, what do these sentences that you just read into the record, what does this describe?

A. In the time frame from the point that we were ready to submit the proposal in, I believe, February of 1986, the program had come to the conclusion that we could no longer have the repository operational in 1998, and the repository was going to be delayed five years. So this essentially reflects the fact that the repository will be delayed five years from the point of operations. Nonetheless, we expected at that point to just – still to receive a construction authorization for the repository from the Nuclear Regulatory Commission by the first quarter of 1998.

Page 2620

Q. Now, the last sentence here says, "Thus, the MRS facility would be critical to DOE's ability to accept waste for disposal in 1998." What does that mean?

A. If you'll remember the previous waste acceptance schedules for the authorized system, our primary mechanism of meeting the contractual obligation was to have a repository operation. At this point in time, the Department was acknowledging the fact that the only way that we were going to be able to do that now was going to be with an MRS facility.

Q. Now, I did pass over one thing that I read. There's a reference to the top of this paragraph to litigation. What is that referring to?

A. In the first sentence, basically, that refers to the fact that the state of Tennessee essentially went to court and obtained from a district judge a temporary restraining order, which was later turned into an injunction against the Department from submitting the proposal to Congress. Subsequent to that, it took essentially a year to appeal that decision by

Page 2621

that district court through circuit court, and in the, I believe in the January time frame of 1987, the Supreme Court denied cert on the last appeal by the state of Tennessee, and therefore, the Department was allowed to submit the proposal to Congress.

Q. Now, if you turn to page 315 of the Bates number page of this document, which is also page five of the document?

A. Yes.

Q There's a paragraph starting with, "some potential adverse." Do you see that?

A Yes, I do.

Q. That paragraph in the middle of that paragraph, starting with, "to allay such concerns," do you see that?

A. Yes, I do.

Q. Would you read that into the record?

A. Okay. "To allay such concerns and to reinforce this country's unwavering commitment to the geologic repository program, the DOE proposes that the Congress link the start-up of the MRS facility to the schedule of the repository. No waste may be accepted at the MRS

Page 2622

facility until a construction authorization for the first repository is received from the Nuclear Regulatory Commission. Furthermore, the DOE proposes that the Congress limit the MRS storage capacity to 15,000 metric tons of uranium."

Q. What does that sentence or sentences mean?

A. As we were working with the local governments within the state of Tennessee at the time where the MRS was proposed to be cited by the Department, specifically, at the former Clinch River Breeder reactor site near Oak Ridge, Tennessee, there was great concern that the MRS, if deployed, would essentially become a de facto repository if the Department was unable to implement a repository.

So in order to address those concerns, as the sentence indicates, the highlighted sentence, what the Department proposed to Congress was that we link the start-up of the MRS facility, in other words, the start of operations, to the point at which the Nuclear Regulatory Commission has authorized the construction of the repository.

Page 2623

At that point in time, the Nuclear Regulatory Commission would have reviewed all the technical information of the Departments and made a determination that, yes, this was a repository, and you can go ahead and construct it, so therefore, that would have provided a clear signal that the repository was going to be implemented.

And therefore, if the MRS was linked to that, that should allay the concerns, so that was essentially the linkage that was submitted to Congress and proposed to Congress in the proposal, as well as limiting another consideration here, was the amount of spent fuel that would be stored at the MRS and whether or not it would become all the spent fuel would go there.

Here, the Department in terms of trying the address that issue, also limited the storage capacity of the MRS to only 15,000 metric tons of uranium.

Q. Thank you. Now, Mr. Kouts, at the time that this proposal was submitted to Congress, how did OCRWM envision the way the MRS would work vis-a-vis the standard contract,

Page 2624

the obligations under the standard contract?

A. It would essentially be the primary mechanism until the repository was operational for us to accept spent fuel by 1998. It would be the only mechanism, instead of the primary.

Q. Now, Mr. Kouts, I'd like to show you what's been marked as – I'm going to show you DX-114.

MR. LO RE: This document, Your Honor, has been admitted as PX-97. May I approach, Your Honor?

THE COURT: Do you want to put DX-107 in for the ability to read?

