**Sacramento Municipal v. U.S No. 98-488C March 29, 2005**

**Heritage Reporting Corporation**

**Page 1826 to Page 2214**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone. 202-628-4888*
*FAX. 202-371-0935*

Page 1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------x
SACRAMENTO MUNICIPAL UTILITY
DISTRICT,
NO 98-488C
Plaintiff
vs
UNITED STATES,
Defendant
-------------------------------
Courtroom 5
National Courts Building
715 Madison Place
Washington, D C

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a m

BEFORE THE HONORABLE SUSAN G BRADEN

Page 1827

APPEARANCES
ON BEHALF OF PLAINTIFF
DAVID S NESLIN, ESQ
TIMOTHY R MACDONALD, ESQ
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N CAYNE ESQ
Arnold & Porter LLP
555 Twelfth Street, N W
Washington, D C 20004-1206
(202) 942-5656

Page 1828

APPEARANCES (Continued )

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ
JOSHUA E GARDNER ESQ
TODD J COCHRAN, ESQ
SCOTT DAMELIN, ESQ
RUSSELL SHULTIS ESQ
ELIZABETH THOMAS, ESQ
U S Department of Justice
1100 L Street, N W
Washington, D C 20036

ALSO PRESENT
STEVEN M COHN, ESQ
STEVE J REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1829

P R O C E E D I N G S
\- - - - - -
THE COURT Let's go
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR CAYNE
Q Good morning, Mr Zabransky
A Good morning
Q I'd like to turn your attention to Plaintiff's Exhibit 121 I believe that will be in the first binder, one out of three Do you have that document before you, sir?
A Yes I see it
Q And is this document a memorandum from you to -- was this a memorandum from you, sir?
A It's an e-mail from me to Mr -- I believe it's Auke Piersma
Q And who is that person?
A Mr Piersma used to be with a group called Public Citizen
Q And there's also a CC?
A Yes

Page 2118

would be decommissioned and go back to its original state, where the repository –

THE COURT· What was the time period?

THE WITNESS I think we had it operating for 20, 25 years That would allow the repository to be filled to the statutory limit, which was 70,000 metric tons and still is today

BY MR DAMELIN

Q Now, you had just mentioned three repository sites at the time of this submission Were the three repository sites still under consideration or being reviewed by Department of Energy?

A. They were still – we had three active projects. We had the salt site, which was – that was in Texas. It was a bedded salt deposit. We had a basalt site, that's b-a-s-a-l-t site, in Hanford, and we had the Yucca Mountain tuff repository, tuff, that's in Nevada

Q. Now, the 15,000 metric ton storage capacity limit you just mentioned, where does that come from?

A That was what we felt was the maximum that we needed, and when we got the facility operational for surge issues, and if we wanted, and if for some reason the repository couldn't take materials, we

Page 2119

could have a surge capacity of the MRS and continue to accept fuel, even if the repository was not operational

Q Now, you just referenced the objections of Tennessee about the proposal Did the MRS proposal that's submitted in March of 1987 refer to any particular sites?

A Yes, it did We focused on three sites within the state of Tennessee, the former Clinch River Breeder Reactor site, which was the primary site; the Oak Ridge Reservation, which was right next to the Clinch River Breeder Reactor site; and also, there was the shutdown – not the shutdown, but the Hartsville Nuclear Station, which was never built by the Tennessee Valley Authority.

Q And you might have just answered this. Was one of the sites the primary site in this submission?

A And that was the Clinch River, the primary site was the Clinch River Breeder Reactor site, which was never built That was our, that was a facility that Congress withdrew funding from

Q And was that the same as –

THE COURT. What was to be built there exactly?

THE WITNESS. It's a breeder reactor,

Page 2120

essentially a reactor that can develop its own fuel in its own, in its own process, so that gets into somewhat of a technical area, but it was a state of the art nuclear facility, generating facility that Congress was interested in and then stopped funding, and since that site was fairly well-understood and excavated, we felt that would be a good site in order to build an MRS facility.

BY MR DAMELIN

Q Is that site part of or related to the Oak Ridge facility?

