**Southern Nuclear Operating Co. v. U.S. No. 98-614C October 26, 2005**

**Heritage Reporting Corporation**

**Page 1731 to Page 1933**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1731

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98-614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Wednesday, October 26, 2005

VOLUME 8

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

Page 1732

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
M. STANFORD BLANTON, ESQ.
K. C. HAIRSTON, ESQ
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417
and
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, Northwest
Washington, DC 20004

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ
MARIAN SULLIVAN, ESQ
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, DC 20530

** Index appears at end of transcript **

Page 1733

P R O C E E D I N G S

JUDGE MEROW: Please be seated. Mr. Ekman, do you have a witness today, or --

MR. EKMAN: We do. We have a couple witnesses, Your Honor, but before we begin our case, or actually before we call our witnesses, at the start of our case there are a few administrative items to take care of.

First of all, there's still the issue of the government exhibits to which there are no objections. I have a list here which I provided the Plaintiffs last week. With the exception of DX329, which is still on this list, but I've crossed off the list which we're withdrawing, I would ask that to the extent these exhibits have not already been admitted -- and some of them have been. For instance, there's some administrative record documents in here that were admitted -- that the government's exhibits to which there are no objections by Plaintiffs be admitted.

JUDGE MEROW: Yes.

MR. BLANTON: No objection from us on that, Your Honor.

JUDGE MEROW: Okay, the exhibits where

Page 1734

there are no objections are admitted in evidence and as according to the list provided by the -- Mr. Ekman.

(DX Exhibits were received in evidence and the list filed electronically.)

MR. EKMAN: Should I provide this list to the court reporter? Or to Ms. Strandell?

JUDGE MEROW: Yes, they should -- we should get it for the record. So we don't have a list of those, do we?

MR. EKMAN: No. Did I -- I don't know if I provided these to Ms. Strandell or not.

JUDGE MEROW: We probably ought to file it.

MR. EKMAN: Okay. Do you want to file it electronically?

JUDGE MEROW: Yeah, you could just file the list. That would be fine.

MR. EKMAN: Sure, we can do that. Absolutely.

THE CLERK: Judge, do you want to have Southern's list electronically filed? Because I have a hard copy of Plaintiff's prior list.

JUDGE MEROW: If --

MR. BLANTON: I'm assuming we could file that electronically, Your Honor.

Page 1775

Plaintiff's Exhibit 23 – 823. No, sorry. Yeah, 823. I skipped ahead. Can you identify this document for the record?

A Yes. This is an acceptance priority ranking and annual capacity report that was issued by the department in March of 1995.

Q Can I direct your attention to page 4 of this document?

A Yes.

Q Bring up that table there in the middle of the page. Mr. Kouts, what is the basis for the rates set forth on that table?

A They were essentially – the assumption was we would begin operation at an MRS facility. At this time we're kind of hedging our bets it might not be in 1998. As a result, you're seeing year one, year two, year three, but we're still holding on to the 10,000-ton maximum limitation that an MRS would have.

Q Can we go back to page 3 and the paragraph that ends on that page and continues to the next page? Could you read the portion of that paragraph that's been highlighted?

A Okay. "In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored

Page 1776

retrievable storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years."

Q Thank you. Why were the years – going back to the table there on page 4, why were the years not identified in this table?

A Again, because the department was, as indicated in that previous paragraph I read, was uncertain as to when we could deploy the facility. We were not encountering great success with interest in Congress for reducing the linkages or for identifying a site.

Q And what was the uncertainty with regard to the program performance at that time?

A That the time that we had to implement an MRS and have it available, the time period had shrunk to such a small amount that it was not feasible for us to anticipate that it could be operational in 1998.

Q Mr. Kouts, I've handed you, I believe, an excerpt of Plaintiff's Exhibit 23. Can we put that up on the screen? Could you identify this document for the record?

Page 1777

A This is an analysis of the total system life cycle cost of the Civilian Radioactive Waste Management Program. We also refer to the acronym as TSLCC. It was issued in September of 1995.

