# Attachment I

[3339:] - [3339:22] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3339

3339

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

-----------------------------------x

**SYSTEM FUELS, INC., and ENTERGY :**
**ARKANSAS, INC., :**
**Plaintiffs, :NO. 03-2623C**
**vs. :**
**THE UNITED STATES, :**
**Defendant. :**

-----------------------------------x

**Courtroom 6**
**National Courts Building**
**717 Madison Place NW**
**Washington, D.C.**

**Thursday, April 12, 2007**

**The parties met, pursuant to the notice of the Judge at 9:03 a.m.**

**BEFORE THE HONORABLE CHARLES LETTOW**

[3371:10] - [3373:20] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3371

**Q. Mr. Kouts, could you identify Defendant's Exhibit 57 -- or the excerpt from which, the document from which this excerpt is taken?**

**A. Yes, I can. This is the, I think, only finalized program mission plan amendment. If you remember, the mission plan was required by the Act to provide a road map in terms of how we were going to implement the program, and at this point in time, it was felt that since there were some major changes to the program, that we needed to provide an amendment to the mission plan. And this document has essentially that amendment, along with comments on the draft amendment that was issued prior to this and the Department's responses to those**

page 3372

**comments.**

**Q. Were you involved in the preparation of this document?**

**A. I believe I was involved in reviewing it. I might have been involved in responding to comments related to MRS issues.**

**Q. And what was your position within the program at the time this document was issued?**

**A. I was still working as part of the MRS team.**

**MS. SULLIVAN: Your Honor, at this time, we would move for admission of Defendant's Exhibit 57.**

**MR. SILBERG: No objection.**

**THE COURT: Admitted.**

**(Defendant Exhibit Number DX-57 was received in evidence.)**

**BY MS. SULLIVAN:**

**Q. Could I direct your attention to page six of this document, the paragraph that begins, "as already mentioned," if you could read that paragraph into the record, please?**

**A. "As already mentioned, several important milestones have been achieved. However, the experience gained in achieving**

page 3373
**those milestones and advances in the technical planning of the program, coupled with the decrease in the budget for fiscal 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule, see table one.**
**The new schedule shows a five-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility."**
**Q. What was the state of DOE's planning at the time this document was issued?**
**A. Essentially, that the MRS was going to be our only vehicle to receive materials in the 1998 timeframe and that that had to be linked to the repository's beginning operation in 2003.**

[3411:8] - [3412:21] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3411
**Q. Mr. Kouts, could you identify Plaintiff's Exhibit 222 for the record?**
**A. Yes, this was an acceptance priority ranking and annual capacity report document that was issued in March of 1995.**
**Q. Could I direct your attention to page four of this document? And there's a table of rates set forth on that page. What was the basis for the rates set forth on that page?**
**A. The basis essentially, was essentially the same basis that existed for the 1991 report, except for one difference, is that we did not have any years associated with the initiation of operation. And the reason for that is that, at this point in time, the chances of having an MRS available in the 1998 timeframe without very specific directive legislation were diminishing rapidly.**
page 3412
**Q. And when you say, "diminishing rapidly, "what do you mean?**
**A. They were coming to the point where the Department could not implement it by the 1998 timeframe.**
**Q. And why was that?**
**A. Just the amount of time to do everything we needed to do, even to construct the facility was, again, being very challenged. The legislation that you would need in order to have the facility available in the 1998 timeframe essentially would have had to by-pass NEPA, would have had to by-pass NRC licensing, and even then, at that point, it might have been challenging still to get the facility operational by that time.**
**So that's not to say that, had we received very directed legislation and appropriations to do that, we couldn't have done it, but it was, it was becoming very challenging to do.**

[3435:18] - [3444:6] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3435
**Q. Mr. Kouts, you said DOE made every effort it reasonably could have to make a facility available in 1998. Did the**

**administration of which DOE is a part make every effort to make a facility available in 1998?**
**A. That varied on the administration.**
**Q. Isn't it true that after 1995, when**
page 3436
**you were working on the design for the centralized interim storage facility and there was legislation pending, that you discussed that President Clinton said he would veto that legislation?**
**A. Yes, he did. My comments were -- if I could add, if you would allow me?**
**Q. Certainly?**
**A. I was referring to the Department, the Department's part of the administration. However, the President obviously makes his own decisions and makes his own decision on the budget, so when I speak for the Department, certainly, within the program, we were doing everything we could in order to bring it about.**
**Q. When you had on the stand the -- if we could have Elmo? DX-279, you said that there were particularly large differences between the requested and the appropriated funds in '87, '88, '89, and '90?**
**A. That's correct.**
**Q. The appropriation, the request in 1987, did that include any money for a second repository program?**
**A. I would have to go back and look at**
page 3437
**the individual budget request. My sense is, for '87, that it probably did, but I have to review the individual budget submission on that.**
**Q. And do you know how much that was?**
**A. No, I do not.**
**Q. Okay. And I believe you also testified that the second repository program at some point was taken off the table either by DOE or by Congress, is that correct?**
**A. That's correct.**
**Q. And once that was taken off the table, that money would not have served a useful function had it been appropriate, isn't that right?**
**A. That's correct.**
**Q. Now, in the 1987, '88 timeframe, DOE was also characterizing several sites for the first repository, isn't that correct?**
**A. That's correct.**
**Q. And was money in the request to characterize all three sites?**
**A. During that timeframe, yes, it was.**
**Q. Okay. And Congress took two of those sites off the table, didn't it?**
page 3438
**A. Yes, they did.**
**Q. So it wouldn't have made sense to appropriate money to characterize sites that the DOE could no longer characterize, isn't that correct?**
**A. That's true, except if I could add, when you terminate sites, you also have to pay the costs of terminating those programs which, if you have employees there, you have to pay severance costs, you have to essentially mothball the facilities or do something with the property of those facilities.**
**So even though those efforts were terminated, there were still residual costs**

