**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLINA POWER & LIGHT COMPANY, et al.** | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-37C<br>(Judge Wheeler) |
| **UNITED STATES OF AMERICA,** | ) | |
| Defendant. | ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Of Counsel:

Paul M. Bessette
David M. Kerr
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

BRAD FAGG
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiff

January 22, 2008

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF ARGUMENT ........ 1

II. STATEMENT OF THE ISSUES PRESENTED ........ 7

III. PROPOSED FINDINGS OF FACT ........ 9

A. Introduction and Background: The Progress Energy Nuclear Power Plants. ........ 9

1. Brunswick. ........ 10

2. Harris. ........ 10

3. Robinson. ........ 12

4. Crystal River. ........ 13

5. Cost tracking and project management practices at Progress Energy. ........ 14

6. Summary of mitigation costs incurred by Progress Energy. ........ 15

B. Government Obligations Regarding Spent Nuclear Fuel. ........ 18

1. The Nuclear Waste Policy Act. ........ 18

2. The Standard Contracts. ........ 19

3. Early evidence regarding contractual "pick-up rate" obligations. ........ 21

a. Understandings by Progress Energy. ........ 21

b. Understandings by DOE. ........ 22

c. Mission Plan drafts, the final Mission Plan, and other early documents and evidence. ........ 24

4. Delays in performance by DOE. ........ 29

a. The 1987 Amendments. ........ 29

b. Acceptance Capacity Reports. ........ 30

c. The 1991-1995 Acceptance Capacity Reports and Acceptance Priority Rankings: the "900 MTU/year" rate. ........ 31

d. Delivery Commitment Schedules. ........ 33

C. Specific Mitigation Activities at Progress Energy's Nuclear Reactors ........ 35

1. Harris C and D Pool activation and storage of spent fuel: removal of "CRUD" and unused racks ........ 35

2. Harris C and D Pool activation and storage of spent fuel: Component Cooling Water system upgrades. ........ 37

3. Loading of casks for transshipment and storage ........ 40

4. Railroad maintenance ........ 41

5. The Crystal River re-rack ........ 42

6. Harris C and D Pool activation and storage of spent fuel: licensing proceedings and interventions ........ 45

**TABLE OF CONTENTS, Continued**

**Page**


7. Progress Energy's use of internal labor. .... 46
8. Allowance for Funds Used During Construction.... 48
9. Warehouse and construction services. .... 49
10. Costs recorded through manual adjustments .... 50
11. Robinson crane studies. .... 50

IV. ARGUMENT .... 51

A. The Applicable Legal Framework .... 51

B. Harris C and D Pool Activation and Storage of Spent Nuclear Fuel: The "Pick-up Rate" Issue. .... 53

1. The government's obligations regarding acceptance of fuel: addressing the missing pick-up rate term.... 53
2. Progress Energy's damages associated with Harris C and D pool activation and storage of spent nuclear fuel are based upon reasonable acceptance rate obligations .... 56
3. The government's pick-up rate arguments are severely flawed. .... 58

C. Government Defenses To Particular Incurred Damages. .... 60

1. The government is not entitled to reduce Progress Energy's damages by the costs of removal of "CRUD" and unused racks associated with Harris C and D Pool activation and storage of spent fuel. .... 60
2. The government is not entitled to reduce Progress Energy's damages by the costs of the Component Cooling Water System upgrades associated with Harris C and D Pool activation and storage of spent fuel. .... 61
3. The government is not entitled to a damage reduction due to hypothetical costs of loading DOE casks that were never supplied. .... 63
4. The government is not entitled to reduce Progress Energy's damages by the costs of railroad maintenance incurred for transshipment campaigns caused by DOE's breach. .... 65
5. The government is not entitled to reduce Progress Energy's damages by the costs of the Crystal River re-rack. .... 66
6. The government is not entitled to reduce Progress Energy's damages by the costs of licensing proceedings and interventions associated with Harris C and D Pool activation and storage of spent fuel. .... 68
7. The government is not entitled to reduce Progress Energy's damages due to Progress Energy's use of internal labor. .... 68
8. The government is not entitled to reduce Progress Energy's damages by the costs incurred for Allowance for Funds Used During Construction. .... 70

**TABLE OF CONTENTS, Continued**

**Page**

9. The government is not entitled to reduce Progress Energy's damages due to Progress Energy's use of warehouse and construction services in connection with breach-related activities. ........ 72

10. The government is not entitled to reduce Progress Energy's damages in connection with costs for breach-related activities recorded through manual adjustments........ 73

11. The government is not entitled to reduce Progress Energy's damages by costs associated with Robinson crane studies........ 73

CONCLUSION........ 74

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES


*Alvin Ltd. v. United States Postal Service*, 816 F.2d 1562 (Fed. Cir. 1987)......................54

*American Federal Bank, FSB v. United States*, 72 Fed. Cl. 586 (2006)......................51, 62

*Bank of America, FSB v. United States*, 70 Fed. Cl. 246 (2006) ......................................62

*Bank of New York v. Southwire Co.*, 470 F.3d 264 (6th Cir. 2006)..................................56

*Barco Urban Renewal Corp. v. Housing Authority of Atlantic City*, 674 F.2d 1001 (3d Cir. 1982)..........................................................................................................56

*Blinderman Construction Co. v. United States*, 695 F.2d 552 (Fed. Cir. 1982)................55

*Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).........73

*Brooklyn Life Insurance Co. v. Dutcher*, 95 U.S. 269 (1877) ..........................................54

*California Federal Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005)................51, 62

*In re Carolina Power & Light Co.*, 53 N.R.C. 113 (2001)..............................................46

*Chicago v. Sheldon*, 9 Wall 50, 76 U.S. 50 (1869).........................................................55

*Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) ..............................68, 69

*David Nassif Associates v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ...........................56

*Dominion Resources, Inc. v. United States*, 77 Fed. Cl. 151 (2007) ................................64

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)...........................53

*Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547 (Ct. Cl. 1971) ....................54

*Gevyn Construction Co. v. United States*, 827 F.2d 752 (Fed. Cir. 1987).........................71

*Howell v. United States*, 51 Fed. Cl. 516 (2002) ............................................................53

*Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639 (2004)........................4, 60

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) ...... *passim*

*Julius Goldman's Egg City v. United States*, 697 F.2d 1051 (Fed. Cir. 1983) .................54

*KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68 (1996)................................................54

**TABLE OF AUTHORITIES, Continued**

**Page**

*Library of Congress v. Shaw*, 478 U.S. 310 (1986)....................................................70

*Lisbon Contractors., Inc. v. United States,* 828 F.2d 759 (Fed. Cir. 1987)......................52

*Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ....................................................................................................1, 20, 51

*Northern States Power Company v. United States*, 78 Fed. Cl. 449 (2007)............. *passim*

*Northern States Power Company v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) ..........1

*Old Colony Trust Co. v. Omaha*, 230 U.S. 100 (1913) ..............................................55

*Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333 (2006)........4, 5, 60, 65

*Roedler v. DOE*, 255 F.3d 1347 (Fed. Cir. 2001)..........................................................55

*Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332 (2006)..........5, 65

*San Carlos Irrigation and Drainage District v. United States*, 111 F.3d 1557 (Fed. Cir. 1997)....................................................................................................73

*Saul Subsidiary II Ltd. v. Barram*, 189 F.3d 1324 (Fed. Cir. 1999) .................................55

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007) ............. *passim*

*System Fuels, Inc. v. United States*, 66 Fed. Cl. 722 (2005)............................................59

*System Fuels, Inc. v. United States*, 79 Fed. Cl. 37 (2007)...................................... *passim*

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2005) ...................... *passim*

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) ....................................70

*White v. Delta Construction International*, 285 F.3d 1040 (Fed. Cir. 2002)....................53

*Wickham Contracting Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994)..............................71

*Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249 (2006) ...................5, 65

**TABLE OF AUTHORITIES, Continued**

**Page**

## FEDERAL STATUTES

Nuclear Waste Policy Act of 1982, 42 U.S.C. §§10101-10270 .......................................18

Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5001-5065, 101 Stat. 1330, 1330-227 ....................................................................30

42 U.S.C. § 10131(a)(2)....................................................................................18
42 U.S.C. § 10131(a)(4)....................................................................................18
42 U.S.C. § 10131(b)(2) ...................................................................................18
42 U.S.C. § 10161(b)(1) ...................................................................................25
42 U.S.C. § 10162(a) .......................................................................................30
42 U.S.C. § 10168(b) .......................................................................................30
42 U.S.C. § 10168(d)(1) ...................................................................................30
42 U.S.C. § 10168(d)(3) ...................................................................................30
42 U.S.C. § 10221(a) .......................................................................................24
42 U.S.C. § 10222(a)(1)....................................................................................18
42 U.S.C. § 10222(a)(5)....................................................................................18

## FEDERAL REGULATIONS

10 C.F.R. Part 21.............................................................................................16

10 C.F.R. § 2.174 .........................................................................................46, 68

18 C.F.R. Part 101 ............................................................................................80

## MISCELLANEOUS

Corbin on Contracts, Vol. 11, § 57.10 ..................................................................52

E. Allan Farnsworth, Contracts § 12.1 (3d ed. 2004)).............................................62

H.R. Rep. No. 97-491 (1982),*reprinted in* 1982 U.S.C.C.A.N. 3792, 3794. ....................18

22 Am. Jur. 2d Damages § 69.............................................................................72

Restatement (Second) of Contracts § 204 (1981) ..................................................54

Restatement (Second) of Contracts § 204 cmt. b (1981) ...........................................54

Restatement (Second) of Contracts § 204, cmt. d...................................................56

Restatement (Second) of Contracts § 347............................................52, 61, 66

**TABLE OF AUTHORITIES, Continued**

**Page**

Restatement (Second) of Contracts § 347 cmt. c ............................................................52

Restatement (Second) of Contracts § 347 cmt. d............................................................52

Restatement (Second) of Contracts § 350 cmt. b) ..........................................................51

Restatement (Second) of Judgments, § 26(1)(b)..........................................................7, 74

Restatement (Second) of Judgments, § 26(1)(e)..........................................................7, 74

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CAROLINA POWER & LIGHT COMPANY, et al.**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA,**<br><br>Defendant. | No. 04-37C<br>(Judge Wheeler) |

**PLAINTIFFS' PROPOSED FINDINGS OF**
**FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's November 20, 2007 Post-Trial Scheduling Order, Plaintiffs Carolina Power & Light Company ("CP&L") and Florida Power Corporation ("FPC") respectfully file their Proposed Findings of Fact and Conclusions of Law.

## I. SUMMARY OF ARGUMENT

The government does not dispute that the Department of Energy ("DOE") breached its contracts with plaintiffs CP&L and FPC (collectively for these purposes, "Progress Energy").[1] (Tr. 1646 line 18, 1662 line 17, statement of counsel.) *See generally Northern States Power Company v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000); *Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Pursuant to those contracts plaintiffs have paid more than $661 million (through December 31, 2005), and have received nothing. The only issue in this case, therefore, is the proper measure of Progress Energy's damages. (Tr. 344, lines 2-3, statement of counsel.) Progress Energy claims recovery of the

[1] CP&L, which also does business as Progress Energy Carolinas, Inc., is a wholly-owned subsidiary of Progress Energy, Inc. FPC, which also does business as Progress Energy Florida, Inc. is an indirect wholly-owned subsidiary of Progress Energy, Inc.

$91,029,704 in costs it incurred through December 31, 2005, to mitigate the impact of the DOE's delay in accepting spent nuclear fuel from Progress Energy's five nuclear power reactors.

At trial, Progress Energy produced compelling, and indeed in many cases uncontroverted, evidence to support the amount and nature of those expenditures. The government does not dispute that all of the costs incurred by Progress Energy were reasonably incurred. The government does not dispute (with a few limited exceptions discussed further below) that the costs were incurred for additional at-reactor storage of spent nuclear fuel for the period after January 31, 1998, when DOE was supposed to start accepting fuel. The government does not dispute (again with a very few limited exceptions) that the costs were actually incurred for the activities claimed. The government does not dispute that the expenditures were reasonably foreseeable consequences of DOE's breach of its contractual obligations. With respect to damages, this was, in the main, about as straightforward as a case of this magnitude can get.

So, then, what does the government argue? Nothing persuasive, and certainly nothing that should result in any reductions of the damage award to Progress Energy. First, the government still seems, nominally, to cling to an argument for no recovery at all (despite the fact that the government offered no evidence whatsoever to dispute some $44 million of the claimed costs). In particular, the government urges the imposition of tortured and impossibly high legal burdens on the part of plaintiffs, and asserts that such burdens have not been met in this case. Those arguments can be dispensed with quickly—the record in this case and the applicable law do not allow for any serious assertion that plaintiffs have not established the recoverability of damages.

Second, with respect to certain costs associated with spent fuel pool activation and fuel storage activities at the Harris site, the government disputes the nature of its contractual

obligations regarding the so-called “pick-up rate.” Precisely what the government contends the metes and bounds of its pick-up rate obligations are, however, remains unclear, even at this late date. At times the government appears to contend that the only enforceable pick-up rate obligations are those contained in a 1991 Acceptance Capacity Report (“ACR”) document (*e.g.*, Tr. 1647, line 25, statement of counsel), but that document contains the express representation that the document is “not contractually binding” upon either party (PX 53, page 1, HQR-002-0803; *see* Zabransky, Tr. 1501, lines 8-10), and nothing in the contracts says that the ACR document can limit DOE’s pick-up obligations in the manner that the government now argues. (PX 10; Zabransky, Tr. 1498-99, lines 24-9; Pollog, Tr. 1278-84, lines 5-10.) Moreover, even the breach-infected obligations in that 1991 ACR document simply cease after ten years. Arguing that DOE’s obligations similarly just cease after ten years is apparently a bit much even for the government, and so the government then arbitrarily borrows obligations for the out years from a document outside of the contract (PX 50, page A-1, FOI-004-4125; DX 300; Pollog, Tr. 1274-75, lines 22-19), while, incredibly, at the same time complaining strenuously that plaintiffs should not be allowed to cite documents outside of the contract in support of their own contentions regarding the nature of the contractual pick-up rate obligations!

At other times the government appears to contend that only approved “Delivery Commitment Schedules” (“DCS”) based upon the 1991 rates represent enforceable contractual obligations. (Zabransky, Tr. 1491-93, lines 23-23; Tr. 1501, lines 11-16; Pollog, Tr. 1263, lines 3-7; Tr. 1269-70, lines 1-3.). This is so even though such schedules were not viewed by DOE as binding commitments at the time they were approved (Pollog, Tr. 1263 lines 3-7; Tr. 1266-67, lines 20-2), even though such schedules ceased being approved by DOE after a few years in the 1990s (Zabransky, Tr. 1496, lines 9-24; Pollog, Tr. 1267-68 lines 21-4); even though such

schedules were accompanied by DOE-dictated instructions that gave no choice to utilities regarding amounts of spent fuel to be identified (PX 55, page CP_FP000111094-95; Zabransky, Tr. 1498, lines 21-23; Pollog, Tr. 1277-78, lines 6-4.); and even though it is impossible for a utility to have an approved DCS today (Zabransky, Tr. 1527, lines 3-6; Pollog, Tr. 1290, lines 11-14).

In any event and whatever formulation of its position the government ultimately settles on, the problems with the government's efforts to limit its liability through convoluted "pick-up rate" arguments are almost too legion to enumerate. Besides the logical inconsistency, illusory nature, and facial improbability of that position noted above and described further below, the government's contentions cannot be squared with the compelling evidence establishing that the parties understood that, in exchange for the hundreds of millions of dollars in fees paid to DOE, utilities would not be responsible for additional at-reactor storage costs after 1998. That, clearly, was the carrot for utilities, and the essence of the deal. Under the law and in order to give these contracts any sort of meaning at all, DOE has to be held to some sort of reasonable performance obligations, and the government's position simply does not accomplish that. The government's present efforts to avoid such reasonable performance obligations are "severely flawed"[2] and should be rejected.

Third, beyond the pick-up rate and associated challenge to Harris pool activation and storage activities, the government offers a miscellany of arguments regarding other specific costs and alleged offsets. These include speculation that certain activities (e.g., removal and

---

[2] *System Fuels v. United States*, 79 Fed. Cl. 37, 56 (2007); *see also Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 417-21 (2007); *Northern States Power Co. v. United States*, 78 Fed. Cl. 449, 462 & n.13 (2007); *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 642 (2004). *But see, contra, Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333 (2006) ("PG&E"). *PG&E* is the only case to hold to the contrary, and that case, along with *Southern Nuclear* and *System Fuels*, are currently on appeal. Progress Energy respectfully disagrees with the result reached by the trial court in PG&E, albeit on the different record then before it, for reasons that include those described in the text.

disposition of "CRUD" and unused racks at Harris) would have had to be "done anyway" decades from now when the plant shuts down. Even if one were to entertain such speculation about hypothetical future activities, however, the government errs by not accounting for efficiencies or impacts of the intervening decades when it asserts a present 100% "disallowance," and falls far short of its burden to establish that plaintiffs' actual incurred mitigation damages should be reduced.

