IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CAROLINA POWER & LIGHT COMPANY and FLORIDA POWER CORPORATION, | ) | |
| Plaintiffs, | ) | No. 04-37C |
| v. | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

ANDREW P. AVERBACH
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0527
Tel: (202) 305-7643

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
CHRISTOPHER J. CARNEY
LISA L. DONAHUE
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

January 22, 2008

Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PROPOSED FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICYACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A. The Proposed Rule.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B. Comments Upon The Proposed Rule.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1. Industry Involvement In Drafting The Standard Contract Terms.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2. Rate Of SNF And HLW Acceptance. . . . . . . . . . . . . . . . . . . . . . . 16

3. Plaintiffs' Comments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C. The Final Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D. Plaintiffs' Execution Of The Standard Contract.. . . . . . . . . . . . . . . . . . . . 28

E. Industry Activities Following The Execution Of The Standard Contract.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III. DOE'S ISSUANCE OF A STATUTORILY REQUIRED MISSION PLAN, WHICH THE INDUSTRY UNDERSTOOD WAS NOT CONTRACTUALLY BINDING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV. THE BELIEFS THAT CP&L EXPRESSED AT TRIAL ABOUT DOE'S OBLIGATIONS UNDER THE STANDARD CONTRACT. . . . . . . . . . 40

V. CP&L's RELATIONSHIP WITH EEI AND UNWMG. . . . . . . . . . . . . . . . . . . . 45

VI. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT AND THE FURTHER DEVELOPMENT OF THE WASTE MANAGEMENT PROGRAM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VII. DOE'S ISSUANCE OF CONTRACTUALLY-REQUIRED ANNUAL CAPACITY REPORTS AND ACCEPTANCE PRIORITY RANKINGS. . . . . . 41

A. 1987 and 1990 Annual Capacity Reports. . . . . . . . . . . . . . . . . . . . . . . . . 51

B. 1991 Acceptance Priority Ranking. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

C. The 1991 Annual Capacity Report.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

D. The 1992 Through 1995 Annual Capacity Reports. . . . . . . . . . . . . . . . . . 57

VIII. DELIVERY COMMITMENT SCHEDULES. . . . . . . . . . . . . . . . . . . . . . . . . . . 59

A. DOE's DCS Submission Instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

IX. TSLCCS AND FEE ADEQUACY REPORTS BASED UPON THE THEN-CURRENT PROGRAM PLANS. . . . . . . . . . . . . . . . . . . . . 60

X. CP&L's PARTICIPATION IN THE DCS PROCESS.. . . . . . . . . . . . . . . . . . . . 62

XI. PLAINTIFFS' CAUSATION MODELS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

A. General.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

B. Progress Energy's 900 MTU Causation Model. . . . . . . . . . . . . . . . . . . . . 68

C. Progress Energy's 3,000 MTU Causation Model.. . . . . . . . . . . . . . . . . . . 68

D. Progress Energy's Analysis Of Damages At A 2,000 MTU Rate. . . . . . . 71

XII. PROGRESS ENERGY'S METHODOLOGY FOR CALCULATING DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

XIII. ISSUES RELATED TO INDIVIDUAL COSTS INCLUDED IN PROGRESS ENERGY'S CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

A. General.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

B. Transshipment And Railroad Maintenance Costs. . . . . . . . . . . . . . . . . . . . 73

C. "C" and "D" Pool Activation Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

D. Crud Cleanup and Rack Disposal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

E. Licensing And Communications Expenses. . . . . . . . . . . . . . . . . . . . . . . . 78

F. Upgrade Of The CCW System At Harris.. . . . . . . . . . . . . . . . . . . . . . . . . 79

G. Rerack Of The Crystal River Spent Fuel Pool.. . . . . . . . . . . . . . . . . . . . . 87

H. Avoided Cost Of Loading Casks To DOE.. . . . . . . . . . . . . . . . . . . . . . . 100

I. Internal Labor Charges.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

J. Overheads. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

K. AFUDC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

L. Robinson Crane Study. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

M. Unsupported Costs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

I. PROGRESS ENERGY HAS FAILED TO MEET ITS BURDEN ESTABLISHING ENTITLEMENT TO THE DAMAGES THAT IT CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

A. To Establish Causation, Progress Energy Bore The Burden Of Demonstrating A Plausible "But For" Scenario.. . . . . . . . . . . . . . . . . . . . 113

B. Plaintiffs Improperly Defined DOE's Obligations Under The Standard Contract And, Thus, Failed To Provide A Basis For Comparison To The Actual World. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

1. The Standard Contract Contains No Language Imposing, And The History Of Its Formation Is Inconsistent With, The Rate Requirement That Plaintiffs Propose.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

2. The Documents Upon Which Plaintiffs Rely Do Not Evidence DOE's Intent To Be Bound To Any Rate Of Acceptance, Let Alone The One Plaintiffs Advocate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

3. The Rate Of Acceptance Should Be Determined In Accordance With The APR/ACR Process Mandated By The Standard Contract, In Which Plaintiffs Willingly Participated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

a. The Parties Agreed That The APR/ACR Process Would Define The Rate. . . . . . . . . . . . . . . . . . . . . . . . . . 128

b. Plaintiffs Voluntarily Participated In The APR/ACR Process And Voiced Concerns To DOE When They Had Them About DOE's Administration Of The Standard Contract.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

4. The Court Should Not Impose A "Reasonable" Rate Of Acceptance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

a. The Parties Reached An Agreement Concerning The Manner In Which Rate Is To Be Calculated.. . . . . . . 133

b. The Rate That Plaintiffs Advocate Does Not Satisfy Their Own Criteria.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

C. Assuming <u>Arguendo</u> That The Standard Contract Requires The Qualitative Rate That Plaintiffs Advocate, Plaintiffs Have Failed To Offer Competent Proof Of The Actions They Would Have Taken Had DOE Accepted Fuel At Such A Rate Beginning in 1998. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

1. Plaintiffs Have Failed To Provide Proof Of The Actions They Would Have Taken At The Minimum Rate That They Acknowledge Was Reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . 136

2. Plaintiffs' 3,000 MTU Model Lacks An Evidentiary Foundation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

D. Plaintiffs Have Failed To Demonstrate That DOE Acted In Bad Faith.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

II. PLAINTIFFS' CLAIM FOR DAMAGES INCLUDES MANY EXPENDITURES THAT WERE NOT CAUSED BY DOE'S DELAY IN ACCEPTING SPENT FUEL OR ARE OTHERWISE NOT RECOVERABLE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

A. Activation Of Spent Fuel Pools "C" And "D" At CP&L's Harris Plant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

B. Disposal Of Unused Racks And Crud. . . . . . . . . . . . . . . . . . . . . . . . . . 145

C. Harris "C" And "D"Pool Licensing And Communications Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

D. Upgrade To The Harris Component Cooling Water System. . . . . . . . . . 146

E. Rerack At Crystal River.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

F. Railroad Track Maintenance Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

G. Transshipments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

H. Crane Upgrade. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

I. Avoided Cost Of Loading Casks To DOE.. . . . . . . . . . . . . . . . . . . . . . . 154

J. Internal Labor.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

K. Overhead Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

L. AFUDC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

M. Unsupported Costs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

# TABLE OF AUTHORITIES

## CASES

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Bell v. United States,
404 F.2d 975 (Ct. Cl. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Bluebonnet Savings Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166, 167

Bluebonnet Savs. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114, 115

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

Campbell v. United States,
661 F.2d 209 (Ct. Cl. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Castle v. United States,
48 Fed. Cl. 187 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Centex Corp. v. United States,
55 Fed. Cl. 381 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

Convoy Co. v. Sperry Rand Corp.,
672 F.2d 781 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

Dairyland Power Co-op v. United States,
No. 04-106, 2007 WL 4208799 (Fed. Cl. Nov. 20. 2007). . . . . . . . . . . . . . . . . . . . . . . . 143

David Nassif Assocs. v. United States,
557 F.2d 249 (Ct. Cl. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Dunn Appraisal Co. v. Honeywell Information Systems, Inc.,
687 F.2d 877 (6th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

England v. Contel Advanced Sys.,Inc.,
384 F.3d 1372 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163, 164

Gevyn Constr. Corp. v United States,
827 F.2d 752 (Fed. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Library of Congress v. Shaw,
478 U.S. 310 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163, 164

Lifewise Master Funding v. Telebank,
374 F.3d 917 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Marshall v. United States,
164 F. Supp. 221 (Ct. Cl. 1958).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Myerle v. United States, 33 Ct. Cl.,
33 Ct. Cl. 1 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

National By-Products, Inc. v. United States,
405 F.2d 1256, 1263 (Ct. Cl. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Nevada Power Co. v. Monanto Co.,
891 F. Supp. 1406 (D. Nev. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

Northern States Power Co. v. United States,
78 Fed. Cl. 449 (2007). . . . . . . . . . . 157, 165, 166

PSEG Nuclear, L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006). . . . . . . . . . . 114

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006). . . . . . . . . . . passim

Quiman, S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997). . . . . . . . . . . 146

Rainey v. American Forest & Paper Ass'n, Inc.,
26 F. Supp. 2d 82 (D.D.C. 1998). . . . . . . . . . . 143

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003). . . . . . . . . . . 115

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006). . . . . . . . . . . 161, 157

San Carlos Irr. & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1989). . . . . . . . . . . 113

Selman v. United States,
498 F.2d 1354 (Ct. Cl. 1974). . . . . . . . . . . 126

Southern Nuclear Operating Company v. United States,
77 Fed. Cl. 396 (2007). . . . . . . . . . . 157, 164, 166

St. Christopher Assocs., L.P. v. United States,
No. 2007-5069, 2008 WL 80671 (Fed. Cir. Jan. 8, 2008). . . . . . . . . . . 126

System Fuels, Inc. v. United States,
79 Fed. Cl. 37 (2007). . . . . . . . . . . 157, 161, 164, 166

TEG-Paradigm Environmental, Inc. v. United States,
465 F.3d 1329 (Fed. Cir. 2006). . . . . . . . . . . 118

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006). . . . . . . . . . . 157, 164, 161, 165, 166

United States Steel Corp. v. United States,
618 F. Supp. 496 (CIT 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

United States v. Mescalero Apache Tribe,
518 F.2d 1309 (Ct. Cl. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Thayer-West Print Hotel Co.,
329 U.S. 585 (1947).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Westfed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166, 167

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Wickham Contracting Co. v. Fisher,
12 F.3d 1574 (Fed. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165, 166

Willems Indus., Inc. v. United States,
295 F.2d 822 (Ct. Cl. 1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Wilner v. United States,
23 Cl. Ct. 241, 258, 262-63 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

**BOARD DECISIONS**

Boeing Corp.,
ASBCA No. 18,916, 74-2 BCA ¶ 10.976 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

LTV Aerospace Corp.,
ASBCA No. 17,131, 76-1 BCA ¶ 11,840 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Wickham Contracting Co. v. GSA,
GSBCA No. 8675, 92-3 BCA ¶ 25040 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

## STATUTES AND REGULATIONS

10 C.F.R. § 961.11. . . . . . . . . . passim

18 C.F.R. § 101. . . . . . . . . . 162

28 U.S.C. §2516.. . . . . . . . . . 163, 165, 166

42 U.S.C. §§ 10131. . . . . . . . . . 6, 7

42 U.S.C. § 10151. . . . . . . . . . 9

42 U.S.C. § 10161 .. . . . . . . . . 9, 33, 38

42 U.S.C. § 10168. . . . . . . . . . 48, 129, 130

42 U.S.C. § 10221. . . . . . . . . . 7, 8, 32

42 U.S.C. § 10222. . . . . . . . . . 9, 10, 11, 60

42 U.S.C. § 10224. . . . . . . . . . 10

48 Fed. Reg. 16590 (April 18, 1983). . . . . . . . . . 21, 22, 23, 25

48 Fed. Reg. 5458 (Feb. 4, 1983).. . . . . . . . . . passim

FAR § 43.205.. . . . . . . . . . 165

Nuclear Waste Policy Act of 1982, Pub. L. 97-425, 96 Stat. 2201. . . . . . . . . . passim

## RULES

Fed. R. Civ. P. 30(b)(6). . . . . . . . . . 68, 75, 76, 142, 143, 144

Fed. R. Evid. 602. . . . . . . . . . 137, 138

## TREATISES

Restatement (Second) of Contracts § 204. . . . . . . . . . 134

Restatement (Second) of Contracts § 211(b). . . . . . . . . . 121

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CAROLINA POWER & LIGHT COMPANY and FLORIDA POWER CORPORATION, | |
| Plaintiffs, | |
| v. | No. 04-37C (Judge Wheeler) |
| THE UNITED STATES, | |
| Defendant. | |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to this Court's post-trial scheduling order dated November 20, 2007, defendant, the United States, respectfully submits the following post-trial brief.

SUMMARY OF ARGUMENT

As we observed at the commencement of trial, a proper adjudication of the claims of plaintiffs, Carolina Power & Light Company and Florida Power Corporation ("CP&L" and "FPC," respectively, and "Progress Energy," collectively), for damages arising out of any partial breach by the Department of Energy ("DOE") of the Standard Contract is governed by two fundamental principles.

First, measuring damages in this case requires a comparison of the expenditures that plaintiffs actually incurred against the expenditures that they would have incurred in the absence of any partial breach by DOE. However, ascertaining the position that plaintiffs would have occupied had DOE begun accepting fuel in 1998 does not mean figuring out what position plaintiffs would have occupied had the DOE accepted spent fuel at a rate that the utilities requested or would have preferred, or even at a rate that is reasonable (or, as plaintiffs have

suggested, the "most" reasonable). It means identifying the position plaintiffs would have occupied had the Department of Energy met its baseline obligations under the Standard Contract.

Second, if plaintiffs fail to prove that they would not have incurred a particular expenditure absent a breach, they are not entitled to a damage award for that expenditure. If they would have performed a project or incurred a cost absent any partial breach, they would have to pay for it. Awarding plaintiffs damages for that expenditure would not place them in the same position that they would have occupied absent the breach, but would place them in a better position. No theory of contract law permits an award of damages under this circumstance.

As applied to the evidence adduced at trial, these principles yield two important conclusions. With respect to the first principle, two weeks of trial demonstrated that the Standard Contract does not require DOE to accept fuel at a rate that would preclude the need for additional at-reactor storage after 1998, or at a rate that meets the industry generation rate and works off the "backlog" of spent fuel. These articulations reflect qualitative tests that the nuclear industry, including both plaintiffs, wanted DOE to adopt in 1983 and that, as the evidence indicates, DOE might have hoped to be able to live up to in the early years of the Federal waste management program. But the evidence is undisputed that DOE informed the nuclear industry, including plaintiffs, that it was not agreeing to these standards when it promulgated the final version of the Standard Contract and that plaintiffs understood when they executed the Standard Contract that these standards, although perhaps reflecting DOE's hope and goal, did not reflect its obligation. To the extent that plaintiffs rely upon these standards as a basis upon which to depict the world that would have existed had DOE performed in accordance with the Standard

Contract, they have failed to meet their fundamental obligation of depicting a world of baseline performance, and their computation of damages is, therefore, fatally flawed.

Further, even assuming, as plaintiffs suggest, that DOE's obligation somehow incorporates the qualitative standard which plaintiffs advocate and that the Court must, therefore, impose a "reasonable" rate of acceptance, plaintiffs still have failed to carry their burden because they have modelled a world that, by their own admission, far exceeds DOE's baseline obligation to accept fuel at a "reasonable" rate. Plaintiffs never presented any detailed analysis of what the world would have looked like had DOE performed at the minimum rate that they concede is reasonable. Instead, they suggested, based solely upon an undocumented and unproduced "high-level" analysis, that the world they have depicted based upon the "most reasonable" 3,000 MTU annual rate of acceptance would be the same as the world that would exist at the reasonable-but-not-quite-as-reasonable 2,000 MTU rate. When pressed, however, plaintiffs conceded that they did not know how much of at least one major component of their claim for damages at the 3,000 MTU rate would also be recoverable at the baseline reasonable rate. In short, the 3,000 MTU world that plaintiffs have modelled is consistent with neither the terms of the Standard Contract nor plaintiffs' own conception of what would constitute a baseline level of reasonable performance.

With respect to the second principle, plaintiffs did not carry their burden of establishing, for many of the elements of their damages claim, that the costs that they have incurred would not have been incurred had DOE begun accepting fuel in 1998. It may be the case, as plaintiffs asserted in a variety of contexts (such as the "rerack" of the spent fuel pool at FPC's Crystal River plant and the upgrade of the component cooling water system at the CP&L's Harris plant),

that, in the actual world, the path that plaintiffs selected to mitigate the effects of DOE's breach itself required the performance of certain tasks, and that plaintiffs acted reasonably in pursuing these paths. However, these assertions do not alter the conclusion that the costs of performing these tasks are not recoverable as damages if they would have been incurred irrespective of any partial breach by DOE. Similarly, it may be the case that certain expenditures, such as labor and overhead charges, were allocated to projects that would not have existed in the absence of DOE's partial breach. However, again, this conclusion does not mean that the same expenditures would not have been incurred by Progress Energy (as opposed to the individual projects to which they were charged) irrespective of any partial breach. Where plaintiffs have failed to prove that a certain expenditure would not have been incurred in the absence of any partial breach, they have failed to sustain their burden of proof, and the cost is not properly included in damages.

In the end, plaintiffs are entitled to recover as damages those expenditures that the evidence demonstrates (1) would not have been incurred (2) had DOE begun accepting fuel at the baseline rate required by the Standard Contract and (3) are not otherwise unrecoverable. In addition, plaintiffs' request to be brought back to the position that they would have occupied in the absence of a partial breach must take into account those expenditures that plaintiffs have avoided as a result of the breach. It is only after the Court determines that plaintiffs have carried their burden of establishing their entitlement to damages in light of all these criteria that a damage award is warranted.[1]

---

[1] In our pretrial brief, we explained that the Government has been specifically enjoined, via a writ of mandamus issued by the United States Court of Appeals for the District of Columbia Circuit, from relying upon the "Unavoidable Delays" clause of the Standard Contract to excuse its delayed performance. We therefore reserved the right to challenge any

(continued...)

## STATEMENT OF THE ISSUES PRESENTED

1. Whether plaintiffs have sustained their burden of establishing that the Standard Contract, despite its integration clause, implicitly mandates a rate of acceptance of spent fuel that is not included in the text of contract and was expressly rejected by the Government during the course of negotiations.

2. Whether plaintiffs have sustained their burden of proving damages where their damages model is based upon a level of performance that, by their own admission, exceeds DOE's minimum obligations under the Standard Contract.

3. Whether plaintiffs have sustained their burden of proving damages at the 3,000 MTU rate where the witness who compiled the damages model upon which their claim was based admitted that he did not know what activities Progress Energy would or would not have undertaken had DOE begun removing fuel at a 3,000 MTU rate beginning in 1998.

4. Whether plaintiffs have sustained their burden of proving that certain components of their damages claim were caused by any partial breach by DOE where they failed to establish that these expenditures would not have been incurred in the absence of such a breach.

5. Whether plaintiffs are entitled to damages for actions that they concede would have been required in the absence of a breach but that would have been undertaken after the close of the damages period set in this case.

---

[1](...continued)
determination of liability with respect to the Standard Contract if the writ of mandamus is lifted or otherwise deemed inapplicable. On December 3, 2007, after the completion of the trial in this matter, the United States Court of Appeals for the Federal Circuit heard oral argument in Nebraska Public Power District v. United States, No. 2007-5083 (Fed. Cir.).

6. Whether plaintiffs can claim as damages expenditures claimed to be attributable to a partial breach by DOE where these expenditures were incurred to defend against legal challenges brought by third parties who intervened in plaintiffs' licensing efforts.

7. Whether, despite the rule against the recovery of pre-judgment interest against the Government and in the absence of any evidence of specific borrowings, plaintiffs are entitled to recover as damages the imputed debt and equity costs for which the company makes an allowance to finance capital projects.

## PROPOSED FINDINGS OF FACT[2]

## I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

1. On January 7, 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)). Congress specifically determined that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).

2. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; establishing Federal

---

[2] "PX __" and "DX __" refers to Plaintiffs' and Defendant's Exhibits, respectively. "Tr. __" refers to the trial transcript or, where the testimony of witnesses has been admitted through the designation of prior testimony, to the applicable transcript and the date upon which the testimony was provided.

responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. § 10131(b).

3. In addition to the process for the siting of a repository, the Secretary of Energy was to "prepare a comprehensive report, to be known as the Mission Plan, which shall provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a) (1982).

4. The Mission Plan was to include, among other things,

> (1) an identification of the primary scientific, engineering, and technical information . . . with respect to the siting and construction of a test and evaluation facility and repositories;
>
> (2) an identification of any information described in paragraph (1) that is not available because of any unresolved scientific, engineering, or technical questions, or undemonstrated engineering or systems integration, a schedule including specific major milestones for the research, development, and technology demonstration program required under this chapter and any additional activities to be undertaken to provide such information, a schedule for the activities necessary to achieve important programmatic milestones, and an estimate of the costs required to carry out such research, development, and demonstration programs;
>
> (3) an evaluation of financial, political, legal, or institutional problems that may impede the implementation of this chapter, the plans of the Secretary to resolve such problems, and

> recommendations for any necessary legislation to resolve such problems;
>
> * * *
>
> (7) a description of known sites at which site characterization activities should be undertaken . . .;
>
> * * *
>
> (9) an estimate of (A) the total repository capacity required to safely accommodate the disposal of all [HLW] and [SNF] expected to be generated through December 31, 2020, . . ., (B) the number and type of repositories required to be constructed to provide such disposal capacity; (C) a schedule for the construction of such repositories . . .;
>
> (10) an estimate, on an annual basis, of the costs required (A) to construct and operate the repositories anticipated to be needed . . .; (B) to construct and operate a test and evaluation facility, or any other facilities, other than repositories . . .; and (C) to carry out any other activities under this chapter; and
>
> (11) an identification of the possible adverse economic and other impacts to the State or Indian tribe involved that may arise from the development of a test and evaluation facility or repository at a site.

42 U.S.C. § 10221(a) (1982) (emphasis added).

5. The Secretary was to provide a draft mission plan to the states, affected Indian tribes, the Nuclear Regulatory Commission ("NRC"), and other Federal Government agencies within 15 months of the date of the NWPA's enactment. Id. § 10221(b)(1). The Secretary was then to obtain those entities' comments, revise the draft mission plan in response to them, and, within 17 months of the NWPA's enactment, provide the appropriate committees of Congress with the Mission Plan. Id. § 10221(b)(2)-(3).

6. Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982). By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1). The proposal was to "include, for the first such facility, at least 3 alternative sites and at least 5 alternative combinations of such proposed sites and facility designs . . . ." Id. § 10161(b)(4). However, the NWPA provided that any MRS facility that Congress might authorize in response to the Secretary's proposal could not "be constructed in any State in which there is located any site approved for site characterization under section 10132 of this title." Id. § 10161(g).[3]

7. In addition, the NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had

---

[3] In the NWPA, Congress also provided that DOE could create a program for interim SNF and HLW storage in other than a permanent repository "to provide for the utilization of available spent nuclear fuel pools at the site of each civilian nuclear power reactor to the extent practical and the addition of new spent nuclear fuel storage capacity where practical at the site of such reactor . . .," 42 U.S.C. § 10151(b)(1) (1982), or for the establishment of Federally-owned interim storage facilities. Id. § 10151(b)(2); see id. §§ 10151-57. This interim storage program would involve interim storage contracts separate from the Standard Contract at issue in this case, to be funded through a separate interim storage fund. Id. § 10156(a). No utility ever entered such a contract. The possibility of an interim storage facility, to be funded through a separate interim storage fund, expired on January 1, 1990. Id.

to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

8. The NWPA also mandated that:

> Contracts entered into under this section shall provide that –
>
> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5). The NWPA did not identify any other requirements for the contracts specified by 42 U.S.C. § 10222(a)(5).

9. The NWPA also "established within the Department of Energy an Office of Civilian Radioactive Waste Management ["OCRWM"]," which would be headed by a Director responsible "for carrying out the responsibilities of the Secretary" under the NWPA. 42 U.S.C. § 10224(a)-(b) (1982).

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

10. On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-

Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983); Joint Stipulation No. 8.

11. The proposed "scope" of the Standard Contract provided for the acceptance and disposal of SNF from civilian nuclear power reactors pursuant to the NWPA:

> This Contract applies to the acceptance by DOE of spent nuclear fuel (SNF) and/or high-level radioactive waste (HLW) from civilian nuclear power reactors and with respect to such material, establishes the fees to be paid by the Purchaser for the services rendered hereunder by DOE. The services provided to the Purchaser by DOE under this contract are related to **disposal** of SNF and/or HLW of domestic origin from civilian nuclear power reactors. . . .

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added).

12. The term "disposal," as referenced in the proposed scope of the Standard Contract, referred to emplacement in a permanent repository:

> The term "Disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.

48 Fed. Reg. 5458, 5462 (Fed. 4. 1983) (Art. I.9).

13. Similarly, the term "DOE facility" in the proposed Standard Contract referred to a facility for disposal, in a permanent repository, of the SNF and/or HLW:

> The term "DOE Facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high level radioactive waste.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.11).

14. As required by the NWPA, the proposed rule contained a mechanism for defining each contract holder's financial obligations under the Standard Contract. Specifically, DOE

proposed that each entity which entered into the Standard Contract would pay fees to the Secretary, for deposit into the Nuclear Waste Fund ("NWF"), in the following forms and amounts: (1) a one-time fee for SNF generated or fuel in-core prior to April 7, 1983, and (2) continuing quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mil per kilowatt-hour (or as otherwise adjusted) on electricity generated by the contract holder's nuclear power reactor. 48 Fed. Reg. at 5464 (Art. VIII).

15. The proposed Standard Contract also provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract required DOE to issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age:

> Acceptance Priority Ranking. Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:
>
> (a) Except as may be provided for in paragraph (2) below, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery commitment schedule. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility.[4]

[4] However, as an exception to the requirement to accept the oldest SNF and/or HLW first, the next paragraph of the proposed rule provided DOE with the discretion to grant priority to SNF and/or HLW removed from a reactor that had shut down permanently. 48 Fed. Reg. 5458, 5464 (Feb. 4, 1983) (Art. VI.B.3).

16. Although the proposed Standard Contract itself did not identify a specific rate at which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> 5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.
>
> 6. Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6) (emphasis added).

17. The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"):

> . . . The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added).

18. Specifically, in describing the purpose of the DCS in the preamble to its proposed rule, DOE stated that the procedures to be followed in defining any particular contract holder's

allocations for SNF acceptance for any given year included the contract holder's obligation to describe the SNF that it would deliver to DOE, followed by submission of a DCS and of a final delivery schedule ("FDS"):

> *Article IV – Delivery of SNF and/or HLW* – Sets forth the procedures to be followed by Purchaser, including the requirement that the Purchaser describe the waste material to be delivered to DOE, the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery. In case of an emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.

48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (italics in original; emphasis added).

19. In Article I.7 of the proposed Standard Contract, the term "delivery commitment" was defined as the SNF and/or HLW that a contract holder would deliver to DOE in a given year:

> The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7).

20. The proposed contract provided that, after DOE had issued its proposed acceptance ranking, the contract holder was required to submit DCSs at least 63 months before the proposed delivery date:

> Delivery commitment schedule(s), in the form set forth in Appendix B, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and

> request a revised schedule from the Purchaser, to be submitted to DOE with thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or - 20%, and the delivery schedule +2 months, up to the submission of the final delivery schedule.
>
> In addition, the Purchaser may change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract. These adjustments shall be subject to DOE's prior written approval, which approval shall not be unreasonably withheld.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.B).

21. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules ("FDSs"), which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year:

> Final delivery schedule(s), in the form set forth in Appendix C, annexed here and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or disapprove final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of disapproval.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.C).

22. Nowhere in the proposed Standard Contract did DOE propose that it would accept at a rate equal to the annual generation rate of SNF plus some additional quantity necessary to eliminate the backlog of SNF that would accumulate by January 31, 1998. Nor did DOE propose

that it would accept SNF at a rate sufficient to eliminate the need to construct additional storage facilities.

23. The proposed rule provided that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458; Joint Stipulation No. 9.

B. Comments Upon The Proposed Rule

1. Industry Involvement In Drafting The Standard Contract Terms

24. The nuclear utilities and their industry representatives were very involved in the drafting of the Standard Contract and its terms. Almost immediately after the act was signed into law, industry groups began working upon drafting comments to DOE regarding the contracts that DOE was to enter into with industry. Mills (Nov. 16, 2006), Tr. 3906:3-3907:21; DX 20 at FPL-0013225; DX 23 at GPE00103.22.

2. Rate Of SNF And HLW Acceptance

25. DOE received numerous comments in response to the proposed rule, all of which became a part of the administrative record of the rulemaking. Tennessee Valley Authority ("TVA") stated that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 25.63 at ARC001 0537. TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at

which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id.

26. Similarly, Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, expressly recognized that "the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate." DX 25.34 at ARC001 0334.

27. However, EEI and UNWMG, like several individual utilities, stated that the Standard Contract should contain a requirement that "DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW." DX 25.34 at ARC001 0334. EEI and UNWMG suggested the inclusion in the Standard Contract of the following language, intended to add an additional obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

Id. at ARC001 0335.

28. The nuclear industry was concerned that the priority system set forth in the draft contract did not give priority to reactors that might need to ship fuel offsite to ensure continued operation of their plants. Martin, Tr. 152:8-14; 153:9-13; 155:5-17. Specifically, in the cover letter to its comments, EEI recognized that "[n]o priority is given to utilities who may need to

ship SNF to DOE in order to keep their facilities operating (although DOE can, in its discretion, take 'emergency deliveries'). Nor is any consideration given to the size of a Purchaser's SNF inventory." DX 25.34 at ARC001 0331.

29. Florida Power & Light Company, in its written comments, stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:
>
>> "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DX 25.43, Attachment 1 at ARC001 0439 (Testimony & Comments of Michael Cook, VP, Florida Power & Light).

30. Many commenters suggested that the proposed contract requirement for DOE to provide reports regarding acceptance information beginning in 1991 was insufficient to allow the contract holders to plan for their future SNF interim storage needs. EEI and UNWMG stated that DOE instead should issue an annual report, beginning in 1984 (after submission of the Mission Plan to Congress), "setting out its schedules, projected receiving rates, and projected allocations for all purchasers," with the report "cover[ing] at least 10 years of repository operation."

DX 25.34 at ARC001 0356 (emphasis added); see DX 25.12 at ARC001 0166 (reports beginning in 1984 "are necessary to provide Northern States Power Company with an adequate planning horizon for interim storage"). Others suggested that, "[t]o assist in planning, DOE should provide in its reports 10 year forward projections of its receiving capacity and purchaser allocations of that capacity." DX 25.69 at ARC001 0627 (emphasis added).

