**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLINA POWER & LIGHT COMPANY, et al.** | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-37C<br>(Judge Wheeler) |
| **UNITED STATES OF AMERICA,** | ) | |
| Defendant. | ) | |

**PLAINTIFFS' POST-TRIAL RESPONSE BRIEF**

Of Counsel:

Paul M. Bessette
David M. Kerr
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

BRAD FAGG
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Attorneys for Plaintiff

February 19, 2008

# TABLE OF CONTENTS

**Page**


I. HARRIS C AND D POOL ACTIVATION AND ASSOCIATED STORAGE COSTS: THE "PICK-UP RATE" ISSUE .......... 3

A. DOE does not have discretion to set its own obligations under the Standard Contract.......... 4

B. The Standard Contract is not too indefinite to enforce. .......... 7

C. The Court may look to extrinsic evidence to interpret the Standard Contract and supply the missing term. .......... 9

D. The circumstances of EEI's request for a recital regarding pick-up rate obligations do not contradict the overwhelming evidence that the parties intended for DOE to accept fuel at a rate sufficient to preclude additional at-reaction storage after 1998. .......... 11

E. The circumstances of the formation of the Standard Contract warrant supplying the missing term. .......... 15

F. The 3,000 MTU/year pick-up rate assumptions upon which Progress Energy presented its damages claims associated with Harris C and D pool activation and associated storage of spent nuclear fuel are reasonable pick-up rate obligations. .......... 16

II. HARRIS C AND D POOL ACTIVATION AND ASSOCIATED STORAGE COSTS: PROGRESS ENERGY'S BURDEN ON THE "PICK-UP RATE" ISSUE. .......... 20

A. Progress Energy does not bear the burden to establish a but-for world, especially with the precision argued by the government. .......... 21

B. The factual record confirms that Progress Energy is entitled to its damages under any plausible, reasonable pick-up rate scenario. .......... 22

C. Progress Energy easily satisfied its burden to establish the requisite causation in these circumstances. .......... 25

III. GOVERNMENT DEFENSES TO PARTICULAR INCURRED DAMAGES .......... 27

A. The government is not entitled to reduce Progress Energy's damages by the costs of removal of "CRUD" and unused racks associated with Harris C and D Pool activation and storage of spent fuel. .......... 28

B. The government is not entitled to reduce Progress Energy's damages by the costs of the Component Cooling Water System upgrades associated with Harris C and D Pool activation and storage of spent fuel. .......... 29

C. The government is not entitled to a damage reduction due to hypothetical costs of loading DOE casks that were never supplied. .......... 32

**TABLE OF CONTENTS** (continued)

**Page**

D. The government is not entitled to reduce Progress Energy's damages by the costs of railroad maintenance incurred for transshipment campaigns caused by DOE's breach. .... 34

E. The government is not entitled to reduce Progress Energy's damages by the costs of the Crystal River re-rack. .... 34

F. The government is not entitled to reduce Progress Energy's damages by the costs of licensing proceedings and interventions associated with Harris C and D Pool activation and storage of spent fuel. .... 38

G. The government is not entitled to reduce Progress Energy's damages due to Progress Energy's use of internal labor. .... 40

H. The government is not entitled to reduce Progress Energy's damages by the costs incurred for Allowance for Funds Used During Construction. .... 41

I. The government is not entitled to reduce Progress Energy's damages due to Progress Energy's use of warehouse and construction services in connection with breach-related activities .... 42

J. The government is not entitled to reduce Progress Energy's damages in connection with costs for breach-related activities recorded through manual adjustments. .... 43

K. The government is not entitled to reduce Progress Energy's damages by costs associated with Robinson crane studies. .... 44

IV. CONCLUSION .... 45

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Aleman Food Services, Inc. v. United States*, 994 F.2d 819 (Fed. Cir. 1993) .....................4

*American Federal Bank, FSB v. United States*, 72 Fed. Cl. 586 (2006)............................30

*Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568 (Fed. Cir. 1991) .........................................................................................................8

*Bank of America, FSB v. United States*, 70 Fed. Cl. 246 (2006) ......................................30

*Bel Pre Health Care Center, Inc. v. United States*, 24 Cl. Ct. 495, 496 (1991) ..................8

*Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).........44

*Brooklyn Life Insurance Company of N.Y. v. Dutcher*, 95 U.S. 269 (1877).....................11

*California Federal Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005)...........3, 30, 35

*Chicago v. Sheldon*, 76 U.S. 50 (1887)..................................................................11

*Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302 (Fed. Cir. 1998)...............................8

*David Nassif Associates v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ......................10, 16

*Edward R. Marden Corporation v. United States*, 803 F.2d 701 (Fed. Cir. 1986)....8, 9, 11

*Franconia Associates v. United States*, 61 Fed. Cl. 718 (2004) .......................................21

*Gallagher v. Gallagher*, 130 F. Supp. 2d 359 (N.D.N.Y. 2001) ......................................11

*Herzberger v. Standard Insurance Company*, 205 F.3d 327 (7th Cir. 2000) ......................5

*Hughes Communications Galaxy, Inc. v. United States*, 38 Fed. Cl. 578 (1997), *aff'd*, 271 F.3d 1060 (Fed. Cir. 2002) ..................................................................28

*Indiana Michigan Power Company v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) ......................................................................................... *passim*

*KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68 (1996)..........................................10, 13

*Kogod v. Stanley Co.*, 186 F.2d 763 (D.C. Cir. 1950) .....................................................14

**TABLE OF AUTHORITIES** (continued)

**Page**

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003)..............32

*LifeWise Master Funding v. Telebank*, 374 F.3d 917 (10th Cir. 2004)............................26

*Mays v. Trump Indiana, Incorporated*, 255 F.3d 351 (7th Cir. 2001)................................8

*Modern Systems Technology Corporation v. United States*, 979 F.2d 200 (Fed. Cir. 1992)...........................................................................................................7

*Nevada Power Company v. Monsanto Company*, 891 F. Supp. 1406 (D. Nev. 1995)...........................................................................................................27

*Northern States Power Company v. United States*, 78 Fed. Cl. 449 (2007).........21, 33, 40

*Old Stone Corporation v. United States*, 450 F.3d 1360 (Fed. Cir. 2006) ..................38, 39

*Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333 (2006).....................33

*Ridge Runner Forestry v. Veneman*, 287 F.3d 1058 (Fed. Cir. 2002)................................7

*Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332 (2006).............33

*Shann v. Dunk*, 84 F.3d 73 (2d Cir. 1996).........................................................................8

*Southern Nuclear Operating Company v. United States*, 77 Fed. Cl. 396 (2006)....................................................................................7, 21, 33, 40

*Sylvania Electric Products, Inc. v. United States*, 458 F.2d 994 (Ct. Cl. 1972)..................8

*System Fuels, Inc. v. United States*, 79 Fed. Cl. 37 (2007)...................................... *passim*

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006)...................... *passim*

*Transamerica Equipment Leasing Corp. v. Union Bank*, 426 F.2d 273 (9th Cir. 1970)...........................................................................................................8

*Tymshare, Inc. v. Covell*, 727 F.2d 1145 (D.C. Cir. 1984).................................................6

*United States v. Capital Sand Co., Inc.*, 466 F.3d 655 (8th Cir. 2006) ............................43

*United States v. Seckinger*, 397 U.S. 203 (1970)...............................................................6

*Wickham Contracting Co., Inc. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994)......................41

**TABLE OF AUTHORITIES** (continued)

**Page**

*Yankee Atomic Electric Company v. United States*, 73 Fed. Cl. 249 (2006) ................7, 33

**FEDERAL STATUTES AND REGULATIONS**

28 U.S.C. 2516(a) ........................................................................................................41

10 C.F.R. § 2.174 (1998) ..............................................................................................40

**MISCELLANEOUS**

Corbin, *Corbin on Contracts* § 97 (1963)..............................................................................8

Corbin, *Corbin on Contracts* § 24.11 (1998).........................................................................9

Corbin, *Corbin on Contracts* § 55.3 (2005)..........................................................................21

Corbin, *Corbin on Contracts* § 57.10 ..................................................................27, 33, 36

E. Allen Farnsworth, Contracts § 12.1 (3d ed. 2004) ..................................................3, 35

Restatement (Second) of Contracts § 204..........................................................................4, 15

Restatement (Second) of Contracts § 204 cmt. b...............................................................4, 15

Restatement (Second) Contracts § 204, cmt. e ...................................................................10

Restatement (Second) of Judgments, § 26(1)(b)..................................................................45

Restatement (Second) of Judgments, § 26(1)(e)..................................................................45

Richard A. Lord, 11 *Williston on Contracts* § 32.14 (4th ed.)(2007)................................11

17A Am. Jur. 2d Contracts § 383 ......................................................................................13

17A C.J.S. Contracts § 317 ..................................................................................................13

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAROLINA POWER & LIGHT COMPANY, et al.** | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 04-37C<br>(Judge Wheeler) |
| **UNITED STATES OF AMERICA,** | ) | |
| Defendant. | ) | |

**PLAINTIFFS' POST-TRIAL RESPONSE BRIEF**

Pursuant to the Court's November 20, 2007 Post-Trial Scheduling Order, Plaintiffs Carolina Power & Light Company ("CP&L") and Florida Power Corporation ("FPC") (collectively for these purposes, "Progress Energy") respectfully file this brief in response to the Defendant's Post-Trial Brief. The government's defenses to Progress Energy's claimed costs suffer from several fundamental deficiencies.

First, in its opening brief, the government devotes most of its time and attention to arguing against the imposition of "any" reasonable "acceptance rate" obligation. (*E.g.*, 1/22/08 Def. Br. at 123). (Acceptance rate issues affect recovery of costs relating to the Harris C and D pool activation and associated transshipment, but only those claimed costs.) According to the government, damages may be measured only by reference to a "baseline obligation" to accept spent nuclear fuel. (1/22/08 Def. Br. at 2) The notion of a purported "baseline obligation," however, is made up—it appears nowhere in the contracts, nor in any DOE document, nor, indeed, in any supporting case or legal authority. Moreover, the unilaterally-determined duties that the government proposes as constituting such "baseline obligations" are so fundamentally

flawed and breach-infected that they simply cannot be the measure of what these contracts required.

Second, even assuming the imposition of a truly reasonable pick-up rate, the government argues that Progress Energy has not "met its burden" with respect to causation, again with respect to Harris C and D pool activation and associated transshipment costs. (1/22/08 Def. Br. at 136-138). In particular, the government contends, in effect, that Progress Energy was required to generate and introduce multiple Excel spreadsheets with yearly ramp-up and pick-up rates that precisely match any annual rates at which DOE might have been required to perform, along with testimony (by whom is not clear) about the activities Progress Energy "would or would not have undertaken" if DOE had performed pursuant to each of those precise annual rates. (1/22/08 Def. Br. at 136). Otherwise, according to the government, Progress has failed to satisfy its burden of proof and the government's flawed 900 MTU/year rate should apply by default.

