IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CAROLINA POWER & LIGHT COMPANY and FLORIDA POWER CORPORATION, | ) | |
| Plaintiffs, | ) | No. 04-37C |
| v. | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# DEFENDANT'S POST-TRIAL REPLY BRIEF

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

ANDREW P. AVERBACH
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0527
Tel: (202) 305-7643

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
CHRISTOPHER J. CARNEY
LISA L. DONAHUE
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

February 19, 2008

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

I. PROGRESS ENERGY HAS INCORRECTLY DESCRIBED ITS BURDEN.. . . . . . . . . 31

II. PROGRESS ENERGY'S LEGAL ARGUMENTS CONCERNING THE RATE OF ACCEPTANCE ARE INCONSISTENT WITH THE TERMS OF THE STANDARD CONTRACT AND THE NWPA.. . . . . . . . . . . . . . . . . . . 34

III. THE ARGUMENTS THAT PROGRESS ENERGY RAISES WITH RESPECT TO INDIVIDUAL EXPENDITURES ARE LEGALLY AND FACTUALLY FLAWED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A. Disposal Of Unused Racks And Crud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B. Upgrade To The Harris Component Cooling Water System. . . . . . . . . . . . . . . . . 40

C. Railroad Maintenance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

D. Crystal River Rerack. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

E. Licensing And Communications Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

F. Internal Labor.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

G. AFUDC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

H. Overhead Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

I. Manual Adjustments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

J. Robinson Crane Studies.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## TABLE OF AUTHORITIES

### CASES

Bluebonnet Savs Bank. F.S.B. v. United States,
67 Fed. Cl. 231 (2005), vacated on other grounds,
339 F.3d 1341 (Fed. Cir. 2003). . . . . . . . . . 32

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000), rev'd on other grounds,
309 F.3d 1353 (Fed. Cir. 2002),
vacated, 320 F.3d 1338 (Fed. Cir. 2003). . . . . . . . . . 32

ECDC Envir., L.C. v. New York Marine & Gen. Ins. Co.,
No. 96-6033, 1999 WL 777883 (S.D.N.Y. Sept. 29, 1999)

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002). . . . . . . . . . 45

Fleet Nat'l Bank v. Anchor Media Television, Inc.,
45 F.3d 546 (1st Cir. 1995). . . . . . . . . . 31

Gevyn Constr. Corp. v United States,
827 F.2d 752 (Fed. Cir. 1987). . . . . . . . . . 46

Granite Mgt. Corp. v. United States,
74 Fed. Cl. 155 (2006). . . . . . . . . . 32

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996). . . . . . . . . . 36

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005). . . . . . . . . . 31, 39, 41

Lisbon Contractors, Inc. v. United States,
828 F.2d 759 (Fed. Cir. 1987). . . . . . . . . . 32

Northern States Power Co. v. United States,
78 Fed. Cl. 449 (2007), appeal pending,
No. 2008-5037 (Fed. Cir. docketed Feb. 13, 2008). . . . . . . . . . 44

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006), appeal pending,
No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007). . . . . . . . . . . . . . . . . . . . . . . . 32, 34, 37

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Southern Nuclear Operating Co. v. United States,
77 Fed. Cl. 346 (2007), appeal pending,
No. 2008-5028 (Fed. Cir. docketed Jan. 14, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

System Fuels, Inc. v. United States,
79 Fed. Cl. 37 (2007), appeal pending,
No. 2008-5025 (Fed. Cir. docketed Jan. 9, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 42

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 47

## STATUTES AND REGULATIONS

10 C.F.R. § 961.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 10131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 10168. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## OTHER MATERIALS

Restatement (Second) of Contracts § 351. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CAROLINA POWER & LIGHT COMPANY and FLORIDA POWER CORPORATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 04-37C (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL REPLY BRIEF

Pursuant to this Court's post-trial scheduling order dated November 20, 2007, defendant, the United States, respectfully submits the following post-trial reply brief.

SUMMARY OF ARGUMENT

The approach that plaintiffs, Carolina Power & Light Company and Florida Power Corporation ("CP&L" and "FPC," respectively, and "Progress Energy," collectively), have adopted in this litigation is perfectly illustrated by the arguments they raise on page 73 of their post-trial brief. There, plaintiffs assert that they are entitled to recover more than $345,000 from the Government, even though the documentation identifying the nature of these expenses has been lost. Plaintiffs assert that "[t]he evidence of the operation and safeguards of Progress Energy's system satisfies with substantial certainty that these charges were properly billed to the correct project and are thus recoverable" (emphasis added).

This argument is a misstatement of the law and evidence of plaintiffs' abdication of their burden of proof. Expenses incurred are not "thus recoverable" simply because they have been charged to a particular project in plaintiffs' accounting system. Expenses are recoverable as

damages when, and only when, plaintiffs have established that they would not have been incurred in the absence of a failure by DOE to abide by the baseline obligations required by the Standard Contract, were foreseeable at the time of contracting, have been proven to a reasonable certainty, and are not otherwise unrecoverable.

The arguments plaintiffs make in their post-trial brief are inconsistent with this fundamental principle. Plaintiffs assert that the primary question for the Court's consideration is whether the costs for which they seek recovery have been appropriately charged to the projects that they elected to undertake. It is perhaps for this reason that the heading of each portion of the argument section of their post-trial brief that concerns a disputed cost begins with the phrase, "The government is not entitled to reduce Progress Energy's damages by the costs of . . .," or a minor variant of that construction. It is not the Government's responsibility to prove entitlement to a "reduction" of the costs that plaintiffs claim to have incurred. It is plaintiffs' burden to prove that these costs are, in fact, properly recoverable as damages, regardless of the label that plaintiffs give to them. To the extent that plaintiffs have failed to meet this burden, the costs that they have incurred are just that – costs – and are not damages that can be awarded against the Government.

<u>RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT</u>

We understood the Court's post-trial scheduling order to have required the parties to provide separately numbered proposed findings of fact, akin to those contemplated by RCFC 56(h)(1). Plaintiffs' proposed finding consists of a narrative that, in many parts, reads more like legal argument than individual proposed findings of fact. Notwithstanding these deficiencies, we attempt below to respond to plaintiff's proposed findings upon a paragraph-by-paragraph basis.

Page 9, "Progress Energy"

Agree.

Page 10, "To refuel"

Agree in part. As set forth in the proposed findings of fact contained in our post-trial brief ("DPFOF"), Progress Energy does more than merely "strive to maintain full core reserve" as a "management goal." The company bases its spent fuel management plans upon the need to maintain full core reserve at each plant. DPFOF 380.

Page 10, "Brunswick"

Agree.

Page 10, "Consequently"

Agree.

Page 11, "Harris"

Agree.

Page 12, "By November 1998"

With respect to the first sentence, we disagree. For the reasons set forth in our post-trial brief, the decision to activate the "C" and "D" pools at Harris would have been made even if DOE had accepted fuel at the 900 MTU rate required by the Standard Contract.

With respect to the specific costs identified to perform the pool activation, we agree in part. As an initial matter, the sum of the pool activation costs that plaintiffs have identified includes amounts for which plaintiffs were not able to provide supporting documentation. Further, the amount that plaintiffs have identified includes activities (such as the CCW upgrade and crud cleanup) that would have been performed irrespective of any breach, sums that are

unrecoverable as a matter of law (such as the expenditures upon "public out-reach"), and allocations of expenses that would otherwise have been borne by the company (such as internal labor and overhead charges) and are, therefore, not incremental to any breach by DOE.

With respect to transshipment costs, we agree that the transshipments identified were, in fact, performed. However, had DOE begun accepting fuel in 1998 in accordance with the Standard Contract at the 900 MTU rate, Progress Energy would have been required to expend at least $5,861,740 of the amount currently claimed in damages in transshipment costs. DPFOF 219-20.

Page 12, "Robinson"

Agree in part. Plaintiffs have not identified any evidence that the suspension of transshipments to Harris was related to delays in fuel acceptance by DOE.

Page 13, "In 2002"

Agree in part. As an initial matter, the sum of the ISFSI constructions costs that plaintiffs have identified includes amounts for which plaintiffs were not able to provide documentation. Further, the amount that plaintiffs have identified includes activities (such as the performance of studies to upgrade the Robinson spent fuel crane) that would have been performed irrespective of any breach, sums that are unrecoverable as a matter of law (such as AFUDC), and allocations of expenses (such as internal labor and overhead charges) that would otherwise have been borne by the company and are, therefore, not incremental to any breach by DOE.

Page 13, "Crystal River"

Agree in part. There is no testimony in the record concerning the time at which FPC decided to seek a license extension for the Crystal River plant.

Page 14, "In 2001"

Agree in part. The new spent fuel storage racks did not simply "hold more spent fuel." As we explained in our post-trial brief, installation of the new racks was required to resolve criticality and silica contamination issues caused by the degradation of Boraflex in the old racks.

Page 14, "In its normal"

Agree.

Page 15, "To calculate"

Agree in part. We agree that plaintiffs employed the methodology described to arrive at its calculation of damages. For the reasons discussed in our post-trial brief, however, we disagree with (1) plaintiffs' characterization of a 3,000 Metric Tonnes Uranium ("MTU") rate as being "reasonable" or required by the Standard Contract; and (2) plaintiffs' suggestion that the 3,000 MTU model that they prepared was either the product of a straightforward exercise or competent proof of what the company would have done had DOE accepted fuel at a 3,000 MTU rate.