MR. LO RE: Thank you, Your Honor.

THE COURT: DX-107 is admitted.

(Defendant Exhibit Number 107 was received in evidence.)

MR. LO RE: I will check. Counsel asked if this is PX-97.

MR. STOUCK: No, I'm sorry. I misspoke.

MR. LO RE: Oh, thank you. We're checking to see if this is in evidence.

MR. STOUCK: The amendment, I don't think so.

Page 2625

THE COURT: It's in.

MR. LO RE: Thank you.

BY MR. LO RE:

Q. This is a document dated June 1987, entitled, "OCRWM Mission Plan Amendment." Mr. Kouts, are you familiar with this document?

A. Yes, I am.

Q. What is it, sir?

A. It's a draft mission. It's, excuse me, a final mission plan amendment that was issued to essentially inform those who followed the program through to Congress, that we had adjusted our thinking, if you will, from the June 1985 mission plan, which we were talking about earlier.

So this reflected changes in the program that had occurred since the issuance of the June 1985 mission plan.

Q. And were you involved in the development of this mission plan amendment, sir?

A. The development and the review, yes.

Q. I'd like to turn to – I'll go with the top Bates numbers, 5810. It's also page six of this document, under extension of the

Page 2626

schedule for the first repository. I'd like to look at the third paragraph down, starting with, "as already mentioned."
A. Yes.
Q. Okay. And it says, "As already mentioned, several important milestones have been achieved. However, the experience gained in achieving those milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (see table one). The new schedule shows an extension of the date for waste acceptance at the first repository from 1998 to 2003(As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility)." What was your understanding of those sentences I just read?
A. Going back in the context of the program at this time, we had three repository sites that we were developing. We had requested -- I believe the footnote at the

Page 2627

bottom of that page indicates 710 million dollars from the Congress We had received close to 500 million dollars due to that budget reduction and other issues that were coming to light in terms of the challenges in implementing repositories. We essentially acknowledged at this point that the repository, the first repository was not going to be operational until 2003 and, as the last sentence indicates, that we could still nonetheless begin accepting waste if we had an MRS in the system by 1998.
MR. LO RE: Your Honor, I understand that we were to quit at 5:45. I still have more on this document, in fact probably quite a bit. I can quit now or go another two minutes, whatever you prefer.
THE COURT: Why don't you take your two minutes?
MR. LO RE: Thank you, Your Honor.
BY MR. LO RE:
Q. Let's look at page 11 of this exhibit, which is also Bates number 5815, and it says, "waste acceptance strategy." Do you see that?
A. Yes, I do.

Page 2628

Q. That second paragraph says, "Without approval of the MRS proposal, the five-year extension of the schedule for the first repository would require a change in the waste acceptance schedule." What does that mean?
A. It essentially means that unless we have an MRS in the system, there was going to be a five-year delay in terms of us being able to receive fuel at a repository.
Q. Let's look at one more part of this, if you were to go to page 144, and this is under the heading, "The MRS Facility." Do you see that?
A. Yes, I do.
Q. Under the second page in, which is 44, it says, "Accelerated waste acceptance from the utilities," there's a reference there to starting in 1998?
A. Yes.
Q. Could you read that into the record, please?
A. "Accelerated waste acceptance from the utilities. By starting in 1998, the MRS facility would allow the system to begin receiving spent fuel five years sooner than the

Page 2629

system described in this amendment without an MRS facility. This would significantly reduce the need for new temporary storage capacity at reactor sites and the attendant fuel handling operations, licensing efforts, and costs. It would also provide assurance that the federal waste management system will begin operations by 1998."
Q. Mr. Kouts, why was the DOE interested in providing assurance that the federal waste management system would begin operations by 1998?
A. Essentially, because the Department was very sensitive to its direction that it needed to open a facility by 1998 in compliance with the standard contract.
MR. LO RE: Thank you.
THE COURT: I'll take your motion now on putting 114 into evidence.
MR. LO RE: Thank you, Your Honor.
MR. STOUCK: Your Honor, our records do show it's the same as Plaintiff's 97, so maybe we could clear that up at the conference this afternoon.
THE COURT: That would be agreeable to