A It's right next to the Oak Ridge facility, Oak Ridge Reservation, in Oak Ridge, Tennessee

Q Now, what type of facility did DOE propose to build in this MRS submission?

A. That's what I more or less went through It was a central packaging facility that would take the fuel and then ship it to the repository site in a disposal-ready container.

Q Now, when this proposal was submitted to Congress in March 1987, what type of schedule did DOE propose for when the MRS was to become operational as part of the waste management system?

A. Well, our expectation was that the facility, if it was approved by Congress in an

Page 2121

expeditious manner, would be operating and available in the 1998 time frame

Q Now, once this proposal was actually submitted to Congress in March of 1987, what happened in response to the submission?

A Not very much. To my recollection, there were no Congressional hearings held on it The proposal was submitted to Congress, and then Congress essentially directed the Department, through the 1987 Amendments Act, as to what to do next with MRS.

Q So the 1987 Amendments Act followed the submission of this proposal?

A That's correct.

Q And what was the impact of the 1987 amendment to the Nuclear Waste Policy Act on DOE's, I guess, plan for an MRS facility?

A Well, the good news was that Congress authorized the facility. The not so good news was that they nullified the site and essentially put restrictions on how the facility would be deployed in the future, and those restrictions are that it could not be sited until we had a site for a repository, it could not be built until we had a construction authorization for a repository, and it also could not have more than 10,000 metric tons until the

Page 2122

repository was operational, and 15,000 metric tons in total
Q. And so when you say, "nullified," nullified this proposal, Plaintiff's Exhibit 113?
A Right And it also directed that the, that an MRS could not be in the same state as the repository, or within 50 miles of the repository.
Q. And did the, did the 1987 amendment address the procedures for potentially siting an MRS that was authorized by the amendments?
A Yes, it allowed the Department to, if it chose, to undertake a survey of sites, based on its own criteria, and then essentially follow the same process that a repository would be sited, where there would be a recommendation of the site, there was an opportunity for a notice of disapproval by the governor of the state, and then potential for a Congressional override with a majority vote in both houses, similar to what happened with the siting of Yucca Mountain, the Yucca Mountain repository in 2002.
Q. Did the 1987 amendment address any other options for siting of either MRS or a repository?
A Yes, it did, it created the office of the Nuclear Waste Negotiator, which was a separate entity

Page 2123

in the executive branch whose duty was to go out and try to find willing hosts It may be a state or an Indian tribe that would be, that either an MRS or a repository would be acceptable to, so it gave two approaches to the siting of these facilities One on a voluntary basis; the other on the survey basis that the Department would conduct, as I mentioned earlier.
Q. Now, the office of Nuclear Waste Negotiator, you also mentioned there was a DOE, I guess, procedure or potential siting of an MRS Did DOE express a preference for either one of these options?
A Basically, and this came down from the Secretary at the time, Secretary Watkins, given our success in the state of Tennessee, I think his view was that it would best – that the Department would put our efforts behind the Nuclear Waste Negotiator and support his efforts to the greatest extent possible, in the hope that he could find a willing host for the facility
Q And how, finding a host, can you explain how the amendments addressed that type of process that the Nuclear Waste Negotiator could potentially undertake to site a facility?
A The Negotiator was empowered to negotiate

Page 2124

an agreement with the host entity, the host state, or Indian tribe, and then that agreement would have to come to Congress for approval, and assuming that Congress approved that agreement, there would also be a siting declaration in that, in that approval by Congress
Q If I can direct your attention to, it should be the final exhibit in that binder, marked as PX-169
A Yes
Q. Do you see that document, sir?
A. Yes, I do
Q. And what is the document marked PX-169?
A. This was the reassessment report that Secretary Watkins, James Watkins, directed the program to develop under his guidance, in terms of how we were going to proceed with the program, based on his analysis of it.
Q. Now, if I can refer you, and there are some numbered pages in small letters, and then it goes to the numbered pages, and it's going to be numbered page 14 at the bottom, the Bates number is DB0001465, and it's going to be the second full paragraph from the top.
A Okay