Q Can I direct your attention to page 2 of this document? And can I ask you to read that paragraph into the record, please?

A "Our national strategy maintains a clear focus on the long-term objective of waste disposal in a geologic repository. The immediate challenge is to provide for the timely acceptance and safe interim storage of spent nuclear fuel from the nation's commercial reactors. In order to accomplish these objectives, the program was restructured in 1994. The program is organized with two," quote-unquote, "business centers, the Yucca Mountain site characterization project and the waste acceptance, storage and transportation, WAST, project, along with a management center that provides integration and management support to the director of OCRWM and the projects.

"Program and project activities were reviewed and focused on near-term interim milestones leading to planned acceptance and in placement of SNF in a geologic repository beginning in 2010. The

Page 1778

program approach is described in detail in the Civilian Radioactive Waste Management plan, values 1 through 3, published on December 19, 1994. Reference is 1-3."

Q Mr. Kouts, at the time this document was issued in September of 1995, what were DOE's plans for performance?

A Primarily, to develop a geologic repository.

Q And when was the repository projected to begin operation?

A In 2010.

Q And can I direct your attention to page 8, table 1-2 on that page? What does this table indicate as to DOE's plans for performance?

A That we were – that our initial waste acceptance would begin in 2010 with the operation of the first repository.

Q Okay. Mr. Kouts, in your current position, do you have responsibility for preparing total system life cycle cost reports and fee adequacy studies?

A Yes, I do.

Q What is a TSLCC?

A It's essentially an analysis of the total

Page 1779

system costs of the program, the system life cycle costs of the program. That's done to support what we call a fee adequacy assessment, which is required by the Nuclear Waste Policy Act. In the act, the secretary is asked to review the adequacy of the fee that's provided by utilities into the Nuclear Waste Fund. As established by the act, that's 1 mill per kilowatt hour of energy produced and sold.

Essentially, what the TSLCC analysis does is in the year of dollars that it's developed, in this case it would be probably 1994 dollars, you look at the course of the program and the spending of the program up to its completion. Then the fee adequacy analysis takes that spending stream, if you will, and looks at the corpus of the Nuclear Waste Fund, the expected revenues, projections of economic growth in the future in terms of how the fund would grow with interest and makes an assessment as to whether or not the mill per kilowatt hour is still adequate, is more than adequate or less than adequate to meet the needs of the program.

By law, by the statute, the secretary is responsible for reporting to Congress if the need for the – there needs to be a change in the fee either up or down.

Page 1780

Q And do these reports contain assumptions regarding DOE's plans for performance?

A Yes, they do.

Q And why is that?

A Essentially, we have to be able to project how the program is going to be deployed, so we essentially look at the program baseline, whatever it is in that one year, and cost out the program based on the anticipated baseline that we have in place.

Q And what is the basis for the assumptions in any given TSLCC?

A Again, it's essentially the technical baseline that exists at the time that that analysis is undertaken.

Q Are there assumptions made regarding the acceptance rate in the TSLCC and fee adequacy studies?

A Yes, they are.

Q Why are those assumptions made?

A In order again, as I mentioned earlier, to look at how the program would spend its money over the years, so it's – and in order to lay that out, you have to understand what the program is accepting and how much waste the program is processing, etc., etc., into the future. And taking this out to the end of the program, whatever monitoring period we have for

Page 1781

the repository, we have to have enough money to make sure that we can pay for that monitoring period, etc., so that the analysis basically has to look at the entire life of the program from its expenditures in the past through where we are at the present when we deploy facilities, when we operate and when we actually shut the repository down at some time in the future.

And this is for both – I hasten to add this is for all the waste that's – that comes into the system, not just for the first repository. So however we would process all the projected waste materials, that also has to be taken into account in the total system life cycle cost analysis.

Q And the acceptance rates that are assumed in a TSLCC, how were those chosen?