**that the program had to incur in order to terminate those facilities, as well as the repository effort, so there were still expenditures that were allocated to those efforts for probably a year or two after that, in order to just close down those programs.**
**Q. And what's the magnitude of those expenditures?**
**A. In the case of the salt project, it was fairly significant, since there were a variety of people who had relocated to Texas,**
page 3439
**and, again, there were severance costs associated with a fairly large contingent of our program. So I don't have those specific numbers, but it wasn't -- it was in the tens, you know, multiple tens of millions of dollars in order to do that.**
**Q. And what were the costs that had been requested for the characterization of that site?**
**A. That's hard for me to comment on without looking at the budget submission, but it was probably in the hundreds of millions of dollars for the three sites.**
**Q. So the characterization costs, the ones that were no longer possible to spend, were significantly greater than your shutdown cost, is that correct?**
**A. That's correct.**
**Q. And that would have been true at the other sites as well?**
**A. Yes.**
**Q. But you haven't done the analysis to show how much money was really not appropriated because of programs that DOE could no longer implement, have you?**
page 3440
**A. I have not done that analysis, no.**
**Q. How much in these years was appropriated for the MRS program which was not -- how much was requested for the MRS program which was not appropriated?**
**A. I'd have to go back and look at the budget submission. It was probably in the tens of millions of dollars.**
**Q. But you haven't done that analysis?**
**A. I don't have that information with me at this time, no.**
**Q. You haven't done the analysis whether you have the information with you or not?**
**A. I have not analyzed that, no.**
**Q. And how much money was requested for the activities associated with the Nuclear Waste Negotiator during the period of time when that was alive?**
**A. That would have been incorporated in the MRS request. The funding for the grant program and for design studies and so forth would be incorporated in the MRS request that you asked me about earlier.**
**Q. But you don't know how much Nuclear Waste Negotiator related funds were not**
page 3441
**appropriated, do you?**
**A. I can't answer that at this time, no.**
**Q. Okay. You also said that DOE had made every effort that it could to make a facility available by 1998. DOE never initiated, after the 1987 amendments, its own siting studies, did it?**
**A. No, it did not.**

**Q. Was that something that DOE could reasonably have done, if it chose to do so?**
**A. Well, it would not have made sense to initiate that effort, based on the limitations of the MRS, as identified in the Nuclear Waste Policy Act amendments.**
**Q. But those were the same limitations that affected the negotiator, weren't they?**
**A. No, they were not.**
**Q. The linkages didn't apply to the negotiator?**
**A. I wasn't referring to the linkages, the question I believe you asked me had to do with siting, and specifically, under the Act, the Department could not identify a site for an MRS under its siting authority until the repository site was approved, the Office of the**
page 3442
**Nuclear Waste Negotiator could work -- wasn't limited to doing siting under those requirements, so he was not part of the Department.**
**As a result, he could go out and negotiate with sites and the expectation was that, assuming he found a willing host site, he would provide that agreement to the Congress for their approval, which would have had stipulations in it to the extent that would have addressed the schedule linkages identified in the Act. So the Negotiator wasn't constrained in the same manner that the Department was at that time.**
**Q. Well, the Department wasn't constrained from going out and evaluating potential sites, was it? It just couldn't choose a site?**
**A. That's correct, but if you look at the timeframe, Mr. Silberg, we didn't recommend the site for Yucca Mountain until -- I believe the Secretary did that on -- what was it, February 13th or 14th of 2001, so to initiate a siting process in the late '90s or the late '80s, if you will, with the eventual selection or the**
page 3443
**recommendation of the site 10 to 12 years away, didn't make a lot of sense to the Department, and as a result, that's why we didn't implement that.**
**Q. But you assumed in the 1991 ACR and other places that Congress would change the law to allow an MRS to go forward. Why didn't you make that same assumption with respect to a DOE siting process?**
**A. Well, if you remember the 1989 reassessment report of the Secretary, essentially, the policy of the Department was we were going to work through the Nuclear Waste Negotiator to obtain a site, and that was the expectation in the 1991 APR/ACR, and that was the strategy that the Department was embarking on at that time.**
**We were focusing our efforts on supporting the Negotiator to provide a site to us, so we could make 1998 operations. We were not embarking on our own siting activities.**
**Q. So you determined -- or the Department determined that DOE siting efforts would not be reasonable?**
**A. The Secretary, in his reassessment**
page 3444
**report, basically made the determination that the Department did not have a lot of success in**

its MRS sitings and therefore wanted to -- he directed that the Department not involve itself in that and rely on the third-party efforts of the Nuclear Waste Negotiator.

[3448:1] - [3448:16] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3448
Q. Now, did you ever do a TSLCC type analysis that included the MRS?
A. Did the program do it?
Q. Yes.
A. Or did I personally do it?
Q. Did the program do it?
A. Yes, the program did do that.
Q. And when was that done?
A. That would have been done when an MRS was an active component of the system, which would have been in the late '80s, '90s, up until the point that, I believe, in 1985, where we essentially removed the MRS, since it didn't appear it was going to be implemented.
Q. You mean 1995?
A. 1995, I'm sorry, that's correct.

[3449:21] - [3450:23] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3449
Q. Do you remember testifying about the 1995 TSLCC report in prior cases, Mr. Kouts?
A. I believe I remember testifying about a preliminary TSLCC report that was issued in late 1995, yes.
page 3450
Q. And it's your understanding that the late 1995 TSLCC used repository acceptance rates and not MRS acceptance rates?
A. You know, I'd have to go back and look at the report. If we had made a decision at that time that the MRS was not going to be available, then we would have focused primarily on the repository only acceptance rate.
Q. But at that time, you were still relying, were you not, on the 1995 ACR report, which assumed a repository?
A. I believe that was issued earlier in the year than that preliminary report on total system life cycle costs was issued.
Q. Now, isn't it -- so between the March issuance of the 1995 ACR and the issuance later in the year, you changed the program to delete the MRS?
A. I didn't change the program. The analysts who were doing the total system life cycle cost at that time made a different assumption in terms of their analytical assumption basis.

[3459:13] - [3465:4] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3459
Q. And it's true, is it not, that all of the ACRs state that they are not to be considered contractually binding, isn't that correct?
A. I'd have to go back and look at the individual ACRs and verify that fact, but my perspective is that they probably should not indicate that they are contractually binding.
Q. Well, do they affirmatively indicate they are not contractually binding?