The government also arbitrarily "deducts" significant offsets for costs and activities by Progress Energy that allegedly were "avoided" due to DOE's breach, i.e., loading of hypothetical DOE casks that were never supplied. Here the government errs, however, for reasons that include the fact that such costs were plainly not "avoided," but, at most, merely deferred. Acceptance of the government's position would therefore impermissibly impose such costs twice upon Progress Energy. (*E.g.*, Maret, Tr. 1904-05, lines 17-6.) Also, as this Court has uniformly held, any purported benefits due to allegedly avoided DOE cask loading costs are "entirely speculative," and the government's argued reduction is unavailing for that reason as well. *System Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 71 (2007) (*citing Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515, 542 (2005); *Northern States Power Company v. United States*, 78 Fed. Cl. 449, 468-69 (2007); *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 450-51 (2007); *Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333, 416 (2006); *Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249, 286 (2006); and *Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332, 372 (2006)). Again, the government falls far short of its burden to reduce plaintiffs' actual incurred mitigation damages.

With regard to the Harris Component Cooling Water ("CCW") system upgrade modification, even the government's expert concedes (albeit grudgingly) that it was a

"reasonable possibility" that such upgrades were necessary due to DOE's failures (*e.g.*, Maret, Tr. 1854, lines 1-8), and the other evidence clearly establishes the relationship of those upgrades to the need for additional spent fuel storage. In these circumstances Progress Energy more than meets the "substantial causal factor" test dictated by the Federal Circuit in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) ("*Indiana Michigan II"*). The government's challenges to CCW system upgrade costs are based upon an incorrect legal standard and erroneous interpretations of engineering analyses and the impacts of other projects, and those interpretations cannot be squared with the substantial testimonial and documentary evidence establishing the recoverability of the CCW system upgrade costs. (Tibbitts, Tr.1008-10, lines 22-25; Edwards, Tr. 359, lines 17-23; Edwards, Tr. 360, lines 16-21.)

Similarly, the government's challenge to costs associated with the Crystal River re-rack activities are based upon erroneous assessments of alternative technical options available to the company to address unrelated water chemistry and criticality issues. The government's arguments flatly contradict the voluminous testimony and contemporaneous documentation that consistently confirms that the "primary reason" that the re-rack project was undertaken was the need for additional storage space, i.e., because of DOE's breach. (*E.g.*, Culver, Tr. 954-955, lines 22-16; *see also* PX 84 at 26; PX 105 Attachment A at 3; PX 106 at 1; PX 108 at 2.)

Finally, the government recites its oft-rejected challenges to internal labor and overhead costs, based upon unsupported arguments regarding "incrementality" that miss the mark. Overhead and internal labor costs associated with breach-related activities reflect real harm incurred by plaintiffs (*e.g.*, Edwards, Tr. 394, lines 18 to 22), and the government's arbitrary purported "disallowance" of such costs should be rejected.

These and all of the other specific costs contested by the government (including railroad maintenance, licensing costs, AFUDC, manual adjustments, and crane modifications) are addressed in more detail below. As a general matter, however, the record in this case establishes that Progress Energy has met the standards applicable to spent nuclear fuel plaintiffs for all of its claimed costs, namely that: "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Michigan II* at 1373; *see also, System Fuels v. United* States, 79 Fed. Cl. 37, 52 (2007); *Southern Nuclear*, 77 Fed. Cl. at 404. Judgment should be entered in the amount of $91,029,704, for damages incurred through December 31, 2005. In its order, the Court should also confirm Progress Energy's right to pursue in subsequent proceedings damages incurred after December 31, 2005, pursuant to the exceptions to the rules of merger and bar set out in the Restatement (Second) of Judgments, §§ 26(1)(b) and (e), as expressly adopted by the Federal Circuit in *Indiana Michigan II,* 422 F.3d at 1377.

## II. STATEMENT OF THE ISSUES PRESENTED

The contested issues in this case, described in more detail below, are few and relatively discrete. Those issues are:

(A) Whether the government is entitled to reductions in damages related to spent fuel storage costs and associated Harris C and D pool activation activities, upon the basis of the government's arguments regarding DOE's so-called "pick-up rate" obligations under the Standard Contracts.

(B) Whether the government is entitled to deduct from Progress Energy's damages all costs of disposal of some unused spent fuel racks and "CRUD" waste material from the pools,

upon the basis of the government's arguments that those activities would allegedly be necessary anyway decades from now.

(C) Whether the government is entitled to deduct from Progress Energy's damages those costs associated with upgrades to the CCW system, despite the fact that such upgrades were "with certainty" required because of DOE's breach.

(D) Whether the government is entitled to a reduction in damages due to hypothesized costs of loading DOE casks that did not occur, despite the wholly speculative nature of such argued reductions and the fact that costs for loading of DOE casks will be incurred by Progress Energy if and when DOE ever does perform (and such reductions would therefore represent a double penalty to Progress Energy).

(E) Whether the government is entitled to deduct from Progress Energy's damages the costs of railroad maintenance to support the real world shipping campaigns undertaken by Progress Energy as a result of DOE's breach, upon the grounds that DOE might have supplied a similar rail cask that would have required similar maintenance.

(F) Whether the government is entitled to deduct from Progress Energy's damages the costs associated with the Crystal River re-racking project, because, in addition to being necessary to increase at-reactor storage space at the site, that project had the secondary benefit of addressing certain criticality and water chemistry issues (for which mitigation measures costing much less than a re-rack could have been employed).

(G) Whether the government is entitled to deduct from Progress Energy's damages the costs associated with interested party interventions, expressly contemplated by existing regulations, in administrative legal proceedings associated with the Harris C and D pool activation.

(H) Whether the government is entitled to deduct from Progress Energy's damages certain internal Progress Energy labor costs, upon the basis of the same government arguments rejected in *System Fuels*, 79 Fed Cl. at 66-67, *Tennessee Valley Authority*, 69 Fed. Cl. at 537-539, and *Southern Nuclear*, 77 Fed. Cl. 396 at 442-443.

(I) Whether the government is entitled to deduct from Progress Energy's damages the costs associated with the use of funds necessary for the major capital projects involved, governed by federal regulation and referred to as Allowance For Funds Used During Construction ("AFUDC").

(J) Whether the government is entitled to deduct from Progress Energy's damages the costs associated with internal Progress Energy warehouse and construction services.

(K) Whether the government is entitled to deduct from Progress Energy's damages certain costs associated with breach-related activities recorded as manual adjustments in official company cost records.

(L) Whether the government is entitled to deduct from Progress Energy's damages certain costs associated with Robinson crane upgrade studies.

## III. PROPOSED FINDINGS OF FACT

### A. INTRODUCTION AND BACKGROUND: THE PROGRESS ENERGY NUCLEAR POWER PLANTS.

Progress Energy, a public utility, operates five nuclear reactors at four power stations: Brunswick Nuclear Plant, Units 1 and 2 ("Brunswick"), Shearon Harris Nuclear Plant, Unit 1 ("Harris"), H.B. Robinson Nuclear Plant, Unit 2 ("Robinson"), and Crystal River Nuclear Plant, Unit 3 ("Crystal River").[3] (Stip. 3.)

---

3 CP&L is the majority owner of Brunswick and Harris, and the full owner of Robinson. A minority ownership interest in Brunswick and Harris is held by the North Carolina Eastern Municipal Power Agency. (Stip. 4.) FPC is the majority owner of Crystal River, and minority ownership interests in Crystal River are held by a

To refuel nuclear power plants, "spent nuclear fuel" is removed from a reactor and temporarily placed in a spent fuel pool connected to the reactor. (Edwards, Tr. 226-27, lines 17-18). The Progress Energy plants refuel periodically, typically on either two-year or eighteen-month cycles. (Edwards, Tr. 229, line 3-12.) Spent nuclear fuel comes in the form of "assemblies," which can be measured in "metric tonnes of uranium," or "MTUs." (Edwards, Tr. 229, lines 13-18.) The number of assemblies in an MTU depends upon whether the reactor is a pressurized water reactor ("PWR") or boiling water reactor ("BWR"). (Edwards, Tr. 229-30, lines 19-10.) Progress Energy, like most utilities, strives to maintain "full core reserve" at each of its reactors. Full core reserve means "sufficient open and usable space in the spent fuel pool so you can discharge the entire reactor core into the spent fuel pool." (Edwards, Tr. 231, lines 8-14.) Full core reserve is not an absolute or regulatory requirement, but for economic and risk management reasons is pursued as a management goal of the company.

**1.** ***Brunswick.*** Brunswick is a two unit boiling water reactor ("BWR") site located near Southport, North Carolina. (Stip. 48.) Brunswick Units 1 and 2 began commercial operation in 1977 and 1975 and are licensed to operate through 2036 and 2034, respectively. (Stip. 49.) Brunswick has two spent fuel pools, which are not connected. (Stip. 50.) Progress Energy increased the capacity of the Brunswick spent fuels pool in 1977 and 1984 by replacing the existing spent fuel storage racks with higher density racks. (Stip. 51.) To further alleviate spent fuel pool capacity constraints, Progress Energy transshipped 3,853 spent fuel assemblies in 113 total shipments from Brunswick Units 1 and 2 to Harris, over a multi-year period, from 1989 through the end of 2005. (Stip. 52.) The transshipments of spent fuel from Brunswick to Harris are scheduled to end in 2008, due in part to the expiration of the cask license in October 2008,

number of Florida municipalities and cooperatives. (Stip. 5.) CP&L and FPC are authorized to act on behalf of the minority owners of their respective plants. (Edwards, Tr. 235-236, lines 22-4; Edwards, Tr. 241-242, lines 24-4.)

and because it has become apparent that capacity at Harris will ultimately be needed for Harris fuel. (Edwards, Tr. 244-245, line 1-21.)

Consequently, Progress Energy is pursuing dry storage at Brunswick. (Edwards, Tr. 245, lines 22-25.) Dry storage at a power plant typically takes the form of an "Independent Spent Fuel Storage Installation," or "ISFSI." As is typical for such large projects, Progress Energy commissioned an architect-engineer to look for a desirable location and define the scope of the dry-storage project by considering whether soil remediation and/or plant modifications will be required. (Edwards, Tr. 247, lines 6-19.) This study cost Progress Energy approximately $200,000. (Edwards, Tr. 247, lines 3-5.)

**2.** ***Harris.*** Harris is a single unit pressurized water reactor ("PWR") site located near New Hill, North Carolina. (Stip. 24.) Harris began commercial operation in 1987 and is currently licensed to operate through 2026. (Stip. 25.) Last year Progress Energy submitted an application to renew the Harris operating license for an additional 20 years. (Stip. 26.) The Harris site was originally planned to accommodate four nuclear units (Units 1, 2, 3, and 4). (Stip. 27.) It was intended that Units 1 and 4 would share spent fuel pools A and B, and Units 2 and 3 would share spent fuel pools C and D. (Stip. 28.) Construction of Unit 1 and the Fuel Handling Building ("FHB"), which housed all four spent fuel pools (A, B, C, and D), was well underway when these plans changed. During construction of Unit 1, Units 2, 3, and 4 were cancelled. Unit 1, those portions of the FHB that supported Unit 1, and all four spent fuel pools were completed. Pools C & D were designed and partially constructed to serve Harris Units 2 and 3, which were never built. (Edwards, Tr. 263, lines 21-23.) While much of the piping and major pieces of equipment associated with Units 2 and 3 spent fuel storage were partially completed (i.e., those that supplied Pools C and D), the Spent Fuel Pool Cooling and Cleanup

("SFPCC") System for Units 2 and 3 was never completed. Components of the SFPCC System that were installed and not required for Unit 1 operation were left in place and remained dormant. (Stip. 29; Edwards, Tr. 262-265, lines 19-22.) To maintain full core reserve at Robinson and Brunswick Units 1 and 2, Progress Energy shipped a number of spent fuel assemblies during the 1990s from Robinson and Brunswick to Harris for storage in Harris spent fuel pools A and B. (Stip. 30.) In order to accommodate the Brunswick and Robinson spent fuel, Progress Energy added additional racks to the A and B pools in 1991 and additional racks to the B pool in 1996. (Stip. 31.)

By November 1998, however, Progress Energy determined that because of DOE's breach, it would have to activate pools C & D at Harris and arrange for the storage of spent fuel in those pools. (Edwards, Tr. 343-44, lines 15-17; PX 95.) Progress Energy incurred approximately $32.7 million in connection with activation and storage of fuel in the C & D pools. This includes the cost of plant modifications, completing the cooling water system, removing CRUD, changing technical specifications, public out-reach, and installing racks. (PX 95; DX 304; Edwards, Tr. 344-45, lines 25-14; Edwards, Tr. 352, lines 8-22; Edwards, Tr. 355, lines 13-17; Edwards, Tr. 377-78, lines 25-18.) Progress Energy also incurred approximately $16.9 transshipping spent fuel from Robinson to Harris from 2000 through 2004, and from Brunswick to Harris from 2001 through 2005, which would not have been necessary if DOE had been accepting spent nuclear fuel. (Edwards, Tr. 335-336, lines 19 to 14; Worthington, Tr. 810, lines 16-20; PX 137.)

**3.** ***Robinson.*** Robinson is a single unit PWR site located near Hartsville, South Carolina. (Stip. 34.) Robinson began commercial operation in 1971 and is licensed to operate through 2030. (Stip. 35.) Robinson has a single spent fuel pool. (Stip. 36.) Progress Energy

significantly increased the capacity of the Robinson spent fuel pool in 1983 by replacing some of the existing low density spent fuel storage racks with higher density racks. (Stip. 43.) To further alleviate spent fuel pool capacity constraints, as explained above, Progress Energy transshipped spent fuel from Robinson to Brunswick from 1977 to 1981. (Stip. 37.) Additionally, Progress Energy shipped spent fuel from Robinson to Harris from 1990 to 2004.[4] (Stip. 38.) The transshipments of spent fuel from Robinson to Harris ended in 2004, due in part to the license restrictions on the spent fuel shipping cask, and also due to the increasingly apparent fact that DOE performance was nowhere in the foreseeable future, and alternatives to transshipment (due to the finite capacity of the Harris pools) would be necessary. (Edwards, Tr. 244-245, lines 1-21; Tr. 251, lines 15-22.)

In 2002, Progress Energy decided to build dry storage at Robinson. (Edwards, Tr. 251-52, lines 25-4.) Progress Energy incurred approximately $36 million to build and load the Robinson ISFSI. This includes the costs to design and build the ISFSI, construct a travel path, replace rail road lines, expand plant security and make modifications to the cask preparation area including an upgrade to the crane to lift the heavier storage cask. (Edwards, Tr. 261-62, lines 23-6.)

**4.** ***Crystal River.*** Crystal River is a single unit PWR site located near Crystal River, Florida. (Stip. 19.) Crystal River began commercial operation in 1977 and is currently licensed to operate through 2016. (Stip. 20.) Progress Energy now plans to submit an application in or around September 2008 to renew the Crystal River operating license for an additional 20 years, although that decision had not been made as of the late 1990s. (Edwards, Tr. 235, lines 6-10.)

---

[4] Progress Energy also shipped one assembly to the DOE in 1975 for research purposes. In addition, during the period from about 1987 until 1989, Progress Energy constructed an ISFSI which holds 56 spent fuel assemblies as part of a DOE dry storage demonstration project, which was partially funded by the DOE. (Edwards, Tr. 224-226, lines 13-16.)

Crystal River has two interconnected spent fuel pools, A and B. (Stip. 21.) Progress Energy increased the capacity of the spent fuels pool in 1978 and 1991 by replacing the existing spent fuel storage racks with higher density racks. (Stip. 22.) The licensed capacity of the Crystal River spent fuel pools after the 1978 and 1991 re-rack projects was 1357 spent fuel assemblies. (Stip. 23.)

In 2001, Crystal River re-racked pool B by removing the spent fuel storage racks and replacing them with racks that can hold more spent fuel. (Edwards, Tr. 239, lines 11-25.) This cost Progress Energy approximately $4.6 million. (Edwards, Tr. 239, lines 5-8.)

**5. *Cost tracking and project management practices at Progress Energy.***

In its normal course of business, Progress Energy tracks its costs with charge codes for projects, activities, resource types and organizations. (Calvello, Tr. 1589, lines 14-18.) Project numbers capture costs, such as company labor, contract labor, materials, expense accounts, etc., through Progress Energy's many source systems. (Edwards, Tr. 312, line 10-23; Calvello, Tr. 1591, lines 10-12.) Progress Energy relies on its cost accounting system for reporting to its regulators, both Federal Energy Regulatory Commission ("FERC") and state commissions, to satisfy Generally Accepted Accounting Principles ("GAAP"), and for preparing financial statements. (Calvello, Tr. 1589, lines 1-8.) Progress Energy also uses the data for cost management and budgeting. (Calvello, Tr. 1589, lines 9-11.) External auditors review Progress Energy's system for tracking costs for GAAP compliance at least annually. (Calvello, Tr. 1589, lines 1-3.) Progress Energy also performs both operational and financial internal audits. (Calvello, Tr. 1589, lines 4-5.) And the IRS and state auditors occassionally audit Progress Energy for tax or rate reasons. (Calvello, Tr. 1589, lines 6-13.)