31. EEI and UNWMG also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX 25.34, Attachment A at ARC001 0336-37. They stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and that, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id.; see DX 25.14 at ARC001 0180 (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 25.69 at ARC001 0625 ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

3. Plaintiffs' Comments

32. Louis Martin, who at the time was CP&L's manager of nuclear fuel, received a copy of the draft Standard Contract in February 1983, when it was issued in the Federal Register. Martin, Tr. 73:11-14, 134:16-18; DX 25.01.

33. On February 10, 1983, six days after the draft's publication in the Federal Register, Mr. Martin attended an industry meeting to discuss EEI's comments to the proposed draft. Martin, Tr. 146:5-8; DX 20 at FPL-0013225. The meeting was also attended by, among

other persons, Steven Kraft and Loring Mills of EEI, and Jay Silberg and John O'Neil of the law firm of Shaw, Pittman, Potts & Trowbridge ("Shaw Pittman"). Martin, Tr. 146:5-8, 149:10-12; DX 20 at FPL-0013225.

34. CP&L submitted its own comments by letter dated March 3, 1983. DX 25.58.

35. Mr. Martin and Robert Kunita, who reported at the time to Mr. Martin, prepared CP&L's comments. Martin, Tr. 104:17, 136:22-137:2.

36. When the letter containing the comments was signed, CP&L had no serious objections to the proposed Standard Contract. Martin, Tr. 137:18-21.

37. In its comments, CP&L stated that the contract should not be issued as a regulation because it would reduce the flexibility of the parties to make changes to the contract. Id. at ARC001 0489. Carolina also stated that "[i]t seems premature to establish detailed acceptance criteria at this point in time." DX 25.58 at ARC001 0490.

38. CP&L believed that it would be premature to address acceptance criteria because the contract would apply for many years in the future and there were "just too many uncertainties" for the parties to be able to commit to acceptance criteria in 1983. Martin, Tr. 139:25-140:12.

39. CP&L's comments did not address the issue of the rate of acceptance. Martin, Tr. 140:13-16.

40. FPC also submitted comments, dated March 4, 1983. DX 25.84. In its comments, FPC stated, among other things, that "priority should be assigned first to operating plants which would be forced to shutdown as a result of a lack of spent fuel storage capability." Id. at ARC001 0691.

C. The Final Rule

41. On April 18, 1983, DOE issued the Standard Contract as a final rule. 48 Fed. Reg. 16590 (April 18, 1983).

42. The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added), that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Id. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added).

43. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:

> The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

Id. § 961.11, Art. I.10 (emphasis added).

44. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

45. The final Standard Contract retained the fee requirements identified in the proposed rule, requiring contract holders to pay the one-time fee for waste generated prior to April 7, 1983, and continuing quarterly fees in the amount of 1.0 mill per kilowatt-hour on electricity generated. 10 C.F.R. § 961.11, Art. VIII.

46. As for the order of SNF acceptance, the final Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

47. As for identification of the rate of SNF acceptance, although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b (emphasis added).

48. In the final Standard Contract, DOE did not adopt TVA's request that DOE add a provision to require DOE to "start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." See 10 C.F.R. § 961.11.

49. Similarly, DOE did not adopt EEI and UNWMG's request for additional "performance standards" by adding a contract clause to require DOE to accept SNF and/or HLW "commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated." 48 Fed. Reg. 16590, 16598 (Apr. 18, 1983); Morgan, Tr. 1441:22-24.

50. In the final Standard Contract, DOE inserted the following whereas clause, which corresponds, in part, to the language that EEI and UNWMG had proposed in its comments:

> Whereas, DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon request of the generator or owner of such waste or spent nuclear fuel.

10 C.F.R. § 961.11.

51. DOE denied these requests to include either an acceptance rate or qualitative acceptance performance standards in the Standard Contract because DOE did not have enough information regarding how the program would develop to be able provide such a rate. Morgan, Tr. 1423:10-17 ("If I had committed to an acceptance rate at this time without a mission plan even published I believe that I should have been fired for malfeasance, because I had no justification for committing the government to a binding contract when there was insufficient information to back it up."); Morgan, Tr. 1422:13-16 (agreeing that it would have been "unconscionable" to put an acceptance rate in the contract).

52. DOE was unable to commit to an acceptance rate in the contract because of the numerous uncertainties that the program faced. In addition to funding constraints from Congress, Mr. Morgan and other program personnel did not know what licensing requirements the Nuclear Regulatory Commission would issue, whether there would be intervenors in the licensing proceedings, or, perhaps most importantly, what type of facility would be designed and built. Morgan, Tr. 1464:11-1465:11.

53. Given these uncertainties, DOE chose to defer the development of an acceptance rate until the program was more developed. By 1987, DOE planned to have selected the

repository site. Morgan, Tr. 1475:13-1476:7. By 1991, DOE planned to submit its request for a license to the NRC. Morgan, Tr. 1477:1-7 ("Then we would have a design to deal with, specifically for the acceptance rate."). These were the dates to which DOE was willing to commit in the Standard Contract. Morgan, Tr. 1462:6-21.

54. DOE also denied the request that priority be granted to utilities which need to ship SNF to DOE to keep their plants operating, stating that, "by the time the repository commences operations, utilities will have made adequate preparations to provide on-site storage in order to ensure continued plant operations." 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983); Morgan, Tr. 1458:4-11.

55. DOE did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan." DX 25.43, Attachment 1 at ARC001 0439.

56. The final Standard Contract also deleted some provisions from the proposed rule regarding the DCSs, but with the intention only of eliminating redundant provisions. As the "Sectional Analysis of Contract" portion of the final rule provided, DOE's intention was to retain the purpose of the DCSs, as had been defined in the proposed rule:

> The definition of "delivery commitment" which appeared in the proposed rule (48 FR 5462, Article I.7) has been deleted as this aspect is adequately covered in the contract itself (See Articles IV and V).

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

57. Accordingly, adopting the purpose of the DCSs from the proposed rule, the final Standard Contract established a procedure through which, after DOE's issuance of the 1991

Annual Capacity Report ("ACR") and Acceptance Priority Ranking ("APR"), contract holders would be required to begin submission of DCSs (beginning January 1, 1992) for any SNF and/or HLW that they wanted DOE to accept 63 months later:

> 1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.
>
> 2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

10 C.F.R. § 961.11, Art. V.B (emphasis added).

58. Unlike the proposed rule, the DCS submission provision of the final Standard Contract included a requirement that, if a contract holder found a DCS that DOE proposed to be unacceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)." Id. The final Standard Contract also included a "Disputes" clause, the purpose of which was to

provide a mandatory administrative mechanism for the resolution of contract disputes arising under the contract:

> Except as otherwise provided in this contract, <u>any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer</u>, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. <u>The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board)</u>. . . .

10 C.F.R. § 961.11, Art. XVI.A (emphasis added).[5]

59. The final Standard Contract, like the proposed rule, contained (1) language providing for the submission of FDSs after the submission and approval of DCSs and (2) a new sentence that required the parties "promptly [to] seek to negotiate mutually acceptance schedules" if the FDS that DOE was willing to approve was unacceptable to the contract holder:

> Final delivery schedule(s), in the form set forth in the Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of

[5] In its comments upon the proposed Standard Contract, EEI recognized that the Disputes clause would function to resolve any differences between the parties concerning DCSs. DX 25.34 at ARC001 0346.

> the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

10 C.F.R. § 961.11, Art. V.C.

60. The final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.A.

61. The final Standard Contract did not contain any language that expressly required DOE to accept fuel at a rate that would preclude the need for expenditures upon at-reactor storage after January 31, 1998, at a rate equal to the annual generation rate of SNF plus an amount sufficient to work off the backlog of fuel that would have accumulated by January 31, 1998, or at any specific numerical acceptance rate. See 10 C.F.R. § 961.11.

62. The final Standard Contract contained an express recognition that its terms "had been developed in the light of uncertainties necessarily attendant upon long-term contracts." 10 C.F.R. § 961.11, Art. XV.

D. Plaintiffs' Execution Of The Standard Contract

63. Mr. Kunita reviewed the final version of the Standard Contract before it was signed and realized, as soon as he reviewed it, that it did not contain a rate of acceptance. Kunita, Tr. 688:10-693:24.

64. On May 25, 1983, Mr. Kunita had a telephone conversation with Robert Taylor of the Power Authority of the State of New York ("PASNY"). During that conversation, Mr. Taylor informed Mr. Kunita that the PASNY board was going to refuse to sign the Standard Contract and spoke of the possibility of suing DOE for developing a contract that was inconsistent with the NWPA. Kunita, Tr. 695:12-697:7; DX 34 at CP_FP000046289.

65. CP&L neither refused to sign the contract nor sued DOE for developing a contract that was inconsistent with the NWPA. Kunita, Tr. 697:8-18.

66. When he first read the final version of the Standard Contract, Mr. Martin was careful to read and initialed every section of the Standard Contract, including the integration clause in Article XXII. Martin, Tr. 168:20-169:14; PX 10 at CP_FP000026875.

67. Mr. Martin and the fuels department recommended that CP&L execute the Standard Contract. Martin, Tr. 186:12-19; PX 9 at CP_FP000063730

68. On or about June 2, 1983, Jim Davis, CP&L's Senior Vice President of the Nuclear Fuels group at CP&L, prepared a memo recommending that CP&L execute the Standard Contract. The letter further indicated that Mr. Martin would draft a letter reserving any rights to possible future challenges to the Standard Contract for review by both John Bode, a CP&L in-house lawyer, and the Shaw Pittman law firm. Martin, Tr. 186:1-189:13; PX 9 at CP_FP000063729-30.

69. CP&L signed its contract on June 3, 1983. PX 10 at CP_FP000026843, 876.

70. FPC signed its contract on June 30, 1983. PX 11 at CP_FP000031305, 338.

71. On or about June 13, 1983, Mr. Martin prepared a letter that accompanied the executed version of the Standard Contract that CP&L returned to DOE. CP&L expressly

requested that DOE reconsider the method by which fees were to be calculated and "reserve[d] the right to enter into any proceeding initiated by DOE or others that may affect the Final Rule." Martin, Tr. 186:9-11; 188:10-14;190:13-20; 191:1-4; PX 12 at CP_FP000063726.

72. CP&L's reservation of rights made no mention of the issue of inclusion of a rate of acceptance in the Standard Contract. PX 12 at CP_FP 000063726.

E. Industry Activities Following The Execution Of The Standard Contract

73. After the contracts were signed, the industry continued to pursue the issue of incorporating additional performance standards in the Standard Contract. In September 1983, Mr. Martin attended a meeting of EEI/UNWMG during which the need for such a rulemaking was discussed. Martin, Tr. 192:19-193:25; 198:9-199:21; DX 40 at CP_FP000146148-149, 151.

74. At an informational meeting held in December 1983 with the nuclear industry, Mr. Mills of EEI explained that, in the contract, DOE had promised to take SNF "at some unspecified rate" in the future and that the industry expected to initiate a petition for rulemaking in the future to define additional contractual performance assurances:

> In return for the money within the contracts, DOE has promised that it will take the nuclear waste some unspecified day, at some unspecified rate, hopefully starting in 1998. The DOE promise must be carried out, and it is our task as contract holders to do everything we can to assure that it is achieved.
>
> * * *
>
> We really were never under an illusion that we would get a fair and equitable contract with DOE, with firm commitments and detailed performance standards, with penalties for non-performance. We were not really looking for that, however, there were many concerns expressed by the utilities that were not resolved, as we believed equitably during the contract generation process. Because several concerns were not handled satisfactorily, we fully expect to see a petition initiated for rule-making to achieve a more

> reasonable understanding on several issues. The money question is not involved. It is a matter of some of the performance assurances, to include some of the things we heard this morning which were not embodied in the contract.

DX 41 at SN069619; Mills (Nov. 16, 2006), Tr. 3924:18-3925:9 ("one of the performance assurances was the rate of acceptance.").

75. In January 1984, UNWMG distributed a draft petition for rulemaking to be submitted to DOE. DX 43. The accompanying draft supporting memorandum noted that DOE had rejected its requests for additional performance standards in the rulemaking on the Standard Contract and urged that "DOE provide for a minimum receiving rate for SNF – an annual receiving rate not less than the rate at which SNF is being discharged – and that DOE commit to accept the entire backlog of SNF over a ten year period." Id. at VAP-0002180.

76. In April 1987, UNWMG submitted to the DOE contracting officer a request that the Standard Contract be "interpreted, clarified or amended to include additional performance standards by which DOE's progress may be evaluated." DX 56 at HQR-008-0180; Mills (Nov. 16, 2006), Tr. 3932:24-3935:10 (letter was a request to DOE to "reconsider" the issue of the rate of acceptance). Specifically, UNWMG requested that "DOE provide for a minimum receiving rate for SNF -- an annual receiving rate not less than the rate at which SNF is being discharged -- and that DOE commit to accept the entire backlog of SNF over a ten year period." Id. at HQR-008-0181.

77. DOE responded to this request by letter dated October 2, 1987. PX 41. In response to the industry's request that DOE commit to minimum receipt rate, the DOE contracting officer explained that, "given the current status of the [waste management system], the Department is unable to make a commitment to a minimum receipt rate of spent nuclear fuel

(SNF) which will equal or exceed the annual rate at which SNF is being discharged from reactors." Id. at PNL-028-1143.

## III. DOE'S ISSUANCE OF A STATUTORILY REQUIRED MISSION PLAN, WHICH THE INDUSTRY UNDERSTOOD WAS NOT CONTRACTUALLY BINDING

78. In June 1985, DOE issued a Mission Plan, DX 49, pursuant to the requirements of 42 U.S.C. § 10221 for "submission to the appropriate committees of the Congress." 42 U.S.C. § 10221(b)(3). Although the Mission Plan contained potential acceptance rates based upon various assumptions regarding the availability of two repositories and an MRS facility, these rates were not intended to be contractually binding or to create some obligation upon DOE to satisfy some particular acceptance rate, regardless of whether the assumptions in the Plan proved accurate:

a. In his cover letter providing the Mission Plan to Congress, Ben Rusche, Director of OCRWM, stated that the purpose of this plan was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this Act." DX 49 at HQR003 1090 (emphasis added); see 42 U.S.C. § 10221 (1982). In the Mission Plan, DOE projected, for informational purposes, that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 49 at HQR003 1129 ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"); Kouts (June 13, 2006), Tr. 2602:2-2303:3 (only first repository was authorized). The 1985 Mission Plan also described an improved performance system that would include An MRS facility that could start

receiving SNF in 1996, two years ahead of the first repository (although DOE recognized that it lacked statutory authority to pursue this approach absent congressional approval of the MRS proposal to be submitted pursuant to section 10161), which would "service[] the first repository." DX 49 at HQR003 1128, 1132-33.

b. Studying an assumption that it would have two repositories and an MRS, DOE projected in the Mission Plan, in Tables 2-2 and 2-3, schedules at which it could potentially accept SNF. DX 49 at HQR003 1130-31; Kouts (June 13, 2006), Tr. 2608:14-2609:7 (steady-state rate of 6,000 MTU annually) . However, these acceptance rates were not intended to be contractually binding, see, e.g., DX 49 at HQR003 1129; Kouts (June 13, 2006), Tr. 2600:15-2601:7 (no relationship between Mission Plan schedules and DOE's contractual obligation), and DOE had declined the utilities' request to include in the Standard Contract a provision making the acceptance rates identified in the 1985 Mission Plan binding. See DX 25.43, Attachment 1 at ARC001 0439.

c. In the Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses." DX 49 at HQR003 1133; see Kouts (June 13, 2006), Tr. 2614:12-2615:2 ("[A]t this point in the program, we were uncertain about what the system would look like, the size of it, the amount of fuel and the materials we were going to be accepting, and we wanted to put everyone on notice that this was our best guess at the time."). Further, in the Mission Plan, DOE advised Congress that it would not begin to publish firm waste acceptance schedules until 1991, as follows:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.

DX 49 at HQR003 1133. Accordingly, in the Mission Plan, DOE pointed to the issuance of the 1991 ACR as the beginning of the process for scheduling deliveries from utilities. Kouts (June 13, 2006), Tr. 2615:11-2616:11.

d. In section 2.7 of the 1985 Mission Plan, DOE expressly represented that the estimated schedule contained in it, based upon particular assumptions, was only an approximation of the how the system "may operate," that it was subject to considerable variation, and that actual acceptance rates had not yet been determined as follows:

> These schedules are for illustrative purposes only at this time. The amount of Defense waste to be disposed of in the repository, and the actual acceptance rates, have not yet been determined by the DOE.
>
> * * *
>
> It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.

DX 49 at HQR003 1132-33 (emphasis added); Kouts (June 13, 2006), Tr. 2613:9-24 (language was included in the Mission Plan to indicate that "this was an estimate and that it was not in any way a commitment . . . there was a lot of uncertainty at this point in the program.").

e. In section 2.4 of the 1985 Mission Plan, DOE explained that, although the baseline assumption of the Mission Plan was that the repository would be built on schedule, a

substantial delay in the repository would require DOE to pursue contingency approaches, with potentially significant effects upon DOE's SNF acceptance capabilities:

> [A]ll those involved in, and concerned about, these activities recognize that this program is highly controversial; involved in it are a number of important constituencies with widely varying views of how, when, and whether elements of the program should be carried out. . . .
>
> * * *
>
> The baseline program assumption, of course, is that the repository is built on schedule. Should the repository be substantially delayed, one of two contingency approaches would be pursued. If the MRS facility is authorized by Congress and constructed, it can begin to accept spent fuel in a timely manner and package and store it (up to the authorized storage-capacity limit) until a repository becomes operational. . . .
>
> If site characterization shows that none of the candidate sites for the first repository are suitable or should successive notices of disapproval be made and upheld, the DOE has two main contingency plans. If an MRS facility has been authorized and constructed, it can accept spent fuel on or ahead of schedule, packaging and storing it (up to the authorized storage-capacity limit) until the "second" repository is authorized (which, of course, would then become the first repository) and becomes operational. <u>If an MRS facility has not been authorized, spent fuel will continue to be stored at reactor sites in spent-fuel pools and possibly in dry storage</u>.

DX 49 at HQR003 1123-24 (emphasis added); <u>see</u> DX 49 at HQR003 1124 ("Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.").

f. DOE issued two drafts of the Mission Plan, both of which contained similar waste acceptance schedules based upon DOE's then-current program plans, including the development of two repositories. PX 17 at SN045171 ("The Mission Plan . . . defin[es] the

program objective, strategy, and current program plans . . ..") (emphasis added), SN045174. In Section II, Program Strategy, of the December 1983 draft Mission Plan, DOE stated that it would not begin publishing firm acceptance schedules until 1991:

> A. Waste Acceptance Schedule
>
> This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. The schedule will eventually be further developed to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element. Under the terms of the utility contracts for disposal services, an annual capacity report with projected annual receiving capacities and rankings will be issued by the Department for planning purposes, beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level waste. In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations.
>
> * * *
>
> While the Department's aggregate acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date).

Id. at SN045173, 175 (emphasis added). The purpose of the draft Mission Plan, like the final version, was "to inform the utilities and other stakeholders what [DOE's] plans were in the program." Morgan, Tr. 1459:17-21. DOE was not obligating itself to accept waste at the schedules set forth in the draft Mission Plan. Morgan, Tr. 1459:22-25; see also Rosselli (Apr. 15,

2002) , Tr. 135:18-136:23 (reference to "firm schedule" in the December 1983 draft Mission Plan meant the delivery commitment schedules to be executed by the utilities and approved by DOE). The language regarding "the need for utilities to provide additional on-site storage after 1998" was removed from subsequent versions of the Mission Plan. Compare PX 17 and 22 and 31; Lawrence, Tr. 2109:21-2111:19 (language deleted because it exceeded the requirements of the NWPA).

g. At a conference attended by Standard Contract holders and others in December 1983, Mr. Morgan described the December 1983 draft Mission Plan as containing DOE's "basic strategy." PX 19 at SN069600 (emphasis added). He also explained that a second repository would be necessary to begin working off the backlog of spent fuel. Id. According to the schedule set forth in the December 1983 draft Mission Plan, the second repository would need to begin operation to enable DOE to stay ahead of the projected generation rate of SNF from nuclear utilities. PX 17 at SN045174; Morgan, Tr. 1480:9-1481:2. However, as of December 1983, a second repository had not been authorized by Congress. PX 17 at SN045176 ("upon Congressional approval, the Department will proceed to license the site and construct a second repository."); DX 49 at HQR003 1126 ("The Act authorizes the DOE to conduct siting activities for a second repository and submit to Congress a proposal for the authorization of a second repository."); Pollog, Tr. 1296:12-19 (at the time DOE published the Mission Plan, the second repository had not been authorized).

h. Because there were "a demanding set of technical, regulatory and institutional challenges" to be met in the development of the first repository, the December 1983 draft Mission Plan also discussed DOE's plans to pursue a Monitored Retrievable Storage

("MRS") facility as an alternative for performance in 1998. PX 17 at SN045178. Mr. Morgan also advised Standard Contract holders and others at the December 1983 conference that the schedule for the repository was "extremely optimistic" and, for this reason, DOE would have "an alternative plan or parallel plan" to begin receiving waste at an MRS by January 31, 1998. Morgan, Tr. 1467:19-1468:2; PX 19 at SN069600. However, the program "strategy" with regard to preventing the need for utilities to add additional on-site storage after 1998 did not apply to DOE's plans for the MRS. Morgan, Tr. 1468:18-1469:12; PX 19 at SN069599 (strategy described for repository operations).

79. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023:

> As already mentioned, several important milestones have been achieved. However, the experience gained in achieving those milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (see Table 1). The new schedule shows a 5-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. (As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility).[6]

DX 59 at HQR0031634; Kouts (June 13, 2006), see Tr. 2626:5-2627:12 ("We essentially acknowledged at this point that the repository, the first repository was not going to be operational until 2003 . . . that we could still nonetheless begin accepting waste if we had an MRS in the system by 1998."), 2647:12-2651:21; DX 59 at HQR32039 (acknowledgment of EEI and

[6] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

UNWMG that DOE could only meet its statutory and contractual obligation to begin acceptance in 1998 with performance at an MRS). Further, in the 1987 Mission Plan Amendment, DOE stated that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation." DX 59 at HQR0031687 (emphasis added). Again, these acceptance rates were not intended or understood to be contractually binding. Instead, this language was intended to indicate that "the Department was still trying to figure out exactly how the system was going to operate, that we understood that there were a variety of uncertainties as to how the program would be implemented and that this was our best estimate at the time, but that estimate could change." Kouts (June 14, 2006), Tr. 2638:6-25.

80. DOE also represented in the 1987 Mission Plan Amendment the importance of the Acceptance Priority Ranking and Annual Capacity Report that would be issued in 1991:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.

DX 59 at HQR0031687. With this statement, DOE was "notifying contract holders and the Congress that we would essentially begin the contractual planning process [] as specified in the contracts, beginning in 1991, by issuing an acceptance priority ranking and an annual capacity report from which the utilities would then provide information to us, which we would then have

to evaluate and approve, which would then form a basis for a commitment for what the Department would be taking from the utility." Kouts (June 14, 2006), Tr.2639:7-2640:14.

## IV. THE BELIEFS THAT CP&L EXPRESSED AT TRIAL ABOUT DOE'S OBLIGATIONS UNDER THE STANDARD CONTRACT

81. According to Progress Energy, a rate is consistent with the Standard Contract if it would eliminate the need for utility expenditures for spent fuel storage after 1998. Edwards, Tr. 472:4-9; Martin, Tr. 121:15-20.

82. The CP&L employees involved in the development of the terms of the Standard Contract, Louis Martin and Robert Kunita, claimed at trial to have understood the Standard Contract to require DOE to accept spent nuclear fuel at a rate that would meet the generation rate and work off the backlog of fuel. Martin, Tr. 159:10-163:6, 175:10-17; Kunita, Tr. 687:1-22.

83. Mr. Kunita never saw any evidence or documentation that was consistent with his understanding of the rate of acceptance required by the Standard Contract. Kunita, Tr. 672:9-673:18.

84. Although Mr. Martin believed that the issue of the pickup rate had been "covered in the [Standard C]ontract," Mr. Martin was unable to specify any provision of that document that sets forth his understanding of the rate of acceptance. Martin, Tr. 169:25-170:3, 185:19-25, 216:25-217:7.

85. Mr. Martin claims to have understood the Standard Contract to "resolve the company's spent fuel storage problem," such that, once the process for accepting fuel was in place, the company "would not have to continue to deal with accumulations of spent fuel at its nuclear power plants." Martin, Tr. 79:22-81:6.

86. Mr. Kunita claims to have understood the Standard Contract to require the acceptance of "batch wise" quantities from utilities, such that DOE would be required to accept fuel at a rate that matched what utilities were discharging. Kunita, Tr. 669:1-23.

87. Mr. Kunita acknowledged that the understanding which he claimed to have of the Standard Contract was consistent with the position, expressed by EEI and UNWMG in their March 7, 1983, comments to the proposed Standard Contract, that the final version of the Standard Contract should include a "recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated along with the accumulated backlog of SNF/HLW." Kunita, Tr. 687:1-21; DX 25.34 at ARC001 0334.

88. Mr. Martin believed that the "whereas" clause as proposed by EEI in its March 1983 comments to the Standard Contract expressed "what DOE was going to do," and he believed that such an obligation "was in the standard contract." Martin, Tr. 162:17-163:6; DX 25.34 at ARC001 0335.

89. Mr. Martin attached no significance to the fact that DOE had rejected the express addition of such a standard in the final version of the Standard Contract. Martin, Tr. 118:1-5.

90. Mr. Martin believed that the addition of explicit language into the Standard Contract expressly requiring DOE to accept fuel in accordance with the standard proposed by EEI and UNWMG was unnecessary because such a requirement already existed and that suggestions advocating such an addition were "nit-picky." Martin, Tr. 117:5-13.

91. Mr. Martin testified that he would have been surprised if DOE had incorporated such language into the Standard Contract because it was not necessary and because he believed

that "the more detail you put into a contract, the more complexity you put into it, the more likely you are to introduce unanticipated problems." Martin, Tr. 118:1-18.

92. Mr. Martin agreed that the concerns expressed by EEI and UNWMG about the lack of "performance standards" contained in the proposed Standard Contract, as expressed in their comments of March 7, 1983, related to the absence of a rate of acceptance. Martin, Tr. 155:22-156:21.

93. Mr. Martin and Mr. Kunita derived their purported understanding of the rate of acceptance required by the Standard Contract from the company's prior contracts for the reprocessing of spent fuel. Martin, Tr. 201:12-21; Kunita, Tr., 643:2-15, 647:22-648:5, 670:2-10.

94. The Standard Contract does not incorporate CP&L's reprocessing contracts. PX 10.

95. Mr. Martin testified that he obtained its understanding of DOE's obligations pursuant to the Standard Contract from written and verbal statements from DOE. Martin, Tr. 167:6-10.

96. Specifically, Mr. Martin contends that his understanding of the parties' obligations pursuant to the Standard Contract arose in part from communications that he received from Robert Morgan. However, Mr. Martin does not recall ever interacting directly with Mr. Morgan or any other person at DOE concerning the rate of acceptance, and he does not specifically recall any communications from Mr. Morgan before the Standard Contract was signed. Martin, Tr. 200:18-201:11; 202:14-22.

97. One of the documents upon which CP&L contends it relied was a draft mission plan issued months after the final Standard Contract was signed. Martin, Tr. 170:11-17; PX 17.

98. The language in the draft mission plan upon which CP&L relies to evidence its understanding of DOE's obligations pursuant to the standard contract was removed from the final mission plan. Martin, Tr. 169:17-170:3; 171:10-12; PX 17 at SN045170; DX 49.

99. CP&L believed that, if DOE accepted SNF and stored it at an MRS facility, DOE would be acting consistently with its contractual obligations. Martin, Tr. 183:7-24.

100. When Mr. Martin first read the Standard Contract, he understood that the actual schedule by which DOE would accept SNF was to be determined in the future, through a framework that included the exchange of information between plaintiffs and the DOE. This exchange of information would be accomplished, in part, through the use of DCSs. Martin, Tr. 183:25-184:25.

101. Mr. Martin also believed that the information CP&L would provide to DOE in a DCS would "be what CP&L could do and what it would do with respect to the delivery of fuel to DOE." Martin, Tr. 185:7-13.

102. Mr. Martin understood that DOE's acceptance of SNF pursuant to the Standard Contract was acceptance from the nuclear industry in the aggregate, and that the Standard Contract's schedule for the acceptance of SNF would apply to the industry as a whole and not just to CP&L. Martin, Tr. 203:23-204:23.

103. Mr. Martin also understood that the Standard Contract signed by CP&L was identical in its material terms to all of the other contracts signed by utilities in the industry at that time. Martin, Tr. 205:19-206:3.

104. Mr. Martin understood that DOE was responsible for designing the rate of acceptance, for designing the SNF acceptance program, and for deciding how many repositories were ultimately needed. Martin Tr. 210:24-211:10.

105. Mr. Martin understood that, pursuant to the Standard Contract, the acceptance rate would not be fixed, but could vary based upon the parties' changing circumstances. Martin, Tr. 211:11-24.

106. In 1986, Mr. Kunita prepared, and Mr. Martin recommended for approval to the next level of management, CP&L's spent fuel management plan. Kunita, Tr. 712:5-25; PX 35.

107. The spent fuel management plan is a document that the company uses for long-range planning purposes. It is prepared annually and is sufficiently important to the company that, one year, Mr. Kunita was required to petition his supervisor, Mr. Martin, to submit it late. Kunita, Tr. 710:5-19.

108. Because it was being submitted up the chain of command, in authoring the document, Mr. Kunita wanted to make sure that everything in it was written as accurately and precisely as possible. Kunita, Tr. 713:12-18.

109. In the 1986 spent fuel management plan, Mr. Kunita provided a description of the Federal waste management program and wrote, "Utilities owning and generating spent fuel have accordingly signed contracts with the U.S. Department of Energy (DOE), obligating the government to begin accepting their spent fuel on or before the target date," January 31, 1998. Kunita, Tr. 716:2-13; PX 35 at CP_FP000062538 (emphasis added).

110. When he wrote this description, Mr. Kunita understood that DOE had an obligation to accept fuel beginning in January 1998. Kunita, Tr. 716:14-19.

111. Mr. Kunita understands the term "obligation" to mean something that a person has to do. Kunita, Tr. 717:8-13.

112. Mr. Kunita understands the term "plan" to mean something to which a person does not have to conform. Kunita, Tr. 718:24-719:4.