The government's elaborate "burden" constructs do not hold up. The government strives to make complicated what, on this record, is a simple and inarguable fact: Progress Energy "would not have undertaken" additional spent fuel storage activities if it did not need to. Any uncertainty regarding precise pick-up rates is of course occasioned by DOE's massive breach, and the law does not impose upon the innocent, non-breaching party the sort of onerous burden to precisely describe the but-for world urged by the government here. Moreover, the record and evidence in this case, and in particular the uncontested facts regarding pool capacities and discharges, comfortably establish that Progress Energy should recover all of its claimed costs under any plausible pick-up rate scenario. The government's tortured arguments regarding Progress Energy's not meeting its burden in connection with the pick-up rate must be rejected.

Third, the remaining government defenses to specific claimed costs suffer from factual and legal deficiencies. Factually, the defenses miss the mark because the government consistently misconstrues the effect of other activities on Progress Energy's mitigation measures. Legally, the defenses miss the mark because they misconstrue the "substantial causal factor" test mandated by the Federal Circuit in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). In particular, by attempting to point to other activities that allegedly would have required various mitigation measures (such as the Harris CCW system upgrades or the Crystal River re-racking project) "irrespective of DOE's breach," the government necessarily contends that DOE's breach must have been the "sole cause" of the claimed mitigation activity. That proposition, however, is directly contrary to the settled law. *E.g., Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005) (confirming that the breach need *not* "be the sole factor or sole cause in the [claimed damages].") (citing E. Allan Farnsworth, Contracts § 12.1, at 150-51 (3d ed. 2004).

The following addresses: (i) the "pick-up rate" issue affecting Harris C and D pool activation and associated costs; (ii) the government's arguments regarding so-called burdens in connection with that pick-up rate issue; and (iii) the government's remaining defenses to various specific elements of Progress Energy's claimed damages.

## I. HARRIS C AND D POOL ACTIVATION AND ASSOCIATED STORAGE COSTS: THE "PICK-UP RATE" ISSUE

The government's arguments that this Court should not base its damages determination upon a reasonable rate of acceptance (1/22/08 Def. Br. at 113-135) must be rejected for a host of reasons. First, the Standard Contract did not give DOE sole discretion to set whatever pick-up rate it chooses. Second, the fact that the parties did not memorialize a rate of acceptance within the four corners of the contract does not make the contract too indefinite to enforce. Third, the

Court is not prohibited from looking to extrinsic evidence to interpret ambiguity and supply a missing term in an integrated contract such as this one. Fourth, EEI's request for a recital of acceptance obligations does not dictate a contrary result, especially considering that DOE never rejected the sentiment expressed. Fifth, the Restatement (Second) of Contracts § 204 is not limited to situations where the parties "failed to foresee" the need for a term, but, rather, clearly contemplates circumstances (such as the present) in which the discussion of the term "might be unpleasant *or might produce delay or impasse*." Restatement (Second) of Contracts § 204 cmt. b (emphasis added). Sixth, Progress Energy's damages regarding activation of the Harris C and D pool and storage of spent fuel there are based upon reasonable acceptance rate obligations, consistent with the record in this case and the law. Each of these is discussed in more detail below.

A. *DOE does not have discretion to set its own obligations under the Standard Contract.* Contract interpretation begins, of course, with the plain language of the agreement. *Aleman Food Servs., Inc. v. United States*, 994 F.2d 819, 822 (Fed. Cir. 1993) ("Wherever possible, courts should look to the plain language of the contract to resolve any questions of contract interpretation."). The plain language provides that "for planning purposes," DOE will issue an annual capacity report ("ACR") beginning in July 1, 1987, and that DOE will also issue an annual acceptance priority ranking ("APR") beginning on April 1, 1991. (PX 10 at 10, Art. IV.B.5.) Based on the ACR and APR, utilities must submit delivery commitment schedules ("DCS") for fuel they wish to deliver to DOE and DOE must approve or disapprove the DCSs. (PX 10 at 11, Art. V.B.) A year before the scheduled delivery of spent fuel, utilities must submit Final Delivery Schedules. (PX 10 at 11-12, Art. V.C.)

The government argues that this "scheduling provision" gives DOE discretion to set its obligations under the Standard Contract. (*E.g.*, 1/22/08 Def. Br. at 128.) Tellingly, it is unclear from the government's argument where in the scheduling process DOE actually confers its obligation on itself. According to the government, DOE's obligation is *not* defined by approved DCSs (Tr. 1663-64, lines 21-1, statement of counsel) and the government does not even mention Final Delivery Schedules, which it never approved. Nor can DOE's obligation be expressed in ACRs, which, like the 1991 ACR, explicitly disclaim that "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." (PX 53 at 1-2.) In addition, schedules published in the ACRs only apply ten years into the future, and thus could not possibly express DOE's complete obligation under the contract. (PX 53 at A-1.) Perhaps for this reason, the government employed for purposes of this litigation a pick-up schedule that ramps up to a steady state rate of 3,000 MTU/year after 18 years (DX 300 at 4), which was adopted from a 1990 cost analysis document (PX 50 at A-1), a source completely unrelated to the scheduling process the government now claims was designed to set DOE's obligations.

But regardless of where in the purported scheduling process the government alleges that DOE's obligation materializes, the plain meaning of the "scheduling provision" is that it establishes a mechanism to coordinate or "schedule" delivery of the spent fuel—it is an administrative planning tool, clearly dependant upon actual performance by DOE. Nowhere in the plain text is there any indication whatsoever that the "scheduling provision" gives DOE the unilateral right to set its own legal obligations under the contract. And before a contract can be interpreted to leave decisions to the sole discretion of one the parties, it must be clear that the parties intended to do so. *Cf. Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 333 (7th Cir. 2000)

(Posner, J.) ("The employees are entitled to know what they're getting into, and so if the employer is going to reserve a broad, unchanneled discretion to deny claims, the employees should be told about this, and told clearly.") An intention to give DOE absolute power to set the pick-up rate under the Standard Contract would also have to be unmistakable because "a contract should be construed most strongly against the drafter, which in this case was the United States." *United States v. Seckinger*, 397 U.S. 203, 211 (1970). The "scheduling provision" simply does not establish that DOE had sole discretion to set the pick-up rate.[1]

This interpretation of the scheduling provisions is confirmed by DOE's own understanding of the DCS process. (*E.g.*, Barrett, April 22, 2002 Deposition Tr. 217, lines 3-17) (describing the DCS process as "administrivia"—"part of the administrative details of the contract that I did not pay much management policy attention to"); Slater, June 13, 2002 Deposition Tr. 96, lines 14-16 ("I don't know how one would perceive a DCS as anything other than for planning purposes.").) The interpretation of the scheduling provisions as not vesting unilateral discretion with DOE is also consistent with Progress Energy's understanding. (Martin, Tr. 109, lines 10-15 ("A DCS is an administrative document, . . . they were vehicles by which the delivery of spent fuel turnover to the government would be planned, scheduled, coordinated.").)

The fact that Progress Energy supposedly "willingly participated" in this administrative process does not make it binding on the parties, contrary to the assertions at pages 128-131 of

[1] As a comparison, in another section of the Standard Contract, DOE did unambiguously invest itself with sole discretion, namely to refuse acceptance of improperly described spent fuel: "DOE reserves the right, in its sole discretion, to refuse to accept such SNF and/or HTW until the SNF and/or HLW has been properly described." (PX 10 at 10, Art. VI.B.3(a).) If DOE had truly intended to invest itself with sole discretion to set its own acceptance rate obligations under the contract, it surely could have employed equal clarity regarding those obligations. And considering that what is at issue is DOE's fundamental obligation under the contract, it is unlikely in the extreme that utilities had in mind a power so absolute as the government now contends. *Cf. Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1154 (D.C. Cir. 1984) (Scalia, J.) ("[A]greeing to such a provision would require a degree of folly on the part of these sales representatives we are not inclined to posit where another plausible interpretation of the language is available.").

Defendant's Post-Trial Brief. First, the government in this very case has expressly disavowed the proposition that the submission and approval of DCS's created the binding obligation. (Tr. 1663-64, lines 21-1, statement of counsel). Second, the circumstances here would in any event not create the sort of accord defense suggested (if not quite argued outright) by the government. *E.g., S. Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 419 (2006); *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 298 (2006) ("Parroting the DOE's delays and acceptance rates did not and does not evidence acquiesce[nce] in them."). Had Progress Energy failed to submit DCSs, it faced a risk of losing its place in the queue for whenever DOE began to pick up fuel. *E.g., Sys. Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 58 n.20 (2007). Progress Energy was merely processing paperwork, as directed by DOE. (*E.g.*, Kunita, Tr. 652-654, lines 2-3; Kunita, Tr. 664, lines 1-7). That Progress Energy filled out the forms as directed by DOE does not absolve the government from liability for its massive breach.

B. *The Standard Contract is not too indefinite to enforce.* The government argues that if this Court rejects its interpretation of the scheduling provision, the contract becomes too indefinite to enforce. (1/22/08 Def. Br. at 135 n. 12.) The government's assertion implicates two issues of contract formation: "First, whether the parties intended to create binding obligations, and second, whether the terms of the contract are sufficiently definite to permit determination of the breach and of remedies." *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202 (Fed. Cir. 1992). There is no dispute that the parties intended to create a contract and that the contract was breached. (Tr. 344, lines 2-4, statement of counsel.) This present case, therefore, differs from the authorities that the government has cited on this point where there was no intention to create binding contractual obligations.[2]

---

[2] *See, e.g., Modern Sys. Tech.*, 979 F.2d at 202 (holding that the Basic Pricing Agreement at issue did not create binding rights and obligations); *Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061-62 (Fed. Cir. 2002)

And the circumstances here clearly permit determination of the breach and remedies. DOE was contractually obligated to begin the service of spent fuel disposal beginning no later than January 31, 1998. (PX 10 at 6, Art. II.) "[O]nce it is determined that the parties did indeed intend to create a contract, courts should be slow to deny enforcement on the basis of indefiniteness in the contract." *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572 (Fed. Cir. 1991) (citing 1A Corbin, *Corbin on Contracts* § 97 (1963)); *see also Shann v. Dunk*, 84 F.3d 73, 81 (2d Cir. 1996) ("[V]oiding an agreement for absence of an essential term is a step that courts should take only in rare and extreme circumstances."); *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 999 (Ct. Cl. 1972) ("The law does not encourage the claims of parties to contracts that obligations are too indefinite for enforcement.").

The government argues, in effect, that either it must prevail or that this is one of those exceedingly rare circumstances in which the Court should void a clear intent by the parties to create a contractually binding obligation, on the grounds that the pick-up rate term "is one of most essential terms of the contract." (10/10/07 Def. Pretrial Br. at 54.) With this argument, however, the government is losing sight of a fundamental principle of contract law: If the intent of the parties can be determined, it should be enforced. *See Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) ("[W]e base our decision on the cardinal rule of contract construction that the joint intent of the parties is dominant if it can be ascertained."). The relevant inquiry is whether the parties' intent can be ascertained. And in this case the

("The government had the option of attempting to obtain firefighting services from Ridge Runner or any other source, regardless of whether that source had signed a tender agreement."); *Mays v. Trump Ind., Inc.*, 255 F.3d 351, 358-59 (7th Cir. 2001) ("But this complicated deal was never reduced to the kind of solid contract that could be comfortably enforced in a court of law.") ("[M]aterial terms are absent in spades."); *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (affirming agency's decision that the parties' agreement was not a requirements contract or indefinite quantity contract); *Transamerica Equip. Leasing Corp. v. Union Bank*, 426 F.2d 273, 274 (9th Cir. 1970) ("The most that appears is an unenforceable agreement to make an agreement."); *Bel Pre Health Care Ctr., Inc. v. United States*, 24 Cl. Ct. 495, 496 (1991) ("The agreement at issue . . . places the Government under no obligation to utilize the services provided by plaintiff.").

overwhelming evidence presented at trial leaves little room for argument regarding the parties' basic expectations for DOE's performance: DOE was to provide spent fuel storage relief to utilities, commencing in 1998. *See* 1/22/08 Pl. Br. at 18-33 and citations therein.