Page 15, "Progress Energy"

Agree in part. Plaintiffs' suggestion that they "carefully considered each project and its subparts to verify that the costs incurred were required to store spent fuel" ignores the fact that plaintiffs did not consider whether the particular charges assigned to each project number were actually incremental to any breach by DOE. DPFOF 213-15; Edwards, Tr. 446:8-447:1.

Page 15, "The total costs"

Agree in part. We do not dispute plaintiffs' assertion that, had DOE commenced accepting fuel at the 3,000 MTU rate in 1998, additional storage would still have been required

and that CP&L would have expanded its capacity in the "B" pool to accommodate this need.[1] However, we disagree with (1) plaintiffs' characterization of the "total costs incurred on the relevant projects" and (2) the suggestion that the reduction which plaintiffs identify was "voluntary," as opposed to being part of its burden of proving a plausible but-for scenario.

Page 16, "In addition"

Agree.

Page 17, "Finally"

Agree in part. Plaintiffs did not reduce their claim "voluntarily." They did so because they recognized that the costs were not recoverable as damages.

Page 17, "With these reductions"

Agree in part. We agree that plaintiffs seek the amounts described but, for the reasons described in our post-trial brief, disagree with any suggestion that the underlying activities with which they are associated were necessarily "designed to mitigate DOE's breach." Footnote 6 is also misleading. Plaintiffs identified on their initial disclosures $408,000 in security costs, about which we inquired during the audit and discovery process. Plaintiffs ultimately agreed to remove these charges from their claim (explaining in their pretrial brief that the charges, though presumably recoverable, were not adequately documented) and then discovered at trial that the charges had in fact already been removed in a series of entries (as opposed to a single entry) in

[1] Plaintiffs' admission that they would be required to construct additional storage even at the 3,000 MTU rate flatly contradicts their assertion that this rate is "reasonable" because it would preclude the need for additional storage after January 31, 1998. Although plaintiffs go to great lengths to characterize our arguments concerning the rate of acceptance as "convoluted," "logically inconsisten[t]," "severely flawed," "illusory," and innumerable other adjectives taken from their thesaurus, they never address the fact that the very rate upon which they premise their claim is inconsistent with their own conception of the Standard Contract.

their transaction journal. We "erroneously" deducted these costs only because plaintiffs erroneously informed us that they were part of their original claim for damages.

Page 18, " The Nuclear Waste Policy Act"

Agree in part. Congress specifically and expressly recognized four statutory objectives in enacting the NWPA. 42 U.S.C. § 10131; see DPFOF 2. Any further suggestion of Congress's intent constitutes legal argument that is inconsistent with the text of the statute.

Page 18, "The NWPA"

Agree in part. The most relevant provisions of the Nuclear Waste Policy Act ("NWPA") are set forth at DPFOF 1-9.

Page 19, "The Standard Contracts"

Agree in part. The most relevant provisions of the Standard Contract are set forth at DPFOF 42-62 and the contract in its entirety was admitted into evidence as PX 10 and PX 11.

Page 19, "In return"

Agree in part. The Standard Contract required that the acceptance of fuel commence on or before January 31, 1998, in accordance with and subject to the terms of that document.

Page 19, "The Standard Contract"

Agree.

Page 20, "After DOE"

Agree in part. Any exchanges among utilities of allocations and any adjustments to the amount of spent fuel specified in a DCS required DOE approval. Further, DOE's ability to take more than the amount set forth in an allocation was, of necessity, limited by capacity limits and

the fact that any adjustment would have to be taken at the expense of the amount allocated to another utility. 10 C.F.R. § 961.11, Art. V.E; Edwards, Tr. 631:15-18, 632:3-13.

Page 21, "The Standard Contract"

Disagree. Plaintiffs' use of the term "traditional negotiations" is vague. The utility industry had substantial input into the formation of the Standard Contract, and its suggestions were the source of many important terms in the final version, including the definition of "DOE facility" and the "whereas" clause identifying a goal for DOE to accept fuel as expeditiously as practicable. DPFOF 24-62. All of the comments that the utility industry provided were reviewed and considered. Morgan, Tr. 1435:16-21. Further, utilities could have chosen to challenge the Standard Contract as being inconsistent with the terms of the NWPA. CP&L considered but rejected this option. DPFOF 64-65.

Page 21, "The expectation"

Disagree. For the reasons set forth in our prior submissions, it is implausible that any Progress Energy employee understood the Standard Contract to require a rate of acceptance that was not set forth in the executed agreement and that was akin to the rate rejected by DOE during the contract formation process. Indeed, Mr. Kunita testified that he knew that the Standard Contract did not contain a rate term as soon as he read it. DPFOF 63. Further, the very document upon which plaintiffs rely, PX 35, demonstrates that CP&L clearly understood the difference between what it was obligated to do – commence accepting fuel on or before January 31, 1998 – and what it was planning to do – accept fuel at a rate that would preclude expenditures upon at-reactor storage after January 31, 1998. DPFOF 106–13.

Page 21, "Going back"

Agree in part. Mr. Kunita may well have possessed the interpretation of the NWPA described in this paragraph. However, for the reasons set forth in our pre-trial and post-trial briefs, there is nothing in the record to support Progress Energy's assertion that this expectation ever manifested itself in a statutory or contractual obligation.

Page 22, "In its early"

Disagree. DOE never stated that it was obligated to "assum[e] responsibility for the spent fuel storage problem in 1998." It was obligated to begin accepting fuel by January 31, 1998. Further, although plaintiffs accurately quote from the June 1983 financing report, the purpose of the cost analyses that DOE developed was to determine the cost for the entire waste acceptance program, which was designed to store fuel for tens of thousands of years, rather than the cost associated with a particular rate of acceptance at the program's inception. Indeed, even when DOE changed its acceptance rate assumptions to account for performance at an MRS rather than a repository, the total projected system cost did not vary greatly and the per-kilowatt-hour fee did not change. DPFOF 149-51.

Page 22, "At an information"

Disagree. For the reasons set forth in our prior submissions, DOE's descriptions of its plans are not akin to a description of a baseline level of performance. Further, as we previously have described, Mr. Morgan made clear that he was merely describing the "basic strategy" for the program based upon the commencement of repository operations in 1998, that the schedule for the repository was "extremely optimistic," and that, for this reason, DOE would have an alternative plan to begin receiving waste at an MRS by January 31, 1998. DPFOF 78(g), (h).

Page 23, "A couple"

Disagree. Mr. Lawrence testified that DOE's obligations were derived from the Standard Contract, not from the goals or intent of the NWPA, and that the rate of acceptance would eventually be determined in 1991, in accordance with the Standard Contract and based upon contingencies that would take place between 1983 and 1991. Lawrence, Tr. 2169:2-18. As we explained on page 126 (footnote 11) of our post-trial brief, DOE's obligations are to be measured by reference to the Standard Contract, not to an unstated term of a statute. In any event, Mr. Lawrence provided comments to the Draft Mission Plan in his role as Manager of DOE's Richland Operations Office. For the reasons stated in our post-trial brief, his personal interpretation of the intent of the NWPA is of no relevance in interpreting either the Standard Contract or the NWPA. See PG&E, 73 Fed. Cl. at 390 ("The court therefore declines to afford any weight to 'after-the-fact' statements made by DOE officials about the intent of Congress in passing the NWPA"). To the extent that plaintiffs suggest that DOE did not distinguish between its goals and obligations, this assertion is belied by the numerous statements that DOE made, in describing its program goals and strategies, indicating that it was, pursuant to the Standard Contract, deferring issuing a firm waste acceptance schedule until 1991. DPFOF 78.

Page 23, "During the contract"

Agree in part. Utility groups to which plaintiffs belonged requested the insertion of the rate term plaintiffs describe. This request was denied, as evidenced by the fact that the proposed language was not included in the final version of the Standard Contract (even though the remainder of the "whereas" clause that contained the proposed language was incorporated with only minor modification). Although Progress Energy accurately quotes Mr. Martin's testimony,

it is implausible to suggest that a rate term that does not appear in the contract and was rejected when it was proposed, and that utilities requested be inserted into the contract after it was executed, was "already there."

Page 24, "Tellingly"

Disagree. As noted in response to the previous paragraph, the fact that DOE chose not to incorporate the two-part test into the final version of the Standard Contract (despite incorporating the rest of the language from EEI's proposed whereas clause) is proof that the proposed standard was rejected. Further, DOE explained when it promulgated the final version of the Standard Contract that it had not accepted the utilities' request for additional "performance standards," including, by EEI's (and CP&L's) own admission, an assurance concerning the rate of acceptance. DPFOF 49, 73, 74.

Page 24, "The Act required"

Agree.

Page 24, "In September 1983"

Agree. However, plaintiffs fail to mention that the only testimony concerning this document was Mr. Lawrence's explanation that this statement "was an objective or a goal that we wanted to have for the mission plan, and for our ability to implement the Act." Lawrence, Tr. 2159:7-25.