Page 2125

Q. It reads, "When the Nuclear Waste Negotiator is appointed, the DOE is prepared to support initiatives developed by the Negotiator that could expedite issuance of the environmental permits necessary to gain access to the Yucca Mountain candidate site The Negotiator is to seek to enter into negotiations on behalf of the United States with the governor of any state in which a potential site is located or the governing body of any Indian tribe on whose reservation a potential site is located "
A couple questions, Mr Kouts, you had referenced earlier that there were three sites prior to the 1987 amendments that were being considered for repositories What does this paragraph mean in reference to the "Yucca Mountain candidate site"? Had anything changed?
A No, it had not I think this was just another opportunity, if you will, if we could find a willing host for a repository, that that would be something that the Department would consider, but the Department was focusing its repository efforts on Yucca Mountain
Q Let me ask this question, did the 1987 amendments affect the sites that DOE could consider for a repository?

Page 2126

A It more or less nullified the siting in Tennessee, so it effectively removed that from the table Other than that, it didn't give any further direction on where an MRS would be located In the expectation that the Negotiator could find a state, it could be any other state except Tennessee and Nevada

Q Let me – I might have asked an imprecise question You had mentioned a couple other sites, I think, including a salt site?

A. Right, those were repository sites

Q Okay. What, what effect, if any –

A Oh

Q – did the 1987 amendments have on the repository sites that were being considered in addition to Yucca Mountain?

A It effectively directed the Department to terminate the site characterization efforts in the state of Washington and the state of Texas, and also, we had a second repository effort underway at that time, it also terminated those programs and told the Department effectively to focus on Yucca Mountain. Now, in relation to the second repository, it did direct us to submit a report to Congress in the 2007, 2010 time frame on the need for a second repository

Page 2127

THE COURT: I'm sure everybody here knows this but me, but who owns Yucca Mountain?

THE WITNESS: It's effectively owned by the federal government. There are three different types of land that it sits on. Part of the site is owned by the Bureau of Land Management, BLM Part of it's owned by the Nevada Test Site. And the other part of the site is owned by the Department of the Air Force It's the Nellis bombing range So it's all federally owned, but it's under different jurisdictions

THE COURT: It's remote?

THE WITNESS: Yes, it's about 100 miles northwest of Las Vegas and extremely remote and very arid.

BY MR. DAMELIN

Q. If I can turn your attention to page 17 of this document, Mr Kouts?

A Sure.

Q In the middle of the page, there is a section marked 4 3, titled, "DOE's Position on the MRS Facility " Now, I neglected to actually ask you, this document, the report to Congress on a reassessment of the OCRWM program, who is submitting this to Congress back in November 1989?

A I believe this was the Secretary's

Page 2128

document We – it was by the Secretary of Energy, as indicated, it's dated November 29th, 1989 It was his report to Congress.

Q Now, in this section, the last sentence of the first paragraph reads, "The DOE also expressed preference for an MRS facility sited through the efforts of the Negotiator, especially if these siting negotiations lead to modified linkages " What does that sentence mean to you, Mr. Kouts?

A Well, obviously, the preference to have a negotiated site with a volunteer state is kind of obvious "Modified linkages" refers to the restrictions in the Act that I mentioned earlier, on how we could deploy the facility I think that the Department's view then and now is that the value of such a facility is very limited with those restrictions in place. So that, basically, we were hopeful that if the Negotiator was going to negotiate a deal, that part of that deal would be that these linkages would be removed, and that we could deploy the facility as quickly as possible.

Q Now, was there any type of – let me ask this, at the time of this report, had there been a Nuclear Waste Negotiator actually appointed?

Page 2129

A I believe it was, it was a few years after the Amendments Act, but the first Negotiator, Mr. Leroy, was appointed, it might have been after this point that he was eventually appointed.

Q. And was there any type of relationship following the 1987 Amendments Act, and I guess the appointment of a Negotiator, between the DOE and the office of Nuclear Waste Negotiator?