A They are essentially taken from the program technical baseline in that specific year.

Q Plaintiff's Exhibit 17. Mr. Kouts, I've handed you an excerpt of Plaintiff's Exhibit 17. Can you identify this document for the record?

A Yes. This is an analysis of the total system life cycle cost for the program that was published in April 1985.

Q Could I direct your attention to page 2-3

Page 1782

of that document. And, Dawn, would you bring up paragraphs number 4 through number 6? Actually, through 7. Sorry. No, all the way.

Mr. Kouts, what were the program assumptions at the time this document was prepared in 1985?

A Well, from the highlighted area of that page, you can see that we have two repositories that – the first repository would have 70,000 metric tons; the second, 60,300, which matches up with the projected amount of spent fuel that was being projected at that time.

Item number 6 is the receipt rate at the first repository and the second repository under that and the startup dates for both facilities, which was in 1998 for the first repository and 2006 for the second repository.

Q And what acceptance rates were assumed for the purposes of this cost analysis?

A From number 6, the first repository receives 400 metric tons per year for the first three year, 900 metric tons per year for the fourth year, 1800 metric tons for the fifth year and 3,000 metric tons every year thereafter to closure.

And the second repository starts at 1800

Page 1783

metric tons per year for the first five years and then proceeds at a rate of 3,000 metric tons per year thereafter to closure.

Q Direct your attention to page –

JUDGE MEROW: Is this a program based on the assumption that it's just going to apply to the existing reactors at that period of time? In other words, do you stop generating electrical power after this waste is stored or what?

THE WITNESS: I'd have to go back and look specifically at this report, but at that period in time, we were still projecting that new reactors would be built and basically, we would use what we called Energy Information Administration range of nuclear growth, if you will. Then we would base our spent fuel projections on whether or not – on how many new reactors would be built.

At this point in time, we weren't looking at reactor life extensions. We were still thinking, at least the EIA, Energy Information Administration, was thinking there would be new reactors that would still be built, which of course hasn't happened up to the present day. So we've adjusted our estimates, if you will, of spent fuel generation but – from no new starts, but then we had to look – presently, we look

Page 1784

at how many reactors actually have extended operation, and many of them have gone in for that, so they want to operate their reactors for another 20 years or so.

JUDGE MEROW: If new reactors are now built in the future, would they be under the same program or –

THE WITNESS: Yes, they would, and depending on the company, we would have contracts with those individuals also. They would probably be built by the existing firm, so we'd have to look, but they'd probably be covered by the same standard contract that we have now with some adjustments.

BY MS. SULLIVAN:

Q Mr. Kouts, may I direct your attention to page 1-6 of this document, the table on that page. What were the estimated total costs of the program at the time this TSLCC was prepared?

A You know, at the time that this program was being prepared, it had – it ranged from roughly 24 or 23.8 to 29.7, so roughly between 24 and $30 billion in 1984 dollars.

Q And that's the last number entered in the far lower right-hand corner of that table?

A Correct.

Q Mr. Kouts, I've handed you an excerpt of

Page 1785

Defendant's Exhibit 330. Put that up on the screen. Can you identify this document for the record, please?

A Yes. This is a preliminary estimate of the total system cost of a restructured program. This was a – an addendum that was provided to external parties that basically showed how the program changed based on the redirection of the Secretary of Energy in the redirection report that we talked about earlier.

Q Let me direct your attention to table A-1, page A-1 of this document.

A Okay.

Q Mr. Kouts, what were the program assumptions or the DOE's planning assumptions at the time this document was prepared?

A For this, for a single repository system, number one, it indicates that since we didn't have a second repository, we were focusing on one repository that would essentially take all the fuel.

And it basically has an MRS facility available in 1998 and adheres to the statutory restrictions laid out in the Nuclear Waste Policy Act amendment so that it does not exceed 10,000 metric tons, capacity of MRS does not exceed 10,000 metric tons until the repository is operational in 2010.