A. Again, I'd have to go and review each of the documents. I'm sure the 2004 did not, and that was the one I was specifically

page 3460

directed -- that I specifically directed the development of.
Q. I'm sorry, that one says it is not contractually binding?
A. That's correct.
Q. Well, let's just look at one or two, and then maybe we can move on. Let's look at the first one, which is 1987, which is Defendant's Exhibit 56. I'm calling your attention to the top of page two, on the fourth line, I guess it's the sixth line, it says, "As specified in the contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the purchasers," is that correct?
A. That's correct.
Q. And you remember that language being in the 1991 ACR?
A. Not specifically, I'll be happy to review it. Actually, I found it for you, Mr. Silberg, it's in the bottom of page one.
Q. Right, so that does appear in the 1991. Do you have any reason to believe that this language doesn't appear in all of them?
A. No.

page 3461

Q. Is there anything in any of the ACRs that say that the delivery commitment schedule is contractually binding?
A. I don't believe so, but I'd have to review the documents to know for sure, to assure myself of that, but my expectation would be that there would be nothing in those documents to indicate that.
Q. And it's also true, is it not, that all the DCSes say that DOE will further define and specify system operating and waste acceptance parameters as the program progresses, do you remember that language in all of the DCSes?
A. Yes.
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Objection, Your Honor, beyond the scope of the direct. We haven't laid any foundation for Mr. Kouts' testimony about this, and also vague.
THE COURT: Well, overruled. The DCSes are part and parcel of the exercise and the natural outgrowth of the ACRs.
MS. SULLIVAN: I don't disagree, Your Honor, and also, my objection is more the

page 3462

reference to generally all the DCSes, rather than --
THE COURT: Oh, that's true.
MS. SULLIVAN: Than providing specifics.
MR. SILBERG: I can go through the one, I was trying to short-circuit the process.
BY MR. SILBERG:
Q. Is it true, Mr. Kouts, that all the DCSes include a statement to the effect that DOE will further define and specify system operating and waste acceptance parameters as the program progresses?
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Same objection, and I'm not clear, is he actually saying that the DCSes

themselves say that?
MR. SILBERG: I'm sorry, the ACRs, if I said DCSes --
THE COURT: Well, now, we're getting confused. I think you might be talking about either the ACRs or the instructions for the DCSes, but not --
MR. SILBERG: In this case, if I said DCS, strike that, I meant to say ACRs. I

page 3463

apologize for the confusion.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Thank you.
THE WITNESS: ACRs, yes.
BY MR. SILBERG:
Q. And is it true that, at least starting in the 1990 ACR, that DOE said it would inform purchasers at the earliest feasible time when it had further defined and specified system operating and waste acceptance parameters?
A. I would have to review the document verify that.
Q. Well, let's take a look at, as an example, the 1991 ACR report, which, what number are we using for that?
THE COURT: PX-168.
BY MR. SILBERG:
Q. PX-168, and ask you to look at page four, second paragraph, the third sentence.
A. The first paragraph, third sentence, which is, starts with, "DOE recognizes that"?
Q. Let me see if I'm in the right -- third paragraph?
A. Third paragraph.
Q. Third sentence. "DOE will further

page 3464

define and specify system operating waste acceptance parameters as the program progresses and inform purchases accordingly at the earliest feasible time"?
A. I see that, yes.
Q. And that same language was in the 1992 ACR, to your knowledge?
A. I would have to review it, and my assumption would be that probably similar language is incorporated into it.
Q. And do you have any reason to doubt that some of the language appears in all the other ACRs?
A. Usually, the documents were fairly consistent among themselves.
Q. Now, in March 1995, DOE issued an ACR that assumed an MRS, is that correct?
A. Yes.
Q. And assumes acceptance at an MRS rate of 900 metric tons per year?
A. And a steady state rate of 900 metric tons per year, yes.
Q. Right. Now, when did DOE inform utilities that the MRS and the waste acceptance parameters of an MRS were no longer operative?

page 3465

A. I don't know the answer to that question.
Q. Did it ever?
A. I don't know the answer.

[3468:17] - [3476:8] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3468

Q. But DOE never undertook any steps since the Negotiator was out of business in

1995, never took, never undertook any steps either to recreate the Negotiator or to undertake its own siting program?
A. We didn't undertake those specific steps, but as I testified earlier, I was involved in my efforts within the program to develop a design for a facility that could be
page 3469
deployed very quickly, assuming that legislation was passed.
So although the Negotiator went away, and that was unsuccessful, and there was Congressional direction also, as you may remember, that basically directed the Department to no longer issue certain grants for the Negotiator, that was done the previous year, but the Department still, as a contingency, it was also developing that topic of safety in its analysis report, and I had personal knowledge of that since I was one of the people in the program that was doing that.
Q. But you weren't looking for a site?
A. No, we were not looking for a site at that time, that's correct.
Q. In September of 1991, it's correct, is it not, that the General Accounting Office issued a study on the MRS facility, are you familiar with that study?
A. I remember the issuance of the study. I don't remember the specifics of it. I'd be happy to review it, if you have it available.
Q. I do, Plaintiff's Exhibit 198. I've handed you a document, GAO/RCDE, 91-194, U.S.
page 3470
General Accounting Office report to Congressional requestors, September 1991, entitled, "Nuclear waste operation of monitored retrievable storage facility is unlikely by 1998." Is this the document you're reflecting on?
A. Yes.
Q. And calling your attention to page five of that document --
MS. SULLIVAN: I'm sorry, Mr. Silberg, I'd like to lodge a foundation objection, Your Honor. This is a report by GAO, a different branch. There's been no foundation laid for Mr. Kouts' testimony about this document.
MR. SILBERG: Mr. Kouts said he was aware of the document, and I believe he said that.
THE COURT: He did say that. That's about as far as we've gotten.
BY MR. SILBERG:
Q. Mr. Kouts, you're aware of the General Accounting Office?
A. Yes, I am.
Q. Can you tell us what it is?
A. It's essentially an office that
page 3471
supports requests for Congressional review and for individual review of different aspects of the government.
Q. Are you aware that DOE regularly receives reports by GAO?
A. Yes, I am.
Q. And are you aware that DOE received this report by GAO?
A. I assumed it received it, yes.
MR. SILBERG: Your Honor, I would ask admission of this document.
MS. SULLIVAN: Your Honor, there's