**6.** ***Summary of mitigation costs incurred by Progress Energy.***

To calculate its damages, Progress Energy identified what actually occurred in the real world for managing spent fuel and then determined how much fuel would have been shipped to DOE had DOE performed pursuant to a reasonable pick-up rate of 3,000 MTU per year (after a brief ramp-up period), starting in 1998. (Edwards, Tr. 279, lines 4-12.) In a straightforward exercise not unlike its real-life spent fuel management, Progress Energy presented a reasonable scenario, by making the most efficient use of its "allocations" and factual information regarding available space, reflecting how the company would have stored its spent fuel discharges had DOE performed under the contracts. (Edwards, Tr. 302, lines 16-22.) Progress Energy then compared its real-world activities to store all of its spent fuel with what it would have done had DOE started picking up fuel to determine what activities were undertaken that would not have been undertaken if DOE had began its performance on time. (Edwards, Tr. 279, lines 13-17.)

Progress Energy identified the specific project numbers that correspond with the activities necessitated by DOE's breach. (Edwards, Tr. 320, lines 12-20.) Progress Energy then carefully considered each project and its subparts to verify that the costs incurred were required to store spent fuel. (Edwards, Tr. 323, lines 3-20.) Finally, Progress Energy collected the costs of those activities using the accounting and project number system that Progress Energy uses to track costs in the normal course of business. (Edwards, Tr. 279, lines 17-18; Calvello, Tr. 1594, lines 15-25.) These costs are reflected in the transaction journal (PX 140; Edwards, Tr. 326, lines 4-6; Calvello, Tr. 1593-94, lines 16-3), which is summarized in PX 139. (Edwards, Tr. 327, lines 19-21.)

The total costs incurred on the relevant projects, approximately $92.7 million, was then voluntarily reduced by approximately $1 million to reflect Progress Energy's assessments of

costs it would have incurred to maintain full core reserve at its plants and avoid much higher expenditures. (Edwards, Tr. 328-29, lines 23-2.) As explained above, Harris B pool is used to store spent fuel from Brunswick. If DOE had performed, Progress would have likely shipped the older Brunswick fuel, which is BWR fuel, from the Harris B pool. And Progress Energy, of course, would have to store fuel discharged from Harris. The spaces vacated by DOE's acceptance of Brunswick BWR fuel would be the wrong size for PWR fuel from Harris. Progress Energy, therefore, would have to either activate the C and D pools to store the Harris fuel or remove a few of the BWR racks and add PWR racks. At a cost comparison of $33 million to activate the pools versus an estimated $1,087,280 to remove a small number of BWR racks and add PWR racks to the B pool (Stip 59), Progress Energy would clearly spend the approximately $1 million to avoid having to activate the C and D pools. (Edwards, Tr. 335-36, lines 19-14.) Progress Energy has thus reduced its claim for recovery of costs to activate the C & D pools by this amount.[5]

In addition, a $6,000 reduction in originally-claimed damages was made to reflect a repair to the Robinson crane that was made during the modification that would have likely been made at some point even if DOE had performed. (Edwards, Tr. 331, lines 20-22.) During the course of analysis to upgrade the Robinson crane for the heavier ISFSI casks, the crane manufacturer identified issues with the existing crane and issued a notification under 10 C.F.R. Part 21 ("Part 21") that required action in order to continue using the crane, as Progress Energy had been, for the lighter transportation cask. (Edwards, Tr. 331-32, lines 20-15.) The Part 21 repair made for the materially identical crane at Brunswick cost approximately $6,000.

---

5 As noted below, at the so-called "900 MTU" rate advocated by the government Progress Energy would not claim any costs for activation of the C&D pools. Thus there would be no such claim to offset, and no corresponding reduction would be warranted.

Finally, Progress Energy voluntarily reduced its original claims concerning Robinson by approximately $600,000 regarding certain mis-posted labor charges (Edwards, Tr. 330-331, lines 20-15), and $19,000 in connection with the pool activation project to remove legal fees that were erroneously charged to the pool activation project but were invoiced with legal fees related to the project (Edwards, Tr. 329-30, lines 12-7).

With these reductions, Progress Energy seeks to recover $91,029,704, which it incurred in connection with activities designed to mitigate DOE's breach, as set forth below:

> (1) $208,120 to complete the Brunswick ISFSI feasibility study, which consists of several independent assessments which collectively establish the scope of work required to implement the Brunswick ISFSI;
>
> (2) $32,734,951 to activate two additional spent-fuel pools at the Harris plant, the "C" and "D" pools;
>
> (3) $16,975,182 to conduct 14 transshipments of spent fuel from Robinson to Harris from 2000 to 2004, 18 transshipments from Brunswick Unit 1 to Harris from 2002 to 2004, and 24 transshipments from Brunswick Unit 2 to Harris from 2001 to 2005;
>
> (4) $36,436,059 to construct and load the Robinson ISFSI, including extensive and necessary modifications to the cask preparation area, spent fuel cask storage area, crane and security perimeter (Stip. 46-47); and
>
> (5) $4,675,392 to analyze, design, construct, and replace the Crystal River spent fuel racks and dispose of the old racks.

(DX 304; PX-D1.) [6]

[6] The values reflected in PX-D1 include an erroneous reduction for approximately $408,000 in security-related costs at Robinson that Progress Energy did not, in fact, initially claim. The government, after originally and erroneously "deducting" those costs from Progress Energy's claim, so agreed at trial. (Tr. 1793-1796, lines 21-4.) The figures in the text above reflect that correction.

## B. GOVERNMENT OBLIGATIONS REGARDING SPENT NUCLEAR FUEL.

**1. *The Nuclear Waste Policy Act.*** In response to the growing problem of spent nuclear fuel accumulating at reactors, Congress enacted the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270 (the "NWPA" or the "Act") "to establish the Federal responsibility, and a definite Federal policy, for the disposal of . . . spent fuel." *Id.* §§ 10131(a)(2), (b)(2). The NWPA, therefore, was in part passed to address the spent fuel storage problems created by the government's decision to prohibit reprocessing. With its plans to reprocess blocked, "[t]he domestic nuclear industry was confronted not only with a shift in its technical future but with a sudden and unanticipated liability in the form of spent fuel stored a reactor sites with no near-term designation." H.R. Rep. No. 97-491, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3794. (*See also* Martin, Tr. 73, lines 17-25.) When enacting the NWPA, Congress recognized that federal policy on nuclear waste "can be seen to have exacerbated or created a spent fuel bottleneck." H.R. Rep. No. 97-491, at 28.

The NWPA, which was signed into law in January 1983, provided that "while the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety of the environment, the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel." 42 U.S.C. § 10131(a)(4). The Act thus authorized DOE to "enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent nuclear fuel." 42 U.S.C. § 10222(a)(1). The Act required such contracts to provide that DOE would commence disposal of spent nuclear fuel "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5).

**2.** ***The Standard Contracts.*** In June 1983, DOE, acting pursuant to the Act and on behalf of the Government of the United States, entered into a "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste" (the "Standard Contract") with each plaintiff, CP&L and FPC.[7] (PX 10 and PX 11.) The Standard Contracts required CP&L and FPC to pay substantial present and ongoing fees to DOE. CP&L and FPC agreed to pay a one-time fee to cover the spent fuel discharged up through April 1983. CP&L, for example, made a $100 million dollar payment to the government in 1983. (Martin, Tr. 79, lines 12-14.) The contract also required the payment of quarterly fees from 1983 forward. Through December 31, 2005, Progress Energy had paid approximately $661 million in fees for the disposal of spent fuel under its Standards Contracts. (Stip. 16.) Under the Standard Contract, Progress Energy must maintain possession of the spent fuel until DOE takes possession, provide the government with information regarding its spent fuel, and arrange for loading of DOE's casks when they arrive to remove the fuel. (Martin, Tr. 78-9, lines 23-9.) (*See generally* PX 10 and 11 at 6-8, Article IV.A.)

In return and consistent with the NWPA, the Standard Contract required DOE to accept title to, transport, and dispose of spent nuclear fuel, commencing "not later than January 31, 1998," and continuing until such time as all fuel has been disposed of. (PX 10 and 11 at 6 & 9, Articles II, IV.B.)

The Standard Contact specified a number of types of forms, reports, and other documentation. For example, DOE was required, no later than July 1, 1987, to issue "for planning purposes" an annual capacity report ("ACR"), setting forth the projected annual receiving capacity for DOE's spent fuel facility(ies). (PX 10 and 11 at 10, Article IV.B.5(b).)

---

7 CP&L is the current holder of the single Standard Contract for Brunswick, Robinson, and Harris. FPC is the current holder of the Standard Contract for Crystal River.

DOE was also required to issue an annual acceptance priority ranking ("APR"), which is essentially a listing of fuel in the country by age, beginning on April 1, 1991. (PX 10 and 11 at 10, Article IV.B.5(a); Pollog, Tr. 1279-1283, lines 2-13.)

After DOE issued an APR, the Standard Contract required the utilities to submit delivery commitment schedules ("DCS") to DOE, beginning in January, 1, 1992. The DCS was to "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." (PX 10 and 11 at 11, Article V.B.1.) The Standard Contracts required DOE to approve or disapprove a DCS within three months of receipt. *Id.* If DOE disapproved a DCS, DOE was required to advise the Purchaser of the reasons and the Purchaser then has 30 days to submit a "revised schedule." *Id.* Utilities had the right to adjust the quantities of spent fuel identified up or down by 20 percent. *Id.* Subject to DOE's approval, utilities also had the right to exchange an approved DCS with other utilities with a higher priority for pickup of SNF and HLW. (PX 10 and 11 at 12, Article V.E.) A year prior to the scheduled pick-up, utilities were required to submit a final delivery schedule ("FDS"). (PX 10 and 11 at 11, Article V.C.)

The Standard Contract was not the product of traditional negotiation between parties. As Michael J. Lawrence, who served as deputy director of the NWPA implementation office (and subsequently as its acting director), admitted during his testimony, "negotiations would not have been the proper term" to describe the process. (Lawrence, Tr. 2135, lines 16-17.) Instead, DOE used "terms like consultation, concurrence and other things where we would get individual views to try to shape our opinion on those things." (Lawrence, Tr. 2135, lines 17-20.) And, in the end, the utilities effectively had no choice but to sign the contract or the NRC would shut down the nuclear power plant. (Morgan, Tr. 1419-20, lines 25-6.) *See Indiana Michigan II,* 422 F.3d at 1372 (citing *Maine Yankee*, 225 F.3d at 1337).

**3. *Early evidence regarding contractual "pick-up rate" obligations.***

a. Understandings by Progress Energy. The expectation was that the Standard Contract would, once DOE was required to commence performance in 1998, "solve [Progress Energy's] spent fuel storage problems." (Martin, Tr. 80, lines 16-18.) Specifically, Progress Energy understood DOE to be obligating itself to design a program that would preclude utilities from having to spend additional funds for storage capacity after 1998. (Martin, Tr. 85, lines 3-10.) Progress Energy's own documents confirm that contractual understanding (PX 35 at 8; PX 25 at YMP-001-1830; Martin, Tr. 84-5, lines 15-10), which "had been communicated by DOE through a number of ways. It was in written statements, it was in the verbal communications." (Martin, Tr. 85, lines 11-19; *see also*, Martin, Tr. 91-92, lines 11 to 19.) Purported distinctions between "objectives" and "obligations" were not made by the parties at the time the obligations came from the contract, and (at least early on) the DOE objectives were understood by Progress Energy to be to meet those obligations. (Martin, Tr. 91, lines 1-10.)

Going back to the mid-1970s, there had been an expectation that nuclear power plants would be able to reprocess spent fuel. (Kunita, Tr. 640, 8-15.) In the late 1970s, however, the government prohibited reprocessing in connection with anti-proliferation concerns. (Kunita, Tr. 641, lines 11-19.) Based in part on federal pronouncements and legislation, it was Progress Energy's expectation that the DOE would in effect take the place of reprocessing to close the fuel cycle by taking "batch wise" quantities of fuel (Kunita, Tr. 643, lines 10-24), i.e., at least as much fuel as the plants were generating, thereby avoiding the need for additional storage at the reactor sites. The passage of the NWPA, and the entry into the Standard Contracts, was understood by Progress Energy to reflect the government's "fulfilling [of] its obligation to take that fuel, like they said they were going to." (Kunita, Tr. 644, lines 16-21.)

b. *Understandings by DOE*. In its early planning and statements, DOE recognized on innumerable occasions that it was assuming responsibility for the spent fuel storage problem in 1998. For example, in June 1983, DOE issued a Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste. (PX 8.) This report "evaluates whether collection of the fee [pursuant to the standard contract] will provide sufficient revenues to offset the costs of disposal of commercially generated spent nuclear fuel and solidified high-level radioactive waste produced from reprocessing such fuel." (PX 8 at Sec. 1.1) This analysis to determine if the fee collected is sufficient assumes a repository receipt rate of 3,000 MTUs per year after a five-year ramp-up period (PX 8 at Tab. 3-1, sent. 3), which generally exceeded the rate of discharge of fuel by the industry at that time. (Martin, Tr. 107-108, lines 4-14.)

At an information meeting in December 1983, Robert Morgan, Acting Director of the Office of Civilian Radioactive Waste Management, advised the nuclear power industry regarding DOE's performance:

> I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the Act requires that we receive waste from the utilities by January 1, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act. However, we do not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.

(PX 19; *see* Morgan, Tr. 1403-1408, lines 2-8.)

A couple of months later, in February 1984, Mr. Lawrence testified to Congress that "by achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998." (PX 21.) Later in 1984, in a letter to the new director of the OCRWM, Mr. Lawrence confirmed that the contemporaneous "interpretation" of the NWPA was that it was intended "that no power reactor would require additional spent fuel storage after January 31, 1998." (PX 26 at 1201, item 3; *see also* 1199 (discussing required rates "to eliminate the need for additional at-reactor storage after January 31, 1998.")). Lower acceptance rates were not viewed as corresponding to the services expected in exchange for the 1 mil/kilowatt hour being paid by utilities, and insufficient to provide "post 1997 storage relief to the utilities as intended by the NWPA." (PX 26 at 1202, item 4.) At the time, the DOE did not make distinctions between what were viewed as "obligations" under reasonable interpretations of the NWPA and Standard Contracts on the one hand, and arguments about non-enforceable "intents," "goals," or "objectives" on the other. (Lawrence, Tr. 2175, lines 16-25; Trebules, April 17, 2002 Deposition Tr. 97, lines 8-13 ("As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.").)

During the contract formation process, certain utilities and groups asked for more specification and commitment on behalf of DOE. (Lawrence, Tr. 2092-93, lines 24-12.) For example, Edison Electric Institute ("EEI") requested an explicit statement regarding the pick-up rate. (Morgan, Tr. 1423, lines 19-25.) Specifically, EEI asked that the contract explicitly set the pick-up rate as commensurate with the amount of spent fuel being generated together with the accumulated backlog. (DX 25.34 at Attachment A, page 2 (ADM002 0279).) Progress Energy

viewed EEI's request as "nit-picky" and an unnecessary clarification. (Martin, Tr. 117, lines 5-10.) Picking up fuel at a rate above the generation rate was inherent to the overall purpose and structure of the contract, and what was "already there." (Martin, Tr. 117, lines 12-13.)

Tellingly, in light of the arguments that the government now makes, there is no document that states that DOE "rejected," or "denied," or "viewed as unconscionable" the terms EEI requested. (Morgan, Tr. 1425, lines 20-23.) The Federal Register notice accompanying the final contract does not mention pick-up rate as an issue DOE even considered during the process (DX25.02; Morgan, Tr. 1427-29, lines 19-7), although it does state that DOE "will be judged" by whether it meets the 1998 date. *Id.* Indeed, in a letter to EEI, DOE assured the organization that all of industry's concerns were adequately "addressed." (PX 13.) DOE further observed that DOE was under "stringent time constraints," and thus could not re-examine issues of concern to utilities prior to execution of the contracts. (*Id.;* Morgan, Tr. 1431, lines 8-23.)

c. *<u>Mission Plan drafts, the final Mission Plan, and other early documents and evidence.</u>* The Act required DOE to prepare a "Mission Plan" to provide a statement of the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and other high-level radioactive waste. 42 U.S.C. § 10221(a).

In September 1983, DOE issued a memorandum regarding Mission Plan Strategy stating, in part, that "the central criteria [sic] for this schedule is an acceptance rate during the first five years such that no utility would have to build additional storage after 1998. And an acceptance rate after the first five years equivalent to the actual rate of utility discharge of spent fuel each year." (PX 15.)

A December 20, 1983 draft of the Mission Plan, which was circulated to Congress, utilities, and other interested parties, also confirmed that the contemplated waste acceptance schedule would preclude the need for additional at-reactor storage:

> The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.

(PX 17 at 2-1.) The acceptance rate for the first repository set forth in this draft mission plan was 3,000 MTU per year. (PX 17 at Table II-1) Mr. Morgan confirmed that he considered this to be a "reasonable" rate at the time the draft mission plan was published. (Morgan, Tr. 1408, lines 5-8.) The draft Mission Plan also assured the nuclear power industry that a delay in opening the repository would not prevent DOE from achieving this objective because temporary alternative storage facilities, such as a Monitored Retrievable Storage facility ("MRS"), could be developed.[8] (PX 17 at 2-1.) Mr. Lawrence also confirmed that the MRS was intended to be a back-up in the event a permanent repository was delayed. (Lawrence, Tr. 2086-87, lines 25-9.) As a back-up to the repository, of course, the MRS would receive fuel at the same rates as DOE was planning on for the repository. (Lawrence, Tr. 2151, lines 5-12; PX 31 at 126; PX 36 at 20.) At the time, DOE did not contemplate initiating acceptance at an MRS at a slower rate and then only ramping up to a higher rate when a permanent repository became operational. (Lawrence, Tr. 2150-51, lines 9-3.)