113. In the same paragraph in which he described the "obligations" of DOE in CP&L's 1986 spent fuel management plan, Mr. Kunita also wrote that "DOE is currently planning to remove from utility storage all spent fuel on a schedule that will preclude utilities from having to provide any additional storage capacity at nuclear power plant sites after January 31, 1998." PX 35 at CP_FP000062538 (emphasis added).

114. The industry-wide generation rate of spent fuel has consistently been approximately 2,000 MTU annually. Barrett (May 10, 2002), Tr. 1331:7-17; Edwards, Tr. 798:8-15.

## V. CP&L's RELATIONSHIP WITH EEI AND UNWMG

115. CP&L and FPC were members of both EEI and UNWMG. Joint Stipulation No. 10.

116. Mr. Martin was a member of the EEI Nuclear Fuel Committee from 1982 through 1988, and he was the Chairman of the EEI Nuclear Fuel Committee during the mid-to-late 1980s. Martin, Tr. 141:4-11.

117. As Chairman of the Nuclear Fuels Committee, Mr. Martin served as CP&L's point of contact with EEI with respect to nuclear fuel matters. Martin, Tr. 141:12-17.

118. The persons with whom Mr. Martin most frequently worked on the EEI staff were Steven Kraft and Loring Mills. Martin, Tr. 141:22-142:1.

119. As Chairman of the EEI Nuclear Fuels Committee, Mr. Martin discussed with Mr. Kraft what topics should be discussed at Nuclear Fuel Committee meetings and whether a topic was of interest to the group, and coordinated the agenda for Nuclear Fuel Committee meetings. Martin, Tr. 142:13-22.

120. Mr. Kunita was a member of EEI's Utility Standard Contract Task Force. Kunita, Tr. 684:17-685:8; DX 48 at CP_FP000146084.

121. In the early 1980s, part of Mr. Kunita's job was to attend meetings conducted by EEI. Kunita, Tr. 673:19-23.

122. Shaw Pittman was counsel to EEI and UNWMG. Kunita, Tr. 677:13-16.

123. Mr. Kunita regularly received, either directly or indirectly, correspondence from Shaw Pittman in the course of performing his responsibilities for CP&L. Kunita, Tr. 681:12-20; DX 1 at CP_FP000040329, DX 42 at CP_FP000196387.

124. In December 1986, UNWMG's Standard Contract Task Force, of which Mr. Kunita was a member, discussed a plan to submit a letter to DOE to resolve certain issues relating to the Standard Contract, including the absence of performance standards. Kunita, Tr. 705:13-706:15; DX 54 at SN007282.

## VI. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT AND THE FURTHER DEVELOPMENT OF THE WASTE MANAGEMENT PROGRAM

125. As directed by the NWPA, DOE submitted a proposal to Congress for the construction of an MRS facility in Clinch River, Tennessee, dated March 1987. PX 36; Kouts, (June 13, 2006), Tr. 2616:18-2617:4. In the proposal, DOE stated that the "MRS facility would be critical to the DOE's ability to accept waste for disposal in 1998," given the announced delay

of the start of repository operations until 2003. PX 36 at CP_FP000039640; Kouts (June 13, 2006), Tr. 2618:17-2620:12 (DOE planning to meet 1998 obligation with waste acceptance at an MRS facility). Recognizing concerns that the MRS would become a "de facto repository" and "would diminish the resolve to develop a geologic repository," DOE proposed that Congress link the start of MRS operations to the issuance by the NRC of the construction authorization for the repository and limit the storage capacity of the MRS to 15,000 MTU. PX 36 at CP_FP000039642; Kouts (June 13, 2006), Tr. 2621:19-2623:21. These proposed limits were based upon comments that DOE received from the State of Tennessee and the Clinch River MRS Task Force. PX 36 at CP_FP000039642; Kouts (June 13, 2006), Tr. 2622:9-17; see DX 52 at DER0033086 and DER0033094; Kouts (June 18, 2007), Tr. 3539:13-3541:4.

126. On December 22, 1987, after DOE had submitted the 1987 Mission Plan Amendment and the MRS Proposal to Congress, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious," and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The Committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach

major decision points in the nuclear waste program, there will be great potential for political opposition." Id.

127. The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a single permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a); Kouts (June 14, 2006), Tr. 2658:20-2659:6 (DOE had been working to characterize three different sites for possible repository sites). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility, 42 U.S.C. § 10162(b), but "annulled and voided the siting of the MRS facility that the Department had proposed" at Clinch River, Tennessee. Kouts (June 14, 2006), Tr. 2659:7-9 and Tr. 2884:13-2885:3. However, the 1987 amendments provided that the Secretary could not select a site for that MRS "until the Secretary recommends to the President the approval of a site for development as a repository under section 10134(a)." 42 U.S.C. § 10164(b). Further, Congress provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3). These requirements for the MRS and linkages between the MRS and the repository were more restrictive and onerous than those proposed by DOE. Kouts (June 14, 2006), Tr. 2659:9-2660:14, 2886:17-2887:9 (DOE could not build MRS until repository construction authorization was received and could not accept more than 10,000 MTU of SNF at MRS until repository began operation); Kouts (Mar. 29, 2005), Tr. 2121:17-2122:2.

128. The 1987 amendments to the NWPA required the establishment of the MRS Review Commission to determine the need for monitored retrievable storage. 42 U.S.C. § 10163 (1987); Kouts (June 14, 2006), Tr. 2885:4-11 (MRS Commission was to provide "its own perspective on the type of MRS, what the linkages should be and implementation should be in the waste management system."). The Commission issued its report to Congress in November 1989, concluding that "the MRS as presently described in the law, which links the capacity and schedule of operation of the MRS to a permanent, geologic repository cannot be justified." DX 70 at HQR-036-3994. The Commission further reported that:

> The Commission notes that the Congress, for many years, has expressed concern that an unlinked MRS might be regarded as a de facto repository and could reduce the impetus for proceeding with permanent geologic disposal. The Commission recognizes this expression of Congressional will, as well as similar sentiments voiced during the course of its hearings. Although the Commission does not believe that there is a technical basis for the linkages, the Commission concludes that some linkages are justified.

Id.; DX 70 at HQR-036-4006; Kouts (April 12, 2007), Tr. 3388:22-3392:25 (conclusion of the MRS Commission was consistent with DOE's experience in trying to site MRS in Clinch River, Tennessee).

129. The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a); Kouts (Mar. 29, 2005), Tr. 2122:8-2123:20. The Negotiator identified several interested Indian tribes and states and several grants were issued to study the

feasibility of hosting the MRS facility. Kouts (June 14, 2006), Tr. 2687:9-2688:3; Kouts (Mar. 29, 2005), Tr. 2128:23-2132:2. However, the authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes. Kouts (June 14, 2006), Tr. 2688:4-6; Kouts (Mar. 29, 2005), Tr. 2132:8-18; Kouts (Oct. 26, 2005), Tr. 1792:2-1793:12.

130. In the same month that the MRS Review Commission issued its report, DOE prepared a report to Congress from the Secretary of Energy titled "Reassessment of the Civilian Radioactive Waste Management Program," dated November 1989. DX 71; Kouts (June 14, 2006), Tr. 2660:21-2661:21. As a result of the reassessment detailed in this report, DOE determined that the repository would not be able to open until 2010, but that DOE would continue to pursue the development of an MRS facility to enable it to begin the acceptance of SNF in 1998. DX 71 at EDB-001-1449-1450; Kouts (June 14, 2006), Tr. 2662:8-2663:16. With regard to the statutory linkages between the schedule for MRS and repository operations, DOE stated that it would seek congressional modification of the linkages when the site negotiated by the Nuclear Waste Negotiator was approved by Congress. Id. at EDB0011463; Kouts,(June 14, 2006), Tr. 2663:17-2664:2, 2665:18-2667:25.

131. In September 1991, DOE issued a draft Mission Plan Amendment that outlined the current plans for the program and sought comments from interested parties. DX 96. In this draft Mission Plan Amendment, DOE advised that,

> [t]o achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy include a provision to repeal the schedule linkages established in the [1987 NWPA Amendments]. This could also be achieved through congressional enactment of a

> negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

DX 96 at HQR-003-0825; see Kouts (June 14, 2006), Tr. 2672:8-2674:3. DOE also stated that its "current plans" were based upon the current statutory storage capacity limits on the MRS and did not indicate any plans to seek amendment of those limits. DX 96 at HQR-003-0826; see Kouts (June 14, 2006), Tr. 2688:7-2689:12, 2892:6-23 (DOE did not seek to remove capacity limits because of continuing concerns that the MRS would become a "de facto" repository). In the 1991 draft Mission Plan Amendment, DOE also published proposed waste acceptance schedules depicting performance at an MRS from 1998-2010 and repository operations beginning in 2010. DX 96 at HQR-003-1000; Kouts (June 14, 2006), Tr. 2674:4-2675:10 (rates in waste acceptance schedule based upon 10,000 MTU capacity limit upon MRS until repository begins operations).

## VII. DOE'S ISSUANCE OF CONTRACTUALLY-REQUIRED ANNUAL CAPACITY REPORTS AND ACCEPTANCE PRIORITY RANKINGS

### A. 1987 and 1990 Annual Capacity Reports

132. Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an Annual Capacity Report ("ACR"). Each of these ACRs expressly stated that, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." PX 38 at CP_FP000122161; PX 51 at 1632; see also PX 38 at CP_FP000122154 ("projections in this initial report are based on current plans and best available information; they are not contractually binding").

133. Each ACR issued between 1987 and 1990 advised contract holders that, beginning in 1991, DOE would issue a firm waste acceptance schedule which would be the basis for the

submission of delivery commitment schedules ("DCSs") by the purchasers, containing the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

PX 38 at CP_FP000122161; PX 51 at 1632.

134. The 1987 ACR contained the following admonitions by DOE, warning contract holders that the waste acceptance schedule was uncertain and presumed both a repository and an MRS in 1998:

> DOE acknowledges that uncertainty with regard to the waste acceptance schedule and the integrated [waste management system ("WMS")] derives, in part, from decisions yet to be made by Congress. DOE has presented the appropriate issues to Congress in the form of the <u>OCRWM Mission Plan Amendment</u>.
>
> * * *
>
> The waste acceptance schedule presumes Congressional approval of DOE's MRS proposal and reflects DOE's plans to integrate an MRS facility into the WMS to begin waste acceptance in 1998.

PX 38 at CP_FP000122162-63 (1987 ACR, ¶¶ 1.2.1 & 1.2.2) (footnotes omitted). Again, the 1987 ACR also notified contract holders that the projections of future events and rates were only projections and were "not contractually binding." PX 38 at CP_FP000122154.

135. The 1990 ACR contained "upper bounding" and "lower bounding" schedule projections for SNF and/or HLW acceptance by DOE. For purposes of simplicity, the "upper bounding" projection contained a shorter ramp-up, a 3,000 MTU per year receipt rate, and 24,000 MTU total acceptance for the first 10 years of WMS operation. PX 51 at 1637-39. The "lower bounding" projection contained a lower receipt rate and longer ramp-up (400, 600, 875 MTU per year), and a 7,375 MTU total acceptance for the first 10 years of WMS operation. Id. The 1990 ACR also contained the following admonitions by DOE:

> The two waste acceptance schedule projections used in this ACR are representative of the bounding cases for a WMS configuration authorized by the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act), which includes an MRS facility. The upper bounding case is representative of the receipt rate of a WMS that is not restricted by MRS storage capacity limits of 10,000 MTU before repository operations and a maximum of 15,000 MTU at any time as imposed by the Amendments Act. This case is also not restricted by the MRS site selection and construction schedule linkages with the repository as imposed by the Amendments Act. The lower bounding case represents a receipt rate that would be in compliance with the Amendments Act restrictions on storage limits at an MRS before a repository starts operation. However, this case assumes removal of the schedule linkages with the repository imposed by the Amendments Act.

PX 51 at 1634 (emphasis added). The 1990 ACR also expressly represented that the information in the 1990 ACR was "not contractually binding on either DOE or the Purchasers." PX 51 at 1632.

B. 1991 Acceptance Priority Ranking

136. Pursuant to Art. VI.B.5.a of the Standard Contract, DOE issued its first official Acceptance Priority Ranking("APR") in April 1991. DX 99; see also DX 103 (letter forwarding 1991 APR to CP&L). The APR "sets the order [of fuel acceptance], the queue based upon oldest

fuel first." Pollog, Tr. 1312:3-10; Pollog, Tr. 1321:5-1322:10. The source of the information that is set forth in the APR are the RW-859 data forms that each of the contract holders are asked to submit periodically describing their fuel discharge information. Pollog, Tr. 1312:8-10. An excerpt of this information was set forth in the 1991 ACR and provided the basis for the allocations set forth in the 1991 ACR. Pollog, Tr. 1317:20-1318:7; DX 103 ("the 1991 APR will be the basis for the annual allocation of waste acceptance capacity to purchasers in the 1991 ACR.").

137. No utility protested the issuance of the 1991 APR. Pollog, Tr. 1319:14-18.

C. The 1991 Annual Capacity Report

138. In December 1991, DOE issued its "Annual Capacity Report" for that year, noting that, "[a]lthough the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the Purchasers." PX 53 at HQR0020803. Like prior ACRs, it provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." PX 53 at HQR0020803-05.

139. However, the acceptance rate set forth in the 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." PX 53 at HQR0020804. It also stated that "[t]he Purchasers' allocations for each delivery year are

presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id.; see PX 53 at HQR0020809 ("[t]hese allocations are the basis for DCS submittals").

140. OCRWM created the acceptance allocations specified in the 1991 ACR with the knowledge that no permanent repository would be available by January 31, 1998, and to be "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." PX 53 at HQR0020809. When DOE issued the 1991 ACR, it assumed that an MRS would be operational in the system by 1998. Kouts. (June 14, 2006), Tr. 2681:19-2682:11. The MRS had a capacity limit of 10,000 metric tons, and the ramp-up and acceptance rate was designed so that DOE would not exceed that amount before the repository was anticipated to begin operation. Kouts (June 14, 2006), Tr. 2683:20-2684:15; Milner (Aug. 11, 2004), Tr. 4742:2-11; Milner (Aug. 11, 2004), Tr. 4737:22-25; Pollog, Tr. 1326:21-1327:10 (basis for the rates in the 1991 ACR was "compliance with the 10,000 metric ton statutory limit in the 1987 Amendments Act."). DOE anticipated that it would receive relief from the "construction linkage" in the NWPA that tied the operation of the MRS to the receipt of construction authorization for the repository. Kouts (June 14, 2006), Tr. 2681:19-2682:11.

141. Based upon anticipated limitations for the projected capacity for the first ten years, DOE identified an 8,200 MTU acceptance, at the rates identified below and stated as follows:

> The waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998 . . . ." DOE

recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of the Nuclear Waste Negotiator, the head of which is a representative of the Federal Government appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or geological repository.

The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time. . . .

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| 1998 | 400 |
| 1999 | 600 |
| 2000 | 900 |
| 2001 | 900 |
| 2002 | 900 |
| 2003 | 900 |

| | | |
|---|---|---|
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| | TOTAL | 8,200 |

PX 53 at HQR0020807 (emphasis added).

142. Table 3.1 in the 1991 ACR set forth specific allocations for each contract holder derived by applying the list of "oldest fuel first" from the 1991 APR to the rate of SNF acceptance in Table 2.1 of the 1991 ACR. PX 53 at HQR0020811; Pollog, Tr. 1327:20-1328:4. Pursuant to this chart, CP&L received its first allocation in 1999 and FPC received its first allocation in 2002. Pollog, Tr. 1328:5-1329:17; PX 53 at HQR0020811.

D. The 1992 Through 1995 Annual Capacity Reports

143. The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 115 at HQR0012324. The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." DX 115 at HQR0012319. It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id. The ACR also stated that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on DOE or the Purchasers." DX 115 at HQR0012321-22.

144. In 1995, DOE issued a combined APR and ACR to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to "appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium

(MTU)." PX 60 at CP_FP000027508. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 MTUs for the first 10 years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| Year 1 | | 400 |
| Year 2 | | 600 |
| Year 3 | | 900 |
| Year 4 | | 900 |
| Year 5 | | 900 |
| Year 6 | | 900 |
| Year 7 | | 900 |
| Year 8 | | 900 |
| Year 9 | | 900 |
| Year 10 | | 900 |
| | TOTAL | 8,200 |

PX 60 at CP_FP000027511.

145. The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). <u>The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations</u>. These projected nominal waste acceptance rates are presented in Table 1. <u>The Department will continue to process DCS submittals on an annual basis</u>.

PX 60 at CP_FP000027510-11 (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." PX 60 at CP_FP000027508. However, it also provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." Id.

## VIII. DELIVERY COMMITMENT SCHEDULES

### A. DOE's DCS Submission Instructions

146. In March 1992, the DOE contracting officer issued a letter to each of the contract holders, including CP&L and FPC, along with instructions for the submission of DCSs. DX 106; Zabransky, Tr. 1535:13-19. Although contract holders had the option to seek approval of any acceptance amount they wanted, subject to their right to exercise the "Disputes" provision of the Standard Contract, Arts. V.B and XVI, the contracting officer recommended that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." E.g., DX 106 at CP_FP000027407. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." E.g., DX 106 at CP_FP000027409. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in

1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. These instructions were consistent with the original intent of the Standard Contract and were necessary for proper implementation of the waste management system.

147. The DCS instructions provided that the contract holders' DCS submissions were to be based upon the allocations set forth in the applicable ACR. DX 106 at CP_FP000027410 (Para. 7(a): "The 1991 ACR applied a 10 year projected waste acceptance rate to the 1991 ACR for planning purposes, resulting in individual Purchaser allocations. The Purchaser's allocations for each delivery year (for a 10 year period) are presented in the 1991 ACR and are the basis for Purchasers submitting DCSs to DOE for approval."). Further, the DCS instructions provided that, "[d]ue to the limited annual acceptance capacity of the [Federal Waste Management System], only DCSs submitted by purchasers with an allocation in the delivery year will be considered for approval." Id.

148. The DCS instructions that the DOE contracting officer distributed to the contract holders were developed pursuant to a cooperative effort with the nuclear utilities, whereby DOE discussed the proper completion of a DCS with utility representatives, drafted the DCS instructions based upon those discussions, and then discussed the draft instructions with utility representatives and obtained their comments upon them. Zabransky, Tr. 1541:22-1542:23; DX 95 at SN196936; see also Slater (Apr. 22, 1999), Tr. 258:19-259:24.

## IX. TSLCCS AND FEE ADEQUACY REPORTS BASED UPON THE THEN-CURRENT PROGRAM PLANS

149. The per-kilowatt-hour fee paid by utilities were established by the original NWPA, 42 U.S.C. § 10222(a)(2) (1982), and have not changed. Kouts, (Oct. 26, 2005) Tr. 1790:21-24.

150. DOE prepares Total System Life Cycle Cost ("TSLCC") reports periodically to analyze the total system life cycle costs of the program. Kouts (Oct. 26, 2005), Tr. 1778:24-1779:13. DOE requires these reports so it can perform a fee adequacy assessment, which is required by the NWPA. Id. at 1779:2-25. These reports contain assumptions regarding DOE's plans for performance, and the assumptions are taken from the then-current program technical baseline. Id. at 1780:1-1781:14. The assumptions include an assumption regarding acceptance rates, which are also taken from the program technical baseline. Id. at 1781:15-18.

151. Although DOE's program technical baseline has changed significantly over the years in terms the types of facilities and the start of performance, the total system cost has not varied greatly. For example, in the TSLCC dated April 1985, DOE assumed the construction and operation of two repositories, for a total steady state rate of 6,000 MTU. PX 29 at PA-176464; Kouts (Oct. 26, 2005), Tr. 1781:19-1783:3; see also PX 29 at PA-176457-458 (description of the evolution of the program strategy between the issuance of the drafts of the Mission Plan issued in December 1983 and April 1984). In the Preliminary Estimates of the Total-System Cost for the Restructured Programs, dated December 1990, which was based upon the Secretary's 1989 Reassessment of the program, DOE assumed the operation of an MRS facility beginning in 1998 and the operation of a single repository beginning in 2010. DX 81 at PNL1071666; Kouts (Oct. 26, 2005), Tr. 1784:25-1786:5; see also DX 81 at PNL1071613 ("It must be recognized that the waste management system is continually evolving. The TSLCC estimates represent "snapshots" in time which incorporate all available and appropriate information on program activities up to a specific point in time . . . ). In the TSLCC dated September 1995, DOE assumed the operation of a single repository beginning operation in 2010. PX 61 at PA-176217; Kouts (Oct. 26, 2005), Tr.

1786:24-1787:9. Despite the variations in the number and type of facilities assumed and the dates of operation, the total system costs projected in these reports do not vary greatly. Kouts (Oct. 26, 2005), Tr. 1788:15-1790:20.

X. CP&L's PARTICIPATION IN THE DCS PROCESS

152. Robert Kunita was the person at CP&L who was responsible for preparing DCSs throughout the 1990s, and was the person at CP&L most knowledgeable about the DCS process. Kunita, Tr. 726:11-25, 728:2-9.

153. On or about May 15, 1991, CP&L received a letter from Carol Reuter, the Department of Energy's contracting officer with respect to the Standard Contract, enclosing a draft annual priority ranking, which contained a chronological list of the spent fuel that had been discharged by the nuclear industry. Kunita, Tr. 719:16-723:16; DX 92.

154. On June 18, 1991, CP&L issued a letter, prepared by Robert Kunita and signed by his supervisor, Sherwood Zimmerman, confirming that the information contained in the draft annual priority ranking was correct from CP&L's perspective, subject to a few minor modifications. Kunita, Tr. 719:24-720:7, 724:4-726:20; DX 93 at CP_FP000131663.

155. CP&L also informed DOE in the letter that the company had an ongoing shipping program that would change the location of its spent fuel. DX 93 at CP_FP000131663.

156. CP&L provided the information to DOE because it wanted to make sure there was no misunderstanding between the company and DOE about the location of its fuel. Kunita, Tr. 726:2-6.

157. In March 1992, CP&L received a set of instructions concerning the preparation of DCSs. Kunita, Tr. 728:18-729:14; DX 106.

158. These instructions indicated that the amount of spent fuel to be included on the DCSs should be based upon the 1991 ACR. Kunita, Tr. 729:15-18; DX 106 at CP_FP000027407.

159. In March 1992, Mr. Kunita had all the information that he needed to begin submitting DCSs. Specifically, he had a set of instructions, a copy of the 1991 ACR, and a copy of the 1991 APR. Kunita, Tr. 730:7-24.

160. Upon receipt of the 1991 ACR (PX 53), Mr. Kunita understood that the amounts listed on page HQR-002-0811 reflected the annual allocations that CP&L was to receive for the first ten years of the waste acceptance program. Kunita, Tr. 737:14-20.

161. Mr. Kunita claimed that, at the time of his receipt of the 1991 ACR, he understood that, pursuant to the Standard Contract, the rate of acceptance would correspond to the batch-wise quantities that CP&L would be discharging in each particular year. Kunita, Tr. 741:20-25.

162. Mr. Kunita understood at the time that, pursuant to the 1991 ACR, the company would not have any allocations during 1998, the first year of the program. Kunita, Tr. 737:20-738:1.

163. The company was projecting at this time that it would discharge batches of fuel in 1998. Kunita, Tr. 747:17-750:5; DX 140 at CP_FP000185341, 343, 344.

164. Even at the 3,000 MTU rate that plaintiffs advocate, CP&L would not have any allocations in 1998. PX 137 at CP_FP000188809.

165. Following his receipt of the 1991 ACR, Mr. Kunita did not complain to DOE that the CP&L's allocations were inadequate or inconsistent with the Standard Contract. Mr. Kunita never made such a complaint, or a complaint about the allocations contained in any other ACR. Kunita, Tr. 746:3-8.

166. In 1991, when the acceptance rate schedules were published by DOE, no one at CP&L contacted Mr. Martin to ask him why the rate schedules did not contemplate a faster rate of acceptance. Martin, Tr. 206:4-18.

167. In April 1991, Mr. Kunita prepared a letter to DOE, raising the issue of whether the certification on the DCS forms contained language that was either misleading or superfluous. Kunita, Tr. 743:11-745:6; DX 108 at CPL-0000151.

168. Mr. Kunita believed that this issue was one that should be clarified with DOE. Kunita, Tr. 745:7-14.

169. This letter did not contain any complaint about the allocations that CP&L had received in the 1991 ACR or the fact that, pursuant to that ACR, CP&L had not received any allocations during the first year of the waste management program. Kunita, Tr. 745:15-746:2.

170. CP&L and FPC submitted DCSs to DOE for each of the years in which they were provided fuel acceptance allocations upon the basis of the allocations contained originally in the 1991 ACR and APR and subsequently published versions of those documents, as applicable. Joint Stipulation No. 17.

171. On September 29, 1993, CP&L submitted its first DCS for acceptance of 70 metric tons of uranium in 1999 from its Robinson plant. The amount of uranium specified in this initial DCS comported with the annual allocation for 1999 with which CP&L was provided in the 1991 ACR. Compare DX 119 at COF035 0036 with PX 53 at HQR-002-0811.

172. The company indicated in the DCS that the Robinson plant had a maximum lifting capacity of 75 tons and proposed that the cask provided by DOE be suitable for rail (rather than truck or barge) transportation. DX 119 at COF035 0036.

173. In submitting the DCS, CP&L did not express any objection to the allocation that it received. DX 119 at COF035 0036.

174. DOE approved the DCS by letter December 6, 1993. DX 119 at COF035 0038.

175. CP&L submitted additional DCSs for acceptance of fuel in 2000, 2001, and 2002, all of which were based upon the rates and allocations set forth in the most recently issued ACR and APR. DX 129 (DCSs submitted October 6, 1994 for fuel acceptance by rail in 2000 at Robinson and Brunswick plants); DX 136 (DCSs submitted September 25, 1995 for fuel acceptance by rail in 2001 at Robinson and Harris plants); DX 135 (DCSs submitted September 25, 1996 for fuel acceptance by rail from Robinson and Brunswick in 2002). The DCSs for acceptance in 2000 and 2001 were approved. Kunita, Tr. 761:17-771:17.

176. CP&L also submitted an FDS on January 28, 1998, for the acceptance, at Harris and Robinson, of the amount of spent fuel designated in its first DCS. PX 88.

177. FPC submitted DCSs, in accordance with the rate of acceptance and allocations set forth in the applicable APR and ACR, for delivery acceptances in 2002, 2004, 2005, and 2007. DX 170, 172, 172.1.

178. In corresponding with DOE during the DCS process, CP&L never complained or suggested to DOE that the allocations contained in the 1991 ACR or in any other ACR were inadequate or inconsistent with the Standard Contract, and never submitted any DCS or FDS subject to a reservation of rights. Kunita, Tr. 746:3-8, 759:10-760:5,764:25-765:4, 767:6-10, 777:6-9, 772, 777:16-778:18.

179. In the cover letter to DOE accompanying the DCS that it submitted in 1993, CP&L informed DOE that the fuel being identified at that time was standard fuel that had particular

enrichments and burn-up rates, and that future fuel would have higher enrichments and burn-ups. Kunita, Tr. 758:7-759:1; DX 119 at COF035 0034.

180. CP&L conveyed this information to DOE because it believed that it would be helpful or useful. Kunita, Tr. 759:7-9.

181. When CP&L submitted its initial DCS in 1993, CP&L expected DOE to begin accepting fuel from the industry in 1998. Kunita, Tr. 760:13-18.

182. In September 1996, CP&L submitted a DCS for the acceptance of spent fuel in 2002. Kunita, Tr. 772:13-18; DX 135 at CP_FP000027606-607.

183. DOE suspended the approval of DCS submission in 1996, after the United States Court of Appeals for the District of Columbia issued its decision in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996), in which the court held that DOE's obligation to begin accepting SNF was not conditioned upon the existence of a facility to receive the SNF. See Zabransky, Tr. 1573:24-1574:6. DOE determined that it was not appropriate to continue to approve DCSs and make commitments to the utilities for the acceptance of their SNF when DOE knew that it could not meet those commitments before 2010. Id. at 1574:6-10; Zabransky, Tr. 1524:16-20 ("it didn't make sense to approve a form that said we were going to pick fuel up in '99, 2000, 2001, and to go through a process of scheduling that when we know we weren't going to do that . . .").

184. If DOE had been able to perform beginning in 1998, DOE would have continued to approve the DCSs that were submitted by utilities in accordance with the ACR issued in 1991 or subsequent years, and would have accepted fuel from utilities in the amounts set forth on those DCSs. Zabransky, Tr. 1574:11-1575:17.

185. DOE responded to the DCS CP&L had submitted in September 1996 by informing CP&L that DOE was not able to approve DCSs and would waive the contract requirement that a revised DCS be submitted within thirty days. PX 78 at CP_FP00027674.

186. By letter dated May 12, 1997, CP&L responded to DOE's letter and informed DOE that it did "not waive DOE's failure to follow the procedures of Article V.B [of the Standard Contract] with respect to approval or disapproval of [its] Delivery Commitment Schedule." CP&L further stated that, "[t]o the extent [DOE's letter] reflect[ed] a determination that DOE will not dispose of spent nuclear fuel beginning by January 31, 1998, [CP&L] neither concur[s] with such determination, nor waive[s] any rights and remedies which may be applicable." PX 80 at CP_FP000027675.

187. CPL's letter of May 12, 1997 did not mention or otherwise challenge the rate of acceptance. Id.

188. Mr. Kunita never had a discussion with any of his supervisors – Louis Martin, Sherwood Zimmerman, or Dan Poteralski – in which he suggested to them that the allocations contained in the 1991 ACR were inconsistent with the Standard Contract. Kunita, Tr. 777:10-14.

## XI. PLAINTIFFS' CAUSATION MODELS

### A. General

189. The process of ascertaining what Progress Energy would have done to manage its spent fuel at various postulated rates of acceptance by DOE is a time-intensive process that requires a person with knowledge of the company's spent fuel management options to act as "puppet master," employing trial and error in determining how best to use the spent fuel allocation

that DOE would provide in any given year. Edwards, Tr. 455:16-457:1, 493:8-13; PX 137; DX 329.

190. The amount of damages to which Progress Energy is entitled as a result of DOE's partial breach is dependent upon the rate of acceptance. For example, Mr. Edwards conceded that reducing the allocations that Progress Energy would receive by one third could affect the company's damages claim. Edwards, Tr. 633:1-4.

B. Progress Energy's 900 MTU Causation Model

191. DX 329 represents the actions the company would have taken had DOE performed at the rate of acceptance ("the 900 MTU rate") that the Government advocates, corresponding to the allocations that Progress Energy would have received if DOE had accepted fuel in accordance with the 1991 ACR. Edwards, Tr. 502:3-12; PX 53 at HQR-002-0807.