C. *The Court may look to extrinsic evidence to interpret the Standard Contract and supply the missing term*. According to the government, "[t]he language in the integration clause in no uncertain terms precludes Progress Energy's attempts to rely upon either the statement of DOE officials or DOE-issued documents, whether pre- or post-contract formation, as the source of DOE's obligation to accept fuel at a particular rate." (1/22/08 Def. Br. at 117.) First, that argument rings a bit hollow, considering that the government *itself* looks to a "DOE issued document," and in particular a cost analysis document from 1990, as part of the "source of DOE's obligation to accept fuel at a particular rate." (PX 50, page A-1, FOI-004-4125; DX 300; Pollog, Tr. 1274-75, lines 22-19)

Second and more fundamental, the government's assertion ignores the distinction between interpretation of a contract and application of the "parol evidence rule." Corbin, *Corbin on Contracts* § 24.11 (1998) (The parol evidence rule is *not* a rule of interpretation.) The Standard Contract, although integrated, is ambiguous and requires interpretation because it is missing an essential term. Specifically, with no explicit pick-up rate, the nature of the service DOE must provide under the Standard Contract is ambiguous. Progress Energy contends that, beginning in 1998, DOE must provide a disposal service that addresses the accumulation of spent fuel at reactors. The government contends, by contrast, that DOE must merely start providing long-term disposal, (Tr. 1667, lines 1-9, statement of counsel), but that no particular rate is required. *See Edward R. Marden Corp.*, 803 F.2d at 705 ("It is a generally accepted rule, which requires no citation to authority, that if a contract is reasonably susceptible of more than

one interpretation, it is ambiguous."). Indeed, it is worth noting that under the government's interpretation, DOE conceptually could have satisfied its obligation by picking up one assembly prior to January 31, 1998. The government's argument, after all, is that under the Standard Contract DOE is not obligated to perform at "*any* rate of acceptance." (1/22/08 Def. Br. at 123 (emphasis supplied).)

In such circumstances, "the post-adoption actions of parties to a contract can be useful in guiding interpretation." *Sys. Fuels*, 79 Fed. Cl. at 53 (citations omitted). When the language of a contract is vague or ambiguous, "factors outside of the contractual terms can be taken into account" to discover the parties' underlying intention. *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 77 (1996). Thus while the source of DOE's obligation is the Standard Contract, the Court clearly may look to contemporaneous statements of DOE officials and DOE-issued documents to determine the meaning of its terms. And, by revealing the intention of the parties, this extrinsic evidence also shows what is reasonable under the circumstances and thus assists the Court in supplying a missing term. *Cf.* Restatement (Second) Contracts § 204, cmt. e ("Where there is complete integration and interpretation of the writing discloses a failure to agree on an essential term, evidence of prior negotiations or agreements is not admissible to supply the omitted term, but such evidence may be admissible, if relevant, on the question of what is reasonable in the circumstances.").

In other words, rather than being offered as evidence of separate agreements or supplements to the Standard Contract, the contemporaneous evidence sheds light on the parties' intention and on the contours of a reasonable pick-up rate. *Cf. David Nassif Assoc. v. United States*, 557 F.2d 249, 256 (Ct. Cl. 1997) ("At virtually every step in its dealings with the Government, plaintiff affirmatively manifested an intent to install a cafeteria."). The

government's argument that statements "made after the Standard Contract was signed . . . cannot be evidence of any 'meeting of the minds,' " therefore misses the mark.[3] (1/22/08 Def. Br. at 123.) The nature of the task that the Court must undertake is to give effect to the parties' intent at the time the Standard Contract was signed, but "[i]t is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises." *Edward R. Marden Corp.*, 803 F.2d at 705 (citation omitted.); *see also Sys. Fuels*, 79 Fed. Cl. at 53 (*citing Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1877); *Chicago v. Sheldon*, 76 U.S. 50 (1887); and Richard A. Lord, 11 *Williston on Contracts* § 32.14 (4th ed.) (2007)).

D. *The circumstances of EEI's request for a recital regarding pick-up rate obligations do not contradict the overwhelming evidence that the parties intended for DOE to accept fuel at a rate sufficient to preclude additional at-reaction storage after 1998*. One of the government's primary arguments is that a reasonable rate of acceptance should not be applied by the Court because a recital related to pick-up rate that was requested by EEI was not incorporated into the contract. (*E.g.,* 1/22/08 Def. Br. at 118). For a variety of reasons, that contention should be rejected. EEI, of course, cannot be considered an agent of Progress Energy. *Cf. Gallagher v. Gallagher*, 130 F.Supp.2d 359, 362 (N.D.N.Y. 2001) ("A trade association cannot be an agent, for purposes of the ADEA, of any of its member employers, even though its purpose is to promote the interests of those members and of the industry in general."). Regardless, the government exaggerates the significance of EEI's request and of the fact that the proposed

---

[3] The government erroneously asserts that the oldest document in evidence that addresses DOE's pick-up rate is the December 1983 draft mission plan. (1/22/08 Def. Br. at 123.) The June 1983 Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste estimates a repository design receipt rate of 1,800 MTU per year for the first five years and 3,000 MTU per year after that. (PX 8 at 9.) So, the same month that utilities signed the Standard Contract that obligates them to pay fees to DOE, DOE released a report evaluating whether those fees were sufficient to fund a waste program that included a repository accepting spent fuel at a steady rate of 3,000 MTU per year.

language was not included in the final contract, and misstates the circumstances regarding the DOE's treatment of that request.

The draft Standard Contract was released on February 4, 1983. (DX 25.01.) On March 3, 1983, a representative from EEI testified before DOE, exclaiming that "[t]he utility industry is vitally concerned with the proposed contract." (DX 25.10.) Specifically, EEI expressed concern about treating (1) the contract as a regulation; (2) the lack of utility audit and review rights; and (3) the method for computing the fee for existing spent fuel. (DX 25.10.) As the government points out, the pick-up rate is "one of the most essential terms of the Standard Contract." (10/10/07 Def. Pre-trial Br. at 54). Indeed, it is central to the *quid pro quo* of this multi-billion dollar transaction. If EEI really believed that DOE had no obligation in this regard, as the government now contends, the issue would have undoubtedly made the short list of concerns presented on March 3, 1983. It did not.

Four days later EEI made a written submission. In its cover letter, EEI outlined "six major comment areas." (DX 25.34 at 2.) The issue of acceptance rate, central to what utilities were receiving in exchange for millions of dollars in payments, did not make EEI's list of six major comment areas. Instead, in its 52-page attachment of "Detailed Comments on DOE Draft Disposal Contract," which was part of its total submission of 88 pages, EEI devoted the equivalent of one page requesting that DOE add a recital to "recognize" that DOE would design its facility to receive spent fuel at a rate commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated. (DOE 25.34, Attachment A at 2-3.) The government mischaracterizes this as a request "that DOE add a two-part minimum acceptance rate obligation in the Standard Contract that would contractually obligate DOE." (1/22/08 Def. Br. at 118.) If EEI wanted to *add* such an essential

term, as opposed to requesting recognition that it already existed, it is unlikely that EEI would have asked for a "whereas" recital: "Recitals in a contract, such as 'whereas' clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations." 17A C.J.S. Contracts § 317; 17A Am. Jur. 2d Contracts § 383 ("Since recitals indicate only the background of a contract, that is, the purpose and motives of the parties, they do not ordinarily form any part of the real agreement."). "A basic rule of contract drafting holds that '[n]o experienced drafter will make the mistake of using such clauses to bear the burden of substantive provisions of the agreement.' " *KMS Fusion*, 36 Fed. Cl. at 80 (quoting E. Allan Farnsworth, Farnsworth on Contracts, vol. 2, § 7.10a, p. 260 (1990)). There is no indication that EEI's attorneys, who submitted 88 pages of suggestions for the standard contract, were inexperienced in drafting contracts. It is more likely, therefore, as Mr. Martin testified, that EEI's request for a recital was "more of a clarification and nit-picky." (Martin, Tr. 117, lines 8-9.) EEI asked for DOE to add a recital to describe or summarize "what was already there." (Martin, Tr. 117, lines 12-13.) Everyone at the time understood the essence of the deal.

On April 18, 1984, approximately six weeks after the due date for comments, DOE released the final version of the Standard Contract. (DX 25.02.) EEI's proposed recital was not incorporated in the final draft. The government claims that this is proof that DOE affirmatively "rejected" the obligation to preclude at-reactor storage after 1998. (1/22/08 Def. Br. at 118.) But, no contemporaneous piece of paper states that DOE "rejected," or "denied," or "viewed as unconscionable" the recital that EEI had requested. (Morgan, Tr. 1425, lines 20-23.) The government points to a reference in the Federal Register notice accompanying the final contract to the effect that DOE declined to accept "performance standards" (DX 25.02), and argues that this constitutes the rejection of the purportedly requested pick-up rate term upon which the

government now so heavily relies. (1/22/08 Def. Br. at 119-20.) Here is how DOE actually described the performance standards issue in the Federal Register: "In essence, these commenters pointed out that no date exists other than the January 31, 1998 date to evaluate DOE's program performance." (DX 25.02 at 16, 598.) Proclaiming that its performance would be judged by meeting the January 31, 1998 date, DOE declined to establish "*intermediate* performance standards or dates." *Id.* (emphasis added). DOE's rejection of "performance standards" to evaluate DOE's progress *prior to* January 31, 1998, clearly did not encompass the substance of EEI's proposed recital regarding pick-up rate obligations to be undertaken *after* that date.[4]

If DOE had interpreted EEI's proposed recital as a request to *add* such an essential term that was not already understood by everyone, DOE would have surely addressed it explicitly and made clear that such an obligation was not part of the bargain. This issue is, as the government has contended, fundamental to the parties' agreement. It is simply not plausible that DOE would "reject" such a proposal in such a passive manner, without directly and affirmatively mentioning it. More likely, as the evidence shows, both sides recognized that DOE would have responsibility for spent fuel storage as of January 1998, and because of the "stringent time constraints" (PX 13) to finalize the contract, DOE did not attempt to craft language to describe or summarize this notion. "In making contracts, people pay more attention to the promises they actually give and take than to any attempts at summarizing or describing them." *Kogod v. Stanley Co.*, 186 F.2d 763, 765 (D.C. Cir. 1950) (rejecting the claim that a recital authorized a party to make certain decisions without concurrence from the other contracting party).

[4] Indeed, at trial Mr. Morgan, who is the government's primary witness in support of its "DOE rejected EEI's request" argument, did not, at least initially, recognize the Federal Register passage upon which the government now bases its argument as constituting a purported rejection of EEI's request. (Morgan, Tr. 1427-1429, lines 19-13).