Page 25, "A December"

Agree in part. Progress Energy has accurately quoted from the draft Mission Plan, but fails to note that this language appeared under the heading "Program Strategy," that the document makes clear that firm waste acceptance schedules would not be published until 1991, and that

this language (which appears in a draft of a document designated by statute as a plan) was not actually included in the final version of the Mission Plan submitted to Congress. DPFOF 78(f). To the extent that plaintiffs suggest that Mr. Lawrence admitted that the rate of acceptance at an MRS would necessarily be the same as the rate of acceptance at a repository, they are incorrect. The testimony to which plaintiffs cite merely indicates that, in the early stages, DOE was not planning on using interim storage of any kind and, as a result, did not plan on accepting fuel at an MRS at a lower rate than it would accept at a repository. Further, even the statements that Mr. Morgan made in December 1983 upon which plaintiffs heavily rely clearly indicate that DOE's "basic strategy" of precluding the need for additional storage after 1998 was premised upon the assumption that that year would be "the first year of operation of the repository." PX 19 at SN069599; Morgan, Tr. 1468:18-1469:12. This issue is addressed in additional detail in the argument section below.

Page 25, "In April 1984"

Agree in part. Plaintiffs have accurately quoted from the draft mission plan, which is silent as to the rate at which fuel would be accepted if fuel acceptance would commence at an MRS in 1998. Plaintiffs have also accurately quoted from their own comments. However, for the reasons set forth in our post-trial brief, any unilateral expectation that DOE would take responsibility for additional spent fuel storage requirements starting in 1998 is inconsistent with the Standard Contract and the history of its formation, as well as plaintiffs' own admission in this case that, at the 3,000 MTU rate they propose, they would be required to expend nearly $8 million upon additional storage after 1998. DPFOF 205.

Page 26, "During the early"

Agree in part. Plaintiffs have correctly characterized a goal of the waste management program in its early years. To the extent that plaintiffs make assertions about the import of Mr. Lawrence's testimony concerning the intent of the NWPA, we incorporate our response under "Page 23, A couple."

Page 27, "In June 1985"

Agree in part. Plaintiffs have accurately quoted from the documents at issue. However, they have provided no support for the suggestion that the statement contained on page 87 of the Mission Plan (PX 31) pertained to the "improved performance system" depicted on page 27.

Page 28, "Lake Barrett"

Agree in part. All of the deposition testimony upon which plaintiffs rely is subject to the objections that we raised in Attachment A to our filing of November 2, 2007. To the extent that Mr. Barrett's testimony is properly considered, plaintiffs' recitation of Mr. Barrett's testimony concerning the plans for the MRS and the goal of accepting fuel in excess of the generation rate is correct. However, for the reasons stated above and in our post-trial brief, Mr. Barrett's testimony concerning the "intent of the NWPA" are legal conclusions depicting DOE's goals, as opposed to its obligations, and are of no relevance in ascertaining DOE's obligations under the Standard Contract.

Page 28, "Numerous other"

Disagree. We have acknowledged that DOE used a 3,000 MTU rate as a planning basis during the early years of the program. However, as explained above and in our post-trial brief, the mere fact that certain documents, including fee adequacy studies, employed this assumption

does not convert DOE's plan into a contractual obligation. Mr. Roselli's deposition testimony is objectionable for the reasons we stated in Attachment A to our filing of November 2, 2007. In any event, for the reasons that we have previously explained, it does not provide a basis for importing into the Standard Contract an obligation to which the parties did not agree. Indeed, Mr. Roselli testified that, "In no way, shape or form was it a contractual intent that we would make all the things happen that [were] in the Mission Plan." Roselli (Apr. 15, 2002), Tr. 159:20-22.

Page 29, "By 1987"

Agree in part. The rates described for the MRS in the proposal were expressly conditioned upon congressional approval. PX 36 at CP_FP000039657.

Page 29, "As Mr. Lawrence"

Disagree. Mr. Lawrence testified that he was not aware of any reason why the rate of acceptance would be different at an MRS than at a repository. The remaining assertions in this proposed finding are unsupported. We further note that, at the time of contracting, Congress had not yet provided approval for DOE to accept fuel at an MRS. DPFOF 6.

Page 29, "To demonstrate"

Agree in part. DOE requested certain linkages "to allay concerns that the MRS facility could become a substitute for a permanent repository." DX 59 at HQR0031640. The "accommodation" described was not necessarily limited to the five-year delay that plaintiffs suggest. Further, the conclusion drawn in the second sentence is misleading because it assumes that, after five years, no additional fuel would be sent to an MRS.

<u>Page 30, "In 1987"</u>

Agree in part. Pursuant to 42 U.S.C. § 10168(d)(3) and (4), the quantity of spent fuel to be stored at the MRS could not exceed 10,000 MTU prior to the first acceptance of fuel at a repository and could never exceed 15,000 MTU in the aggregate.

<u>Page 30, "In June 1987"</u>

Agree.

<u>Page 30, "In December 1990"</u>

Agree in part. The mere fact that the two cases assumed modifications of the linkages does not mean that the rates proposed in the 1990 ACR were not in "compliance" with the law.

<u>Page 31, "In 1991"</u>

Agree in part. Plaintiffs themselves note that the 1990 ACR contained two rates, one of which was premised upon Congress maintaining the MRS's capacity limitations. We further note that the Standard Contract only requires DOE to supply "capacity information for ten (10) years following the commencement of operation of the original DOE facility." DPFOF 47.

<u>Page 31, "The government"</u>

Disagree. The entirety of this proposed finding of fact consists of legal argument. Moreover, it is incorrect. For the reasons stated in our brief, the Standard Contract clearly sets forth a process, as articulated in numerous documents prepared by DOE in the 1980s, pursuant to which the parties, beginning in 1991, would agree to the acceptance of quantities of spent fuel. 10 C.F.R. § 961.11. Arts. IV.B.V, V.B- C. DOE specifically determined in 1983 that it could not commit itself to a particular rate of acceptance when it promulgated the Standard Contract

and, for that reason, declined to obligate itself to set firm waste acceptance schedules until 1991. DPFOF 51-53.

Page 32, "The government"

Disagree. The entirety of this proposed finding of fact consists of legal argument. Moreover, as stated in response to the previous paragraph, DOE specifically determined in 1983 that it could not commit itself to a particular rate of acceptance when it promulgated the Standard Contract and, for that reason, declined to obligate itself to set firm waste acceptance schedules until 1991. DPFOF 51-53.

Page 32, "The record"

Disagree. DOE relied upon the efforts of the Nuclear Waste Negotiator to attempt to find a site for an MRS, but the Negotiator was unable to reach an agreement with a host. DPFOF 129, 131. Throughout this period, DOE remained hopeful that it would be able to find a host site and secure congressional authorization for an MRS. E.g., Kouts (Dec. 10, 2007), Tr. 1791:8-1793:12. The fact that these efforts proved unsuccessful does not mean that DOE was not attempting to site and construct an MRS that would commence operations in 1998.

Page 33, "Nonetheless"

Disagree. DOE published an ACR in 1995 that contained the same rates as the 1991 ACR but substituted "year 1" for "1998." DPFOF 144-45. However, the rates were not published to "minimize DOE's liability," as plaintiffs assert. As Mr. Zabransky (who is not a lawyer) explained, the rates were "in sync" with what DOE could reasonably hope to achieve prior to the commencement of operations of a repository in 2010. Zabransky, Tr. 1517:6-12.

Page 33, "According to"

Agree in part. The second sentence in this proposed finding is vague. The 1991 ACR provided that the allocations contained in Table 3.1 (page HQR-002-0811) should be the basis for the utilities' DCS submissions. PX 53 at HQR-002–0809.

Page 33, "When Progress Energy"

Disagree. As an initial matter, the assertions contained in this finding consist primarily of legal argument. Nonetheless, the Standard Contract makes clear that it is through the ACR/APR and DCS process that the parties are to reach agreement upon the logistics of spent fuel acceptance. DPFOF 146-48. As Mr. Zabransky testified, the DCSs "put a time frame" upon DOE's obligation to accept spent fuel. Zabransky, Tr. 1563:17-22. Absent an approved DCS, there would no way for DOE to know how much fuel the utility expected it to pick up at a particular time and place or to prepare and transport appropriate casks for that acceptance. Zabransky, Tr. 1565:5-13.

Page 34, "In any event"

Agree in part. As Mr. Zabransky testified, no DCSs have been approved since the DCS process was suspended. Zabransky, Tr. 1527:3-13.

Page 35, "Brunswick Fuel"

Agree in part. As plaintiffs indicate, the crud would eventually have been required to be removed upon decommissioning. It is therefore misleading to suggest that its removal was caused by the need to activate the "C" and "D" pools at Harris.

<u>Page 35, "Indeed, CRUD"</u>

Agree in part. There is no evidence in the record suggesting that, upon decommissioning, the crud would require a different disposal method. As our technical expert, Gregory Maret, testified, the critical point was that, regardless of its classification, the crud was radioactive and would require disposal either upon pool activation or upon decommissioning. Maret, Tr. 1844:19-1845:8.