A As I mentioned earlier, it was an independent entity from the Department and was his own – he had his own office in the executive branch of government with that specific role, so the Department and the Negotiator were definitely separate. We did, however, support his efforts through administering a grant program for him and also providing technical staff and, whenever he needed it, to go out and talk to people to explain what the Department's concept of an MRS was and to explain, for instance, issues that might be of interest to, to local governments about how much employment was going to be there, how much the facility was going to cost, et cetera, those kinds of issues

Q Now, you had referenced – I'm not sure if

Page 2130

you used the word "grants" or "money " Can you describe what DOE did in reference to either funding or providing financial support to the Negotiator?

A Well, as I mentioned earlier, we administered a grant process for him. The grants were to be issued in phases. A Phase I grant was essentially $100,000 to a local community to study the issue, the feasibility of the issue Phase II, Phase II was cut into two different pieces, a Phase IIA and a Phase IIB

Phase IIA was further feasibility, that was a couple of hundred thousand dollars. And then Phase IIB was a 2 8 million dollar grant, which was to be given to a party that was serious about negotiating, in the expectation that we would have a negotiated agreement with those expenditures of funds

Q Were any of the grants you described actually provided to parties that were engaged with the Nuclear Waste Negotiator?

A. As I remember There were about 14 or 15 requests for Phase I grants, about six of those were issued. Phase IIA grants, which were the $200,000 grants, I think there were eight applications, and we issued five grants along those lines, and there were two applications for the big grants, the 2.8 million

Page 2131

dollars grants, by two Indian tribes, the Goshutes and the Mescalero Apaches. The Goshutes are in Utah –

THE COURT. We've learned a little bit about that

THE WITNESS If you're familiar with the private fuel storage facility, which is a private facility funded by utilities, the Goshutes are the tribe that were interested in that, they were also involved back in the MRS days And the Mescalero Apaches in New Mexico were also interested in having an MRS, and they applied for a grant, but Congress essentially withdrew all funding for these grants prior to the time that they were issued.

BY MR. DAMELIN

Q. And do you, do you know the time period, when you're referencing these grants, approximately what period of time we're talking about?

A It was the '93 to '94 time frame, as I remember, that the grants were issued

Q And you had just mentioned that, I guess, Congress had discontinued or cut off funding for the later grants Was that in that same time frame?

A Yes, and this gets into the political world, but one of the tribes was in a state of a very

Page 2132

influential Senator who was not happy with the concept.

THE COURT· This is Bingaman?

THE WITNESS It might have been Bingaman or Senator Domenici at the time, from the state of New Mexico

BY MR DAMELIN:

Q Now. The office of Nuclear Waste Negotiator – let me ask this question, what was the outcome of the Nuclear Waste Negotiator's efforts to negotiate a site for a MRS facility?

A He was not successful.

Q. And when did that office or the Negotiator's efforts end?

A The Act Amendments basically formed the office for a period of seven years, and after those seven years were up, basically, the office was terminated.

Q. Now, during the 1990s, and in addition to the MRS we've spoken about, were there, were there any other efforts to provide interim storage for commercial spent nuclear fuel, apart from the permanent repository?

A What you'll find in the mid-'90 time frame is moving away from the words and the acronym MRS

Page 2133

because that seemed to carry a lot of bad baggage, and what you seem to see is the emergence of the term "interim storage " So in Congress, there were a variety of bills that were introduced, and at some point, they had hearings on them, where Congress was interested in trying to identify a site and basically authorize the Department to undertake the building of an interim storage facility, which is essentially just a storage facility a little different than the integrated MRS we were looking at back in the mid-'80s

But a storage facility in the sense of trying to get a facility available in the near term, to take materials away from utility sites

Q. And during, if we can just be specific as to the time frame, when you had referenced these interim storage facilities were being considered or bounced around in Congress, when was that?

A They started in – I don't remember exactly because there were various bills on the House and the Senate side I believe in the '93, '94 time frame, there were various pieces of legislation that were introduced, and they carried up through a bill that was eventually actually passed in the '99 to 2000 time frame, which was then vetoed by then President