Q And what acceptance rates were assumed in

Page 1786

the preparation of this document?

A This would have been the current baseline of the program, and again, it would accept spent fuel at 1998 at 400 metric tons for two years, 900 metric tons up until the year 2010.

Q And I direct your attention to page 4 of this document. Bring that table forward. And what were the estimated total costs of the program at the time this document was prepared in 1990?

A Okay. This – there are three cases given in this table. The first case, the first column indicates that we have a single repository that disposes of the entire quantity of waste and in that case, the total system cost is roughly about 25 and a half billion dollars.

For a two-repository case with no new orders, again, previous case was no new orders, no new reactor orders, we'd have a total of about $34 billion.

And in an upper reference case, which has some growth in the nuclear power industry with two repositories, you'd have basically about a 34-and-a-half-billion-dollar cost of the program.

Q I'd like to go back now to Plaintiff's Exhibit 23, which we've talked about already, but I'd

Page 1787

like to direct your attention to page 8. And the table on page 8, what does that show with regard to DOE's plan for performance at the time this document was issued?

A At the time that document was issued, we had essentially made the assumption that we were not going to have an MRS facility and that our first receipt would be in the 2010 time frame at a repository.

Q Okay. And what were the acceptance rate assumptions at the time this document was prepared?

A In 2010, 300 metric tons; 2011, 600; 2012, 1200; 2013 and 2014 until near closure, roughly 3,000 metric tons.

Q Can we go to page 3 of this document, please, table 1-1. Mr. Kouts, what were the estimated total costs of the program at the time this document was prepared?

A According to this chart, it was $33 billion.

Q I'd like to ask Dawn to put up the three cost tables from the three documents that we just reviewed from Plaintiff's Exhibit 13, Defendant's Exhibit 330 and Plaintiff's Exhibit 23.

MS. SULLIVAN: Your Honor, while she puts

Page 1788

this together, could we take a ten-minute break?

JUDGE MEROW: Sure.

MS. SULLIVAN: I don't have many more questions, but rather than us sit here and watch her put these tables together, can we take a break?

JUDGE MEROW: Return at half past.

MS. SULLIVAN: Very good. Thank you.

(A recess was taken from 11:30 AM through 11:30 AM)

JUDGE MEROW: Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor. I believe we've now worked or magic with the electronic documents.

BY MS. SULLIVAN:

Q Mr. Kouts, I've had put on the screen together the three cost tables that we had just looked at in those three documents, Plaintiff's Exhibit 17, table 1-1; Defendant's Exhibit 330, table 1-1; and Plaintiff's Exhibit 23, table 1-1. Mr. Kouts, could you explain to the Court whether the costs of the program changed between these documents based upon the different program assumptions that we have seen?

A Well, yes. The – if you look back at the January 1998 analysis, you see you're in a range

Page 1789

between 24 and $30 billion. And that's basically dependent on where the repository is from the lower cost to the upper cost repository. One of the difficulties in comparing these charts, as you can tell with the dollars, that they're done in different year dollars. 1984 dollars, you've got 1988 dollars and 1994 dollars, so the costs of the program are going to go up as you go into the future when you rewicker the dollars to whatever year you're doing the analysis, because the assumption of the analysis is that all the money is spent in that year, so all the costing is done based on that, the costs of the program, if you expended it all in that year. So between these estimates, you're not seeing a wide variation in the overall cost of the program, given the different scenarios being run and given the variability in the dollars that are being considered.

Q And based upon the different cost tables that we have here, what is the effect of different acceptance rate assumptions on the cost of the program?