**still been no foundation laid that Mr. Kouts is the proper witness to talk about this document, and he's not a 30(b)(6) witness with regard to the Department of Energy's views on this document, and, again, it's a Congressional document. He's not the proper witness.**
**THE COURT: The Court can ask about three questions and solve all this, but I'm reluctant to do so. Mr. Silberg, why don't you ask those three questions? Well, let me start with the first one. Mr. Kouts, what were your responsibilities in September of 1991?**
**THE WITNESS: In September of 1991, I**
page 3472
**was supporting strategic and contingency planning for the program.**
**THE COURT: Did that include an MRS?**
**THE WITNESS: Yes, generally looking at, certainly, the contingency of having an MRS available, yes.**
**THE COURT: Now, Mr. Silberg, I've gotten you started.**
**BY MR. SILBERG:**
**Q. And in the context of that, were you aware at that time or thereafter of this report?**
**A. Yes, I believe I read it when it was issued.**
**Q. And this report deals with GAO's analysis of the MRS program?**
**A. My assumption is that its an analysis primarily of the schedule aspects of an MRS, yes.**
**MR. SILBERG: I repeat the request.**
**THE COURT: Ms. Sullivan?**
**MS. SULLIVAN: The only foundation is that Mr. Kouts read the report at the time it was issued, not that he had any involvement in it, contributed to it, we would renew our**
page 3473
**foundation objection.**
**THE COURT: Well, except that this is, the GAO might be an arm of Congress, but it's still part of the government, and as a consequence of that --**
**MS. SULLIVAN: Your Honor --**
**THE COURT: I'm sorry, go ahead.**
**MS. SULLIVAN: I'm not sure the report of GAO can be construed as admissions against the administrative branch.**
**THE COURT: It can't.**
**MS. SULLIVAN: Okay.**
**THE COURT: It can't, I don't think there's any doubt about that. But on the other hand, at least, at least there's not in the Court's mind, I might be wrong, I basically agree with you, but on the other hand, there is a public record and a report.**
**MS. SULLIVAN: I think that's true, Your Honor, my concern goes to Mr. Kouts being the proper witness to talk about this, and I'll draw a parallel to my direct examination where I asked him about the MRS Commission report, where Mr. Kouts was directly involved in the activities of the MRS Commission from the DOE**
page 3474
**side, and I asked him based on that knowledge.**
**I don't think we've established the foundation for the admission of, in his testimony, about this document, in the same vein that I did with that report.**
**THE COURT: Well, it might be**

**admissible under Federal Rule of Evidence 803(a). That doesn't mean that Mr. Kouts agrees with it or agrees with all the statements or assumptions.**
**MS. SULLIVAN: Or is the proper witness to talk about it.**
**THE COURT: Well, it was part of his responsibilities to know about these things at the time, that's why -- I'm sorry to help counsel out, but that's why I asked the two questions I did. I find it very hard not to help counsel out, but the objection is actually overruled.**
**MS. SULLIVAN: Thank you, Your Honor.**
**THE COURT: Now, you move for admissibility.**
**MR. SILBERG: I do.**
**THE COURT: It's admitted under Federal Rule of Evidence 803(a). That's not to**

page 3475

**say that Mr. Kouts doesn't agree with it or disagree with it.**
**BY MR. SILBERG:**
**Q. Calling your attention to page five, which has a Bates number of 1344 on the bottom, in the middle paragraph, this indicates that GAO's conclusion, and I'll read, is highly -- "believes it is highly unlikely that DOE can develop an MRS facility by 1998." Is that GAO's conclusion?**
**A. That's what the document says.**
**Q. And did DOE understand that to be GAO's conclusion at the time?**
**MS. SULLIVAN: Objection, Your Honor, I don't think we've laid a foundation that Mr. Kouts knew how DOE viewed this document.**
**THE COURT: Well, he might have. That's the point. I'll just correct the record, page five is actually 1344. And where are you on page five, Mr. Silberg?**
**MR. SILBERG: In the middle paragraph, matters for Congressional consideration.**
**THE COURT: All right. Thank you.**
**MR. SILBERG: First sentence.**
**THE COURT: Now, let's focus your**

page 3476

**question.**
**BY MR. SILBERG:**
**Q. When you read this report, Mr. Kouts, did you understand this to set forth GAO's position that it believes it was highly unlikely that DOE can develop an MRS facility by 1998?**
**A. Yes.**

[3478:7] - [3487:5] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3478

**Q. Mr. Kouts, we were talking about the GAO report of 1991, Plaintiff's Exhibit 198, and if I could ask you to turn to page three of that report? I think, just before we broke for lunch, we were talking about the first of the GAO's reasons for its conclusion that an MRS by 1998 was highly unlikely.**
**And if you look down on the bottom paragraph, Bates 1342, I think we -- on Bates page 1342, GAO says that, "DOE's plans depend on the Negotiator completing and Congress approving siting agreement by the end of 1992. That would permit early development of an MRS facility."**