In April 1984, DOE issued another draft of the Mission Plan reaffirming its intention to employ a meaningful acceptance rate even if repository operations were delayed:

---

8 The Act required DOE to complete a detailed study of the need for and feasibility of an MRS facility and submit a proposal to Congress for the construction of one or more MRS facilities by June 1, 1985. 42 U.S.C. § 10161(b)(1).

> The acceptance rate is based on the emplacement capacity currently projected for the two planned geologic repositories and will be maintained by the Department. In the event of a delay in repository operation, the Department could take the waste materials in accordance with the Waste Acceptance Schedule and arrange for either continued storage at the utilities in Federal storage casks, or for storage elsewhere pending transfer to the repository.

(PX 22 at 2-1.) In a July 1984 letter, Progress Energy provided comments regarding the draft mission plan, expressing concern that under the phased repository approach reflected in the draft mission plan, the "1998 repository acceptance rate" might be too slow and that an "overall plan" needed to be developed to accommodate the storage and disposal of spent fuel after January 31, 1998. (PX 25 at 425; Martin, Tr. 96-97, lines 25-6.) Progress Energy also stressed that if the repository were not available in 1998, DOE should evaluate the most economical alternative. (PX 25 at 426.) One option suggested by Progress Energy in its letter was for DOE to meet its contractual obligations by temporarily leasing excess space from utilities. (PX 25 at 426; Martin, Tr. 97-98, lines 23-12.) The expense of such an arrangement would be borne by DOE; Progress Energy clearly expected DOE to take responsibility for additional spent fuel storage requirements starting in 1998.

During the early years while the Mission Plan was being developed, the evidence repeatedly confirms that the overall intent of the federal waste program was for the government to provide storage for spent fuel starting in 1998, and that utilities would not have to expend funds for additional at-reactor storage after that date. For example, comments regarding the draft mission plan submitted by Mr. Lawrence, shortly after he left the implementation office and was working in the Richland operations office of DOE, emphasized that "based on our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent

that no power reactor would require additional spent fuel storage after January 31, 1998." (PX 26 at 1201, item 3.) Specifically, "it should be noted that to eliminate the need for additional at-reactor storage after January 31st, 1998, the initial waste acceptance rate for 1998 should be about 2800 MTU, plus some amount up to 630 MTU, depending upon the extent of federal interim storage is utilized." (PX 26 at 1199, item 1). In his testimony at trial, Mr. Lawrence ultimately affirmed that these statements reflected his interpretation of the Act. (Lawrence, Tr. 2174, lines 2-4.)

In June 1985, DOE published the final Mission Plan. (DX 31.) The Final Mission Plan set forth, as the "authorized system," a phased repository acceptance schedule with the first repository receiving 3,000 MTUs per year after a six-year ramp up period. (PX 31 at 26.) The acceptance rates in the 1985 Mission Plan were based, in part, on trying to keep up with spent fuel discharges and alleviating the need for additional at-reactor storage by purchasers. (Pollog, Tr. 1231, lines 11-12.) The Mission Plan also outlined an "improved performance system," illustrating the possibility of integrating an MRS into the program. (PX 31 at 28.) The DOE described the anticipated role of an MRS in the Federal Waste Management Program:

> The MRS facility would allow the DOE to accept spent fuel without interruption even if the repository is delayed or its emplacement operations or reduced. The MRS facility would safely store spent fuel until the repository was capable of receiving and emplacing it. . . . . Consequently, a firm schedule for spent-fuel acceptance could be established to accommodate the DOE's contractual commitments to the utilities paying fees into the Nuclear Waste Fund.

(PX 31 at 73.) The waste-acceptance schedule illustrating the proposed improved performance system provided for the MRS accepting spent fuel prior to 1998 and hitting a steady rate of 3,000 MTUs per year starting in 1998. (PX 31 at 27.) This proposed schedule would "provide

assurance that the DOE's acceptance of spent fuel in 1998 and subsequent years will be at sufficient rates to meet obligations." (PX 31 at 87.)

Lake Barrett, deputy director of the Office of Civilian Radioactive Waste Management, testified in a deposition that in 1986, DOE was designing a system to receive 3,000 MTUs a year: "My recollection is that the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000." (Barrett, April 22, 2002 Deposition Tr. 51-52, lines 17-10.) Mr. Barrett explained that accepting fuel in excess of the generation rate was important because "it was significant that you design a system to remove the backlog of materials that were accumulating under the intent of the act." (Barrett, April 22, 2002 deposition Tr. 52, lines 11-17.) Mr. Barrett confirmed that the 3,000 MTU per year rate was consistent with the intent of the NWPA to reduce the backlog of spent nuclear fuel throughout the nation in a reasonable period of time. (Barrett, April 22, 2002 Deposition Tr. 59, lines 4-11; Barrett, May 10, 2002 Deposition Tr. 1163-66, lines 10-7.)

Numerous other planning documents DOE published at the time of the Standard Contracts and during the early years reflected a 3,000 MTU per year rate, as compared to assumed discharges by the industry of approximately 2,000 MTUs per year. (Martin, Tr. 106-108, lines 4-14.) For example, as noted above, in June 1983, DOE issued a Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste, assuming a repository receipt rate of 3,000 MTUs per year after a five year ramp-up period. (PX 8 at Tab. 3-1, sent. 3.) Similarly, in February 1985, DOE published an update to the nuclear waste fund fee adequacy assessment and again employed a repository receipt rate of 3,000 MTUs per year after a five year ramp-up. (PX 27 at 3.) DOE clearly recognized that under the Standard Contract utilities were paying for a disposal service that would preclude the need for

additional at-reactor storage after 1998. (Rosselli, April 15, 2002 Deposition Tr. 148-49, lines 21-17.)

**4. *Delays in performance by DOE.***

a. <u>*The 1987 Amendments.*</u> By 1987 DOE had become concerned that there would be a significant delay in opening a permanent geologic repository. (Kouts, *System Fuels* April 12, 2007 Tr. 3372-73, lines 19-20.) At that time, DOE estimated that acceptance at the first repository would be delayed five years, from 1998 to 2003. (DX 59 at 6.) To implement a meaningful waste-acceptance schedule in 1998, DOE continued to explore the development of an integrated MRS facility. (DX 59 at 11.) On March 31, 1987, DOE submitted to Congress a proposal for construction of an MRS facility on the Clinch River in Oak Ridge, Tennessee. (PX 36 at 1.) DOE reported to Congress that the MRS would operate at a full-scale rate of about 2,500 to 3,000 MTUs per year by 2004. (PX 36 at 20; Kouts, *Pacific Gas* Tr. 2775-76, lines 21-4.)

As Mr. Lawrence testified at trial, at the time the contract was formed there was no reason for the acceptance rate utilizing an MRS to differ from the rate DOE was planning for a permanent repository. (Lawrence, Tr. 2151, lines 10-12.) By the late 1980s, however, the political realities of DOE's increasingly apparent delay regarding a permanent repository began to affect matters.

To demonstrate that storage at a proposed MRS was only a temporary measure to accommodate what was then believed to be a five-year delay in opening of the repository, the DOE requested Congress to limit the storage capacity for the MRS to 15,000 MTUs and to specify that the MRS could not be opened until the Nuclear Regulatory Commission had authorized construction of the repository. (PX 36 at 5; DX 59 at 12-13.) With the assumption of

a five year delay in repository operations, the 3,000 MTU/year rate could be achieved with these restrictions. (Milner, May 3, 2002 Deposition Tr. 555-56, lines 21-12.)

In 1987, Congress amended the NWPA. *See* Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5001-5065, 101 Stat. 1330, 1330-227 to 1330-255 (1987) (codified in scattered sections of Title 42). The 1987 Amendments did not adopt DOE's proposal for the Clinch River MRS. 42 U.S.C. § 10162(a). Congress, however, authorized DOE to site, construct, and operate an MRS facility, subject to various conditions set forth in the Amendments. 42 U.S.C. § 10168(b). Among the conditions were: (1) construction of the MRS could not begin until a license was issued for the construction of a permanent repository; and (2) the storage capacity of the MRS could not exceed an aggregate of 10,000 MTUs. 42 U.S.C. § 10168(d)(1) and (d)(3); *see generally System Fuels*, 79 Fed. Cl. at 44-45.

b. *Acceptance Capacity Reports.* In June 1987, DOE published its first ACR. (PX 38.) "As specified in the Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." (PX 38 at 2; *e.g.*, Zabransky, Tr. 1501, lines 8 to 10 (1991 ACR itself "not contractually binding").) In the 1987 ACR, DOE set forth an acceptance schedule, based on a proposed MRS, that called for picking up fuel beginning in 1998 and ramping up to 2,650 MTUs in the first five years. (PX 38 at 7.)

In December 1990 DOE published an ACR with two pick-up rates, both based upon an assumption of an MRS (Pollog, Tr. 1258, lines 4-9), and both based upon assumed changes in the law by Congress (Pollog, Tr. 1258, lines 10-16). In the first "upper bounding" case, Congress was assumed to change the law in two ways, namely to eliminate the so-called "linkage" between an MRS and construction of a permanent repository, as well as to eliminate capacity limits on an MRS. Under those assumptions, DOE would, after a ramp-up, achieve a

steady state 3,000 MTU acceptance rate. In the second "lower bounding case," Congress was assumed only to amend the law regarding linkages to construction of a permanent repository, which, with "a little bit of rounding" and an assumption of a 12-year delay in the repository, approaches the 900 MTU rate. (PX 51 at 1637; Pollog, Tr. 1259-60, line 17-1.) DOE published no ACR that assumed compliance with the law as it then existed.

c. *The 1991-1995 Acceptance Capacity Reports and Acceptance Priority Rankings: the "900 MTU/year" rate.* In 1991, DOE published another ACR, this time eliminating the assumption that Congress would lift the capacity limitations on an MRS contained in the 1987 Amendments, as DOE had assumed in 1990 (PX 51), but retaining the assumption that Congress would change the law regarding required linkages to a permanent repository. (*E.g.,* Pollog, Tr. 1249, lines 4-9; PX 53 at 4-5.) Accordingly, the 1991 ACR included a single rate, akin to the "lower bounding case" of the prior year. That rate acceptance of 400 MTU in 1998, 600 MTU in 1999, and 900 MTU a year from 2000 through 2007 for a total of 8,200 MTUs was consistent with the 10,000 MTU storage capacity limit imposed by the NWPA, *but* it assumed the linkages with the repository development would be lifted by Congress. (PX 53 at 4-5.) No rates for years after the first ten were supplied.

The government now emphasizes the 1991 date when it argues that DOE was able to unilaterally set its obligations, based upon the serendipity of whatever happened to be "going on with the program at the time." (Pollog, Tr. 1372-73, lines 24-6.) Given that position, it is important to recall that the 1991 date appears in the Standard Contract only in connection with the APR (PX 10 and 11 at 10, Article IV.B.5(a)), which is essentially just a listing of all fuel in the industry, by age. (Pollog, Tr. 1281-1282, lines 22-1.) The APR contains no "capacities." The ACR, which does recite capacities, is "not contractually binding on either DOE or the

Purchasers," (PX 38 at 2; *e.g.*, Zabransky, Tr. 1501, lines 8-10 (1991 ACR itself "not contractually binding")), and nothing in the Standard Contracts permits the ACR to be used to limit DOE's liability in the manner now argued by the government. (PX 10; Zabransky, Tr. 1498-99, lines 24-9; Pollog, Tr. 1278-84, lines 5-10.)

The government also argues, and various former government personnel have suggested, that "binding" obligations on the part of DOE could not be established at the time of contract formation because there was no "design of the facility" at that time. (*E.g.*, Morgan, Tr. 1411-12, lines 10-20; Morgan, Tr. 1476-77, lines 20-16; Lawrence, Tr. 2091-92, lines 4-2.) But, there was of course no such "design" in 1987. And there was no such "design" in 1991, when DOE now argues it was entitled to limit its liability. Indeed, there is no such "design" even today.

The record contains no evidence that during the period following 1991 DOE ever proposed to Congress a legislative amendment eliminating only the statutory linkages, as assumed by the 1991 ACR. (Kouts, *System Fuels* April 12, 2007 Tr. 3480, lines 5-22; Kouts, *Systems Fuels* April 12, 2007 Tr. 3540-41, lines 7-9.) Indeed, by 1995, President Clinton had announced that he would veto proposed legislation to remove the linkages between the repository and an MRS facility. (Kouts, *Systems Fuels* April 12, 2007 Tr. 3545, lines 14-16.) As early as 1991, the General Accounting Office ("GAO") reported that "it is unlikely that DOE will meet its objective to have an MRS facility operating by 1998." (PX 156 at 19.) Those views were shared with DOE, which took no exception. (Kouts, *System Fuels* April 12, 2007 Tr. 3486-87, lines 6-5.) Among the reasons cited by GAO for this conclusion, "DOE is being optimistic in assuming that Congress will reverse the position it took in the 1987 amendments by removing or modifying the linkage between the MRS facility's and repository's schedules." (PX 156 at 19.) In its formal "Notice of Inquiry" published in the Federal Register in May 1994,

DOE acknowledged that no permanent repository was possible prior to 2010, and that "no significant progress" had been made toward locating and developing a site for an MRS. (PX 162; Zabransky, Tr. 1510-1512, lines 10-4.)

Nonetheless, in its 1994 ACR, issued in March 1995, DOE still applied the 900 MTU/year rate from its 1991 ACR. (PX 60 at 4; Milner, May 3, 2002 Deposition Tr. 412, lines 3-22.) "No one discussed" changing the published rates, but one of the "considerations" in continuing to use those artificially low rates was to "minimize the commitments" that DOE had to utilities. (Zabransky, Tr. 1515-1517, lines 13-19.) Stated another way, DOE sought to minimize its "liability." *Id.* DOE still expected utilities to use that 900 MTU/year rate when filling out Delivery Commitment Schedules, discussed immediately below. Although the 1995 ACR substituted "year 1" for "1998," DOE was accepting DCS's as if 1998 was in fact "year 1." (Zabransky, Tr. 1519-1520, lines 22-7.) *System Fuels*, 79 Fed. Cl. at 46-47.

d. *Delivery Commitment Schedules.* According to the Standard Contract, beginning in January 1, 1992, purchasers were to submit DOE Delivery Commitment Schedules ("DCSs") that identify spent fuel the purchasers plan to deliver to DOE beginning 63 months thereafter. (PX 53 at 7; PX 10 and 11 at 11, Article V.B.1.) The 1991 APR was used for the DCS submittals, to show utilities how the capacities in the 1991 ACR should be allocated across the industry. (PX 53 at 7.) As with all ACRs, the 1991 ACR specified that "the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." (PX 53 at 1-2; Pollog, Tr. 1248, lines 11-14.)

When Progress Energy signed the Standard Contract, it viewed the Delivery Commitment Schedules as administrative tools to coordinate delivery of spent fuel to DOE. (Martin, Tr. 109, lines 7-15.) The forms were certainly not seen as a mechanism that DOE could use to alter its

obligation to preclude additional at-reactor storage costs after 1998. (Martin, Tr. 109, lines 20-24.) Although the government now seems to have abandoned that position (*e.g.*, Tr. 1647, line 25, statement of counsel), at times it has asserted that "approved DCSs" reflected the only binding commitments on the part of DOE. (Zabransky, Tr. 1491-93, lines 23-23; Zabransky, Tr. 1501, lines 11-16; Pollog, Tr. 1263, lines 3-7; Pollog, Tr. 1269-70, lines 1-3.) Keeping with its consistent "heads-I-win-tails-you-lose" approach, this is so even though such schedules were not viewed *by DOE* as binding commitments at the time they were approved, because DOE viewed its own obligations as "conditioned" upon the existence of an operating disposal facility. (Pollog, Tr. 1263, lines 3-7; Pollog, Tr.1266-67, lines 20-2.) Moreover, the schedules were accompanied by DOE-dictated instructions that gave no choice to utilities regarding amounts of spent fuel to be identified. (PX 55, page CP_FP000111094-95; Zabransky, Tr. 1498, lines 21-23; Pollog, Tr. 1277-78, lines 6-4.) The DCS process was a "choreographed dance" between the government and the utilities with the government leading the dance by providing the information. (Brownstein, April 10, 2002 Deposition Tr. 367-68, lines 20-25.) Thus like the ACRs upon which they are based, the DCSs are for planning purposes only. (Slater, June 13, 2002 Deposition Tr. 94-94, lines 16-18.)

In any event, in 1997, such schedules ceased being approved by DOE altogether. (Zabransky, Tr. 1496, lines 9-24; Pollog, Tr. 1267-68, lines 21-4). It is impossible for a utility to have an approved DCS today. (Zabransky, Tr. 1527, lines 3-6; Pollog, Tr. 1290, lines 11-14.)

## C. Specific Mitigation Activities at Progress Energy's Nuclear Reactors

### 1. *Harris C and D Pool activation and storage of spent fuel: removal of "CRUD" and unused racks.*

a. Brunswick fuel introduced into the Harris borated pools caused a particulate material known as "CRUD" to accumulate in the C and D pools. (Edwards, Tr. 377, lines 10-24.) To activate the C and D pools, the CRUD had to be removed from the C pool for fuel handling purposes – to increase visibility and reduce radiation exposure. (Edwards, Tr. 377-78, lines 25-18.) If the C and D pools had not been activated, the CRUD would have been left in the C pool indefinitely. (Edwards, Tr. 379-80, lines 19-2.)