192. DX 304 contains a comparison of the damages that Progress Energy was originally claiming in this lawsuit at the 3,000 MTU rate to the damages that it would be claiming if the 900 MTU rate were adopted. This document was provided to the Government in response to a Rule 30(b)(6) deposition notice issued by the Government. Edwards, Tr. 504:2-25; DX 300 at 4-5.

C. Progress Energy's 3,000 MTU Causation Model

193. PX 137 purports to show what fuel storage activities the company would have undertaken had DOE begun removing spent fuel from the industry at a 3,000 MTU rate (after a ramp-up) beginning in 1998 (the "3,000 MTU rate"). Worthington, Tr. 860:3-7.

194. This causation model was prepared for purposes of this litigation and serves no purpose outside this lawsuit. Worthington, Tr. 863:5-8.

195. Progress Energy makes decisions regarding these types of fuel storage activities years in advance of implementing them. Worthington, Tr. 837:9-20.

196. Wayne Worthington was the Progress Energy employee primarily responsible for preparing the 3,000 MTU causation model. Worthington, Tr. 785:3-11; Edwards, Tr. 483:25-484:3.

197. Mr. Worthington is a civil engineer and, other than the work that he performed in connection with this litigation, is not involved in determining the types of storage activities Progress Energy should undertake at its plants to accommodate its spent fuel needs. Mr. Worthington had no involvement in dry fuel storage at any of the Progress Energy Plants in 1998 or earlier and had only limited input in the actual dry fuel storage projects undertaken at the Progress Energy plants. Mr. Worthington was not involved in wet fuel storage at any of the Progress Energy plants in 1998 and is not involved in determining whether a particular spent fuel storage pool needs racks. Worthington, Tr. 839:10-841:17, 878:19-879:4.

198. Prior to 1999, Mr. Worthington was not in the spent fuel management group. The decision to activate the Harris “C” and “D” pools and the designs for the modifications necessary to activate the pools were made prior to Mr. Worthington joining the spent fuel management group. Worthington, Tr. 839:18-840:5, 841:18-842:5.

199. Mr. Worthington has no knowledge of what activities Progress Energy would or would not have undertaken had DOE come to remove fuel at a 3,000 MTU rate beginning in 1998, and he does not know who at Progress Energy would be able to answer the question as to what the company actually would have done had DOE begun removing fuel at the 3,000 MTU rate beginning in 1998. Worthington, Tr. 879:5-17.

200. Mr. Worthington did not refer to or use the Standard Contract in preparing the 3,000 MTU causation model. Worthington, Tr. 786:23-787:1.

201. To determine how much fuel DOE would have begun accepting from the industry starting on January 31, 1998, Mr. Worthington relied on a document, the July 2004 ACR, created more than six years after that date. Worthington, Tr. 863:19-864:2; PX 128.

202. The 2004 ACR is based upon spent fuel acceptance beginning in 2010 at a permanent repository. Worthington, Tr. 864:17-865:4; PX 128 at KRGNSP03600.

203. The July 2004 ACR is not based upon performance by DOE at an MRS. Worthington, Tr. 865:5-7.

204. The rate of acceptance upon which Progress Energy's 3,000 MTU model is based does not eliminate the need for post-1998 expenditures on additional storage either at Progress Energy or across the industry. Edwards, Tr. 471:15-21.

205. Even at the 3,000 MTU rate, Progress Energy would still have been required to spend nearly $8 million on additional storage. Specifically, Progress Energy would be required to make changes to the racks in the Harris "B" pool, the cost of which would be $1,087,280. In addition, Progress Energy would be required to transship 782 assemblies, the cost of which would be approximately $6.7 million. Joint Stipulation No. 59; Worthington, Tr. 874:7-12; Edwards, 477:19-478:2.

206. Progress Energy's calculation of the cost to perform a rerack of the Harris "B" pool that would be required at the 3,000 MTU rate does not include any overhead costs that would have been allocated to such a project had it been performed. Edwards, Tr. 479:10-481:17.

207. Had the rerack been performed, the amount of overhead charges that would be allocated to the Harris "B" pool rerack project would be $42,295. Edwards, Tr. 479:10-481:17, DX 305 at 2.

208. When Progress Energy prepared its 3,000 MTU causation analysis, the company had a document in its possession, the cost of which ($6,350) is included in Progress Energy's damages claim, which showed that, even had DOE begun accepting fuel in January 1998 at the 3,000 MTU rate that Progress Energy advocates, the nuclear industry as a whole would have to construct sufficient additional storage to store as much as 2,400 MTU of spent fuel. Edwards, Tr. 483:1-492:1; Worthington, Tr. 872:23-873:13; DX 241 at CP_FP000112221, 231, 233.

D. Progress Energy's Analysis Of Damages At A 2,000 MTU Rate

209. Progress Energy has never provided the Government with any analysis showing what activities it would need to undertake at a 2,000 MTU rate. Any such analyses were withheld from the Government on work product grounds. Edwards, Tr. 469:6-22.

210. Progress Energy performed only a "high-level" analysis of the actions that would have been required at a 2,000 MTU rate. Edwards, Tr. 457:22-458:21, 461:25-462:6.

211. Because it only performed a high-level analysis of how it would have managed spent fuel at a 2,000 MTU rate, Progress Energy never analyzed, for example, how many transshipments of spent fuel would have been required, and how much of the approximately $17 million in transshipment costs that Progress Energy seeks in this litigation would have been incurred, had DOE accepted fuel at a 2,000 MTU rate. Edwards, Tr. 463:24-464:11.

## XII. PROGRESS ENERGY'S METHODOLOGY FOR CALCULATING DAMAGES

212. Michael Calvello compiled the costs associated with Progress Energy's damages claim by extracting the costs from the company's corporate financial accounting system corresponding to the charges made to each of the projects identified by Steven Edwards as being traceable to any partial breach by DOE. Calvello, 1618:9-22; PX 139.

213. Plaintiffs' financial accounting system is not maintained for the purpose of recording costs associated with damages. Calvello, Tr. 1620:5-8.

214. Mr. Calvello did not conduct any analysis to determine whether the individual costs charged to the projects identified by Mr. Edwards would have been incurred had DOE begun acceptance of SNF from the industry in 1998. Calvello, Tr. 1619:16-22.

215. Mr. Calvello possessed no direct knowledge about the underlying charges of specific journal entries included in plaintiffs' claim. He is only familiar with the general process that is typically undertaken to perform a journal entry in the company's accounting system. Calvello, Tr. 1601:13-1602:24.

## XIII. ISSUES RELATED TO INDIVIDUAL COSTS INCLUDED IN PROGRESS ENERGY'S CLAIMS

### A. General

216. Larry Johnson performed an analysis of the monetary deductions and adjustments that would be warranted from plaintiffs' claims based upon the Government's view of how the factual and legal issues at trial are appropriately decided. For his primary set of adjustments, which resulted in a reduction of plaintiffs' damage claim from $91,029,703 to $44,339,037, Mr. Johnson assumed a 900 MTU rate of acceptance. Johnson, Tr. 1960:18-1961:4; DX-D5 at 42.

217. Alternatively, Mr. Johnson calculated a secondary set of adjustments postulating the damages that would be recoverable at the 3,000 MTU rate, again based upon the Government's view of how the factual and legal issues raised at trial are appropriately decided. These adjustments resulted in a reduction of plaintiffs' damage claim from $91,029,703 to $61,301,941. Johnson, Tr. 2018:19-2019:2; DX-D5 at 42-43.

B . <u>Transshipment And Railroad Maintenance Costs</u>

218. Had DOE begun accepting fuel in 1998 at the 900 MTU rate, Progress Energy would have continued to transship fuel by railroad through 2004. Edwards, Tr. 577:6-578:25; DX 329 at CP_FP00195560.

219. Had DOE begun accepting fuel in 1998 at the 900 MTU rate, Progress Energy would have been required to perform 20 of the transshipments of spent fuel to its Harris plant for which it seeks damages. Edwards, Tr. 507:2-510:10; DX 304 at 1-2 & n.2.

220. Mr. Johnson calculated that the average cost of each transshipment campaign is $293,087. For this reason, a deduction of $5,861,740 from plaintiffs' claim for transshipment is warranted at the 900 MTU rate. This amount is less than the deduction that plaintiffs computed at the 900 rate because it excludes the cost of railroad maintenance, which is included in plaintiffs' calculation of the cost of each transshipment campaign (and, as set forth below, has been independently excluded from damages at both the 900 and 3,000 MTU rates). Johnson, Tr. 1983:2-13; DX-D5 at 22-25.

221. At the 3,000 MTU rate, transshipments from Brunswick to Harris would continue through 2001. Edwards, Tr. 475:1-25; PX 137 at CP_FP000188814.

222. To perform the transshipments at either the 900 or 3,000 MTU rate, Progress Energy would have had to keep its railroads maintained. Edwards, Tr. 579:5-13; Maret, Tr. 1828:7-19; DX 307 at 17.

223. Had DOE commenced acceptance of fuel in 1998, CP&L's preferred method of acceptance for each of its plants was by rail. Edwards, Tr. 580:15-582:23; Kunita Tr. 758:3-6 (Robinson), 764:6-16 (Brunswick), 766:19-767:5 (Harris); DX 259 at CP_FP000028531.

224. Progress Energy would have been required to perform railroad maintenance in order to permit the acceptance by DOE of spent fuel for shipment by rail. Maret, Tr. 1827:16-1828:6; DX 307 at 17.

225. Mr. Johnson has deducted from his calculation of damages $260,037 in railroad maintenance costs at both the 900 and 3,000 MTU rates. Johnson, Tr. 1962:4-1963:3; DX 308 at 7; DX-D5 at 11.

C. "C" and "D" Pool Activation Costs

226. Had DOE accepted fuel at the 900 MTU rate, Progress Energy would have been required to activate the "C" and "D" pools at the Harris plant. Edwards, Tr. 510:25-511:5, 514:22-515:5; Maret, Tr. 1758:25-1760:23; DX 304 at 2 n.1, DX 307 at 4-5; DX-D4 at 4-5.

227. The same activities required to activate the Harris "C" and "D" pools in the actual world would have been required had DOE begun accepting fuel in 1998 at the 900 MTU rate. Maret, Tr. 1764:4-1765:15; DX 307 at 5; DX-D4 at 6.

228. The parties agree that, had DOE accepted fuel at the 900 rate, the following costs reflected on DX 304 relating to the "C" and "D" pool activation would have been incurred and, therefore, would not be recoverable:

- $2,838,482, representing the first, second, and fourth items, and 4/14ths of the third item listed under "HNP Set Fuel Racks in Fuel Pool C." Edwards, Tr. 512:10-514:2; DX 304 at 1;

- $627,639, representing the sum of the costs for "crud cleanup in SFP D" and "BNP spent fuel sludge cleanup." Edwards, Tr. 533:6-535:15; Maret, Tr. 1764:4-1765:15; DX 304 at 1; DX 307 at 6-7; DX-D4 at 7;

- $16,214,073, designated as the cost of "SFP C& D Cooling/Cleanup." Edwards, Tr. 511:18-512:9; DX 304 at 1; and

- $1,901,788, representing the sum of the costs for "Spent Fuel Pool Communications" and "ES_HNP Spent Fuel Pool License," less $19,782 in legal fees for which plaintiffs no longer seek recovery, Edwards, Tr. 538:3:539:10; DX 308 at 10.

229. Based solely upon the cost figures contained in the preceding paragraph, an adjustment of $21,581,983 for costs that plaintiffs would have incurred to activate the "C" and "D" pools if DOE had begun acceptance of SNF from the industry in 1998 at the 900 MTU rate of acceptance is warranted. Johnson, Tr. 1977:21-1979:6; DX-D5 at 18.

230. Had DOE accepted fuel at the 900 MTU rate, the company would also have been required to install an additional BWR rack either in the "B" pool or in the "C" pool. Edwards, Tr. 517:12-518:4; Maret, Tr. 1768:10-1770:15; DX 304 at 2 n.3; DX 329 at CP_FP00195560 n.3.

231. CP&L provided the information concerning the installation of this rack in connection with the Rule 30(b)(6) deposition of the company. Although Mr. Edwards's testimony at trial suggested that this rack would not have been installed had DOE accepted fuel at the 900 MTU rate, CP&L never attempted to correct the documentation that the company provided or the testimony that Mr. Edwards provided upon behalf of the company during the Rule 30(b)(6) deposition concerning the installation or cost of this rack. Edwards, Tr. 518:9-520:1; DX 300 at 4-5, DX 329 at CP_FP00195560 n.3 .

232. In calculating CP&L's damages claim at the 900 MTU rate, Mr. Johnson deducted an additional $227,520, representing the cost to install a rack in the "B" pool that the company indicated during the Rule 30(b)(6) deposition that would be required at the 900 MTU rate. Johnson, Tr. 1979:23-1980:7; DX 308 at 10; DX-D5 at 18.

233. Had DOE accepted fuel at the 900 rate, the company would have been required to install a total of ten racks in the "C" pool. This sum includes four BWR racks (to be installed in 2003 and 2004), Edwards, Tr. 516:7-517:11, DX 329 at CP_FP00195560, and six PWR racks (to be installed beginning in 2004), Edwards, Tr. 521:20-524:3; Maret, Tr. 1767:14-1769:1, 1769:9-1770:15, 1772:19-1774:5; DX 329 at CP_FP00195562-63; DX-D4 at 8-10.

234. In the actual world, Progress Energy installed 14 racks as part of the first phase of the pool activation project. Edwards, Tr. 515:6-11.

235. The per-rack cost that would have been incurred by Progress Energy to install racks into the "C" pool at Harris at the 900 MTU rate is 1/14th of the total cost ($5,359,214) of installing 14 racks. Progress Energy employed this formula in calculating its own estimate of the cost of installing racks into the "C" pool at the 900 MTU rate. Edwards, Tr. 514:3-516:6.

236. Because CP&L would have been required to add ten additional racks – six more than plaintiffs acknowledged in DX 304[7] – to the pool, Mr. Johnson calculated the costs associated with those six racks and deducted an additional $2,296,806 ($5,359,214 x 6/14ths)

[7] Progress Energy acknowledged at trial that one of these six racks would be installed prior to the end of the claim period and that its cost (approximately $382,000) would therefore not be recoverable as damages. Progress Energy did not make an adjustment for the remaining five racks. Edwards, Tr. 367:10-368:20.

from his calculation of damages at the 900 MTU rate. Johnson, Tr. 1980:17-1981:9; DX 308 at 11 & n.27; DX-D5 at 19.

237. Mr. Johnson also added plaintiffs' offset of $1,087,280 associated with the addition of racks into pool B back into the damage calculation (thereby increasing his calculation of the damages) at the 900 MTU rate, to account for the differences between the 900 MTU- and 3,000 MTU-rate scenarios. Johnson, Tr. 1979:6:-1980:7; DX 308 at 10-11; DX-D5 at 18.

D. Crud Cleanup and Rack Disposal

238. Crud consists of radioactive corrosion products resulting from the operation of a nuclear reactor. DX 307 at 6.

239. As set forth above, the cost of crud removal has been deducted from our calculation of damages at the 900 MTU rate. DX-D5 at 18. Additionally, independent of the pool activation, crud removal would be required as part of the plant decommissioning process. Maret, Tr. 1765:21-1766:22; DX 307 at 6-7; DX-D4 at 7.

240. Even if DOE accepted fuel at the 3,000 MTU rate (such that it would not have been necessary to activate the "C" and "D" pools), the crud and sludge would ultimately have had to have been disposed of upon decommissioning as low-level waste. Edwards, Tr. 535:16-537:7.

241. The decommissioning cleanup cost would be substantially the same as the cost incurred by Progress Energy in the actual world to cleanup the crud. DX 307 at 7.

242. At the 3,000 MTU rate, a deduction of $627,639, representing the sum of the costs for "crud cleanup in SFP D" and "BNP spent fuel sludge cleanup," is warranted. Johnson, Tr. 2016:7-24; DX 304 at 1; DX 308 at 10 n.22, 23; DX-D5 at 43.

243. Progress Energy's claim also includes costs to dispose of seven unused spent fuel storage racks as part of the Harris "C" and "D" pool activation. Edwards, Tr. 536:21-24.

244. These racks were disposed of due to concerns with Boraflex. DX 307 at 7.

245. Even if DOE had begun accepting fuel in 1998 at the 3,000 MTU rate, these unused racks would have needed to be disposed of as part of the decommissioning of the plant. Edwards, Tr. 535:25-537:7; Maret, Tr. 1765:16-1767:13; DX 307 at 7; DX-D4 at 7.

246. Steven Edwards, the only witness who testified for Progress Energy about the rack disposal, did not know whether the method used employed to dispose of these racks in the actual world would be different than the method that would have been used upon decommissioning had DOE accepted fuel at the 3,000 MTU rate. Edwards, Tr. 537:8-13.

247. The decommissioning rack disposal cost would be substantially the same as the actual world disposal cost. DX 307 at 7.

248. At the 3,000 MTU rate, a deduction of $174,636, representing the cost that CP&L incurred for unused rack disposal, is warranted. Johnson, Tr. 2016:7-2017:2; DX 308 at 10 n.21; DX-D5 at 43.

E. Licensing And Communications Expenses

249. The amount that Progress Energy seeks for licensing expenses, $1,901,788, representing the sum of the costs for "Spent Fuel Pool Communications" and "ES_HNP Spent Fuel Pool License," less $19,782 in legal fees for which plaintiffs no longer seek recovery, were incurred by the company as a result of challenges brought by third-party intervenors to Progress Energy's efforts to gain approval from the regulators to activate the "C" and "D" pools at the Harris plant. Edwards, Tr. 537:14-540:2; DX 304 at 1; DX 308 at 10 n.24, 25.

250. As set forth above, the parties agree that the cost of these expenses should be deducted from the calculation of damages at the 900 MTU rate, as costs incurred in connection with the activation of the "C" and "D" pools. Edwards, Tr. 538:3:539:11; DX 304 at 1; DX-D5 at 18.

251. At the 3,000 MTU rate, at the instruction of counsel, Mr. Johnson included a deduction to plaintiffs' damage claim of $1,901,788, representing the cost that CP&L incurred for licensing and communications expenses. Johnson, Tr. 2016:7-2017:6; DX 308 at 10 n.24, 25 ; DX-D5 at 43.

F. Upgrade Of The CCW System At Harris

252. Although Progress Energy has included the cost of upgrading its component cooling water ("CCW") system, the CCW upgrade would have been required, regardless of DOE's acceptance of SNF from Progress Energy, to accommodate the increased heat loads from Progress Energy's power uprate and steam generator replacement. Maret, Tr. 1774:6-1775:13; DX 307 at 8-10; DX-D4 at 11-14.

253. The work that Progress Energy performed in connection with the CCW upgrade consisted primarily of replacing pump impellers in the component cooling water system, enabling more cold water to circulate at a higher pressure. Edwards, Tr. 547:13-25; Tibbitts, Tr. 1034:7-10.

254. The pump impellers that were replaced had been modified from their original design and were not performing up to their original design capacity. Tibbitts, Tr. 1036:10-22.

255. Progress Energy acknowledges that, if DOE had begun accepting fuel in 1998 at the 900 MTU rate, the company would eventually have been required to perform a CCW upgrade.

According to Mr. Edwards, however, this upgrade would not have been required prior to December 31, 2005. Edwards, Tr. 566:10-17.

256. At or around the time that Progress Energy was activating the "C" and "D" pools at Harris, it was also performing a power uprate and a steam generator replacement. Edwards, Tr. 541:18-543:4.

257. Each of the three projects was authorized independently. Edwards, Tr. 543:14-22.

258. Neither the steam generator replacement project nor the power uprate project was undertaken because DOE did not begin accepting fuel in 1998. Edwards, Tr. 543:5-10.

259. As a result of the power uprate, fuel in the reactor core at Harris was burned to a hotter temperature, forcing plant management to make sure that the plant was capable of handling the increased heat load. Edwards, Tr. 545:10-20.

260. As the power level in the reactor core is increased, such as through a power uprate, the amount of heat that has to be removed by the CCW system is increased proportionally. Maret, Tr. 1781:4-1782:2; DX 307 at 8-10; DX-D4 at 13-14.

261. The new CCW pump impellers provided the flow needed to meet the cooling requirements necessitated by the steam generator replacement and power uprate. Tibbitts, Tr. 1053:14-1054:16; DX 236 at CP_FP00188907.

262. Aside from the "C" and "D" pool heat load, the increased heat load placed upon the CCW system post-power uprate was 19.5 MBTU/hr – 13.2 MBTU/hr in additional heat load on the residual heat removal ("RHR") heat exchanger and 6.3 MBTU/hr in additional heat load in the "A" and "B" pools. Maret, Tr. 1785:24-1787:18; DX 307 at 10; DX-D4 at 13-14.

263. The licensed heat load limit for the "C" and "D" pools increased from 1.0 MBTU/hr to 7.0 MBTU/hr. Maret, Tr. 1786:17-1787:2; DX 307 at 10; DX-D4 at 13-14.

264. The combined increase in heat load on the CCW system, following the power uprate, that is attributable to the RHR heat exchanger and the "A" and "B" pools is more than twice the total allowable heat load in the "C" and "D" pools (19.5 MBTU/hr vs. 7.0 MBTU/hr.). Maret, Tr. 1788:12-1789:3; DX 307 at 10; DX-D4 at 13-14.

265. Because the CCW system does not distinguish between sources of heat, the fact that the increased heat load attributable to other sources, following the power uprate, was far greater than that attributable to the storage of fuel in the "C" and "D" pool demonstrates that the CCW upgrade would have been needed to accommodate the increased heat load attributable to the power uprate, absent the storage of fuel in pools "C" and "D." Maret, Tr. 1788:12-1789:3.

266. Steven Edwards was the project manager for the portion of the Harris "C" and "D" pool activation project pertaining to the pool cooling system and made a number of Power Point presentations about the pool activation process. Edwards, Tr. 552:5-22; e.g., PX 86, PX 90, DX 185, DX 206.

267. In January 1998, Mr. Edwards prepared a presentation as part of a review team depicting, among other things, the various options being considered by Progress Energy to provide cooling to the pools upon activation. One of the options considered was providing cooling through the CCW system. Edwards, Tr. 553:5-554:2; DX 185 at CP_FP000029201.

268. In that presentation, Mr. Edwards addressed the advantages and disadvantages to utilizing the CCW system to provide cooling associated with "C" and "D" pool activation. Among the disadvantages that Mr. Edwards identified was that "there [would be] inadequate long-

term (post power up rate) CCW margin without plant modifications (additional heat exchanger capacity and pump upgrades)." Edwards, Tr. 554:9-24; DX 185 at CP_FP000029205.

269. The presentation also included a bar graph reflecting projected heat loads on the CCW system. According to this projection, the largest single annual increase in heat load would take place in the year in which the initial phase of the power uprate was to be performed. Edwards, Tr. 555:24-557:8; DX 185 at CP_FP000029206.

270. In April 1998, Mr. Edwards prepared another presentation concerning the "C" and "D" pool activation project in which he indicated, among other things, that the "CCW upgrade [would be performed] to accommodate power uprate impacts." Edwards, Tr. 557:17-559:4; PX 90 at CP_FP000029231.

271. In December 1998, Mr. Edwards prepared a presentation concerning the "C" and "D" pool activation project in which he indicated, among other things, that "the existing CCW system [was] adequate for near-term operation until power uprate is implemented. Edwards, Tr. 559:15-560:24; DX 206 at CP_FP000034846.

272. Dean Tibbitts was the responsible engineer for the CCW upgrade. Worthington, Tr. 845:22-25.

273. Mr. Tibbitts was not part of the "C" and "D" pool activation team, but was a member of the power uprate project. Worthington, Tr. 846:6-14.

274. Mr. Tibbitts was not involved in the "C" and "D" pool activation, and his familiarity with the activation stems from working on the same floor as those who actually worked on the project. Tibbitts, Tr. 980:19-25.

275. By the time that Mr. Tibbitts joined the major projects section, the decision to activate the Harris "C" and "D" pools had already been made. Tibbitts, Tr. 1033:6-10.

276. Likewise, by the time that Mr. Tibbitts joined the major projects section, the separate decisions to perform the power uprate and replace the steam generator had already been made. Tibbitts, Tr. 1033:6-18.

277. By the time that Mr. Tibbitts became responsible for accounting for the heat loads in the Harris "C" and "D" pools, the CCW upgrade had already occurred. Tibbitts, Tr. 1036:3-9.

278. Progress Energy has checks and balances in place to make sure that a project manager is only supervising those projects for which he is responsible. Edwards, Tr. 447:2-448:4.

279. William Peavyhouse was the project manager for the power uprate project and was responsible for the power uprate analysis and for implementing the modifications necessary for the power uprate. While performing his work as the engineer responsible for the CCW upgrade, Mr. Tibbitts reported to Mr. Peavyhouse. Tibbitts, Tr. 978:14-979:1.

280. Mr. Peavyhouse was also the designated company representative for the CCW pump impeller replacement. DX 230.1 at CP_FP000021593.

281. In June 2000, Progress Energy prepared an offer to Bechtel for the preparation of engineering system requests ("ESRs"). Edwards, Tr. 549:1-16; DX 230.1.

282. The offer lists Mr. Peavyhouse as Progress Energy's designated representative for purposes of the contract. DX 230.1 at CP_FP000021593.

283. The offer listed a series of tasks and modifications associated with the Harris power uprate, including the CCW pump impeller replacement. DX 230.1 at CP_FP000021591.

284. Mr. Peavyhouse, the power uprate manager, was the Progress Energy employee responsible for approving the engineering service request ("ESR") for the CCW pump impeller replacement. DX 236 at CP_FP00188890.

285. Mr. Tibbitts is identified as a power uprate and steam generator replacement engineer on the ESR for the CCW pump impeller replacement. Tibbitts, Tr. 1043:3-6; DX 236 at CP_FP00188891.

286. Mr. Edwards, the Harris "C" and "D" pool activation manager, is not identified among those who reviewed and/or approved the ESR for the CCW pump impeller replacement. DX 236 at CP_FP00188890-891.

287. The ESR Form associated with the CCW pump impeller replacement states in relevant part: "Request: In order for the power uprate program to be fully implemented, additional flow will be required in the CCW system." DX 236 at CP_FP00188892.

288. In response to that request, the ESR Form states in relevant part: "The pump supplier has determined that the required capacity can be achieved by replacing the impellers of the CCW pumps." DX 236 at CP_FP00188892.

289. Progress Energy's "[i]nservice test results indicated that the existing . . . CCW pumps would not be capable of delivering the flow and head <u>required for PUR [power uprate] or SGR [steam generator replacement]</u>." DX 236 at CP_FP00188906 (emphasis added).

290. Mr. Tibbitts described the increased heat load for the "C" and "D" pools as a "silent player" behind the CCW pump impeller replacement, and that many documents only refer to the increased demand from the power uprate and the steam generator replacement. Tibbitts, Tr. 1050:23-1051:8.

291. The fact that the CCW upgrade was needed to accommodate the power uprate is borne out by Progress Energy's own submissions to the NRC and the NRC's findings in that regard. Maret, Tr. 1789:21-1791; DX 237 at CXP003 0189.

292. In issuing License Amendment No. 107 on October 12, 2001, the NRC concluded that, "[b]ased on our review and evaluation, and the experience gained from our review of [power uprate] applications for similar PWR plants, we conclude that the CCWS, with the pump impeller changes, is acceptable for [Harris Nuclear Plant] operations at the proposed [steam generator replacement]/[power uprate] level." DX 237 at CXP003 0189 (emphasis added); Maret, Tr. 1791:4-1792:6.

293. The NRC's issuance of the license amendment to Progress Energy required that Progress Energy replace the CCW pump impellers to operate the plant at the higher uprate power level, without regard to any additional heat load from the "C" and "D" pools above the original 1.0 MBTU/hr limit. Maret, Tr. 1917:5-1920:2; DX 237 at CXP003 0189 n.1.

294. More than a year after the NRC issued a license amendment requiring Progress Energy to upgrade its CCW pump impellers to operate the plant at a higher power level, Progress Energy told the NRC, in requesting a higher heat load limit for the "C" and "D" pools, that the 1.0 MBTU/hour limit no longer served its intended purpose because the CCW system was "significantly upgraded as part of the HNP [Harris Nuclear Plant] steam generator replacement and power uprate modifications." Tibbitts, Tr. 1058:12-24; PX 119 at A1-1 (emphasis added).

295. Progress Energy went on to say in its NRC license amendment request to increase the heat load limits in the "C" and "D" pools that, "[a]s part of the SGR [steam generator

replacement]/PUR [power uprate] project, the Component Cooling Water (CCW) pumps were modified and upgraded by installing new impellers." PX 119 at A1-2 (emphasis added).

296. Finally, Progress Energy told the NRC in its license amendment request that "[f]urther information on the CCW system, including a description of the higher capacity CCW pump impellers installed as part of the power uprate" could be found in the plant's Final Safety Analysis Report. PX 119 at A1-4 (emphasis added).

297. Although Mr. Tibbitts opined that the CCW upgrades would be necessary if Progress Energy were to store the maximum heat load (7.0 MBTU per hour) permitted under the plant's NRC license in the "C" and "D" pools, he has no opinion as to where between 1 and 7 MBTU per hour those modifications would be necessary. Tibbitts, Tr. 1023:19-23.

298. Mr. Tibbitts has never separately analyzed the effects of increasing the heat load in the "C" and "D" pools, apart from the power uprate and steam generator replacement projects, to determine whether the CCW upgrades would be required even without the increased heat load in the "C" and "D" pools. Tibbitts, Tr. 1018:2-15; 1034:11-18; 1048:3-1049:1.

299. Progress Energy never assessed whether it was possible to perform the power uprate and the steam generator replacement without replacing the CCW pump impellers. Tibbitts, Tr. 1052:21-1053:2.

300. Although Mr. Tibbitts claims that the power uprate and steam generator replacement would "not necessarily" have required replacement of the CCW pump impellers, he has never performed an analysis to support that statement. Tibbitts, Tr. 1025:11-18, 1066:23-1067:7; 1068:11-19; 1070:17-1071:4.

301. Progress Energy has not calculated the costs of alternative means, other than the CCW upgrades, that "may have been possible" for dealing with the increased heat loads from the power uprate. Tibbitts, Tr. 1063:8-19.

302. Any alternate measures that "may have been possible" would have associated analytical and engineering costs, and perhaps costs associated with the physical work that might be needed as well. Tibbitts, Tr. 1063:20-1064:9.

303. Progress Energy has not provided the Government with an offset from its damages claim for the costs of any such alternative measures.

304. Progress Energy has expended $1,166,640 to upgrade the CCW system. Mr. Johnson has deducted this amount from his assessment of damages at both the 900- and 3,000-MTU rate scenarios. Johnson, Tr. 1981:10-1982:18; DX 304 at 1; DX-D5 at 21.