E. *The circumstances of the formation of the Standard Contract warrant supplying the missing term*. The "stringent time constraints" faced by DOE to finalize the contract are a classic example of when a missing term should be supplied by the Court. The government asserts that this Court should not impose a reasonable rate of acceptance because "none of the circumstances described in Restatement (Second) of Contracts § 204 is present." (1/22/08 Def. Br. at 134.) To be precise, section 204 applies "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to determination of their rights and duties." Restatement (Second) of Contracts § 204. There is no qualification that the omission must occur only under particular circumstances, and the provision itself does not "describe" any circumstances. The comment b to Section 204 offers possible explanations for how an omission may have occurred, but there is no indication or suggestion that the list is meant to be exhaustive. Nevertheless, at least one of the explanations provided in the comments undeniably applies in this case: "[The parties] may have expectations but fail to manifest them, either because the expectation rests on an assumption which is unconscious or only partly conscious, . . . or because discussion of it might be unpleasant or might produce delay or impasse." Restatement (Second) of Contracts § 204 cmt. b. At the time the Standard Contract was created, DOE acknowledged that discussion of the contract must yield to time constraints: "Recognizing the stringent time constraints the Act has imposed on the Department, we clearly cannot reexamine any issue of concern to the utilities prior to the June 30, 1983, deadline." (PX 13.) One "issue of concern" raised by EEI that DOE addressed was "a lack of standards for Department of Energy's (DOE) performance." (PX 13.) From DOE's letter, it appears that this was interpreted by DOE, at least, as another reference to pre-January 31, 1998 milestones discussed above, as opposed to a rate of acceptance for performance after that date. (PX 13 ("all

the issues you raised in your letter . . . were addressed in the pre-amble [sic] to the April 18, 1983, final rule.”). In any event, this letter confirms that to avoid delay DOE curtailed discussions of contractual terms. (*See also* Morgan, Tr. 1431, lines 8-23.) And, not surprisingly, the overwhelming evidence shows that the parties had expectations about what the federal waste management program would achieve, which are not manifested within the express terms of the Standard Contract. When the parties’ intention can be ascertained, as in the present case, “the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court.” *David Nassif Assoc.*, 557 F.2d at 158.

F. *The 3,000 MTU/year pick-up rate assumptions upon which Progress Energy presented its damages claims associated with Harris C and D pool activation and associated storage of spent nuclear fuel are reasonable pick-up rate obligations.* The government further disputes that the 3,000 MTU/year rate is appropriate even if one were to accept that a reasonable rate must be applied. Specifically, the government contends that the 3,000 MTU/year pick-up rate does not accomplish what it is supposed to do, namely, achieve the goal of precluding the need for all additional at-reactor storage after 1998. According to the government, Progress Energy therefore has not “met its burden” to establish damages at a reasonable rate, (1/22/08 Def. Br. at 135-36), and the government’s flawed 900 MTU/year rate must apply by default. This alternative basis for disputing the Harris C and D pool activation and associated costs is unavailing.

First, it cannot seriously be questioned that the intent of the parties was to preclude additional at-reactor storage, in the aggregate, after 1998. (*E.g.*, PX 17 at 2-2 (“While the Department’s acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998); PX 19 at 11 (“During the first

year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location."); PX 25 ("In the event that a geological repository is not available in 1998, DOE should evaluate the most economical alternative—considering MRS, dry storage at plant site, reactor storage, and any other alternative that may be available."); PX 35 at 8 ("DOE is currently planning to remove from utility storage all spent fuel on a schedule that will preclude utilities from having to provide any additional storage capacity at nuclear power plant sites after January 31, 1998."); (Martin, Tr. 84-5, lines 15-10).)

Second, the evidence is similarly overwhelming that in order to meet this goal, DOE was designing a system to pick up fuel at 3,000 MTU per year. (*E.g.* PX 8 at 9, PX 17 at 1082.) Even the contemplated MRS was to "be designed to receive spent fuel at a rate of about 3,000 MTU per year." (PX 31 at 126.) Conceptually, being above the 2,000 MTU/year per year discharge rate, 3,000 MTU/year covers the discharge and works off the backlog. Indeed, multiple DOE officials agree that 3,000 MTU/year is "reasonable." (Morgan, Tr. 1408, line 5-8; Zabransky, Tr. 1530, lines 9-11; Barrett, May 10, 2002 Deposition Tr. 1370-71, lines 13-14; Milner, August 11, 2004 Deposition Tr. 4749-50, lines 16-6; Kouts, *Pac. Gas* Tr. 2777, lines 2-5.)

The goals and associated pick-up rates by DOE, however, contemplated avoidance of additional utility at-reactor storage *in the aggregate*:

> While the Department's acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior

> approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date). The use of such brokering arrangements should prevent the need for any utility to expand on-site storage and minimize transshipments.

(PX 17 at 2-2 through 2-4.) In addition, under the Standard Contract, Progress Energy had the right to increase the amount of spent fuel DOE would accept by 20%: "Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule." (PX 10 at 11.)

For all of the reasons stated in Parts I.A-E above, and in our initial post-trial brief at pages 18-33 and 51-60, a pick-up rate obligation ramping up to a steady state acceptance rate of 3,000 MTU/year is the appropriate rate to apply in these circumstances. Accordingly, Progress Energy used such a rate in calculating its claimed damages for purposes of this lawsuit. (PX 137; Edwards, Tr. 303-4, lines 16-20; PX 128 at 2). To get the most up-to-date picture regarding how DOE might "ramp up" to a steady rate of 3,000 MTU per year, Progress Energy used the 3,000 MTU rate as set forth in the July 2004 APR & ACR. (Edwards, Tr. 303-4, lines 16-20; PX 128 at 2.) For the first three years of this pick-up schedule, DOE would accept fuel below the discharge rate. As a result of its place in the priority ranking and because of the location of its fuel, Progress Energy determined that if DOE had performed at the 3,000 MTU per year rate with that ramp up, Progress Energy would have spent approximately $1 million to replace BWR racks with PWR racks (to avoid activating the Harris C & D pools) and another approximately $6.7 million for transshipments after January 31, 1998. (Edwards, Tr. 335-36, lines 19-14; Edwards, Tr. 477-8, lines 19-2.)

In the interests of simplicity and conservatism, Progress Energy did not claim those costs in this proceeding, for example by trying to model the sort of market for exchanges clearly

contemplated by the parties (*e.g.*, Morgan, Tr. 1412-1414, lines 14-4), or by basing its claims on the exercise of its rights under the contract to increase its allocations by 20 percent. *E.g.*, *Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 532-33 (2006).[5] Of course, as a result of DOE's massive breach, the government has rendered it more difficult to determine how the "brokering arrangements" described by DOE would work, under what conditions DOE would approve such agreements, and how much they would cost. Similarly, assessment of how parties would have utilized the plus or minus 20 percent contractual provisions has been rendered more complicated by DOE's utter failure to perform. Progress Energy simply accepted the oldest fuel first position advocated by the government for purposes of this proceeding.

Incredibly, the government now argues that because of Progress Energy's straightforward approach, Progress Energy failed to carry its "burden of providing a rate" that would preclude the need for at reactor storage after 1998. (1/22/08 Def. Br. at 136.) The government's position must be rejected. Progress Energy has no such burden (more on that immediately below). More to the present point, however, Progress Energy's conservatism regarding its damage calculations does not cast any doubt upon the above-described contractual intent to preclude additional at-reactor storage in the aggregate, nor upon the overwhelming evidence confirming that the 3,000 MTU/year rate satisfies that obligation. And it certainly does not ratify the government's "severely flawed" 900 MTU/year rate,[6] as the government contends.

---

5 The 2002 report cited by the government in its brief (1/22/08 Def. Br. at 136) also did not take these two provisions into account (DX 124.) For example, the report looked at the "cumulative" need for at-reactor storage at several utilities and did not consider excess capacity across the industry as a whole. (DX 124 at 8-17, 8-29.)

6 *Sys. Fuels*, 79 Fed. Cl. at 56.

## II. HARRIS C AND D POOL ACTIVATION AND ASSOCIATED STORAGE COSTS: PROGRESS ENERGY'S BURDEN ON THE "PICK-UP RATE" ISSUE.

At pages 136-138 of its post-trial brief, along with the associated proposed findings of fact, the government contends that Progress Energy was required to introduce additional detailed spreadsheets that "analyze damages" at alternative rates, and in particular at a 2,000 MTU/year rate, and that Progress Energy was required to adduce testimony about the "actions [Progress Energy] would have taken" at the rates upon which its damage calculations were based, as well as, presumably, all other possible alternative potentially reasonable, or even unreasonable, rates. Progress Energy's purported failure to do so, the government contends, constitutes (surprise!) another failure to meet its burden of proof regarding pick-up rate, requiring the Court to default to the government's 900 MTU/year position and to deny Harris C and D pool activation and associated spent fuel storage costs.

The government's semantic defenses should be summarily rejected. First, the law does not impose upon Progress Energy the burden of establishing the precise particulars of the but-for world, as the government contends. Second, the evidentiary record in this case comfortably establishes that Progress Energy is entitled to recover all claimed damages under any alternative, plausible, reasonable pick-up rate scenario—the fact that innumerable alternative Excel spreadsheets for every conceivable ramp up or pick-up rate were not prepared and introduced is of no moment. Third, the causation showing that Progress Energy did introduce at trial was accompanied by more than sufficient foundational and supporting testimony, and on this record Progress Energy easily met its burden to establish that DOE's breach was a "substantial causal factor" in the Harris C and D pool activation and associated storage costs claimed. *Ind. Mich.*, 422 F.3d at 1373.

A. *Progress Energy does not bear the burden to establish a but-for world, especially with the precision argued by the government.* For the reasons explained at more length at pages 14-17 of our pre-trial brief dated September 12, 2007 (Docket item 41), in these circumstances Progress Energy does not bear the burden of establishing a but-for world, because of the nature of the mitigation damages it is seeking. *Cf. Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 750 (2004). As we explained, the government's effort to impose that burden upon plaintiffs results from erroneously casting its defenses to mitigation damages as failures of causation by the plaintiff. Under the government's approach, "[a] breaching party could spin out a tangled web of damage-reducing hypothetical events in hopes that the injured party would become ensnared in failing to disprove at least one of them." *Id.*.

The government's argument that Progress Energy's causation model failed to depict an "accurate 'but for' world" therefore misses the mark completely. (1/22/08 Def. Br. at 114.) Even if a "but for" world is required, it clearly need only be a plausible account of what *might* have been: "The position that one would have occupied if history had been different is purely hypothetical. And yet that is the problem that the trial court and jury are required to solve." Corbin, *Corbin on Contracts* § 55.3 (2005). Progress Energy does not have to prove with absolutely certainty exactly what would have happened had DOE performed under the Standard Contract. DOE's massive breach has rendered that an impossibility, but recovery is still plainly warranted. *E.g., Sys. Fuels*, 79 Fed. Cl. at 55-58; *N. States Power Co. v. United States*, 78 Fed. Cl. 449, 457-61 & n.13 (2007); *S. Nuclear*, 77 Fed. Cl. at 415-27. The government cannot credibly contend that Progress Energy would have undertaken additional spent fuel storage activities even if Progress Energy had no need to do so, yet, that is essentially the proposition the government asks the Court to adopt with its "burden" arguments.