<u>Page 35, "The CRUD"</u>

Agree in part. There is no evidence in the record to support plaintiffs' suggestion that whatever specialized activities CP&L performed to remove crud would not have been required upon decommissioning. In fact, the opposite conclusion is true. <u>See</u> DX 307 at 6-7.

<u>Page 36, "Similarly"</u>

Agree in part. The racks would eventually have been required to be removed upon decommissioning. DPFOF 245.

<u>Page 36, "The Government's expert"</u>

Disagree. Mr. Maret opined that, regardless of the rate of acceptance, the racks would eventually require removal, at substantially the same cost. DPFOF 247; DX 307 at 7. The rack disposal was therefore required "irrespective of" any breach by DOE and is therefore not properly included in plaintiffs' damage claim.

<u>Page 36, "The Harris plant"</u>

Agree with respect to plaintiffs' assertions concerning the expiration of the operating license of the Harris plant. The remaining assertions contained in this proposed finding consist primarily of legal argument. However, Steven Edwards did not testify that disposing of the racks

upon decommissioning would be "far cheaper than it was in the real world." He responded to counsel's question concerning the cost of rack disposal upon decommissioning with the nonresponsive statement that "[t]hat was our strategy at the time." Edwards, Tr. 385:7-11. Further, he never provided any testimony, as would be necessary to permit a comparison of real world costs to performance-world costs so as to provide a basis for the computation of damages, of the costs that would have been incurred to dispose of the racks (or the crud) upon decommissioning. For the reasons set forth in our prior submissions and below, neither Mr. Maret nor the Government bears the burden of providing testimony as to what these costs would have been.

Page 37, "It cannot be seriously"

Agree in part. The suggestion that the CCW upgrades were "required for" pool activation is a legal conclusion that, for the reasons stated in our briefs, rests upon a misapprehension of plaintiffs' burden of proof. To establish causation, plaintiffs must demonstrate that the upgrades would not have been performed in the absence of DOE's delay.

Page 37, "Given DOE's ongoing breach"

Disagree. Numerous documents prepared by CP&L indicate that the CCW system would be inadequate to accommodate the heat load after the power uprate and that the CCW system was upgraded as part of the steam generator and/or power uprate projects. DPFOF 268, 270, 271, 283, 289, 294. Moreover, plaintiffs mischaracterize the reference in DX 237 to effects of additional fuel in the pool (and ignore the fact that we elicited testimony upon precisely this subject during the redirect of our technical expert, Mr. Maret). Mr. Maret explained that the increase which is described as being "primarily due" to spent fuel pool heat load refers to newly

discharged fuel in the "A" and "B" pools and the effects of the power uprate and is not related to the placement of fuel in pools "C' and "D," as plaintiffs suggest. Maret, Tr. 1918:4-1920:2.

Page 38, "One cannot say"

Disagree. As noted in our response to the preceding proposed finding, plaintiffs drew precisely these conclusions in documents circulated internally and in submissions to the NRC. To the extent that plaintiffs rely upon the testimony of Dean Tibbits to support their assertion that the CCW upgrade would not have been performed solely to support the steam generator replacement and power uprate projects, their reliance is misplaced. Mr. Tibbits was only able to state that it was "not necessarily" the case that Progress Energy would not have had to perform this work under such a scenario. Tibbitts, Tr. 1025:11-18. Plaintiffs bear the burden of proving that they would not have performed the upgrade under these circumstances, and Mr. Tibbits's conspicuously equivocal testimony does not provide anywhere near the level of certainty required to sustain a finding to this effect. In fact, this testimony contradicts Progress Energy's statements to the NRC and Mr. Edwards's statements concerning "C" and "D" pool activation and is refuted by Mr. Maret's expert testimony.

Page 38, "Regarding power uprate"

Agree in part. The maximum potential increase in potential heat load resulting from a 4.5-percent power uprate would be 4.5 percent. However, Progress Energy's assertion concerning the "increased heat load that the CCW system had to accommodate" for storage in the "C" and "D" pool is not supported by the testimony that it cites, which pertains to fuel in the "A" and "B" pools. We agree that power uprates are common in the industry. Although Mr. Maret knew of no other instances in which a utility was required to uprate its CCW system as a result of

power uprate, that fact is irrelevant. Indeed, Mr. Tibbits acknowledged that the pump impellers that were replaced as part of the CCW upgrade had been modified from their original design and were not performing up to their original design capacity. DPFOF 254. Any comparison between what was needed at Harris and what was needed at other plants that performed power uprates is, therefore, a comparison of apples to oranges.

Page 39, "The government's challenge"

Disagree. As an initial matter, our assertion that the CCW upgrade was not attributable to DOE's delay is based both upon Mr. Maret's testimony and the statements of and writings of Mr. Edwards, Mr. Tibbits, and others indicating that the CCW upgrade was necessitated by projects other than the placement of fuel in the "C" and "D" pools. See, e.g., DPFOF 268, 270, 271, 283, 289, 294. With respect to plaintiffs' contention that Mr. Maret "vaguely concluded" that "there was reason to believe" that the power uprate and steam generator replacement projects "would have required CCW upgrades on their own," plaintiffs completely misunderstand Mr. Maret's testimony. Mr. Maret concluded that there was reason to believe that, absent these projects, it might not have been necessary to upgrade the CCW system. Maret, Tr. 1855:10-18. Although this statement is entirely consistent with the Government's position, the relevant question is not what the world would have looked like in the absence of the steam generator replacement or power uprate. The relevant question is whether the CCW upgrade would have been required in the absence of the need to place fuel in the "C" and "D" pools. Mr. Maret unequivocally testified that, regardless of DOE's acceptance of SNF from Progress Energy, the CCW upgrade

would have been required to accommodate the increased heat loads from Progress Energy's power uprate and steam generator replacement. DPFOF 252.[2]

Page 40, "The government seeks"

Agree in part. Much of this proposed finding consists of legal conclusions and characterization of our legal argument. As set forth in our prior submissions, we believe that the proper computation of damages should take into account the expenditures that plaintiffs would have been required to make to load fuel to DOE during the claim period.

Page 40, "The government's position"

Agree in part. There may be costs to load fuel to DOE in the future. However, for the reasons set forth in our prior submissions, there is substantial reason to believe that these costs will not approach the level of the costs that we have identified (because of plaintiffs' use of transportable canisters and the upgrade of plaintiffs' facilities) and no guarantee that there will be an opportunity in future litigation to account for such future costs.

Page 41 "Also, the government"

Agree with factual assertions contained in this paragraph. However, plaintiffs' statements concerning the speculativeness of the expenses are legal argument and, given that the methodology which we employed represents the most conservative means of calculating loading costs, unfounded. DPFOF 405-15.

---

[2] In footnote 9 of their brief, plaintiffs assert that "Mr. Maret's opinions were formed before he had even considered the relevant factual Progress Energy testimony." This statement misapprehends the testimony cited, in which Mr. Maret simply testified that he did not remember the sequence in which his opinions with respect to this issue were formed. Maret, Tr. 1857:19-1858:5.

Page 41, "In connection with"

Agree with the factual assertions made in this paragraph. However, much of this proposed finding consists of legal conclusions and characterization of our legal argument that are incorrect. First, it is hardly speculative to assume that, had DOE accepted fuel, it would have done so by rail, a means that was employed by plaintiffs themselves. Second, plaintiffs acknowledge that, regardless of the rate of acceptance, they would be required to transship hundreds of assemblies of fuel between and among the CP&L plants. DPFOF 205, 218. They have presented no explanation for why these transshipments would not require the expenditure of the same costs that they currently seek for railroad maintenance.

Page 42, "The need for"

Disagree. Whether one thing is a "substantial causal factor" of another is a legal determination. However, for the reasons stated in our prior submissions, DOE's delay in accepting spent fuel cannot be deemed a "substantial causal factor" of FPC's decision to rerack its spent fuel pool if it would have made the same decision in the absence of any delay. As we explain in our post-trial brief, the gain in space was, at most, a minor reason that did not drive FPC's decisionmaking process with respect to the rerack.

Page 42, "The racks in"

Agree in part. The May 1996 report expressly concluded that follow-up action was required to maintain subcriticality and manage silica. PX 66 at CP_FP000137621. The November 1996 report did not in any way suggest that reverse osmosis was the "best" solution. In fact, it suggests otherwise. The report stated that reverse osmosis was at the time the most "cost effective" but also the most complicated option. It concluded that removing the silica or

replacing the racks was the "optimal" solution and that, if it became cost effective, this solution "would completely eliminate the problem, instead of designing around it." PX 72 at CP_FP00193355. In addition, the report does not state anything about "DOE's impending breach."

Page 42, "The third phase"

Agree that the September 1997 report recommended reracking the pool and disagree with the remainder of the proposed findings in this paragraph. The report concluded that it was "imperative" that the criticality and silica concerns arising from Boraflex degradation be resolved "in any event" – that is, regardless of how FPC might address its spent fuel management needs – and that the costs of solving these problems could be considered "sunk costs." PX 84 at CP_FP 000112264. Plaintiffs accurately quote from PX 108, but fail to mention that the statements in the document about "provid[ing] adequate spent fuel storage capacity" are based upon an increase of 117 spaces – an amount far in excess of the space that was contemplated when FPC decided to perform a rerack. DPFOF 375-87.