A They have a fairly minor effect. I didn't program these analyses or they weren't done under my direction, but certainly the ones that we do now,

Page 1790

roughly two-thirds of the cost of program are fixed costs and roughly a third are operational costs. And when you look at an analysis of when the dollars are spent and so forth, it's actually, from an adequacy of the funds standpoint, it's better to spend dollars in the future than it is to spend dollars in the present because future dollars are worth less than present dollars. So to the extent that you operate slower and push your operations off into the future, the costs – the adequacy of the fund is actually better and you have more confidence in the adequacy of the fund. When you spend dollars sooner and faster, basically, the adequacy of the fund is lesser. So what these tables indicate to me, basically, is that the costs of the program haven't migrated very much depending on the assumptions, and the variability of acceptance rates really has a relatively minor effect on the overall cost of the program.

Q And, Mr. Kouts, did the fee that utilities have paid change as a result of these analyses over time?

A No, it did not.

Q Mr. Kouts, I'd like to go – let's go back

Page 1791

to Plaintiff's Exhibit 23. Dawn? And could we go to page 8 of that document?
Now, Mr. Kouts, at the time this document was issued in September 1995, DOE assumed operation of repository in 2010, as you previously testified. But are you familiar with other efforts that would have still allowed DOE to perform in 1998?
A Yes. There were still a variety of bills that were being considered in Congress that would have given the department interim storage authority and would have removed the linkages that existed between the MRS and the repository.
In fact, as I mentioned when I went through my history in the program, around this time frame, I was actually working on a topical safety analysis report that would have expedited the licensing of an interim storage facility, if you will, should Congress have given us the technical direction in order to proceed. So we were still expending resources on developing technical information that would have allowed us to implement new legislative direction from Congress if it was received.
Q Can I direct you back to Plaintiff's Exhibit 823? And pages 3 and 4 of that document, that paragraph that we highlighted.

Page 1792

A Yes.
Q At the time this document was issued, Plaintiff's Exhibit 823 in March of 1995, what was the status of DOE's program?
A Status of the program at that time is that we were still hopeful, I believe, that we would get some kind of legislative relief and get the opportunity to deploy a storage facility earlier.
Our – as this indicates, our perspective of our ability to do it by 1998 was such that there was more uncertainty being added to it, but as indicated here, we were still hopeful that it was going to happen in the near future.
If I could also correct something that I might have said earlier, if I remember, the negotiator – the negotiator's office went out of business in the 1994 time frame, so – and I think where I got confused was essentially that David Leroy, who was the initial negotiator, left at the beginning of the Clinton administration and then there was another gentleman that was appointed at that time, and he carried out until the end of the office, which I believe ended in 1994.
So just prior to this, I believe was toward the end of 1994, the negotiator had just gone

Page 1793

out of business. There was still some hope that there were some Indian tribes that were interested, and there were some discussions about whether or not an interim storage site could be identified in one of those sites that was still interested or Congress could pick another site.
So there was still possibilities and the department was still hopeful, although we admit here, I think, that there are uncertainties and 1998 was going to be a challenge, so therefore, we were putting the acceptance schedule in terms of year one, year two.
Q Thank you.
I'd like to change topics. Can we go to Defendant's Exhibit 332, please? Mr. Kouts, could you identify the chart that is Defendant's Exhibit 332, please?
A Yes. This is a summary history of the appropriations history, requested funds for the program versus appropriated funds for the program since its inception in 1983 continuing through this last fiscal year.
Q Did you direct that this chart be prepared?
A Yes, I did.

Page 1794

Q And what information does this chart convey regarding DOE's funding since the inception of the program?
A Well, first of all, it indicates that we did not always receive what we had requested of Congress, and there were certain years that had substantial impact on the program.
If you look back at 1987, basically, Congress took away a lot of our funds because they redirected the program in the sense of only having one repository site to characterize instead of three.
Another area that – and every year virtually you see we get less than we typically ask for. Probably one of the biggest dislocations was in 1996 where, although it shows we received $400 million, we actually received $315 million because 85 million of the appropriated 400 million was withheld and was not to be provided to the department unless interim storage legislation was passed by the Congress.
So this was another indication as late as 1996 that Congress was still indicating an interest in trying to pass interim storage legislation and we could not use those funds, nor were they ever released because that legislation was never passed.