**Now, the Negotiator did not complete the siting agreement by the end of 1992, did it?**
**A. No, it did not.**
**Q. Okay. Did it ever complete a siting**
page 3479
**agreement?**
**A. No, we did not.**
**Q. Second part of that argument says that, and in the next sentence, GAO states, "Because the Negotiator expects the process to take considerable time, he does not believe that these activities could be completed by then," meaning 1990 and 1992. And that, in fact, turned out to be the case, isn't that correct?**
**A. That's correct.**
**Q. The second reason that GAO provided in this report for concluding that it was highly unlikely to have an MRS by 1998 was that affected states strongly opposed DOE's siting activities for an MRS facility. Do you see that on the bottom of page 1342, the last line continuing over?**
**A. Yes, I do.**
**Q. And that was certainly correct, was it not, that Tennessee opposed the MRS in that facility?**
**A. Yes, the state of Tennessee did.**
**Q. Opposed the siting of that facility in Tennessee?**
page 3480
**A. Yes.**
**Q. And that Nevada vigorously opposes Yucca Mountain?**
**A. That's correct.**
**Q. And then it goes on at the end of that top paragraph of 1343, GAO says, "Finally, Congress would have to rescind, as DOE has requested, the links between the MRS facility and repository schedules to prevent the facility from adversely affecting the incentive to complete a repository." And Congress never took such action, did it?**
**A. No, it has not to this date.**
**Q. Was such a bill in the 1991 to 1995 timeframe, was such a bill ever reported out of committee?**
**A. Not that I'm aware of.**
**Q. And after 1995, did DOE ever ask the administration to propose legislation to allow it to undertake siting of an MRS?**
**A. From my perspective in the program, I'm unaware of any such request.**
**Q. And we agreed that no agreement with a candidate site was ever negotiated, that's correct?**
page 3481
**A. That's correct.**
**Q. So you don't know what assurances a candidate host site might have required with such an agreement?**
**A. That's correct, although in your document on page two here, in that same paragraph that you've been focusing on, it was the view that, if you look at the bottom of page two, I believe.**
**Q. What's the Bates number on that?**
**A. Page three, I'm sorry, it's the Bates 1342, it does say in the last full sentence on that page that, "The Negotiator also believes that any prospective host for the facility**

would require some type of assurance that the MRS facility would not become a permanent substitute for the repository."
Q. But those assurances might not have been restricted at -- might not have been as restrictive as the restrictions in the linkages as they existed in the 1987 amendments?
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Objection, speculation.
THE COURT: Mr. Kouts, you may answer, if you know.
page 3482
THE WITNESS: I have no way of knowing.
BY MR. SILBERG:
Q. Isn't it true -- well, Mr. Kouts, you were involved with discussions with the host communities around the Clinch River site, weren't you?
A. Yes.
Q. In connection with the DOE proposal for an MRS that was submitted to Congress ultimately in 1986 or 1987?
A. Yes.
Q. And isn't it true that in those discussions, that people at Clinch River actually proposed linkages that were less restrictive than the ones that DOE ultimately proposed?
A. I'd have to go back and review it. In general, I think the Department was in general agreement with the local hosts, but I'd have to go back and look at the specific recommendations of the Clinch River task force, if you will, for the MRS facility.
Q. Isn't it true that those recommendations, and we've talked about it in
page 3483
other testimony, included operation up to a 3000 metric ton limit, even though the repository had not yet been licensed?
MS. SULLIVAN: Objection, Your Honor, vague as to those recommendations. I'm not sure if he's talking about DOE's or somebody else's.
MR. SILBERG: We're talking about the Clinch River task force, the local people's recommendations to DOE.
THE COURT: Thank you for clarifying. The objection then is overruled with the qualification.
THE WITNESS: I'm trying to understand your question, Mr. Silberg. Are you referring to a 3000 ton.
BY MR. SILBERG:
Q. I believe it was a 300 ton capacity limit prior to the repository being licensed.
A. That could be true. I'd have to, again, I'd have to review those specific documents. I just don't have a specific recollection. I remember they did have a capacity limit. I don't remember the specifics of it.
page 3484
Q. Okay. And if we turn for a minute to page 22 of this document, which is Bates 1361, and let me, about halfway down that paragraph, you see the sentence that starts, "the Negotiator told us"?
A. Yes.
Q. Could you just read that into the record, please?

A. "The Negotiator told us that, even with a very aggressive effort, it is unlikely that he can negotiate and gain approval of an agreement by late 1992."
Q. And do you disagree with the statement that's attributed to the Negotiator?
A. I have no basis to disagree with it.
Q. So you would agree that it would have been --
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Objection, Your Honor, the question implicates hearsay because the Negotiator said something in the document, and he's being asked about that statement.
THE COURT: Well, there's an objection, but it's based on the fact that the report is reciting what the Negotiator's
page 3485
position was, and I'm not sure that Mr. Kouts would have personal knowledge of what the Negotiator's position was.
BY MR. SILBERG:
Q. Did you have dealings with the Nuclear Waste Negotiator in this timeframe?
A. I did have some interactions with his staff on occasion, but it was not on a regular basis.
Q. Are you aware of what he believed to be the likelihood that he could negotiate an agreement with the host community?
MS. SULLIVAN: Your Honor.
THE COURT: Ms. Sullivan.
MS. SULLIVAN: It's still a hearsay objection, and speculation.
THE COURT: Well, that's not actually -- are you aware of what he believed? He could become aware of it through all sorts of means, so it's not a hearsay objection.
MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: I have no recollection of what the Negotiator was specifically planning on at that point in time. I'm just reflecting what the document here is, and
page 3486
that's, I have no reason to doubt the GAO's presentation here, but I don't have any confirming information in my memory that that was the case.
BY MR. SILBERG:
Q. Did DOE take issue with this statement when it received the GAO report?
A. All I can do is go back to the statement in the document here, which said that this -- I believe it's on page, regarding agency comments on page 1344, page five of the document, Bates number 1344, where it basically said that GAO discussed the facts in the report with DOE officials, who generally agreed with their accuracy. But I have no knowledge as to whether or not that was a specific fact that the Department attested to its accuracy.
Q. But you're not aware of DOE taking issue with the statement, are you?
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Well, foundation, I think that's what Mr. Kouts just testified to.
THE COURT: Well, yes, but it's the second time it's been asked. Let's find out.
THE WITNESS: Could you repeat the
page 3487
question?
(The reporter read the record as

**requested.)**
**THE WITNESS: I have no knowledge, one**
**way or the other.**

[3493:24] - [3494:6] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3493
**Q. Is your recollection that the linkage**
**would have allowed MRS to go into operation,**
page 3494
**even though the repository had not been**
**licensed for no more than 300 metric tons?**
**A. According to my testimony in that**
**trial, yes. I, again, I have no reason to**
**doubt myself, but I had the document in front**
**of me at that time.**