Indeed, CRUD has a very short half-life, of about five years. (Edwards, Tr. 379-80, lines 19-16.) Letting it sit for several years therefore has the benefit of lowering exposure to employees who handle it (Edwards, Tr. 380-81, lines 25-8) and would allow Progress Energy to ship it offsite in the traditional manner under existing regulations as "low level" radioactive waste (Edwards, Tr. 384-85, lines 19-2). It was thus Progress Energy's philosophy and strategy to leave the CRUD in the pool as long as possible, with the preference of leaving it there until decommissioning. (Edwards, Tr. 385, lines 16-22.)

The CRUD in Harris pool was unique because of the large volume and small particle size. (Edwards, Tr. 381-82, lines 16-16.) Progress Energy, therefore, had to design and install a unique system to remove the CRUD and, because the CRUD had not yet aged sufficiently to be shipped off site, designed special collection vessels to store the CRUD until it decayed enough for shipment. (Edwards, Tr. 384, lines 1-13.) Progress Energy is seeking $297,294 for the cost of the CRUD clean-up and $330,345 for related Sludge clean-up. (DX-D5 at 43.)

b. Similarly, racks stored in Pool C also had to be removed. (Edwards, Tr. 387, lines 1-16; PX 101.) If pools C & D had not been activated, Progress Energy would have left these racks in pool C indefinitely. (Edwards, Tr. 387, lines 17-21.) Progress Energy is seeking $174,636 for the cost it incurred disposing of the unused racks. (DX-D5 at 43.)

The government's expert, Gregory Maret, does not dispute that these activities were required to activate pools C and D, and thus, at the 3,000 MTU level, necessitated by DOE's breach. Indeed, he professed to have "no opinion" about whether costs for removal of CRUD should or should not have been included in Progress Energy's claim. (Maret, Tr. 1839-1841, lines 18-15.) Mr. Maret, however, argued that Progress Energy would have had to dispose of the unused pool racks and CRUD waste material from the C and D pools when the Harris site is decommissioned. (Maret, Tr. 1766-67, lines 18-11.) The government seeks a reduction in Progress Energy's recovery to reflect the alleged costs of these activities at decommissioning. (Johnson, Tr. 2016, lines 21-22.)

The Harris plant is currently licensed to operate through 2026, and Progress Energy has submitted an application to renew the Harris operating license through 2046. (Edwards, Tr. 385, lines 3-6.) It is simply impossible to estimate the cost of these disposal activities 40 years from now. Indeed, during decommissioning these would not be isolated costs but part of a much larger disposal and cleanup effort. And, even if one could isolate the potential costs four decades hence, they would likely be much less than the dollars actually expended in or around 1998 because of economies of scale and, with regard to the CRUD, the radioactivity would have decayed significantly as it sat in the pool, rendering its handling and disposal far cheaper than it was in the real world. (Edwards, Tr. 383-85, lines 15-22.) Finally, even though Mr. Maret acknowledges the self-evident proposition that there is economic value to deferring activities and

costs where possible (Maret, Tr. 1841-42, lines 21-18), the government simply "deducts" 100 percent of the actual 1998 dollars spent, rather than attempt to assess the net present value of the costs of such activities in 2046 (upon which the government offered no evidence) (Maret, Tr. 1842, lines 19-22).

***2. Harris C and D Pool activation and storage of spent fuel: Component Cooling Water system upgrades.***

It cannot be seriously disputed that the CCW system upgrades, which cost Progress Energy $1,166,640 (DX-D5 at 43), were required for the activation and use of the Harris C and D spent fuel storage pools and for storage in those pools of the amount of fuel necessary due to DOE's breach. (Edwards, Tr. 359, lines 17-23 (able to say "with certainty" that CCW upgrades were necessary for C/D activation and storage of fuel); Maret, Tr. 1854, lines 1-8 (acknowledging that it was a "reasonable possibility" that CCW upgrades required for C/D activation and storage of fuel).) The initial CCW thermal-hydraulic margin was not adequate to add all of the spent fuel pool cooling required for storing the amount of fuel in pools 'C' and 'D' that Progress Energy would ultimately need to place there (PX 86 at 7), although there was some margin. In 1998, Progress Energy calculated that it would be acceptable to add an additional million BTUs ("MBTU") per hour to the CCW total heat load to accommodate activation itself and *some* additional storage of spent fuel. (Tibbitts, Tr. 1008-9, lines 22-7.) The calculations for that initial 1.0 MBTU heat load were reflected in a document entitled SF-40, Rev. 0. (PX 94.) Progress Energy approached that limit in the spring of 2004, only three years into the loading of pool C. (Tibbitts, Tr. 1010, lines 23-25.)

Given DOE's ongoing breach, however, Progress Energy had a continuing need to add spent fuel to the Harris C and D pools after 2004. In addition, Progress Energy had determined to pursue "power uprate" and steam generator replacement projects, which were unrelated to

DOE's breach. In performing the assessments of the heat load requirements for the CCW system, potential impacts from all of the projects were analyzed together. That analysis was reflected in SF-40, Rev. 3. (PX 115.) Once Progress Energy concluded that the CCW upgrade was necessary for the storage of the additional fuel in the Harris pools, Progress Energy never separately went back to analyze the issue of whether the CCW upgrade would have been necessary solely for the power uprate or steam generator replacement. (Edwards, Tr. 360, lines 5-15.) Similarly, much of the contemporaneous documentation discusses all of the interrelated and concurrent projects together, although some of that documentation (in portions that the government did *not* highlight at trial) characterize the impacts of steam generator replacement and power uprate on heat loads as "slight," while referring to the increased heat loads as being "primarily due" to increased spent fuel pool heat load and associated impacts. (DX 237 at 62, section 7.2.7; Maret, Tr. 1869-70, lines 19-19.)

One cannot say with certainly that the CCW upgrade would have been necessary for the power uprate alone. (Edwards, Tr. 359-60, lines 24-3.) Similarly, one cannot say with certainly that the CCW upgrade would have been necessary for the steam generator replacement alone. (Edwards, Tr. 360, 16-21.) The evidence strongly suggests, however, that one would not expect either scenario to be the case. (*See generally* Tibbits, Tr. 1025-1028, lines 11-21.) For example, steam generator replacements typically do not directly affect the demands upon the CCW or analogous systems, because such projects involve simply replacing the existing system with a like system – referred to as the same "fit, form, and function." (Edwards, Tr. 358-59, lines 21-16.) Indeed, the CCW system does not provide any direct support to the steam generators. *Id.*

Regarding power uprate, the *maximum* potential increase in heat load resulting from a 4.5 percent power uprate such as the one undertaken here at Harris would be 4.5 percent (Maret, Tr.

1864, lines 15-21), but the increased heat load that the CCW system had to accommodate for storage of the expected fuel in the Harris C and D pools far exceeded that amount (Maret, Tr. 1868, lines 3-14). Power uprates such as the Harris uprate are referred to in the industry as "harvesting margin," that is, reanalyzing certain margins of safety built into the design of the applicable systems, without plant modifications and replacement of equipment. (Edwards, Tr. 357-58, lines 3-20; Edwards, Tr. 545-46, lines 21-12.) Moreover, such power uprates are "common in the industry," yet the government's expert was unaware of a single other instance where a utility has had to perform a physical upgrade to a CCW or analogous system as a result of such an uprate. (Maret, Tr. 1870-1871, lines 20-2.)

The government's challenge to CCW costs is based solely upon the opinions of its retained expert, Gregory Maret, which is of course inconsistent with the factual testimony of the Progress Energy employees actually involved in the matters.[9] Mr. Maret acknowledges that he performed no independent modeling (Maret, Tr. 1858, lines 12-14), and any opinions about purported independent impacts of the steam generator replacement and power uprate projects are therefore based upon his assessments of the consolidated analyses of Mr. Tibbits, Mr. Edwards, and others from Progress Energy. More particularly, Mr. Maret based his testimony upon some comparisons of the SF-40 rev. 0 and SF-40 rev. 3 analyses. (PX 94 and PX 115.) He still did not say "with certainty" that those other projects would have required CCW system upgrades on their own, but vaguely concluded that there is "reason to believe" that that might be the case. (Maret, Tr. 1855-1856, lines 3-3.) The comparisons of the values from the two heat load studies, however, simply do not add up to yield the conclusions that Mr. Maret seeks to draw from them. When confronted with that fact on cross examination, he acknowledged that "a number" of

[9] Mr. Maret's opinions were formed before he had even considered the relevant factual Progress Energy testimony. (Maret, Tr. 1857-58, lines 19-5.)

additional factors, beyond power uprate and steam generator replacement, and including assumed cooldown rates, higher operating levels, and changes in assumed temperature levels, likely "impact[ed] the whole analysis." (Maret, Tr. 1868-69, lines 3-4.) Mr. Maret, in other words, compared apples to oranges, and the opinions he expresses upon the basis of such comparisons are not persuasive.

### 3. *Loading of casks for transshipment and storage*

The government seeks a $9,818,462 offset for the costs Progress Energy "saved" by not having to load DOE casks. (Johnson, Tr. 1968, lines 19-20.)[10] The government uses the actual costs Progress Energy incurred loading its own transfer casks to estimate the costs that Progress Energy would have incurred to load DOE casks. (Johnson, Tr. 1967-72, lines 21-12.) The government does not challenge recovery of loading costs Progress Energy incurred in the actual world as a result of DOE's breach for purposes of taking its argued reductions. (Johnson, Tr. 2023, lines 13-14.) (Although, inconsistently, the government does "deduct" from Progress Energy's claimed costs any overheads and internal labor costs that do not meet its arbitrary criteria.) Instead, the government argues that Progress Energy's recovery should simply be reduced by costs it allegedly would have incurred to load DOE's casks in the but-for world had DOE performed in a timely manner. (Johnson, Tr. 1968, lines 22-24.)

The government's position, however, does not take into account DOE's future performance. (Johnson, Tr. 2019, lines 15-18.) If the government shows up one day in the real world, there will be a cost to load DOE's casks. (Edwards, Tr. 388-89, lines 25-6; Johnson, Tr. 2021, lines 20-24; Maret, Tr. 1904-05, lines 17-4.) That cost would be in addition to the

---

[10] This amounts assumes no reductions due to the government's 900 MTU/year "pick-up rate" arguments. The amounts of the argued deduction under the government's pick-up rate theory would be lower, because Progress Energy would have loaded fewer casks.

hypothetical "savings" that the government seeks to impose now Progress Energy will effectively incur such costs twice, rather than once. (Edwards, Tr. 388-89, lines 13-6.)

Also, the government never committed to supply a particular type or size of cask to Progress Energy. (Edwards, Tr. 389, lines 7-10; Zabransky, Tr. 1528, lines 14-19.) Nor has the government committed to accept any already-loaded casks at Robinson without unloading and repacking, at Progress Energy's expense. (Edwards, Tr. 389, lines 11-14.) The government's extrapolations about hypothetical DOE loading, therefore, represent pure speculation.

#### 4. ***Railroad maintenance.***

In connection with the transshipments to Harris necessitated by DOE's breach, Progress Energy periodically performs visual inspection and ultrasonic testing of the rail lines and performs maintenance as required. (Edwards, Tr. 390-91, lines 19-1.) Such maintenance is not performed when the tracks are not being used. (Edwards, Tr. 391-92, lines 25-4.) Progress Energy is claiming $260,037 for railroad track maintenance. (DX-D5 at page 43.) The government contends such costs are "non-incremental" because railroad track maintenance would have been necessary for the movement of fuel in the "but-for" world and for the transshipments of fuel that occurred in the real world. (Johnson, Tr. 1962, lines 8-19.) DOE, however, has not committed to use railroad casks. (Edwards, Tr. 389, lines 22-25; Zabransky, Tr. 1528, lines 14-19.) Progress Energy has used rail to transship in the past and there would thus be advantages to using that method; however, one cannot simply assume that DOE would have honored a request from Progress Energy to use rail. The government, therefore, is merely speculating that this activity would have occurred if DOE had performed under the contract.

**5. *The Crystal River re-rack.***

The need for storage space as a result of DOE's delay in picking up spent fuel was at a minimum a substantial causal factor in Progress Energy's decision to re-rack at Crystal River, for which Progress Energy is claiming the cost of $4,675,392. (DX-D5 at 43.) All of the contemporaneous documentation generated after conclusion of a spent fuel storage study by Progress Energy in 1997 expressly recites the need for additional storage space as a reason for the project, and the testimony persuasively confirms that conclusion.

The racks in the Crystal River spent fuel pool did suffer from Boraflex degradation. Over time, Boraflex degradation can cause two problems: (1) the neutron-absorbing properties of the boron in the Boraflex are necessary to control criticality, and that function decreases upon degradation; and (2) there are associated water chemistry issues regarding silica, which can be problematic if the silica is introduced into certain systems. In May 1996, a team at Progress Energy was assembled to examine the problem and concluded, in its "phase one" report, that the Boraflex racks were in "relatively good condition" and were expected to maintain their integrity through the end of the plaint's current operating license in 2016. (PX 66 at 1.) The team did *not* recommend re-racking at that time. In November 1996, in its "phase two" report, the Boraflex team concluded that reverse osmosis, combined with isolating pool B, appeared to be the best option to manage the silica issue. (PX 72 at 20.) Significantly, however, no final decision from management was requested regarding the Boraflex issues, pending a study of spent fuel storage options in light of DOE's impending breach. (PX 72 at 1.) Again, and more to the point, no recommendation to re-rack was made at that time.

The third phase of the project was to develop a strategic spent fuel storage plan. In its September 1997 phase three report, the Boraflex team, for the first time, recommended re-

racking the Crystal River pool as part of a ten-year project to address the spent fuel storage problem, noting that this would also solve the Boraflex and silica problems. (PX 84 at 1.) From that point forward, all of the contemporaneous documentation expressly recites the need for additional storage space in connection with the re-rack project. For example, the NRC concluded that the additional space afforded by the re-rack was "necessary to provide adequate spent fuel storage capacity," and that, "in addition," the project would also address Boraflex degradation issues. (PX 108, Attachment, page 2; Culver, Tr. 958-59, lines 25-23. *See also* PX 105, Attachment A, page 3 of 14; Culver, Tr. 952-54, lines 23-15.)

Michael Culver, the reactor engineer on the Boraflex team, testified persuasively that if Crystal River could have created sufficient space in the pools by other means, for example by shipping spent fuel to Harris, he would have recommended *against* re-racking. (Culver, Tr. 963, lines 10-20.) He explained that "we could have taken care of subcriticality margin and the silica through other means." (Culver, Tr. 963, lines 16-18.) Mr. Culver testified unequivocally that the need for additional space was the "primary reason" for the re-rack project. (Culver, Tr. 954-955, lines 22-16.) Similarly, Thomas Lehman, issue manager for the Boraflex and space issues for Crystal River, testified that if Boraflex had not been an issue, he still would have recommended re-racking to resolve the space issues. (Lehmann, Tr. 1105, lines 15-19.) Re-racking is the most cost effective way of increasing capacity, and the government does not dispute that additional capacity was necessary. (Maret, Tr. 1879, lines 3-7 ("this is not a pickup rate issue").)

With regard to criticality issues, those could have been satisfied by taking credit for a combination of other neutron absorbers, including soluble boron and the remaining Boraflex. (Williams, Tr. 1218, lines 1-13; Williams Tr. 1220-21, lines 25-3; Culver, Tr. 911-912, lines 19-

18 ("[I]t would have been very easy to credit 50 or 80 percent of the Boraflex.").) Or, "RackSavers™" could have been inserted around the fuel. (Culver, Tr. 914-7, lines 23-14.) Using RackSavers™ alone would have cost an estimated $961,000; however, using them in conjunction with other methods or in addition to other neutron absorbers could reduce the cost to a quarter of that amount or less. (Culver, Tr. 915-16, lines 23-16.) In short, there were a host of available "long term management strategies" short of re-racking available to Progress Energy to address the Boraflex issues, if the need for additional space due to DOE's breach had not been present. (Culver, Tr. 947-48, lines 25-10.)

With regard to silica, "the most cost-effective method to decrease silica would be bringing in a vendor and leasing reverse osmosis equipment, periodically cleaning up the pool." (Lehmann, Tr. 1206, lines 17-23.) This method would cost $100,000 to $120,000 every couple of years, as compared with the $4.6 million capital expenditure to re-rack. (Lehmann, Tr. 1106, lines 4-10. *See also* Culver, Tr. 915-16, lines 23-16.)[11] The need for space was clearly a driving force, and at a minimum a substantial causal factor, in the decision to re-rack the Crystal River pool.

The government again relies upon the opinions of its retained expert, Gregory Maret. Mr. Maret, however acknowledged that "wet storage" was more economical than dry storage in circumstances such as those at Crystal River. (Maret, Tr. 1881-82, lines 6-11.) Accordingly, Progress Energy will save money for any extra fuel that Progress Energy can place in its new racks, rather than in an eventual and likely dry storage facility. That fact alone is sufficient to justify Progress Energy's damages, and to require rejection of the government's opposition.