G. Rerack Of The Crystal River Spent Fuel Pool

305. Although Progress Energy has included the cost of the rerack that it performed at Crystal River in its damages claim, the Crystal River rerack would have occurred in the but-for-world, independent of DOE's acceptance rate. Maret, Tr. 1797:4-1798:5, 1803:2-1805:15; DX 307 at 10-13; DX-D4 at 15-18.

306. The Crystal River rerack was necessary to eliminate the direct threat to the fuel and the long-term economical and safe operation of the plant. Maret, Tr. 1809:6-1810:5; DX 307 at 12.

307. The racks that were replaced during the rerack at Crystal River were Boraflex racks. Maret, Tr. 1802:23-1803:1.

308. Boraflex is a soft-rubber neutron absorbing material that is used to control criticality in spent fuel pools. Maret, Tr. 1798:6-1801:13.

309. Impregnated in the Boraflex rubber material is boron carbide, which acts as a neutron absorber, and silicon dioxide, which acts as a filler. Maret, Tr. 1799:16-1800:3.

310. It was discovered after being used in the industry for some time that Boraflex is subject to degradation following exposure to high levels of gamma radiation. Maret, Tr. 1801:14-24; DX 307 at 11 n.25; DX-D4 at 16.

311. When Boraflex breaks down its constituent materials, boron carbide and silicon dioxide (silica) can leach out into the spent fuel pool. Maret, Tr. 1801:25-1802:6; DX 307 at 11 n.25.

312. This degradation of Boraflex causes problems related both to criticality and silica contamination. With respect to the first problem, the loss of boron reduces the ability of the racks to absorb neutrons, thereby undermining the very function for which they were purchased. Maret, Tr. 1802:7-14; Lehmann, Tr. 1126:2-6; DX 307 at 11 n.25.

313. With respect to the second problem, the silica that is released as part of the degradation is a contaminant that can make its way into the reactor vessel or other systems within the plant. Maret, Tr. 1802:15-19, 1803:24-1805:15; Lehmann, Tr. 1126:7-11.

314. Silica contamination is a threat to the fuel cladding, which serves as the principal barrier to the release of harmful radiation into the environment. Maret, Tr. 1804:25-1805:15; DX 307 at 11.

315. Allowing silica to attach to the fuel can potentially violate the conditions under which the fuel manufacturer warrants the fuel that it has provided. Lehmann, Tr. 1136:3-1137:9; PX 84 at CP_FP000112264.

316. Progress Energy's fuel vendor imposed silica concentration limits on the reactor coolant system to limit damage to the fuel that it had supplied and warranted. Maret, Tr. 1805:16-1806:3.

317. It is extremely important to ensure that fuel vendor warranty requirements are met because the fuel assemblies represent a significant investment by the company and are key physical assets of an operating reactor. Maret, Tr. 1806:4-1807:2.

318. Meeting these vendor requirements and preventing damage to the fuel is also a vital part of protecting the health and safety of the general public. Maret, Tr. 1807:2-6.

319. In fact, most of the equipment that is installed in the construction of a multibillion dollar nuclear power plant is configured specifically to protect and preserve the fuel cladding, or is designed in a way so as not to threaten that fuel barrier. Maret, Tr. 1807:6-21.

320. FPC was required to address both problems caused by Boraflex degradation, namely, silica contamination and loss of neutron control. It was required to address these problems regardless of whether DOE began accepting spent fuel in 1998. Lehmann, Tr. 1126:19-21, 1128:5-1130:2.

321. In 1995, Thomas Lehmann notified FPC management that the source of excess silica in the spent fuel pool at FPC's Crystal River plant might be Boraflex in the spent fuel racks. In response, management placed Mr. Lehmann in charge of assembling a team to ascertain the source of the excess silica. Lehmann, Tr. 1111:9-18.

322. Mr. Lehmann was designated as the issue manager of the team and was responsible for the conclusions set forth in the reports prepared by the team. Lehmann, Tr. 1112:20-23; PX 66 at CP_FP000137589.

323. Ted Williams was never a part of the team. Lehmann, Tr. 1113:1-15.

324. Michael Culver was a member of the team, but missed a number of the team's meetings. Mr. Culver was unable to identify how many meetings he missed. Lehmann, Tr. 1112:24-25, Culver, Tr. 967:5-8.

325. Mr. Culver never had any discussions with management as to how the company would have addressed the problems concerning Boraflex degradation if space in the pool had not been an issue. Culver, Tr. 967:15-968:3.

326. In November 1996, Mr. Lehmann's team prepared a silica assessment report. PX 72.

327. In the recommendations section of the report, the team concluded that "[r]emoval of the root cause of the silica contamination - the Boraflex from the racks, or replacement of the racks would provide the optimum solution." PX 72 at CP_FP00193355.

328. The reason why removing the root cause of the contamination was the optimal solution is that it would completely eliminate the problem rather than requiring FPC to design around it. Lehmann, Tr. 1116:19-1117:4.

329. The only reservation that the team had about pursuing the option it deemed to be optimal was that it might not be cost-effective. Lehmann, Tr. 1117:5-8; PX 72 at CP_FP00193355.

330. At the time the report was prepared, the company had received estimates of between $7 and $8 million to perform a rerack. Lehmann, Tr. 1117:9-1118:5; PX 72 at CP_FP00193349.

331. In December 1996, FPC notified the Westinghouse Corporation, the maker of the racks in the spent fuel pool, that plant modifications would be necessary to manage anticipated silica levels and that the company's preliminary estimate of the cost of permanently addressing the Boraflex problem would be at least $4 million. Lehmann, Tr. 1118:17-1120:8; DX 159.

332. FPC believed that Westinghouse was responsible for the costs that would be incurred to address the Boraflex degradation occurring in the racks. Lehmann, Tr. 1124:16-20.

333. In September 1997, Mr. Lehmann's team prepared a Long-Term Spent Fuel Storage Strategic Plan. PX 84.

334. The team concluded, among other things, that "[t]he resolution of the Boraflex degradation and silica issue is a major driver in modifying the current wet storage arrangement at Crystal River 3." PX 84 at CP_FP00011264.

335. The team recognized that it was "imperative" that the silica and criticality issues be addressed "in any event." Id.

336. No matter what method FPC used, resolution of these issues would have costs. Lehmann, Tr. 1134:19-1135:22.

337. In December 1997, Mr. Lehmann prepared a request for project approval ("RPA") for the rerack project. Mr. Lehmann executed the document as the "project sponsor." Lehmann, Tr. 1139:8-18; DX 182.

338. The project was approved on December 29, 1997. DX 182 at CP_FP000029508.

339. The RPA consists of a form that is submitted to management so that management can determine whether it wants proceed with a proposed project. Mr. Lehmann was responsible for making sure that the document was as accurate as possible. Lehmann, Tr. 1140:4-13.

340. Under the heading, "Project Justification," Mr. Lehmann's team stated that "[r]eracking the 'B' pool will eliminate the on-going problems associated with the degradation of the Boraflex, as well as intrusion of silica into the [reactor cooling system]. Additionally, it will provide supplemental cell locations to increase the effective life of the pool by approximately one fuel cycle, or about 70 fuel cell locations ." DX 182 at CP_FP000029511(emphasis added).

341. The RPA also contained a section describing alternatives to the rerack project. DX 182 at CP_FP000029511-512.

342. The first alternative listed was to take no action. Mr. Lehmann's team rejected this option because it would compromise the margin of safety and the fuel warrantees. Lehmann, Tr. 1144:6-1145:11; DX 182 at CP_FP000029511.

343. The second alternative posited the isolation of the two spent fuel areas in the pool in conjunction with a reverse osmosis system to provide a means to manage the silica issue. The team concluded that "[t]his option was identified as the least initial cost (@ $2 Million), but it is the most complicated to implement, and will require detailed procedure and scheduling changes for future outages. Management rejected this approach for its complexity." DX 182 at CP_FP000029512.

344. The second alternative listed in the request for project approval would not address the criticality issues caused by Boraflex degradation, which would also have to be addressed. The

$2 million minimum listed in the description was solely for the cost of addressing silica contamination and would not address criticality. Lehmann, Tr. 1147:4-14.

345. The reverse osmosis method and isolation method described in the second alternative listed in the request for project approval was more complicated than a rerack. Lehmann, Tr. 1148:18-24.

346. No other method for employing reverse osmosis, such as renting or leasing a reverse osmosis system, was presented to management in the request for project approval. DX 182.

347. A temporary reverse osmosis would require expenditure of as much as $150,000 every four years. Culver, Tr. 937:17-937:19.

348. Reverse osmosis is a "band-aid fix" that, if implemented as a means of controlling silica, would require continued monitoring, at cost to FPC. Lehmann, Tr. 1169:8-1170:12.

349. Removing silica through reverse osmosis could potentially have the effect of increasing the rate of Boraflex degradation. Lehmann, Tr. 1166:8-1169:20.

350. Taking credit for soluble boron is a potentially available means of addressing criticality concerns. Lehmann, Tr. 1127:2-1128:4.

351. Mr. Lehmann's team reported to management in the request for project approval that it had "completed a criticality analysis, in an effort to pursue credit for soluble boron" and that "[t]he results indicated that this [was] not a viable option." DX 182 at CP_FP000029512.

352. Dennis O'Shea, FPC's Fuels Department Manager at the time, sent Mr. Lehmann an e-mail on December 17, 1997, stating that the results of a criticality safety evaluation indicated

that a soluble boron credit would provide very little benefit to FPC. DX 186 at CP_FP000139468.

353. Mr. O'Shea's statement is consistent with the statement that Mr. Lehmann made one week earlier in the RPA, that taking credit for soluble boron was not a viable option. Lehmann, Tr. 1154:18-22.

354. If taking credit for soluble boron was not an option for addressing criticality, another possibility was the use of a device known as a racksaver. Mr. Lehmann's team determined that the cost of installing racksavers would be approximately $961,000. Lehmann, Tr. 1157:4-1158:15; PX 66 at CP_FP000137594.

355. The third option raised in the RPA was removal of the Boraflex from some of the racks and replacement of others. This option was considered not to be viable. Lehmann, Tr. 1171:6-18; DX 182 at CP_FP000029512.

356. The fourth option listed in the RPA was to rerack the pool with Boral, rather than Boraflex, racks. With respect to this option, Mr. Lehmann concluded that "[t]he most desirable recommendation is to permanently resolve the source of the silica by removal of the Boraflex and then completely replace all the spent fuel racks with Boral as the desired neutron absorbing material. This eliminates the root cause of the silica contamination, the Boraflex, from the racks and provides the highest margin of safety relative to maintaining the K effective." DX 182 at CP_FP000029512.

357. Unlike reverse osmosis, reracking would not be a "band-aid fix" and would solve both the criticality problem and the silica problem. Lehmann, Tr. 1172:21-1173:6.

358. DX 166 is an FPC document entitled "Integrated Planning Manual, Revision 5." It provides a set of instructions for completing an RPA. Lehmann, Tr. 1173:18-24.

359. The planning manual contains a list of questions to be answered by the preparer, with each answer being assigned a score that is ultimately tallied, so that management can determine how to prioritize the project for which approval is being sought. Lehmann, Tr. 1175:1-1176:7; DX 166 at CP_FP00196356-365.

360. Mr. Lehmann completed the scoresheet portion of the RPA and is listed as the evaluator. Lehmann, Tr. 1177:9-19; DX 182 at CP_FP000029515-516.

361. Mr. Lehmann determined that, with respect to the rerack project, there were four questions contained in the instructions that would contribute to the score and should be answered. Lehmann, Tr. 1177:20-1178:5.

362. Question 23 sought an estimate of the magnitude of the change in recurring operating and maintenance costs that would be expected if the rerack project were implemented. In response, Mr. Lehmann wrote that "[r]eplacement of the B spent fuel racks [would] eliminate the need for all pre and post outage water chemistry conditioning for the [reactor cooling system]" and estimated that the project would decrease annual O&M costs by at least $100,000, an amount that corresponded with a score of eight. Lehmann, Tr. 1178:21-1180:4; DX 166 at CP_FP00196361; DX 182 at CP_FP000029515.

363. Question 28 assessed the magnitude of change in fuel reliability that would be experienced if the rerack project were implemented. In response, Mr. Lehmann wrote that "[t]his project implements Phase 1 of [the] Spent Fuel Storage Long Term Strategic Plan. By fully removing the source of silica [](the Boraflex) in the spent fuel pools, it will improve primary

system and coolant chemistry, so that fuel cladding corrosion due to chemical impurities will be eliminated." DX 166 at CP_FP00196362; DX 182 at CP_FP000029515.

364. For question 28, Mr. Lehmann gave the proposed rerack a score of 4, indicating that, in his estimation, the project would result in two fewer fuel pins (components of the fuel assemblies used in the reactor) being corroded and therefore leaking. Lehmann, Tr. 1180:24-1181:20.

365. Question 29 sought an estimate of the magnitude of change in the estimated unit operated life that would be experienced if the rerack project were implemented. This question was the only part of the scoresheet that concerned the increase in storage space that would be obtained through the proposed rerack. Lehmann, Tr. 1182:4-12; DX 166 at CP_FP00196363.

366. In response, Mr. Lehmann wrote, "By reracking the B pool with additional cell locations, the effective on-site storage of spent fuel increases by four years, so that CR3 will maintain full core offload capability through 2013." DX 182 at CP_FP000029515.

367. In fact, Mr. Lehmann indicated elsewhere in the request for project approval that the added space would extend the period of time during which the plant would be able to maintain full core reserve by three years, from 2010 to 2013. Lehmann, Tr. 1183:20-1185:9; DX 182 at CP_FP000029511, 515.

368. Based upon his conclusion that the rerack would increase the storage capacity by four years, Mr. Lehmann assigned the project a score of 6. DX 182 at CP_FP000029515.

369. The instructions to the request for project approval indicated that an extension of two years should receive 4 points, and an extension of five years should receive 6 points. DX 166 at CP_FP00196363.

370. Mr. Lehmann assigned the project a score of 6 on this question because the length of the extension he attributed to the project, four years, was "closer to five than two is." Lehmann, Tr. 1182:23-1183:4.

371. Applying this same logic, a three-year extension would yield a score of 2.

372. Question 35 sought an estimate of the magnitude of change in performance ratings that would be experienced if the rerack project were implemented. In response, Mr. Lehmann wrote that the rerack project would "reduce[] the required maintenance, surveillances, operations and other labor intensive tasks required to maintain coolant chemistry, and the margin of safety within the spent fuel system and pools. The rerack improves the quality of []CR3 spent fuel management approach and prepares the plant for continued, safe operations." DX 166 at CP_FP00196364; DX 182 at CP_FP000029516.

373. Mr. Lehmann assigned the project a score of ten (the maximum score for any question), corresponding to a projected annual decrease in man-hours of at least 2,500. Lehmann, Tr. 1187:16-1188:1; DX 166 at CP_FP00196364; DX 182 at CP_FP000029516.

374. The sum of the scores that the project received in the questionnaire contained in the request for project approval was 28. Of this amount, six were attributed to the increase in storage space. Lehmann, Tr. 1188:2-21.

375. When the RPA was prepared, FPC contemplated that it would only obtain approximately 70 additional storage spaces through the rerack. DX 182 at CP_FP000029511; Lehmann, Tr. 1191:8-1192:4.

376. The precise number of additional spaces that FPC believed it was obtaining when it sought approval for the project was 64. Lehmann, Tr. 1202:18-23.

377. The number of additional storage spaces referenced in the request for project approval would enable FPC to maintain full core reserve at Crystal River through 2013. Culver, Tr. 969:24-970:4; Lehmann, Tr. 1189:21-1190:1.

378. As of the time that approval for the project was sought and up until the time of trial, the plant's license was scheduled to expire in 2016. Culver, Tr. 970:5-11; Lehmann, Tr. 1190:2-7.

379. Had FPC obtained the amount of space that it contemplated when it sought approval for the rerack project, it would not have been unable to offload the reactor core during operations between 2013 and 2016 and, because there would still be fuel in the reactor core, it would not have been able to complete the process of decommissioning. Culver, Tr. 971:9-972:13.

380. Plaintiffs base their spent fuel management plans upon the need to maintain full core reserve at each plant. Joint Stipulation No. 4.

381. It is "very desirable" for a utility to maintain full core reserve because, without full core reserve, there is a chance of a shutdown and an inability to restart the reactor. Martin, Tr. 208:6-14, 208:20-25.

382. The most expensive consequence of a reactor shutdown includes the cost of purchasing replacement power while the reactor is inoperable. Martin, Tr. 209:6-10.

383. In peak power demand times, replacement power could cost up to ten times more than the usual costs for replacement power. Martin, Tr. 209:22-210:1.

384. In January 1999, FPC and Westinghouse reached an agreement whereby Westinghouse would design, engineer, and license new racks for the spent fuel pool containing 879 cells, at a cost of $3.2 million. PX 87 at CP_FP00193532-533.

385. This amount represented a discount of approximately $1 million from Westinghouse's regular price for these cells. The price was agreed upon as a result of negotiations stemming from FPC's complaints about the degradation of the original Boraflex racks that Westinghouse had provided. Lehmann, Tr. 1197:11-1198:9, 1209:3-23.

386. When asked whether the price for a rerack had become cost-effective as a result of the negotiations with Westinghouse, Mr. Lehmann agreed. Lehmann, Tr. 1198:10-18.

387. The total number of additional storage spaces obtained as a result of the rerack was 117. The increase was attributable to an agreement reached in July 1998 whereby Westinghouse agreed to provide 53 more storage cells than had been contemplated when the project was approved. Lehmann, Tr. 1201:14-1202-2.

388. When nuclear power plants make decisions about how to operate their facilities, they do not simply look at which option is the least expensive. Maret, Tr. 1807:22-1809:5.

389. The most important considerations to a nuclear power plant in deciding how to deploy its resources are whether the action is consistent with preserving the plant for its long-term safety and power generation mission and the risks that various choices present. Maret, Tr. 1808:9-1809:5.

390. Of paramount concern in deciding what course of action to pursue are preservation of the physical asset of the plant and preservation of the goodwill relationship with regulators and the public. Maret, Tr. 1808:22-1809:5.

391. It would not have made sense for Progress Energy to continue to deal with the problems presented by Boraflex degradation through interim, temporary solutions, rather than by addressing the root cause of the problem. Maret, Tr. 1809:19-1810:5; DX 307 at 12-13.

392. There would be pressure from regulators and the rest of the industry for Progress Energy to permanently fix its Boraflex degradation problems because of the potential threat to the industry if the problems were allowed to persist. Maret, Tr. 1809:24-1810:5.

393. Each of the alternatives for addressing the two separate problems of criticality control and silica contamination that Boraflex degradation implicates has its own associated cost. Maret, Tr. 1813:2-1814:1.

394. Progress Energy has not provided an offset from its damages claim for the alternative measures, aside from reracking, that it claims it could have used to address the two separate problems – criticality and silica contamination – caused by Boraflex degradation.

395. Because plaintiffs would have performed the rerack at the Crystal River facility, independent of DOE's performance, Mr. Johnson has removed $4,675,392 from his calculation of plaintiffs' damages at both the 900 and 3,000 MTU rates. Johnson, Tr. at 1985:20-1986:13; DX 308 at 12; DX-D5 at 26.

H. Avoided Cost Of Loading Casks To DOE

396. The process of loading spent fuel into a cask requires several steps and can take at least a few days. The tasks include placing the cask into a spent fuel pool, loading the fuel into the cask assembly-by-assembly, sealing the cask, lifting the cask, draining water from the cask, and decontaminating it. Edwards, Tr. 570:10-572:14.

397. Because DOE has not yet begun accepting fuel, Progress Energy has to date not incurred any costs associated with loading to DOE. Edwards, Tr. 572:15-23.

398. The canisters that Progress Energy has loaded to its dry storage facility at Robinson are designed for both storage and transportation. Edwards, Tr. 572:24-574:1.

399. If the canisters were transported off-site, Progress Energy would not have to incur any additional costs to load them. Edwards, Tr. 574:2-575:10.

400. In calculating the number of loadings that Progress Energy would have conducted in the but-for-world, Mr. Maret assumed that a 75-ton rail cask would be used at the Brunswick, Harris, and Robinson Plants. Maret, Tr. 1817:5-25; DX 307 at 14; DX-D4 at 22.

401. Mr. Maret's assumption is based upon the DCSs that Progress Energy submitted to DOE, the crane capacities as they existed at the plants prior to any modifications made for purposes of moving to dry fuel storage, and the fact that Progress Energy used a 75-ton IF-300 to transship fuel between the plants. Maret, Tr. 1817:5-25; DX 307 at 13-14; DX-D4 at 22.

402. An IF-300 cask is capable of holding seven PWR assemblies and 17 channeled BWR assemblies. Maret, Tr. 1821:22-1822:19; DX 307 at 14.

403. Alternatives to using a 75-ton cask would each have their own implications on the costs that Progress Energy would incur to load to DOE. Maret, Tr. 1820:9-18.

404. A smaller truck weight cask would handle fewer fuel assemblies, which would therefore require more shipments to load the same number of assemblies, and thus would ultimately be more costly to Progress Energy. Maret, Tr. 1820:19-1821:3.

405. Alternatively, to load a rail cask weighing 100 tons or more, Progress Energy would have needed to make major modifications to its facilities, similar in nature to those that it made in the actual world at its Robinson plant to handle dry fuel storage canisters. Maret, Tr. 1821:4-21; DX 307 at 17-21; DX-D4 at 27.

406. Exhibit VI to Mr. Johnson's expert report identifies the costs of each of these modifications, in the total amount of $5,948,645. Johnson, Tr. 1974:1-1975:16; DX 308 at 28; Joint Stipulation No. 46.

407. The assumption of a 75-ton cask is favorable to Progress Energy because, if plaintiffs were to use large rail casks to load fuel to the DOE, the adjustment to plaintiffs' damage claim for DOE loading costs would not only equal the actual costs to load the casks, but also would include the costs of the structural modifications at Robinson, plus any costs associated with making similar structural modifications at Brunswick and Harris. Such costs would likely exceed the loading costs that the Government's experts have calculated as necessary if a 75-ton cask were used. Johnson, Tr. 1974:1-1975:16; DX 308 at 8-9, 28, & n.18, 20.

408. Based upon the crane capabilities at Crystal River, Mr. Maret assumed that Progress Energy would have used a legal weight GA-4 truck cask, which holds four PWR assemblies, to load to DOE at Crystal River. Maret, Tr. 1823:6-1824:4; DX 307 at 15; DX-D4 at 22.

409. Progress Energy's costs to load an IF-300 are a reasonable proxy for what it would have cost Progress Energy to load a 75-ton rail cask in the "but for" world. Maret, Tr. 1824:5-1825:5; DX 307 at 14; DX-D4 at 23.

410. Progress Energy has provided data regarding the total cost of loading and unloading IF-300 casks, and, from that, it is reasonable and conservative to assume that the cost to load an IF-300 cask is one-half this total cost. Maret, Tr. 1824:5-1825:5; DX 307 at 14 & n.41; DX-D4 at 23.

411. Because a GA-4 truck cask holds 4/7ths the number of PWR assemblies that an IF-300 holds, a conservative assumption, favorable to Progress Energy, is that the cost to load a GA-4 truck cask would be 4/7ths the cost of loading an IF-300. Maret, Tr. 1825:8-22; DX 307 at 15; DX-D4 at 23.

412. The number of fuel assemblies shipped to DOE at the respective acceptance rates can be divided by the capacity of the appropriate cask to be used to arrive at the total number of casks needed to be loaded at the given acceptance rate. Maret, Tr. 1825:23-1827:15; DX 307 at 15-16; DX-D4 at 24-25.12. Because plaintiffs are contractually required to bear the costs for loading any SNF to DOE, plaintiffs have experienced a cost benefit "measured by what they've actually spent to load versus what they would have spent" if DOE had begun accepting fuel from the industry in 1998. Johnson, Tr. 2022:6-10.

413. To identify the costs that plaintiffs would have incurred to load fuel to DOE, Mr. Johnson relied upon Mr. Maret's opinions concerning the types of available casks and the relative costs of loading them and plaintiffs' identification of the number of fuel assemblies that plaintiffs would have shipped to DOE in a given year. Johnson, Tr. 1967:13 - 1977:20; DX 308 at 7-9; DX-D5 at 12-16.

414. To account for the costs that plaintiffs would have incurred to load their SNF to DOE, Mr. Johnson deducted $4,427,726 from his calculation of plaintiffs' damages at the 900 MTU rate. Johnson, Tr. 1967:21-1969:8; DX 308 at 9; DX-D5 at 12-16.

415. Using the same methodology, to account for the costs that plaintiffs would have incurred to load their SNF to DOE, Mr. Johnson deducted $9,818,462 from his calculation of

plaintiffs' damages at the 3,000 MTU rate. Johnson, Tr. 2015:8-24; DX 308 at 9 n.18; DX-D5 at 43.

I. Internal Labor Charges

416. To compile the internal labor charges that Progress Energy included in its claim for damages, the company extracted the time entries charged by employees in the company's timekeeping system. Calvello Tr. 1605:5-1606:16.

417. When Progress Energy employees charge time to a particular project, they do not consider whether the time that they are charging is incremental to any partial breach by DOE. Edwards, Tr. 446:8-20.

418. Progress Energy could not identify any projects that the company would have pursued but did not because it was occupied by any partial breach. Edwards, Tr. 584:22-585:3; Johnson, Tr. 2010:21-2011:15.

419. Prudent businesses staff their enterprises to give the business the capability to take on a moderate amount of unexpected work and to obviate the need constantly to hire and fire personnel. Johnson, Tr. 2009:2-18.

420. Beyond limiting their inclusion of labor charges to time charged to those projects that they consider to be breach-related, plaintiffs have made no effort to distinguish between the labor charges that they incurred which were incremental to any partial breach from those that were not. Johnson, Tr. 2002:22-2004:22; DX-D5 at 35.

421. Plaintiffs provided no evidence that their staffing levels changed based upon the existence of breach-related projects. Johnson, Tr. 2009:19-2010:4.

422. Not all work that a company's labor force performs because of a breach results in economic harm to the company. As an extreme example, where a salaried employee works one hour on a project but receives the same salary for his or her work, the company has not sustained economic harm. Johnson, Tr. 2003:20-2004:17.

423. The proper method for determining whether an internal labor charge is incremental is to conduct an analysis to determine what amount of claimed costs associated with internal labor has resulted in economic harm to the company. Johnson, Tr. 2004:18-22.

424. To determine the amount of Progress Energy's labor charges that were incremental to the breach, Mr. Johnson analyzed the labor data produced by the plaintiffs and isolated those salaried employees whose time was included within Progress Energy's damage claim who never worked more than half of their time on a breach-related project in any given year. Johnson, Tr. 2007:2-2008:8; DX 308 at 17.

425. Using this filter, Mr. Johnson determined that, on average, the Progress Energy employees who fell into this category worked less than two hours per week on a breach-related activities. Johnson, Tr. 2008:9-17; DX 308 at 17; DX-D5 at 37.

426. Mr. Johnson opined, as an expert in analysis of economic damages, that, in the absence of any proof of foregone opportunities, Progress Energy did not incur economic harm merely because a portion of its salaried work force was required to perform, on average, two additional hours of work per week upon breach-related projects. Johnson, Tr. 1944:24-1946:24, 2008:9-17; DX 308 at 18; DX-D5 at 37.

427. Mr. Johnson made no adjustment for labor costs associated with hourly employees or for overtime pay, all of which he considered to be incremental to DOE's delay. Johnson, Tr. 2005:15-2006:20; DX-D5 at 36.

428. At the 900 MTU rate of acceptance, Mr. Johnson adjusted plaintiffs' claim for internal labor costs to deduct $2,787,811 of non-incremental internal labor costs, corresponding to the amount of work performed by employees who never worked more than half their time on a breach-related project in any given year. In Mr. Johnson's expert opinion, this amount reflects a "reasoned estimate" of the portion of the approximately $15 million in labor charges included in plaintiffs' damage claim that would have been incurred in the absence of a partial breach by DOE. Johnson, Tr. 2010:10-17; DX 308 at 17-18; DX 311 at CXP011 000002; DX-D5 at 37.

429. Using the same methodology, Mr. Johnson calculated that, at the 3,000 MTU scenario, $4,383,222 worth of work would be performed by employees who never worked more than half their time on a breach-related project in any given year and that, therefore, that amount should be deducted from Progress Energy's damage claim. Johnson, Tr. 2015:8-24; DX 308 at 18 n.55; DX-D5 at 43.

J. Overheads

430. In cost accounting, there are two types of costs: variable costs and fixed costs. Variable costs change, depending upon with the volume of activity. Fixed costs are costs that do not change with a corresponding change in the volume of an activity. Johnson, Tr. 1987:1 - 1988:12.

431. To determine whether an overhead cost is properly included in damages, one needs to determine whether the overhead is a fixed or variable cost. Id.

432. Most overhead costs are fixed costs that represent the indirect costs of supporting other activities, such as the cost of a receptionist's salary, which does not change with the volume of activity. Johnson, Tr. at 1988:14-1990:7; DX-D5 at 28.

433. As a matter of cost accounting, when a fixed cost is allocated to a number of projects, the total cost remains the same. However, the amount of that cost that is allocated to each project will vary, depending upon the number of projects. Johnson, Tr. 1990:8-25; DX-D5 at 28.

434. Although the allocation of fixed overhead costs to a company's projects is not improper as a method of cost accounting, this cost accounting methodology is not the proper measure of damages for fixed overheads. Rather, the proper measure of damages is whether the total overhead cost changes as a result of the breach-related activity. Johnson, Tr. 1992:3-1994:6; 2030:11-2032:24.

435. Through its internal accounting system, Progress Energy has allocated a portion of its overhead costs, including its stores overheads and indirect overheads, to projects for which it seeks recovery in this case. Edwards, Tr. 592:12-593:19.

436. Plaintiffs have not provided any evidence that their overheads are variable costs. Instead, plaintiffs simply have allocated fixed overhead costs to a number of breach-related projects. Johnson, Tr. 1990:25-1991:18; DX 308 at 14; DX-D5 at 28.

437. Stores expenses, including labor costs and other costs associated with running the plaintiffs' warehouses, are recorded in a separate account, the contents of which are allocated through a burdening process to Progress Energy's projects. Calvello, Tr. 1611:3-12; 1612:24-1613:12; 1621:13-25.

438. Plaintiffs use the indirect overhead as a method to allocate total, general, labor management costs to a variety of projects. Calvello, Tr. 1613:2-1614:13; 1614:21-1615:15.

439. Progress Energy's stores overheads costs consist primarily of the labor costs of the persons employed by Progress Energy's material control organization who staff the company's warehouses. Edwards, Tr. 594:13-595:2.

440. Viewed from the perspective of the entire material control organization, the costs of operating the warehouses remain relatively fixed. Edwards, Tr. 597:16-25.