B. *The factual record confirms that Progress Energy is entitled to its damages under any plausible, reasonable pick-up rate scenario*. The government complains bitterly that no alternative Excel spreadsheet at a 2,000 MTU/year, or some other rate less than 3,000 MTU/year, was introduced. Clearly, however, the law does not require any particular type of proof (such as a particular form of an Excel spreadsheet). The factual record in this case easily establishes that Progress Energy should recover all of its claimed damages, even pursuant to application of reasonable pick-up rates that might differ in the particulars from the precise rate and ramp-up used by Progress Energy.

For example, the government's initial ACR document was published in June 1987 (PX 38), and expressly incorporated the rates set forth in the DOE's 1987 Mission Plan Amendment (DX 59). (*See* PX 58, at p. 7.) Those pick-up rates were: 1,200/year for five years, 2,000/year for year six, 2,650/year for years seven through ten, and 3,000/year thereafter. (DX 59 at 61; PX 58, at p. 7). For purposes of calculating its damages, Progress Energy used the ramp-up reflected in the DOE's most recent ACR, namely 400/year for year one, 600 MTU/year for year two, 1,200/year for year three, 2,000/year for year four, and 3,000/year thereafter. (*See* PX 137; PX 128 at p.2).

Comparison of these rates and the substantial margins that Progress Energy possessed under the assessment presented in PX 137 confirms the recoverability of all of Progress Energy's claimed damages under the 1987 ACR rates. In particular, application of the 1987 ACR rates clearly results in no detrimental impact for the first three years—indeed, those 1987 rates result in assumptions of DOE accepting 1,400 *more* MTUs from the industry than the ramp up rates utilized by Progress Energy in PX 137. That would translate into approximately 50.5 additional

MTUs of fuel removed from Progress Energy plants in those years,[7] and *increase* the margins during those years accordingly. In years four and five the assumed 1987 rates are somewhat less than the aggregate industry annual discharges, but the 1987 rates approach that aggregate discharge rate in year six, and comfortably exceed it thereafter.

Looking at PX 137, pg. 4, the Robinson plant has a substantial margin over FCR from 1998–2000, which would only be increased using the 1987 rates.[8] The substantial margin over FCR at Robinson from 2001 onward would be reduced somewhat at the 1987 rates but would still comfortably exceed FCR due to the additional margin gained from 1998 to 2000, and because the 1987 rate meets or exceeds the aggregate industry discharge rate beginning in 2003.[9] Similarly, margin over FCR at Brunswick Units 1 and 2 from 1998 to 2000 (which is maintained by Progress Energy's transshipment program)[10] would also increase at the 1987 rates, and the margin over FCR from 2001 onward would easily be maintained through 2003 when the 1987 rate meets and then exceeds the aggregate industry rate.[11] Finally, for Harris, DOE pick-up would be delayed one year from 2006 to 2007 at the 1987 rate but the substantial margins over

---

[7] In particular, see the entries for Carolina Power and Light between the aggregate of 2,200 MTUs (which is the aggregate for the first three years under the assumptions used by Progress Energy in PX 137) in the far right column of page A.4 of PX 128, and the aggregate of 3,600 MTUs (which is the aggregate of the first three years under the 1987 ACR rates in PX 58) on page A.6 of PX 128. There are two such entries, for 26.3 and 24.2, for a total of 50.5 MTUs.

[8] Margin over FCR at Robinson for years 1998–2000 can be determined by subtracting 157 (number of assemblies in the Robinson core) from the number of open spent fuel spaces shown on PX-137, pg. 4, Column J, Rows 35-37.

[9] *See* PX-137, pg. 4, Column J, Rows 38 - 67.

[10] *See* PX-137, pg. 6, Column L, Rows 33 - 35 (Brunswick Unit 1) and pg. 8, Column titled "END OPEN FCR=560," Rows 1998–2000. Margin over FCR at Brunswick can be determined by subtracting 560 (number of assemblies in the Brunswick Unit 1 and 2 cores) from the number of open fuel spaces in the referenced data cells.

[11] *See* PX-137, pg. 6, Column L, Rows 36 onward; PX-137, pg. 8, Column titled "END OPEN FCR=560," Rows 2001 onward.

FCR at Robinson and Brunswick Units 1 and 2 during that timeframe[12] would allow Progress Energy to use additional allocations at Harris to maintain FCR.[13]

Similar exercises would be possible under any different alternative reasonable rate or ramp-up one might care to pick. Indeed, both Mr. Edwards and Mr. Worthington testified that there was significant margin within Progress Energy's capacity to handle rates lower than 3,000 MTU/year. (Edwards, Tr. 308-9, lines 10-7; Worthington, Tr. 815-819, lines 19-14.) In response to the question of whether damages at rates less than 3,000 MTU/year would be "the same," Mr. Edwards responded "sure." (Edwards, Tr. 307, lines 3-21). Mr. Edwards specifically confirmed that at a rate of 2,100 MTU per year, Progress Energy could have avoided the Harris C & D pool activation, the Crystal River rerack, the Robinson ISFSI and the Brunswick ISFSI. (Edwards, Tr. 308, lines 10-21.) There was "margin within our capacity to use rates lower than 3,000," and, of course, "as long as you're meeting that discharge rate for your acceptance rate at the permanent repository, you're keeping up." (Edwards, Tr. 308-309, lines 10 to 7.) At Robinson, for example, Progress Energy has enough capacity to store fuel for three 18-month cycles. (Worthington, Tr. 819, lines 7-12.) To the extent that the government misconstrues out of context snippets of testimony or assertions by counsel to suggest that Progress Energy concedes that the applicable rate is one that would *not* prevent additional at-reactor storage, in the aggregate, by utilities after 1998, such a suggestion obviously misstates plaintiffs' position. [14] The clear intent of the parties, the legal obligations imposed by the

---

[12] *See* PX-137, pg. 4, Column J, Rows 43 onward; PX-137, pg. 6, Column L, Rows 41 onward; PX-137, pg. 8, Column titled "END OPEN FCR=560," Rows 2006 onward.

[13] Margin over FCR at Harris for years 2006 onward can be determined by subtracting 157 (number of assemblies in the Harris core) from the number of open spent fuel pool spaces shown on PX-137, pg. 12, Column L, Rows 29 onward.

[14] The government, for example, misconstrues the testimony of Mr. Edwards at pages 463-464, in asserting that it is not possible to determine how much of the approximately $17 million in transshipment costs would be recoverable at a rate of 2,000 MTU/year. *See* 1/22/08 Def. Br. at 3, 71 (PFOF 209-211), 137. What Mr.

contracts, and the correct application of the law to these facts require application of a rate sufficient to prevent additional at reactor storage. Arguments by the government that are inconsistent with that proposition must fail.

C. *Progress Energy easily satisfied its burden to establish the requisite causation in these circumstances.* The other part of the government's "burden" argument regarding pick-up rate issues consists of a challenge to the testimony of Mr. Worthington, who prepared the summary of factual discharge data, capacity information, and DOE performance assumptions contained in PX 137, upon the basis that Mr. Worthington could not testify with certainty regarding the activities the company "*would* have undertaken" if DOE had performed. Well, no one can, truthfully, do that. And no plaintiff is required to present such contrived testimony in order to recover damages for breach of contract. The data and evidence presented by Mr. Worthington established the necessary and the obvious: if DOE had performed reasonably, Progress Energy would not have needed to expend the sums that it did in the real world to activate the Harris C and D pools and transship and store fuel there. DOE's breach was plainly a "substantial causal factor" in the expenditure of those sums. *Ind. Mich.*, 422 F.3d at 1373.

Tellingly, the government does not attack the accuracy or integrity of the model presented by Mr. Worthington. For example, Mr. Maret, the government's expert, testified that he "didn't see any reason not to accept the information in the causation model in [his] analysis after reviewing all of the information." (Maret, Tr. 1835, lines 17-20.) The model is based on spreadsheet forms that were already in existence and that Progress Energy used for spent fuel

---

Edwards actually said is that he "did not run" a separate Excel spreadsheet at that 2,000 MTU/year rate—and why would he, since no evidence or legal principle even arguably suggests that that should be the applicable pick-up rate? Mr. Edwards did not try to "wing it" on the stand, but the evidence in the record (i.e., PX 137) can be reviewed, as with the 1987 ACR rates in the text above, to assess the recoverability of Progress Energy's damages at any specific postulated rate. And, under any plausible pick-up rate that exceeds the generation rate, Progress Energy is entitled to full recovery of its claimed costs.

planning purposes, (Edwards, Tr. 281, lines 7-14), and upon actual spent fuel storage and discharge data, which is of course carefully tracked. Using allocations Progress Energy would have had if DOE had performed, Mr. Worthington and Mr. Edwards applied the assumptions and data "to make the most efficient use of [those] allocations and space available." (Edwards, Tr. 302, lines 16-22.)

The cases cited by the government in connection with Mr. Worthington's testimony are inapposite. (1/22/08 Def. Br. at 138.) For one thing, they concern the *admissibility* of evidence, and Mr. Worthington's causation spreadsheet and his extensive testimony about it are in evidence. Regardless, even the sentiments expressed in those cases do not apply to Mr. Worthington's testimony describing his causation spreadsheet or call into question the facts that it proves. In *LifeWise Master Funding v. Telebank*, for example, the Tenth Circuit noted that the president of the company did not have personal knowledge of rolling averages, S-curves, and compound growth rates, which were used in a model to estimate lost profits. 374 F.3d 917, 931 (10th Cir. 2004). Mr. Worthington, on the other hand, clearly had personal knowledge of the analyses and factors used in the model about which he testified. Mr. Worthington has been lead engineer in the spent fuel management section since 2002 and is involved in dealing with a wide range of spent fuel storage issues. (Worthington, Tr. 783, lines 17-22; Worthington, Tr. 784, lines 4-9.) During trial Mr. Worthington gave a detailed description, recorded on approximately 35 pages of the trial transcript, of the bases, facts, sources of information, assumptions, and conclusions of the causation model. The government offered no challenge, in cross examination or otherwise, to *the substance* of that testimony or the information presented. There is simply no basis to suggest that Mr. Worthington was not qualified to testify about the process and analyses

he used.[15] That evidence was persuasive, and easily met any burdens Progress Energy might have had.

## III. Government Defenses To Particular Incurred Damages

In an attempt to preclude specific elements of Progress Energy's mitigation costs, the government applies erroneous standards and arbitrary "screens" to reach preordained conclusions that certain claimed costs are not "incremental." Each of the government's various claims for deductions, however, is undermined by one or more fundamental principles. First, as explained above, once Progress Energy has established that DOE's delay caused a shortage in spent fuel storage space, Progress Energy should recover all costs it incurred in its reasonable efforts to mitigate the damage caused by DOE's breach, and the government has not disputed the reasonableness of a single penny claimed. Second, Progress Energy need not show that the shortage of spent fuel storage caused by DOE's breach was the "sole" factor in its mitigation decisions—that is not the law, and no decision at a nuclear power plant is made in a vacuum. Third, "[t]he only saving that is to be deducted is the saving of expense with respect to performance by the plaintiff that the defendant's breach has made unnecessary." Corbin, *Corbin on Contracts* § 57.10. The fact that Progress Energy might arguably avoid future costs *unrelated* to Progress Energy's performance under the Standard Contract if DOE had performed on time does not affect Progress Energy's present right to recovery for the delay. *Id.* Fourth, the government must establish any claimed offset or deduction with "reasonable certainty." With these principles in mind, the government's specific argued offsets are discussed below.