Page 43, "Michael Culver"

Disagree. Putting aside plaintiffs' characterization of the persuasiveness of Mr. Culver's testimony, the hypothetical offered assumes that the company had the option of shipping fuel to Harris. However, FPC decided to perform a rerack in late 1997 and did not merge with CP&L until approximately three years later. DPFOF 338; Edwards, Tr. 223:8-9. As to Mr. Culver's testimony concerning the "primary reason" for the rerack, it is unpersuasive for the reasons set forth in our post-trial brief including, but not limited to, the "score" that the space increase was assigned during the project approval process and the fact that the space increase, as of the time of

project approval, would not have allowed the plant to maintain full core reserve throughout the duration of its license. Mr. Lehmann's testimony concerning what his preference would have been in the absence of a Boraflex problem is irrelevant. The issue in this case is what the company would have done if it was forced to address precisely this issue, absent any delay by DOE.

Page 43, "With regard to"

Disagree. Mr. Williams never suggested that the company could use soluble boron. Presumably, plaintiffs mean to cite to pages 1219-20 (rather than 1220-21) of Mr. Williams's trial testimony. However, in response to the question, "Could you have credited the Boraflex?," Mr. Williams merely testified that they did not but could "always petition and ask for other things to be credited in a license amendment request." Williams, Tr. 1218:13-1220:3. Moreover, FPC itself concluded that taking credit for soluble boron was not a viable option. DPFOF 351-53. To the extent that plaintiffs rely upon other solutions such as the use of racksavers, these solutions not only had substantial costs (approximately $961,000) but were not included within the options submitted to management during the approval of the rerack project. DX 182 at CP_FP000029511-12; DPFOF 354. Moreover, the reduction in cost for racksavers by as much as 75 percent that plaintiffs propose is both inconsistent with the conclusion of the team of which Mr. Culver was a member and is premised upon taking credit for soluble boron, a strategy that, as described above, was deemed not to be viable. DPFOF 354; Culver, Tr. 917:4-10.

<u>Page 44, "With regard to"</u>

Disagree. The cost of performing the reverse osmosis system proposed to management (which would not even have addressed the criticality problem) was at least $2 million. DPFOF 343-44.

<u>Page 44, "The government"</u>

Disagree. The cited portion of Mr. Maret's testimony did not bear upon "circumstances such as those at Crystal River," and the comparison between the cost of dry storage and wet storage has no bearing upon this case. In any event, in applying his experience to this case, Mr. Maret testified that nuclear utilities do not make decisions solely upon the basis of what is most economical. DPFOF 388-92.

<u>Page 45, "Moreover"</u>

Disagree. Plaintiffs rely upon a series of applications, with put proof that they were ever approved, that post-date the rerack decision by at least four-and-one-half years to suggest that taking credit for soluble boron was a widely used strategy that could have been employed at Crystal River. Maret, Tr. 1905:15-1907:22. Mr. Maret had experience with brands, other than Boraflex, of neutron- absorbing racks, because it was a constituent material in the racks of the plants that he managed, and stated that he was aware that, in some circumstances, utilities had taken credit for soluble boron to address concerns with Boraflex. Maret, Tr. 1893:4-19, 1914:7-18. He explained, however, that, in this circumstance, FPC itself had concluded that it was not

possible to use this option because taking credit for soluble boron would actually have the effect of decreasing storage space in the pool. Maret, Tr. 1909:25-1910:9.[3]

Page 45, "North Carolina"

Agree.

Page 46, "The BCOC"

Agree.

Page 46, "When the BCOC"

Disagree. There is no support in the record concerning Progress Energy's confidence level.

Page 46, "Community outreach"

Agree in part. The "community outreach" projects for which plaintiffs seek compensation would not have been undertaken in the absence of the independent decisions of third parties to intervene in NRC licensing proceedings. Edwards, Tr. 539:18-22.

Page 47, "Progress Energy relied"

Agree in part. Progress Energy supplied no proof that it was "deprived" of the time that its employees spent on breach-related projects. Indeed, Progress Energy supplied no evidence that it suffered an opportunity cost because these employees were unable to work on other, non-breach-related projects. PFOF 418, 421.

[3] Again, plaintiffs assert that Mr. Maret formulated his opinions before reading the depositions of various Progress Energy employees. They fail to mention Mr. Maret's testimony that he took their opinions into account and carefully considered them before attaching his signature to his report. Maret, Tr. 1914:22-1915:13.

<u>Page 47, "Progress Energy does not"</u>

Agree in part. Mr. Edwards's testimony suggesting that employees are terminated if they cannot find an open position after the disbanding of a project speaks merely to "typical" circumstances. There is no evidence in the record of any employees who were terminated as a result of the disbanding of any breach-related project.

<u>Page 47, "The Government"</u>

Disagree. The assertions set forth in this proposed finding consist largely of legal arguments and characterizations of Larry Johnson's testimony, which are addressed in our post-trial brief. However, Mr. Johnson did not merely impose a screen, as plaintiffs suggest. He took the results of this screen and ascertained that, on average, the Progress Energy employees who fell into the category that he defined worked less than two hours per week on breach-related activities. He further opined, as an expert in analysis of economic damages, that, in the absence of any proof of foregone opportunities, Progress Energy did not incur economic harm merely because a portion of its salaried work force was required to perform, on average, two additional hours of work per week upon breach-related projects. DPFOF 425-26.

<u>Page 48, "Progress Energy routinely"</u>

Agree.

<u>Page 48, "Progress Energy, in the normal"</u>

Agree in part. We disagree (here and throughout) with plaintiffs' characterization of the projects for which they seek recovery as "mitigation projects." As plaintiffs use it, this term presupposes that the projects would not have been performed in the absence of any delay by DOE.

Page 48, "AFUDC is not"

Disagree. AFUDC is equivalent to interest because it compensates plaintiffs for the time value of money. A utility's inclusion of AFUDC in its rate base compensates the utility for the use of its money for capital expenditures and allows the utility to earn a return upon the use of its capital during construction, before the capital project is placed into service. DPFOF 451-52, 454-55.

Page 49, "Stores adders"

Agree in part. The only evidence of increased warehouse costs that Progress Energy incurred as a result of its undertaking of breach-related activities was the hiring of an employee whose work was directly charged to the Robinson dry storage project, the cost of which is already included in plaintiffs' claim. DPFOF 441. In addition, plaintiffs' calculation of the amount of stores costs assumes a 3,000 MTU rate. Mr. Johnson deducted $1,153,932 in stores overhead costs from his calculation of plaintiffs' damages at the 900 MTU rate. DPFOF 444.

Page 49, "Similarly"

Agree in part. Plaintiffs' calculation of the amount of "CWIP" costs assumes a 3,000 MTU rate. Mr. Johnson deducted $1,422,948 in indirect overhead costs from his calculation of plaintiffs' damages at the 900 MTU rate. DPFOF 447.

Page 49, "As a result"

Agree in part. For cost accounting purposes, it is appropriate to allocate overhead costs among all projects so that they assume a fair proportion of these costs. For this reason, we are not suggesting that, for accounting purposes, overhead expenses should be re-allocated among those projects not traceable to DOE's delay. However, for purposes of determining whether

Progress Energy as a company has incurred harm as a result of DOE's delay, it is necessary to ascertain whether overhead costs would be different had DOE begun accepting fuel in 1998. DPFOF 434.

Page 50, "The government"

Agree in part. We do not dispute that Progress Energy has controls in place to ensure the regularity of the charges reflected in the manual adjustments at issue. However, in the absence of any proof of what these charges were for, there is no basis to assume that these charges would not have been incurred in the absence of DOE's delay, were foreseeable, or have been proven to a reasonable certainty.

Page 50, "On the eve"

Disagree. We informed Progress Energy more than a week before trial that we were unable to ascertain whether certain crane studies that were included within plaintiffs' claim would have been incurred in the absence of DOE's delay and that we would require Progress Energy to meet its burden of proof with respect to this issue. As we explained in our post-trial brief, Mr. Worthington testified that the NRC's criteria for evaluating cranes had evolved over time, and that the analyses which were performed were needed to meet the NRC's current criteria for evaluating cranes. Worthington, Tr. 849:24-852:12. Although Progress Energy believed that this work was necessary to meet the NRC's current criteria, no plausible explanation was offered as to why, in the absence of a dry fuel storage program and the lifting of a 110-ton cask, these same new NRC standards would not need to be met, even if Progress Energy were only lifting a 75-ton cask, for transshipments and/or DOE shipments.

# ARGUMENT[4]

## I. PROGRESS ENERGY HAS INCORRECTLY DESCRIBED ITS BURDEN

Beginning on page 51 of its brief, Progress Energy purports to describe the "applicable legal framework" governing its claims in this case. Much of this discussion is consistent with the description of the parties' burdens beginning on page 113 of our post-trial brief. However, Progress Energy goes awry on page 52 of its brief when it contends that the Government bears the burden of proving the appropriateness of any reduction to the amount of damages that plaintiffs claim. As set forth in out pre-trial and post-trial briefs, a plaintiff bears the burden of establishing (1) that any expenditures that it claims as damages would not have been incurred in the absence of a breach; and (2) the costs it would have incurred in the absence of a breach but avoided as a result of the breach. This conclusion holds true regardless of whether the plaintiff (unilaterally) designates its expenditures as "mitigation damages." See Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005); Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 560-62 (1st Cir. 1995) (fact that entity characterizes damages as "mitigation damages" does not somehow eliminate causation requirement that entity prove, "as an element of its case, the extent to which it was *damaged* by the . . . breach").