[3518:9] - [3519:7] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3518
**Q. The office that's referred to there is**
**the Nuclear Waste Negotiator office?**
**A. That's correct.**
**Q. And do you agree that that was true at**
**that time?**
**A. The Office of the Negotiator was still**
**continuing for another year, and this was the**
**Secretary's perspective that that was the case.**
**It was certainly unlikely at that point that it**
**appeared that the Negotiator was going to be**
**successful.**
**Q. But you're not challenging the**
**Secretary's statement to Congress that the**
**Negotiator had not been able to find a site**
**that would permit spent fuel receipt by January**
**1998?**
**A. I'm not challenging the Secretary's**
page 3519
**perspective, no.**
**Q. And the Secretary speaks for the**
**entire Department?**
**A. Yes, he does.**
**Q. Including the Office of Civilian**
**Radioactive Waste Management?**
**A. Yes, he does.**

[3521:15] - [3524:1] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3521
**Q. Did you assume favorable Congressional**
**action to changing the linkage while you were**
**reviewing the 1991 ACR?**
**A. I believe the 1991 ACR was based on**
**the premise that there would have been a**
**removal of the schedule linkages in the MRS, so**
**that was certainly my assumption when I**
**reviewed that document, and my sense is that**
**was the perspective of the Department when it**
**issued it.**
**Q. But you don't know what the basis for**
page 3522
**that premise was, do you?**
**A. Well, back in 1991, we had an active**
**program with the Nuclear Waste Negotiator, and**
**we were supporting that office's efforts to**
**identify a facility, site for that facility, so**
**my sense is that the premise for it and the**
**assumption was that the Negotiator was going to**
**be successful.**
**Q. So you, A, assumed the Negotiator**
**would be successful, is that correct --**

**A. Yes.**
**Q. -- in finding a site? B, that he would negotiate an agreement with a volunteer host community that would contain linkages that would allow the assumption that's made in the 1991 ACR, is that correct?**
**A. That's correct.**
**Q. And then you assumed that Congress would enact that agreement into law, is that correct?**
**A. That's correct.**
**Q. And you assumed that an application would be filed for that facility with the NRC?**
**A. A license application, yes, that's correct.**

page 3523

**Q. And you assumed that the NRC would favorably review that application?**
**A. That's correct.**
**Q. And you assumed that that favorable review of the application would be completed before January 31, 1998?**
**A. That's correct. In addition, the assumption was that we were going to have the budget to implement the program and that there would be no litigation that would slow us down along the way, so there were a variety of assumptions that played into it, in addition to the ones that you identified.**
**Q. And you assumed, if the NRC issued a favorable licensing decision, that that would not be held up by litigation?**
**A. That was the operating assumption of the program at the time.**
**Q. And you assumed that if the license was not held up by litigation, that you could construct the facility and have it operational by January 31, 1998?**
**A. That's correct.**
**Q. And is there a document which explains the basis for all those favorable assumptions?**

page 3524

**A. Not one that comes to mind, no.**

[3537:22] - [3541:9] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3537

**Q. But as of 1992, when the Department terminated all facility site work from MRS, you continued to say that the MRS was the contractual basis for the acceptance rate,**

page 3538

**isn't that correct?**
**A. It was the only basis that we had to have a facility well in advance of the repository, that would have been close to 1998, to meet that commitment, that's correct.**
**Q. But you couldn't get there, isn't that what the Secretary said, you could not get there with an MRS?**
**THE COURT: Ms. Sullivan.**
**MS. SULLIVAN: Objection, vague as to timeframe and what statement by the Secretary.**
**THE COURT: We do have a difference between 1991 and 1992, and I think Mr. Kouts is aware of that.**
**THE WITNESS: The Secretary evolved his strategies also. Based on the events transpired in the implementation of the program in 1989, Admiral Watkins was very committed to working with the Nuclear Waste Negotiator when he believed, as indicated in his letter to**

**Bennet Johnston in December of 1992, that that didn't seem to be a viable option.**
**He was trying to provide another option for Congress to provide the Department the authority in order to receive these**
page 3539
**materials at a DOE site.**
**So what I think this is reflective of is the fact that the Department tried to evolve and do everything it could, as I stated earlier, in response to Ms. Sullivan's questioning, took every reasonable action that it could take, informing the Congress, informing its constituency, if you will, the Department's constituency of its challenges in implementing this and trying to change the strategy as to make this happen in 1998.**
**So I think what you're suggesting here is, did we evolve? Yes, we evolved, and we had to evolve because circumstances indicated that each strategy we took basically didn't work out as we had anticipated.**
**BY MR. SILBERG:**
**Q. But in 1995, you were still putting forward an acceptance rate based on a linked -- an unlinked MRS, where you had, two years before, stopped work on that project?**
**MS. SULLIVAN: Objection, mischaracterizes witness' testimony.**
**BY MR. SILBERG:**
**Q. Stopped work on siting that project.**
page 3540
**THE COURT: Well, and you're referring, Mr. Silberg, to the APR/ACR that was issued in 1995, in March?**
**MR. SILBERG: Yes, sir, yes, sir.**
**THE COURT: Thank you. Mr. Kouts, you may answer.**
**THE WITNESS: If you remember that APR/ACR, it was still holding on to the potential that we would somehow get authorization, and it did not have a 1998 date in it, it had a year one, year two, year three, year four, so the Department was, if you will -- the chances of an MRS in '98 were certainly evaporating.**
**However, the Department still had hopes that some kind of legislation would be passed, and as you know, Mr. Silberg, there was legislation that was being contemplated in Congress in that timeframe to provide the Department with sites.**
**So it was not totally out of the realm of possibility that that authorization could have still come forward.**
**BY MR. SILBERG:**
**Q. That legislation was not put forward**
page 3541
**by DOE, was it?**
**A. No, it was not.**
**Q. And it was not put forward by the administration, was it?**
**A. No, it was not, but it was still being considered in Congress.**
**Q. And the administration said they would veto that legislation?**
**A. That's correct.**

[3545:5] - [3547:18] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3545
**Q. Mr. Kouts, do you remember why**