---

11 Progress Energy assessed the possibility that such alternative strategies such as reverse osmosis might accelerate degradation of the Boraflex, and (a) concluded that they would not, and (b) assessed back-up strategies in the event that they would. (Culver, Tr. 949-50, lines 6-14.)

Moreover, Mr. Maret was clearly unfamiliar with widely-used industry strategies for managing criticality issues such as soluable boron credits (Maret, Tr. 1885-87, lines 14-3), although he admitted that taking credit for soluble boron could, at least in part, address these concerns (Maret, Tr. 1893, lines 10-14). Mr. Maret further admitted that there were other criticality control strategies that he "was not familiar with." (Maret, page 1894-95, lines 7-1.) Mr. Maret did not recall the extent of the degradation of the Boraflex at Crystal River (Maret, Tr. 1897, lines 14-21), and Mr. Maret never worked at a plant with Boraflex racks or issues (Maret, Tr. 1879, lines 8-14). Mr. Maret acknowledged that "all of the company documentation from at least September 1997 on discusses the need for additional space in connection with the re-rack option at Crystal River." (Maret, Tr. 1880-81, lines 24-5.) In short, Mr. Maret's conclusory assertion that Progress Energy would have re-racked Crystal River "anyway" even if DOE had performed is without support, and is belied by the substantial contrary evidence in the record.[12]

**6. *Harris C and D Pool activation and storage of spent fuel: licensing proceedings and interventions.***

North Carolina Waste Awareness Network, a local environmental organization, and the Board of Commissioners of Orange County ("BCOC"), a local government organization, were actively opposed to Progress Energy's activation of Harris C & D pools. (Edwards, Tr. 349, lines 2-18.) Public comments and, if contentions exist, intervention are an expressly contemplated part of the process set forth in the NRC regulations. (Edwards, Tr. 346, lines 1-19.) Under NRC's rules of practice for licensing procedures in effect at the time Progress Energy filed for an amendment to activate spent fuel pools C and D, "[a]ny person whose interest may be affected by a proceeding and who desires to participate as a party shall file a

[12] And, again, Mr. Maret formulated his opinions before he ever read the deposition testimony of the relevant Progress Energy employees. (Maret, Tr. 1875-79, lines 6-2.)

written petition for leave to intervene." 10 C.F.R. § 2.174 (1998). And full Atomic Safety Licensing Board ("ASLB") hearings are common for large capital projects at nuclear power plants. (Edwards, Tr. 348-49, lines 25-1.) Indeed, Mr. Morgan acknowledged the potential for intervenors with regard to construction of the permanent repository. (Morgan, Tr. 1464, line 17.)

The BCOC filed oppositions with the Nuclear Regulatory Commission ("NRC") according to the applicable regulations, and the NRC determined that the Board had standing. (Edwards, Tr 349-50, lines 19-1.) As a result, full NRC ASLB hearings were held. (Edwards, Tr. 345, lines 24-25.) Progress Energy is claiming $1,800,500 incurred to defend its licensing request and $101,288 for public out reach related to the licensing request. (DX-D5 at 43.)

When the BCOC intervened under this process, Progress Energy was confident that BCOC's contentions were without merit and that the activation of the Harris C and D pools posed no significant safety hazards. Indeed, Progress Energy was ultimately successful. *In re Carolina Power & Light Co.*, 53 N.R.C. 113 (2001) (denying BCOC's petition for review of staff's issuance of license amendment).

Community outreach is also "a part of doing business" for nuclear power plants and common when dealing with plant modifications and contested NRC proceedings. (Edwards, Tr. 350-51, lines 14-6.) As part of the C & D pool activation, Progress Energy engaged in such community outreach efforts. (Edwards, Tr. 352, lines 8-22.)

**7. *Progress Energy's use of internal labor.***

Progress Energy relied on its own employees to assist in the mitigation activities (Edwards, Tr. 395, lines 16-22), which offers a number of advantages (Edwards, Tr. 395-96, lines 18-1). Progress Energy was thus deprived of the time its employees spent on mitigation activities, as none of that time could be spent on other projects or tasks. Progress Energy's cost

accounting system captures all company labor dedicated to a specific project. (Edwards, Tr. 395, lines 5-6.) All labor costs are calculated and included in the project cost for budgeting and cost reporting purposes. (Edwards, Tr. 394-95, lines 21-1.) This is true even if just one hour is recorded to a particular project. (Edwards, Tr. 395, lines 2-6.) For its own cost tracking and other purposes, Progress Energy does not impose any sort of threshold number of hours that an employee must record to a particular project before the costs associated with such time are treated as costs attributable to that project. (Edwards, Tr. 395, lines 7-13.)

Progress Energy does not staff its divisions or organizations with excess capacity. (Edwards, Tr. 395, lines 14-17.) With regard to the many of the substantial mitigation projects at issue in this case, specific dedicated organizations were created, for which personnel were "hired" either through internal offers or externally. (Edwards, Tr. 396-97, lines 13-4.) After the projects were completed, the project organization was "disbanded." (Edwards, Tr. 397-98, lines 5-9.) For company employees that cannot find other open positions in such circumstances, "[t]hey're no longer a company employee." (Edwards, Tr. 398, line 8-9.)

The government argues that Progress Energy's internal labor costs should be reduced by $4,383,222. (DX-D5 at 43.) This portion of Progress Energy's labor costs, according to the government's consultant Mr. Johnson, is a fixed, "non incremental" cost. Mr. Johnson relies upon a made-up, arbitrary threshold "screen," namely, that any particular employee must have spent more than "half" of his time on a mitigation project during one of the years during which the activities were occurring. (Johnson, Tr. 2004-10, lines 23-17.) Application of that "screen" results in exclusion of, for one employee, 860 hours in 2005, 838 hours in 2004, 106 hours in 2002, and 376 hours in 2001. (Johnson, Tr. 2041-42, lines 7-10.) The "screen" Mr. Johnson purports to apply in this case differs from ones he has tried out, unsuccessfully, in other spent

fuel damages cases. (Johnson, Tr. 2045-46, lines 20-8.) The "screen" does not appear anywhere in Generally Accepted Accounting Principles ("GAAP"). (Johnson, Tr. 2042-43, lines 11-23.) The "screen" does not appear in any legal hornbook. (Johnson, Tr. 2044, lines 2-4.) The "screen" does not appear in any accounting books. (Johnson, Tr. 2044-45, lines 5-14.) Mr. Johnson just made it up, based upon what he thought was "reasonable." (Johnson, Tr. 2004, line 4.)

### 8. *Allowance for Funds Used During Construction.*

Progress Energy routinely issues short and long-term debt. (Edwards, Tr. 404, lines 8-10.) There "definitely would have been" short and long term debt issued by Progress Energy during the time period when the large mitigation projects were occurring. (Edwards, Tr. 404, lines 11-24.)

Progress Energy, in the normal course of business, calculates the Allowance for Funds Used During Construction ("AFUDC") for each capital project, and includes such costs as part of the recorded total cost of the capital project. (Edwards, Tr. 398-99, lines 21-13.) AFUDC is applied, consistent with FERC regulations, from the time a utility begins to incur costs to the time a capital project is placed into service. (Edwards, Tr. 401, lines 20-24.) Under the AFUDC calculation, funds used on the mitigation project cost $1,996,045, which Progress Energy has included in its claim. (DX-D5 at 43.)

AFUDC is not interest on a claim. It is a cost that is calculated in real time and applied contemporaneously with the project. (Edwards, Tr. 403, lines 23-25.) It is not applied retroactively to bring the costs up to the current value. (Edwards, Tr. 404, lines 1-2.)

**9. *Warehouse and construction services.***

Stores adders are the costs incurred by the project to recover the costs of warehousing operations. (Edwards, Tr. 405, lines 3-7.) Warehousing costs include those incurred for procurement, expediting, quality control, receipt inspections, material handling, people that issue material, as well as warehouse operation itself. These costs are applied to the material being processed through the warehouse, which most accurately places cost on those projects using the materials. (Edwards, Tr. 405-6, lines 11-10.) And there is no dispute that the mitigation-related activities projects used warehousing services. (Johnson, Tr. 2029, lines 11-14.) Nonetheless, the government seeks to reduce Progress Energy's recovery by $2,190,504, the share of warehousing costs that falls to the mitigation projects. (DX-D5 at 43.)

Similarly, projects are proportionately charged for their share of Construction Work in Progress ("CWIP") costs, which pays the salary of management level individuals and financial people who provide services such as plant review groups, or project review groups, and oversight. (Edwards, Tr. 407-8, lines 1-25.) The government seeks to reduce Progress Energy's claim a further $1,819,575, the share of CWIP that falls to the mitigation projects. (DX-D5 at 43.)

As a result of Progress Energy's adders, all projects that use these services, including the mitigation activities, assume a fair proportion of the overhead and CWIP costs. (Calvello, Tr. 1612-13, lines 5-15; Calvello, Tr. 1615-16, lines 16-6.) If certain projects did not assume their share of overhead, then other projects would assume a disproportionate amount of the overall overhead costs. (Calvello, Tr. 1613, lines 16-20.)

**10.** ***Costs recorded through manual adjustments***

The government seeks to reduce Progress Energy's claim by $345,701, because it disputes that the costs were properly charged to the projects. (DX-D5 at 43; Johnson, Tr. 2013, lines 17-24.) The costs were added to the mitigation project as journal entries and, while the paperwork for the underlying charge has been lost or purged, there was a process in place to ensure that manual adjustments, which are recorded in the cost records upon which the company relies, were properly made. (Calvello, Tr. 1597, lines 4-16.) Journal entries are made to correct mistakes such as an item being billed to the wrong project. (Edwards, Tr. 420, lines 1-10.) Once the problem is identified, the original charge is validated and then both project managers must approve of the change. (Edwards, Tr. 420, lines 11-20.) Project Managers, of course, are conscious of budget restraints and would not allow costs to hit their projects unless they were satisfied that such a charge is appropriate. (Edwards, Tr. 439, lines 16-21.) Finally, once the project managers have approved the change, the journal entry must be authorized by someone with the appropriate financial controls access. (Edwards, Tr. 434, lines 20-25.)

**11.** ***Robinson crane studies.***

On the eve of trial, the government informed us that it would seek to reduce Progress Energy's recovery by $368,121, purportedly for the cost of certain Robinson crane studies. (DX-D5 at 43.) The Robinson crane studies, however, were necessary to ensure that the crane capacity was sufficient to support the ISFSI that Progress Energy had to build as a result of the DOE's breach and, more particularly, the heavier (110 ton) casks that would have to be loaded onto that ISFSI. (*E.g.*, Worthington, Tr. 851, lines 2-6; Worthington, Tr. 857, lines 10-14; Worthington, Tr. 880, lines 9-13.) Mr. Maret provided no substantive testimony to the contrary or in support of the government's claim. Mr. Johnson provided no substantive testimony to the

contrary or in support of the government's claim. No documents in the record are to the contrary or support the government's claim.

## IV. ARGUMENT

Through December 31, 2005, Progress Energy had paid approximately $661 million in fees for the disposal of spent nuclear fuel under the contracts. Yet the Government has not collected any spent nuclear fuel for disposal from Progress or any other utility. There is thus no dispute that DOE breached its contracts not just with CP&L and FPC but with "all the utilities that had signed the contract the entire nuclear electric industry." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). DOE's failure to pick up the spent fuel in a timely manner is thus a partial breach of the contract. *See generally Indiana Michigan II*, 422 F.3d at 1374. The essential issue to be resolved in the present case, therefore, is the measure of damages.

### A. THE APPLICABLE LEGAL FRAMEWORK

The basic legal principles that control Progress Energy's claim against DOE for its partial breach of the Standard Contracts are straightforward. " 'Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.' " *Indiana Michigan II*, 422 F.3d at 1375 (quoting Restatement (Second) of Contracts § 350 cmt. b). Provided that a causal connection can be "definitely established" between the breach of contract and the harm to the plaintiffs, mitigation damages can be recovered. *See American Fed. Bank, FSB v. United States*, 72 Fed. Cl. 586, 598 (2006) (citing *California Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005) ("[T]he causal connection between the breach and the [claimed damages] must be 'definitely

established.' . . . That is not to say that the breach must be the sole factor or sole cause in the [claimed damages].")).

Actual costs incurred in a reasonable effort to avoid loss are then recoverable as damages. Restatement (Second) of Contracts § 347 cmt. c. An injured party's damages, however, should be reduced by an amount equal to "any cost or other loss that he has avoided *by not having to perform*." Restatement (Second) of Contracts § 347 (emphasis added). "The only saving that is to be deducted is the saving of expense with respect to performance by the plaintiff that the defendant's breach has made unnecessary." Corbin on Contracts, Vol. 11, §57.10. The fact that an injured party may have suffered subsequent unrelated loses had the contract been performed is wholly immaterial. *See* Restatement (Second) of Contracts § 347 cmt. d ("Loss avoided is subtracted only if the saving results from the injured party not having to perform rather than from some unrelated event.").

To recover damages, Progress Energy must show that "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Michigan II* at 1373; *see also Southern Nuclear*, 77 Fed. Cl. at 404. Foreseeability and certainty, with limited exceptions, are not contested. The principal dispute regarding most of the issues in this case, therefore, is causation. To satisfy this element, DOE's "breach must be a 'substantial causal factor' in the mitigation decisions." *Id.* at 405.

After Progress Energy satisfies its burden to establish mitigation damages, the government bears a concomitant burden of proof to show that mitigation costs should be reduced or offset. *See, e.g., Lisbon Contrs., Inc. v. United States*, 828 F.2d 759, 769 (Fed. Cir. 1987) (affirming that the burden was on the government to establish a setoff to plaintiff's damages).

This approach balances two fundamental principles of contract law: (1) preventing the non-breaching party from recovering more than the benefit of his bargain, *see White v. Delta Constr. Int'l.*, 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("[T]he non-breaching party should on no account get more than would have accrued if the contract had been performed" (internal quotation marks and citation omitted)); and (2) placing the risk of uncertainty with the breaching party, *see Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002) ("[T]he risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages."). Moreover, the government bears a burden regarding claimed offsets due to purported losses avoided or benefits conferred that is "correlative" to a plaintiff's under *Indiana Michigan II*: "any 'benefits' the government seeks to offset must be shown to a reasonable certainty, or they must be denied as too speculative to meet the standards set forth in *Indiana Michigan*." *System Fuels*, 79 Fed. Cl. at 71 (*citing Tennessee Valley Authority*, 69 Fed. Cl. at 543).

### B. HARRIS C AND D POOL ACTIVATION AND STORAGE OF SPENT NUCLEAR FUEL: THE "PICK-UP RATE" ISSUE.

#### 1. *The government's obligations regarding acceptance of fuel: addressing the missing pick-up rate term.*

Although the Standard Contract embodies a clear exchange of obligations, it does not identify on its face a numeric rate by which DOE was obligated to accept SNF over the course of the Contract. In this circumstance, where parties to a contract fail to specify a term that is essential to a determination of their respective legal obligations, the omitted contract term is supplied by the court. *See Howell v. United States*, 51 Fed. Cl. 516, 523 (2002) (supplying a minimum reasonable order amount where government's minimum order obligation under a contract was not stated). As the Restatement (Second) of Contracts explains:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

Restatement (Second) of Contracts § 204 (1981). The Restatement recognizes that there are various circumstances in which a term may be omitted from a contract and should be supplied by the court, and one specific circumstance it describes is where parties fail to include a term because "discussion of the issue may be unpleasant *or might produce delay or impasse*." Restatement (Second) of Contracts § 204 cmt. b (1981) (emphasis added).[13]

In determining what constitutes a "reasonable" acceptance rate, the Court must examine both the provisions of the Standard Contract and evidence of the parties' contemporaneous intent. *See Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct. Cl. 1971). In supplying a reasonable acceptance rate under the Standard Contract, the Court must interpret the parties' contractual obligations "in accordance with the parties' understanding as shown by their conduct before the controversy." *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed. Cir. 1983). Indeed, the Court's function is to effectuate the "original intention[s]" and "principal purpose of the parties" at the time of contract formation. *Alvin Ltd. v. U.S. Postal Service*, 816 F.2d 1562, 1565 (Fed. Cir. 1987) (citations omitted).

To determine the intent of the parties, the court may look to "all of the relevant circumstances surrounding the transaction," including the "conduct of the parties before the advent of the controversy, oral statements, writings, the recitals to a contract, prior negotiations, and other conduct by which the parties manifested their assent." *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 76 (1996), *aff'd mem.*, 108 F.3d 1393 (Fed. Cir. 1997); *Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1877) ("The practical interpretation of an agreement by a party

---

13 And that was, manifestly, the circumstance here. (PX 13; Morgan, Tr. 1431, lines 8-23.)

to it is always a consideration of great weight. The construction of a contract is as much a part of it as any thing else. There is no surer way to find out what parties meant, than to see what they have done."). Thus in cases like this one "where the language used by the parties to the contract is indefinite or ambiguous, and, hence of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence . . . . [I]n an executory contract, . . . where its execution necessarily involves a practical construction, if the minds of both parties concur, there can be no great danger in the adoption of it by the court as the true one." *Chicago v. Sheldon*, 9 Wall 50, 76 U.S. 50, 54 (1869).