441. The Robinson dry storage project assigned an employee to perform material control functions associated with that project. The cost of the labor performed by that employee, which is included in Progress Energy's damage claim, was charged directly to the dry storage project and was not included within the stores overhead pool. Edwards, Tr. 599:11-600:20.

442. Progress Energy has not quantified the amount, if any, by which the company's indirect or stores overhead costs have increased as a result of engaging in any of the activities for which it seeks damages in this case. Edwards, Tr. 600:20-602:17.

443. Mr. Johnson determined that Progress Energy's claim included a total of $2,336,679 of stores overheads costs that, in his expert opinion, had not been demonstrated to be incremental to the breach. Johnson, Tr. 1994:7-1995:25; DX 308 at 14; DX-D5 at 29.

444. To avoid double-counting of stores overhead costs included in other components of plaintiffs' claims and already removed in the course of other adjustments, Mr. Johnson deducted from his calculation of plaintiffs' damages at the 900 MTU rate $1,153,932 in stores overhead costs. Johnson, Tr. 1994:7-1995:25; DX 308 at 14, 25; DX-D5 at 29.

445. For the same reason, at the 3,000 MTU rate of acceptance, Mr. Johnson deducted from his calculation of plaintiffs' damages $2,190,504 in stores overhead costs. DX 308 at 14 n.41, 27; DX-D5 at 43.

446. Mr. Johnson determined that Progress Energy's claim included a total of $1,895,031 in indirect overheads costs that, in his expert opinion, had not been demonstrated to be incremental to the breach.. Johnson, Tr. 1996:1-1997:10; DX 308 at 15; DX-D5 at 31.

447. To avoid the double-counting of indirect overhead costs included in other components of plaintiffs' claims and already removed in the course of previous adjustments to plaintiffs' claims, Mr. Johnson deduced from his calculation of plaintiff's damages (at the 900 MTU rate) $1,422,948 in indirect overhead costs. Johnson, Tr. 1996:1-1997:10; DX 308 at 15, 25; DX-D5 at 31.

448. For the same reason, at the 3,000 MTU rate of acceptance, Mr. Johnson deducted from his calculation of plaintiffs' damages $1,819,575 in indirect overhead costs. DX 308 at 16 n.48, 27; DX-D5 at 43.

K. <u>AFUDC</u>

449. Progress Energy has included a charge for an Allowance for Funds Used during Construction ("AFUDC") in its claim for damages, the amount of which represents the "estimated debt and equity costs of capital funds necessary to finance the construction of new regulated assets." Edwards, Tr. 588:17-589:12; DX 268 at 63.

450. As a rate-based utility, Progress Energy cannot incorporate the cost of its capital expenditures into its rate base (the costs upon which the utility's charges to consumers for energy are based) until the project is in service. Edwards, Tr. 590:10-14.

451. Once a capital project comes into service, a utility is permitted, by Federal Energy Regulatory Commission ("FERC") regulations, to include in its rate base the amounts that have accumulated as AFUDC during construction. Edwards, Tr. 590:15-20.

452. Inclusion of the AFUDC rate in the rate base compensates the utility for the use of its money for capital expenditures and allows the utility to earn a return upon its capital investment. Edwards, Tr. 590:21-591:3.

453. CP&L and FPC borrow money at the company level, rather than the project level, and funds its capital construction projects through the issuance of generalized debt and equity. It made no specific borrowings to perform any of the capital projects that have been included as damages in this lawsuit. Edwards, Tr. 591:4-592:3; Calvello, Tr. 1608:5-9; 1609:3-11.

454. FERC allows plaintiffs to apply AFUDC to their capital construction costs to compensate them for the time lag between when they incur the costs and when they are allowed to recover those costs from the rate base. Calvello, Tr. 1607:3-23.

455. AFUDC is equivalent to interest because it compensates plaintiffs for the time value of money. Johnson, Tr. 1998:4-14; DX-D5 at 33.

456. A portion of plaintiffs' AFUDC costs is a return upon equity, which is not a cost, but income. Calvello, Tr. 1610:2-3; Johnson Tr. 1998:15-1999:6; DX 308 at 16; DX-D5 at 33.

457. A total of $2,018,111 in AFUDC costs is included in plaintiffs' claim. Johnson, Tr. 2000:17-2002:3; DX 308 at 16; DX-D5 at 34.

458. To avoid double-counting of AFUDC amounts already included in other components of plaintiffs' claims and removed in the course of previous adjustments, Mr. Johnson

deducted from his calculation of plaintiff's damages (at the 900 MTU rate) $1,373,930 in AFUDC costs. Johnson, Tr. 2000:17-2002:3; DX 308 at 16, 25; DX-D5 at 34.

459. For the same reason, at the 3,000 MTU rate, Mr. Johnson deducted from his calculation of plaintiff's damages $1,966,045 in AFUDC costs. DX 308 at 16 n.52, 27; DX-D5 at 43.

L. Robinson Crane Study

460. Mr. Johnson deducted from his calculation of damages, at both the 900 and 3,000 MTU rate scenarios, $368,121, reflecting the cost of crane studies performed at the Robinson plant, based upon instruction from counsel that the costs of these studies had not been demonstrated to be incremental to any partial breach. Johnson, Tr. 2011:16-2012:9; DX-D5 at 39.

M. Unsupported Costs

461. Mr. Johnson identified in his expert report a number of expenses for which he believed Progress Energy failed to provide adequate supporting documentation. DX 308 at 21.

462. On October 9, 2007, Mr. Johnson provided an Addendum to his Expert Report that adjusted the amount of damages disputed as a result of additional documentation provided to the Government by the plaintiffs after the issuance of Mr. Johnson's original report. DX 311.

463. By letter dated October 26, 2007, following the receipt of additional materials, the Department of Justice provided counsel for plaintiffs with a list of charges that the Government still considered to be unsupported. PX 160.

464. Based upon testimony offered at trial, the Government agreed to stipulate that four of the charges set forth on the second page of PX 160 had been adequately supported, but indicated that it still contested the remaining charges. The four charges that the Government

agrees are now supported are the first charge for $77,378 and the last three charges for $17,026, $10,125, and $7,666. Tr. 1627:8-1628:24; PX 160.

465. As a result of this stipulation, at the 900 MTU, rate Mr. Johnson deducted from his calculation of plaintiffs' damages $173,361 in unsupported costs. Johnson, Tr. 2012:20-2014:10; DX-D5 at 41.

466. For the same reason, at the 3,000 MTU rate, Mr. Johnson deducted from his calculation of plaintiff's damages $345,701 in unsupported costs. The amount of unsupported costs deducted from plaintiffs' claim is higher at the 3,000 MTU rate because some of the unsupported costs are costs associated with projects that have been removed from damages at the 900 MTU rate. At the 3,000 MTU rate, these costs must be removed from damages as unsupported. Tr. 1627:8-1628:24; Johnson, Tr. 2017:7-2018:12; DX 308 at 21; DX-D5 at 44.

ARGUMENT

We outlined the legal framework governing this case in our memorandum of contentions of fact and law dated October 10, 2007, and incorporate into this brief the arguments contained in that memorandum. The discussion below supplements the discussion in our pre-trial submission in light of the evidence adduced at trial and the specific legal issues that the evidence raised.[8]

[8] As used in this section, "PFOF ___" refers to the proposed findings of fact included in the previous section.

# I. PROGRESS ENERGY HAS FAILED TO MEET ITS BURDEN OF ESTABLISHING ENTITLEMENT TO THE DAMAGES THAT IT CLAIMS

## A. To Establish Causation, Progress Energy Bore The Burden Of Demonstrating A Plausible "But For" Scenario

The United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), provides the proper framework for evaluating damages in a spent nuclear fuel case. In that case, in which the plaintiff purported to seek "mitigation damages," the Federal Circuit explained that "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Id. at 1376. Critically, in Indiana Michigan, the Federal Circuit upheld the trial court's decision not to award any damages, based in part upon its finding that the utility could not show that its actions were caused by DOE's breach and that these actions would have taken place even in the absence of a partial breach. Id. at 1376.

In light of this holding, the question is not simply whether the actions that plaintiffs took were the product of a "reasonable" business judgment made in an effort to limit their damages. As a threshold matter, Progress Energy must prove, as a means of demonstrating that the costs that it incurred were "caused" by the partial breach, that it would not have incurred these so-called mitigation costs absent any delay. See San Carlos Irr. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1989) ("A plaintiff must show that but for the breach, the damages alleged would not have been suffered."); Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822, 831 (1961) ("[T]he measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the

breach of contract. Were this not true, the doctrine of mitigation of damages would lose much of its significance.").

Requiring Progress Energy to depict an accurate "but for" world is crucial to the Court's ability to evaluate whether certain items claimed as damages are costs that would have been incurred even if DOE had begun accepting spent fuel in 1998. This Court's decision in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) ("PG&E"),[9] recognizes the general principle that, when seeking expectancy damages, a plaintiff must establish a plausible "but for" world against which to measure causation. Specifically, the Court stated that "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." Id. at 386 (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see id. at 406 ("[t]o derive the proper amount for the damages award, the cost resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach" (quoting Bluebonnet, 339 F.3d at 1345)). The Court further clarified that PG&E's alleged expectancy damages could only be measured by reference to a world where DOE performed and that, without reference to the performance world, the measure of plaintiff's damages would be "irrelevant." Id. at 375 n.38; see PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006) ("Any issues related to the types of damages permitted under the contract, if any, and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations." (emphasis added)).

---

[9] The Federal Circuit is scheduled to hear oral argument of the appeal in PG&E on February 4, 2008.

To establish causation in this context, Indiana Michigan requires Progress Energy to show that, at a minimum, had DOE begun accepting fuel in 1998, it would not have incurred the costs it now seeks as damages. Imposition of this requirement is necessary to ensure that plaintiffs are merely restored to the position that they would have occupied in the absence of DOE's delay in performance and are not reimbursed for costs that they otherwise would have been required to incur (and are thus placed in a better position than they would have occupied but for any breach by DOE). See Indiana Michigan, 422 F.3d at 1373; Bluebonnet Savs. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)) ("[T]he non-breaching party should on no account get more than would have accrued if the contract had been performed." (internal quotation marks omitted)); PG&E, 73 Fed. Cl. at 385 (same).

B. Plaintiffs Improperly Defined DOE's Obligations Under The Standard Contract And, Thus, Failed To Provide A Basis For Comparison To The Actual World

1. The Standard Contract Contains No Language Imposing, And The History Of Its Formation Is Inconsistent With, The Rate Requirement That Plaintiffs Propose

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original); see PG&E, 73 Fed. Cl. at 375 n.38 (damages can be determined "[o]nly by determining the scope of plaintiff's performance obligation"). Although Progress Energy contends that the Standard Contract required DOE to accept fuel at a rate that would eliminate the need for additional

expenditures upon spent fuel storage after 1998 and therefore asks the Court to identify a "reasonable" rate that satisfies this test, there is no basis in either the NWPA or the Standard Contract for such a test. By arguing that DOE was obligated to perform at the rate that they (unilaterally) deem to be reasonable, plaintiffs are asking the Court to rewrite the contract using terms to which the parties not only never agreed, but that were expressly rejected during the course of the contract formation process.

At trial, Progress Energy failed to cite to any language in the Standard Contract that requires DOE to accept SNF at a rate designed to preclude utility at-reactor storage after 1998. Instead, the witnesses who participated in the formation of the Standard Contract testified (1) that they "understood" the Standard Contract to contain such a standard (or, alternately, that it required DOE to accept fuel at a rate commensurate with the industry-wide generation rate and that would begin to work off the backlog); (2) that the addition of a qualitative test into the Standard Contract would have been unnecessary; and (3) with perfect circularity, that DOE's decision not to accept such a qualitative standard was of no moment because the terms of the contract already required DOE to accept fuel at such a rate. PFOF 81-82, 87-90. These witnesses further testified that they derived their "understanding" not from the Standard Contract itself, but from the company's contracts for the reprocessing of spent fuel, the terms of which are not incorporated into the Standard Contract. PFOF 93-94.

Progress Energy's arguments are fundamentally flawed for several reasons. First and foremost, there is no dispute that the Standard Contract does not contain or incorporate any language that supports plaintiffs' purported understanding. The importance of the absence of any such language, though perhaps lost in the course of a lengthy trial, cannot be overstated. Progress

Energy asks the Court to endorse an interpretation of a document that would impose billions of dollars in contractual liability upon the United States without even the faintest glimmer of textual support. To endorse such an interpretation is to defy the most fundamental rule of contract interpretation – that it "begins with the plain language of the written agreement." PG&E, 56 Fed. Cl at 662 (citing Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002)).

Second, the Standard Contract contains an integration clause providing that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party." PFOF 60. The evidence was unrefuted that Louis Martin, who recommended to management that CP&L execute the Standard Contract, read and initialed the entire agreement, including the integration clause, and that the document was reviewed by the company's legal department before it was executed. PFOF 66-68. The language in the integration clause in no uncertain terms precludes Progress Energy's attempts to rely upon either the statements of DOE officials or DOE-issued documents, whether pre- or post-contract formation, as the source of DOE's obligation to accept fuel at a particular rate. Where a contract includes an integration clause, "it is a fair bet that the parties agreed to no more than they said." Campbell v. United States, 661 F.2d 209, 218 (Ct. Cl. 1981). It is for precisely this reason that, in PG&E, this Court found that "[t]he existence of the integration clause in the Standard Contract . . . militates strongly against modifying or supplementing it by adding a specific acceptance rate term." PG&E, 73 Fed. Cl. at 385.

Third, even assuming that it is appropriate to refer to anything other than the plain terms of the Standard Contract to discern the parties' obligations, the rate that plaintiffs have asked the Court to incorporate, though perhaps "reasonable" in the eyes of the utilities that requested such a

term, is wholly inconsistent with both the intentional omission from the Standard Contract of any qualitative rate standard and the history of the parties' negotiations. Because the Standard Contract was promulgated through notice-and-comment rulemaking in which both plaintiffs participated, there is a substantial administrative record containing industry comments and requests regarding the originally proposed contract terms that can assist in interpreting the Standard Contract. See, e.g., LTV Aerospace Corp., ASBCA No. 17,131, 76-1 BCA ¶ 11,840 (1976) (analyzing regulatory administrative history in interpreting contract clause developed through notice-and-comment rulemaking); Boeing Co., ASBCA No. 18,916, 74-2 BCA ¶ 10.976 (1974) (same); see also TEG-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329 (Fed. Cir. 2006) (relying upon pre-award discussions between Government and bidders, in which the plaintiff participated, to confirm that the plaintiff's understanding of the contract comported with its plain language). This record conclusively demonstrates that DOE unequivocally rejected the very rate that plaintiffs' witnesses now claim to be consistent with their understanding of the Standard Contract and confirms that plaintiffs and the industry groups to which they belonged fully understood the clear implications of this rejection.

In response to DOE's February 4, 1983 proposed rule, which contained no rate of acceptance, EEI and UNWMG, utility trade associations of which plaintiffs were members, specifically requested that DOE add a two-part minimum acceptance rate obligation in the Standard Contract that would contractually obligate DOE to accept SNF at a rate (1) commensurate with the amount of such fuel and waste then being generated together with (2) the amount of such fuel and waste previously generated. PFOF 27. Importantly, both Mr. Martin and Mr. Kunita, the only witnesses who testified at trial about either plaintiff's understanding of the

terms of the Standard Contract at the time that it was executed, acknowledged that this proposal was consistent with what they understood to be DOE's obligations under the Standard Contract. PFOF 82, 87.

Like CP&L, FPC also expressed specific concerns in response to the proposed rule. It noted, among other things, that the manner in which the Standard Contract prioritized fuel acceptance rights (that is, the order in which DOE proposed to accept spent fuel from utilities and the amounts that DOE would accept) should be altered so that DOE would accept fuel first at those plants that would otherwise be forced to shut down because of a lack of available space to store discharged spent fuel. PFOF 40. This suggestion comported with the concern, also articulated by EEI and UNWMG in their comments, that the proposed standard contract did not give priority to reactors that might need to ship fuel offsite to continue operating. PPOF 28. The industry, including plaintiffs, wanted assurances that DOE would accept fuel fast enough so as to prevent the need for additional storage.

However, neither those assurances nor the two-part test were incorporated into the Standard Contract. PFOF 49, 51, 54; see PG&E, 73 Fed. Cl. at 348 (acknowledging that "DOE did not adopt the suggestion of EEI and many of the utilities . . . to incorporate into the Standard Contract a firm commitment from DOE regarding the rate of DOE's acceptance of SNF from utilities"). In fact, the evidence adduced at trial demonstrated that the utility industry, in general, and Progress Energy's witnesses, in particular, were aware of the fact that the final version of the Standard Contract did not incorporate a rate of acceptance. DOE explained in the Federal Register notice accompanying the promulgation of the final version of the Standard Contract that it had declined to accept the utilities' suggestion that the Standard Contract include performance

standards other than a January 31, 1998, commencement date for spent fuel acceptance. PFOF 49, 51-52. The utilities understood that the "performance standards" that DOE chose not to incorporate into the contract included a rate of acceptance. PFOF 73-74. Further, Mr. Kunita testified that he reviewed the final version of the Standard Contract before it was signed and understood, as soon as he reviewed it, that it did not include a rate of acceptance. PFOF 63. In fact, CP&L even sent DOE a reservation of rights when it executed the Standard Contract, yet did not make any mention of the rate of acceptance. PFOF 71-72. Simply stated, Progress Energy claims to have understood the Standard Contract to require the very standard that the utilities requested and that DOE declined to include in the contract. Adoption of CP&L's litigation-inspired interpretation of the Standard Contract would require the Court to accept a position that, factually, is implausible on its face.

Importantly, the evidence is also undisputed that DOE did not understand the Standard Contract to impose the performance standard that plaintiffs advocate. As Robert Morgan, the first director of DOE's Office of Civilian Radioactive Waste Management, testified, the large number of technical, budgetary, and regulatory uncertainties surrounding a complex and unprecedented nuclear waste acceptance program that was to commence 15 years in the future would have made it "unconscionable" for DOE to commit to any particular rate of acceptance in 1983. PFOF 51-52. These uncertainties, of course, were the same ones that CP&L identified when it recognized, in providing comments to the proposed Standard Contract, that in 1983 it was too early for the parties to commit themselves to any particular set of acceptance criteria. PFOF 37-38. The parties expressly recognized as much in the body of the Standard Contract, and they specifically

agreed that its terms "had been developed in the light of uncertainties necessarily attendant upon long-term contracts." PFOF 62 (10 C.F.R. § 961.11, Art. XV).

At trial, plaintiffs attempted to downplay their involvement with EEI and UNWMG, and they suggested that they should not be bound by the understanding of the Standard Contract that these groups, or any other utilities, espoused during the contract formation process. These arguments fail for a number of reasons. First, the law is clear that standardized contracts are to be interpreted uniformly amongst all contract holders. See Restatement (Second) of Contracts § 211(b). This tenet is particularly apt, where, as here, the negotiations were conducted as part of a public notice-and-comment process in which plaintiffs themselves participated. It simply cannot be the case that the obligations of the United States to accept fuel from the industry under a Standard Contract, in a sequence determined by the order in which fuel was discharged by individual members of the industry, are actually subject to dozens of different subjective interpretations.

Second, there is no factual basis for either plaintiff, and CP&L in particular, to disassociate itself from EEI or UNWMG. Although, at trial, counsel for plaintiffs suggested that plaintiffs' membership in these groups was akin to his own personal membership in the American Automobile Association, the facts clearly demonstrate that this comparison is inapt. As members of EEI and UNWMG, plaintiffs are part of an elite handful of large corporations that operate nuclear power plants. See PFOF 115. This arrangement is a far cry from a multi-million-member organization that provides travel services and roadside assistance to passenger car drivers across the country.

Nor was CP&L merely a passive member of these organizations. Both Mr. Kunita and Mr. Martin served on task forces for these organizations that were devoted to the Standard Contract. PFOF 116-17, 119-20. Mr. Martin himself was the Chairman of the EEI Nuclear Fuel Committee during the mid-to-late 1980s. PFOF 117. Further, CP&L regularly received communications from counsel to EEI and UNWMG concerning the Standard Contract and consulted with that law firm in preparing a reservation of rights letter that it sent to the Department of Energy along with its executed version of the Standard Contract. PFOF 68, 71, 122-23. On February 10, 1983, six days after DOE issued the proposed Standard Contract and three weeks before EEI and UNWMG submitted comments on the proposed contract upon behalf of its members, Mr. Martin attended a meeting in Washington, D.C., of the "EEI task group on waste contract." Although Mr. Martin testified that "it's entirely possible that I was, you know, only there briefly or whatever," Martin, Tr. 145:11-146:8, 149:1-9, it strains credulity to suggest that Mr. Martin went on a business trip to Washington to attend a meeting but was somehow unaware of the concerns that EEI and UNWMG raised in their comments to the proposed contract. Regardless of whether Mr. Martin personally believed that UNWMG's and EEI's insistence upon a rate was "nit-picky," PFOF 90, the industry knew or, at a minimum, was on notice that DOE was <u>not</u> agreeing to a rate of acceptance when it refused to incorporate the language that EEI and UNWMG suggested. Plaintiffs ignored DOE's actions at their own peril.

Finally, the evidence showed that, even <u>after</u> the promulgation and execution of the Standard Contract, representatives of EEI and UNWMG continued to request that DOE <u>add</u> the two-part test to the Standard Contract (requiring DOE to work off the backlog within 10 years) and that, once again, DOE did not accept any industry request for a minimum receiving rate for

SNF. PFOF 75. Again, these efforts to amend the contract included the direct participation of both Mr. Martin and Mr. Kunita. PFOF 116, 120-21, 124. These repeated requests, and DOE's rejection of the requests, is unequivocal evidence that the qualitative test which plaintiffs advocate was never a part of the contract between the parties.

2. The Documents Upon Which Plaintiffs Rely Do Not Evidence DOE's Intent To Be Bound To Any Rate Of Acceptance, Let Alone The One Plaintiffs Advocate

Plaintiffs elicited evidence concerning a series of documents and statements outside the four corners of the Standard Contract that they claim demonstrates that DOE contractually committed itself to accept spent fuel at the rate that plaintiffs advocate. As stated above, resort to these materials to discern the scope of DOE's obligation is unnecessary in light of the plain terms of the Standard Contract, the existence of the integration clause, the history of the formation of the contract, and the rejection of the test plaintiffs advocate. However, even assuming arguendo that resort to such materials is proper, these materials do not demonstrate that the parties understood that DOE would commit to the rate that plaintiffs advocate (or to any other rate).

First, plaintiffs failed to introduce a single document speaking DOE's obligations under the Standard Contract that pre-dates plaintiffs' execution of the Standard Contract. The oldest documents to which plaintiffs cite that speak to the issue of a rate of acceptance are a December 1983 draft mission plan, PX 17, and the statements that Mr. Morgan made in December 1983 as part of the Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, PX 19. Of course, both of these statements were made after the Standard Contract was signed and, therefore, cannot be evidence of any "meeting of the minds." See, e.g., PG&E, 73 Fed. Cl. at 383 n.41 ("[D]espite plaintiff's statement that 'the parties understood from the time of

contracting . . . that a reasonable acceptance rate should accomplish [the two part obligation,' not one of the numerous citations provided by plaintiff in support of this statement is contemporaneous with or antecedent to the execution of the Standard Contract between the parties on June 30, 1983.").

Second, the documents upon which plaintiffs rely do not reflect DOE's understanding of its obligations under the Standard Contract. For example, the statements that Robert Morgan made in 1983 concerned only "basic strategy . . . outlined in the mission plan" and clearly stated that the proposed schedule was optimistic and that, in light of the challenges that the program faced, it would be necessary to have an alternate MRS program in place to ensure that waste acceptance could commence on or before January 31, 1998. PFOF 78(g)-(h). Similarly, the language in the draft mission plan, which was not even included in the final mission plan actually submitted to Congress, made clear that DOE would not begin publishing firm acceptance schedules until 1991 and that the rate described in that document merely reflected DOE's "planning basis." PFOF 78(f), 98.[10] These statements are simply not probative of DOE's understanding of what was required under the Standard Contract. Indeed, the documents to which plaintiffs cite, most notably the final version of the Mission Plan itself, consistently indicated that they are merely plans or strategies, that they were not contractually binding, and that it was the ACR process contained in the Standard Contract that would be the means through which a firm delivery schedule was to be reached beginning in 1991. PFOF 78(c)-(f). As Judge Hewitt

[10] DOE chose not to incorporate a request from the industry that the rate contained in the Mission Plan be incorporated into the contract. PFOF 29, 55. For the same reason that the two-part test cannot be deemed part of DOE's obligation, any statements DOE made in its Mission Plan (and certainly, in a draft mission plan) do not rise to the level of, and are not probative of, a contractual obligation.

explained in examining the litany of documents that the radioactive waste management program has generated during the last 20 years and upon which plaintiffs now rely, "the court's role is not to enforce and impose on DOE an obligation to carry out a strategy as it was envisioned at that time in the absence of a contractual understanding." See PG&E, 73 Fed. Cl. at 391. As a result, "examples of predictions, hopes, goals, or aspirations . . . do not amount to binding promises that can be enforced by the court through the award of contract damages." Id. at 393; see National By-Products, Inc. v. United States, 405 F.2d 1256, 1263 (Ct. Cl. 1969) ("Before a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction.") Id. at 1263.

Importantly, the evidence squarely indicated that CP&L appreciated the distinction between DOE's obligations and its plans. In 1986, Mr. Martin and Mr. Kunita explained, in the same paragraph of a thoroughly vetted spent fuel management plan that was sent up the company's chain of command, that DOE was "obligated" to accept fuel beginning January 31, 1998, but was merely "planning" on accepting fuel at a rate that would preclude the need for additional at-reactor storage after 1998. Mr. Martin and Mr. Kunita developed an understanding, through personal participation in the contract formation process, of what the Standard Contract required. The contemporaneous and unfiltered language that they employed, and their intentional juxtaposition of DOE's plans against its obligations, speaks volumes about what the company actually believed.

Third, much of the "evidence" upon which plaintiffs rely to support DOE's understanding of the intent behind the NWPA and, apparently, DOE's understanding of its obligations under the Standard Contract, is not even admissible for that purpose. For example, Progress Energy elicited

evidence at trial concerning the personal understandings of DOE witnesses regarding the intent of Congress in promulgating the NWPA. Such evidence is of no relevance, because even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985). The opinions of DOE personnel are similarly inadmissible. See PG&E, 73 Fed. Cl. at 390 ("The court therefore declines to afford any weight to 'after-the-fact' statements made by DOE officials about the intent of Congress in passing the NWPA").[11]

Finally, Progress Energy relied in large part at trial upon the fact that DOE has assessed the adequacy of the fees charged the utilities under the Standard Contract based upon the

---

[11] Undoubtedly, as plaintiffs have suggested, it is appropriate to construe a Government contract in a manner consistent with the act that authorizes it. However, we are unaware of any case law suggesting, as Progress Energy apparently contends, that the Court should interpret a Government contract so as to include a command that is expressed neither in the contract nor in the authorizing statute. Indeed, the Federal Circuit recently explained in St. Christopher Assocs., L.P. v. United States, No. 2007-5069, 2008 WL 80671 at *6 (Fed. Cir. Jan. 8, 2008), that regulations are not properly incorporated into Government contracts merely by implication. The same conclusion holds true with respect to the textually unsupported interpretation of the NWPA that plaintiffs advance. It also bears noting in this regard that CP&L was presented with the opportunity to challenge the terms of the Standard Contract as being inconsistent with the NWPA, but opted not to do so. PFOF 64-65. Adjudication of Progress Energy's claim – and this Court's jurisdiction – is necessarily limited to consideration of what the Standard Contract (and not some other authority) actually requires.

assumption of a 3,000 MTU rate. This reliance is misplaced. As an initial matter, DOE expressly rejected the idea of obligating itself to any particular rate of acceptance at the time of contract formation because of the uncertainties in developing a program 15 years in the future. PFOF 51-52. By relying upon documents relating to fee adequacy, Progress Energy would have the Court admit through the back door precisely the proposed obligation upon which DOE closed the front door during the contract formation process. There is no reason why DOE's plans for the program should be converted into obligations simply because they were employed by DOE in connection with DOE's financial planning analyses.

Second, the purpose of the total system life cycle cost analyses that DOE developed was to determine the cost for the entire waste acceptance program, rather than the cost associated with a particular rate of acceptance. PFOF 150. The financial planning documents that DOE generated did not uniformly utilize a 3,000 MTU rate. As a result, even when DOE changed its acceptance rate assumptions to account for performance at an MRS rather than a repository, the total projected system cost did not vary greatly and the per-kilowatt-hour fee did not change, thus belying plaintiffs' assertion that they were paying for a particular rate. PFOF 149-51.

In the end, the fee-related documents upon which plaintiffs rely focus solely upon how much it would cost to store tens of thousands of tons of ultrahazardous radioactive waste for tens of thousands of years. The initial rate at which DOE assumed, solely for purposes of calculating the total cost of the program, that it would accept spent fuel into this facility simply has no bearing upon its obligations pursuant to the contract between the parties.

3. The Rate Of Acceptance Should Be Determined In Accordance With The APR/ACR Process Mandated By The Standard Contract, In Which Plaintiffs Willingly Participated

a. The Parties Agreed That The APR/ACR Process Would Define The Rate

Although plaintiffs ask the Court to import into the Standard Contract an obligation for DOE to accept 3,000 MTU of SNF every year soon after 1998, to do so, the Court would have to ignore the actual language of the Standard Contract. That language, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). PFOF 58.

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract recognizes the uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule mechanism seeks to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." PFOF 47. Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" for receipt

of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." PFOF 16.

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. PFOF 16-20 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id.

DOE and the utilities acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. As established at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTU of SNF for storage at an MRS prior to the operation of a Federal repository. PFOF 140; 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010. PFOF 131, 141.

Plaintiffs suggested at trial that the rates contained in the 1991 ACR reflect a "minimalist" interpretation of DOE's obligations under the Standard Contract or, alternately, were prohibited

by the 1987 NWPA Amendments Act because they violated the statutory "linkage" that prevented construction of the MRS facility prior to the issuance of a license for the construction of a repository. See 42 U.S.C. § 10168(d)(1) . These arguments are unavailing. First, when it promulgated the 1991 ACR, DOE was aware that a repository would not be ready by 1998 and, instead, was making a good faith effort to secure performance at an MRS. Far from seeking to manipulate its obligations under the Standard Contract, DOE promulgated the rates contained in the 1991 ACR as part of its plan to begin performance at a repository in 1998 at the highest rate that existing law would permit. As the evidence demonstrated, and as DOE publicly explained, DOE believed that the best strategy for finding a party to host an MRS would be to leave the linkages in place, thereby alleviating concern from a potential host that the MRS would become a de facto repository. PFOF 125. Once a repository host was located, DOE intended to seek congressional authorization to lift the construction linkage, a change in law that DOE believed would be easier to obtain after an MRS host had been located. PFOF 130. This change in the law is just one of several ways that the performance world would have differed from the world that exists today. However, it does not make DOE's plan "illegal" or demonstrate that the agency somehow acted in bad faith.