---

[15] The other case cited by the government, *Nevada Power Co. v. Monsanto Co.*, involved a claim for fraudulent concealment under Nevada law, for which the plaintiff must show that he would not have acted as he did if he had known of the concealed or suppressed fact. 891 F. Supp. 1406, 1415 (D. Nev. 1995). A witness testified that even knowing the dangers of PCBs he would continue to purchase PCB equipment. *Id.* The court ruled that testimony from other witnesses regarding whether the first witness would have really purchased PCB equipment after becoming aware its toxicity was speculative and thus inadmissible. *Id.* The ruling in *Nevada Power* is simply not relevant to the present case.

A. *The government is not entitled to reduce Progress Energy's damages by the costs of removal of "CRUD" and unused racks associated with Harris C and D Pool activation and storage of spent fuel.* It is undisputed that activating the Harris C and D pools was reasonable to address the need for spent fuel storage. (Maret, Tr. 1759, lines 13-17.) And it is undisputed that removal of "CRUD" and disposal of unused racks was necessary to activate the Harris C & D pools. (Maret, Tr. 1841, lines 16-20.) Yet the government claims that the cost of these activities is not recoverable because these activities would be required upon the decommissioning of the Harris plant. (1/22/08 Def. Br. at 145.) The Harris plant will likely be decommissioned some time after 2046. (Edwards, Tr. 262-3, lines 19-4.) Any costs avoided at decommissioning 40 years from now (resulting from Progress Energy's mitigation activities today) should not be deducted because they are wholly unrelated to Progress Energy's performance under the contract. *See, e.g., Hughes Comm. Galaxy, Inc. v. United States*, 38 Fed. Cl. 578, 582 (1997), *aff'd*, 271 F.3d 1060 (Fed. Cir. 2002) ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step."). The government's claims in these circumstances fall into that class of argued damage reductions "that, as a matter of law, the courts will find too remote." *Id.* Only benefits related to the contract, such as performance costs that DOE's delay have made unnecessary, may be deducted.

In addition, there is no basis for Mr. Maret's conclusion that the costs would be the same at decommissioning. (1/22/08 Def. Br. at 145.) Mr. Maret did not account for the present value of money. (Maret, Tr. 1842, lines 7-22; Maret, Tr. 1848, lines 4-10.) Mr. Maret also did not take into account the change in radioactivity of CRUD over time. (Maret, Tr. 1844-45, lines 3-8.) Mr. Edwards testified that, prior to the activation of the unused C and D pools, it was Progress Energy's strategy to leave the CRUD in them "as long as possible," because with its

short half-life the CRUD would significantly decay. That decay would allow transportation as low-level waste and reduce exposure to employees. (Edwards, Tr. 379-85, lines 19-22.) Finally, the government failed to account for certain economies of scale, considering that "[t]here's a lot of material to deal with" when you decommission a nuclear power plant. (Maret, Tr. 1845, lines 9-12.) The government's "estimate" of these costs 40 years from now is wholly speculative. *See Sys. Fuels*, 79 Fed. Cl. at 71 ("any 'benefits' the government seeks to offset must be shown to a reasonable certainty, or they must be denied as too speculative to meet the standards set forth in *Indiana Michigan*") (*citing Tenn. Valley Auth.*, 69 Fed. Cl. at 543). And the government's counter-argument that Mr. Edwards "did not supply any competing estimate" and "acknowledged that he did not know whether the method employed to dispose of the racks in the actual world would be different than the method that would have been used upon decommissioning" (1/22/08 Def. Br. at 145) only supports this conclusion.

B. *The government is not entitled to reduce Progress Energy's damages by the costs of the Component Cooling Water System upgrades associated with Harris C and D Pool activation and storage of spent fuel.* The government's efforts to deduct the costs of the Harris CCW system upgrades from Progress Energy's damages are both legally and factually deficient. Legally, the government seriously misconstrues the Federal Circuit's holding in *Indiana Michigan*. In *Indiana Michigan*, the Federal Circuit held that DOE's breach must be a "substantial causal factor" in the decision to undertake a mitigation activity. 422 F.3d at 1373. In applying this standard, the Federal Circuit held that a utility could not recover costs when the decision to engage in the activity was made six years before DOE's announcement of breach and was thus "not affected" by DOE's delay: The decision was "*purely* a business judgment which it would have had to pursue irrespective of DOE's partial breach." *Ind. Mich.*, 422 F.3d at 1376

(emphasis added). In other words, the Federal Circuit concluded that when the partial breach was not even *a* factor in the decision, it certainly was not a "substantial causal factor," and thus the activity was clearly not undertaken to mitigate the breach.

The government twists this straightforward holding into the awkward assertion that Progress Energy bears a "burden of establishing that [its] actions would not have been undertaken irrespective of any partial breach by DOE." (1/22/08 Def. Br. at 146.) That is not what *Indiana Michigan* says, and the government's contorted interpretation of that case is quite incorrect. As we explained in our initial post-trial brief at pages 61-63, any time that a breach and one or more other causes could be said to have contributed to an action, it is logically possible (as the government does here) to argue that the action would have occurred "irrespective" of the breach. The necessary implication, then, of the government's position is that a plaintiff must show that the breach was the "sole" cause of the action. But, that is plainly not the law. *E.g.*, *Cal. Fed. Bank*, 395 F.3d at 268 (breach need *not* "be the sole factor or sole cause in the [claimed damages]") (citing E. Allan Farnsworth, Contracts § 12.1, at 150-51 (3d ed. 2004)).[16]

Factually, Progress Energy has more than satisfied its burden to show that DOE's delay was a "substantial causal factor" in its decision for the CCW upgrades. Again, it is undisputed that activating the C and D pools was a reasonable way to acquire more spent fuel storage space. (Maret, Tr. 1759, lines 13-17.) And Mr. Edwards testified that storing fuel in the C and D pools "with certainty" required CCW system upgrades. (Edwards, Tr. 359, lines 17-23.) The CCW

---

16 *See also Bank of America v. United States*, 70 Fed. Cl. 246, 251 (2006) (concluding that mitigation costs are recoverable "even if other business considerations later informed the [plaintiff's] decisions: no business judgment is exercised in a vacuum . . . [and] it is thus irrelevant that [plaintiff] may have had independent business reasons for" engaging in a transaction that mitigated the breach); *American Fed. Bank v. United States*, 72 Fed. Cl. 586 (2006) ("despite the existence of secondary business reasons for American Federal's [mitigation activity], the court concludes that the bank has satisfied its burden to prove that the government's breach directly caused [the mitigation activity]").

upgrades were required to increase the heat limit to accommodate new fuel in the C and D pool. (Tibbitts, Tr. 1023, lines 3-23.) Even Mr. Maret admitted that it was "reasonably possible" that storing fuel in the C and D pools required CCW upgrades. (Maret, Tr. 1854, lines 1-8.) Indeed, the government argues that the CCW "would eventually be needed at the 900 MTU rate." (1/22/08 Def. Br. at 148.) It is only logical that the CCW would be needed (and much sooner) to store the greater amount of fuel that accumulated as a result of DOE not accepting fuel at the 3000 MTU/year rate.

Nonetheless, under its erroneous "sole factor" standard, the government argues that the cost of the CCW upgrades is not recoverable because Progress Energy would have made the same upgrades "to accommodate increased heat demands from Progress Energy's power uprate." (1/22/08 Def. Br. at 147.) The evidence, however, does not support the government's contentions, even assuming for argument's sake that the contentions were legally material (which they are not). As explained on page 39 of Progress Energy's initial post-trial brief, power uprates such as the one at Harris are designed to "harvest margin," by reanalyzing certain margins of safety built into the design of the applicable systems, *without plant modifications* and replacement of equipment. (Edwards, Tr. 357-58, lines 3-20; Edwards, Tr. 545-46, lines 21-12.) Indeed, while power uprates are "common in the industry," Mr. Maret was unaware of a single other instance where a utility has had to perform a physical upgrade to a CCW or analogous system as a result of such an uprate. (Maret, Tr. 1870-1871, lines 20-2.)

Mr. Maret also acknowledged that the maximum impact one would expect on the heat load in the pool from Progress Energy's power uprate would be 4.5%. (Maret, Tr. 1867, lines 16-22.) Yet Mr. Maret implied during his direct examination that the power uprate increased the heat load by nearly 20%. (Maret, Tr.1788-89, lines 21-3.) When asked to explain the

discrepancy during cross-examination, Mr. Maret conceded that the increase he relied upon was not "strictly from the power uprate." (Maret, Tr. 1868, lines 5-7.) And Mr. Maret did not perform any independent modeling to estimate the heat load increase attributable to the power uprate. (Maret, Tr. 1858, lines 6-18.) Mr. Tibbitts confirmed that the power uprate would "not necessarily" require a CCW upgrade because there are other options available to accommodate the changes. (Tibbitts, Tr. 1025-6, lines 11-18.) On this record, which is quite extensive on this issue, one simply cannot conclude that the CCW system would have been upgraded irrespective of DOE's breach.

Finally, the government misses the mark in asserting that Progress Energy must deduct the hypothetical costs of other potential options that could have been used to accommodate the increased heat loads from the power uprate. (1/22/08 Def. Br. at 147.) There is no evidence that there would even be such costs. Moreover, as the government points out, the power uprate project is "totally unrelated to DOE acceptance of SNF." *Id.* Benefits derived from "unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong." *LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1373 (Fed. Cir. 2003) (limiting reduction on lost profits claims to actual profits from a "substitute transaction").

C. *The government is not entitled to a damage reduction due to hypothetical costs of loading DOE casks that were never supplied.* The government argues that there should be an offset for the costs that Progress Energy would have incurred to load DOE's casks had DOE begun performance in 1998 as the Standard Contract requires. (1/22/08 Def. Br. at 154.) DOE's delay, however, did not make the loading of DOE's casks unnecessary, it only deferred the cost to a later date. There are no costs "avoided," only possibly deferred. When DOE arrives to pick

up spent fuel, Progress Energy will be responsible for loading DOE's casks. Only costs "made unnecessary" by the breach should be deducted. Corbin, *Corbin on Contracts* § 57.10.

The government cannot now show that Progress Energy has "unquestionably avoided" future loading costs, and a present offset should not be based on the possibility, which is clearly speculative, that the government might be able to show some savings in the future. (1/22/08 Def. Br. at 156.) Any uncertainty regarding whether Progress Energy will incur costs in the future to load DOE's casks was, of course, created by the government's massive breach. The government, therefore, should not be allowed to benefit from that uncertainty.[17]

Moreover, any benefit derived from deferring this cost is, in fact, truly speculative. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 542. The government's assertion that "it is not necessarily the case that Progress Energy will be required to incur anywhere near the same costs to load casks to DOE at a later date" (1/22/08 Def. Br. at 155) is obviously conjecture. While DOE *could* pick up Progress Energy's loaded casks, the evidence shows that DOE has not committed to doing so. (Edwards, Tr. 389, lines 22-25.) It is thus "wholly speculative to assume that DOE would use the same type of cask and loading arrangements as that employed for dry storage." *Tenn. Valley Auth.*, 69 Fed. Cl. at 534. Such claims by the government have been rejected in every spent fuel case to date,[18] and the present record does not warrant a departure from those correct holdings.