To the extent that Progress Energy suggests that the Government bears the burden of showing that any expenditure was not caused by the Government's actions or that a loss was avoided a result of DOE's delays, its arguments are based upon a misallocation of the burden of proof. A plaintiff sustains its burden of proof only by presenting a complete picture of its actual

---

[4] Many of the arguments that plaintiffs raise are already addressed in our post-trial brief. In this section, we address only those arguments that have not already been addressed.

expenses and, as a basis for comparison, a complete picture of the expenses that it would have incurred absent a breach. Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 385-86 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) ("PG&E") ("Plaintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007))("PG&E"); Granite Mgt. Corp. v. United States, 74 Fed. Cl. 155, 169 (2006) (plaintiffs bear burden of propounding realistic "but for" scenario); Bluebonnet Savs Bank. F.S.B. v. United States, 67 Fed. Cl. 231, 237-38 (2005), vacated on other grounds, 339 F.3d 1341 (Fed. Cir. 2003); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003).[5]

Progress Energy's reliance upon Lisbon Contractors, Inc. v. United States, 828 F.2d 759 (Fed. Cir. 1987), to support its allocation of the burden of proof is misplaced. In Lisbon Contractors, the United States Court of Appeals for the Federal Circuit held, in a dispute arising under the Contract Disputes Act, that the Government carried the burden of proving entitlement to a setoff for corrective work claimed to be required with respect to a bridge construction contract following the termination for convenience of a contractor. Id. at 769. Unlike the setoff at issue in Lisbon Contractors, the expenditures that are at issue in this case are not the subject of an argument that the amount of damages against the Government should be reduced as a result of

[5] As we described in detail at pages 35-39 of our pretrial memorandum of contentions of law and fact filed on October 10, 2007, plaintiffs' burden is not in any way lessened through application of the "substantial causal factor" test. That test requires a plaintiff to establish that a claimed expenditure would not have been incurred in the absence of a breach.

the Government's need to perform work that the terminated contractor failed to perform properly. The Government bears the burden of proving the cost of such independent expenditures following a termination for convenience. Rather, the issues that we have raised in connection with plaintiffs' damages claims raise questions of the extent to which plaintiffs have suffered economic damage as a direct consequence of the breach that plaintiffs allege. Specifically, these questions concern the issues of (1) whether the expenditures claimed as damages would have been incurred in the absence of DOE's delay and (2) whether plaintiffs have avoided the need to incur costs as a result of DOE's delays. These issues relate not to an independent claim for setoff, but to the threshold issue of whether DOE's delay is the cause of the specific financial injury that plaintiffs claim. They are, therefore, issues upon which plaintiffs bear the burden of proof.

To the extent that plaintiffs rely upon Energy Capital Corp. v. United States, 302 F.3d 1314, 1327 (Fed. Cir. 2002), in support of their assertion that the risk of uncertainty falls upon the breaching party, their reliance is likewise misplaced. The passage to which plaintiffs cite in Energy Capital, which they fail to mention is actually a quotation from the Alabama Supreme Court that the United States Court of Appeals for the Seventh Circuit subsequently endorsed, concerns the manner in which courts should scrutinize a defendant's argument that a plaintiff has met its burden of adducing evidence of its lost profits with reasonable certainty. Id. This statement neither constitutes nor even suggests a reallocation or transfer of the burden of proof.

Finally, plaintiffs cite to System Fuels, Inc. v. United States, 79 Fed. Cl. 37, 71 (2007), appeal pending, No. 2008-5025 (Fed. Cir. docketed Jan. 9, 2008), which in turn cites to Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006) ("TVA"), for the

proposition that the Government carries the burden of proving with reasonable certainty any losses avoided or benefits or benefits conferred that it seeks to "offset" from plaintiffs' claims. This argument, and any suggestion in TVA to this effect, is misguided. As noted previously, plaintiffs must compare the activities that were required in the actual world against those that would have been required in the absence of a delay by DOE. Indeed, plaintiffs state as much on page 15 of their post-trial brief when they explain the manner in which they compiled their own damages claim: "Progress Energy than compared its real world activities to store all of its spent fuel with what it would have done had DOE started picking up fuel" (emphasis added). Plaintiffs even go on to explain that they "voluntarily" reduced their claim by approximately $1 million to reflect their assessment of the costs that they would have incurred absent any delay by DOE. Notwithstanding their characterization, this reduction was not "voluntary." It is simply a reflection of their obligation, as a plaintiff seeking expectation damages, to establish a plausible "but for" world against which to measure causation. PG&E, 73 Fed. Cl. at 386.

## II. PROGRESS ENERGY'S LEGAL ARGUMENTS CONCERNING THE RATE OF ACCEPTANCE ARE INCONSISTENT WITH THE TERMS OF THE STANDARD CONTRACT AND THE NWPA

Without irony, plaintiffs criticize our legal position concerning the terms of the Standard Contract as being "convoluted," yet fail even to mention what the terms of the contract actually require with respect to rate. Instead, plaintiffs resort to their argument that the Court should replace the contractually mandated process for reaching a rate, in which plaintiffs participated without raising even a hint of an objection, with a "reasonable" rate that happens to coincide with the rate that was rejected during the contract formation process. Although we rely upon the arguments that we raised in our prior submissions concerning rate and upon our identification of

plaintiffs' misstatements in our response to plaintiffs' proposed findings of fact, a few additional points that plaintiffs raise bear noting.

First, plaintiffs assert on page 24 of their post-trial brief that "there is no document that states that DOE 'rejected,' or 'denied,' or 'viewed as unconscionable'" the two-part test that EEI requested be incorporated into the Standard Contract, and rely upon their belief that such an obligation was "already there" and was positively "addressed" by DOE. Relatedly, plaintiffs assert on page 54 that the parties may have failed to discuss the issue of rate because it may have produced delay or impasse and that the rate term is "missing." These arguments are unavailing because they ignore the unassailable facts that (1) the language proposed by EEI was deliberately omitted from the final version of the Standard Contract, an omission that EEI and the individual utilities recognized at the time and later attempted to rectify by seeking to amend the final rule; (2) the Standard Contract contains an integration clause; and (3) the Standard Contract contains a mechanism for setting the rate and, therefore, is not "missing" a rate term.

EEI requested that the following language be inserted into the Standard Contract:

> WHEREAS, <u>DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated</u>, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

DPFOF 27 (emphasis added). DOE accepted, with modification necessary to comply with the command of the NWPA, the entirety of this clause <u>except for the underscored language</u>. DPFOF 50. DOE explained when it promulgated the final version of the Standard Contract that it had not accepted EEI's request for additional "performance standards," including, by EEI's (and

CP&L's) own admission, an assurance concerning the rate of acceptance. DPFOF 49, 73, 74. Mr. Morgan bluntly testified that he "didn't think it took a rocket scientist to understand that [EEI's request] was denied." Morgan, Tr. 1425:17-19. He is correct. The notion that some of the largest and powerful corporations in the United States, their lawyers, and the trade associations that spoke for them somehow were hoodwinked into believing that DOE had accommodated their request for a specific rate of acceptance, or opted not to discuss it for fear of not being able to reach agreement, is implausible upon its face.

Second, in their effort to distance themselves from the 900 MTU rate to which they never voiced any contemporaneous objection during the DCS process, plaintiffs also suggest on page 57 of their brief that the parties never intended that the rate of acceptance would be lower if DOE commenced accepting fuel at an MRS instead of a repository. This argument is, like plaintiffs' vague references to contractual and statutory "purpose" and "intent," belied by the terms of both the NWPA and the Standard Contract. Indeed, both the NWPA and the Standard Contract clearly indicate that the obligation to accept fuel as "expeditiously as practicable" – the closest that the Standard Contract comes to mandating a particular rate of acceptance – only applies to the acceptance of fuel following the commencement of operation of a repository. This obligation does not apply to the circumstance, requested by the utilities themselves during the contract formation process, where spent fuel is being delivered to a "DOE facility" other than a permanent repository. DPFOF 8, 31, 43, 50.[6] Indeed, even the statements that Mr. Morgan made in

---

[6] At the utilities' request, the term "DOE facility" was specifically expanded to include facilities other than a repository, such as an MRS. DPFOF 31, 43. Further, the NWPA did not require DOE to have a repository available and operational by 1998, but merely required DOE to begin SNF acceptance at some facility by that date. Indiana Michigan Power Co. v. Department (continued...)