President Clinton vetoed the legislation that you were discussing with Mr. Silberg?
MR. SILBERG: Objection, incorrectly characterizes his testimony.
THE COURT: Right. I can help you out, Ms. Sullivan.
MS. SULLIVAN: I'm sorry, I missed that.
THE COURT: It's just that President Clinton said he would veto it if it were passed by Congress. It's not that he actually did it. That was enough.
BY MS. SULLIVAN:
Q. Mr. Kouts, do you recall why President Clinton said he would veto --
MR. SILBERG: Objection, lack of foundation, if this witness can't talk about things from a DOE perspective on cross-examination, I'm not sure why he can talk about it on redirect.
page 3546
THE COURT: Well, President Clinton might have expressed a view, but in any event, we'll see what happens. Overruled.
THE WITNESS: My recollection of the President's objection to the deployment of interim storage was that he believed that -- I believe it was related to the fact that the program should focus its efforts on a repository and site a repository prior to the time that an interim storage site was ultimately selected, as I remember the general argument put forth, I believe, by the administration at that time.
So he was not supportive of interim storage until there was a repository site identified, and I think there were several other things that were being considered that were part of it, but that's, to the best of my recollection, what the objections were.
BY MS SULLIVAN:
Q. And when was the site for Yucca Mountain finally recommended?
A. It was recommended by Secretary Abraham in February of 2002.
Q. And when, the legislation that you
page 3547
were discussing with Mr. Silberg that President Clinton said he would veto, when was that legislation being considered?
A. In the mid-'90s, and let me just also, several of the pieces of legislation would have identified Yucca Mountain, and I probably should have, should have clarified my previous comment, would have identified Yucca Mountain as the site where we should move these materials, and that's what was contained in several of the industry bills.
And the President was of a view that, before you would move materials there, you had to make sure that was the ultimate repository site, and until that occurred, he would not be supportive of interim storage at Yucca Mountain. That's the best, to my recollection, of his objections to it.

[3560:9] - [3561:10] 4/12/2007 Systems Fuels and Entergy Arkansas vs US, Transcript, 4/12/07

page 3560
Q. Okay. Thank you. Mr. Kouts, when the Department issued the 1994 ACR, did the Department believe that it could perform at an

**MRS?**
**A. The 1995 or the '94?**
**Q. '94 ACR issued in March of '95?**
**A. We did, but, again, we recognized in that, that it would probably not be in 1998. As you remember, the waste acceptance schedule went to a year one, year two, year three, but we still had some hopes, again, that there would be some legislation that would give us authority in order to implement it, so that was what that acceptance schedule was based on, without a start date, if you will, for the facilities, since 1998 seemed highly unlikely.**
**Q. At the time the 1998 ACR was issued in**
page 3561
**March of 1995, if DOE were to accept fuel from the utilities pursuant to the standard contract prior to 2010 at a repository, where would that acceptance have been?**
**A. It would have had to have been at a monitored retrievable storage facility, and essentially, the linkages would have had to be broken, et cetera, et cetera. So that's the only facility that, potentially, we could have had available before 2010.**

[2633:] - [2633:23] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2633

**2633**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**------------------------------x**
**PACIFIC GAS & ELECTRIC :**
**COMPANY, :No. 04-74C**
**Plaintiff, :**
**vs. :**
**THE UNITED STATES, :**
**Defendant. :**
**------------------------------x**
**Courtroom 5**
**National Courts Building**
**717 Madison Place NW**
**Washington, D.C.**

**Wednesday, June 14, 2006**

**VOLUME 8**

**The parties met, pursuant to the notice of the Judge at 9:00 a.m.**

**BEFORE THE HONORABLE EMILY C. HEWITT**

[2745:11] - [2745:15] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2745
**Q. Your understanding, whatever understandings you have about DOE's contractual obligations under the standard contract, you have obtained since June 4, 1999, correct?**
**A. That's correct.**

[2747:1] - [2747:12] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2747
**Q. Thank you. And as of June 4, 1999, you did not understand what a delivery commitment schedule is, correct?**
**A. I was aware of what they were, but in terms of the intricacies of them, no, I was**

**not.**
**Q. Prior to June 4, 1999, did you understand what a delivery commitment schedule was?**
**A. I had heard the term. I knew that they existed. I was not intimately involved with their development or their approval.**

[2748:4] - [2748:12] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2748
**Q. Mr. Kouts, as of June 4, the time of this deposition that you've got in your hand, as of June 4, 1999, you would not have been able to testify about the significance of delivery commitment schedules in a case such as this because you did not have enough of an understanding at that time to do that, is that correct?**
**A. Yes.**

[2751:20] - [2753:6] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2751
**Q. I'm not asking what the document says. I'm asking you about what you know. And isn't it true that as of January 1986, DOE's commitment to begin receiving radioactive waste for disposal in 1998 was unequivocal?**
**A. Yes.**
page 2752
**2752**
**Q. And to that end, it was DOE's position that it would procure a fleet of casks capable of beginning deliveries to the MRS as early as 1996, isn't that correct?**
**A. Yes.**
**Q. And isn't it also correct, Mr. Kouts, at that time, DOE planned to ensure that equipment for transporting radioactive waste would be available to make shipments beginning in 1996?**
**A. Yes.**
**Q. And OCRWM, at that time, was supporting the developments of, excuse me, supporting the development of casks on a schedule that would allow the availability of NRC certified prototypes by the early 1990s, isn't that correct?**
**A. May I ask a question? When you say, "at that time," what time are you referring to?**
**Q. Referring to the time that this plan was in force, was operative.**
**A. Yes.**
**Q. And one of the reasons that strategy of having casks developed on a schedule that would allow the availability of NRC's certified**
page 2753
**2753**
**prototypes by the early 1990s, one reason why that strategy was being pursued was that it would ensure that the transportation system would be ready for disposal system start-up and operations, correct?**
**A. Yes.**

[2755:24] - [2756:3] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2755
**Q. OCRWM would not have published a transportation business plan that contained a**

page 2756

**2756**

**schedule for development of transportation casks that was unreasonable, would it?**
**A. At that time, that's correct.**