Of course, "[t]he closer in time to contract formation, and the more distant the prospect of litigation, the more reliable the parties' practical interpretation should be." *System Fuels*, 79 Fed. Cl. at 53; *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to the subject of controversy is deemed of great, if not controlling, influence."). In short, "[i]t is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation." *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982); *see also Saul Subsidiary II Ltd. v. Barram*, 189 F.3d 1324, 1326 (Fed. Cir. 1999).

In addition, because the Standard Contract "implements a statutory enactment," the Court must take care to give meaning and effect to the fundamental objectives underlying the NWPA. *Roedler v. DOE*, 255 F.3d 1347, 1352 (Fed. Cir. 2001). Thus, in determining what constitutes a reasonable acceptance rate obligation, the Court must "inquire into the governing statute *and its purpose*" in determining what the parties intended at the time of contracting. *Id.* (emphasis added).

Finally, in determining what the parties' understanding and intent at the time of contracting, the Court must consider the available evidence in light of "community standards of fairness and policy" in order to determine "what is *reasonable* in the circumstances." *Restatement* § 204, cmt. d, e (emphasis added). *See also Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir. 1982) ("Determination of what is a reasonable time requires an inquiry into the circumstances surrounding the formation of the contract, its purpose, community standards of fairness, and public policy."). Thus, considerations of reasonableness should guide the Court's resolution of any ambiguity and selection of the term to be supplied. *See David Nassif Assocs. v. United States*, 557 F.2d 249, 262-63 (Ct. Cl. 1977). *See also Bank of New York v. Southwire Co.*, 470 F.3d 264, 272 (6th Cir. 2006) (applying § 204 and giving "preference to the party burdened with additional risk" as a result of post-contract developments).

**2. *Progress Energy's damages associated with Harris C and D pool activation and storage of spent nuclear fuel are based upon reasonable acceptance rate obligations.***

Application of these standards to the record in this case leads ineluctably to the conclusion that the assumptions upon which Progress Energy's damage calculations are based are reasonable and appropriate. At the time the Standard Contracts were signed, both Progress Energy and DOE considered the 3,000 MTU per year pick-up rate, given that the industry discharges approximately 2,000 MTUs per year, to be a "reasonable" rate. (Morgan, Tr. 1408, lines 5-8.) DOE today acknowledges the rate to be "reasonable" and "appropriate." (Zabransky, Tr. 1530, lines 9-11; Barrett, May 10, 2002 Deposition Tr. 1370-71, lines 13-14 (explaining that a rate of 3,000 MTUs per year is "reasonable rate" while a rate of 2,000 MTUs per year would be "too low" because it would only match the generation rate); Milner, August 11, 2004

Deposition Tr. 4749-50, lines 16-6; Kouts, *Pacific Gas* Tr. 2777, lines 2-5.) Precluding the need for at-reactor storage was the intent behind the Standard Contract and the aim of the NWPA. (PX 19 at SN069599; PX 21 at PNL-173-0228; PX 26 at 1201; Rosselli, April 15, 2002 Deposition Tr. 140, lines 6-10.) And the 3,000 MTU acceptance rate was designed to keep up with spent fuel discharges and alleviate the need for additional at-reactor storage. (Pollog, Tr. 1231, lines 17-12.) Moreover, DOE clearly continues to consider 3,000 MTUs per year a comfortable receipt rate for a working repository. (PX 128; Barrett, April 22, 2002 deposition, Tr. 117-122, lines 3-6 (declaring that it has been *and continues to be* DOE's goal to develop a program with "a reasonable receipt rate going toward the steady state of 3,000 tons per year").) And if a repository could not be opened on time, the original conception for the MRS back-up was rate at the repository rate of 3,000 MTUs. (DX 49 at 126.) Indeed, Mr. Lawrence testified that he "couldn't see a reason not to have them at the same rate." (Lawrence, Tr. 2151, lines 10-12.) And a lower pick-up rate for the MRS "[h]as no technical design aspect to it." (Barrett, May 8, 2002 Deposition Tr. 949, lines 1-7.)

At the 3,000 MTU per year rate, Progress Energy would not have had to activate the C and D pools at the Harris plant. (Edwards, Tr. 335-36, lines 19-14.) With the small adjustment in the racks described above, space in the existing Harris pools A and B could have accommodated BWR fuel being shipped from Brunswick (Worthington, Tr. 808, lines 16-20), as well as PWR fuel discharged from Harris (Worthington, Tr. 810, lines 7-11). (PX 137.) The Harris C and D pool activation costs should be recovered.

Even if DOE had picked up at just above the industry-wide discharge rate of 2,000 MTU, Progress Energy could have avoided the costs of the large capital projects necessitated by DOE's breach at the 3,000 MTU rate. (Edwards, Tr. 308-09, lines 10-7.) Specifically, had DOE picked

up fuel at a rate of 2,100 MTUs per year, Progress Energy could have avoided the Harris C and D pool activation, the Crystal River re-rack, the ISFSI at Robinson, and the ISFSI at Brunswick. (Edwards, Tr. 459-60, lines 6-16; Edwards, Tr. 461, lines 2-19.) Of course, it is intuitive that as long as DOE is meeting the discharge rate and there is room in the pool, "you're okay for the long haul." (Edwards, Tr. 309, lines 3-7.)

The government's 900 MTU rate, of course, is below the discharge rate and thus the situation changes somewhat. At the 900 MTU rate, Progress Energy accepts that it would have to activate the Harris C and D pools. (DX 304.) The *entire* $1,087,280 offset described above, of course, would be unnecessary because Progress Energy would not logically spend money to try to avoid activating the Harris C and D pools when such a result, at a 900 MTU pick-up rate, would be inevitable. (Edwards, Tr. 369-70, lines 15-11.) In short, at a 900 MTU pick-up rate, Progress Energy's claim for mitigation activities would be $64,587,709. (Edwards, Tr. 377, lines 1-9; DX 304.)

### 3. ***The government's pick-up rate arguments are severely flawed.***

The government's argument for a 900 MTU pick-up rate suffers many flaws, all fatal, but the primary failing is that it contradicts the compelling evidence of the parties' intent: In exchange for the hundreds of millions of dollars in fees paid to DOE, utilities would not be responsible for additional at-reactor storage costs after 1998.

Despite the clear evidence, the government nonetheless disputes that this is its contractual obligation. Precisely what the government contends its obligation under the Standard Contract to be is wholly unclear. At times the government appears to contend that the only enforceable pick-up rate obligations are those contained in a 1991 Acceptance Capacity Report ("ACR") document (*e.g.*, Tr. 1647, line 25, statement of counsel), but that document contains the express

representation that the document is "not contractually binding" upon either party, (PX 53 at 1, HQR-002-0803; *see* Zabransky, Tr. 1501, lines 8-10), and nothing in the contracts says that the ACR document can limit DOE's pick-up obligations in the manner that the government now argues (PX 10; Zabransky, Tr. 1498-99, lines 24-9; Pollog, Tr. 1278-84, lines 5-10). Moreover, the 1991 ACR only projects out ten years. To avoid the uncomfortable position of arguing that DOE's obligations cease after ten years or continue on indefinitely at a rate below the discharge rate, the government inexplicably adopts obligations from a cost analysis document. (PX 50 at A-1, FOI-004-4125; DX 300; Pollog, Tr. 1274-75, lines 22-19.)

At other times the government appears to contend that only approved "Delivery Commitment Schedules" based upon the 1991 rates represent enforceable contractual obligations. (Zabransky, Tr. 1491-93, lines 23-23; Zabransky, Tr. 1501, lines 11-16; Pollog, Tr. 1263, lines 3-7; Pollog, Tr. 1269-70, lines 1-3.) This position is also patently untenable. The evidence shows that DCSs were not viewed by DOE as binding commitments at the time they were approved. (Pollog, Tr. 1263, lines 3-7; Pollog, Tr. 1266-67, lines 20-2.) Mr. Barrett described the DCS process as "administrivia" meaning "part of the administrative details of the contract that [he] did not pay much management policy attention to." (Barrett, April 22, 2002 Deposition Tr. 217, lines 3-17.) Perhaps this position changed because DOE stopped approving DCSs in 1997 – an easy way to control its liability if DCSs were DOE's only enforceable obligations to utilities. (Zabransky, Tr. 1496, lines 9-24; Pollog, Tr. 1267-68, lines 21-4.) Indeed, no DCSs have been approved for over ten years (Zabransky, Tr. 1527, lines 3-6; Pollog, Tr. 1290, lines 11-14), and it is impossible to have an approved DCS today (Zabransky, Tr.1527, line 3-6). *See Southern Nuclear*, 77 Fed. Cl. at 421; *System Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 731 (2005). Finally, during the DCS process, utilities had no choice regarding amounts

of spent fuel to be identified. (PX 55, page CP_FP000111094-95; Zabransky, Tr. 1498, lines 21-23; Pollog, Tr. 1277-78, lines 6-4.)

For all of these reasons and those stated by the Court in *System Fuels v. United* States, 79 Fed. Cl. 37, 55-58 (2007); *Northern States* Power, 78 Fed. Cl. 449, 457-61 & n.13; *Southern Nuclear*, 77 Fed. Cl. at 415-27; and *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 642 (2004), the government's efforts to limit its damages through its so-called "pick-up rate" arguments should be rejected.[14] If DOE had started picking up spent nuclear fuel from purchasers by January 31, 1998, pursuant to the Standard Contract, it would have performed at the rate it was planning to before its delay and performance failures became an issue: "[T]he operation rate which transiented [sic] and leveled out at 3,000 metric tons per year after five years." (Barrett, May 14, 2002 Deposition Tr. 120-21, lines 22-6.)

### C. GOVERNMENT DEFENSES TO PARTICULAR INCURRED DAMAGES.

#### 1. *The government is not entitled to reduce Progress Energy's damages by the costs of removal of "CRUD" and unused racks associated with Harris C and D Pool activation and storage of spent fuel.*

The government argues that prospective costs to remove the spent fuel racks and CRUD as part of the overall decommissioning of the plant *some 40 years from now* were arguably avoided by Progress Energy as a result of Progress Energy's mitigation activities. The Court should reject the government's contention that present damages should therefore be reduced. First, the amounts of such alleged "savings" are wholly speculative, and must be rejected for that reason. *E.g.*, *System Fuels*, 79 Fed. Cl. at 71 (*citing Tennessee Valley Authority*, 69 Fed. Cl. 543). Second, and relatedly, whatever costs might be argued to be "saved" in 2046 or thereafter,

---

[14] *But see, contra, Pacific Gas & Electric Company v. United States,* 73 Fed. Cl. 333 (2006) ("*PG&E*"). *PG&*E is the only case to hold to the contrary, and that case, along with *Southern Nuclear* and *System Fuels*, are currently on appeal. Progress Energy respectfully disagrees with the result reached by the trial court in *PG&E*, albeit on the different record then before it, for reasons that include those described in the text.

those costs plainly would not correspond in absolute dollar terms with the actual sums expended in or around 1998, and the government's failure to address (or offer evidence regarding) time value of money impacts is fatal to its alleged damage reduction. Third, and perhaps most fundamental, as set forth above, an alleged loss or cost avoided is subtracted from a plaintiffs' damages only if the savings results from Progress Energy's not having to perform its obligations under the Standard Contract. *E.g.*, Restatement (Second) of Contracts § 347. Progress Energy has performed, and intends to perform, its obligations under the Standard Contract. Decommissioning activities are of course unrelated to Progress Energy's performance under the contract, and deductions to actual damages on the basis of speculation about what such activities might entail are therefore not permissible.

**2. *The government is not entitled to reduce Progress Energy's damages by the costs of the Component Cooling Water System upgrades associated with Harris C and D Pool activation and storage of spent fuel.***

The evidence confirms and the government cannot credibly dispute that the CCW upgrade was required for the activation and use of the C and D spent fuel storage pools. (Edwards, Tr. 359, lines 17-23 (fuel storage required CCW upgrades "with certainty"); Maret, Tr. 1854, lines 1-8 ("reasonable possibility" that CCW upgrades required for activation and storage of fuel in Harris C and D pools).) The government's breach, therefore, was, at a minimum, a "substantial causal factor" in Progress Energy's upgrade of the CCW system. *Indiana Michigan II*, 422 F.3d at 1373.[15] That is dispositive under the applicable standards.

According to the government, however, "the effect of the C and D activation on the CCW system is not really the issue in the case." (Tr. 1007-8, lines 24-2, statement of counsel.) Under

[15] Indeed, Mr. Maret "did not understand a distinction" between his admission that there was a "reasonable possibility" that the fuel storage requirements required the CCW system upgrades and saying that such fuel storage requirements were a "substantial causal factor" for the upgrades. (Maret, Tr. 1856-1857, lines 7-11.) There is no such distinction: any common sense application of the "substantial causal factor" standard leads to the conclusion that that standard is met here.

the government's theory, it does not matter that the CCW upgrade was needed because of DOE's breach. (Johnson, Tr. 2038, lines 2-4.) This argument is plainly wrong and should be rejected. DOE's breach did not occur in a vacuum, and the fact there were other factors to consider in Progress Energy's decision making does not defeat recovery.

Under the government's unyielding and incorrect but-for theory, any time two or more causes could be said to have contributed to an activity for which damages are claimed, no recovery could be had, because when one breach-related cause is hypothetically eliminated the other could of course be argued to have required the activity anyway. But, that is clearly not the law: the Federal Circuit has explicitly confirmed the well-accepted proposition that the breach need *not* "be the sole factor or sole cause in the [claimed damages]." *California Fed. Bank*, 395 F.3d at 1268 (citing E. Allan Farnsworth, Contracts § 12.1, at 150-51 (3d ed. 2004)); *Bank of America, FSB v. United States*, 70 Fed. Cl. 246, 251 (2006) (concluding that mitigation costs are recoverable "even if other business considerations later informed the [plaintiff's] decisions: no business judgment is exercised in a vacuum . . . [and] it is thus irrelevant that [plaintiff] may have had independent business reasons for" engaging in a transaction that mitigated the breach); *American Federal Bank, FSB v. United States*, 72 Fed. Cl. 586 (2006) ("despite the existence of secondary business reasons for American Federal's [mitigation activity], the court concludes that the bank has satisfied its burden to prove that the government's breach directly caused [the mitigation activity]").

Moreover, as a factual matter, the government overstates the impact of the power uprate and steam generator replacement projects. Mr. Maret's testimony demonstrably misconstrued the Progress Energy engineering analyses upon which he relied. For example, the maximum increase in heat load from the 4.5 percent power uprate here would have been 4.5 percent (Maret,

Tr. 1864, lines 15-21), but Progress Energy needed to accommodate far greater potential heat load increases for the storage of the spent fuel that it needed to place in the Harris C and D pools (Maret, Tr. 1868, lines 3-14). Indeed, on cross examination, Mr. Maret admitted that "there's nothing that says the [required increase in heat removal capacity in pools A and B] is strictly from power uprate," *id.* and further admitted that there were a "number of factors," beyond power uprate and steam generator replacement, that might explain the differences in the values between the two analyses upon which his contentions were based (Maret, Tr. 1868-1869, lines 15-18). Precisely. The government draws faulty conclusions from an apples-to-oranges comparison.

This is not altered by selected snippets from licensing and other documents that the government may cite. Fairly read, those documents reflect the actual impact of the storage of spent fuel on the expected heat loads, and, moreover, Progress Energy employees in real time may well have used "power uprate" or "PUR" terminology – as even Mr. Maret did – as a "kind of shorthand" for the several interrelated and simultaneous projects. (Maret, Tr. 1860, lines 15-19.) There is certainly no evidence in the record that would outweigh the testimony of Mr. Edwards and Mr. Tibbitts, who were responsible for implementing these projects in the real world.

For all of these reasons, both legal and factual, the government's challenge to the Harris CCW system upgrades should be rejected.

**3. *The government is not entitled to a damage reduction due to hypothetical costs of loading DOE casks that were never supplied.***

This is, necessarily, a case for partial breach. *Indiana Michigan II*, 422 F.3d at 1373-74. Progress Energy is seeking damages for DOE's delay in picking up its spent fuel, but Progress Energy still retains its right to insist that DOE come one day. Accordingly, Progress Energy did

not "avoid" the costs of loading DOE's casks as a result of DOE's delay in picking up the fuel. These costs have only been deferred until the time that DOE finally performs. If Progress Energy's claim is reduced by the cost of loading DOE's cask in the but-for world, when DOE arrives to pick up spent fuel Progress Energy still will incur effectively for a second time the costs of loading DOE's casks in real world. (Edwards, Tr. 388-89, lines 25-6; Johnson, Tr. 2021, lines 20-24; Maret, Tr. 1904-05, lines 17-4.)

The Court's observations about alleged benefits conferred due to DOE's non-performance in another spent nuclear fuel context are fully applicable here. In *Dominion Resources, Inc. v. United States*, the government argued that reductions in damages should be taken because a utility avoided having to pay the "one time fee" due to DOE's failures – precisely the same argument it makes with respect to allegedly avoided DOE loading costs here. The Court held:

> That observation is true, but irrelevant, because it ignores what actually happened. Plaintiffs still have the SNF, the government still has the obligation to pick it up, and plaintiffs still have to pay the one-time fee when it becomes due. The only thing that is different from the contract scenario is that plaintiffs claim to have been forced to absorb unnecessary interim storage costs. If the government reimburses such costs, it hardly puts plaintiffs in a better position.