Further, Progress Energy ignores the fact that its own assumptions about DOE performance, as proposed in the draft mission plan upon which it so heavily relies, would itself require congressional authorization for a second repository. Like the modification of the construction linkage, such authorization would have required congressional approval. PFOF 78(g). Progress Energy cannot be heard to complain that the Government's conception of the

performance world is "illegal" when the world that it seeks to depict would likewise have required legislative action.

In PG&E, the Court explained that plaintiffs' interpretation of the Standard Contract does not merely supplement its text and cannot be harmonized with it:

> If the court were to insert a firm acceptance rate obligation of 3,000 MTU/year in the Standard Contract, or if it were the understanding of the parties that the Standard Contract continued a firm acceptance rate obligation that the court should somehow enforce, then the ACR provision would be rendered "inexplicable, inoperative . . . , insignificant, meaningless, [or] superfluous." If there existed a firm acceptance rate obligation, there would be no need to "project[ ]" the "annual receiving capacity for the DOE facility" and update such projections annually.

PG&E, 73 Fed. Cl. at 387 (citations omitted). The same conclusion applies in this case (and in every other spent nuclear fuel case). To accept plaintiffs' interpretation is to ignore the mechanism in the Standard Contract for determining the sequence and timing of fuel acceptance and to write a contract to which the parties simply did not agree.

b. Plaintiffs Voluntarily Participated In The APR/ACR Process And Voiced Concerns To DOE When They Had Them About DOE's Administration Of The Standard Contract

If plaintiffs truly held the understanding of the Standard Contract that they espoused at trial, one would expect to see evidence of their having objected to conduct by DOE that was fundamentally at odds with that understanding. However, the evidence adduced at trial indicates that precisely the opposite is true. When it had a concern with the Standard Contract or believed there was information that it believed DOE should know, CP&L notified DOE. Yet, the record indicates that, when it was informed of its allocations and of the rate of acceptance that DOE was

proposing, CP&L stayed silent. The incongruity of this conduct only serves to confirm that CP&L never held the understanding of the rate of acceptance that it advanced at trial.

Beginning in 1991, Progress Energy had all of the information that it needed to begin submitting DCSs to DOE and begin the process of scheduling deliveries of spent fuel to DOE. Although Mr. Kunita claims to have understood that DOE was obligated to accept "batch wise" quantities from DOE, he understood from the outset that, by application of the 900 MTU rate published in the 1991 ACR, CP&L had no allocations during the first year of the waste management program, a year during which the company was scheduled to discharge spent fuel. PFOF 86, 161-63. Mr. Kunita even studied the instructions for completing a DCS carefully enough to communicate to DOE his belief that the certification on the DCS form that utilities were required to complete required Progress Energy to provide unnecessary information. PFOF 167-68. When he sent DCSs and other communications to DOE, he frequently provided the contracting officer with information that he believed DOE would find useful or would be necessary to avoid any misunderstandings. PFOF 156, 167-68, 179-80. Yet neither Mr. Kunita nor anyone at CP&L even raised an eyebrow when they learned, via publication of the 1991 ACR, that DOE was adopting a rate of acceptance that would require CP&L to make tens of millions of dollars more in expenditures on the storage of spent fuel than the company claims to have anticipated.

Similarly, CP&L and FPC dutifully submitted DCSs to DOE in accordance with DOE's instructions, never once complaining that the rates or allocations contained in the 1991 ACR were inconsistent with DOE's obligations under the Standard Contract or invoking the Disputes Clause of the Standard Contract. PFOF 170, 178, 188. Even when DOE suspended the DCS process in

1996, CP&L sent DOE a reservation of rights that made no mention about the rates at which DOE would be accepting fuel and, instead, claimed that it was inappropriate for DOE to deviate from "the procedures of Article V.B [of the Standard Contract] with respect to approval or disapproval of [its] Delivery Commitment Schedule." PFOF 186-87. Rather than objecting to a DCS process that was premised upon the acceptance of fuel at the 900 MTU rate, CP&L cried foul because that very process had been discontinued.

The facts that plaintiffs had an open line of communication with DOE, did not object to the rates promulgated during the ACR/APR process, and were active and willing participants in that process is proof positive that the rate contained in the 1991 ACR was well within the parameters of plaintiffs' understanding of DOE's obligations under the Standard Contract. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Plaintiffs' willing participation in the DCS process is yet another reason to reject their attempt to import an extra-contractual rate of acceptance into the Standard Contract.

4. The Court Should Not Impose A "Reasonable" Rate Of Acceptance

a. The Parties Reached An Agreement Concerning The Manner In Which Rate Is To Be Calculated

Despite the unrefuted evidence that DOE specifically considered – and rejected – the requests of various interested parties, including plaintiffs, that DOE obligate itself contractually to satisfy qualitative acceptance rate standards, plaintiffs contend that the Court should determine a "reasonable" acceptance rate based upon those proposed standards because the acceptance rate is an "omitted" term. This argument is misguided.

We agree that, in appropriate circumstances, if a term of a contract "which is essential to a determination of [the parties'] rights and duties" has been omitted from a contract, "a term which is reasonable in the circumstances may be supplied by the court." Restatement (Second) of Contracts § 204 (1981). However, an "omission" occurs where "[t]he parties to an agreement . . . entirely fail to foresee the situation which later arises and gives rise to a dispute" or whether they "have expectations but fail to manifest them either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse." Id. § 204 cmt. b. "Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention" when negotiating the contract. Id. § 204 cmt. d.

In this case, none of these circumstances described in Restatement (Second) of Contracts § 204 is present. As the evidence in this case demonstrated, and as this Court found in PG&E, the acceptance rate was a contentious and important issue carefully considered by all parties involved in the nuclear industry. PFOF 24-31, 47-57; accord PG&E, 73 Fed. Cl. at 339. As a result, it cannot plausibly be argued that the parties failed to foresee the situation that later arose and gave rise to the dispute, or that any other of the circumstances identified in the Restatement for imposing a reasonable term are applicable. Simply stated, the parties squarely considered, and reached resolution upon, the method by which the rate of acceptance would be determined. To insert a "reasonable" term would render superfluous the terms upon which the parties did agree. PG&E, 73 Fed. Cl. at 387.

Plaintiffs' reliance upon the Court of Claims' decision in David Nassif Assocs. v. United States, 557 F.2d 249 (Ct. Cl. 1977), is, for this reason, misplaced. Nassif is plainly distinguishable because, in that case, the parties never considered the term that the Court was required to insert. Id. at 258. By contrast, and as the Court explained in PG&E, in this case, "DOE specifically chose not to obligate itself to a firm acceptance rate, and [] all parties to the Standard Contract recognized that choice, even if they had hoped a rate would be specifically provided for." PG&E, 73 Fed. Cl. at 382. DOE placed into the final version of the Standard Contract the contractual mechanism by which acceptance allocations would be determined – namely, the 1991 ACR/APR. It simply cannot be said that the parties, through "oversight," did not think about the rate during contract formation. To the contrary, the Court's imposition of its own rate would create a contract that the parties did not create themselves.[12]

b. The Rate That Plaintiffs Advocate Does Not Satisfy Their Own Criteria

Plaintiffs asserted at trial that the Court should accept 3,000 MTU rate of acceptance because it is "reasonable." Presumably, they have selected this number because it comports with some of the planning documents that DOE generated in the early phases of the waste management program and, thus, appears to cloak their theory with legitimacy. However, plaintiffs never account for the fact that this rate, although undeniably higher than a 900 MTU rate, does not achieve the goal of eliminating the need for expenditures upon additional at-reactor storage after 1998. Plaintiffs themselves acknowledge the need, at the 3,000 MTU rate, not only to perform a

[12] As we explained at pages 52-54 of our memorandum of contentions of fact and law dated October 10, 2007, eschewing the schedule provisions of the Standard Contract and the submitted DCSs as the source of the parties' obligations in this case in favor of a "reasonable" schedule term would effectively render the Standard Contract too indefinite to enforce.

rerack at one of spent fuel pools at the Harris plant, the cost of which exceeds $1 million, but also the need to transship 782 assemblies to the Harris plant (the cost of which, using plaintiffs' own methodology, approaches $7 million) see PFOF 205. Further, plaintiffs were in possession of a comprehensive study (the $6,350 cost of which is even included in their claim for damages), indicating that the rate that they advocate would have required the construction of as much as 2,400 MTU of dry fuel storage. PPF 208. Simply stated, the rate that plaintiffs propose not only is not contained in the Standard Contract, but does not even satisfy the qualitative test that they have proposed because it requires both Progress Energy and utilities nationwide to make millions of dollars in expenditures to store fuel after January 31, 1998. Thus, even if plaintiffs' request that the Court insert a "reasonable" rate of acceptance into the Standard Contract were appropriate, it is evident that they have failed to carry their burden of providing a rate that conforms to their own standard.

### C. Assuming *Arguendo* That The Standard Contract Requires The Qualitative Rate That Plaintiffs Advocate, Plaintiffs Have Failed To Offer Competent Proof Of The Actions They Would Have Taken Had DOE Accepted Fuel At Such A Rate Beginning in 1998

#### 1. Plaintiffs Have Failed To Provide Proof Of The Actions They Would Have Taken At The *Minimum* Rate That They Acknowledge Was Reasonable

Plaintiffs acknowledged in their pretrial brief that a steady-state acceptance rate of at least 2,000 MTU per year would satisfy DOE's obligations under the Standard Contract because it would meet the industry-wide generation rate, Pl. Pretrial Br. at 42; PFOF 114. However, Progress Energy presented no evidence as to the actions it would have taken at such a rate. In fact, the company never analyzed its damages at this rate, except for a "high-level" analysis (the

results of which have never been provided to the Government and, were, apparently, withheld as work product). PFOF 209-10. According to Mr. Edwards, this high-level analysis does not even enable plaintiffs to determine how much, if any, of the approximately $17 million in transhipment costs that Progress Energy seeks in this litigation would be recoverable at the 2,000 MTU rate. PFOF 211. Because plaintiffs have not made a prima facie showing of the damages to which they would be entitled at the baseline rate that they concede would satisfy DOE's obligations, the Court should assess damages, if any, based solely upon the damages calculated at the 900 MTU rate – the only rate at or below the Government's baseline obligation for which plaintiffs have presented any competent evidence of damages.

2. Plaintiffs' 3,000 MTU Model Lacks An Evidentiary Foundation

In an attempt to establish their damages at the 3,000 MTU rate, plaintiffs rely upon PX 137, their so-called "causation spreadsheet." The primary sponsoring witness for this spreadsheet was a Progress Energy civil engineer, Wayne Worthington. The purported intent behind the spreadsheet was to show what actions Progress Energy would have taken at the 3,000 MTU rate, and to thereby establish which of the activities Progress Energy claims as damages in this litigation would not have been necessary at that rate. The fundamental flaw in plaintiffs' chosen method for proving causation is the lack of personal knowledge on the part of Mr. Worthington, who prepared the spreadsheet and testified at trial regarding it. See Fed. R. Evid. 602 (witness testimony must be based on personal knowledge). Because the causation model was not based on Mr. Worthington's personal knowledge and experience as an employee of Progress Energy, it cannot properly serve as the foundation for plaintiffs' claims against the Government. See Lifewise Master Funding v. Telebank, 374 F.3d 917, 929-30 (10th Cir. 2004) (holding that

president of plaintiff company could not testify regarding damages model that was not based on his personal knowledge and experience at the company).

Mr. Worthington candidly admitted at trial that, because he was not involved in spent fuel management during the relevant time period, he does not know what activities Progress Energy would or would not have undertaken had DOE begun removing fuel at a 3,000 MTU rate beginning in 1998. PFOF 197-99. He also admitted that he does not know who at Progress Energy would be able to answer that question. PFOF 199. His testimony as to what the company would have done had DOE come in 1998 at a 3,000 MTU rate is therefore entirely speculative and does not meet Progress Energy's burden of proof on the issue of causation. Nevada Power Co. v. Monanto Co., 891 F. Supp. 1406, 1415 (D. Nev. 1995) ("[S]peculative testimony about how another might have acted without personal knowledge is not admissible as evidence") (citing Fed. R. Evid. 602). The Court should therefore disregard Mr. Worthington's causation spreadsheet and any calculation of damages based upon this spreadsheet in assessing whether plaintiffs have met their burden of establishing damages at the 3,000 MTU rate.

D. Plaintiffs Have Failed To Demonstrate That DOE Acted In Bad Faith

Progress Energy also suggested at trial that DOE's suspension of the DCS process is evidence of bad faith and that, for that reason, the Court should disregard the mechanism for identifying the rate contained in the Standard Contract.[13] This argument is unavailing.

---

[13] To the extent that Progress Energy's assertion of bad faith rests upon its allegation that the rates contained in the 1991 ACR are the product of bad faith, we rely upon our discussion, supra, of the reasons that DOE opted to pursue an MRS, as expressly contemplated by the NWPA and the Standard Contract, and DOE's recognition that the rate at which it could accept fuel at an MRS was necessarily constrained by fears that the MRS would become a de facto repository. We also note, as discussed above, that, if Progress Energy truly believed that DOE

(continued...)

First, DOE's conduct in 1996 has no bearing upon the legitimacy of the rates promulgated in 1991, and provides no reason to deviate from what the contract actually requires. As we established at trial, DOE suspended the DCS process in 1996 after it determined that it would be unable to meet its contractual obligation to begin accepting spent fuel in 1998. PFOF 183. This suspension simply shows that DOE viewed the DCS process as creating binding commitments and reflects the realization that it would not be able to begin performing under the terms of the Standard Contract. As Mr. Zabransky explained at trial, it made no sense for DOE to continue to commit itself to performance that it could not meet. PFOF 183. The suspension of the DCS process years after the contractual mechanism was set (in the Standard Contract) and put into place (through promulgation of the 1991 ACR) in no way detracts from the use of the contractually prescribed method for identifying the "but for" world. That DOE recognized that it would not be able to timely perform the Standard Contract years after the document was executed does not mean that the mechanism which the contract sets for ascertaining the rate of acceptance should be disregarded.

Second, to establish bad faith on the part of Government officials, a plaintiff must establish by a clear and convincing evidence that the Government was acting with malice towards plaintiff with the intention to harm it. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002). Progress Energy did not come close to meeting that standard in this matter. Far from acting in bad faith with the intent of harming Progress Energy, DOE suspended

[13](...continued)
had acted in bad faith in promulgating the 1991 ACR, one would expect to see at least some contemporaneous evidence of Progress Energy's disagreement with DOE's approach. No such evidence was presented at trial, and none, apparently, exists. PFOF 167-69, 173, 178.

the DCS process because it recognized that it could not meet its obligations and that continuing with the DCS process would require the Government to incur obligations that it could not perform. Indeed, contrary to plaintiffs' contention, DOE acted in good faith by informing all Standard Contract holders when it determined that it could not make any promises regarding acceptance. PFOF 185. In any event, were Progress Energy to establish some kind of bad faith, it would, at best, mean that Progress Energy might argue that the contract has no schedule. Yet, such an argument would simply render the contract too indefinite to enforce. It would not mean that Progress Energy is somehow entitled to select any schedule that it unilaterally chooses to impose or, worse yet, impose upon the Government a schedule that DOE expressly rejected at the time of contract formation.

In short, DOE's failure to perform in a timely manner in no way undermines the mountain of evidence indicating that, years prior to the suspension of the DCS process, DOE promulgated the 1991 ACR in accordance with the terms of the Standard Contract and that CP&L and FPC participated in the DCS process without objection or qualification. Progress Energy has simply offered no basis for deviating from the plain text of the Standard Contract to identify the rate of acceptance in the "but for" world.

## II. PLAINTIFFS' CLAIM FOR DAMAGES INCLUDES MANY EXPENDITURES THAT WERE NOT CAUSED BY DOE'S DELAY IN ACCEPTING SPENT FUEL OR ARE OTHERWISE NOT RECOVERABLE

Set forth below is a description of the individual adjustments to plaintiffs' damages claim that we believe are warranted. We address each adjustment below and, as part of our discussion of each issue, include the effect on damages traceable to that issue.

A. Activation Of Spent Fuel Pools "C" And "D" At CP&L's Harris Plant

Whether the cost of activating pools "C" and "D" at Harris is traceable to the delay in DOE's performance depends upon what was required of DOE pursuant to the Standard Contract. At a 3,000 MTU rate, CP&L asserts that it would not have been required to activate these pools. However, CP&L acknowledges that, had the Government performed at the rate contained in the 1991 ACR (the 900 MTU rate), the company would have been required to activate them. Resolution of whether plaintiffs are entitled to the cost of activating the pools therefore requires, in the first instance, a determination of a rate of acceptance under the Standard Contract. If the Court adopts the 900 MTU rate, plaintiffs will have failed to show that the costs of "C" and "D" pool activation would not have been incurred irrespective of a breach, and the costs, therefore, will not be recoverable.

Assuming that the Court adopts the 900 MTU rate, two additional issues remain with respect to the activation of the "C" and "D" pools at Harris. The first issue concerns the propriety of a damage reduction for the PWR racks that both parties agree would need to be installed in the "C" pool at the 900 MTU rate. Plaintiffs acknowledge that, at the 900 MTU rate of acceptance, they would have been required to install a complement of four BWR racks in the "C" pool. DX 329 at CP_FP00195560 n.4 & 5. For this reason, they have reduced their damage claim at the 900 MTU rate to account for the cost of this installation. Plaintiffs' own analysis also concludes, however, that six additional PWR racks would be needed at the 900 MTU rate, PFOF 233, 236, yet they have failed to make any adjustment for the cost of placing these six racks into use.

Progress Energy contends that, at the 900 MTU rate, it should only be responsible for the cost of installing one of the six racks because the remaining five racks, although ultimately

necessary, would not have to be installed until after some point after December 31, 2005, the close of the damages period in this case.[14] This argument is contrary to basic principles of causation. The company's assertion that it would not need these five racks until after the close of the damages period does not mean that CP&L should be able to recover their costs as damages. Rather, it constitutes an admission that these racks would ultimately have been purchased irrespective of any partial breach by DOE.

In Indiana Michigan, the Federal Circuit limited a spent nuclear fuel plaintiff's damages to those incurred prior to the date of suit, reasoning that, "[b]ecause of its highly speculative nature, a claimant may not recover, at the time of the first suit for partial breach, prospective damages for anticipated future nonperformance resulting from the same partial breach." 422 F.3d at 1376-77. This limitation refers only to costs incurred prior to the date of suit, and does not prevent the Government from arguing that costs that are incurred in the actual world before the damage period but that, in the "but for" world, would be incurred after the damages period should not be recoverable as damages. Indeed, such a limitation would contravene the very purpose of the limitation imposed by the Federal Circuit – that future nonperformance is speculative in nature. Here, the need to install five additional racks in the "C" pool at Harris after 2005 is anything but speculative. Indeed, Progress Energy prepared a detailed analysis in response to the Government's Rule 30(b)(6) deposition notice acknowledging that, at the 900 MTU rate, CP&L would be required to install these racks. Plaintiffs installed 14 racks in the "C" pool in the actual

[14] As a factual matter, CP&L's suggestion that it would have purchased these five racks only in the years in which they were required, and thus after December 31, 2005, is dubious. The terms of CP&L's contract with its vendor only entitled CP&L to a discount for purchases made in bulk. DX 145 at CP_FP000021117.

world for which they seek damages and acknowledge that they would have been required to install a total of 10 racks (four BWR racks and six PWR racks) had DOE begun accepting fuel in 1998 at the 900 MTU rate. It follows that, at the 900 MTU rate, only four of the 14 racks are incremental to DOE's delay and that the cost of installing all six of the racks in question must be deducted from plaintiffs' damages claim.

The second issue related to pool activation relates to the need to install a single rack in the "B" pool at the 900 MTU rate. Central to this issue is the discrepancy between the testimony that Progress Energy offered with respect to this issue pursuant to a Rule 30(b)(6) deposition and the testimony that it offered at trial. As an initial matter, we note that our technical expert, Gregory Maret, opined that the installation of this rack would be necessary at the 900 MTU rate because, without it, there would be insufficient space to store the spent fuel in CP&L's possession. PFOF 230. Although Steven Edwards testified that he no longer believed that the cost of this rack would be incurred at the 900 MTU rate, Edwards, Tr. 369:12-370:11, he failed to offer any explanation of where the company would store the fuel that this rack would be required to hold.

Moreover, Progress Energy has offered no explanation as to why it should not be bound by the testimony about the need for this rack that it provided pursuant to the Rule 30(b)(6) deposition notice issued by the Government regarding the steps the company would take to manage spent fuel had DOE accepted fuel at the 900 MTU rate. PFOF 231. RCFC 30(b)(6) obligates a corporate party to provide a person who will be able to "give complete, knowledgeable and binding answers" on its behalf, Dairyland Power Co-op v. United States, No. 04-106, 2007 WL 4208799 (Fed. Cl. Nov. 20. 2007) (emphasis added); see Rainey v. American Forest & Paper Ass'n, Inc., 26 F. Supp. 2d 82, 9496 (D.D.C. 1998) (declining to consider affidavit submitted in

opposition to motion for summary judgment that materially contradicted testimony provided by witness produced pursuant to Fed. R. Civ. P. 30(b)(6)). At trial in this case, Mr. Edwards provided testimony that directly contradicts the sworn testimony that the company provided (through Mr. Edwards himself) at its own deposition. At a minimum, Mr. Edwards's trial testimony should be afforded little or no weight.[15]

In sum, plaintiffs concede that, at the 900 MTU rate, their damages should be reduced by $21,581,983, for the costs that they would have to incur associated with the activation of the "C" and "D" pools, including four racks.[16] Plaintiffs further concede that, at the 900 MTU rate, their damages should be reduced by the cost of one of the six additional PWR racks that would need to be installed in the "C" pool. We believe that the proper adjustment at the 900 rate is the sum of (a) $21,581,983 that plaintiffs concede; (b) the cost of all six of the additional required racks, or $2,296,806; (c) $227,520, representing the cost of the installation of a BWR rack in the "B" pool at Harris; and (d) removal of the $1,087,020 rerack credit that CP&L included at the 3,000 MTU rate but that would not be required at the 900 MTU rate. The total amount of this adjustment is $23,019,029.

---

[15] As we explained at trial, in objecting to Mr. Edwards testimony on this subject, we attempted to depose Mr. Edwards about the steps that the company would have taken at the 900 MTU rate. It was because of the complexity of this issue that, at the suggestion of Progress Energy's counsel, the Government agreed to reserve these questions for a Rule 30(b)(6) deposition. Edwards, Tr. 372:6-24. Having used the prospect of a Rule 30(b)(6) deposition to prevent Mr. Edwards from having to testify in his deposition about what the company would have done at the 900 MTU rate, Progress Energy should not be permitted to introduce a new theory that contradicts the testimony that Mr. Edwards provided about this very subject as the company's designated representative.

[16] This sum includes the cost of the disposal of unused racks and crud and the "C" and "D" pool licensing and communications expenses, as discussed in the next two sections. The Court need only consider those items independently if it adopts plaintiffs' 3,000 MTU rate.

B. Disposal Of Unused Racks And Crud

As described above, there is no dispute that the cost of removing unused racks and crud would have been required at the 900 MTU rate. However, if the Court adopts a 3,000 MTU rate, the evidence adduced at trial would still compel the conclusion that these costs should be deducted from Progress Energy's claim. Mr. Maret, who has extensive experience in nuclear power plant operations, provided expert testimony that, regardless of the rate of acceptance, the same cleanup and disposal activities would be required upon the decommissioning of the Harris plant and that these activities and the associated costs would be the same at the time of decommissioning as they are today. PFOF 240-41, 245, 248. Mr. Edwards, who testified about rack disposal for CP&L but did not dispute this assertion, did not supply any competing estimate of the costs of disposing of the racks or crud at decommissioning, and acknowledged that he did not know whether the method employed to dispose of the racks in the actual world would be different than the method that would have been used upon decommissioning. PFOF 246. Because these costs would be incurred irrespective of any breach, they are not recoverable in this case and a deduction of $802,275 is warranted.[17]

C. Harris "C" And "D" Pool Licensing And Communications Expenses

Plaintiffs contend that they are entitled to the cost of legal and communications expenses expended in connection with an intervenor's challenge to CP&L's application for regulatory approval to activate the "C" and "D" pools at Harris. Plaintiffs concede that these expenses

---

[17] This amount consists of the sum of $627,639, representing the sum of the costs for crud and sludge cleanup, and $174,636, representing the cost CP&L incurred for unused rack disposal. PFOF 242, 248. As described supra note 3, this adjustment is already been included within the adjustment for the cost of "C" and "D" pool activation at the 900 MTU rate.

would not have been incurred at the 900 MTU rate, and these costs ($1,901,788) already have been deducted within the adjustment, the 900 MTU rate, for the "C" and "D" pool activation.

Even if the Court were to adopt a 3,000 MTU rate of acceptance, however, the testimony was undisputed that the costs for which plaintiffs seek recovery were necessitated solely by the actions of a third-party intervenor in the proceedings that CP&L initiated to obtain permission to activate the "C" and "D" pools at Harris. PFOF 249. These expenditures, which would not have been necessary in the absence of actions by an intervening agent, are, by definition, not a direct result of DOE's delay in performance and, for the reasons we explained at pages 63-65 of our memorandum of contentions of fact and law dated October 10, 2007, are not recoverable in this case. See generally Myerle v. United States, 33 Ct. Cl. 1, 27 (1897); Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999).

D. Upgrade To The Harris Component Cooling Water System

Contemporaneously with its activation of the "C" and "D" pools, CP&L upgraded the component cooling water ("CCW") system at its Harris plant by installing new pump impellers. Although Progress Energy now seeks to recover the costs of this project, it failed to meet its burden of establishing that these actions would not have been undertaken irrespective of any partial breach by DOE. To award Progress Energy the cost of performing this work absent a showing that it would not have been performed had no breach occurred is to place it in a better position than it would have occupied absent any breach by DOE.

In fact, rather than showing that the work would not have been performed absent a breach by DOE, the evidence showed precisely the opposite – that the work was necessary for reasons wholly unrelated to DOE performance. As was explained at trial by the Government's expert,

Gregory Maret, the CCW upgrade claimed by Progress Energy would have been required, regardless of the rate at which DOE accepted SNF from Progress Energy, to accommodate the increased heat demands from Progress Energy's power uprate – a project totally unrelated to DOE acceptance of SNF. PFOF 252. As Mr. Maret described, the NRC required that Progress Energy upgrade its CCW pump impellers to operate the plant at a higher power level, without regard to any increased heat load in the Harris C&D pools above the original 1.0 MBTU per hour limit. PFOF 293. The need to replace the pump impellers to effectuate the power uprate is borne out by plaintiffs' own contemporaneous engineering and procurement documents, which show that the pump impellers were replaced as part of the power uprate project, and that the new impellers were necessary to accommodate the higher heat loads resulting from the same. PFOF 267-71, 287-89; 291-96.

Importantly, Mr. Tibbitts, the main Progress Energy witness with respect to this issue, acknowledged that he never analyzed the critical issue with respect to causation – whether the CCW upgrades would have been required in the absence of the activation of the "C" and "D" pools. PFOF 298-99. The most that he could say at trial was that it was "not necessarily" the case that the CCW pump impellers would have to be replaced to support the power uprate and steam generator replacement. PFOF 300. This statement falls far short of meeting plaintiffs' burden to show that the cost of upgrading the CCW impellers would not have been incurred "irrespective of DOE's partial breach." Indiana Michigan, 422 F.3d at 1376.

Putting aside that plaintiffs have failed to meet their burden on this issue, they have also failed to account for and deduct the cost of other measures that hypothetically might have been taken to accommodate the increased heat loads from the CCW system. PFOF 301-03. Awarding

plaintiffs the cost of the CCW upgrade without proving an offset for the cost of these alternative measures would result in a windfall to Progress Energy. At a minimum, plaintiffs' failure to demonstrate the cost of the alternatives that they would have needed to pursue compels the conclusion that they have failed to demonstrate the harm that they have suffered from having to perform the CCW upgrade with reasonable certainty.

Finally, even though plaintiffs have included the costs of the CCW upgrade in their claim for damages at both the 900 MTU and 3,000 MTU rates, Mr. Edwards conceded at trial that the CCW upgrade would eventually be needed at the 900 MTU rate. The sole justification for the inclusion of these costs in the claim at the 900 MTU rate is that the costs would purportedly not have been incurred until after December 31, 2005, the date of the damages cut-off in this lawsuit. For the reasons discussed in connection with the installation of racks in the "C" pool at Harris, this is not a proper basis for including these costs in their current claim. The fundamental issue of causation is not governed by the timing of plaintiffs' claim for partial breach.

In sum, plaintiffs should not be entitled to recover the $1,166,640 in costs that they have incurred to the CCW system at the Harris plant. Accordingly, deduction of this amount from the calculation of damages at both the 900 and 3,000 MTU rate scenarios is warranted. Johnson, Tr. 1981:10-1982:18; DX 304; DX-D5 at 21.

E. Rerack At Crystal River

Like its claim for reimbursement for the expenses of upgrading its CCW system, Progress Energy's claim for the cost of reracking the spent fuel pool at Crystal River fails because the company failed to meet its burden of establishing that this work would not have occurred in the absence of any partial breach by DOE. Once again, reimbursing Progress Energy for work that it

would have performed absent any breach by DOE would not restore Progress Energy to the place that it would have occupied. It would place the company in a better position.

Progress Energy concluded in the late 1990s that reracking the spent fuel at the Crystal River plant was the "optimal" solution to the problems caused by Boraflex degradation. PFOF 326-28. This is because, unlike the other potential alternatives that it now claims it would have pursued, reracking not only addressed the problems of silica contamination and criticality, but also provided a permanent, as opposed to a "band-aid," solution. PFOF 348, 356-57. The only reason that FPC ever expressed ambivalence about reracking was the concern that the solution might cost as much as $8 million and, therefore, was not cost-effective. PFOF 329-30.

Any concerns about the high cost of a rerack disappeared as a result of FPC's negotiations with Westinghouse. Ultimately, the company was able to negotiate the price of a rerack down to $3.2 million, a discount of approximately $1 million from Westinghouse's regular price for these cells. PFOF 384. The price was agreed upon as a result of negotiations stemming from FPC's complaints about the degradation of the original Boraflex racks that Westinghouse had provided. PFOF 385. In the words of Thomas Lehmann, the employee at FPC who was responsible for the team that analyzed the alternatives available to the company to address the problems created by Boraflex degradation, the "optimal" solution of reracking the spent fuel had become cost-effective. PFOF 386.