---

[17] The government's argument that Progress Energy should bear the risk of reconciling future loading costs with present offsets in subsequent proceedings is unjustified. If the court awards an offset against Progress Energy and then, as is likely, Progress Energy incurs costs to load DOE casks, Progress Energy would, at a minimum, face obstacles to recovery of its actual future DOE cask loading costs, because Progress Energy has the responsibility to load those casks under the contract. So, Progress Energy would then face the prospect of being left without a remedy, or, alternatively, trying to reopen a court judgment regarding the offsets that might be decades old by that point.

[18] *Sys. Fuels*, 79 Fed. Cl. at 71 (*citing Tenn. Valley Auth.*, 69 Fed. Cl. at 542; *N. States Power*, 78 Fed. Cl. at 468-69; *S. Nuclear*, 77 Fed. Cl. at 450-51; *Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 416 (2006); *Yankee Atomic*, 73 Fed. Cl. at 286; and *Sacramento Mun. Utility Dist. v. United States*, 70 Fed. Cl. 332, 372 (2006)).

D. *The government is not entitled to reduce Progress Energy's damages by the costs of railroad maintenance incurred for transshipment campaigns caused by DOE's breach.* The government is speculating when it argues that Progress Energy would have been required to maintain its tracks in the "but for" world "to accommodate CP&L's preferred method for delivering casks to DOE by rail." (1/22/08 Def. Br. at 153.) There is no basis to conclude that DOE would have used CP&L's "preferred" method to pick up casks, as DOE has not committed to the use of railroad casks. (Zabransky, Tr. 1528, lines 14-19.) Indeed, Progress Energy would have "preferred" for DOE to start accepting spent fuel in 1998, and that didn't happen.

In addition, despite the government's contrary assertion, the maintenance at issue is not performed when the tracks are not used. (Edwards, Tr. 391-2, 25-4.) And if DOE had performed at the 3,000 MTU rate, Progress Energy would have ceased transshipping from Robinson in 1997, from Brunswick Unit 2 in 1999, and from Brunswick Unit 1 in 2001. (Edwards, Tr. 475-76, lines 1-12; PX 137 at CP_FP000188812-16.) Because one cannot say that Progress Energy would have used the tracks at these facilities to transfer fuel to DOE, the costs of maintaining the tracks after these dates, which were charged to the mitigation projects at issue in this case (Edwards, Tr. 389, lines 16-20), should not be removed from Progress Energy's recovery.

E. *The government is not entitled to reduce Progress Energy's damages by the costs of the Crystal River re-rack.* In its challenge to Progress Energy's recovery of the costs for the Crystal River re-rack, the government once again misstates Progress Energy's burden, as it does with the Harris CCW system upgrades. (1/22/08 Def. Br. at 148.) *See* Part III.B, above. Progress Energy need not show that DOE's delay was the "sole factor or sole cause" of the re-rack the Crystal River pool (or, to use the government's awkward phrasing, that the rerack would

not have occurred "irrespective" of the breach). *E.g.*, *Cal. Fed. Bank*, 395 F.3d at 1268 (citing E. Allan Farnsworth, Contracts § 12.1, at 150-51 (3d ed. 2004)).[19] Progress Energy must establish that DOE's delay in picking up spent fuel was a "substantial causal factor" in its decision to re-rack the Crystal River pool. Fairly viewed, the evidence allows no conclusion other than that it was.

Even under the government's erroneous standard, however, the evidence is that, more likely than not, Progress Energy would *not* have pursued a re-rack at Crystal River in the absence of DOE's delay. In an attempt to demonstrate otherwise, the government obscures several important points.

i. First, the government attempts to downplay the alternatives that exist to solve the silica and criticality issues. (1/22/08 Def. Br. at 151.) The silica could have been managed by bringing in a vendor at a fraction of the cost of re-racking to perform a straightforward process that did not have a "significant impact on plant resources." (Culver, Tr. 937-8, lines 25-19.) It is true that in 1996 Progress Energy decided that isolating the pool and *installing* a permanent reverse osmosis system was "too complicated," but it was the structural changes, and not the reverse osmosis process, that made it complicated: "it meant cutting a hole, boring holes in concrete walls and other piping modifications. That's why it was so complex." (Lehmann, Tr. 1149, lines 8-12.) In addition, the Boraflex team concluded that reverse osmosis did *not* increase the rate of Boraflex degradation (as the government contends it would) and developed contingency procedures just in case. (Culver, Tr. 949-50, lines 24-14.)

[19] Crystal River's decision to re-rack is altogether distinct from situation the Federal Circuit encountered in *Indiana Michigan*. In that case, the decision to re-rack was made in 1989 solely for reasons unrelated to DOE's breach, which was announced in 1994. By contrast, the decision to re-rack the Crystal River pool was made in late 1997, three years after DOE announced its delay, and the evidence leaves little room to dispute that the need for space was a driving factor, indeed the "primary reason," for the rerack. (Culver, Tr. 954-55, lines 22-16; PX 84.)

Criticality concerns also could have been resolved in a variety of ways. As the government acknowledges, Racksavers™ were an option. (1/22/08 Def. Br. at 152.) Indeed, Racksavers™ were designed as "a highly cost effective alternative to re-racking." (PX 66 Attachment E.) Contrary to the government's assertion, however, Racksavers™ were not the *only* option. For example, Racksavers™ could have been combined with a process called checkerboarding, which would have dramatically cut the $961,000 estimate to approximately a quarter of that amount. (Culver, Tr. 916, lines 2-16.) In addition, Progress Energy could have taken credit for other neutron absorbers, such as soluble boron. The government's assertion that this option was rejected by Progress Energy misses the mark. (1/22/08 Def. Br. at 151-52.) Progress Energy rejected the idea of crediting *only* soluble boron, but there are many other options that would have been available, including crediting some of the Boraflex remaining in the racks in addition to soluble boron, if space had not been an issue. (Williams, Tr. 1216-17, lines 17-12; Williams, Tr. 1219-20, lines 15-3.) Finally, because of the offset principles described at the beginning of Part III above and in our initial post-trial brief at page 52, the government's assertion that there should at least be an offset to cover the estimated cost of these alternatives should also be rejected. *See e.g.*, Corbin, *Corbin on Contracts* § 57.10.

ii. Second, the government errs in asserting that the only reason Progress Energy did not re-rack in the mid-1990s, when the Boraflex issue first came to light, was that it was not seen as cost-effective. As Mr. Culver testified, re-racking "is a very complex event" and "it's not to be taken lightly." (Culver, Tr. 932-3, lines 6-18.) A re-rack like that done at Crystal River involves somewhere between 700 and 1,000 fuel moves. (Culver, Tr. 933, lines 9-11.) Divers must enter the pool, a life-threatening environment, to cut obstacles off the wall. (Culver, Tr. 932, lines 17-23.) Mr. Culver testified that because of the complexity, combined with the fact

that other options were available to take care of criticality and silica, he would have recommended against the re-rack if space had not been an issue. (Culver, Tr. 963, lines 11-20.)

iii. Third, the government quite erroneously argues that the nature of its agreement with Westinghouse drove its decision to re-rack. (Def. Br. 149.) The mediation with Westinghouse occurred *after* Progress Energy made the decision to re-rack. (Lehmann, Tr. 1207-08, lines 18-18.) The evidence suggests that Progress Energy would have sought compensation from Westinghouse for whatever solution to the Boraflex problem it chose. (Lehmann, Tr. 1121, at 2-5.) Indeed, one might logically conclude that Progress Energy was in a weaker negotiating position with Westinghouse because the re-rack provided much needed additional spent fuel storage.

iv. Fourth, the government attempts to downplay the importance to Crystal River of achieving additional space in the re-rack. What the government characterized as "only 64 cells" was significant because it increased the available cell locations by one fuel cycle. (PX 84 at 1.) That gave Crystal River considerably more time to build dry storage, which will be "a significant undertaking" because of the "special set of circumstances" related to Crystal River's location. (Culver, Tr. 945, lines 3-12.) The additional storage from the re-rack also gave Progress Energy enough room to refuel the reactor and run the final cycle. Although it would have lacked full core reserve during the final cycle, having this option created the possibility of getting to the end of license while delaying the need for dry storage even further. (Culver, Tr. 970-72, lines 12-13.) Most important, however, regardless of how long the dry storage could be put off, the additional spaces anticipated from the re-rack made economic sense because expanding "wet storage" is unquestionably more economical than dry storage. (Maret, Tr. 1881-82, lines 6-11.)

v. Finally, the government misinterprets the project approval "scoresheet." (1/22/08 Def. Br. at 150.) Mr. Lehmann testified that the scoresheet was not used in the way the government is attempting to use it: "This really does not use that method to add up all the individual numbers, each question is individually assessed." (Lehmann, Tr. 1188, lines 7-10.) More persuasive is the fact, confirmed by Mr. Maret, that *all* company documents created after the September 19, 1997 "Long Term Spent Fuel Storage Strategic Plan" discuss the need for additional spent fuel storage space in connection with Crystal River re-rack. (Maret, Tr. 1880-81, lines 24-5). Again, fairly viewed, the evidence plainly establishes that DOE's breach was a "substantial causal factor" of the Crystal River re-rack.

F. *The government is not entitled to reduce Progress Energy's damages by the costs of licensing proceedings and interventions associated with Harris C and D Pool activation and storage of spent fuel.* The government seeks an adjustment for licensing and communication costs related to the Harris C and D pool activation because such costs were not a "direct result of DOE's delay in performance." (1/22/08 Def. Br. at 146.) Notably, the government does not cite any cases holding that *mitigation costs* must be a "direct result" of a breach. Indeed, mitigation costs by definition are not a direct result of a party's breach. Rather, mitigation costs are incurred in a reasonable effort to avoid the direct result of a party's breach: "A non-breaching party may generally recover its mitigation costs incurred in a reasonable effort to *avoid loss caused by a breach*." *Old Stone Corp. v. United States*, 450 F.3d 1360, 1368 (Fed. Cir. 2006) (emphasis added). Otherwise, all mitigation costs could be attacked on causation grounds. Indeed, the government could argue that any and all costs incurred in mitigation activities were not a "direct result" of DOE's breach, and should not be recovered.

The government's citation to *Old Stone* reveals the government's attempt to muddle the concepts of mitigation and causation. (1/22/08 Def. Br. at 64.) In *Old Stone,* the Federal Circuit reviewed two awards, one for mitigation costs and the other based on a theory of restitution, or, in the alternative, a theory of reliance. *Old Stone*, 450 F.3d at 1363. The Federal Circuit affirmed the award of mitigation costs: "We agree with the Court of Federal Claims conclusion here that OSC's mitigation efforts were *reasonable under the circumstances*." *Id.* at 1370 (emphasis added). At the same time, the Court reversed the second award and held that it was not recoverable under a restitution theory because the appellant continued to perform under the contract, and was also not recoverable under a reliance theory because the damages were not foreseeable as a matter of law. *Id.* at 1363. The Federal Circuit explained that "reliance damages are subject to two pertinent limitations—the damages must have been both proximately caused by the breach, and foreseeable." *Id.* at 1375. But "[b]ecause these two doctrines are not meaningfully distinct," the court analyzed the claim "under the rubric of foreseeability." *Id.* Rather than cite the Federal Circuit's analysis of the award of mitigation costs, clearly relevant to this case, the government points to the Federal Circuit's analysis of recovery under a theory of reliance, which is not the theory of damage applicable here. (1/22/08 Def. Br. at 64.) Nonetheless, even if the latter standard applied to mitigation costs as well, the licensing and communication costs are recoverable under the "foreseeability"-based test in *Old Stone* cited by the government.