December 1983 upon which plaintiffs heavily rely clearly indicate that the "basic strategy" of precluding the need for additional storage after 1998 assumed that that year would be "the first year of operation of the repository." PX 19 at 069599; Morgan, Tr. 1468:18-1469:12. Congress's directive (and the parties' agreement) that the obligation to accept fuel "as expeditiously as practicable" only attaches once a repository has been constructed would be rendered superfluous if, as plaintiffs suggest, DOE were obligated to accept spent fuel at the same rate without regard to whether the repository has commenced operation. See PG&E, 73 Fed. Cl. at 388 n.45.[7]

Third, beginning on page 58 of their brief, plaintiffs create a straw man by inaccurately characterizing out legal position concerning the 1991 ACR and the DCS process and then attacking it. Contrary to Progress Energy's assertions, the position that we articulated at trial was simple – that any damages arising from DOE's delays should be measured against performance at the 900 MTU rate set forth in the 1991 ACR because that document represents a set of allocations that we acknowledge to be consistent with DOE's obligations and that was agreed upon during the DCS process. It is true that, to facilitate plaintiffs' depiction of the steps that it would have taken to manage its spent fuel had DOE accepted fuel at the 900 MTU rate, we

---

[6](...continued)
of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

[7] Further, the NWPA itself merely authorized DOE to study the possibility of creating an MRS and to report back concerning the feasibility of such a facility. DPFOF 6. Given the absence of congressional authorization to construct an MRS at the time the Standard Contract was executed, it would be unreasonable for contract holders to have assumed that the MRS facility would not be subject to Congressional restrictions, including those eventually imposed in 1987 with respect to the timing and quantity of spent fuel to be shipped to such a facility. Plaintiffs simply cannot claim to have had a reasonable expectation at the time of contracting that performance at an MRS would be the same as performance at a repository.

instructed Progress Energy to assume a set of projected rates beyond the first ten years of the waste management program.[8] However, we did not suggest that these post-2007 acceptance rates constituted contractual obligations, or identify anything at trial other than the mechanism set forth in the Standard Contract as the proper means of ascertaining the rate of acceptance.

In the end, much of plaintiffs' argument boils down to their assertion, expressed first on page 4 of their brief and repeated throughout, that the "essence of the deal" for utilities was to alleviate the need to construct additional storage after 1998. It is certainly curious that the purported "essence" of the deal is not actually encapsulated within a single provision of the contract between the parties. The most compelling explanation for this phenomenon is not the implausible notion that sophisticated parties somehow failed to capture the essence of their agreement into an otherwise integrated document. Rather, the most compelling explanation is that the "essence of the deal" is consistent with the framework contemplated by the NWPA – that, in exchange for obtaining the right to generate ultrahazardous material as a by-product of their lucrative production of electricity through nuclear power, the utilities agreed to fund the construction by DOE of a storage facility that would store the utilities' nuclear waste upon a permanent basis. As a result, the key question in evaluating whether the rate of acceptance that DOE promulgated for the first ten years of the Federal waste management program is not, as plaintiffs would have it, whether plaintiffs' fuel would have been removed by, for example, the year 2001. Rather, the key question is whether this rate that DOE promulgated in 1991

[8] The Standard Contract only requires DOE to issue annual capacity reports for the ten years following the commencement of fuel acceptance. 10 C.F.R. § 961.11, Art. IV.B.5.b (emphasis added). As a result of its delay in accepting fuel and of the cancellation of the MRS program, DOE never issued a subsequent version of an annual capacity report that projected the amounts of fuel that would be accepted at an MRS after the first ten years of the program.

represented a first step toward making sure that this fuel would be safely and permanently stored in the long-term future.

## III. THE ARGUMENTS THAT PROGRESS ENERGY RAISES WITH RESPECT TO INDIVIDUAL EXPENDITURES ARE LEGALLY AND FACTUALLY FLAWED

### A. Disposal Of Unused Racks And Crud

Plaintiffs misapprehend our arguments concerning the disposal of unused racks and crud. Plaintiffs seem to assert that we contend that plaintiffs have incurred a cost "savings" because they will not have to dispose of the crud upon decommissioning and (incorrectly, as set forth above) claim that the Government bears the burden of calculating such a savings. This argument is unpersuasive (and only serves to underscore the folly of plaintiffs' suggestion that the burden of proof shifts to the Government to prove that expenses have been saved). We are simply asserting that Progress Energy is not entitled to recover the costs that it incurred to dispose of crud and fuel racks because these same activities would have been required "irrespective of" any breach by DOE. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005). To the extent that the costs to perform this work upon decommissioning would have been different in the absence of DOE's delay, Progress Energy (not the Government) bears the burden of providing proof of any such discrepancy and, thus, of its damages. Absent such a showing, Progress Energy is not entitled to reimbursement at the 3,000 MTU rate for the expenses that it incurred to perform this work.[9]

---

[9] Plaintiffs admit that these expenses are not recoverable at the 900 MTU rate.

B. Upgrade To The Harris Component Cooling Water System

Plaintiffs' legal arguments concerning the CCW system rest upon their assertion that they need not show that the upgrades they performed would not have been performed in the absence of DOE's delay. For the reasons we have previously explained, this argument is legally flawed, as it would permit a plaintiff to recover damages for an expense that would have been incurred in the absence of a breach and, therefore, enable that plaintiff to occupy a better financial position than it would have occupied absent that breach. Further, contrary to plaintiffs' assertions, we do not assert that plaintiffs must show that DOE's delay was the sole cause of a particular expenditure. Rather, they must show that the expenditure would not have been incurred in the absence of a breach, and no legal standard of which we are aware, when properly applied, suggests otherwise.

Plaintiffs also suggest that, as a factual matter, we have "overstated the impact of the power uprate and steam generator replacement projects." However, contemporaneously prepared documents from plaintiffs' own files acknowledge, for example, that (1) "there [would be] inadequate long-term (post power up rate) CCW margin without plant modifications (additional heat exchanger capacity and pump upgrades);" (2) the CCW upgrade was being performed "to accommodate power uprate impacts"; and (3) the "existing . . . CCW pumps [were not] capable of delivering the flow and head required for PUR [power uprate] or SGR [steam generator replacement]." DPFOF 268, 270, 271, 283, 289. Similarly, CP&L represented to the NRC that the CCW system had been "significantly upgraded as part of the HNP [Harris Nuclear Plant] steam generator replacement and power uprate modifications." DPFOF 289. These are not the "overstatements" of the Government, but are the statements of plaintiffs' own witnesses made

before this litigation commenced. Plaintiffs have simply failed to meet their burden of demonstrating that the CCW upgrade would not have been performed in the absence of DOE's delay.

C. Railroad Maintenance

Plaintiffs' arguments concerning its claim for railroad maintenance are fundamentally flawed for several reasons.

First, in suggesting that we are seeking a "reduction" of their damages, plaintiffs again misapprehend the nature of the issue. Once again, we are merely asserting that the cost of maintaining CP&L's railroads would have been required "irrespective of" any delay by DOE. Indiana Michigan, 422 F.3d at 1376. This is simply an issue of causation upon which the Government bears no burden and upon which plaintiffs have presented no evidence.

Second, plaintiffs make absolutely no effort to explain how the transshipments by rail that they acknowledge would have occurred at both the 900 MTU and 3,000 MTU rate would not have necessitated the same transshipment costs. DPFOF 218-19, 221. Indeed, Mr. Edwards admitted that such railroad maintenance would have had have been performed, regardless of the rate of acceptance. DPFOF 222. If railroad maintenance would have been required to support transshipments even absent a delay by DOE, its costs are not recoverable as damages.

Finally, it bears noting that plaintiffs' conception of what actions are "speculative" appears to vary in accordance with whether identification of the action would have the effect of increasing or reducing their damages claim. Plaintiffs have prepared a comprehensive model purporting to depict the spent fuel management decisions that they would have made to accommodate performance at the 3,000 MTU rate, apparently unconcerned that its author,

Wayne Worthington, admitted that he had no knowledge of what activities Progress Energy would or would not have undertaken had DOE accepted fuel at a 3,000 MTU rate beginning in 1998. DPFOF 198-99. Nonetheless, plaintiffs suggest that it would be too "speculative" to assume that DOE would accept fuel by rail cask – a method of shipment that plaintiffs themselves requested in their DCSs and had employed in the past – had it commenced accepting fuel in 1998. It simply cannot be the case that only DOE's actions are too speculative to predict.[10]

D. Crystal River Rerack

Plaintiffs have not attempted to explain how they met their burden of establishing that the work which they performed in reracking the spent fuel pool at Crystal River would not have been performed in the absence of DOE's delay. For this reason, their arguments on this issue require only a limited response.

As an initial matter, plaintiffs suggest on page 67 of their post-trial brief that our arguments about the rerack are based "entirely" upon the testimony of Mr. Maret. This assertion ignores the mountain of evidence, adduced primarily through the cross-examination of Thomas Lehmann, that (1) reracking represented the "optimal solution" to the Boraflex degradation that was chosen as soon as it became cost effective, DPFOF 327-31, 384-86; (2) the alternate solutions that plaintiffs proposed were both costly either less effective or, in the case of taking

[10] The quotation from System Fuels, 79 Fed. Cl. at 71, that plaintiffs cite on page 65 of their brief concerning the method of DOE acceptance pertains solely to the question of the expense that would be required to load casks to DOE. System Fuels does not speak to the issue of whether DOE would accept fuel by rail and is therefore inapposite to the railroad maintenance issue. Further, in this case, the cost of loading to DOE cannot be deemed overly speculative because our calculations assumed the most conservative calculation of the expenditures that would, in all events, be required to support loading. DPFOF 405-07.

credit for soluble boron, not viable, DPFOF 341-57; and (3) the space increase represented only a very small portion of the reason that FPC elected to perform a rerack and, at the time that the project was approved, did not enable FPC to obtain full core reserve throughout the life of the plant. DPFOF 357-83.