[2767:8] - [2770:18] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2767

**Q. Okay. And so in the mid-1980s, before the 1987 amendments, DOE was looking at a facility that had a great deal more capability than the MRS that you were looking at after the '87 amendments, isn't that correct?**
**A. Yes.**
**Q. And isn't it also true that an MRS, such as the one that DOE was contemplating at the time of this mission plan, would be able to accept waste at a rate well above 3,000 MTU?**
**A. No.**
**Q. Turn to page 80, please. If you look at the sentence that, beginning at the very bottom, "accordingly," and this is in a section entitled, "Basis for the design of the MRS facility." Do you see that?**
**A. Yes.**
**Q. Let me read the sentence that I've**

page 2768

**2768**

**directed you to. It starts, "accordingly," at the bottom of page 80, "According" -- no l-y, "According to the current designs being developed for the proposal to Congress, the integral MRS facility would be able to accept waste at a rate of up to 3,600 MTU." Do you see that?**
**A. Yes, I do.**
**Q. And that certainly was true also, correct?**
**A. Yes.**
**Q. Okay. It goes on, I'm still reading, this is the top of page 81, "This waste acceptance rate could preclude the addition of new at-reactor storage capacity and would allow the orderly removal of aging fuel from reactor sites." Do you see that?**
**A. Yes.**
**Q. True statement?**
**A. That's what the document says, yes.**
**Q. And it's true?**
**A. At that time, yes.**
**Q. And it also says that it, referring to the MRS, is that right, is that your understanding?**

page 2769

**2769**

**A. Yes.**
**Q. "It could also accommodate the growth of the reactor population forecasted by the Energy Information Administration in its middle growth case." Do you see that?**
**A. Yes.**
**Q. And the facility would have sufficient capacity to prepare and ship waste to the first repository and to the second repository if deemed appropriate, correct?**
**A. Yes.**
**Q. I'll continue reading. "The design would provide capability to simultaneously accept spent fuel, package the spent fuel for direct shipment to the repository or storage at the MRS facility, retrieve fuel from storage,**

**and ship to the repository." Do you see that?**
**A. Yes.**
**Q. And so on, and let me, just for completeness, it goes on to say, "The MRS facility would be designed to simultaneously accept and unload current generation truck or rail shipping casks, disassemble and consolidate spent fuel of nearly all designs, and load into canisters spent fuel of all**
page 2770
**2770**
**current designs.**
**To prepare waste packages for the repository, the facility would include space in the receiving and handling building to overpack the canister materials if ongoing systems studies confirm this operation to be appropriate at the MRS facility." Do you see that?**
**A. Yes.**
**Q. And that was all, again, part of DOE's vision for the MRS as of the time of this mission plan?**
**A. Yes.**
**Q. Now, I think, if you take a look at page 17 again, it may be easier just to look at the document. Are you there? Tell me when you're there.**
**A. Yes.**

[2773:14] - [2773:23] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2773
**Q. Now, Mr. Kouts, would it be consistent with your understanding of the Department of Energy's contract obligations to Pacific Gas & Electric Company and the other standard contract holders, would it be consistent with those obligations for the nation to be in a situation where it had no viable assured method for the permanent disposal of spent nuclear fuel and high-level waste?**
**A. In my opinion, no.**

[2774:7] - [2774:11] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2774
**Q. Here's my question, the 1987 amendments nulled and voided the Department's monitored retrievable storage proposal as submitted under Section 141, is that correct?**
**A. That's a fair statement, yes.**

[2775:21] - [2776:4] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2775
**All right. Mr. Kouts, you were involved in the design of the MRS facility we were just discussing, correct?**
**A. Yes.**
**Q. And the MRS facility that you were**
page 2776
**2776**
**involved in the design of had an acceptance capacity in excess of 3,000 MTUs per year, correct?**
**A. Yes.**

[2777:2] - [2777:5] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2777

Q. And 3,000 MTU per year is a reasonable acceptance rate for the DOE spent fuel program, correct?
A. A reasonable steady state rate, yes.

[2797:14] - [2798:8] 6/14/2006 Testimony of Thomas Pollog & Christopher Kouts Pacific Gas

page 2797

Q. And it says, "The currently estimated schedule for an MRS facility, if authorized, would allow the DOE to start operations by the end of fiscal year 1996." Do you see that?
A. Yes, I do.
Q. And that correlates with the schedule we just looked at, 2,200, pre-'98, which let's say, for sake of discussion, means starting in '96, 3,000 in 1998, correct, according to the schedule in this plan?
A. Yes.
Q. And then the next sentence says,

page 2798

2798

"Implementation of MRS, according to this schedule, will provide assurance that the DOE's acceptance of spent fuel in 1998 and subsequent years will be at sufficient rates to meet obligations." Do you see that?
A. Yes, I do.
Q. And that's a reference to the contract obligations, isn't it, Mr. Kouts?

[1731:] - [1731:25] 10/26/2005 Kouts, Christopher Southern Nuclear Testimony Vol. 8 (Tria

page 1731

1731

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98-614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Wednesday, October 26, 2005

VOLUME 8

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

[1832:5] - [1832:22] 10/26/2005 Kouts, Christopher Southern Nuclear Testimony Vol. 8 (Tria

page 1832

Q Now, did I understand your testimony correctly that by March of 1995, the Office of Nuclear Waste Negotiator had been eliminated?
A That's correct. I believe it went out of existence or that office went out of existence in late 1994.
Q And the purpose, as I understand it, of

**the Office of Nuclear Waste Negotiator was to go out and negotiate with different states to try to get somebody to host a monitored retrievable storage facility. Is that correct?**
**A That was one of his duties. He was also charged with trying to find a willing host for a repository.**
**Q Okay. Another thankless job, I'm sure. At any rate, by March of 1995, the Nuclear Waste Negotiator is history?**
**A That's correct.**

[1833:18] - [1834:10] 10/26/2005 Kouts, Christopher Southern Nuclear Testimony Vol. 8 (Tria

page 1833
**Q Glad you mentioned that. Let me ask you about that. There were several pieces of legislation that were calling for interim storage facilities that percolated through the mid to late '90s, correct?**
**A That's correct.**
**Q And at that time, President Clinton was in office, correct?**
**A Yes, he was.**
page 1834
**Q And therefore, he appointed the Secretary of Energy, correct?**
**A He did.**
**Q Are you aware that the Clinton administration vetoed legislation calling for centralized interim storage when it was passed by both houses of Congress?**
**A Yes, I am. That was in the year -- I believe it was in 2000 that that occurred.**
**Q I believe it was too.**