*Dominion Resources*, 77 Fed. Cl. 151, 156 (2007). Likewise, plaintiffs here "still have to" load DOE casks when DOE performs. The logic of *Dominion Resources* is compelling and correct, and requires rejection of the government's arguments regarding the alleged damage reductions.

In other spent fuel damage cases, this Court has uniformly rejected the government's efforts to reduce damages due to allegedly avoided DOE loading costs. *See System Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 70-71 (2007) (*citing Tennessee Valley Authority v. United States*, 69 Fed. Cl. 665, 542 (2005); *Northern States Power Company v. United States*, 78 Fed. Cl. 449,

468-69 (2007); *Southern Nuclear v. United States*, 77 Fed. Cl. 396, 450-51 (2007); *Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333, 416 (2006); *Yankee Atomic Power Company v. United States*, 73 Fed. Cl. 249, 286 (2006); and *Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332, 372 (2006)). "Any benefit inhering in TVA because of delayed loading costs would be entirely speculative." *Tennessee Valley Auth.*, 69 Fed. Cl. at 542; *see also Sacramento Mun. Utility Dist.*, 70 Fed. Cl. at 372 ("Since DOE and SMUD both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to SMUD, because of delayed loading costs, would be entirely speculative."). These rulings are eminently correct, and the present record does not warrant a departure from the Court's consistent holdings.

**4. *The government is not entitled to reduce Progress Energy's damages by the costs of railroad maintenance incurred for transshipment campaigns caused by DOE's breach.***

The government's argument the Progress Energy's damages should be reduced by the amount of railroad maintenance costs should be denied for at least two reasons. First, the assertion is entirely speculative. In light of DOE's undisputed refusal to commit to use of rail casks at the Progress Energy plants (*e.g.,* Zabransky, Tr. 1528, lines 14-19), there is no basis simply to assume that DOE would necessarily have used such casks, for purposes of reducing Progress Energy's actual incurred costs. "The government overstates what is known today about the circumstances that may appertain to DOE's pickup of SNF" from Progress Energy. *System Fuels,* 79 Fed. Cl. at 71. Given such uncertainty and speculation, the government has not satisfied its burden to establish the claimed reduction with the requisite reasonable certainty. *E.g., id., citing Tennessee Valley Authority,* 69 Fed. Cl. at 543.

Second, and perhaps more fundamentally, the damage reduction argued by the government is legally impermissible because it did not arise from Progress Energy's lack of performance of its own contractual duties. As described further in Section IV.A above, an injured party's damages may only be reduced by an amount equal to "any cost or other loss that he has avoided by not having to perform." Restatement (Second) of Contracts § 347 (emphasis added). Progress Energy has performed (i.e., it has continued to pay), and will perform all of its contractual responsibilities when, and if, DOE ever shows up.

**5. *The government is not entitled to reduce Progress Energy's damages by the costs of the Crystal River re-rack.***

As described in more detail in the Proposed Findings of Facts above, substantial testimonial and documentary evidence establish that the need for additional storage space at Crystal River was the "primary reason" for the re-rack project. (*E.g.,* Culver, Tr. 954-955, lines 22-16.) Re-racking was not pursued until after completion of a spent fuel storage plan in September 1997, and, after that point, *all* of the contemporaneous documentation explicitly mentions the need for additional space in connection with the re-rack project. (Maret, Tr. 1880-1881, lines 24-5.) Wet storage options such as re-racking are indisputably cheaper than dry storage (Maret, Tr. 1881 to 1882, lines 6-11), and securing additional necessary space (and the government does not dispute that additional space was necessary) through such means is therefore patently justified. Substantial evidence confirms that a host of cheaper, widely-used, and routine "long term management strategies" were available to address Boraflex degradation issues of criticality and silica, had the need for additional storage space not been an issue at Crystal River. (*E.g.,* Culver, Tr. 947-48, lines 23-16.) Under any plausible interpretation of the

"substantial causal factor" test dictated by the Federal Circuit in *Indiana Michigan II*, 422 F.3d at 1373, Progress Energy has met its burden here.[16]

The government's opposition is, again, based entirely upon the opinion of its retained expert Gregory Maret, but that opinion cannot be squared with the more persuasive factual evidence and testimony in the record. As described in more detail in the Proposed Findings of Facts above, Mr. Maret: (1) acknowledged that "wet storage" was more economical than dry storage in circumstances such as those at Crystal River;[17] (2) was clearly unfamiliar with widely-used industry strategies for managing criticality issues, such as soluble boron credits;[18] (3) nevertheless admitted that taking credit for soluble boron could, at least in part, address criticality concerns;[19] (4) admitted that there were other criticality control strategies that he "was not familiar with;"[20] (5) did not recall the extent of the degradation of the Boraflex at Crystal River;[21] (6) never worked at a plant with Boraflex racks or issues; [22] and, significantly, (7) acknowledged that "all of the company documentation from at least September 1997 on discusses the need for additional space in connection with the re-rack option at Crystal River."[23] The government's attacks upon the Crystal River damages incurred by Progress Energy should be rejected.

---

16 Progress Energy's decision to re-rack is the exact opposite of the re-racking circumstances in *Indiana Michigan II*. Indiana Michigan's decision to re-rack was made *in the normal course of business* six years before DOE's 1994 announcement that it would be unable to begin timely collection of spent fuel. *Indiana Michigan II*, 422 F.3d at 1376. Here, it is uncontested that there was a need for additional storage space, and that the re-racking addressed that need.

17 (Maret, Tr. 1881 to 1882, lines 6-11.)

18 (Maret, Tr. 1885 to 1887, lines 14-3.)

19 (Maret Tr. 1893 lines 10-14.)

20 (Maret, Tr. 1894 to 1895, lines 7-1.)

21 (Maret, Tr. 1897, lines 14-21.)

22 (Maret, Tr. 1879, lines 8-14.)

23 (Maret, Tr. 1880-1881, lines 24-5.)

**6. *The government is not entitled to reduce Progress Energy's damages by the costs of licensing proceedings and interventions associated with Harris C and D Pool activation and storage of spent fuel.***

Public comments and, if contentions exist, interventions are part of the process set forth in the NRC regulations. (Edwards, Tr. 346, lines 1-19); *see* 10 C.F.R. § 2.174 (1998). Interventions, therefore, are not only reasonably foreseeable, but sometimes inevitable. Community outreach is also "a part of doing business" for nuclear power plants and common when dealing with plant modifications and contested NRC proceedings. (Edwards, Tr. 350-51, lines 14-6.) The costs incurred by Progress Energy in connection with such activities do not result from an unexpected or legally superseding cause. Rather, these costs were the foreseeable result of reasonable mitigation activities. And had DOE not breached, these specific activities would not have been necessary. (Edwards, Tr. 352-53, lines 23-5.) *See generally Northern States Power Company v. United States*, 78 Fed. Cl. at 463-64 ("plaintiff should not have to bear the unavoidable costs associated with [an activity] that defendant acknowledges constituted an otherwise reasonable and successful effort to mitigate damages.").

**7. *The government is not entitled to reduce Progress Energy's damages due to Progress Energy's use of internal labor.***

The government's specific arguments regarding recoverability of internal labor costs in this case have been dealt with extensively in prior decisions by the Court, which provide persuasive guidance here. *See generally System Fuels*, 79 Fed. Cl. at 66-67; *TVA*, 69 Fed. Cl. at 539; *Southern Nuclear*, 77 Fed. Cl. at 396.

As those authorities confirm, whether a cost is "fixed" is not relevant to the issue of whether it is recoverable. *TVA*, 69 Fed. Cl. at 539 ("That TVA would have paid its employees in all events is not material to this inquiry."). In reaching this conclusion, the Court in *TVA* was persuaded by cases like *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982), in

which the "fixed cost" analysis was rejected: "The issue is not whether Convoy would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived Convoy of the services it paid for." *Id.* at 785. Under this correct analysis there is no logical minimum threshold of amount of time a particular employee must spend on a mitigation project. If government's breach deprived Progress Energy of *any* of the services it paid for, that amount should be recoverable. And Progress Energy was deprived of *all* the time that its employees spent on mitigation activities. It is clearly a commercially reasonable decision to pull resources from throughout the company as opposed to segregating a group of employees to work full-time on mitigation activities.[24]

As the Court noted in *Southern Nuclear*, the government's position creates a perverse incentive. If the rule in these spent nuclear fuel cases were that a company employee's time under a certain hour threshold is not recoverable, the natural consequence by a rational utility would be to prohibit its employees from undertaking tasks associated with mitigation activities involving spent fuel, and to instead utilize outside contractor or supplemental labor. Such outside labor, however, would almost surely be more expensive than utilization of internal resources, and the resulting damages in subsequent proceedings would accordingly increase. The government's arguments in this regard are not well founded, and efficiency and common sense further dictate that the government's argued reductions be rejected.

---

[24] Moreover, the time that Progress Energy's employees spent on various projects was accurately recorded and allocated. In *Convoy* the Ninth Circuit awarded costs, despite the contention that employee estimates (ten years after the event) of how much time was spent on the relevant activities were too speculative. Although the evidence in Convoy was sufficient, Progress Energy's evidence is even better. An employee's time was billed to particular projects contemporaneously, in the normal course of business. (Edwards, Tr. 311-15, lines 13-19; Calvello, Tr. 1590-91, lines 11-12.) Progress Energy, therefore, has complete and accurate business records, which the government does not challenge, establishing that the challenged time was spent on mitigation activities. The government's attempts to limit recovery of Progress Energy's claim for internal labor should be rejected.

**8. *The government is not entitled to reduce Progress Energy's damages by the costs incurred for Allowance for Funds Used During Construction.***

Mr. Johnson, and presumably the government, argue that AFUDC it is not a recoverable cost (Johnson, Tr. 1998-99, lines 22-3) because it is not "directly identifiable debt incurred to finance the activity" (Johnson, Tr. 1999, lines 13-17.) The fact that Progress Energy issues general rather than specific debt, however, should not work against it. Progress Energy borrowed money, Progress Energy's funds were tied up during the construction of the capital mitigation projects like the Robinson ISFSI, and FERC regulations specify how to account for the cost of the use of those funds. The fact that AFUDC only applies during the construction of the project, and not after, confirms that the cost is wholly distinct from the notion of interest on a claim.

And, it is important to emphasize that AFUDC is not interest on a claim.[25] It is a cost that is calculated in real time and applied contemporaneously with the project. (Edwards, Tr. 403, lines 23-25.) It is not applied retroactively to bring the costs up to the current value. (Edwards, Tr. 404, lines 1-2.) Including AFUDC in the cost of capital projects is "an industry-wide practice that is consistent with requirements promulgated by the Federal Energy Regulatory Commission ("FERC"). *TVA*, 69 Fed. Cl. at 541 (citing 18 C.F.R. pt. 101, Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act, Electric Plant Instructions, ¶ 3.A(17)). AFUDC charges to a Project ID are based on the individual project's characteristics, including the timing of charges to the project and the in-

[25] In contrast, Progress Energy does not seek "cost of capital" or after-the-fact calculated interest expense, based upon hurdle rates and expert opinions, of the sort rejected by the Court in *Southern Nuclear*, 77 Fed. Cl. at 396, and *System Fuels*, 70 Fed. Cl. at 69-70, and in recognition of the rule in cases such as *Library of Congress v. Shaw*, 478 U.S. 310 (1986). However, AFUDC, unlike such prejudgment interest claims, is different. It is a cost incurred in real time and recorded contemporaneously in the books and records of the company. Even if one calls it "interest," it is not interest "on a claim," but, rather, interest as "an element of damages." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part*, 407 F.3d 1352 (Fed. Cir. 2005). As such, it is recoverable.

service date. AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used." *Id.*

AFUDC is part of the cost Progress Energy incurred to mitigate DOE's breach. The Federal Circuit has recognized that the cost of funds used as a result of a breach are recoverable: "Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994). In *Wickham*, a contractor recovered interest paid on funds that it borrowed to finance a construction contract that was delayed due to the government's breach.

To recover under *Wickham*, a plaintiff must show that "borrowed funds were used in connection with the . . . project." *Id.* at 1583. The government will apparently contend, as it did unsuccessfully in *TVA*, that this means that in order to recover AFUDC, Progress Energy must demonstrate that it borrowed funds specifically to finance the particular mitigation projects for which costs are claimed. Like most utilities, however, Progress Energy does not issue debt instruments for specific capital projects. Rather, on a regular basis, it issues short- and long-term general debt. This capital structure is commercially reasonable and widely-accepted. *TVA*, 69 Fed. Cl. at 542. Indeed, it conforms to the FERC standard for calculating the cost of the funds used in capital projects. Progress Energy obviously had to gather substantial financial resources to build the Robinson ISFSI and activate the Harris C & D pools. The costs of those efforts should be recoverable from the government.[26]

[26] *But see, contra, System Fuels*, 70 Fed. Cl. at 70, *citing Wickham* and *Gevyn Constr. Corp. v. United States*, 827 F.2d 752, 754 (1987). For the reasons stated above, we respectfully disagree with *System Fuels* (and agree with *TVA*), and believe that the proper rule of law should not penalize Progress Energy for simply utilizing general, rather than specific, debt instruments.

**9. *The government is not entitled to reduce Progress Energy's damages due to Progress Energy's use of warehouse and construction services in connection with breach-related activities.***

There is simply no basis in law or logic for the government's claim that Progress Energy should not be compensated for overhead expenses. Progress Energy incurred costs maintaining and operating the warehouses and providing construction services. The warehouses and CWIP services, of course, were essential to the mitigation projects. An appropriate portion of these costs, therefore, should be allocated to the mitigation activities.

Mr. Johnson argues that if costs can be reallocated to other projects "then there's been no damage, costs haven't changed." (Johnson, Tr. 1988, lines 6-9.) The fact that costs may have not changed, however, is not relevant. These are costs that were incurred and are properly attributable to mitigation activities. And if no overhead or CWIP charges are allocated to the mitigation projects, Progress Energy's other projects would assume a disproportionate amount of these expenses. It would make the other projects, in effect, more expensive. (Calvello, Tr. 1613, lines 16-20.) The government provides no compelling explanation why activities conducted to mitigate its breach should not assume a fair proportion of the overhead expenses. Overhead, by definition, is the cost of doing business and for a time part of Progress Energy's "business" was mitigating DOE's breach. Recovery of these costs, therefore, is about fairness and complete compensation:

> When a breach by one party imposes a delay on the ability of the other party to perform its obligations under the contract, the damages are to be measured by the direct cost of all labor and material, plus fair and reasonable overhead expenses properly chargeable during the reasonable time required to complete performance.

22 Am. Jur. 2d Damages § 69. Progress Energy should recover the overhead and CWIP that have been properly charged to the mitigation projects.

**10. *The government is not entitled to reduce Progress Energy's damages in connection with costs for breach-related activities recorded through manual adjustments.***

Progress Energy relies on a system of oversight and restricted access to ensure that only legitimate manual adjustments are entered into its cost records. Manual adjustments move charges both into claimed projects and out of them. The evidence of the operation and safeguards of Progress Energy's system satisfies with substantial certainty that these charges were properly billed to the correct project and are thus recoverable. As in the present case, "where the responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision . . . ." *San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (citation omitted). No particular type of documentation, such an actual invoice, is required. Once a "reasonable probability of damage" is established, this Court can "make a fair and reasonable approximation of the damages." *Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001) (citation omitted); *see also Southern Nuclear*, 77 Fed. Cl. at 408. Under this standard, the Court may rely on "a document regularly prepared in the normal course of business" even if the sponsoring witness is "unable to fully explain the basis for all the costs set out in it." *Bluebonnet Savings Bank*, 266 F.3d at 1357. *See also System Fuels*, 79 Fed. Cl. 59-60 (relying on evidence "derived from System Fuels' accounting system, which the court finds to be reliable indicator of incurred costs").

**11. *The government is not entitled to reduce Progress Energy's damages by costs associated with Robinson crane studies.***

There is not a scintilla of evidence in the record, nor any other legal or logical support, for this eleventh-hour challenge by the government. The government summarily asserts that this category was added as a consequence of testimony by Wayne Worthington, (Johnson, Tr. 2011-

12, lines 20-9), but does not identify what that testimony was. There is nothing in Worthington's testimony or elsewhere in the record to suggest that Progress Energy would have commissioned a study at Robinson to determine if its crane could lift more than a fully loaded IF 300 cask unless it had a *need* for the crane to lift more than a fully loaded IF 300. Progress Energy of course did not have that need until it determined to pursue the Robinson ISFSI, which the government concedes was a result of DOE's breach under any scenario. This aspect of the government's purported challenge to Progress Energy's damages is frivolous.

**CONCLUSION**

Judgment should be entered for Progress Energy for those costs incurred as a result of DOE's breaches through December 31, 2005, in the amount of $91,029,704. In its order, the Court should also confirm Progress Energy's right to pursue in subsequent proceedings damages incurred after December 31, 2005, pursuant to the exceptions to the rules of merger and bar set out in the Restatement (Second) of Judgments, §§ 26(1)(b) and (e), as expressly adopted by the Federal Circuit in *Indiana Michigan II*, 422 F.3d at 1377.

Respectfully submitted,

s/ Brad Fagg

Brad Fagg
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiffs

Of Counsel:

Paul M. Bessette
David M. Kerr
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

January 22, 2008

CERTIFICATE OF FILING

I hereby certify that on this 22nd day of January 2008, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Brad Fagg