Progress Energy suggested at trial that the motivating factor for FPC's decision to perform a rerack was the need for space in the spent fuel pool, triggered by DOE's delay in acceptance. It asserts that it engaged in the rerack project primarily because the rerack enabled it, in light of DOE's delay, to maintain full-core reserve through the end of its operating license. It further

contends that, absent DOE's breach, it would have pursued other alternative solutions to address the problems created by Boraflex degradation in its spent fuel pool. Its arguments fail for several reasons.

First, the amount of space that the company believed it would obtain when it made the decision was not 117 cells. Rather, it was only 64 cells, an amount that would only enable the company to maintain full-core reserve through 2013, three years before license expiration. PFOF 376-77, 387. Operating for three years without full core reserve was both inconsistent with the company's spent fuel management policy (in that it could have jeopardized the safety of the plant and could have jeopardized its revenue-generating capacity) and would have delayed the process of decommissioning. PFOF 379-83. The fact that FPC decided to install new racks would did not provided it with enough space to enable it to operate in accordance with its own spent fuel management policy belies the company's conclusion that it decided to perform the rerack to address its need for space.

Contemporaneous documentation also provides objective proof of the relative (un)importance that FPC assigned to the gain in space when approval was sought for the project. Indeed, even after Mr. Lehmann assigned an inflated score to the category corresponding to the increase in space to be attained by the rerack, only six of the 28 points that the project received on the scoresheet contained in the approval form submitted to management were attributable to that gain in space. PFOF 367-74. The other benefits of the project, including, most importantly, resolving the Boraflex degradation problem and "reduc[ing] the required maintenance, surveillances, operations, and other labor intensive tasks required to maintain cooling chemistry and the margin safety within the spent fuel systems and pools," provided the lion's share of the

basis for the justification provided to management for proceeding with the project. PFOF 372, 374. Progress Energy's assertions that these benefits were "secondary" are, to say the least, unsustainable.

Second, the alternatives that Progress Energy now claims it would have pursued were both inferior and would themselves have resulted in substantial expenditures (the cost of which Progress Energy has not attempted to calculate). FPC contended at trial that it would have pursued reverse osmosis to address the problem of silica contamination and further claims that it would have taken credit for soluble boron to address the fact that the Boraflex was not performing the neutron-absorbing function for which it was designed. However, in 1999, when FPC identified reverse osmosis as a potential solution to management, it informed management that this solution would not only cost approximately $2 million, but would be the most complicated to implement. PFOF 343. [18] Further, in addition to requiring constant monitoring and thus providing only a band-aid solution to the silica contamination problem, reverse osmosis could potentially have the effect of increasing the rate of Boraflex degradation, ultimately making the problem worse. PFOF 349.

The testimony was also undisputed that, even if implemented, reverse osmosis would not have addressed the criticality concerns created by Boraflex degradation. PFOF 344. FPC recognized in 1999 that taking credit for soluble boron was not a viable solution, and Progress

---

[18] FPC did not even present to management the form of reverse osmosis that it now contends it would implement, whereby machinery would be rented, ostensibly at smaller cost to the company (but certainly not, as Progress Energy would now apparently have it, for free). PFOF 346.

Energy presented no evidence at trial refuting its contemporaneous and unequivocal rejection of this alternative. PFOF 351-53. The only evidence adduced at trial of a viable solution, other than reracking, for controlling criticality were the use of a "racksaver," a device that FPC estimated would cost $961,000 to install. PFOF 348-49.

Third, FPC's arguments concerning the alternatives that it would have pursued ignore the priorities with which nuclear utilities make decisions. As explained by Mr. Maret, the only witness with management-level experience to testify, nuclear utilities consider, first and foremost, which option is consistent with preserving the plant for its long-term safety and power generation mission and the risks that various choices present. PFOF 389. Viewing FPC's decision through the lens of these priorities, rather than simply by comparison of the price, Mr. Maret explained that it would not have made sense for Progress Energy to continue to try to solve the problems presented by Boraflex degradation through interim, temporary solutions and that only the long-term solution of reracking the pool would be consistent with the company's priorities. PFOF 391-92.

In short, Progress Energy failed to demonstrate that it would not have performed a rerack at its Crystal River plant in the absence of any partial breach. Even if it had met this burden, it also failed to calculate any offset for the substantial amount of costs that the company would have had to incur to address the "imperative" need to resolve serious problems caused by the degradation of its Boraflex racks. As a result, it failed to demonstrate with reasonable certainty the cost it incurred as a result of having to perform a rerack. Accordingly, removal of $4,675,392 from the plaintiffs' claim at both the 900- and 3,000-MTU acceptance scenarios is warranted. Johnson, Tr. at 1985:20-1986:13; DX-D5 at 26.

F. Railroad Track Maintenance Costs

Progress Energy's damage claim includes the cost of performing railroad track maintenance at CP&L's Robinson and Harris plants. However, Progress Energy has failed to account for the fact that, assuming DOE had begun accepting fuel from the nuclear industry in 1998, CP&L would have been required to maintain its railroad tracks (1) to accommodate its transshipment campaigns, which would continue until 2004 at the 900 MTU rate and until 2001 at the 3,000 MTU rate, PFOF 218, 221-22; and (2) to accommodate CP&L's preferred method for delivering casks to DOE by rail (a method that CP&L had used for its own transshipment campaigns and that it specifically included on all the DCSs it provided to DOE, for each of its plants), PFOF 224. Plaintiffs failed to prove that they would not have made any portion of their expenditures upon railroad track maintenance (and that they would have permitted the existing rail lines to deteriorate) if DOE had commenced accepting fuel in 1998. For this reason, the $260,037 in railroad track maintenance that is included in Progress Energy's claim is not recoverable at either the 900 or 3,000 MTU rates of acceptance.

G. Transshipments

Progress Energy acknowledged that, had DOE begun accepting fuel in 1998 at the 900 MTU rate, Progress Energy would have been required to perform 20 of the transshipments of spent fuel to its Harris plant that it performed in the actual world, and that the cost of these transshipments would not be recoverable at the 900 MTU rate. PFOF 219. For this reason, deduction of $5,861,740 from plaintiffs' claim for transshipment is warranted at the 900 MTU rate. PFOF 220.

H. Crane Upgrade

As is the case with respect to each element of its claim, Progress Energy bore the burden of proving that the upgrades which it made to its crane at the Robinson plant would not have been incurred absent any partial breach by DOE. However, with respect to certain crane studies that were performed on behalf of Progress Energy by three outside vendors, Mr. Worthington testified that the NRC's criteria for evaluating cranes had evolved over time, and that the analyses which were performed were needed to meet the NRC's current criteria for evaluating cranes. Worthington, Tr. 849:24-852:12. Although Progress Energy believed this work was necessary to meet the NRC's current criteria, no plausible explanation was offered as to why, in the absence of a dry fuel storage program and the lifting of a 110 ton cask, these same new NRC standards would not need to be met, even if Progress Energy were only lifting a 75-ton cask, for transshipments and/or DOE shipments. It follows that, at a minimum, removal from plaintiffs' damage claim of $368,121, reflecting the cost of studies needed to analyze the Robinson crane to this new criteria, is warranted. Johnson, Tr. 2011:16-2012:9; DX-D5 at 38.

I. Avoided Cost Of Loading Casks To DOE

We established at trial that, had DOE begun accepting fuel from DOE in 1998 at the 900 MTU rate, CP&L and FPC would have been required to load 132 casks through 2005, and that the cost associated with these loadings, based upon the labor costs that plaintiffs have employed in this case to compute their own cost to transship fuel, would be at least $4,427,726.[19] PFOF 414. Far from being unduly speculative, this amount represents the most conservative calculation of the

[19] At the 3,000 MTU rate, plaintiffs would be required to load 310 casks, at a total cost of $9,818,462. PFOF 415.

expenditures that would be required to support loading to DOE because it assumes the use of rail casks that would not have required the company to make expenditures upon plant modifications and, wherever possible, assumed the use of a rail cask that would require fewer loadings than a smaller-capacity truck cask. PFOF 405-07. The evidence was also undisputed that, in the actual world, Progress Energy has not been required to incur any of these costs to date. PFOF 397.

Plaintiffs have asserted that, although damages are measured by actual world expenditures less expenses that would have been incurred, these costs should not be included in the would-have-been column because the costs will ultimately be incurred (and thus included in the actual costs column). This argument is unavailing for several reasons.

First, it is not necessarily the case that Progress Energy will be required to incur anywhere near the same costs to load casks to DOE at a later date. In fact, Progress Energy's purchasing habits suggest otherwise. CP&L purchased and loaded for its dry storage facility canisters that are suitable not only for fuel storage, but also for fuel shipment, in apparent contemplation of being able to ship this fuel without having to insert it back into its spent fuel pool. PFOF 398-99. Fundamental fairness dictates that Progress Energy should not be permitted to seek reimbursement from the Government for the cost of placing fuel into a transportable canister and argue that the company will incur loading costs again because these canisters will not actually be transported.

Second, the evidence at trial demonstrated that, in the actual world, CP&L has expended in excess of $6 million to upgrade its Robinson facility so as to accommodate the loading of 100-ton casks to its dry storage facility. The Government is not contesting responsibility for the cost of this upgrade. However, because loading larger casks is more efficient than loading smaller

ones, the enhanced capacity of the Robinson facility will substantially reduce the loading costs that CP&L will incur in the future at the Robinson plant. For this reason, the cost of loading casks has not simply been deferred, as plaintiffs contend. It has been avoided in significant part and the effects of this avoidance should be reflected in the calculation of any damages.

Finally, if, as plaintiffs contend, they will incur costs in the future to load casks to DOE, that expenditure can be included in the calculation of damages in future litigation. However, if the Court does not award an offset at this time, there is no mechanism that guarantees the right of the Government to recover an offset in the future for costs that CP&L has unquestionably avoided. The Government's ability to require plaintiffs to account for its costs avoided should not be tied to plaintiffs' unilateral decision as to whether it should bring lawsuits in the future.

J. Internal Labor

Progress Energy cannot meet its burden of establishing causation with respect to certain costs associated with internal labor. Because these costs would have been incurred even if DOE had performed under the Standard Contract, they are not incremental to the partial breach and, therefore, not appropriately included as damages.

It is settled . . . that a [party] is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Thus, Progress Energy only may recover for labor performed by its employees to the extent that it can show that these labor costs represent an incremental cost to Progress Energy. See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked "but for" the delay); Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th

Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"); SMUD, 70 Fed. Cl. at 375-76 (rejecting claimed internal labor where SNF plaintiff failed to demonstrate that incurred labor costs were caused by Government's breach).[20]

As part of its claim, Progress Energy has included all $15 million of the internal labor costs that were billed to any damages-related projects. PFOF 416. However, as Mr. Johnson explained at trial, Progress Energy's damages claim includes approximately $2 million of labor costs that would have been incurred regardless of the DOE's delay in SNF acceptance. PFOF 428. Mr. Johnson concluded, based upon an analysis of a type that Progress Energy did not perform, that Progress Energy's computation of labor costs included labor charges for employees who spent a relatively minimal amount of time on damage-related projects. PFOF 423-27.

---

[20] In Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006), the Court referred to Convoy Co. v. Sperry Rand Corp., 672 F.2d 781 (9th Cir. 1982), and Dunn Appraisal Co. v. Honeywell Information Systems, Inc., 687 F.2d 877 (6th Cir. 1982), in considering the causation standard necessary for the recovery of internal labor. See TVA, 69 Fed. Cl. at 538. To the extent that these cases can be construed to obviate the requirement that a plaintiff demonstrate that the labor costs incurred would not have been incurred absent the wrongful act, they conflict with the prevailing law in this circuit. See Indiana Michigan, 422 F.3d at 1376. The same goes for the Court's decisions in Northern States Power Co. v. United States, 78 Fed. Cl. 449, 468 (2007), Southern Nuclear Operating Company v. United States, 77 Fed. Cl. 396, 442-743 (2007), appeal pending, No. 2008-5028 (Fed. Cir. docketed Jan. 14, 2008), and System Fuels, Inc. v. United States, 79 Fed. Cl. 37, 67 (2007), appeal pending, No. 2008-5025 (Fed. Cir. docketed Jan. 9, 2008), all of which rely upon the Court's decision in TVA with respect to internal labor, without conducting an independent analysis of whether the costs of the labor performed was incremental to the breach. The Government respectfully disagrees with the Court's decision in these cases and has appealed the decisions in Southern Nuclear and System Fuels.

Because reasonable companies generally staff their operations to handle a moderate amount of unexpected work, the salaries of full-time employees who are temporarily assigned to breach-related projects are costs that Progress Energy would have incurred in the normal course of its business, and do not constitute damages. PFOF 419, 422, 426.

Progress Energy, which bears the burden to prove that its internal labor costs are damages, made no effort to analyze its internal labor charges to prove that the charges were incremental to the DOE's delay. PFOF 420. Other than the conclusory and unsubstantiated statements from Mr. Edwards that Progress Energy does not operate at excess capacity and that some unnamed, unidentified individuals left the company when their work was complete, Progress Energy offered no justification for recovering the entirety of the $15 million it claimed in internal labor charges. Rather than seeking to exclude all of the internal labor charges in Progress Energy's claim upon the basis that Progress Energy has failed to meet its burden of proof, Mr. Johnson conducted an analysis designed merely to make a reasonable determination of what amount of those charges would have been incurred absent DOE's delay. As a result of this analysis, Mr. Johnson acknowledged that the vast majority of Progress Energy's internal labor costs, approximately $13 million, are properly included as damages at the 900 MTU rate. This amount includes charges for hourly labor and the salaries of Progress Energy employees who spent more than half their time working on breach-related projects. PFOF 427.

However, a portion of the claimed internal labor costs reflect salaries of individuals who, on average, performed only two hours of work on that project, an amount that, in the expert opinion of Mr. Johnson, would not cause the company to incur any measurable economic harm. PFOF 426. Progress Energy has not established that such a minimal amount of time spent

working on a damage-related project resulted in additional cost to the company, nor has Progress Energy established (or attempted to establish) that it suffered an opportunity cost because these employees were unable to work on other, non-breach related projects. PFOF 418, 421. Thus, $2,787,811 million in internal labor costs must be removed from Progress Energy's claim at the 900 MTU rate, a $4,383,222 million adjustment must be made for internal labor at the 3,000 MTU rate. PFOF 428-29.[21]

K. Overhead Costs

Progress Energy has included in its damages claim costs associated with two separate overhead pools: stores expenses ($2,336,679) and indirect overhead expenses ($1,895,031). However, plaintiffs have not established that either of these types of overhead costs are variable, and, in fact, Mr. Edwards himself testified that the stores overheads remained relatively fixed. PFOF 436, 440, 442. The Court cannot allow plaintiffs to recover the portion of their fixed overhead costs that have been allocated to breach-related projects, because these costs are not incremental to the breach and doing so would put Progress Energy in a better position than it would occupy if DOE had begun accepting fuel in 1998.

Progress Energy contends that, because it allocates its total overhead costs to various projects through the company's cost accounting system, the portion of overhead allocated to a

[21] Although the Government believes that all non-incremental labor costs must be deducted from plaintiffs' damages claim, some of these costs have already been deducted in connection with projects that, for the reasons set above, we do not consider to be traceable to DOE's delay, and should not be deducted again. For example, the exclusion of pool activation costs at the 900 MTU rate, discussed abover, has the effect of removing a significant component of plaintiffs' internal labor costs. At the 3,000 MTU rate, Mr. Johnson has not deducted the entire cost of the pool activation project, but has deducted the non-incremental portion of the internal labor costs charged to that project.

breach-related project is recoverable. Progress Energy's theory of recovery for overheads employs a cost allocation methodology that, while acceptable for the purposes of cost accounting, is not a proper measure of damages. PFOF 434. Progress Energy implied at trial that if one of the breach-related projects were to be removed from the number of projects to which the overhead was allocated, then all of the other projects would become "more expensive." However, even in that scenario, the allocation of a fixed cost to a number of projects does not affect the total amount of that cost. PFOF 430, 433. Instead, the total cost to CP&L and FPC (which are, after all, the plaintiffs in this case) remains the same, and the fixed cost is simply distributed evenly among the remaining projects. PFOF 430, 433.

Tellingly, when it calculated the cost to the company of the rerack that CP&L would have to perform at the 3,000 MTU rate, Progress Energy did not include an overhead component. PFOF 206-07. This, of course, is because the company would not incur any additional overhead costs to perform this work. In fact, that evidence indicated that, when in connection with a particular project the company does have to incur additional costs to perform functions that are usually charged to overheads, these costs were charged to the directly to the project. For example, any additional warehouse work necessitated by the Robinson dry storage project was performed by an employee who charged his time to that project and that has already been included in plaintiffs' damages claim. PFOF 441.

Moreover, Progress Energy has not quantified the amount, if any, by which the company's overhead costs changed as a result of breach-related projects. PFOF 436, 442. This Court has rejected similar claimed overhead costs where the plaintiff failed to show any relationship to the dry storage project or that such costs were incremental to the Government's delay in SNF

acceptance. See TVA, 69 Fed. Cl. at 542 (rejecting claimed "capital support" overhead expenses reflecting management allocations where plaintiff failed to show any relationship between the claimed cost to the dry storage project); Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 377 (2006) (rejecting claimed overhead where plaintiff failed to meet burden of proving that costs were incremental to DOE's delay in SNF acceptance), appeal pending, No. 2007-5052 (Fed. Cir. docketed Feb. 6, 2007) ("SMUD");[22] System Fuels, 78 Fed. Cl. at 800 (rejecting claimed overhead where plaintiffs did not know whether the damage-related projects had any effect on the overhead expenses).

Because plaintiffs have failed to prove that the stores overhead charges which they included in their claim were incremental to the breach, a deduction of $1,153,932 million in stores overhead costs at the 900 MTU rate and $2,190,504 million in stores overhead costs at the 3,000 MTU rate is warranted. PFOF 444, 447. For the same reason, a deduction of $1,422,948 million in indirect overhead costs at the 900 MTU rate and $1,819,575 million in indirect overhead costs at the 3,000 MTU rate is warranted. PFOF 445, 448.[23]

---

[22] The Federal Circuit is scheduled to hear oral argument of the appeal in SMUD on February 4, 2008.

[23] It is the Government's position that all of plaintiffs' overhead charges should be removed from their damages claim. However, depending upon the rate of acceptance, some of these overheads have been removed as a result of other adjustments, and the deductions set forth in the text above assume that the Court adopts these adjustments. Mr. Johnson's report contains tables reflecting those adjustments that contain components that, based upon his calculations, have already been deducted as part of other adjustments. DX 308 at 25, 27. These tables permit the Court to arrive at a proper assessment of damages if it agrees with some, but not all, of Mr. Johnson's assumptions. For example, if the Court finds that plaintiffs' stores overhead charges should not be included in their damages claim but that the CCW upgrade is incremental to DOE's delay, the amount of the adjustment for stores overheads should at the 900 MTU rate should be increased by $59,364, because that amount was included as part of the adjustment that (continued...)

L. AFUDC

Progress Energy seeks to recover $2,018,111 charged to its "Allowance For Funds Used During Construction" ("AFUDC") account, a sum that represents the financing costs that Progress Energy claims to have incurred as a result of having to construct the capital projects for which it seeks damages in this lawsuit. PFOF 449. As set forth below, this claim should be denied because it is the functional equivalent of interest, which is not allowable in claims against the Government in the absence of a waiver of sovereign immunity.

The Federal Energy Regulatory Commission ("FERC") prohibits rate-based utilities like Progress Energy from incorporating the costs of capital construction projects into their rate bases, until the project becomes "in-service." 18 C.F.R. § 101, Electric Plant Instructions Section 3A(17); PFOF 450-51. To compensate Progress Energy for the delay in time between when the capital expenditures occur and when the utility recovers those costs from its ratepayers, FERC permits Progress Energy to apply an AFUDC rate, or ratio of Progress Energy's company-wide debt and equity, to its capital construction costs. PFOF 454. The application of this rate to the capital expenditures results in the AFUDC amount, which is the rate of return, or the interest charge, associated with Progress Energy's capital expenditures. PFOF 452. Once the capital construction project becomes in-service, Progress Energy can incorporate the AFUDC amount into its rate base to compensate it for the loss of the use of its money during construction and enable it to earn a return upon its capital investment. PFOF 452. As Mr. Johnson testified, the

[23](...continued)
Mr. Johnson made for the CCW system. See DX 308 at 25.

"cost" that Progress Energy claims to have incurred is the equivalent of a claim for interest because it compensates plaintiffs for the time value of money. PFOF 455.

Pursuant to 28 U.S.C. § 2516(a), a party may not recover interest upon a claim against the United States in the Court of Federal Claims unless specifically permitted under a contract or act of Congress. Library of Congress v. Shaw, 478 U.S. 310, 317 (1986). Thus, a provision requiring the Government to pay interest "must be affirmative, clear-cut, [and] unambiguous." United States v. Thayer-West Print Hotel Co., 329 U.S. 585, 590 (1947). Neither the NWPA nor any other act of Congress has mandated that the United States pay interest on damages claims. Further, no provision of the Standard Contract provides for the payment of interest on damages claims. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1340 (Fed. Cir. 2000). Although plaintiffs are permitted by regulation to record AFUDC in the course of their cost accounting, no regulation waives the Government's sovereign immunity with respect to the recovery of AFUDC. Absent such a waiver of sovereign immunity, plaintiffs cannot recover their AFUDC costs. 28 U.S.C. § 2516(a); Shaw, 478 U.S. at 322 (1986); see Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 660 (2004), aff'd,, 422 F.3d 1369 (Fed. Cir. 2005) (application of "plaintiff's average after-tax cost of capital to damages incurred each year . . . is prejudgment interest, which is not allowable against the United States absent a specific waiver of sovereign immunity."). .

Because the no-interest rule applies "broadly to claims for interest," England v. Contel Advanced Sys.,Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004), the rule "extends to any form of award for the time value of money that has not been authorized by the express terms of the transaction sued on." Castle v. United States, 48 Fed. Cl. 187, 217 (2000), aff'd in relevant part, 301 F.3d

1328 (Fed. Cir. 2002); Shaw, 478 U.S. at 322 n.7 (1986) ("An interest rate reflects not only the real opportunity cost of capital, but also the inflation rate. Thus, loss of value due to delay is an element of an interest adjustment." (citations omitted)).

Progress Energy cannot avoid the no-interest rule by claiming that AFUDC is a financing cost, recorded in real time. "[L]ike interest on substantive claims against the government, '[i]nterest on bank loans made because of financial stringency resulting from a breach by the Government of a contract between it and the borrower is not recoverable.'" England, 384 F.3d at 1379 (Fed. Cir. 2004)); see Marshall v. United States, 164 F. Supp. 221, 224 (Ct. Cl. 1958) ("interest on borrowed money is not recoverable in suits against the Government unless it is called for in the contract itself or in the governing statute"). Moreover, where a plaintiff uses its own money to finance breach-related activities, any claim for the loss of interest that money might have earned him is similarly barred. Southern Nuclear, 77 Fed. Cl. at 447 (quoting England, 384 F.3d at 1379 (Fed. Cir. 2004); System Fuels, 79 Fed. Cl. at 70 n. 31 (2007) (even where the loss of a return on equity is a "real economic cost," . . . it is not one that fits within the exception to the general ban on the recovering interest against the federal government."). Indeed, "the character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it." United States v. Mescalero Apache Tribe, 207 Ct. Cl. 369, 518 F.2d 1309, 1322 (1979).

To the extent that Progress Energy relies upon Tennessee Valley Authority v. United States, 69 Fed. Cl. 515, 541-42 (2006), for its contention that AFUDC is recoverable, its reliance is misplaced because TVA was wrongly decided and has not been followed in other spent fuel

cases. In TVA, the Court determined that the plaintiff could recover AFUDC costs based upon its analysis of the Federal Circuit's decision in Wickham Contracting Co. v. Fisher, 12 F.3d 1574 (Fed. Cir. 1994), but Wickham is inapplicable to the Court's analysis here. The contract at issue in Wickham involved a contract clause – the "Changes" clause contained in most Federal procurement contracts – that has been held to authorize recovery of interest on funds borrowed to address a contract change. See Bell v. United States, 404 F.2d 975, 984 (Ct. Cl. 1968).[24] Without a "Changes" clause or similar contractual provision,[25] the statutory provision barring recovery of interest from the Government, 28 U.S.C. § 2516(a), "and its policy" continue to "apply to demands for damages in 'breach' claims against the United States." Bell, 404 F.2d at 984. Indeed, in Bell, the Court specifically noted that "[t]he demand here is not based upon a 'breach' but upon a change compensable under the 'Changes' article which entitles the contractor to reimbursement for the resulting 'increase * * * in the cost of performance of this contract.'" Id. at 984. Here, the Standard Contract contains no "Changes" or similar clause, and plaintiffs seek breach damages, not an equitable adjustment. As a result, the Wickham decision, and the analysis of the Court in TVA, should not govern plaintiffs' claim for AFUDC.

[24] Although the Federal Circuit's decision in Wickham does not specifically mention the "Changes" clause, it is clear that a "Changes" clause was included in that Federal procurement contract, pursuant to the mandatory language in the Federal Acquisition Regulation ("FAR") that requires the inclusion of that clause in all contracts subject to the FAR. See FAR § 43.205, 48 C.F.R. § 43.205; see also Wickham Contracting Co. v. GSA, GSBCA No. 8675, 92-3 BCA ¶ 25040, 1992 WL 88326, at *1 (GSBCA 1992) (discussing 110 change orders upon which claims were based), aff'd, 12 F.3d 1574 (Fed. Cir. 1994).

[25] In Northern States, the Court questioned the recoverability of interest against the Government, even where a "Changes" clause exists, noting that the FAR does not appear to waive sovereign immunity with respect to "interest on borrowings." 78 Fed. Cl . at 472 n. 16.

Moreover, even if plaintiffs were entitled to recover interest on borrowings pursuant to Wickham, to recover under such a theory, "[t]he changed work must be directly traced to a specific loan or a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the Government." Gevyn Constr. Corp. v United States, 827 F.2d 752, 754 (Fed. Cir. 1987) (emphasis added). However, Progress Energy admits that it cannot make any direct link between its generalized borrowing and any breach-related projects. Instead, Progress Energy funds its capital construction projects through the issuance of generalized debt and equity and borrows money at the company level. PFOF 453. Such generalized evidence of borrowings is insufficient to make a claim for interest recoverable. Southern Nuclear, 77 Fed. Cl. at 449 (2007) (denying plaintiff's claim for cost of capital where plaintiffs could not identify any specific or general debt or actual costs incurred as a result of borrowing); Northern States Power Co. v. United States, 78 Fed. Cl. 449, 471-72 (2007) (plaintiff's claim for its cost of capital is barred by 28 U.S.C. § 2516, "absent proof of any borrowings with which the interest claim can be causally identified"). In fact, where utility plaintiffs have failed to show that their claimed financing costs "are directly related to required borrowing through specific debt instruments," this Court – in an opinion authored by the same judge who decided TVA – has denied the plaintiff's claims for cost of capital, cost of debt, and AFUDC. System Fuels, 79 Fed. Cl. at 70.[26]

---

[26] In footnote 29 of its pretrial memorandum, Progress Energy cited Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135 (2002), in support of its position with respect to AFUDC. Westfed Holdings is one in a series of cases arising out of the passage of the Financial Institution Reform, Recovery And Enforcement Act ("FIRREA"). These FIRREA cases primarily rely upon Bluebonnet Savings Bank, F.S.B. v. United States, 266 F.3d 1348 (Fed. Cir. 2001), as support for the idea that "interest *on* a claim" may be recoverable. However, Bluebonnet addresses the recoverability of financing costs arising under a contract the very purpose of which was to raise financing to infuse cash into an acquired thrift; it does not support the argument that "interest on
(continued...)

To avoid double-counting of reductions for AFUDC charges already included in other components of plaintiffs' claims and removed in the course of other adjustments, an adjustment of $1,373,930 in AFUDC costs is warranted at the 900 MTU rate. PFOF 458. At the 3,000 MTU rate, an adjustment of $1,966,045 in AFUDC costs is warranted. PFOF 459.[27]

M. Unsupported Costs

We stipulated at trial to the recoverability of a portion of the expenses we previously designated as unsupportable, and have revised our calculations of damages accordingly. Beyond the expenses that we agreed on the record had been supported, however, plaintiffs failed to provide any competent evidence that any of the other charges listed on PX 160 were incremental to any partial breach by DOE. Indeed, the testimony on these subjects revealed that certain charges had been incurred and charged to particular project numbers, without a description of

---

[26](...continued)
a claim" is generally recoverable absent a contractual or statutory provision waiving the Government's sovereign immunity. Even in cases where a court has recognized the possibility that interest as a claim may be recoverable, the Court has held that the claimant must offer "direct proof that the parties discussed [plaintiffs'] need for borrowed cash in the event of a breach." Centex Corp. v. United States, 55 Fed. Cl. 381, 390 (2003), aff'd on other grounds, 395 F.3d 1283 (Fed. Cir. 2005); see Westfed Holdings, 52 Fed. Cl. at 163 n. 22 (2002) (original negotiations were "predicated on the fact that Westfed planned to invest $220 million, $60 million of which defendant knew would be borrowed."). Here, there is no evidence that the Government understood, in developing the Standard Contract, that plaintiffs would require financing in the event of a breach.

[27] As was the case with respect to internal labor, we believe that all of plaintiffs' AFUDC charges should be excluded from damages. However, the amounts set forth above assume that the Court has accepted a number of other proposed adjustments for projects that include AFUDC charges. As described supra note 23, Mr. Johnson's report contains tables reflecting the amount of AFUDC charges that are included within, and have been already removed as part of the adjustment for, the various projects for which plaintiffs seek recovery. If, for example, the Court decides to accept the adjustment for AFUDC but to deem the CCW upgrade to be incremental to DOE's delay, at the 900 MTU rate, the amount of the AFUDC adjustment should increase by $7,724. DX 308 at 25.

what the charges were or whether they would have been incurred absent any breach. E.g., Tr. 436:17-439:11. Such conclusory assertions are insufficient to carry plaintiff's burden of proof.

CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court eliminate from plaintiffs' damage claim all costs that plaintiffs have failed to demonstrate were directly caused by the Government's breach, foreseeable, and proven to a reasonable certainty, and all costs that are otherwise not recoverable as a matter of law.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Andrew P. Averbach
ANDREW P. AVERBACH
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0527
Tel: (202) 305-7643

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
CHRISTOPHER J. CARNEY
LISA L. DONAHUE
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

January 22, 2008

Attorneys for Defendant

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 22nd day of January, 2008, a copy of the foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Andrew P. Averbach