As stated above, it is undisputed that activating the Harris C and D pools was a reasonable way to create additional spent fuel storage. (Maret, Tr. 1759, lines 13-17.) A necessary part of the activation was seeking a license amendment with the Nuclear Regulatory Commission ("NRC"). The NRC's rules of practice for licensing procedures invite interested

parties to intervene. 10 C.F.R. § 2.174 (1998). An intervention in the types of spent fuel storage projects at issue in this case are not only foreseeable, according to Mr. Martin "it's certain." (Martin, Tr. 123-24, lines 23-2; *accord* Edwards, Tr. 348-49, lines 25-1; Morgan, Tr. 1464, line 17.) Defending a license application against interveners, therefore, was a foreseeable and an unavoidable cost associated with activating Harris C and D pools. Progress Energy "should not have to bear the unavoidable costs associated with [an activity] that defendant acknowledges constituted an otherwise reasonable and successful effort to mitigate damages." *N. States Power*, 78 Fed. Cl. at 463-64.

G. *The government is not entitled to reduce Progress Energy's damages due to Progress Energy's use of internal labor.* The government's argument that Progress Energy would have incurred some of its labor costs even absent the partial breach (1/22/08 Def. Br. at 156) is based upon the flawed "fixed cost" theory we addressed at pages 68-69 of our initial post-trial brief. (1/22/08 Pl. Br. at 68-69). The fact that Progress Energy "would have paid its employees in all events is not material to this inquiry." *Tenn. Valley Auth.*, 69 Fed. Cl. at 569; *see also, e.g., S. Nuclear*, 77 Fed. Cl. at 442 (ruling that "plaintiffs made an appropriate showing of the amount of time spent by internal personnel on breach-related project-efforts for which those employees were not hired."). The government agrees that the time for which Progress Energy is claiming its labor costs was spent on mitigation activities. Progress Energy was clearly deprived of the time its employees spent on mitigation activities. Progress Energy, therefore, should be compensated for the full cost of its mitigation activities.

Moreover, the government's offset is clearly speculative. It is based on the notion that "reasonable companies generally staff their operations to handle a moderate amount of unexpected work," without any analysis specifically regarding staffing at Progress Energy. In

fact, the only basis for the government's offset is a completely arbitrary "screen" that Mr. Johnson "looked at . . . and said, I think that that's a reasonable assessment of the cost that you would have incurred anyhow." (Johnson, Tr. 2008, lines 9-11.) As we described in our initial brief, the criteria applied by the government for this argued offset was just made up by Mr. Johnson.

H. *The government is not entitled to reduce Progress Energy's damages by the costs incurred for Allowance for Funds Used During Construction.* The government erroneously argues that Progress Energy's claim for AFUDC costs is barred by 28 U.S.C. 2516(a). (1/22/08 Def. Br. at 163.) The government bases its assertion on Mr. Johnson's testimony that AFUDC is the equivalent of interest. (1/22/08 Def. Br. at 163.) But the fact that AFUDC may be "like interest" in some respects is not enough to support the government's proposed offset, because there is a distinction between interest *on* a claim and interest *as* a claim. *See Tenn. Valley Auth.*, 69 Fed. 541 (citing *Wickham Contracting Co. v. Fisher*, 12 F.3d 1574 (Fed. Cir. 1994)). In *Wickham* the Federal Circuit held that "a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." *Wickham*, 12 F.3d at 1582. The government's attempts to distinguish *Wickham* based on the contract at issue in that case is unpersuasive. The Federal Circuit did not even mention the contractual language in *Wickham,* and thus it is unlikely that it was relying on the contract for its holding. Rather, the Federal Circuit was clearly relying on the distinction between interest "on a claim" and interest "as a claim." AFUDC is clearly the latter.

The government next argues that to recover interest as claim, there must be a "direct link" between the capital expenditures and a specific debt instrument. This Court in *Tennessee Valley Authority* rejected this standard, 69 Fed. at 542 ("TVA is not required to meet a standard as

stringent as the one the government postulates.”), although the assertion was accepted in *System Fuels*, 79 Fed. Cl. at 70. How Progress Energy issues its debt, however, should not prohibit its recovery of the cost of obtaining capital. Taking a simplified hypothetical of a company with two major capital projects, pursuant to the government’s arguments the company would recover AFUDC if it issued two project-specific debt instruments, but would not recover if it combined its needs and issued just general company debt. That makes no sense, does not accord with how utilities and sophisticated companies do business, and should not be the rule. The evidence shows that Progress Energy borrowed funds at the same time as paying out large capital expenditures for the mitigation projects, and the borrowed funds were therefore clearly used on the projects. This should be sufficient to support Progress Energy’s recovery of the cost, as measured pursuant to federal regulations, of using the funds.

I. *The government is not entitled to reduce Progress Energy’s damages due to Progress Energy’s use of warehouse and construction services in connection with breach-related activities.* The government erroneously argues that overhead costs must be “variable” to be recoverable. (1/22/08 Def. Br. at 159.) According to the government, mitigation projects should not be charged a portion of “fixed” overhead costs because the costs can be “simply distributed evenly among the remaining projects.” (1/22/08 Def. Br. at 160.) Mitigation projects, however, used overhead-related services and therefore should bear their fair share of overhead costs. The government fails to explain why non-breach related capital projects should incur disproportionate overhead expenses.

The government’s reliance on other spent fuel cases as support for its argued general prohibition on overhead costs is misplaced. This Court “previously has determined that loader costs may be included in a claim for mitigation damages.” *Sys. Fuels*, 79 Fed. Cl. at 799 (citing

*Tenn. Valley Auth.*, 69 Fed. Cl. at 530.) An offset, therefore, is only appropriate if the government satisfies its burden of establishing that the claimed overhead charges are unreasonable. *Id.* For example, in *System Fuels* this Court determined that a portion of payroll loader costs should be deducted from the damages claim because it applied to retired employees and other employees who did not work on the dry storage project. *Id.* But more pertinent to the present case, in *System Fuels* this Court also refused to offset material loaders, which were captured under specific project codes, despite the government's claim that such costs are not incremental to the partial breach. *Id.* In *TVA*, this Court offset overhead charges because TVA "provided no evidence to show the utility of [the overhead] costs to the project." 69 Fed. Cl. at 542. In this case, however, the fact that the projects used and benefited from the services is not in dispute. (Johnson, Tr. 2029, lines 11-14.)

Finally, it is worth noting that in analogous situations where the government seeks compensation for work it has performed, the government recovers its own overhead as part of the "fair and reasonable charge for repairs" and what was "necessary to complete the job." *See, e.g., United States v. Capital Sand Co.*, 466 F.3d 655, 658 (8th Cir. 2006) (suit in admiralty to recover cost to repair lock and gate on the Mississippi River). The overhead charges claimed by Progress Energy are reasonable, directly related to its mitigation activities, and appropriately captured by specific project codes. The government's proposed offset should be rejected.

J. *The government is not entitled to reduce Progress Energy's damages in connection with costs for breach-related activities recorded through manual adjustments.* The government argues that there is no "competent evidence" that manual adjustment charges were incremental to DOE's partial breach. (1/22/08 Def. Br. at 167.) That is not true. The "competent evidence" consists of the contemporaneous records and data from Progress Energy's

accounting system upon which it relies in the normal course of business to collect costs for capital projects, along with the testimony regarding the processes, sign-offs, and other checks and balances utilized by Progress Energy to ensure that manual adjustments are properly recorded.[20] The law does not require any particular *type* of evidence. If a capital project is otherwise recoverable, which those at issue regarding the challenged manual adjustments are, then Progress Energy should recover all costs that it can reliably show were incurred by that project. Progress Energy could make this showing any number of ways, including with "a document regularly prepared in the normal course of business" even if the sponsoring witness is "unable to fully explain the basis for all the costs set out in it." *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1357 (Fed. Cir. 2001) (citation omitted). The evidence in the record is competent and sufficient to support full recovery.

K. *The government is not entitled to reduce Progress Energy's damages by costs associated with Robinson crane studies.* There is absolutely no evidence to support the government's assertion that the crane analyses were required for any reason other than the need to lift the 110-ton dry storage cask for the Robinson ISFSI, which was unquestionably caused by DOE's breach. (1/22/08 Def. Br. at 154.) Progress Energy's 125-ton crane was qualified to lift the 75-ton shipping cask. (Worthington, Tr. 823-24, lines 25-1.) Progress Energy determined that it would be prudent to perform the analyses at issue as part of the Robinson dry-fuel storage project because lifting the heavier 110-ton storage casks with its 125-ton crane would reduce its safety margin from 75:125 to 110:125. (Worthington, Tr. 824, lines 2-7; Worthington, Tr. 857, lines 10-14.) Mr. Worthington's testimony unequivocally establishes that the analyses at issue

[20] (*See, e.g.*, Calvello, Tr. 1597, lines 4-16.; Edwards, Tr. 434, lines 20-25; Edwards, Tr. 439, lines 16-21; Edwards, Tr. 420, lines 1-20.; 1/22/08 Pl. Br. at 73.)

were not required to load the 75-ton shipping cask. (Worthington, Tr. 826, lines 8-11; Worthington, Tr. 829, lines 14-16; Worthington, Tr. 831-2, lines 25-2.)

There is no evidence suggesting that the analyses were needed to lift the 75-ton cask. While it is true that the NRC criteria for analyzing cranes evolved over time (Worthington, Tr. 850, lines 24-1), there is no basis to postulate, as the government does, that the changes required all cranes to be re-analyzed. Indeed, the uncontroverted evidence proves the cranes did not need to be re-analyzed under the current set of NRC criteria to lift the 75-ton cask. (Worthington, Tr. 826, lines 8-11; Worthington, Tr. 829, lines 14-16; Worthington, Tr. 831-2, lines 25-2.) Clearly the analyses at issue, which were performed pursuant to NRC's current criteria, were required solely because Progress Energy needed to lift a heavier cask to support its dry storage facility at Robinson.

## IV. CONCLUSION

Progress Energy respectfully requests that this Court enter judgment for the costs incurred through December 31, 2005, in the amount of $91,029,704. In its order, the Court should also confirm Progress Energy's right to pursue in subsequent proceedings damages incurred after December 31, 2005, pursuant to the exceptions to the rules of merger and bar set out in the Restatement (Second) of Judgments, §§ 26(1)(b) and (e), as expressly adopted by the Federal Circuit in *Indiana Michigan*, 422 F.3d at 1377.

Respectfully submitted,

Of Counsel:

s/ Brad Fagg

Brad Fagg
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-5191
Facsimile: (202) 739-3001

Paul M. Bessette
David M. Kerr
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Telephone: (202) 739-3000
Facsimile: (202) 729-3001

Attorneys for Plaintiffs

February 19, 2008

CERTIFICATE OF FILING

I hereby certify that on this 19th day of February 2008, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Brad Fagg