Moreover, plaintiffs' criticisms of Mr. Maret's testimony, which focus primarily upon the discredited notion that taking credit for soluble boron was a means that FPC could have employed to address its criticality problem, ring hollow. Beyond the fact that FPC acknowledged that soluble boron was not a viable solution for addressing criticality, there was no dispute that taking credit for soluble boron would not solve the silica contamination problem and that plaintiffs' proposed solution to this problem would merely constitute a "band-aid fix." DPFOF 343-49. Most importantly, plaintiffs' arguments do not alter Mr. Maret's reasoned conclusions that, from a plant management perspective, (1) it would not have made sense for Progress Energy to continue to try to solve the problems presented by Boraflex degradation through interim, temporary solutions; and (2) only the long-term solution of reracking the pool would be consistent with the company's most important priorities, namely, preservation of the physical asset of the plant and preservation of the goodwill relationship with regulators and the public. DPFOF 390-91.[11]

E. <u>Licensing And Communications Expenses</u>

We explained in our pre-trial and post-trial beliefs that "[f]or a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and

[11] Plaintiffs also fail to account for the costs of the alternative methods that they claim would have been employed to address Boraflex degradation.

naturally, not possibly nor even probably." Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). Plaintiffs assert on page 68 of their brief that expenses they incurred defending against an intervention during its licensing proceedings for the activation of the "C" and "D' pools at Harris are recoverable because such interventions are "sometimes inevitable."

This admission dooms plaintiffs' argument. If something is only sometimes inevitable, it is not inevitable at all. It may well be the case that intervention by a third party in the licensing proceedings was not an unexpected outcome. However, such a showing, even if made, would not satisfy plaintiffs' burden. See Restatement (Second) of Contracts § 351 & cmt a (to be recoverable, damage must be foreseeable as a probable result of breach). The costs that plaintiffs incurred to defend against the intervening acts of the intervenors are dependent upon the independent decision of third parties to inject themselves into the licensing process. They are, therefore, not recoverable as contract damages.[12]

F. Internal Labor

Plaintiffs' arguments concerning internal labor are largely addressed in our prior submissions. We note, however, that plaintiffs' arguments concerning the "perverse incentive" to hire contract labor are dubious at best. As we have previously explained, we have taken issue with only a relatively small percentage of the hours charged to projects claimed to be breach-related. It is difficult to believe, and there is certainly no evidence in the record suggesting, that a company would change its hiring practices as a result of the need to obtain labor for what is

[12] Plaintiffs rely upon Northern States Power Co. v. United States, 78 Fed. Cl. 449, 463 (2007), appeal pending, No. 2008-5037 (Fed. Cir. docketed Feb. 13, 2008), apparently for the proposition that the downstream consequences of actions taken in mitigation of a breach are recoverable as damages in a claim for breach of contract. We have appealed that decision.

largely a de minimis amount of work that is being performed over a period of years upon a sporadic basis. Morever, in the event that they hired contract labor at a substantially higher price to perform all of their breach-related activities, as they appear to suggest, plaintiffs would be spending more money than would be necessary based upon the highly uncertain premise that all of these expenses would be recovered through litigation. The simple fact is that a relatively small portion of the work that has been performed by the company's employees has not resulted in financial harm to the company, and the methodology employed by Mr. Johnson reflects a reasoned and principled attempt to limit the labor charges included in plaintiffs' claim to those that actually resulted in pecuniary loss to Progress Energy. See ECDC Envir., L.C. v. New York Marine & Gen. Ins. Co., No. 96-6033, 1999 WL 777883, at *6 (S.D.N.Y. Sept. 29, 1999) (salaried employee's salary was not recoverable because it was a cost that would have been incurred regardless of breach).

G. AFUDC

Plaintiffs' brief does little to undermine the principal argument that we have raised in our prior submissions – that AFUDC is a means of obtaining a return on funds that are employed to finance construction projects before the projects are placed into service and is conceptually indistinguishable from prejudgment interest. The fact that FERC regulations permit utilities to account for the loss of the use of funds during construction has absolutely no bearing upon the question of whether the United States has waived its sovereign immunity with respect to the recoverability of such an interest charge. Further, even if the Government has waived sovereign immunity to a limited extent such as through the "Changes" clause found in numerous Federal procurement contracts, interest on borrowings is recoverable only where "[t]he changed work is

directly traced to a specific loan or a necessity for increased borrowing [is] shown to have been required by extra work or delay by the Government." Gevyn Constr. Corp. v United States, 827 F.2d 752, 754 (Fed. Cir. 1987). Generalized evidence of borrowings is insufficient to satisfy this burden. Southern Nuclear Operating Co. v. United States, 77 Fed. Cl. 346, 449 (2007), appeal pending, No. 2008-5028 (Fed. Cir. docketed Jan. 14, 2008). Given plaintiffs' admission that they have only generalized debt, their AFUDC claim should fail.

H. Overhead Costs

Progress Energy premises its arguments concerning overhead costs upon the alleged irrelevancy of "[t]he fact that [these] costs that may have not changed." Pl. Br. at 72. It further asserts that failing to award damages for these costs would make other projects that the company performs "more expensive."

These arguments, which we have addressed in our prior submissions, are difficult to understand. The other – allegedly more expensive – projects are not the plaintiffs in this case. The only issue in this litigation is the extent to which CP&L and FPC have suffered economic harm as a result of the Government's breach. There has been no showing that these companies incurred additional warehouse or indirect overhead costs as a result of DOE's delays for which they are not already receiving compensation. Indeed, the only evidence adduced at trial of additional overhead-related costs that plaintiffs incurred as a result of DOE's delays are labor costs for warehouse work that were charged directly to the Robinson dry storage project and are already included in plaintiffs' claim. DPFOF 441. Plaintiffs supplied no evidence, as they could have attempted, that fluctuations in their overhead charges coincided with their engagement in breach-related activities, and there simply is no basis upon which to conclude that plaintiffs have

suffered economic harm, in the form of increased overhead charges, that is attributable to DOE's delay.

I. Manual Adjustments

As we noted at trial and in our post-trial brief, plaintiffs' arguments concerning its post-trial brief boil down to their assertion that they are entitled to additional compensation merely because certain charges, even if their provenance is unknown, were assigned to the project numbers that plaintiffs have identified as being breach-related. However, the mere fact that a charge has been assigned to a project that plaintiffs have designated being breach-related does not mean that it would not have been incurred in the absence of a breach. Indeed, plaintiffs acknowledged that, when labor and other costs are charged to a particular project, no thought is given to this issue. Edwards, Tr. 446:8-447:1. Further, in addition to the numerous charges that we have identified as being non-incremental, plaintiffs themselves have reduced their claim to account for charges that were originally included within the project numbers they have chosen but that, upon reflection, they have agreed were not actually traceable to DOE's delay. Plaintiffs have the burden of showing that the expenditures they claim as damages were, in fact, caused by DOE's conduct. They are simply not entitled to a presumption, particularly with respect to charges that for some undisclosed reason had to be manually adjusted from the original project code to which they were assigned, that the unknown and undescribed costs that they have identified are recoverable as damages. See TVA, 69 Fed. Cl. at 540 (rejecting claim for labor charges where supporting records did not indicate amounts and descriptions of work performed).

J. Robinson Crane Studies

Even though the Court sustained our objection with respect to this characterization, Tr. 819:15-820:3, Progress Energy persists in labeling our arguments concerning the recoverability of crane study costs as being brought on the "eve of trial" as part of an "eleventh-hour challenge." As we informed plaintiffs more than a week before trial, we simply opted to hold plaintiffs to their burden of proving that these costs were caused by DOE's delay. It is not our burden, as plaintiffs' brief apparently suggests, to adduce evidence from our expert witnesses indicating that these costs were not caused by DOE's delay, and the mere fact that we elicited no such testimony is irrelevant. Plaintiffs bear the burden of proving entitlement to damages for these costs and, as explained in our post-trial brief, have failed to explain why the costs incurred to perform these studies would not have been performed in the absence of any delay by DOE. It is hardly "frivolous" to hold a party to its burden of proof, and CP&L and FPC's suggestion to that effect reflects, at bottom, a fundamental misunderstanding of their obligations as plaintiffs in this lawsuit.

## CONCLUSION

For the reasons outlined above and in our pre-trial and post-trial briefs, the Government respectfully requests that the Court eliminate from plaintiffs' damage claim all costs that plaintiffs have failed to demonstrate were directly caused by the Government's breach, foreseeable, and proven to a reasonable certainty, and all costs that are otherwise not recoverable as a matter of law.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Andrew P. Averbach
ANDREW P. AVERBACH
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0527
Tel: (202) 305-7643

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
CHRISTOPHER J. CARNEY
LISA L. DONAHUE
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

February 19, 2008

Attorneys for Defendant

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 19th day of February, 2008, a copy of the foregoing "DEFENDANT'S POST-TRIAL REPLY BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Andrew P. Averbach